**No. 25-14507**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

United States of America,

*Plaintiff–Appellee,*

v.

Knight First Amendment Institute at Columbia University; American Oversight,

*Interested Parties–Appellants,*

Donald J. Trump; Waltine Nauta; Carlos de Oliveira,

*Defendants–Appellees.*

On appeal from the United States District Court for the
Southern District of Florida — No. 9:23-cr-80101-AMC
(Judge Aileen M. Cannon)

## OPENING BRIEF OF APPELLANTS

David Buckner
Buckner + Miles
2020 Salzedo Street
Suite 302
Coral Gables, FL 33134
(305) 964-8003

Scott Wilkens
Jameel Jaffer
Alex Abdo
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
scott.wilkens@knightcolumbia.org

*Counsel for Appellant Knight First
Amendment Institute at Columbia
University*

**Certificate of Interested Persons and Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rules 26.1-1, 26.1-2, and 26.1-3, Appellant Knight First Amendment Institute at Columbia University certifies that the following have an interest in the outcome of this appeal.

1. Abdo, Alex

2. American Oversight

3. Buckner & Miles, P.A.

4. Buckner, David

5. Cannon, Hon. Aileen

6. De Oliveira, Carlos

7. Delgado, Jorge

8. E & W Law

9. Fein, Ronald A.

10. Gelber Schachter & Greenberg, P.A.

11. Haddix, Elizabeth

12. Irving, John

13. Jaffer, Jameel

14. Kim, Noah

15. Klugh Jr., Richard

16. Knight First Amendment Institute at
    Columbia University

17. Llanes, Barbara

18. Murrell Jr., Larry

19. Nauta, Waltine

20. O'Byrne, Haden

21. Porter, Michael

22. Schachter, Adam

23. Stark, Lorree

24. Siblesz, Alessandra M.

25. Smachetti, Emily

26. Trump, Donald

27. Wharton, Kendra

28. Wilkens, Scott

The Knight First Amendment Institute at Columbia University further certifies that it has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

*/s/ Scott Wilkens*
Scott Wilkens

**Statement Regarding Oral Argument**

The Knight Institute believes that oral argument would assist the Court's decisional process in this case of significant public importance. *See* 11th Cir. R. 28-1(b).

# Table of Contents

Certificate of Interested Persons and Corporate Disclosure Statement .................... 1

Statement Regarding Oral Argument ......................................................... i

Table of Authorities ...................................................................... iv

Introduction ............................................................................... 1

Jurisdictional Statement ................................................................... 1

Statement of the Issues .................................................................... 2

Statement of the Case ...................................................................... 2

I.      The course of proceedings and disposition below .................................... 2

II.     Statement of the facts ............................................................ 4

        A.      The Special Counsel's investigation and prosecution of then-former President Trump ........................................................... 4

        B.      The Special Counsel's report and the district court's Injunction ............................................................ 6

        C.      The Knight Institute's efforts to access Volume II ...................... 14

        D.      The District Court's denial of the Motion to Intervene and subsequent proceedings ................................................ 16

        E.      The congressional investigation of the Special Counsel's conduct ............................................................... 17

III.    Standard of review ............................................................... 18

Summary of Argument ....................................................................... 18

Argument .................................................................................. 22

I.      The district court erred in holding that the Knight Institute lacks standing to intervene. ........................................................... 22

A.    The Knight Institute has standing to intervene to assert the common law and First Amendment public right of access to Volume II. .................................................................... 22

B.    The Knight Institute also has standing to intervene to challenge the injunction blocking the Institute's statutory right of access to Volume II under FOIA. ................................... 23

II.    The district court erred in concluding that the Knight Institute lacks a public right of access to Volume II under the common law and the First Amendment. .............................................................. 28

A.    Volume II is subject to the presumptive public right of access under the common law........................................ 28

B.    Volume II is subject to a presumptive right of access under the First Amendment.................................... 35

C.    The presumptive right of access under the common law and the First Amendment cannot be overcome. .................................. 39

III.    The Injunction barring the Institute's FOIA rights should be vacated because there is no valid basis for maintaining it. .................... 48

Conclusion ........................................................................................ 51

Certificate of Compliance ........................................................................ 52

# Table of Authorities

## Cases

*Amoco Prod. Co. v. Gambell*, 480 U.S. 531 (1987) ................................ 50

*Baltimore Sun Co. v. Goetz*, 886 F.2d 60 (4th Cir. 1989) ...................................... 38

*Callahan v. United Network for Organ Sharing*, 17 F.4th 1356 (11th Cir. 2021) ................................................................................................ passim

*Chicago Tribune v. Bridgestone/Firestone*, 263 F.3d 1304 (11th Cir. 2001) ............................................................................................... 28

*Civ. Beat L. Ctr. for Pub. Int., Inc. v. Maile*, 117 F.4th 1200 (9th Cir. 2024) ................................................................................................ 36

*Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023) ...................................................... 48

*Comm'r, Ala. Dep't of Corr. v. Advance Loc. Media, LLC*, 918 F.3d 1161 (11th Cir. 2019) ................................................................. passim

*Dietz v. Bouldin*, 579 U.S. 40 (2016) ....................................................... 50

*Fed. Election Comm'n v. Cruz*, 596 U.S. 289 (2022) ....................................... 19, 23

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982) ................................................................................ 35, 37, 39

*Gubarev v. Buzzfeed, Inc.*, 365 F. Supp. 3d 1250 (S.D. Fla. 2019) ....................... 45

*In re Application of United States for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283 (4th Cir. 2013) ................................................. 38

*In re Hearst Newspapers, L.L.C.*, 641 F.3d 168 (5th Cir. 2011) ........................... 36

*In re Subpoena to Testify Before Grand Jury Directed to Custodian of Records*, 864 F.2d 1559 (11th Cir. 1989) ........................................................... 36

*Kearney v. Auto–Owners Ins. Co.*, Case No. 8:06–cv–00595–T–24, 2009 WL 10664317 (M.D. Fla. Sept. 8, 2009) ................................................. 43

*LaRouche v. FBI*, 677 F.2d 256 (2d Cir. 1982) ................................................. 25, 26

*N.Y. Times Co. v. U.S. Dep't of Justice*, Case No. 1:25-cv-562-GHW, 2025 WL 2549435 (S.D.N.Y. Sept. 4, 2025) .................................................... 50

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ....................... 25

*Newman v. Graddick*, 696 F.2d 796 (11th Cir. 1983) ................................ 36, 40, 41

*Nicol v. Gulf Fleet Supply Vessels, Inc.*, 743 F.2d 298 (5th Cir. 1984).................. 48

*Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978).................................... 28, 35

*NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978).................................... 25

*Okeelanta Corp. v. U.S. Army Corps of Eng'rs*, 132 F.4th 1320 (11th Cir. 2025)...................................................................................................... 23

*Petition of Trib. Co.*, 784 F.2d 1518 (11th Cir. 1986)........................................... 19

*Polelle v. Fla. Sec'y of State*, 131 F.4th 1201 (11th Cir. 2025)............................. 23

*Press-Enter. Co. v. Superior Ct. of Cal*, 464 U.S. 501 (1984) ........................ 35, 37

*Press-Enter. Co. v. Superior Ct. of Cal.*, 478 U.S. 1 (1986) ............................ 35, 37

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)......................... 35, 37

*Romero v. Drummond Co.*, 480 F.3d 1234 (11th Cir. 2007)........................... passim

*Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089 (11th Cir. 2020) .............................. 47

*The News–Press v. U.S. Dep't of Homeland Security*, 489 F.3d 1173 (11th Cir. 2007) ................................................................................................ 25

*United States v. Amodeo*, 71 F.3d 1044 (2d Cir. 1995) ......................................... 45

*United States v. Atesiano*, Case No. 18-20479-CR-Moore/Simonton, 2018 WL 5831092 (S.D. Fla. Nov. 7, 2018) ............................................... 24, 25

*United States v. Carmichael*, 342 F. Supp. 2d 1070 (M.D. Ala. 2004)............ 24, 25

*United States v. Cone*, 627 F.3d 1356 (11th Cir. 2010) .......................................... 18

*United States v. Couch*, 906 F.3d 1223 (11th Cir. 2018) ........................................ 24

*United States v. Cox*, No. 14-CR-140, 2015 WL 13741738 (M.D. Fla. Oct. 7, 2015) ................................................................................................ 24

*United States v. Hasting*, 461 U.S. 499 (1983) ........................................................ 50

*United States v. Nixon*, 418 U.S. 683 (1974) .......................................................... 35

*United States v. Ochoa-Vasquez*, 428 F.3d 1015 (11th Cir. 2005) .................. 36, 37

*United States v. Ross*, 964 F.3d 1034 (11th Cir. 2020) .......................................... 39

*United States v. Torkington*, 874 F.2d 1441 (11th Cir. 1989) .............................. 51

*United States v. Trump*, 740 F. Supp. 3d 1245 (S.D. Fla. 2024) ........................... 44

*United States v. Valenti*, 987 F.2d 708 (11th Cir. 1993) ....................................... 23

*United States v. Wecht*, 484 F.3d 194 (3d Cir. 2007) ............................................. 34

*Vision Bank v. Horizon Holdings USA*, LLC, 2011 WL 4478772 (S.D. Ala. Sep. 27, 2011) ................................................................................... 47

*Weinberger v. Romer-Barcelo*, 456 U.S. 305 (1982) ....................................... 50, 51

**Statutes**

18 U.S.C. § 1001 ...................................................................................................... 42

18 U.S.C. § 1512 ...................................................................................................... 42

18 U.S.C. § 1519 ...................................................................................................... 42

18 U.S.C. § 3282 ...................................................................................................... 42

28 C.F.R. § 600 .................................................................................................. 6, 7, 33

**Other Authorities**

Alan Feuer, *Four Takeaways From the Special Counsel's Report on the Trump Election Case*, N.Y. Times (Jan. 14, 2025), https://perma.cc/PT99-YFZL .......................................................... 10

David S. Ardia, *Court Transparency and the First Amendment*, 38 Cardozo L. Rev. 835 (2017) ............................................................. 36

Deposition of Jack Smith Before the H. Comm. on the Judiciary (Dec. 17, 2025), https://perma.cc/A6BY-Q28S ........................................ 17

*DOJ's Response to Knight Institute's Administrative Appeal* (June 20, 2025), https://perma.cc/27MM-2CZG .............................................. 14

Ella Lee, Max Rego, & Mike Lillis, *Jack Smith gives public defense of Trump probes to House committee: 5 takeaways*, The Hill (Jan. 22, 2026), https://perma.cc/NE7S-SY6H ............................................... 18

Glenn Thrush & Alan Feuer, *House Republicans Press Jack Smith Over Investigations Into Trump*, N.Y. Times (Dec. 17, 2025), https://perma.cc/WT79-QQ76. ....................................................... 17

Jack Smith's prepared statement before the House Judiciary Committee (Jan. 22, 2026), https://perma.cc/XB25-4J2D ............................... 18

*Letter from Attorney General Merrick Garland to Chairman Charles Grassley, Chairman Jim Jordan, Ranking Member Dick Durbin, and Ranking Member Jamie Raskin* (Jan. 8, 2025), https://perma.cc/QKT8-PRRC............................................................ 9

*Letter from Special Counsel Jack Smith*, https://perma.cc/8SWU-PKL7....................................................................................... 7, 8, 10

*Letter from Special Counsel Jack Smith, to Att'y Gen. Merrick Garland, Re: Final Report of the Special Counsel Under 28 C.F.R. § 600.8* (Jan. 7, 2025), https://perma.cc/8SWU-PKL7........................ 6

Office of the Attorney Gen., Order No. 5559-2022, Appointment of John L. Smith as Special Counsel (Nov. 18, 2022), *available at* https://perma.cc/H6GX-8N7A.............................................................. 4

Special Counsel David C. Weiss, *Report on the Investigation Into the Criminal Conduct of Robert Hunter Biden* (Jan. 10, 2025), https://perma.cc/8LHM-9P2N ............................................................. 7

Special Counsel John H. Durham, *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns* (May 12, 2023), https://perma.cc/2WW9-6WDD ........................................................................................................... 7

Special Counsel Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* (Feb. 5, 2024), https://perma.cc/Q6QS-HPSG ...................................................... 7, 43

Special Counsel Robert S. Mueller III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* (Mar. 2019) ("*Mueller Report*"), https://perma.cc/42LF-NLXC ................................. 7

U.S. Dep't of Justice, Special Counsel Jack Smith, *Report on Efforts to Interfere with the Lawful Transfer of Power Following the 2020 Presidential Election or the Certification of the Electoral College Vote Held on January 6, 2021* (2025), https://perma.cc/T9LM-7ZQF .............................................................................................. 45

## Introduction

This appeal concerns the public's right of access to Special Counsel Jack Smith's report on the investigation and prosecution of then former-President Donald Trump for the alleged willful retention of highly classified national defense secrets in violation of the Espionage Act and for obstruction of justice to conceal his conduct. The Knight Institute filed a motion to intervene in the district court to assert the common law and First Amendment right of access to the report and to seek the rescission of the district court injunction preventing the Department of Justice from releasing the report to the public. The district court denied the motion on legally erroneous grounds. This Court should reverse the district court's denial of the Institute's motion to intervene, vacate the injunction, and direct the district court to post on the public docket the redacted copy of Volume II in its possession.

## Jurisdictional Statement

The district court denied the Knight Institute's motion to intervene on December 22, 2025. Dkt. 760[1]. The Knight Institute filed a timely notice of appeal on December 23, 2025. Dkt. 762. This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] Pursuant to 11th Cir. R. 28-5, citations to documents in the docket below are cited herein as "Dkt. [#] at [Page #]."

## Statement of the Issues

Whether the district court erred in holding that the Knight Institute lacks standing to intervene to assert the common law and First Amendment right of access to Volume II and to seek rescission of the injunction preventing the Institute from vindicating its statutory rights under FOIA.

Whether the district court erred in holding that the Knight Institute does not have a First Amendment or common law right of access to Volume II.

Whether the injunction preventing the Institute from vindicating its statutory rights under FOIA should be vacated.

## Statement of the Case

### I.    The course of proceedings and disposition below

In October 2023, a grand jury in the Southern District of Florida returned a superseding indictment charging Donald Trump with willful retention of national defense information, in violation of 18 U.S.C. § 793(e), and charging Trump and two others, Walt Nauta and Carlos De Oliveira, with multiple counts, including obstructing and conspiring to obstruct an official proceeding and making false statements. Dkt. 85. In July 2024, the district court dismissed the indictment based on its conclusion that Special Counsel Smith's appointment violated the Appointments Clause, and the government appealed. Dkt. 672 & 673. After Trump won the 2024 presidential election, he was dismissed from the case, based on the

Department of Justice's longstanding policy that a sitting President is constitutionally immune from indictment and criminal prosecution.[2]

On January 7, 2025, while the appeal was pending, the district court temporarily enjoined the Department of Justice from releasing the Special Counsel's report on the Classified Documents Case to anyone outside the Department. On January 21, 2025, after reviewing the report *in camera*, the district court issued an injunction providing the same relief pending further order of the court (the "Injunction"). On February 24, 2025, the Knight Institute sought to intervene in the district court to assert constitutional, common law, and statutory rights of access to the report. On November 3, 2025, acting on the Knight Institute's petition for a writ of mandamus, this Court found "undue delay" in the adjudication of the Institute's motion but held the petition in abeyance to afford the district court additional time to fully resolve the motion. On December 22, 2025, the district court denied the Knight Institute's intervention motion.

---

[2] *See* Order Granting Mot. to Dismiss Appeal, *United States v. Trump*, No. 24-12311, ECF No. 81-2 (11th Cir. Nov. 26, 2024); *See* Mot. to Dismiss the Appeal as to Donald J. Trump, *United States v. Trump*, No. 24-12311, ECF No. 79 (11th Cir. Nov. 25, 2024) (incorporating the reasoning given in Gov't's Mot. to Dismiss, *United States v. Trump*, No. 1:23-cr-00257-TSC (D.D.C. Nov. 25, 2024), ECF No. 281).

## II.     Statement of the facts

### A.     The Special Counsel's investigation and prosecution of then-former President Trump

On March 30, 2022, the FBI opened a criminal investigation into then-former President Donald Trump's retention of classified documents at the Mar-a-Lago Club, and a federal grand jury was convened shortly thereafter. Dkt. 85. On November 18, 2022, Attorney General Merrick Garland appointed Jack Smith as Special Counsel to oversee the ongoing DOJ investigations into President Trump's alleged interference with the lawful transfer of power following the 2020 presidential election ("Election Interference Case") and his alleged unlawful retention of classified documents after leaving office ("Classified Documents Case").[3]

The Special Counsel filed an indictment in the Classified Documents Case on June 8, 2023, charging President Trump with thirty-seven felony counts, including thirty-one violations of the Espionage Act. Dkt. 3. The indictment alleged that, upon leaving the White House on January 20, 2021, President Trump instructed aides to transport boxes containing classified documents to Mar-a-Lago; that the classified documents included highly sensitive military and intelligence secrets; that the

---

[3] Office of the Attorney Gen., Order No. 5559-2022, Appointment of John L. Smith as Special Counsel ¶ (c) (Nov. 18, 2022), *available at* https://perma.cc/H6GX-8N7A.

president stored these boxes carelessly in various locations that were potentially accessible to thousands of members and guests; that he showed classified documents to non-security-cleared members of his club staff and others; that he failed to return classified documents to the government after being served with a subpoena requiring their immediate return; and that he made false statements and conspired with others to "obstruct the FBI and grand jury investigations and conceal his continued retention of classified documents." *Id.* at 2–3.

The June 2023 indictment also charged one of Trump's associates, Walt Nauta, as a co-conspirator, alleging that he had conspired with Trump to conceal the presence of documents. *Id.* at 3. On July 27, 2023, a superseding indictment added a second Trump associate, Carlos De Oliveira, as a co-conspirator. Dkt. 85. The superseding indictment also added additional charges against Trump and Nauta. *Id.*

On July 15, 2024, the district court presiding over the Classified Documents Case dismissed the superseding indictment in its entirety on the grounds that Smith's appointment as Special Counsel violated the Appointments Clause. Dkt. 672. The Special Counsel filed a notice of appeal on July 17, 2024. Dkt. 673. Following President Trump's re-election, however, the Special Counsel moved to dismiss the appeal as to Trump in light of the Justice Department's longstanding position "that the United States Constitution forbids the federal indictment and subsequent

5

criminal prosecution of a sitting President."[4] This Court granted the motion to dismiss on November 26, 2024. *United States v. Trump*, No. 24-12311, ECF No. 81 (11th Cir. Feb. 11, 2025). The Special Counsel subsequently withdrew from the Classified Documents Case and transferred it to the U.S. Attorney for the Southern District of Florida. Dkt. 84.[5]

### B.    The Special Counsel's report and the district court's Injunction

On January 7, 2025, the Special Counsel submitted his final report to Attorney General Garland, as DOJ regulations required him to do.[6] The report comprised two volumes—the first addressing the Election Interference Case and the second addressing the Classified Documents Case.

---

[4] *See* Mot. to Dismiss the Appeal as to Donald J. Trump, *United States v. Trump*, No. 24-12311, ECF No. 79 (11th Cir. Nov. 25, 2024) (incorporating the reasoning given in Gov't's Mot. to Dismiss, *United States v. Trump*, No. 1:23-cr-00257-TSC (D.D.C. Nov. 25, 2024), ECF No. 281).

[5] The Special Counsel also moved to dismiss the Election Interference Case, and the U.S. District Court for the District of Columbia granted that motion on November 25, 2024. *United States v. Trump*, Criminal Action No. 23-257, ECF No. 283 (D.D.C. Nov. 25, 2024) (order dismissing superseding indictment).

[6] *Letter from Special Counsel Jack Smith, to Att'y Gen. Merrick Garland, Re: Final Report of the Special Counsel Under 28 C.F.R. § 600.8* (Jan. 7, 2025), https://perma.cc/8SWU-PKL7. The Special Counsel regulations provide that, "[a]t the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel." 28 C.F.R. § 600.8(c).

In a cover letter accompanying the report, Smith expressed his understanding that the Attorney General was considering releasing the report to the public "consistent with applicable legal restrictions."[7] Smith cited regulations providing that the Attorney General may "determine that public release of [a Special Counsel's final report] would be in the public interest, to the extent that release would comply with applicable legal restrictions." 28 C.F.R. § 600.9(c). (Since 1999, when the Special Counsel regulations went into effect, *see* 28 C.F.R. § 600, DOJ has publicly released every final report of a Special Counsel, with Volume II of Special Counsel Smith's report the only exception.[8]) Smith assured the Attorney General that both volumes of the report "minimize the identification of witnesses and co-conspirators, consistent with accepted Department practice," and he explained that he was providing "a redacted version of Volume Two that identifies certain information that

---

[7] *Letter from Special Counsel Jack Smith*, https://perma.cc/8SWU-PKL7.

[8] Special Counsel Robert S. Mueller III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* (Mar. 2019) ("*Mueller Report*"), https://perma.cc/42LF-NLXC; Special Counsel Robert K. Hur, *Report of the Special Counsel on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* (Feb. 5, 2024) ("*Hur Report*"), https://perma.cc/Q6QS-HPSG; Special Counsel John H. Durham, *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns* (May 12, 2023), https://perma.cc/2WW9-6WDD; Special Counsel David C. Weiss, *Report on the Investigation Into the Criminal Conduct of Robert Hunter Biden* (Jan. 10, 2025), https://perma.cc/8LHM-9P2N.

remains under seal or is restricted from public disclosure by Federal Rule of Criminal Procedure 6(e)."[9] He also wrote, "[b]ecause Volume Two discusses the conduct of Mr. Trump's alleged co-conspirators in the Classified Documents Case, Waltine Nauta and Carlos De Oliveira, consistent with Department policy, Volume Two should not be publicly released while their case remains pending."[10]

On January 6, 2025, the day before the Special Counsel transmitted his report to the Attorney General, Nauta and De Oliveira filed an Emergency Motion in the district court to enjoin DOJ from releasing the report to anyone outside the Department. Dkt. 679. On January 7, Nauta and De Oliveira filed a similar motion in this Court. *United States v. Trump*, No. 24-12311, ECF No. 85 (11th Cir. Jan. 7, 2025). Also on January 7, President-elect Trump filed a motion to intervene in the district court seeking to join the Emergency Motion. Dkt. 681 at 1. In their Emergency Motions before the district court and this Court, Nauta and De Oliveira argued that DOJ's disclosure of the Special Counsel's report to the public or even to select members of Congress would prejudice their fair trial rights. Dkt. 679; *United States v. Trump*, No. 24-12311, ECF No. 85 (11th Cir. Jan. 7, 2025).

---

[9] *Letter from Special Counsel Jack Smith*, https://perma.cc/8SWU-PKL7.

[10] *Id.*

On January 7, 2025, to preserve the status quo pending a ruling by this Court on the Emergency Motion before it, the district court granted a temporary injunction barring DOJ from releasing the final report to anyone outside DOJ. Dkt. 682.

In a letter to the Chairmen and Ranking Members of the House and Senate Judiciary Committees the following day, the Attorney General stated that when permitted to do so by the district court, he would provide Volume II to the members *in camera* upon their "agreement not to publicly release any information from that review."[11] He also stated that "to avoid any risk of prejudice" to defendants Nauta and De Oliveira, Volume II "should not be made public so long as those defendants' criminal proceedings are ongoing."[12] Attorney General Garland also stated "I have determined that once those criminal proceedings have concluded, releasing Volume Two of the Report to you and to the public would also be in the public interest, consistent with law and Department policy."[13]

On January 13, 2025, after receiving assurances from the government that Volume I of the report concerned only the Election Interference Case, the district court denied Nauta and De Oliveira's Emergency Motion as to Volume I. Dkt. 697.

---

[11] *Letter from Attorney General Merrick Garland to Chairman Charles Grassley, Chairman Jim Jordan, Ranking Member Dick Durbin, and Ranking Member Jamie Raskin* (Jan. 8, 2025), https://perma.cc/QKT8-PRRC.

[12] *Id.*

[13] *Id.*

Attorney General Garland publicly released Volume I the following day. Dkt. 760 at 4.[14] The court reserved ruling on the Emergency Motion, as narrowed to concern only Volume II, pending full briefing and an expedited hearing. Dkt. 697 at 2–3.

On January 15, 2025, "in advance of the January 17, 2025 hearing," and to "facilitate" its resolution of the Emergency Motion, the district court ordered DOJ to "hand deliver a copy of Volume II to the Court to be reviewed in camera." Dkt. 705. The court also ordered DOJ to provide Defendants' counsel with "a reasonable opportunity . . . to further review Volume II before the hearing." *Id.* Finally, the court stated that the hearing would be open to the public, but that "any discussions of specified content in Volume II will be conducted in closed, sealed session to preserve Defendants' fair trial rights and to comply with protective orders previously entered in this case. *Id.*

On January 16, 2025, DOJ filed a notice confirming that it had "provided to the Court for in camera review two hard copies of Volume Two: (1) an unredacted copy . . . ; and (2) a redacted copy representing what the Attorney General would make available to the Chairmen and Ranking Members of the House and Senate Judiciary Committees absent an order from the Court foreclosing those procedures."

---

[14] Alan Feuer, *Four Takeaways From the Special Counsel's Report on the Trump Election Case*, N.Y. Times (Jan. 14, 2025), https://perma.cc/PT99-YFZL; *see also Letter from Special Counsel Jack Smith*, https://perma.cc/8SWU-PKL7.

Dkt. 708 at 1–2. DOJ stated that "[t]he redacted copy protects the secrecy of matters occurring before the grand jury, subject to Federal Rule of Criminal Procedure 6(e), as well as information sealed by court order." *Id.* at 2.[15]

The district court held the hearing on the Emergency Motion and on President Trump's related motion to intervene on January 17, 2025. At the outset, the court stated that it had "reviewed the various filings" and "Volume II itself, which was submitted to me in camera for purposes of adjudicating this motion." Jan. 17, 2025 Hearing Tr. 4:11–16.[16] During the hearing, the parties and the Court referred repeatedly to the contents of Volume II in discussing whether the report's release, even if limited to congressional leadership, risked prejudice to Nauta and De Oliveira's fair trial rights.[17] At one point, for example, the court asked Nauta and De Oliveira's counsel:

> Having reviewed Volume II, again speaking in generalities, what categories of information do you believe are in the redacted version of Volume II that, in your view, runs afoul of 6(e)?

Tr. 14:24–15:2. Later in the hearing, the court said:

> My review of the volume tentatively indicates that there could be information that was at least asserted to be privileged by the President-

---

[15] DOJ also confirmed that "[n]either the redacted nor unredacted copies of Volume Two contain any classified information." *Id.*

[16] The Jan. 17, 2025 Hearing Transcript was filed in the 11th Circuit on January 13, 2026 as ECF No. 23.

[17] Tr. 12:19–17:12, 22:17–23, 34:9–37:8, 42:8–43:3.

elect in the underlying case, and that is another area that I don't think
has been at least briefed or evaluated.

Tr. 39:25–40:4. The court held a closed portion of the hearing "in order for the Court

to hear the specifics of Volume II." Tr. 58:7-11.

On January 21, 2025, "following the hearing and the court's review of all

relevant filings, including an *in camera* review of Volume II itself," the district court

issued the Injunction, prohibiting DOJ from releasing Volume II to anyone outside

the Department, out of concern for the fair trial rights of Nauta and De Oliveira. Dkt.

714 at 2, 13. The injunction was to remain in place "pending further Court order."

*Id.* at 13.

In justifying the injunction, the district court invoked the "supervisory

powers" of the federal courts "to remedy violations of recognized rights, to protect

the integrity of the federal courts, and to deter illegal conduct by government

officials." *Id.* at 7 (citation omitted). The district court explained that its

"independent in camera review of Volume II confirms [the] assessment" of the

parties that "Volume II (even in its redacted form) expressly and directly concerns

this criminal proceeding and should not be released publicly." *Id.* at 5. The court

then described the contents of Volume II in general terms based on its *in camera*

review:

> Volume II includes detailed and voluminous discovery information
> protected by the Rule 16(d)(1) Protective Order entered in this case[,] .
> . . . including interview transcripts, search warrant materials, business

records, toll records, video footage, various other records obtained pursuant to grand jury subpoena, information as to which President-Elect Trump has asserted the attorney-client privilege in motions in this proceeding, potential Rule 404(b) evidence, and other non-public information.

*Id.* at 5–6 (citations omitted). Finally, in response to the Special Counsel's objection to the court's "own in camera review of Volume II for purposes of adjudicating the Emergency Motion," the court stated,

This objection is startling. The Court is tasked with determining whether review of substantive case information by Congress, during the pendency of a criminal proceeding, accords with Defendants' constitutional rights, applicable law, and this Court's rules. Independent judicial review of the information in question is important to make a considered determination on those matters. It is regrettable that the Department would deem it appropriate to resist this Court's in camera review of information directly relevant to a pending motion.

Dkt. 714 at 5 n.8 (citations omitted).

After President Trump was sworn in as the forty-seventh President of the United States, DOJ moved this Court to dismiss the appeal as to Nauta and De Oliveira with prejudice.[18] The Court granted the motion on February 11, 2025, bringing the criminal case to an end.[19]

---

[18] Mot. to Voluntarily Dismiss the Appeal, *United States v. Trump*, No. 24-12311, ECF No. 111 (11th Cir. Jan. 29, 2025).

[19] Order Granting Mot. to Dismiss the Appeal, *United States v. Trump*, No. 24-12311, ECF No. 113 (11th Cir. Feb. 11, 2025).

### C.     The Knight Institute's efforts to access Volume II

On January 26, 2025, the Knight Institute submitted a FOIA request to DOJ seeking a copy of Volume II of the Special Counsel's report. Dkt. 721 at 26–32 (Ex. 1). DOJ denied the request on February 6, 2025, stating that Volume II "is protected from disclosure by a court injunction issued by the United States District Court for the Southern District of Florida." Dkt. 721 at 37 (Ex. 3). DOJ also stated that because the criminal case against Nauta and De Oliveira was ongoing, the Department was withholding Volume II pursuant to Exemption 7(A) of FOIA, which "pertains to records or information compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement proceedings." *Id.* After this Court dismissed the criminal case against Nauta and De Oliveira on February 11, 2025, DOJ denied the Knight Institute's administrative appeal based solely on the Injunction.[20]

On February 24, 2025, the Knight Institute filed a Motion to Intervene to Seek Rescission of the Court's January 21, 2025 Order and Public Release of Volume II of the Special Counsel's Report. Dkt. 721. The Institute argued that the public has a First Amendment and common law right of access to the copy of Volume II in the district court's files—a copy the court requested and obtained from DOJ in mid-

---

[20] *DOJ's Response to Knight Institute's Administrative Appeal* (June 20, 2025), https://perma.cc/27MM-2CZG.

January 2025 and expressly relied on in its January 21, 2025 decision granting Nauta and De Oliveira's motion to enjoin the release of Volume II to anyone outside the Department. *Id.* at 11–17. The Knight Institute also challenged the district court's justification for keeping the Injunction in place after this Court had dismissed the criminal case against Nauta and De Oliveira on February 11, 2025. *Id.* at 9–11. DOJ has cited to the Injunction as grounds for denying the Knight Institute's request for Volume II under FOIA. *Id*.

On March 14, 2025, the parties submitted a joint status report opposing the release of Volume II. Dkt. 738. The government made clear that it "does not intend to revive the charges brought by Special Counsel Smith." *Id.* at 2.

On September 30, 2025, more than six months after the Knight Institute filed its motion to intervene, the Institute petitioned this Court for a writ of mandamus directing the district court to fully resolve the motion to intervene without further delay. *In re: Knight Institute at Columbia University*, No. 25-13403, ECF No. 1 (11th Cir. Sep. 30, 2025). In an order issued on November 3, 2025, this Court agreed with the Knight Institute that there had been "undue delay" in the district court's resolution of its motion and held the mandamus petition "in abeyance for a period of 60 days to allow the district court to fully resolve the motion[]." *Id.*, ECF No. 11.

**D.    The District Court's denial of the Motion to Intervene and subsequent proceedings**

On December 22, 2025, shortly before the expiry of the 60-day period set by this Court, the district court denied the Knight Institute's motion to intervene. Dkt. 760. The court held that the copy of Volume II it reviewed *in camera* in deciding Nauta and De Oliveira's motion is not a judicial record subject to the public right of access, because no party attached Volume II to the Emergency Motion or any other substantive motion, and because Volume II contains "myriad references" to "nonpublic discovery information" and thus should be treated like attachments to discovery motions, which are exempt from the public right of access. *Id.* at 15–17 & n.13. The court also rejected the Institute's motion to intervene to vindicate its rights under FOIA, stating that no court had allowed intervention in a criminal case for that purpose. *Id.* at 14.

Shortly after denying the Institute's motion to intervene, the district court issued an order regarding the Injunction. Dkt. 761. Acknowledging that the "immediate basis" for the Injunction ceased to exist on February 11, 2025, when this Court dismissed the criminal appeal, the district court ordered that the Injunction will automatically expire on February 24, 2026, absent further order of the court. *Id.* At the same time, however, the court invited the parties and President Trump to seek "appropriate relief" before that deadline, and specifically referred to Defendants'

16

position that Volume II should not be released because it is the work product of an unconstitutionally appointed Special Counsel. *Id.* at 1–2.

Defendants have since filed motions seeking a permanent injunction against the release of Volume II on that basis. Dkt. 772 & 774. Nauta and De Oliveira have also asked the court to order the destruction of all copies of Volume II. Dkt. 774 at 1. The government submitted a response agreeing with Defendants that Volume II should not be released outside DOJ and stating that Volume II "belongs in the dustbin of history." Dkt. 773 at 1, 3.

### E.    The congressional investigation of the Special Counsel's conduct

The House and Senate Judiciary Committees have launched investigations into Jack Smith's conduct as Special Counsel, but the Injunction has prevented him from testifying about the Classified Documents Case, both in a closed-door deposition on December 17, 2025, and at a public hearing of the House Judiciary Committee on January 22, 2026.[21] Shortly before the deposition, DOJ instructed Smith, through his lawyers, that the Injunction barred him from testifying about the Classified Documents Case.[22] And in his prepared statement for the January 22, 2026

---

[21] Glenn Thrush & Alan Feuer, *House Republicans Press Jack Smith Over Investigations Into Trump*, N.Y. Times (Dec. 17, 2025), https://perma.cc/WT79-QQ76.

[22] Deposition of Jack Smith Before the H. Comm. on the Judiciary at Tr. 13:12-25 (Dec. 17, 2025), https://perma.cc/A6BY-Q28S.

hearing, Smith explained that Judge Cannon's order and DOJ's interpretation of it precluded him from discussing the contents of Volume II.[23] At the close of the hearing, Representative Jamie Raskin asked that the committee call Smith back to testify about the Classified Documents Case once Judge Cannon's order expires.[24]

## III.    Standard of review

The issues presented are questions of law this Court reviews *de novo*. *See United States v. Cone*, 627 F.3d 1356, 1358 (11th Cir. 2010) ("We review *de novo* questions about our subject matter jurisdiction, including standing."); *Comm'r, Ala. Dep't of Corr. v. Advance Loc. Media, LLC*, 918 F.3d 1161, 1165 (11th Cir. 2019) ("Whether a document is a 'judicial record' subject to the common law right of access is a question of law we review *de novo*.").

## Summary of Argument

This Court should reverse the district court's denial of the Knight Institute's motion to intervene; vacate the Injunction barring the Department of Justice from releasing Volume II; and direct the district court to post on the public docket the redacted copy of Volume II in its possession. If the Court believes that the parties

---

[23] Jack Smith's prepared statement before the House Judiciary Committee (Jan. 22, 2026), *available at* https://perma.cc/XB25-4J2D.

[24] Ella Lee, Max Rego, & Mike Lillis, *Jack Smith gives public defense of Trump probes to House committee: 5 takeaways*, The Hill (Jan. 22, 2026), https://perma.cc/NE7S-SY6H /.

18

should be afforded an opportunity to identify other information that warrants redaction, the Court should direct the district court to address the parties' arguments expeditiously.

This relief is appropriate for these reasons:

I. The district court erred in denying the Knight Institute standing to intervene. Settled law establishes that the press and public have standing to intervene in criminal cases to assert the common law and First Amendment right of access. *See Petition of Trib. Co.*, 784 F.2d 1518, 1521 (11th Cir. 1986). The district court improperly conflated standing with the merits by holding that the Institute lacks standing because Volume II is not a "judicial record." This contradicts Supreme Court precedent requiring courts to accept a litigant's legal claims when determining standing. *See Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022).

The Institute also has standing to challenge the Injunction blocking its FOIA rights. The district court misapprehended the Knight Institute's "theory of FOIA intervention in criminal cases." The Institute does not claim that nonparties should be allowed to intervene whenever they have "a statutory right somewhere that is 'implicated' by a ruling in the criminal case." Dkt. 760 at 14. The Institute has standing here because the Injunction effectively nullifies its FOIA rights, and intervention is the Institute's only remedy. The district court also ignored directly applicable precedent from within this Circuit that supports intervention here.

19

II. The district court erred in holding that Volume II is not subject to a presumptive public right of access. Under this Court's decisions interpreting the common law right of access, documents submitted to but not formally filed with a court constitute judicial records if they are "integral to the judicial resolution of the merits in any action taken by that court." *Advance Local Media*, 918 F.3d at 1167; *see also Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1361–62 (11th Cir. 2021). Volume II plainly meets this standard: the court ordered it delivered to chambers, reviewed it *in camera*, discussed its contents at the hearing, and relied on it in making its decision. Indeed, the court itself stated that its "independent *in camera* review" of Volume II was "important to make a considered determination" on the Emergency Motion. Rather than apply—or even acknowledge—the framework this Court established in *Advance Local Media* and *Callahan* for determining whether a document constitutes a judicial record, the district court held that Volume II is not a judicial record because it was not filed with the court. This was clear error.

The district court also erred in concluding that Volume II falls within the exception to the common law right of access for discovery material. The Emergency Motion is not a discovery motion, and Volume II was not part of Rule 16 discovery. That Volume II contains material that was gathered during the Special Counsel's investigation and later turned over in discovery does not render Volume II a

20

discovery document. Even if some of Volume II's contents could be characterized as discovery material, Volume II became a judicial record once submitted in connection with a substantive motion. *See Callahan*, 17 F.4th at 1362.

The court also erred in concluding that Volume II is not subject to a right of access under the First Amendment. It is well-established that a qualified First Amendment right attaches to criminal proceedings and related documents. The district court imported the common law "judicial record" requirement into its First Amendment analysis, but a document is subject to the First Amendment right of access if it is submitted to the court in connection with a hearing that is itself subject to that right—which the January 17, 2025 hearing indisputably was.

The presumptions in favor of access cannot be overcome in this case. Defendants cannot meet the "compelling interest" or "narrow tailoring" requirements under the First Amendment or establish "good cause" under the common law. The criminal case has been dismissed, the government has said it will not revive the charges, and the charges against Nauta and De Oliveira will become time-barred in 2028. Any risk to Trump's fair trial rights is remote and highly speculative, particularly given the scope of presidential immunity, and is decisively outweighed by the public's interest in disclosure of a document that concerns the investigation of the President for serious crimes. The constitutional and common-law right of access require that any legitimate concerns about grand jury secrecy or

attorney-client privilege be addressed through discrete redactions and not wholesale suppression.

III. The Injunction should be vacated because no valid basis exists for maintaining it. The district court's sole justification—protecting fair trial rights—evaporated when this Court dismissed the appeal and the government stated it would not revive the charges. The district court's later suggestion that the Injunction might be warranted because Smith was appointed unconstitutionally is misguided because none of the statutory, common law, or constitutional access rights here depends on the constitutionality of Smith's appointment. The Injunction is no longer necessary, even if it once was, and the public interest in disclosure of Volume II is overwhelming. Accordingly, the Injunction must be lifted.

## Argument

## I.    The district court erred in holding that the Knight Institute lacks standing to intervene.

### A.    The Knight Institute has standing to intervene to assert the common law and First Amendment public right of access to Volume II.

As the district court correctly observed, the "law is settled" in this Circuit that the press and public have standing to intervene in criminal cases to assert the common law and First Amendment right of access to judicial proceedings and documents. Dkt. 760 at 8–9 (citing *Petition of Trib. Co.*, 784 F.2d at 1521; *United*

*States v. Valenti*, 987 F.2d 708 (11th Cir. 1993)). The Knight Institute has standing because it seeks to intervene for that reason.

The district court reached the opposite conclusion by "improperly conflat[ing] the standing inquiry with the merits inquiry." *Okeelanta Corp. v. U.S. Army Corps of Eng'rs*, 132 F.4th 1320, 1332 (11th Cir. 2025). The court stated that "[w]hen a prospective intervenor seeks material under a theory of access to 'judicial records,' courts need not allow non-party intervention to vindicate such a right if the material sought is not properly considered a 'judicial record' to begin with." Dkt. 760 at 9. However, "[t]he Supreme Court has been clear that 'standing in no way depends on the merits of the plaintiff's' claim." *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1211 (11th Cir. 2025) (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). In determining a party's standing, a court must accept as valid the merits of [the plaintiff's] legal claims . . . ." *Fed. Election Comm'n v. Cruz*, 596 U.S. at 298. Had the district court properly assumed, for standing purposes, that Volume II is a judicial record, it would have allowed the Institute to intervene in this case.

    **B.**    **The Knight Institute also has standing to intervene to challenge the injunction blocking the Institute's statutory right of access to Volume II under FOIA.**

The Knight Institute has standing to intervene to challenge the injunction preventing the Institute from vindicating the statutory right of access to Volume II under FOIA. Intervention in a criminal case is proper when "a third party's

23

constitutional or other federal rights are implicated by the resolution of a particular motion, request, or other issue during the course of a criminal case." *United States v. Carmichael*, 342 F. Supp. 2d 1070, 1072 (M.D. Ala. 2004); *see also United States v. Cox*, No. 14-CR-140, 2015 WL 13741738, at *3 (M.D. Fla. Oct. 7, 2015) (intervention in criminal cases is allowed "where the third party's constitutional rights or other federal rights are implicated during the course of the prosecution"); *United States v. Atesiano*, Case No. 18-20479-CR-Moore/Simonton, 2018 WL 5831092, at *2–*4 (S.D. Fla. Nov. 7, 2018) (same). "The intervenor must have an important right at stake, either in a representative capacity (i.e., the press) or in a personal privilege or interest, and that right must be significant enough for society to value and protect." *Cox*, 2015 WL 13741738, at *3.

The Knight Institute's motion to intervene meets these requirements. The Institute has a statutory right under FOIA to obtain Volume II from the Department of Justice, and the Injunction is preventing the Institute from vindicating that right. The Injunction implicates the Institute's FOIA rights in a concrete, conclusive way—it effectively nullifies them. Furthermore, intervening in this case is the Knight Institute's only option for challenging the injunction. Unlike nonparties who have been denied standing to intervene in other criminal cases, the Knight Institute is not seeking to "compel a prosecution or alter a sentence," *United States v. Couch*, 906 F.3d 1223, 1227 (11th Cir. 2018), obtain discovery for use in civil litigation,

*Atesiano*, 2018 WL 5831092, at *3, or resolve a private dispute based on state law, *Carmichael*, 342 F. Supp. 2d at 1072–73.

To the contrary, the Institute is seeking to vindicate an important federal right—the public right of access to government records under FOIA. As the Supreme Court has explained, "[t]he basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978); *see also The News–Press v. U.S. Dep't of Homeland Security*, 489 F.3d 1173, 1190 (11th Cir. 2007). Put another way, FOIA is "a means for citizens to know 'what the Government is up to.' This phrase should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (citation omitted). The Institute's FOIA request for Volume II directly serves FOIA's purposes because it seeks to inform the public about the character and actions of the nation's highest-ranking official and the scope and integrity of the Special Counsel's investigation.

The Second Circuit's decision in *LaRouche v. FBI*, 677 F.2d 256 (2d Cir. 1982), which involved similar circumstances, supports the Institute's standing to intervene. In *LaRouche*, a civil case, the district court entered an order enjoining public disclosure of certain FBI documents, and a third party seeking those

documents through FOIA moved to intervene. *Id.* at 257. The Second Circuit found that the intervenor had demonstrated "a recognizable interest in the litigation" because FOIA "creates in clear language a judicially enforceable public right to secure such information from possibly unwilling official hands." *Id.* at 258 (cleaned up). The court concluded that "[w]here, as here, a member of the public is being foreclosed from exercising that right by an order entered . . . in litigation to which she is not a party, her effective remedy, perhaps her only one, is by way of intervention." *Id.* So too here.

In concluding that the Institute lacked standing to intervene, the court misapprehended the Knight Institute's "theory of FOIA intervention in criminal cases." The Institute does not claim that nonparties should be allowed to intervene whenever they have "a statutory right somewhere that is 'implicated' by a ruling in the criminal case." Dkt. 760 at 14. Intervention is proper here because the Knight Institute has a federal right to seek the release of Volume II under FOIA, the Injunction is blocking the Institute from vindicating that right, and intervention is the Institute's only means of challenging the Injunction. Allowing intervention under these narrow circumstances would not "risk[] havoc in criminal proceedings through FOIA-interested parties." *Id.* at 14. It is far from common for district courts to enjoin government agencies from disclosing agency records that they would otherwise have a right or duty to disclose.

The district court failed to acknowledge, much less address, *Carmichael*, *Cox*, or *Atesiano*, even though they were cited by the Knight Institute and the parties in their briefing on the motion to intervene, and even though they are directly relevant to the motion and support the Knight Institute's standing to intervene in this case.[25] The court also failed to engage seriously with *LaRouche*, instead dismissing it in a conclusory footnote. *Id.* at 14 n.10. These omissions are particularly troubling given that the district court denied intervention based in part on the Knight Institute's alleged "fail[ure] to cite a single case in support of the proposition" that nonparties have standing to intervene in criminal cases to protect their rights under FOIA. *Id.* at 13 (stating the Institute's failure to cite a single case supporting its position "is a telling and unsurprising comment on prospective intervenor['s] FOIA theory—which defies the limits of third-party intervention in criminal cases").

Finally, the district court repeatedly invoked the "limits of intervention in criminal cases" and the "caution" shown by courts in allowing such intervention, but failed to explain why those limits or caution should prevent the Knight Institute from intervening in this case. *Id.* at 7–8, 13–14. Cautious courts have recognized that intervention is permissible and appropriate in the kinds of circumstances presented here.

---

[25] These cases were cited by the Knight Institute and the parties in the briefing below. *See* Dkt. 721 at 8; Dkt. 739 at 6–7; Dkt. 740 at 6–7; Dkt. 745 at 5–7.

**II.     The district court erred in concluding that the Knight Institute lacks a public right of access to Volume II under the common law and the First Amendment.**

Both the First Amendment and the common law provide a qualified right of access to judicial proceedings and documents. *See, e.g., Chicago Tribune v. Bridgestone/Firestone*, 263 F.3d 1304, 1309–11 (11th Cir. 2001); *Romero v. Drummond Co.*, 480 F.3d 1234, 1245–46 (11th Cir. 2007). In applying these rights, courts ask first whether the presumption of access attaches and, if so, whether the party seeking closure of the proceeding or sealing of the document has overcome the presumption. *Id.* The district court concluded that the common law and First Amendment presumptions of public access do not attach to Volume II. This was error.

**A.     Volume II is subject to the presumptive public right of access under the common law.**

The common law recognizes a presumptive public right of access to judicial proceedings, including the right to "inspect and copy . . . judicial records." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). This qualified right is "an essential component of our system of justice, [and is] instrumental in securing the integrity of the [judicial] process." *Romero*, 480 F.3d at 1245. It "may only be overcome when a court determines—after balancing the respective competing

28

interests of all parties—that the party seeking to keep the information confidential has shown good cause." *Advance Local Media LLC*, 918 F.3d at 1173.

This Court has made clear that filing a document is neither sufficient nor necessary to turn it into a "judicial record" subject to the common law right of access. *Id.* at 1167; *see also Callahan*, 17 F.4th at 1361–62. Rather than look solely at whether a document was filed on the docket, this Court applies "'a more refined approach' that accounts for the tradition favoring access," which is consistent with the approach taken by other circuits. *Advance Local Media*, 918 F.3d at 1168 (citing *Chicago Tribune*, 263 F.3d at 1312). Under this approach, documents *filed* with the court constitute judicial records only if they are "filed in connection with any substantive pretrial motion, unrelated to discovery." *Callahan*, 17 F.4th at 1362–63 (citing *Romero*, 480 F.3d at 1245). The substantive motion "need not be dispositive for the rule to apply; any motion presented to the court to invoke its powers or affect its decisions is subject to the public right of access." *Id.* at 1363 (citing *Romero*, 480 F.3d at 1246). Thus, whether a document filed with the court "is a judicial record depend[s] on the type of filing it accompanied." *Id.* (citing *FTC v. AbbVie Prods. LLC*, 713 F.3d 54, 64 (11th Cir. 2013)). In other words, in determining whether documents filed on the docket are judicial records, "[w]hat matters is how the document was used by the parties—to support an argument before the court—and not whether the court itself used the document to resolve that argument." *Id.* at 1363.

29

By contrast, documents *not filed* on the docket constitute judicial records if they are submitted to the court and are "integral to the 'judicial resolution of the merits' in any action [unrelated to discovery] taken by that court." *Advance Local Media*, 918 F.3d at 1167; *see also Callahan*, 17 F.4th at 1361–62. The Court adopted this test in *Advance Local Media*, a case involving an inmate's constitutional challenge to Alabama's lethal injection protocol. The Court found that the protocol was "unambiguously integral" to the district court's resolution of two substantive motions, because "[t]he parties discussed the protocol with the district court in an *in camera* hearing, the district court noted that [the] substantive motions . . . incorporated and referred to the protocol[,] [and] [t]he court relied upon—and cited to—the protocol in denying" the motions. 918 F.3d at 1168 & n.6; *see also id*. at 1167, 1173 (reasoning that its prior decision in *Newman v. Graddick* "compelled" the conclusion that the protocol was a judicial record, because, like the lists of inmates at issue in *Newman*, it was "submitted to the court in connection with a litigated dispute, discussed in proceedings and motions by all parties, and relied upon by the court to dispose of substantive motions").

Under this Court's decisions, Volume II qualifies as a judicial record even though it was not filed on the docket because it was submitted to the court for *in camera* review and was integral to the court's adjudication of the Emergency Motion on the merits—a motion unrelated to discovery that Nauta and De Oliveira presented

30

to the court to invoke its powers. *See id.* at 1167.  The district court ordered that a copy of Volume II be delivered to chambers to "facilitate" its consideration of the Emergency Motion, reviewed Volume II *in camera*, and discussed Volume II and its contents with the parties at the hearing, in the open and closed sessions. *See* Dkt. 705, Dkt. 708 at 1–2, Jan. 17, 2025 Hearing Tr. 14:24–15:2; 39:25–40:4; 58:7–11; Dkt. 714 at 4 n.6. In ruling on the motion, the court stated, that its "independent *in camera* review of Volume II confirm[ed] [the parties'] assessment" that "Volume II (even in its redacted form) expressly and directly concerns this criminal proceeding and should not be released publicly." Dkt. 714 at 5. The court then summarized the types of content in Volume II that formed the basis for that assessment. *Id.* at 5–6. Most importantly, the court stated that its "[i]ndependent judicial review" of Volume II was "important to make a considered determination" as to "whether review of substantive case information by Congress, during the pendency of a criminal proceeding, accords with Defendants' constitutional rights, applicable law, and this Court's rules." *Id.* at 5 n.8; *see id.* (describing Volume II as containing "information directly relevant to a pending motion").

The district court's conclusion that Volume II is not a judicial record is without merit. The court never mentioned—let alone applied—the test this Court set forth in *Advance Local Media* and reaffirmed in *Callahan* for determining whether documents not filed with the court constitute judicial records—despite the district

court's reliance on *Advance Local Media* and *Callahan* in concluding that Volume II is not a judicial record. Dkt. 760 at 10–11, 15–17. Nor did the district court mention its own statements—quoted in the preceding paragraph—making clear that its *in camera* review of Volume II was essential to its adjudication of the Emergency Motion. Instead, the court held that Volume II is not a judicial record because it was not filed with the court. This was clear error.[26]

The district court's brief analysis of *Advance Local Media* does not withstand scrutiny. The district court reasoned that Volume II, unlike the lethal injection protocol at issue in *Advance Local Media*, "was not admitted into evidence or attached as an exhibit to any motion or pleading." *Id.* at 15; *see also id.* at 17 n.15. However, this Court expressly stated in *Advance Local Media* that "neither party moved to admit the protocol into evidence or attach it as an exhibit to any motion or pleading." 918 F.3d at 1164. The district court also emphasized that while all parties in *Advance Local Media* had copies of the protocol, "*no defendant ever maintained Volume II or retained it for submission to this Court as part of their substantive motion*." Dkt. 760 at 15 (emphasis in original); *see also id.* at 17 n.15. However, Defendants were provided access to Volume II before it was submitted to the

_____

[26] *See id.* at 15 ("[n]o part of Volume II was attached by any party to a substantive motion for resolution on the merits"); *see also id.* at 17 n.15 ("Volume II certainly was not filed by the parties in connection with the Emergency Motion").

Attorney General, and again before the hearing on the Emergency Motion. *See id.* at 3 n.2, 15 n.12; Dkt. 705; Dkt. 708 at 2; 714 at 6 n.9.

The district court's reasoning that Volume II is not subject to the common law or First Amendment rights of access because it "contains large swaths of nonpublic discovery material" is also without merit. Dkt. 760 at 15–16. First, Nauta and De Oliveira's motion is not a discovery motion, and Volume II was not part of the Rule 16 discovery process. It is the final report of the Special Counsel, prepared pursuant to regulations contemplating public disclosure. *See* 28 C.F.R. § 600.8. The fact that some material included in the report was also relevant to the criminal prosecution is beside the point, and certainly no basis for treating the report as a discovery document. As the government emphasized below, "the Court dismissed the criminal charges against the defendants well before the issuance of Volume II." Dkt. 740 at 11.

Second, Volume II was submitted to the court in connection with a substantive motion and was integral to the court's resolution of the motion. This Court has explained that the presumptive common law right of access does not attach to documents filed in connection with discovery motions, because "the need for public access to discovery is low"—"discovery is essentially a private process the sole purpose of which is to assist trial preparation." *Romero*, 480 F.3d at 1245 (cleaned

up).[27] But the Court has also recognized that discovery materials "take on [the] status" of "judicial records subject to the common-law right of access . . . once they are filed in connection with a substantive motion." *Callahan*, 17 F.4th at 1362. Thus, even if some of the contents of Volume II could properly be characterized as discovery material, once Volume II was submitted to the court and the court ruled on the Emergency Motion, Volume II, in its entirety, took on the status of a judicial record.

The district court was also incorrect in suggesting that a court's *in camera* review of documents is exempt from the common law right of access. Dkt. 760 at 16–17 (citing *United States v. Nixon*, 418 U.S. 683, 714 (1974)). There is no such rule, and the district court's reliance on *United States v. Nixon* is misplaced. That case did not concern the public right of access to judicial records, and the district court's *in camera* review was for a decidedly different purpose—to determine what

---

[27] Notably, the exception for discovery material has only limited application to discovery in criminal cases, because the prosecution's obligations under *Brady* "are governed not by rules of procedure but by the Constitution." *United States v. Wecht*, 484 F.3d 194, 209 (3d Cir. 2007). "*Brady* materials, unlike civil discovery, are turned over by the government to the defense during its prosecution of alleged criminals on behalf of the public," and " [t]he process by which the government investigates and prosecutes its citizens is an important matter of public concern." *Id.* at 209–210.

evidence might be admissible at trial.[28] *Nixon*'s "scrupulous protection" language addressed the risk that evidence determined to be inadmissible would be made public. 418 U.S. at 714.

### B.    Volume II is subject to a presumptive right of access under the First Amendment.

The Supreme Court has recognized a qualified First Amendment right of access to criminal trials and pretrial proceedings. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982); *Press-Enter. Co. v. Superior Ct. of Cal.* (*Press-Enterprise I*), 464 U.S. 501 (1984); *Press-Enter. Co. v. Superior Ct. of Cal.* (*Press-Enterprise II*), 478 U.S. 1 (1986). Underlying the First Amendment right of access is "the common understanding that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," so that "the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604.

Applying these decisions and the Supreme Court's "experience and logic" test, this Court and others have recognized a qualified First Amendment right of access to the full range of criminal proceedings and to court documents submitted in

---

[28] A different Supreme Court case, *Nixon v. Warner Communications, Inc.*, concerned the common law right of access to the Watergate Tapes. 435 U.S. 589 (1978).

connection with those proceedings. *See* David S. Ardia, *Court Transparency and the First Amendment*, 38 Cardozo L. Rev. 835, 909 (2017) ("lower courts have held that a First Amendment right of access applies to almost all pretrial, mid-trial, and post-trial criminal proceedings" (collecting cases)); *Civ. Beat L. Ctr. for Pub. Int., Inc. v. Maile*, 117 F.4th 1200, 1208 (9th Cir. 2024) ("As both we and the Supreme Court have recognized, the First Amendment grants the public a presumptive right to access nearly every stage of post-indictment criminal proceedings, including pretrial proceedings, preliminary hearings, voir dire, trials, and post-conviction proceedings, as well as records filed in those criminal proceedings" (collecting cases)); *In re Hearst Newspapers, L.L.C.*, 641 F.3d 168, 176 (5th Cir. 2011) (collecting cases); *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1028–31 (11th Cir. 2005) (documents submitted to the court in connection with post-trial criminal proceedings); *Newman v. Graddick*, 696 F.2d 796, 800–02 (11th Cir. 1983) (documents submitted to the court in connection with post-trial civil proceedings).[29]

The courts have reasoned that public access to these proceedings serves the same societal interests as public access to trials. First, as noted above it facilitates an

---

[29] Grand jury proceedings are the exception, *In re Subpoena to Testify Before Grand Jury Directed to Custodian of Records*, 864 F.2d 1559, 1561–63 (11th Cir. 1989), but that exception is not relevant here because the Knight Institute is not seeking the release of information properly protected by Federal Rule of Criminal Procedure 6(e).

informed discussion of governmental affairs by providing the public with a more complete understanding of the judicial system. *Globe Newspaper*, 457 U.S. at 604–05. Second, it acts as "an effective restraint on possible abuse of judicial power" by subjecting the proceedings "to contemporaneous review in the forum of public opinion." *Richmond Newspapers*, 448 U.S. at 596 (Brennan, J., concurring in the judgment). Third, it "fosters an appearance of fairness, thereby heightening public respect for the judicial process," *Globe Newspaper*, 457 U.S. at 606, because "people not actually attending [the hearings] can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press-Enterprise I*, 464 U.S. at 508 (emphasis in original).

Once the First Amendment presumption of access attaches, a proceeding may be closed or a document sealed only when the party requesting closure demonstrates that secrecy is "necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper*, 457 U.S. at 607. In ordering that a proceeding be closed or a document sealed, a district court must make "specific, on the record findings" justifying closure, and must consider whether reasonable alternatives to closure would adequately protect the compelling interest at stake. *Press-Enterprise II*, 478 U.S. at 13–14; *see also Ochoa-Vasquez*, 428 F.3d at 1030.

Under these precedents, the presumptive right of access attached to the district court's January 17, 2025 hearing on Nauta and De Oliveira's Emergency Motion and to Volume II, which, as discussed above, was submitted to the court in advance of the hearing and was discussed by the court and the parties at the hearing.

The district court's conclusion that Volume II is not subject to the presumptive First Amendment right of access rests on two fundamental errors. First, the court applied the wrong legal standard. It used the "judicial record" requirement, which is specific to the common law right of access.[30] As noted above, a document is subject to the First Amendment right of access if it is submitted to the court in connection with a hearing that is itself subject to that right. Second, for the reasons already discussed, the court erred in concluding that Volume II is not subject to the common law or First Amendment rights of access because it allegedly contains large amounts of discovery material.

---

[30] The government may have led the court astray by citing *In re Application of United States for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 290 (4th Cir. 2013), which relied on a misreading of an earlier Fourth Circuit case, *Baltimore Sun Co. v. Goetz*, which in fact properly applied the "judicial record" requirement only to the common law right of access. 886 F.2d 60, 64–65 (4th Cir. 1989).

**C.    The presumptive right of access under the common law and the First Amendment cannot be overcome.**

Defendants cannot overcome the presumptive right of access under the First Amendment or the common law.[31] The presumptive First Amendment right of access can be overcome only by a "compelling interest," and only if the denial of access is "narrowly tailored to serve that interest." *Globe Newspaper*, 457 U.S. at 607. The presumptive common law right of access can be overcome only by "a showing of good cause, which requires balancing . . . the public interest in accessing court documents against a party's interest in keeping the information confidential. Whether good cause exists is decided by the nature and character of the information in question." *Romero*, 480 F.3d at 1246.

This Court has provided further guidance on the "good cause" standard under the common law right. To assess whether good cause exists, "courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns,

---

[31] Nauta and De Oliveira were the only parties below to address whether the presumptions of access could be overcome. President Trump, participating as *amicus curiae*, adopted their arguments. Dkt. 755 at 3. The government, however, did not address this issue below and has therefore waived the right to do so on appeal. *See, e.g., United States v. Ross*, 964 F.3d 1034, 1036 (11th Cir. 2020).

and the availability of a less onerous alternative to sealing the documents." *Id*. at 1246. Courts also consider "whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage, whether access is likely to promote public understanding of historically significant events, and whether the press has already been permitted substantial access to the contents of the records." *Newman*, 696 F.2d at 803.

Defendants cannot meet their burdens under either the First Amendment or the common law right of access. Before the district court, Defendants mistakenly applied the common law "good cause" standard to both access rights. Dkt. 739 at 14–16. As a result, Defendants did not argue that a compelling interest necessitated withholding Volume II, or that withholding the entire report is narrowly tailored to serve such an interest. With respect to the common law right, Defendants have not shown that the interests in keeping Volume II confidential outweigh the public interest in accessing Volume II. To the contrary, because the charges against Defendants have been dismissed, all of the factors weigh in favor of release.

First, Volume II concerns a public official of the highest rank—the current and former president. Second, Volume II addresses a matter of public concern—the investigation and prosecution of a former president for the alleged willful retention of military secrets in violation of the Espionage Act. Third, public access to Volume II would "promote public understanding of historically significant events," because

it contains a wealth of information about the investigation and prosecution of President Trump that has not been made public. *Newman*, 696 F.2d at 803. Fourth, the Knight Institute is not seeking public access to Volume II for "illegitimate purposes," such as "promot[ing] public scandal"; it seeks the report to inform the public about matters that are of manifest public importance and historical significance. *Id*.

Finally, it is unlikely that the release of Volume II will cause significant injury to Defendants' reputation or public standing beyond the injury that has already resulted from the publicly filed indictment, which accused Defendants of a profound betrayal of public trust and included copious information to justify the accusation. If Nauta and De Oliveira wish to respond to the report, President Trump possesses a singularly powerful platform from which to do so on their behalf. In these circumstances, any concerns about private injury are vastly outweighed by the public interest in disclosure.

Defendants have identified five interests that they claim are sufficient to overcome the presumptive right of access—prejudice to their fair trial rights, impairment of court functions, harm to their privacy interests, the unreliability of the information in Volume II, and their limited ability to respond. Dkt. 739 at 15–16. These interests, however, cannot justify the withholding of Volume II now that all of the charges against the Defendants have been dismissed. Far from "clearly

41

weigh[ing] against access," Dkt. 730 at 14–16, these interests are no match for this Court's "resolute . . . enforcement of [the] presumption of public access." *Callahan*, 17 F.4th at 1359.

First, the release of Volume II poses no risk of prejudice to Nauta and De Oliveira's fair trial rights, and the risk of prejudice with respect to President Trump is remote and is greatly outweighed by the public interest in disclosure. Nauta and De Oliveira claimed below that there is a risk of prejudice to their fair trial rights because "the statute of limitations has not yet expired in this matter." Dkt. 738 at 3, 5. But as they conceded, "the United States Attorney's Office for the Southern District of Florida does not intend to revive the charges." *Id.* at 2, 3. There is also no risk that a future administration will revive the charges, because the five-year statute of limitations that applies to the charges will expire in 2028, before President Trump leaves office.[32] It is thus disingenuous for Nauta and De Oliveira to represent that they remain in "jeopardy" and that as a result "their due process rights remain a serious concern that strongly outweighs any interest that the Government or the public might have in the release of the Special Counsel's Report." *Id.* at 6.

---

[32] The criminal conduct alleged in the Superseding Indictment took place in 2022 and 2023, *see* Dkt. 85 at 38–43, 46–53, and each crime with which Nauta and De Oliveira were charged has a five-year statute of limitations, *see* 18 U.S.C. §§ 1001, 1512, 1519, 3282; Dkt. 738 at 5–6. Nauta and De Oliveira confirmed this in a motion filed in the district court on January 3, 2026. Dkt. 774 at 3–4.

Although the ten-year statute of limitations that applies to the Espionage Act charges against President Trump will not expire until 2033, whether a future administration would revive the charges is highly speculative. Furthermore, President Trump claims that presidential immunity protects him from the Espionage Act charges, because they "stem directly from official acts by [him] while in office."[33] It is also important to note that other Special Counsel reports were released to the public even though the individuals targeted faced the possibility that a future administration would bring charges against them within the applicable statute of limitations for the conduct alleged in the reports.[34] The Knight Institute knows of no case in which a court has enjoined the government from releasing information on the grounds that the information might prejudice individuals who might be charged with crimes at some future date.

Second, release of Volume II would not "impair court functions." Dkt. 739 at 15. In fact, denying access to Volume II "may well diminish the public's regard for the court's role in an open society." *Kearney v. Auto–Owners Ins. Co.*, Case No. 8:06–cv–00595–T–24, 2009 WL 10664317, at *3 (M.D. Fla. Sept. 8, 2009). The district court's ruling that Jack Smith was unconstitutionally appointed does not change the calculus. Indeed, it underscores the public interest in Volume II, because

---

[33] Dkt. 324; *see also* Dkt. 664 & 669.

[34] *See Mueller Report* & *Hur Report*, *supra* n.7.

releasing Volume II will assist the public in determining whether—if the district court's constitutional conclusion was correct—special counsels play a sufficiently important role in our system of justice to warrant "Congress . . . authoriz[ing] [their] appointment through enactment of positive statutory law consistent with the Appointments Clause." *United States v. Trump*, 740 F. Supp. 3d 1245, 1253 (S.D. Fla. 2024). And although Defendants repeatedly suggest without support that Jack Smith engaged in misconduct, the Eleventh Circuit has held that even if a court finds that an attorney engaged in misconduct in preparing or filing a judicial record, withholding the document from the public is not a proper sanction. *Romero*, 480 F.3d at 1247.

Third, Defendants' assertion that the release of Volume II would harm their privacy interests is undermined by the fact that, as Nauta and De Oliveira acknowledged, the detailed allegations against them have already received "a year-and-a-half of rampant pretrial publicity." Dkt. 738 at 4; *see also* Dkt. 774 at 4 (stating that they have suffered "undue media scrutiny and reputational damage" over the past three years). Moreover, this Court has held that even "court files that instigate public scandal or libel" should not be sealed when they "support the already-public" allegations against the defendant. *Romero*, 480 F.3d at 1247. Furthermore, "in cases involving public concerns like 'the citizen's desire to keep a watchful eye on . . . the operation of government,' documents—even sensitive ones—may speak to the

'heart of the interest protected by the right of access,' making public disclosure paramount." *Gubarev v. Buzzfeed, Inc.*, 365 F. Supp. 3d 1250, 1257 (S.D. Fla. 2019) (quoting *Romero*, 480 F.3d at 1246).

Fourth, Defendants' assertion that Volume II contains "unreliable allegations," Dkt. 739 at 15, misconstrues what "reliable" means in this context. It means "verified," not "undisputed." *United States v. Amodeo*, 71 F.3d 1044, 1050–51 (2d Cir. 1995) (explaining that "a court should consider the reliability of the information," because "[r]aw, unverified information should not be as readily disclosed as matters that are verified"); *see also Romero*, 480 F.3d at 1246 (adopting the "reliability of the information" factor from *Amodeo*). Volume II is not raw, unverified information. To the contrary, as the district court indicated based on its *in camera* review, Volume II cites to "interview transcripts, search warrant materials, business records, toll records, video footage, [and] various other records obtained pursuant to grand jury subpoenas." Dkt. 714 at 5–6. That is consistent with Volume I of the Special Counsel's report, which cites to hundreds of documentary sources.[35]

---

[35] U.S. Dep't of Justice, Special Counsel Jack Smith, *Report on Efforts to Interfere with the Lawful Transfer of Power Following the 2020 Presidential Election or the Certification of the Electoral College Vote Held on January 6, 2021* (2025), *available at* https://perma.cc/T9LM-7ZQF.

Finally, Nauta and De Oliveira greatly exaggerate the "hurdles" they would face in responding to the allegations in Volume II. Dkt. 739 at 16. They complain that "[r]esponding to each and every allegation in the Report would essentially be akin to defending the case at trial." *Id.* at 15. But the amount of potentially incriminating information in the report does not counsel against its release, and in any event, President Trump is certain to mount a vigorous response to Volume II, likely obviating the need for them to respond. Their claim that the Rule 16(d) protective order will prevent them from responding is unconvincing, Dkt. 738 at 3–4, Dkt. 739 at 10, because the protective order provides that they need only obtain the "consent of the United States or approval of the Court" to be excused from the order's non-disclosure requirement. Dkt. 27 at 3.

In sum, under the First Amendment right of access, none of these interests constitutes a compelling interest justifying the withholding of Volume II. Furthermore, these interests do not establish good cause to overcome the common law presumption, because the balancing of interests strongly favors disclosure.

Even if these presumptions could be overcome with respect to any specific information in Volume II, such as Rule 6(e) material not already redacted or attorney/client privileged information, this information should be protected through discrete redactions, not wholesale suppression. The First Amendment right of access requires that the sealing of documents be narrowly tailored to serve a compelling

interest, and the common law right of access requires courts to consider "the availability of a less onerous alternative to sealing the documents." *Romero*, 480 F.3d at 1246.[36]

To the extent Defendants contend that wholesale suppression of Volume II is required, they have waived that argument. Defendants asserted below that "[t]here is no less restrictive alternative to keeping the document private; this Court has already identified the reasons that redaction is inappropriate." Dkt. 739 at 16.[37] That single sentence assertion is not sufficient to preserve the argument on appeal. *See, e.g., Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1110–11 (11th Cir. 2020). In the parties' March 14, 2025 JSR, Defendants told the court that they wanted to "avoid the arduous task of dissecting Volume II . . . to identify and seek protection for additional 6(e) and other confidential information," but it hardly needs to be said that sparing the parties this "arduous task" is not a compelling interest sufficient to overcome the public's right of access. Dkt. 738 at 3.

---

[36] Courts in this Circuit routinely require targeted redactions in place of the wholesale sealing of documents, "given the vital importance of the public's right of access to judicial proceedings." *See, e.g.*, *Vision Bank v. Horizon Holdings USA, LLC*, 2011 WL 4478772, at *5 n.11 (S.D. Ala. Sep. 27, 2011).

[37] The Knight Institute has been unable to find in the record any suggestion by the district court that additional redactions to Volume II would be inappropriate. In fact, at the January 17, 2025 hearing on the Emergency Motion, the court discussed with the parties whether there was additional Rule 6(e) material that would need to be redacted before Volume II could be released to members of Congress. Jan. 17, 2025 Hearing Tr. 14:23–17:12; 22:9–23:4; 34:9–37:8.

President Trump recently told the district court that making further Rule 6(e) redactions to Volume II is "complicated by the reality that defense counsel no longer have access to the very materials that would be necessary to assess the adequacy of [Special Counsel] Smith's redactions." Dkt. 772 at 15–16. To the extent defense counsel would need access to anything other than Volume II itself, there would be no bar to defense counsel seeking access to the materials they say they need to review. Any obstacle here is one that the government itself has the power to remove.

## III. The Injunction barring the Institute's FOIA rights should be vacated because there is no valid basis for maintaining it.

There is no longer any legitimate basis for the Injunction. As an initial matter, it is doubtful that the district court had jurisdiction to issue the Injunction in the first place, because the court's dismissal of the superseding indictment was on appeal to this Court. It is a "longstanding tenet of American procedure" that the filing of a notice of appeal confers jurisdiction on the court of appeals and "divests the district court of its control over those aspects of the case involved in the appeal." *Coinbase, Inc. v. Bielski*, 599 U.S. 736, 740 (2023) (quoting *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam)). When, as here, "an appeal is taken from a judgment which determines the entire action, the district court loses power to take any further action in the proceeding . . . except to act in aid of the appeal or correct clerical errors." *Nicol v. Gulf Fleet Supply Vessels, Inc.*, 743 F.2d 298, 299 (5th Cir. 1984).

Even if the district court had jurisdiction to issue the Injunction, however, the court's sole justification for doing so ceased to exist after February 11, 2025, when this Court dismissed the appeal. The district court predicated the Injunction on its "supervisory powers." Dkt. 714 at 7 (citation omitted). The court noted that the government had not "sought leave to dismiss the appeal" and had not ruled out "proceed[ing] on the Superseding Indictment should it prevail in the Eleventh Circuit or in subsequent proceedings." *Id.* at 8, 11. Four days later, however, the government moved to dismiss the appeal with prejudice, and this Court granted the government's motion on Feb. 11. Mot. to Voluntarily Dismiss the Appeal, *United States v. Trump*, No. 24-12311, ECF No. 111 (11th Cir. Jan. 29, 2025); Order Granting Mot. to Dismiss the Appeal, *United States v. Trump*, No. 24- 12311, ECF No. 113 (11th Cir. Feb. 11, 2025). On March 14, moreover, DOJ represented to the district court that it did not "intend to revive the charges." Dkt. 738 at 2–3. On December 22, 2025, the district court itself acknowledged that "[t]he criminal appeal as to Nauta and De Oliveira has since been dismissed on motion of the United States, and hence the immediate basis underlying the Court's January 21, 2025, appears to no longer apply." Dkt. 761 at 1.

Given the change in circumstances, there is no valid basis to maintain the injunction. The district court properly noted that federal courts may exercise their supervisory power "to preserve judicial integrity by ensuring that a conviction rests

49

on appropriate considerations validly before the jury." *United States v. Hasting*, 461 U.S. 499, 505 (1983). But a court's use of its supervisory power "must be a reasonable response to a specific problem." *Dietz v. Bouldin*, 579 U.S. 40, 46 (2016) Even if one assumes that the injunction was once necessary to protect the integrity of the trial, there is no longer any trial to protect, and DOJ has ruled out any possibility of a future trial. *Cf. N.Y. Times Co. v. U.S. Dep't of Justice*, Case No. 1:25-cv-562-GHW, 2025 WL 2549435, at *7 n.3 (S.D.N.Y. Sept. 4, 2025) (finding these to be "compelling arguments" that Nauta and De Oliveira's "fair trial rights, which the Permanent Injunction aimed to protect, are no longer at risk").

The Supreme Court "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romer-Barcelo*, 456 U.S. 305, 312 (1982); *see also Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco*, 480 U.S. at 542. The Supreme Court has also emphasized that "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences in

50

employing the extraordinary remedy of injunction." *Weinberger*, 456 U.S. at 312.

As explained above, the balance here overwhelmingly favors disclosure.[38]

## Conclusion

For all of these reasons, this Court should reverse the district court's denial of

the Knight Institute's motion to intervene, vacate the Injunction barring the

Department of Justice from releasing Volume II, and remand with instructions to

direct the district court clerk to post on the public docket the redacted copy of

Volume II in the district court's possession.

February 9, 2026                         Respectfully submitted,

                                          /s/ Scott Wilkens
David Buckner                            Scott Wilkens
Buckner + Miles                          Alex Abdo
2020 Salzedo Street                      Jameel Jaffer
Suite 302                                Knight First Amendment Institute at
Coral Gables, FL 33134                      Columbia University
(305) 964-8003                           475 Riverside Drive, Suite 302
                                         New York, NY 10115
                                         (646) 745-8500
                                         scott.wilkens@knightcolumbia.org

                                         *Counsel for Petitioner*

---

[38] Lifting the injunction will not result in the immediate release of Volume II under FOIA. Attorney General Pam Bondi has claimed "that Volume II is an internal deliberative communication that is privileged and confidential and should not be released outside the Department of Justice," Dkt. 773 at 2 (citing 5 U.S.C. § 552(b)(5)). The Knight Institute will contest that claim in FOIA litigation, assuming that the Injunction is lifted (and assuming that Volume II is not otherwise made public).

**Certificate of Compliance**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 21(d)(1), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 12,504 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: February 9, 2026                    /s/ Scott Wilkens
                                           Scott Wilkens