**No. 25-14507**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

United States of America,

*Plaintiff-Appellee*,

v.

Knight First Amendment Institute at Columbia University, American Oversight,

*Interested Parties-Appellants*

Donald J. Trump; Waltine Nauta; Carlos de Oliveira,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Florida

No. 9:23-cr-80101-AMC

---

**JOINT APPENDIX TO APPELLANTS' OPENING BRIEFS, VOLUME II**

---

Scott Wilkens
Jameel Jaffer
Alex Abdo
 Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
Tel: (646) 745-8500
scott.wilkens@knightcolumbia.org

Loree Stark
Daniel Martinez
Ronald Fein
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
Tel: (304) 913-6114
loree.stark@americanoversight.org

David Buckner
Buckner + Miles
2020 Salzedo Street
Suite 302
Coral Gables, FL 33134
Tel: (305) 964-8003

*Attorneys for Interested Party-Appellant Knight First Amendment Institute at Columbia University*

Barbara R. Lllanes
Gelber Schachter & Greenberg, P.A.
One Southeast Third Avenue, Ste. 2600
Miami, FL 33131
Tel: (305) 728-0950
bllanes@gsgpa.com

*Attorneys for Interested Party-Appellant American Oversight*

<u>INDEX OF APPENDIX</u>

Volume I

<u>Docket/Tab #</u>

District Court Docket Sheet ........................................................................A

Indictment, filed June 8, 2023 ....................................................................3

Superseding Indictment, filed July 27, 2023 ...........................................85

INDEX OF APPENDIX

Volume II

Docket/Tab #

District Court's Dismissal of Superseding Indictment, filed July 15, 2024 ......................................................................................... 672

Notice of Appeal by Special Counsel, filed July 17, 2024 .................................... 673

Dismissal of Trump, filed July 17, 2024 ............................................... 677

Defendants' Motion to Preclude Dissemination of Special Counsel Report, filed Jan. 6, 2025 ........................................................ 679

President Donald J. Trump's Motion for Leave to Intervene or Participate as Amicus Curiae, filed Jan. 7, 2025 .................................. 681

Order Temporarily Enjoining Dissemination of Special Counsel Report, filed Jan. 7, 2025 ...................................................... 682

Order, filed Jan. 13, 2025 ...................................................... 697

Notice of Compliance to Jan. 15, 2025 Order, filed Jan. 16, 2025 ...................... 708

Order Granting Defendants' Emergency Motion to Preclude Release of Volume II of Special Counsel's Report, filed Jan. 21, 2025 ........................... 714

Dismissal of Nauta and De Oliveira, filed Feb. 11, 2025 ................................... 716

American Oversight's Motion to Intervene, filed Feb. 14, 2025 ......................... 717

## <u>INDEX OF APPENDIX</u>

Volume III

<u>Docket/Tab #</u>

Knight First Amendment Institute at Columbia University's Motion to Intervene, filed Feb. 24, 2025 ............................................................... 721

Joint Status Report, filed Mar. 14, 2025 .............................................. 738

Defendants' Waltine Nauta and Carlos De Oliveira's Opposition to Motions to Intervene, filed Mar. 14, 2025 ............................................. 739

United States' Response in Opposition to Motions to Intervene, filed Mar. 24, 2025 ..................................................................................... 740

Reply by Knight First Amendment Institute in Support of Motion to Intervene, filed Mar. 31, 2025 ................................................................ 745

American Oversight's Consolidated Reply in Support of Motion to Intervene, filed Mar. 31, 2025 ................................................................ 746

Joint Status Report and Exhibit A (Order Holding Mandamus Petition in Abeyance), filed Dec. 1, 2025 ........................................................... 753

Order Denying Non-Party Motions to Intervene, filed Dec. 22, 2025 ................. 760

Order Following Joint Status Report Addressing January 21, 2025 Order, filed Dec. 22, 2025 ..................................................................... 761

Notice of Appeal by Knight First Amendment Institute, filed Dec. 23, 2025 ..................................................................................................... 762

Notice of Appeal by American Oversight, filed Dec. 29, 2025 ........................... 763

Transcript of Jan. 17, 2025 Hearing on Defendants' Emergency Motion to Preclude Release of Volume II of Special Counsel's Report, filed Jan. 12, 2026 ................................................................................. 768

## INDEX OF APPENDIX

### Volume IV

Docket/Tab #

President Trump's Unopposed Motion for an Order Prohibiting the
Release of Volume II, filed Jan. 20, 2026..............................................................772

United States' Response to December 22, 2025 Order, filed Jan. 23,
2026 .......................................................................................................................773

Waltine Nauta's and Carlos De Oliveira's Expedited Motion For, and
Response in Support of, an Order Permanently Prohibiting Release of
Volume II of the Final Report Unlawfully Prepared by Jack Smith,
filed Jan. 30, 2026 ................................................................................................774

Joint Expedited Motion of the Knight First Amendment Institute at
Columbia University and American Oversight to Intervene for the
Purpose of Seeking a Stay of Proceedings, filed Feb. 9, 2026.............................775

TAB 672

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 672

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON**

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.

**DONALD J. TRUMP**,
**WALTINE NAUTA**, and
**CARLOS DE OLIVEIRA**,

      Defendants.

_____/

**ORDER GRANTING MOTION TO DISMISS SUPERSEDING INDICTMENT**
**BASED ON APPOINTMENTS CLAUSE VIOLATION**

Former President Trump's Motion to Dismiss Indictment Based on the Unlawful Appointment and Funding of Special Counsel Jack Smith is **GRANTED** in accordance with this Order [ECF No. 326]. The Superseding Indictment is **DISMISSED** because Special Counsel Smith's appointment violates the Appointments Clause of the United States Constitution. U.S. Const., Art. II, § 2, cl. 2. Special Counsel Smith's use of a permanent indefinite appropriation also violates the Appropriations Clause, U.S. Const., Art. I, § 9, cl. 7, but the Court need not address the proper remedy for that funding violation given the dismissal on Appointments Clause grounds. The effect of this Order is confined to this proceeding.

## INTRODUCTION

The Motion before the Court challenges the legality of Special Counsel Smith (hereinafter, "Special Counsel Smith" or "Special Counsel") in two consequential respects, both of which are matters of first impression in this Circuit, and both of which must be resolved before this

prosecution proceeds further [ECF No. 326]. The first is a challenge to his appointment under the Appointments Clause, which provides the exclusive means for appointing "Officers of the United States." Article II, § 2, cl. 2. The Appointments Clause sets as a default rule that all "Officers of the United States"—whether "inferior" or "principal"—must be appointed by the President and confirmed by the Senate. *Id.* It then goes on to direct that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in Heads of Departments." *Id.* For purposes of this Order, the Court accepts the Special Counsel's contested view that he qualifies as an "inferior Officer," not a "principal" one, although the Court expresses reservations about that proposition and addresses those arguments below. The Motion's second challenge is rooted in the Appropriations Clause, which prohibits any money from being "drawn from the Treasury" unless such funding has been appropriated by an act of Congress. Art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law. . . .").

Both the Appointments and Appropriations challenges as framed in the Motion raise the following threshold question: is there a statute in the United States Code that authorizes the appointment of Special Counsel Smith to conduct this prosecution? After careful study of this seminal issue, the answer is no. None of the statutes cited as legal authority for the appointment—28 U.S.C. §§ 509, 510, 515, 533—gives the Attorney General broad inferior-officer appointing power or bestows upon him the right to appoint a federal officer with the kind of prosecutorial power wielded by Special Counsel Smith. Nor do the Special Counsel's strained statutory arguments, appeals to inconsistent history, or reliance on out-of-circuit authority persuade otherwise.

The bottom line is this: The Appointments Clause is a critical constitutional restriction stemming from the separation of powers, and it gives to Congress a considered role in determining the propriety of vesting appointment power for inferior officers.  The Special Counsel's position effectively usurps that important legislative authority, transferring it to a Head of Department, and in the process threatening the structural liberty inherent in the separation of powers.  If the political branches wish to grant the Attorney General power to appoint Special Counsel Smith to investigate and prosecute this action with the full powers of a United States Attorney, there is a valid means by which to do so.  He can be appointed and confirmed through the default method prescribed in the Appointments Clause, as Congress has directed for United States Attorneys throughout American history, *see* 28 U.S.C. § 541, or Congress can authorize his appointment through enactment of positive statutory law consistent with the Appointments Clause.

This Order proceeds as follows.  After laying forth pertinent factual and procedural background leading to the present Motion, the Court summarizes the legal principles underlying the Appointments Clause and the separation-of-powers doctrine on which it rests.  The Court then surveys the statutory structure of the Department of Justice, focusing on the provisions which grant the Attorney General appointment authority.  Following that contextual summary, the Court engages with the text, context, and structure of each of the statutes cited in the Appointment Order.  Finding no officer-appointing authority in the cited statutes—and seeing no reason in the mixed historical record to deviate from the absence of such authority—the Court addresses the Supreme Court's dictum with respect to those statutes in *United States v. Nixon*, 418 U.S. 683, 694 (1974).  As the *Nixon* decision and record bear out, the Attorney General's statutory appointment authority, or the matter of the Appointments Clause more generally, was not raised, argued, disputed, or analyzed; at most, the Supreme Court assumed without deciding that the Attorney General

possessed statutory appointment authority over the special prosecutor involved in that action. Following the discussion of *Nixon* and related out-of-circuit precedent, the Court turns to the question whether Special Counsel Smith is a principal officer requiring Presidential nomination and Senatorial consent. On that issue, although there are compelling arguments in favor of a principal-officer designation given the regulatory framework under which he operates, the Court rejects the position based on the available Supreme Court guidance. The Court then examines the question of remedy, concluding that dismissal of this action is the only appropriate solution for the Appointments Clause violation. Finally, the Court considers the Appropriations Clause challenge to the funding of Special Counsel Smith, concluding for many of the same reasons that Congress has not authorized the appropriation of money to be drawn for the expenses of his office. The Order concludes there, finding it unnecessary under the current posture to reach the remedy question for the Appropriations Clause violation.

<div align="center">

**PROCEDURAL HISTORY AND OVERVIEW OF MOTION**

</div>

On June 8, 2023, a grand jury in the Southern District of Florida returned an indictment, signed by the Special Counsel, charging former President Trump with thirty-one counts of willful retention of national defense information in his Mar-a-Lago residence, in violation of 18 U.S.C. § 793(e) [ECF No. 3]. The indictment also brought seven conspiracy and concealment charges against Trump and Waltine Nauta, collectively and/or individually [ECF No. 3 (charging 18 U.S.C. §§ 1512(k), 1512(b)(2)(A), 1512(c)(2), 1519, 1001(a)(2), 2)]. On July 27, 2023, the grand jury returned a Superseding Indictment, also signed by the Special Counsel, increasing the number of total charges to forty-two, and adding a third defendant, Carlos De Oliveira [ECF No. 85].

On February 22, 2024, Trump filed the instant Motion [ECF No. 326].[1]   The Special Counsel filed an Opposition on March 7, 2024 [ECF No. 374], and Trump filed a Reply on March 24, 2024 [ECF No. 414].[2]   Three sets of *amicus* parties filed briefs on the Appointments Clause question [ECF Nos. 364-1, 586–587, 618 ("Meese *amici*"); ECF No. 410-2 ("Landmark Legal *amici*"); ECF No. 429 ("Constitutional Lawyers *amici*")].   And the Court later ordered and received supplemental briefing addressing the need for factual development on the Motion [ECF No. 588; *see* ECF No. 617, 619–620].   Finally, on June 21 and 24, 2024, the Court heard lengthy oral argument on the Motion from the parties and the authorized *amici*.[3]

The Motion seeks dismissal of the Superseding Indictment "based on the unlawful appointment and funding of Special Counsel Jack Smith" [ECF No. 326].   The Motion argues that his appointment violates the Appointments Clause for two basic reasons: (1) Special Counsel Smith was not nominated by the President or confirmed by the Senate, as would be required for the appointment of a principal officer or for the appointment of an inferior officer as to which Congress has not authorized such appointment, and (2) even accepting the position that he qualifies as an inferior officer, none of the statutes cited in the Appointment Order, *see* 28 U.S.C. §§ 509, 510, 515, 533, vests the Attorney General with authority to appoint a special counsel "with the full power and authority to exercise all investigative and prosecutorial functions of any United States Attorney," as is the case with Special Counsel Smith, *see* 28 C.F.R. § 600.6.   The Motion

---

[1] Defendants De Oliveira and Nauta join the Motion [ECF Nos. 331, 611].

[2] Defendant Trump stood trial in New York state criminal court from April 15, 2024, through late May 2024 [ECF No. 421].

[3] The Appointments Clause challenge was argued on June 21, 2024; the Appropriations Clause challenge was argued on June 24, 2024.   Transcripts for these hearings can be located at ECF Nos. 647 and 648.

separately raises an Appropriations Clause challenge because (1) he is drawing on a permanent indefinite appropriation reserved for an "independent counsel" under a statutory appropriation that does not apply to him, *see* Department of Justice Appropriations Act of 1988, Pub. L. No. 100-202, 101 Stat. 1329 (Dec. 22, 1987) (hereinafter, "Indefinite Appropriation"); and (2) there is no "other Law" authorizing the appropriation as to him [ECF No. 326].

The Special Counsel opposes both challenges.  As to the Appointments Clause issue, he urges that the Attorney General exercised statutory authority in 28 U.S.C. §§ 515 and 533 to appoint him, citing the Supreme Court's decision in *United States v. Nixon*, 418 U.S. 683 (1974), D.C. Circuit authority, and historical practice [ECF No. 374 pp. 1–16].  As to the Appropriations Clause issue, Special Counsel Smith argues that he lawfully draws from the Indefinite Appropriation for independent counsels, because he retains substantial independence from the Attorney General and was appointed pursuant to "other law" in the form of the same statutes cited above—28 U.S.C. §§ 515 and 533.   In any case, Special Counsel Smith continues, any appropriations defect should not result in dismissal of the Superseding Indictment because the Department could lawfully have drawn funds from another source to investigate and prosecute this action [ECF No. 374 p. 25].

## FACTUAL BACKGROUND

### I.      Smith Appointment Order

On November 18, 2022, by Order Number 5559-2022, Attorney General Garland appointed John L. Smith, an attorney from outside the United States Government, to serve as

Special Counsel for the United States Department of Justice.[4]  Special Counsel Smith was not nominated by the President or confirmed by the Senate.

The Appointment Order states that Attorney General Garland is "vested" with appointment authority to issue the Appointment Order pursuant to 28 U.S.C. §§ 509, 510, 515, 533—statutes discussed further below.  The Appointment Order then authorizes the Special Counsel to conduct two specified "ongoing investigation[s]" and to "prosecute federal crimes arising from" those investigations.  Appointment Order at 1–2.  The first investigation relates to "efforts to interfere with the lawful transfer of power following the 2020 presidential election."  *Id.* at 1.  The second investigation is "referenced and described in the United States' Response to Motion for Judicial Oversight and Additional Relief, *Donald J. Trump v. United States*, No. 9:22-CV-81294-AMC (S.D. Fla. Aug. 30, 2022) (ECF No. 49 at 5–13), as well as any matters that arose or may arise directly from this investigation or that are within the scope of 28 C.F.R. § 600.4(a)."  *Id.* at 2.  The instant Superseding Indictment—and the only indictment at issue in this Order—arises from the latter investigation.

With respect to funding, all parties agree that Special Counsel Smith's office has been funded since its inception using "a permanent indefinite appropriation . . . established within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. § 591 et seq. [now expired] or other law."  101 Stat. 1329.  This is a limitless appropriation.  As of September 2023, Special

---

[4] The Appointment Order is made part of the record on this Motion and is referred to herein as the "Appointment Order."  *See* https://www.justice.gov/d9/press-releases/attachments/2022/11/18/2022.11.18_order_5559-2022.pdf.  The Department of Justice's main webpage contains an "Oversight" category with links to webpages for various Special Counsel's Offices, including that of Jack Smith.  https://www.justice.gov/agencies/chart/grid; https://www.justice.gov/sco-smith.

Counsel Smith's Statement of Expenditures reflects $12,807,668 in direct expenses drawn from the Indefinite Appropriation, plus an additional $11,096,601 in "component" expenses "attributable to this investigation," also drawn from the Indefinite Appropriation.[5]

## II.   Special Counsel Regulations

At the end of the Appointment Order, there is the following reference to Department of Justice regulations: "Sections 600.4 to 600.10 of title 28 of the Code of Federal Regulations are applicable to the Special Counsel."   Appointment Order at 2.   Those regulations, hereinafter referred to as the "Special Counsel Regulations" or "Regulations," are in force today, and they stem from a Final Rule promulgated by the Office of the Attorney General in July 1999 and later codified at 28 C.F.R. §§ 600.1 through 600.10.   *See* Office of Special Counsel, 64 Fed. Reg. 37038 (July 9, 1999).[6]   The Notice of Final Rule states that the regulations "replace the procedures for appointment of independent counsel pursuant to the Independent Counsel Reauthorization Act of 1994," and it cites as statutory authority the following seven statutes in Title 28, Chapter 31 of the United States Code: 28 U.S.C. §§ 509, 510, 515–519.[7]

The Special Counsel Regulations consist of ten sections spanning various topics, ranging from jurisdiction, power, staffing, conduct, and accountability, among others.   28 C.F.R. §§ 600.1–600.10.   As most relevant here, and as explored more fully below, the Special Counsel Regulations

---

[5] Special Counsel's Office – Smith Statement of Expenditures, November 18, 2022 through March 31, 2023; Special Counsel's Office – Smith Statement of Expenditures, April 1, 2023 through September 30, 2023.   See https://www.justice.gov/sco-smith (last visited July 13, 2024).   No additional financial statements have been published yet.

[6] This rule was deemed exempted from the notice and comment requirements of the Administrative Procedure Act on the view that it "relate[d] to matters of agency management or personnel."   64 Fed Reg. at 37041.

[7] 28 U.S.C. § 533, cited in the Appointment Order, is not among the authorizing statutes listed in the Final Rule.

➢ declare the grounds for appointing a Special Counsel from "outside the United States Government," *id.* §§ 600.1, 600.3 (referencing "a conflict of interest for the Department or other extraordinary circumstance");

➢ direct the Attorney General to "establish[]" the "jurisdiction of a Special Counsel" through a "specific factual statement of the matter to be investigated," with any expansion of that jurisdiction to be determined by the Attorney General, *id.* § 600.4(a)–(b);

➢ authorize the Special Counsel to wield, "within the scope of his or her jurisdiction, the full power and independent authority to exercise all investigative and prosecutorial functions of any United States Attorney," *id.* § 600.6, and without being "subject to the day-to-day supervision of any official of the Department," *id.* § 600.7(b);

➢ permit the Attorney General to remove the Special Counsel but only "for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Departmental policies," *id.* § 600.7(d);

➢ give the Special Counsel discretion to "determine whether and to what extent to inform or consult with the Attorney General or others within the Department about the conduct of his or her duties and responsibilities," *id.* § 600.6;

➢ permit (but do not require) the Attorney General to seek explanations from the Special Counsel about "any investigative or prosecutorial step," *id.* § 600.7(b);

➢ dictate that the Special Counsel "shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice," *id.* § 600.7(a); and

➢ authorize the Attorney General, on a permissive basis, and after "review," to determine that a particular action of the Special Counsel should not be pursued because it is "so inappropriate or unwarranted under established Departmental practices," *id.* § 600.7(b)—except that if the Attorney General makes that determination, he must notify Congress of his decision to countermand the Special Counsel, *id.* § 600.9.

Distilled down for present purposes, the Special Counsel Regulations mandate that the Special Counsel be selected from outside the Department, and then they empower that outside attorney to exercise "all investigative and prosecutorial functions of any United States Attorney" within his jurisdiction. *Id.* § 600.6.

### III.     Independent Counsel Act, *Morrison v. Olson*, and Lapse of Independent Counsel Act

Prior to promulgation of the Special Counsel Regulations—specifically, from 1978 through 1999 (with a two-year gap between 1992 and 1994)—there was a statute that expressly authorized the appointment of independent counsels.  That statute was the now-expired Independent Counsel Act, passed as part of the Ethics in Government Act of 1978.  Pub. L. No. 95–521, §§ 601–04, 92 Stat. 1824, 1867–75, *as amended by* Pub. L. No. 97–409, 96 Stat. 2039 (1983), Pub. L. No. 100–191, 101 Stat. 1293 (1987), Pub. L. No. 103–270, 180 Stat. 732 (1994).

Under the now-expired Independent Counsel Act, Congress authorized the Attorney General—after finding "reasonable grounds to believe that further investigation [was] warranted"—to request that a three-judge panel (termed "division of the court") appoint an "independent counsel" to "fully investigate and prosecute" violations of federal criminal law by certain categories of executive persons, including Presidents and former Presidents for a year after leaving office.  28 U.S.C. § 591(a)–(b); *id.* § 592(c)(1)(A), (d).  Under that framework, the judicial division would "appoint an appropriate independent counsel" from outside the United States government and "define that independent counsel's prosecutorial jurisdiction."  *Id.* § 593(b)(1)–(2); *see also id.* § 593(c) (authorizing judges to "expand the prosecutorial jurisdiction of an independent counsel").  Once appointed, the independent counsel would have the "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department of Justice."  *Id.* § 594(a).

The legality of the Independent Counsel Act took center stage in *Morrison v. Olson*, 487 U.S. 654 (1988), a suit challenging and upholding the statute under the Appointments Clause and

other constitutional provisions and principles.[8]  In 1994, after *Morrison*, Congress reauthorized

the Independent Counsel Act in accordance with its five-year sunset provision.  28 U.S.C. § 599.[9]

But then in 1999, when the matter of reauthorization returned to the legislative table—and in the

wake of meaningful criticism of the Act[10]—Congress let the Act expire and has never reauthorized

it since.  At that time, then-Attorney General Janet Reno opposed reauthorization in a public

statement to Congress.[11]  Attorney General Reno expressed various criticisms of the Act[12] and

called for a return to what she described as a "non-statutory independent counsel" built on a set of

preexisting regulatory procedures that were premised on the Attorney General's "authority to

---

[8] The Supreme Court rejected related challenges to the appointment under Articles II and III of the Constitution.  *Id.* at 684, 678–696.

[9] Congress reauthorized the Act in 1983 and 1987 but then let it expire in 1992, ultimately reauthorizing it in 1994.  *See* Ethics in Government Act Amendments of 1982, Pub. L. No. 97-409, 96 Stat. 2039 (1983); Independent Counsel Reauthorization Act of 1987, P.L. 100-191, 101 Stat. 1293 (1987); Independent Counsel Reauthorization Act of 1994, P.L. 103-270, 108 Stat. 732 (1994).

[10] Brett M. Kavanaugh, *The President and the Independent Counsel*, 86 Geo. L.J. 2133, 2135–2137 (1998) (recommending that Congress enact an amended statute authorizing the President to appoint a special counsel, with advice and consent of Senate).

[11] *See* Statement of Attorney General Janet Reno Concerning the Independent Counsel Act, Committee on Governmental Affairs, United States Senate (Mar. 17, 1999), *available at* https://www.justice.gov/archive/ag/testimony/1999/aggovern031799.htm.

[12] Attorney General Reno observed that the Act "distort[ed]" the process of prosecutorial discretion by "creat[ing] a new category of prosecutors" with "no practical limits on their time or budgets," thus artificially incentivizing prosecution; vested an independent counsel "with the full gamut of prosecutorial powers, but with little of its accountability"; applied too broadly to various categories of public officials, most of whom could be prosecuted by the Department of Justice without conflicts; contained an unduly broad and malleable "triggering mechanism," resulting in appointments that ordinarily would not have been sought; created disputes about the independent prosecutor's jurisdiction; made removal of an independent counsel by the Attorney General politically difficult; and contained a final-report requirement that "created a forum for unfairly airing a target's dirty laundry," among other issues.  *Id.*

appoint a special prosecutor when the situation demands it." *Id.* Then, a day after the Independent

Counsel Act expired, the same Special Counsel Regulations described above came into being to

"replace the procedures for appointment" under the lapsed Act. *See* 64 Fed. Reg. 37038-01.

As noted, the Special Counsel Regulations have remained in place without change since

their effective date in July 1999, with at least one unsuccessful legislative effort in 2019 to enact

a special counsel statute.[13] No such special counsel statute exists today, and no such statute existed

in November 2022 when Attorney General Garland issued the Appointment Order.

## APPOINTMENTS CLAUSE DISCUSSION

### I.      Background Legal Principles

Article II, Section 2, Clause 2:

> *He shall have Power, by and with the Advice and Consent of the Senate, to make*
> *Treaties, provided two thirds of the Senators present concur; and he shall*
> *nominate, and by and with the Advice and Consent of the Senate, shall appoint*
> *Ambassadors, other public Ministers and Consuls, Judges of the supreme Court,*
> *and all other Officers of the United States, whose Appointments are not herein*
> *otherwise provided for, and which shall be established by Law: but the Congress*
> *may by Law vest the Appointment of such inferior Officers, as they think proper, in*
> *the President alone, in the Courts of Law, or in the Heads of Departments.*

Art. II, § 2, cl. 2.

The Appointments Clause "prescribes the exclusive means of appointing 'Officers of the

United States.'" *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 244 (2018). An "Officer of the

United States," as distinct from a non-officer employee, is any appointee who exercises

"significant authority pursuant to the laws of the United States," *Buckley v. Valeo*, 424 U.S. 1, 126

(1976), and who occupies a "'continuing' position established by law," *Lucia*, 585 U.S. at 245

(quoting *United States v. Germaine*, 99 U.S. 508, 511–12 (1878)); *Edmond v. United States*, 520

---

[13] *See* S. 71, 116th Cong. (2019) (proposed legislation copying Special Counsel Regulations almost
verbatim).

U.S. 651, 662 (1997) ("The exercise of 'significant authority pursuant to the laws of the United States; marks, not the line between principal and inferior officer for Appointments Clause purposes, but rather, as we said in *Buckley*, the line between officer and nonofficer." (quoting *Buckley*, 424 U.S. at 126)).

The Appointments Clause establishes "two classes" of Constitutional officers: "principal" officers and "inferior" officers. *Germaine*, 99 U.S. at 509–10.[14] Principal officers must be appointed by the President, with the advice and consent of the Senate. Art. II, § 2, cl. 2; *Edmond*, 520 U.S. at 659; *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021). That mechanism—Presidential nomination and Senatorial confirmation—is the "default manner of appointment" for principal and inferior officers. *Arthrex, Inc.*, 594 U.S. at 12. But the Appointments Clause provides another means to facilitate inferior-officer appointments, and it does so through the so-called "Excepting Clause." *Edmond*, 520 U.S. at 660. That clause permits Congress—"by law," and as it "thinks proper"—to "vest" the appointment of such inferior officers in three places, and only three places: "in the president alone, in the Courts of Law, or in the Heads of Departments." Art. II, § 2, cl. 2. But "any decision to dispense with Presidential appointment and Senate confirmation *is Congress's to make*, not the President's." *Weiss v. United States*, 510 U.S. 163, 187 (1994) (Souter, J., concurring) (emphasis added); *United States v. Perkins*, 116 U.S. 483, 485 (1886) ("The head of a department has no constitutional prerogative of appointment to offices independently of the legislation of congress, and by such legislation he must be governed, not only in making appointments, but in all that is incident thereto.").

Importantly, the Framers considered, and initially maintained, a proposal by which the President alone would have had the authority to "'appoint officers in all cases not otherwise

---

[14] The principles governing inferior versus principal officer are explored below. *Infra* pp. 67–80.

provided for by this Constitution.'" *Morrison*, 487 U.S. at 675 (quoting 1 Records of the Federal Convention of 1787, pp. 183, 185 (M. Farrand ed. 1966)).  That proposal, however, was replaced on September 15, 1787, when Gouverneur Morris moved to add the Excepting Clause to Article II, which was adopted shortly thereafter.  That left Congress with an important—though circumscribed—role in vesting appointment authority for inferior officers.  *Id.*  The Framers' rejection of unilateral executive-appointment authority traces its roots to the American colonial experience with the English monarchy and to the Framers' desire to limit executive aggrandizement by requiring shared legislative and executive participation in the area of appointments.  *See Edmond*, 520 U.S. at 559–660; *Freytag v. Comm'r*, 501 U.S. 868, 884 (1991) (examining historical sources on the subject of executive appointment-power abuses); *Weiss*, 510 U.S. at 184 (1994) (Souter, J., concurring) (discussing Framers' awareness of the English monarchy's pre-revolutionary "manipulation of official appointments" and corresponding recognition "that lodging the appointment power in the President alone would pose much the same risk as lodging it exclusively in Congress: the risk of an incautious or corrupt nomination." (internal quotation marks and brackets omitted)); *Trump v. United States*, 144 S. Ct. 2312, 2349 (2024) (Thomas, J., concurring).

For these and other reasons, and as the Supreme Court has emphasized, the Appointments Clause is "more than a matter of 'etiquette or protocol'; *it is among the significant structural safeguards of the constitutional scheme*."  *Edmond*, 520 U.S. at 659 (quoting *Buckley*, 424 U.S. at 124 (emphasis added)); *see Buckley*, 424 U.S. at 132 (referring to the Appointments Clause as setting forth "well-established constitutional restrictions stemming from the separation of powers").  Indeed, it is rooted in the separation of powers fundamental to our system of government and to the limitations built into that structure—all of which aim to prevent one branch from

aggrandizing itself at the expense of another. *Freytag*, 501 U.S. at 878 ("The roots of the separation-of-powers concept embedded in the Appointments Clause are structural and political. Our separation-of-powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch."). The Appointments Clause also preserves "the Constitution's structural integrity by preventing the diffusion of the appointment power" and thus enhancing democratic accountability. *Id*. at 878; *id.* at 884–86 (explaining that the Appointments Clause protects democratic accountability by limiting "the distribution of the appointment power" to "ensure that those who wielded it were accountable to political force and the will of the people"); *Ryder v. United States*, 515 U.S. 177, 182 (1995).

Turning to the Excepting Clause more specifically, the Appointments Clause requires that any Congressional decision to vest inferior-officer appointment power must be made by "Law"— meaning statutory law, as all parties rightly agree [ECF Nos. 326 pp. 4–5; ECF No. 374 pp. 3–4]. Art. II, § 2 cl. 2. This "Law," it bears noting, is a means by which Congress, in the words of the Clause, can express its determination of whether it is "proper" to vest such appointment power in one of the three circumscribed repositories. *Id.* (providing that "Congress may *by Law* vest the Appointment of such inferior Officers, *as they think proper*, in the President alone, in the Courts of Law, or in the Heads of Departments") (emphasis added). Congress thus retains a critical role in determining which offices to create and whom to vest with inferior-officer appointment power. And that role cannot be usurped or minimized, for doing so would "'breach . . . the national fundamental law'" of separation of powers and violate the principle that "[a]ll Legislative power . . . shall be vested in . . . Congress." *Buckley*, 424 U.S. at 122 (quoting *Hampton & Co. v. United States*, 276 U.S. 394 (1928)); *see* Art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of

Representatives.").[15]   Put another way, there can be no expansion of the vesting power beyond

what is permitted in the Clause, and there can be no usurpation of the appointment power "by

indirection." *Buckley*, 424 U.S. at 135–36; *Myers v. United States*, 272 U.S. 52, 164 (1926) (stating

that the Excepting Clause must be "strictly construed" and not "extended by implication").

Pausing for a moment to distill the key principles so far, the following points stand out:

➢ The Appointments Clause reflects a carefully crafted system, rooted in the separation
  of powers, by which the Executive and Legislative branches jointly participate in
  appointments, exerting limitations upon each other, ensuring "public accountability,"
  and "curb[ing] Executive abuses." *Edmond*, 520 U.S. at 659.

➢ Congress retains a pivotal role in the appointment sphere, a role that cannot be usurped
  or expanded. *Freytag*, 501 U.S. at 878.

➢ The Appointments Clause imposes a mandatory and exclusive procedure that must be
  enforced according to its plain meaning, without exception. *Buckley*, 424 U.S. at 127,
  132, 138–39 (rejecting effort to read Appointments Clause "contrary to its plain
  language" and insisting upon strict compliance with the Clause); *Myers*, 272 U.S. at
  164 (stating that the Appointments Clause must be "strictly construed" and not
  "extended by implication").

There is an additional background legal topic, and it concerns the degree of clarity with

which Congress must speak when expressing its intent to "vest" inferior-officer appointment

power.  In other words, should courts apply a "clear statement rule" in this context?  The Meese

*amicus* brief urges application of such a rule, arguing that requiring Congress to speak clearly

before determining that a statute permits deviation from the default appointment method is

warranted to preserve the structural separation-of-powers foundation and federalism features upon

which the Appointments Clause is built [ECF No. 364-1 pp. 19–20 (advocating for clear-statement

---

[15] *See also Lucia*, 585 U.S. at 263–64 (Breyer, J., concurring) ("The use of the words 'by Law' to
describe the establishment and means of appointment of 'Officers of the United States,' together
with the fact that Article I of the Constitution vests the legislative power in Congress, suggests that
(other than the officers the Constitution specifically lists) Congress, not the Judicial Branch alone,
must play a major role in determining who is an 'Office[r] of the United States.'  And Congress'
intent in this specific respect is often highly relevant.").

rule but defending position on the basis of ordinary statutory interpretation too)].  *See* Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment As Special Counsel Was Unlawful*, 95 Notre Dame L. Rev. 87, 115–16 (2019).  Trump appears to agree with these arguments, although not explicitly in "clear statement" terms.  And Special Counsel Smith seems to reject imposition of any rule of construction or presumption [ECF No. 374 pp. 11–14; *see* ECF No. 647 pp. 87–88].

Without purporting to survey the Supreme Court's "clear statement" jurisprudence, it is enough to say that clear statement rules have been applied as substantive canons of construction in various contexts to protect foundational constitutional guarantees, and usually to solve questions of ambiguity in statutory interpretation.  *See* Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 168 (2010); *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 735–36 (2022) (Gorsuch, J., concurring).[16]  Clear statement rules do not require Congress to "use magic words" or to "state its intent in any particular way," but they do require Congress to speak clearly— not merely "plausibly"—as discerned through traditional tools of statutory construction. *MOAC Mall Holdings LLC v. Transform Holdco LLC*, 598 U.S. 288, 298 (2023)); *Spector v. Norwegian*

---

[16] These include attempted waivers of federal and state sovereign immunity, *Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Centro de Periodismo Investigativo, Inc*., 598 U.S. 339, 346 (2023), *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024), *Seminole Tribe of Fla. v. Fla*., 517 U.S. 44, 55 (1996); efforts to impose retroactive liability, *Landgraf v. USI Film Products*, 511 U.S. 244, 265–66 (1994); attempts to grant agencies powers of "vast economic and political significance," *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs*., 594 U.S. 758, 764 (2021); federal preemption of state law and federal efforts to regulate areas of traditional state responsibility, *Bond v. United States*, 572 U.S. 844, 859 (2014), *Nixon v. Missouri Municipal League*, 541 U.S. 125, 128 (2004), *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 544 (1994); jurisdictional time bars affecting a court's adjudicatory capacity, *Wilkins v. United States*, 598 U.S. 152, 159 (2023); *Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 206 (2022); and in cases that could be described as implicating the balance between the federal branches, *Kucana v. Holder*, 558 U.S. 233, 237 (2010); *I.N.S. v. St. Cyr*, 533 U.S. 289, 298 (2001); *Davis v. Passman*, 442 U.S. 228, 246–47.

*Cruise Line Ltd.*, 545 U.S. 119, 139 (2005) (plurality opinion).  When a clear statement rule does apply, it can mean that a court chooses a lesser, though still tenable, interpretation of a statute as a means to protect significant constitutional values.  *Biden v. Nebraska*, 143 S. Ct. 2355, 2378 (2023) (Barrett, J., concurring) (noting that "the hallmark of a true clear-statement rule" is where a court "purports to depart from the best interpretation of the text").

There are reasons to believe that application of a clear statement rule would apply to the interpretation of statutes affecting the separation-of-powers balance animating the Appointments Clause.  Clear statement rules, as noted, generally apply "when a statute implicates historically or constitutionally grounded norms that we would not expect Congress to unsettle lightly." *Jones v. Hendrix*, 599 U.S. 465, 492 (2023).  And separation of powers norms ring strong here, where the Special Counsel's proffered statutory interpretations would displace the Senate from its ordinary and longstanding role of confirming United States Attorneys and give to the Executive seemingly unchecked power to create offices for outside prosecutors beyond the scheme designed in Title 28 of the United States Code.  Additionally, there are indications in the language of the Appointments Clause itself—specifically, its repeated reference to "Law" and to Congress's determination of what it "think[s] proper" for vesting purposes—that support requiring Congress to make its intent known with discernable clarity.  Article II, § 2, cl. 2.  And then there are cases specifically in the Appointments Clause context—principally *Edmond* and *Weiss*, discussed later—where the Supreme Court has insisted upon textual clarity when faced with more ambiguous language.[17]

---

[17] *Edmond*, 520 U.S. at 656–58 (recognizing clear statute granting appointment power and declining to find appointment power in a separate statute lacking similarly clear language); *Weiss*, 510 U.S. at 757 (recognizing that Congress knows how to speak clearly in the appointment context and then, on the basis of that Congressional know-how, declining to find appointment power in statutes that lacked sufficient precision); *Germaine*, 99 U.S. at 509–10; *Lucia*, 585 U.S. at 257 (Breyer, J., concurring) (agreeing with majority that Commission did not properly appoint ALJs

In any case, despite the appeal of applying a clear statement rule in this constitutional setting, the Court finds it unnecessary to do so and would reach the same conclusion in this Order regardless.  Neither party presses hard for or against such a rule; the Supreme Court has not expressly addressed whether a clear statement rule applies in the context of the Appointments Clause; and in any case, the Court is satisfied that standard tools of statutory interpretation suffice to discern whether the "Law" at issue, 28 U.S.C. § 515, 533, evinces a Congressional intent to "vest the Appointment" of inferior Officers in the Attorney General as the Special Counsel suggests.  *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006) (finding resort to clear statement rule unnecessary because the text and structure of the statute at issue showed that Congress did not intend a substantial alteration in federal-state relations).

## II.     Statutory Structure of Justice Department and Attorney General's Appointment Authority

Before delving into the particular statutes cited in the Appointment Order, the Court surveys the statutory structure of the Department of Justice, focusing on provisions that authorize the Attorney General to appoint officers and/or employees, and also noting Congress's displayed legislative agility in prescribing appointment methods within that structure.  Some of this material features later in this Order, but the Court deems it helpful to provide initial structural context for the discussion to follow.

Title 28 of the United States Code governs the Department of Justice, an executive department of the United States, 28 U.S.C. § 501, and it contains various structural chapters.  For present purposes, the most important are Chapter 31 for the Attorney General, 28 U.S.C. § 501–530D; Chapter 33 for the Federal Bureau of Investigation, 28 U.S.C. §§ 531–540d; and Chapter

_____

and then observing that "no other statutory provision . . . would permit the Commission to delegate the power to appoint its administrate law judges to its staff").

35 for United States Attorneys, 28 U.S.C. §§ 541–550.  Title 28 also includes chapters for the United States Marshals Service, 28 U.S.C. §§ 561–569; United States Trustees, 28 U.S.C. §§ 581–589b; the now-expired Independent Counsel, 28 U.S.C. §§ 591–599; and the Bureau of Alcohol, Tobacco, Firearms, and Explosives, 28 U.S.C. § 599a–599b.

In **Chapter 31**, Congress requires the President to "appoint, with the advice and consent of the Senate, an Attorney General of the United States" to serve as "head of the Department of Justice." *Id.* § 503.  Congress then provides for the Presidential appointment of various officers within the Department, all expressly "by and with the advice and consent of the Senate." *Id.* §§ 504, 504a, 505, 506.  These include a Deputy Attorney General, *id.* § 504; an Associate Attorney General, *id.* § 504a; a Solicitor General, *id.* § 505; and eleven Assistant Attorneys General, *id.* § 506; *see also* § 507.  In each of these statutes, Congress employs statutory language fully tracking the default manner of appointing principal officers in the Appointments Clause.  By contrast, in a separate section of the same chapter, Congress permits the Attorney General to appoint an Assistant Attorney General for Administration, a non-officer employee whom Congress expressly places in the competitive service. *Id.* § 507.

**Chapter 33** governs the Federal Bureau of Investigation (FBI).  The FBI is headed by a director appointed by the President, by and with the advice and consent of the Senate, for a term of ten years, who is paid under the Federal Executive Salary Schedule.  P. L. 90-351, Title VI, § 1101, 82 Stat. 236 (1968).[18]  Chapter 33 also authorizes the Attorney General, within his control of the FBI, and as discussed later in connection with 28 U.S.C. § 533, to "appoint officials" to "detect and prosecute crimes against the United States," to "assist in the protection" of the

---

[18] Prior to 1976, Congress authorized the Attorney General to appoint the FBI director, but then it switched course to the default appointment method.  28 U.S.C. § 532; *see* Oct. 15, 1976, P. L. 94-503, Title II, § 203, 90 Stat. 2427.

President and the Attorney General, and to conduct investigations "regarding official matters under the control" of the Departments of Justice and State.  28 U.S.C. § 533.

**Chapter 35** relates to United States Attorneys, and it directs the President, in mandatory terms, to "appoint, by and with the advice and consent of the Senate, a United States attorney for each judicial district"—further specifying that such United States attorneys "shall be appointed for a term of four years" and shall be "subject to removal by the President."  28 U.S.C. § 541.  It is undisputed, and correct, that all United States Attorneys (93 currently) have been appointed by the President and confirmed by the Senate throughout our Nation's history, except that Congress has permitted the Attorney General to appoint interim United States Attorneys with specific restrictions.  28 U.S.C. § 546 (limiting duration of terms and prohibiting Attorney General from appointing an interim United States Attorney "whose appointment by the President to that office the Senate refused to give advice and consent").  It also bears noting, in the context of the Attorney General's appointment authority, that 28 U.S.C. § 543 (within Chapter 35 for United States Attorneys) allows the Attorney General to "appoint attorneys to assist United States attorneys when the public interest so requires, including the appointment of tribal prosecutors," further indicating that such special attorneys are "subject to removal by the Attorney General."  28 U.S.C. § 543(a)–(b).  As discussed further *infra*, Special Counsel Smith does not rely on 28 U.S.C. § 543 to provide authority for his appointment, and he disavows any notion that he is "assisting" a United States attorney.[19]

---

[19] Chapter 37 addresses the United States Marshals Service and provides for a Director of the Service who is "appointed by the President, by and with the advice and consent of the Senate," 28 U.S.C. § 561, along with individual United States marshals in each judicial district, all of whom also are appointed by the President and confirmed by the Senate.  *Id.*  Chapter 39 is designated for United States Trustees, who are appointed by the Attorney General for various specified judicial districts, and who are "subject to removal by the Attorney General."  28 U.S.C. § 581.  Chapter 40A establishes "the Bureau of Alcohol, Tobacco, Firearms, and Explosives [ATF]," which is

There is one last piece in the United States Code in which the Attorney General is given appointment authority, and it is codified at **18 U.S.C. § 4041**.  That section, located within the Prisons and Prisoner Part of Title 18, and passed in 1948, authorizes the Attorney General to appoint the director of the Bureau of Prisons (BOP) who serves "directly under the Attorney General," and then also permits the Attorney General to "appoint such additional officers and employees as he deems necessary."  18 U.S.C. § 4041.

There are no other provisions in the United States Code of which the Court is aware that permit the Attorney General to appoint "officers" or employees.

## III.    Analysis of Statutes Cited in Appointment Order

The Court now proceeds to evaluate the four statutes cited by the Special Counsel as purported authorization for his appointment—28 U.S.C. §§ 509, 510, 515, 533.  The Court concludes that none vests the Attorney General with authority to appoint a Special Counsel like Smith, who does not assist a United States Attorney but who replaces the role of United States Attorney within his jurisdiction.

In considering each of these four provisions, the Court "begins where all such inquiries begin: with the language of the statute itself."  *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989).  This requires the Court to interpret statutory language according to its ordinary meaning, and to read it within the specific context in which it appears and within the broader context of the statute as a whole.  *See, e.g.*, *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (noting "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on

---

headed by a Director who "shall be appointed by the President, by and with the advice and consent of the Senate."  28 U.S.C. § 599A(a)(1)–(2).

context" (internal citation omitted)); *Regions Bank v. Legal Outsource PA*, 936 F.3d 1184, 1192 (11th Cir. 2019) ("The whole-text canon refers to the principle that a judicial interpreter should consider the entire text, in view of its structure and of the physical and logical relation of its many parts, when interpreting any particular part of the text." (internal quotation marks and brackets omitted)).

### A.  28 U.S.C. § 509

The first statute cited in the Appointment Order is 28 U.S.C. § 509, a generic provision vesting DOJ's functions in the Attorney General.  It is titled "Functions of the Attorney General," and it provides, in full, as follows:

> All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General except the functions—
>
>> (1) vested by subchapter II of chapter 5 of title 5 in administrative law judges employed by the Department of Justice;
>>
>> (2) of the Federal Prison Industries, Inc.; and
>>
>> (3) of the Board of Directors and officers of the Federal Prison Industries, Inc.

28 U.S.C. § 509.

Special Counsel Smith neither argues that Section 509 establishes an office, nor that it grants officer-appointing power to the Attorney General.  Indeed, it does neither of these.  It is a general statute simply declaring that the Attorney General is imbued with all functions of the Department and its agencies except in the limited instances of administrative law judges and private federal prisons.  No more discussion about Section 509 is necessary.

**B.  28 U.S.C. § 510**

The second statute cited in the Appointment Order is 28 U.S.C. § 510, a general provision

allowing the Attorney General to delegate his functions to officers, employees, and agencies of

DOJ.  The full text of Section 510, titled "Delegation of authority," provides as follows:

> The Attorney General may from time to time make such provisions as he considers
> appropriate authorizing the performance by any other officer, employee, or agency
> *of the Department of Justice* of any function of the Attorney General.

28 U.S.C. § 510 (emphasis added).

Special Counsel Smith does not classify or rely on Section 510 as an officer-appointing or

office-creating statute, nor is it.  Using similarly general phrasing as Section 509, Section 510

merely gives the Attorney General flexibility to authorize *existing* DOJ officers, employees, or

agencies to perform the functions of the Attorney General, consistent with the nature of those

functions.  *See* Calabresi & Lawson, *supra* at 107 (noting the authority granted in Section 510 to

delegate "*delegable* functions" (emphasis in original)).  Special Counsel Smith, as all agree, and

as required by the extant Special Counsel Regulations, was "selected from outside the United

States Government."  28 C.F.R. § 600.3(a).  No more discussion about Section 510 is necessary.

**C.  28 U.S.C. § 515**

The third statute cited in the Appointment Order is 28 U.S.C. § 515, titled "Authority for

legal proceedings; commission, oath, and salary for special attorneys."  28 U.S.C. § 515.  It

contains two subsections, quoted fully below:

> (a) The Attorney General or any other officer of the Department of Justice, or any
> attorney specially appointed by the Attorney General under law, may, when
> specifically directed by the Attorney General, conduct any kind of legal
> proceeding, civil or criminal, including grand jury proceedings and proceedings
> before committing magistrate judges, which United States attorneys are
> authorized by law to conduct, whether or not he is a resident of the district in
> which the proceeding is brought.

> (b) Each attorney specially retained under authority of the Department of Justice shall be commissioned as special assistant to the Attorney General or special attorney, and shall take the oath required by law. Foreign counsel employed in special cases are not required to take the oath. The Attorney General shall fix the annual salary of a special assistant or special attorney.

28 U.S.C. § 515.  Although Special Counsel Smith relies primarily on Section 515(b), the Court analyzes each subsection in turn.

### i.     Section 515(a)

Section 515(a) does not authorize the creation of any office and does not authorize the Attorney General to appoint anyone.  Nor does the Special Counsel meaningfully argue that it does.  As its text indicates, Section 515(a) simply declares that the Attorney General, any "officer of the Department of Justice," or any "attorney specially appointed by the Attorney General under law"—referring to previously existing special attorneys appointed under statutory law—are authorized to conduct legal proceedings "which United States attorneys are authorized by law to conduct," regardless of whether the litigating officer or special attorney resides in the district in which the proceeding is brought.  28 U.S.C. § 515(a).[20]  This is a provision conferring territorial flexibility to the Attorney General; it permits the Attorney General to use DOJ officers and previously appointed special attorneys to litigate on behalf of the United States, regardless of residency.  No more can be inferred from the text of Section 515(a), and again, Special Counsel Smith does not meaningfully rely on it as a source of officer-appointing power.

---

[20] To the extent Special Counsel Smith insinuates that "under law" in Section 515(a) does not require what it plainly says—that special attorneys must be appointed by the Attorney General under statutory law [ECF No. 374 p. 12]—no basis is provided for that atextual suggestion. *Trump*, 2024 WL 3237603, at *27 (Thomas, J., concurring).  The phrases "under law" in Section 515(a) and "under authority of the Department of Justice" in Section 515(b) plainly refer to statutory law *outside* of Section 515.  Any other reading would render these phrases surplusage. *See Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 621 (D.D.C. 2018) (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

ii.     **Section 515(b)**

The Court thus shifts to Section 515(b), where the Special Counsel devotes more attention. According to the Special Counsel, Section 515(b) "gives the Attorney General authority to appoint 'special attorneys' like the Special Counsel" [ECF No. 374 p. 11]. This is so, he contends, because (1) "'[s]pecially retained *under authority of the Department of Justice*' necessarily means specially retained by the Attorney General, who is head of the Department of Justice and vested with all of its functions and powers" [ECF No. 374 p. 11 (emphasis in original, quoting 28 U.S.C. § 515(b))]; (2) the terms "commissioned" and "specially retained" in the statute effectively mean "appoint" [ECF No. 374 pp. 11–12; *see* ECF No. 647 pp. 62–63]; and (3) the history of Section 515(b) "confirms that it provides appointment power" [ECF No. 374 p. 14; *see, e.g.*, ECF No. 647 p. 56]. These arguments cannot be squared with the statutory text, context, or history.

a.  **Ordinary Meaning**

Section 515(b), read plainly, is a logistics-oriented statute that gives technical and procedural content to the position of already-"*retained*" "special attorneys" or "special assistants" within DOJ. It specifies that those attorneys—again already *retained* in the past sense—shall be "commissioned," that is, designated, or entrusted/tasked, to assist in litigation (more on "commissioned" below). Section 515(b) then provides that those already-retained special attorneys or special assistants (if not foreign counsel) must take an oath; and then it directs the Attorney General to fix their annual salary. Nowhere in this sequence does Section 515(b) give the Attorney General independent power to appoint officers like Special Counsel Smith—or anyone else, for that matter.

This understanding of Section 515(b) as a descriptive statute about already-retained attorneys—rather than as a source of new appointment power—is confirmed by additional textual features within the provision itself.

First, as the district court in *Concord Mgmt. & Consulting LLC*, observed in evaluating a similar challenge, and as alluded to above, the statute uses the past participle tense of the word *retain*. 317 F. Supp. 3d at 621. Congress's use of a verb tense can be significant in evaluating statutes. *See, e.g.*, *Carr v. United States*, 560 U.S. 438, 448 (2010) (describing that "varied" verb tenses communicate different meanings). And that is so here, where the text of Section 515(b) plainly does not announce or give anyone the active power to "retain" anyone afresh but simply notes specific requirements or features about attorneys already "specially retained" in the past "under the authority of the Department of Justice." *Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 621 (observing that regardless of whether Section 515(b) refers to past or present conditions, it "does not appear to convey the power to bring those conditions about").

Second, absent from Section 515(b) is any reference to the verb "appoint," an active verb used in the Appointments Clause itself. Art. II, § 2, cl. 2. To justify that void, the Special Counsel says the Court should read the terms "specially retained" and "commissioned" in Section 515(b) as the functional equivalent of "appoint." The Court declines to engage in such linguistic distortion, nor is it aware of any vesting statute that uses those verbs as replacements for the verb "appoint." For starters, the term "appoint," on the one hand, and the terms "retain" or "commission," on the other, are not invariably interchangeable. *See In re Walter Energy, Inc.*, 911 F.3d 1211, 1143 (11th Cir. 2018) ("When a statute does not define a term, we often look to dictionary definitions for guidance."). Definitions of the verb "appoint" describe the filling of a more enduring—and often formal or official role or office. Black's Law Dictionary (4th ed. 1951)

(defining "appoint" as "[t]o designate, ordain, prescribe, nominate," and explaining that "'appoint' is used where exclusive power and authority is given to one person, officer, or body to name person to hold certain offices"); *see* Merriam-Webster's Collegiate Dictionary (11th ed. 2003) ("to name officially"); Oxford American Dictionary (3d ed. 2010) ("assign a job or role (to someone)").  This differs from definitions of "retain" and "commission," which often connote a narrower, mission- or task-specific hiring or charge.  *Retain*, Webster's Third New International Dictionary (1961) ("to keep in pay or in one's services" or "to employ (a lawyer) by paying a preliminary fee that secures a prior claim upon services in case of need"); *commission*, *id.* ("to endow with effective right or power" or "to appoint to a certain task, mission, function, or duty"); *retain*, Black's Law Dictionary (4th ed. 1951) ("[t]o continue to hold, have, use, recognize, etc., and to keep," and "[t]o engage the services of an attorney or counsellor to manage a cause").[21]

In any case, even accepting some degree of overlap among some of these definitions, it remains the case that the Supreme Court has been apprehensive to accept other statutory terms as stand-ins for the word "appoint" in the Appointments Clause context, recognizing that Congress consistently uses the word "appoint" rather than "terms not found within the Appointments Clause."  *See Edmond*, 520 U.S. at 657–58 (holding that statute's use of "assign" did not vest

---

[21] Many definitions of the transitive verb "commission" merely invoke the noun form of the word, "commission."  *E.g.*, Webster's Seventh New Collegiate Dictionary (1969) (defining the verb "commission" as "to furnish with a commission"); Webster's Third New International Dictionary (1961) (similar).  Notably, though, definitions of the noun "commission" convey the same task-specific—as opposed to role-oriented—meaning as the verb.  *See* Webster's Seventh New Collegiate Dictionary (1969) (defining noun "commission" as "a formal written warrant granting the power to perform various acts or duties" or "an authorization or command to act in a prescribed manner or to perform prescribed acts"); Webster's Third New International Dictionary (1961) (defining noun "commission" as "a formal written warrant or authority granting certain powers or privileges and authorizing or commanding the performance of certain acts or duties," referencing "an order to perform a particular task or carry out a work").

officer-appointing authority); *Weiss*, 510 U.S. at 171–72.[22]  Moreover—for the same verb-tense reasons as stated above—whatever possible linguistic overlap might exist between the present-tense formulations of the verbs "appoint," "retain," or "commission," Section 515(b) does not use them in that format, using instead the past participle adjective application.

All of this yields the following in terms of ordinary meaning for the terms "specially retained" and "commissioned as . . . special attorney" in Section 515(b): (1) "retained" essentially means employed or hired; (2) "commissioned" means designated, classified, or tasked in a role; and (3) together those phrases transmit the fairly mundane, descriptive point that already-hired attorneys within the Department shall be classified as special assistants or special attorneys and shall take an oath and have a fixed salary.  That is all that fairly can be extracted from Section 515(b).  There is no granting of appointment power in this language.

Nor, as the Special Counsel suggests, does the historical pedigree of Presidential "commissions" dating back to *Marbury v. Madison*, 5 U.S. 137 (1803), transform the adjective phrase "shall be commissioned . . . as special attorney" into an implicit grant of officer-appointment power for the Attorney General [ECF No. 374 p. 11].  True, as *Marbury* informs, the "last act to be done *by the President*" in making an appointment for a constitutional officer is "the signature of the commission," thus demonstrating his action "on the advice and consent of the senate to his own nomination."  *Id.* at 157 (emphasis added); *see* Art II, § 2, cl. 3 (Recess Appointment Clause).  But nothing in the language of Section 515(b) speaks in terms of a traditional Presidential appointment with Senate confirmation followed by the signing of an

---

[22] This is not to suggest, of course, that an appointment statute has to use "magic words" lest it fail the "appointment test."  *See Lucia*, 585 U.S. at 264 (Breyer, J., concurring).  But, as noted, the Supreme Court has demonstrated a preference for language that tracks the constitutional text, *see Edmond*, 520 U.S. at 657–58; *Weiss*, 510 U.S. at 171–72; *Germaine*, 99 U.S. at 510, and so has Congress, *see supra* pp. 47–50.

officer-level commission, as was the case in *Marbury*.  Far from it, for all of the reasons already stated.  Simply put, whatever historical relevance there is to take from the fact that Presidents— not Attorneys General—sign commissions for constitutional officers, it does nothing to alter the ordinary meaning of Section 515(b).

### b.  Statutory Context

The broader statutory context of Title 28—and the use of the term "special attorney" within that context, in particular, in Section 543—also refutes the Special Counsel's untenable reading of Section 515(b).  It is an axiom of statutory interpretation that "'identical words used in different parts of the same act are intended to have the same meaning.'" *See, e.g.*, *Gustafson v. Alloyd Co*., 513 U.S. 561, 570 (1995) (citing *Dep't of Revenue of Oregon v. ACF Indus., Inc.*, 510 U.S. 332, 342 (1994)); *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 231 (2020) (consistent usage canon); *Deal v. United States*, 508 U.S. 129, 132 (1993) (noting that it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").  It is also well settled that statutory provisions should be interpreted harmoniously, not in contradictory fashion, after considering the whole statutory scheme and context holistically.  *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988); *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 439 (1935) (Cardozo, J., dissenting).  These guideposts matter much here.

Section 515 was enacted in 1966 as part of a wide-scale government reorganization act across the Executive branch.  Act of Sept. 6, 1966, Pub. L. No. 89-554, 80 Stat. 378.  *See infra* pp. 34–36 (discussing predecessor statutory history of Section 515).  As relevant to Title 28, that legislation contained two other explicit references to "special attorneys" in the Department, both of which remain in force today: Section 543 and 519.  *Id.* §§ 515, 519, 543, 80 Stat. 378, 611–618.

Section 543—titled "Special attorneys"—gives the Attorney General authority to "appoint attorneys to assist United States attorneys when the public interest so requires." 28 U.S.C. § 543. And then Section 519 directs the Attorney General to supervise all litigation involving the United States or its officers by specifically providing that he "shall direct all United States attorneys, assistant United States attorneys, and *special attorneys appointed under section 543 of this title in the discharge of their duties*." 28 U.S.C. § 519 (emphasis added).

The term "special attorney" thus has a known meaning in Title 28 that coincides harmoniously with the broader statutory context. That meaning, per Section 543, consists of attorneys appointed by the Attorney General to *assist* United States Attorneys—a role Special Counsel Smith expressly disclaims [ECF No. 647 pp. 57–58]. This leaves Special Counsel Smith to offer a highly strained reading of "special attorney" in Section 515(b), which is that the term used in that provision somehow denotes a different category of "special attorney" than what Congress specifically created in Section 543 and then referenced again in Section 519—all within the same public law [*see* ECF No. 647 pp. 57–58]. Neither the statutory text of Section 515 nor its statutory context gives any reason to believe such discordancy matches congressional intent. *United States v. Castleman*, 134 S. Ct. 1405, 1417 (2014) ("[T]he presumption of consistent usage [is] the rule of thumb that a term generally means the same thing each time it is used [and] most commonly applie[s] to terms appearing *in the same enactment*.") (Scalia, J., concurring) (emphasis added). Nor is there any basis to believe that Congress, when it expressly designated the categories of attorneys within the Department whose duties the Attorney General must direct somehow omitted a separate fourth category of United States Attorney-like special counsels nowhere created

in the 1966 Act.  If Congress intended "special attorney" to mean something different in Section 515(b) than in Section 543, it could have used different language, but it did not.[23]

Zooming out beyond Sections 543 and 519 as contextual counterpoints, Congress repeatedly has demonstrated its ability to imbue the Attorney General with appointment power over officers and employees—yet Section 515 looks nothing like those examples.  In Section 546(a), for instance, codified in the same enactment as Section 515, Congress authorized the Attorney General to "appoint an [interim] United States attorney for the district in which the office of United States attorney is vacant."  *Id.* § 546(a).  Likewise, in 18 U.S.C. § 4041, Congress permitted the Attorney General to "appoint such additional officers and employees as he deems necessary [within BOP]." 18 U.S.C. § 4041.  And in Section 542(a), Congress authorized the Attorney General to "appoint one or more assistant United States attorneys."  28 U.S.C. § 542(a). Even more, Congress has shown its facility in vesting appointment power in Heads of Departments across the Executive Branch, ranging from the Secretary of Education, to Agriculture, to Transportation, and to Health and Human Services.  *See* 7 U.S.C. § 610(a) ("The Secretary of Agriculture may appoint such officers and employees . . . ."); 18 U.S.C. § 4041 ("The Attorney General may appoint such additional officers and employees as he deems necessary."); 49 U.S.C. § 323(a) ("The Secretary of Transportation may appoint and fix the pay of officers and employees of the Department of Transportation and may prescribe their duties and powers."); 20 U.S.C. § 3461(a) ("The Secretary is authorized to appoint and fix the compensation of such officers and employees, including attorneys, as may be necessary to carry out the functions of the Secretary and the Department."); 42 U.S.C. § 913 (The Secretary [of Health and Human Services] is

---

[23] It is true that Section 519 contains a cross-reference to Section 543 whereas Section 515(b) does not, but that technical omission in a numerical cross-reference simply cannot overcome the presumption of consistent usage of "special attorney" in the same enactment.

authorized to appoint and fix the compensation of such officers and employees. . . .").  None of those examples bears any resemblance to Section 515, and notably, all of the examples use the present tense, unlike Section 515.  *See Carr*, 560 U.S. at 449–451.

The Special Counsel has no response to this clear pattern of congressional appointment language, presumably on the general theory that Congress can avail itself of different legislative phrasing as it pleases [ECF No. 374].  But statutory context cannot be discounted, nor can clear statutory patterns be ignored.  Simply put, the Special Counsel's strained inferences about Section 515 do not make sense when viewed against the backdrop of Congress's clear and consistent ability to legislate in the appointments arena.

### c.  History:  Section 515's predecessor statutes, and the historical use of special-counsel-like figures.

Finding little support in the plain language of Section 515(b), the Special Counsel makes a series of unconvincing historical arguments that fail upon close scrutiny [ECF No. 374 p. 14 ("The history of Section 515 removes any question that it authorizes the Attorney General to appoint special attorneys such as the Special Counsel.")].  The relevant history, according to Special Counsel Smith, shows that Congress tacitly authorized—or silently acquiesced to—the use of Section 515 (or its predecessor statutes) to appoint "special attorneys" like himself [ECF No. 374 pp. 14–16; *see* ECF No. 647 pp. 58–62].  Upon review of the murky historical record, the Court determines that, whatever themes can be drawn from that background, they cannot supplant the plain language of the statute itself, which clearly does not vest the Attorney General with such authority.  *See In re BFW Liquidation, LLC*, 899 F.3d 1178, 1189–90 (11th Cir. 2018).

The Special Counsel's historical argument breaks into two parts: (1) Section 515's statutory history going back to 1870, and (2) the historical use of "special attorney"-like figures throughout American history.

### i. Statutory History

The currently codified version of Section 515(b) can be traced back to the establishment of the Department of Justice in 1870.  *See* An Act to Establish the Department of Justice, ch. 150, 16 Stat. 162, 164–65 (1870) (hereinafter, the "DOJ Act").  The relevant portion of that Act is provided below:

> And be it further enacted, That it shall not be lawful for the Secretary of either of the executive Departments to employ attorneys or counsel at the expense of the United States; but such Departments, when in need of counsel or advice, shall call upon the Department of Justice, the officers of which shall attend to the same; and no counsel or attorney fees shall hereafter be allowed to any person or persons, besides the respective district attorneys and assistant district attorneys, for services in such capacity to the United States, or any branch or department of the government thereof, unless hereafter authorized by law, and then only on the certificate of the Attorney-General that such services were actually rendered, and that the same could not be performed by the Attorney-General, or solicitor-general, or the officers of the department of justice, or by the district attorneys.  And every attorney and counselor who shall be specially retained, under the authority of the Department of Justice, to assist in the trial of any case in which the government is interested, shall receive a commission from the head of said Department, as a special assistant to the Attorney General, or to some one of the district attorneys, as the nature of the appointment may require, and shall take the oath required by law to be taken by the district attorneys, and shall be subject to all the liabilities imposed upon such officers by law.

*Id*. at § 17.  The latter portion of this section, which largely mirrors the text of the current statute, provides no new insights as to the meaning of Section 515 and contains no indication that any of the "specially retained" attorneys "authorized by law" to be hired do anything other than assist the Attorney General in a non-officer capacity.   Put another way, nothing in this language shows Congress's intent that "special assistants"—personnel authorized to "assist in the trial of any case in which the government is interested"—would function with the power of a United States Attorney.

Subsequent enactments do not dictate otherwise.  In 1930, Congress added the term "special attorney."  Pub. L. No. 71-133, ch. 174, 46 Stat. 170.[24]  And in 1948, Congress made some non-substantive changes to simplify the provision's wording.  Pub. L. No. 80-773, ch. 646, § 62 Stat. 869, 985–86.  Again, and mindful that "changes in statutory language generally indicate an intent to change the meaning of the statute," *Edwards v. Prime, Inc*., 602 F.3d 1276, 1299 (11th Cir. 2010) (citation omitted), these revisions do not indicate that Congress (1) intended the DOJ Act to authorize the appointment of private citizens; or (2) envisioned "special attorneys" as possessing the power or autonomy of contemporary special counsels.  Put simply, these amendments offer nothing new from a textual-analysis standpoint.[25]

Nevertheless, as Special Counsel Smith sees it, these amendments—and Congress's failure to object to the use of special attorneys in the intervening years—suggest that Congress "ratified" the Executive branch's use of Section 515 for this purpose [ECF No. 647 pp. 58–62; *see* ECF No. 374 pp. 15–16 ("Despite widespread use of special counsels before these enactments . . . Congress never questioned the Attorney General's power of appointment.")].  For the reasons that follow,

---

[24] Although resort to legislative history is unnecessary and generally ill advised, the Court notes that a House Report accompanying the 1930 amendment suggests that the addition of the phrase "special attorney"—to accompany the already-present "special assistant"—did not effectuate a substantive change to the DOJ Act: "The bill does not provide authority for any new appointments but merely permits commissions to issue to attorneys as special attorneys in those cases where the Attorney General feels that it is undesirable to use the title of 'special assistant to the Attorney General.'"  H.R. Rep. No. 71-229 (1930).  As far as the Court can tell, the terms "special assistant" and "special attorney" in Section 515 have the same functional meaning except, potentially, in who they assist—special assistants assisting the Attorney General; special attorneys assisting United States Attorneys, *see* 28 U.S.C. § 543—but any technical daylight between those non-officer employees has not been explored in caselaw.

[25]  Special Counsel Smith also describes the statutory history leading to Section 515(a) [ECF No. 374 p. 15].  Even if the Court were to accept the inferences drawn by Special Counsel Smith on this point, Section 515(a)'s predecessor statutes—much like the now-codified provision—have nothing to do with appointment power.

the Court declines to interpret Congress's silence on the intermittent, historical use of "special attorneys" as tantamount to acquiescence here. "Legislative silence is a poor beacon to follow in discerning the proper statutory route." *Zuber v. Allen*, 396 U.S. 168, 185 (1969); *id.* at n.21 (explaining that "[t]he verdict of quiescent years cannot be invoked to baptize a statutory gloss that is otherwise impermissible"); *cf. Rapanos v. United States*, 547 U.S. 715, 749–52 (2006) (discussing the limited utility of "congressional acquiescence"); *Regions Bank*, 936 F.3d at 1196 (same); *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985) ("[W]e are chary of attributing significance to Congress' failure to act . . . ."); *Bob Jones Univ. v. United States*, 461 U.S. 574, 600 (1983) ("Nonaction by Congress is not often a useful guide . . . .").

### ii.  Historical Practice

Special Counsel Smith argues that the use of special attorneys throughout American history "amply confirms the Attorney General's authority to appoint the Special Counsel here" [ECF No. 374 p. 16]. The Court disagrees. At most, the history reflects an ad hoc, inconsistent practice of naming prosecutors from both inside and outside of government (typically in response to national scandal) who possessed wildly variant degrees of power and autonomy. The lack of consistency makes it near impossible to draw any meaningful conclusions about Congress's approval of modern special counsels like Special Counsel Smith—much less its acquiescence to Section 515 as a vehicle for such appointments.

Special Counsel Smith's broad historical argument proceeds from two mistaken premises. The first is rooted in the notion that "past Attorneys General have 'made extensive use of special attorneys'" by "drawing on the authority to retain counsel originally conferred in 1870 [ECF No. 374 p. 16 (quoting *In re Persico*, 522 F.2d 41, 45–46 (2d Cir. 1975))]. This incorrectly assumes that "special attorneys" have consistently been appointed pursuant to Section 515 or one of its

predecessor statutes [ECF No. 374 p. 16].  But a review of historical appointments shows a far spottier picture.  Some "special attorneys" were appointed by regulation.  *E.g.*, 38 Fed. Reg. 30,739, *amended by* 38 Fed. Reg. 32,805 (appointing Leon Jaworski to investigate and prosecute the Watergate scandal).[26]  Some were appointed by statute.  *E.g.*, ch. 16, 43 Stat. 6 (1924) (directing President Coolidge to appoint, with Senate confirmation, special prosecutors to investigate Teapot Dome scandal).  Some were appointed by both.  *See In re Sealed Case*, 829 F.2d 50, 51–54 (D.C. Cir. 1987) (explaining how Independent Counsel Lawrence Walsh was appointed under the Independent Counsel Act *and* by separate regulation).  And some—as far as this Court can tell— were appointed without any formal statutory or regulatory authority at all.  *See* Terry Eastland, *Ethics, Politics, and the Independent Counsel* 8–9 (1989).[27]  Thus, it can hardly be said that Attorneys General have drawn consistently on Section 515 or its predecessor statutes as a source of appointment authority [*see* ECF No. 374 p. 16].

Nor is it true that "past Attorneys General" were solely and exclusively responsible for the act of appointment [*see* ECF No. 374 p. 16].  Notable nineteenth- and twentieth-century special prosecutors were appointed directly by U.S. Presidents.  Logan, *supra* at 10, 13, 28–29 (describing appointments by President Grant (with Senate confirmation) and President Truman).[28]  Moreover,

---

[26]  Appointing regulations themselves have cited an inconsistent patchwork of statutory authority. Crucially here, many such regulations did not cite Section 515 (or Section 533).  The regulation appointing Special Prosecutor Jaworksi serves as an example.  38 Fed. Reg. 30,739, *amended by* 38 Fed. Reg. 32,805 (citing 28 U.S.C. §§ 509, 510 and 5 U.S.C. § 301).  So does the regulation appointing Special Counsel Ken Starr to investigate the Whitewater scandal, which (interestingly) cited Section 543.  28 C.F.R. § 603.1 (citing 28 U.S.C. §§ 509, 510, 543 and 5 U.S.C. § 301).

[27]  *See also* David A. Logan, *Historical Uses of a Special Prosecutor: The Administrations of Presidents Grant, Coolidge and Truman* 7, 28–29 (Congressional Research Service Nov. 23, 1973); Andrew Coan, *Prosecuting the President* 23–40 (2019); [ECF No. 647 pp. 110–11].

[28]  These appointments do not appear to have been made by formal order or regulation.

the practices and protocol for removing such officers varied considerably. Some were removable—and were, in fact, removed—at will by Presidents, *see id.* at 12–13, 33–34 (discussing President Grant and Truman firing special prosecutors), whereas others were largely insulated from removal by certain statutory or regulatory features, *e.g.*, 38 Fed. Reg. 30,739, *amended by* 38 Fed. Reg. 32,805 (dramatically limiting President Nixon's power to remove Special Prosecutor Jaworski, following Nixon's firing of former Special Prosecutor Archibald Cox).

The second mistaken premise is that Special Counsel Smith is just another in a long line of "special attorneys" of similar ilk. In fact, very few historic special attorneys resemble Special Counsel Smith. For starters, the title "special counsel" is of fairly recent vintage. Special-attorney-like figures bore many titles throughout the decades. Special attorneys. Special assistants. Special prosecutors. Independent counsels. And most recently, special counsels. In the Court's view, this is not an insignificant semantic detail. *See* Kavanaugh, *supra* at 2136 n.5. As discussed below, it is emblematic of the variant backgrounds, roles, and authorities possessed by these historical figures.

Moreover, the appointment of private citizens like Mr. Smith—as opposed to already-retained federal employees—appears much closer to the exception than the rule. The historic cases cited in Special Counsel Smith's Opposition demonstrate as much [ECF No. 374 pp. 14–15]; *compare United States v. Crosthwaite*, 168 U.S. 375, 376 (1897) (appointing "special assistant" from within DOJ to aid in prosecution), *and United States v. Winston*, 170 U.S. 522, 524–25 (1898) (designating federal district attorney to serve as "special counsel" in another district), *and In re Persico*, 522 F.2d at 45–46 (appointing internal DOJ attorney to act as "Special Attorney" on organized crime "strike force"), *with United States v. Rosenthal*, 121 F. 862 (S.D.N.Y. 1903) (seeming to appoint private citizen as "special assistant to the Attorney General").

And while the past half century has shown an uptick in private-citizen special counsels, that practice is far from uniform. *Compare* Order No. 3915-2017 (appointing private citizen Robert Mueller as Special Counsel), *with* Letter from Acting Attorney General James B. Comey to Patrick J. Fitzgerald (Dec. 30, 2003) (appointing U.S. Attorney Patrick Fitzgerald as Special Counsel), *and* Order No. 4878-2020 (appointing U.S. Attorney John Durham as Special Counsel), *and* Order No. 5730-2023 (appointing U.S. Attorney David Weiss as Special Counsel).

Nor is it true that special attorneys have operated with the same degree of power and autonomy as Special Counsel Smith. Consider again the historic cases cited in the Opposition [ECF No. 374 pp. 14–15]: those cases featured special attorneys with varying degrees of authority, most of whom were subject to greater oversight than Special Counsel Smith. *See Crosthwaite*, 168 U.S. at 376 (describing "special assistant" whose authority was largely limited to aiding the U.S. Attorney, to whom he reported); *In re Persico*, 522 F.2d at 51–52 (describing special attorney as existing in a "tight bureaucratic hierarchy controlled by the Attorney General" and "under virtually constant specific direction and control").[29] [30]   Additionally, on several occasions, Congress has helped define and indeed controlled the degree and scope of special counsels'

---

[29]  The special attorney in *In re Persico* operated under the supervision of at least three separate higher-ranking members. 522 F.2d at 45. He functioned in an assisting capacity and lacked the independent authority to take various actions without approval. *See id.* at 45–46. "The situation here is quite unlike that we would face were the Attorney General to grant such a commission to a single person outside the bureaucratic structure who might take action and incur fiscal and other liabilities for the government without limit." *Id.* at 52.

[30]  The "Special Assistant to the Attorney General" featured in *Rosenthal* bears closer resemblance to Special Counsel Smith. He "appeared before [a] grand jury, and chiefly conducted the proceedings that resulted in the indictments" of several individuals involved in fraudulent importations of Japanese silks. *Rosenthal*, 121 F. at 865. In that case, however, the court determined that the special assistant was not an "officer" under the relevant statutes, nor did those statutes authorize him to appear before grand juries. *Id.* at 866–69. *See also supra* p. 35 n.25.

authority.  *See* Logan, *supra* pp. 30–31 (describing Congress's denial of President Truman's request that special prosecutor be given subpoena and immunity-granting power); *id.* p. 22 (detailing Senate's role in "direct[ing] the President to appoint special counsel" to investigate Teapot Dome).

And perhaps most importantly, Congress—historically, and in the present moment—has shown that it knows how to create offices for special counsels.  In 1924, Congress did so in response to the Teapot Dome scandal.  Ch. 16, 43 Stat. 6 ("[T]he President is further authorized and directed to appoint . . . special counsel who shall have charge and control of the prosecution of such litigation.").  In 1978, Congress passed the much-discussed (and now-defunct) Independent Counsel Act.  28 U.S.C. §§ 591 *et seq*.  In fact, there are statutes on the books *right now* that create offices for "special counsels" with unique jurisdictions.  5 U.S.C. §§ 1211–19 (establishing an "Office of Special Counsel" to protect federal employees from "prohibited personnel practices"); 8 U.S.C. § 1324b(c)(1) (establishing a "Special Counsel for Immigration-Related Unfair Employment Practices" to investigate and prosecute immigration-related employment offenses).[31]  All this stands to demonstrate that Congress knows how to legislate in this space.  And when it does, it does so expressly and unequivocally.

\*\*\*

In the end, there does appear to be a "tradition" of appointing special-attorney-like figures in moments of political scandal throughout the country's history.  But very few, if any, of these

---

[31]  The Court expresses no opinion on whether these "special counsels" are truly constitutional officers.  Notably, however, in both cases, Congress required these special counsels to be nominated by the President and confirmed by the Senate.  5 U.S.C. § 1211(b) ("The Special Counsel shall be appointed by the President, by and with the advice and consent of the Senate, for a term of 5 years."); 8 U.S.C. § 1324b(c)(1) ("The President shall appoint, by and with the advice and consent of the Senate, a Special Counsel for Immigration-Related Unfair Employment Practices . . . within the Department of Justice to serve for a term of four years.").

figures actually resemble the position of Special Counsel Smith.  Mr. Smith is a private citizen exercising the full power of a United States Attorney, and with very little oversight or supervision. When scrutinized, this spotty historical backdrop does not "amply confirm[] the Attorney General's authority to appoint the Special Counsel here" [ECF No. 374 p. 16].  Whatever marginal support the history may lend to Special Counsel Smith's position, the inconsistent patchwork of practices detailed above does not show that Congress ratified—or acquiesced to—the Executive's use of Section 515 (or its predecessor statutes) to appoint special counsels like Mr. Smith.  And it is far from sufficient to overcome the plain language of Section 515, which, as covered above, does not confer upon the Attorney General officer-appointing power but merely establishes procedures (oath and commission) for already retained special attorneys who act in an assistant capacity.  Special Counsel Smith is not an assistant.

### D.  28 U.S.C. § 533

The last statute cited in the Appointment Order and relied upon by the Special Counsel is 28 U.S.C. § 533 [ECF No. 374 pp. 12–14; *see* ECF No. 429 pp. 22–23].  Section 533 is housed within a chapter (Chapter 33) devoted to the FBI.  28 U.S.C. §§ 531–540d.  *See infra* pp. 50–52. It is titled "Investigative and other officials; appointment," and it permits the Attorney General to appoint four different types of "officials" as specified below

The Attorney General may appoint officials—

(1)    to detect and prosecute crimes against the United States;

(2)    to assist in the protection of the person of the President; and

(3)    to assist in the protection of the person of the Attorney General.

(4)    to conduct such other investigations regarding official matters under the control of the Department of Justice and the Department of State as may be directed by the Attorney General.

> This section does not limit the authority of departments and agencies to investigate crimes against the United States when investigative jurisdiction has been assigned by law to such departments and agencies.

28 U.S.C. § 533.[32]

As a preliminary point, the Appointment Order issued in November 2022 is the first appointment order or regulation that has cited Section 533 as a source of special-counsel-appointing authority. The Special Counsel Regulations promulgated in 1999, which replaced the Independent Counsel regime of the Independent Counsel Act, did not cite Section 533 as a source of authority. 28 C.F.R. §§ 600.1 *et seq.* (citing 5 U.S.C. § 301; 28 U.S.C. §§ 509, 510, 515–519). Nor did the regulation appointing the Special Prosecutor in *United States v. Nixon*, 418 U.S. 683 (1974). 38 Fed. Reg. 30738, *as amended by* 38 Fed. Reg. 32805 (citing 5 U.S.C. § 301; 28 U.S.C. §§ 509, 510). Nor did the Order appointing Special Counsel Robert Mueller, or any preceding special counsel appointing order. Order No. 3915-2017 (citing 28 U.S.C. §§ 509, 510, 515). In the Court's review, Section 533 was cited for the first time in 2022—in the Order appointing Special Counsel Smith—although it has twice been employed since then.[33]

Special Counsel Smith argues that Section 533(1) confers on the Attorney General the authority to appoint special counsels, specifically, constitutional officers wielding the "full power and independent authority . . . of any United States Attorney." 28 C.F.R. § 600.6. After careful review, the Court is convinced that it does not. Congress "does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001). Special Counsel

---

[32] The misplaced "and" following subsection (2)—which should properly follow subsection (3)—appears to stem from a 2002 amendment to Section 533. *See* Pub. L. 107-273, § 204(e), 116 Stat. 1758, 1776 (2022). This apparent drafting error does not impact the Court's statutory analysis.

[33] Order No. 5730-2023 (appointing David C. Weiss); Order No. 5588-2023 (appointing Robert K. Hur).

Smith's interpretation would shoehorn appointment authority for United States Attorney-equivalents into a statute that permits the hiring of FBI law enforcement personnel. Such a reading is unsupported by Section 533's plain language and statutory context; inconsistent with Congress's usual legislative practice; and threatens to undermine the "basic separation-of-powers principles" that "give life and content" to the Appointments Clause. *Morrison*, 487 U.S. at 715 (Scalia, J., dissenting). The Court explains below.

### i.     The term "officials" is not synonymous with "officers."

Section 533(1) authorizes the Attorney General to "appoint officials . . . to detect and prosecute crimes against the United States." 28 U.S.C. § 533(1). The parties dispute the proper interpretation of the term "officials." Defendants argue that "officials" is most naturally read as "nonofficer employees" [ECF No. 326 pp. 7–8; *see* ECF No. 364-1 pp. 16–18]. Special Counsel Smith advances a broader interpretation, arguing that "'official[s]' is a generic term that covers both officers and employees" [ECF No. 374 p. 13]. The Court agrees with Defendants.

Courts interpreting statutes "look to the plain and ordinary meaning of the statutory language as it was understood at the time the law was enacted." *United States v. Chinchilla*, 987 F.3d 1303, 1308 (11th Cir. 2021). "One of the ways to figure out that meaning is by looking at dictionaries in existence around the time of enactment." *Id.* (citation omitted). Here, applicable dictionary definitions indicate that "officer" and "official," though overlapping in some areas, are not synonymous. Definitions of "officer" emphasize the elevated degree of authority, responsibility, and duty that inheres in the position. Webster's Third New International Dictionary (1961) (defining "officer" as "one who holds an office: one who is appointed or elected to serve in a position of trust, authority, or command esp. as spefic. provided for by law" and "distinguished

from employee and sometimes from official").[34]   These same characteristics are often absent from definitions of "official," which tend to describe a more general class of bureaucratic personnel.  *Id.* (defining "official" as "a person authorized to act for a government . . . esp. in administering or directing in a subordinate capacity," but also referring to "one who holds or is invested with an office").[35]   To be sure, some definitions overlap, and the words share linguistic echoes and roots. *See* Random House Dictionary of the English Language (1967) (defining "official" as "a person appointed or elected to an office or charged with certain duties, esp. in the government").  But the terms are not synonymous, nor can they be superficially substituted.  *See Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 618–19.  Definitions indicate that "officers" are distinguished from "officials" by the "greater importance, dignity, and independence of [their] position[s]." *Officer*, Black's Law Dictionary (4th ed. 1951).  Put succinctly: while all officers may be officials, not all officials are officers.

It may be true that, in some circumstances, the broader term "officials" can operate as a "catch-all phrase that includes both officers and employees" [ECF No. 647 p. 53; *see* ECF No. 374 p. 12].  "But a statute's meaning does not always 'turn solely' on the broadest imaginable 'definitions of its component words.'  Linguistic and statutory context also matter." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018) (quoting *Yates v. United States*, 574 U.S. 528, 537

---

[34]   Webster's Seventh New Collegiate Dictionary (1971) (defining "officer" as one holding an "office of trust, authority, or command," not simply that of an unspecified "office"); Black's Law Dictionary (4th ed. 1951) (defining "officer" as "one who is lawfully invested with an office," and "one who is charged by a superior power (and particularly by government) with the power and duty of exercising certain functions"); *id.* (explaining that "'officer' is distinguished from an 'employee' in the greater importance, dignity, and independence of his position, in requirement of oath, bond, more enduring tenure, and fact of duties being prescribed by law").

[35]   Webster's Seventh New Collegiate Dictionary (1971) (defining "official" as one "invested with an office," but "esp. a subordinate one"); Black's Law Dictionary (4th ed. 1951) (defining "official" as "[a]n officer; a person invested with the authority of an office").

(2015)); *see Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071, 2082 (2024) ("When faced with a catchall phrase . . . courts do not necessarily afford it the broadest possible construction it can bear."). As discussed below, when read in context, "officials" is narrowed by what it describes.

### ii. When read in its specific statutory context, Section 533(1) cannot bear the expansive meaning advanced by Special Counsel Smith.

"When words have several plausible definitions, context differentiates among them." *United States v. Hansen*, 599 U.S. 762, 775 (2023). "[T]he meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal*, 508 U.S. at 132. Under the *noscitur a sociis* canon, "a word is known by the company it keeps." *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961). This canon "is often wisely applied where a word is capable of many meanings in order to avoid giving unintended breadth to the Acts of Congress." *Id*.

Like all statutory terms, "officials" as used in Section 533(1) "does not stand alone but gathers meaning from the words around it." *Id*. When "officials" is read in relation to the subsections it describes, it is evident that Section 533(1) does not afford the Attorney General broad power to appoint special counsels. Consider its fellow subsections. Subsections (2) through (4) describe security and investigative employees within the FBI—bureaucratic personnel making up the "broad swath of 'lesser functionaries' in the Government's workforce." *Lucia*, 585 U.S. at 245 (defining "employees"); *see* 28 U.S.C. § 533(2)–(4). While undoubtedly important, these individuals cannot fairly be characterized as constitutional officers who, by definition, exercise "significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 126; *see Edmond*, 520 U.S. at 662 (describing authority as "the line between officer and nonofficer"). It is implausible, then, that Congress intended to wedge appointment power for special counsels

possessing the "full power . . . of any United States Attorney" into a statute concerning low- and mid-level law enforcement personnel in a statutory section governing the FBI.  28 C.F.R. § 600.6.[36]

Section 533(1)'s use of the phrase "detect and *prosecute* crimes" does not otherwise transform the provision into a grant of special-counsel-appointing authority.  28 U.S.C. § 533(1) (emphasis added).  In the context of this FBI provision, and drawing from applicable dictionary definitions, the meaning of "prosecute" naturally encompasses FBI employees who are engaged or involved in federal investigations and prosecutions.  *See, e.g.*, *Prosecute*, Black's Law Dictionary (3d ed. 1933) ("To follow up; to carry on an action or other judicial proceeding; to proceed against a person criminally.").[37] This could include FBI attorneys and other legal staff, but it also naturally encompasses non-lawyer FBI personnel involved in prosecutorial efforts to pursue and/or investigate a crime or claim, such as FBI agents, intelligence officials, and forensic specialists.  At any rate, as Section 533(1)'s subsections clarify, it authorizes only the hiring of

---

[36]  This reading comports with how "officials" is used elsewhere in Chapter 33.  Section 534 uses the term to describe positions that are far more consistent with an "employee" designation than an "officer" designation.  *See* 28 U.S.C. § 534 (describing "officials" that the Attorney General "may appoint . . . to perform the functions authorized by this section").  Moreover, Congress's uses the express phrase "officers and employees" (not the umbrella term "officials") elsewhere in the same chapter.  28 U.S.C. § 535(a) ("The Attorney General and the [FBI] may investigate any violation of Federal criminal law involving Government officers and employees . . . ."); *see also* 28 U.S.C. §§ 509, 510 (differentiating between "officers" and "employees").  Reading "officials" to mean "officers and employees" would conflict with the meaningful variation canon.  *See In re Failla*, 838 F.3d 1170, 1176 (11th Cir. 2016) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012)).

[37]  Webster's Third New International Dictionary (1961) (providing various formulations, including "to follow, follow after, pursue"; "to follow to the end: press to execution or completion: pursue until finished"; "to develop in detail: go further into: INVESTIGATE"; "to engage in or proceed with: carry on: PERFORM"; "to institute legal proceedings against, *esp.*: to accuse of some crime or breach of law or to pursue for redress or punishment of a crime or violation of law in due legal form before a legal tribunal"; "to institute legal proceedings with reference" to a "claim," an "action," or a "prosecution" for "public offenses").

prosecutorial *employees*—not constitutional officers like Special Counsel Smith.   *See* 28 U.S.C. §§ 533(2)–(4).

Nor is the Court persuaded by the Special Counsel's suggestion that reading "officials" as "non-officer employees" would render superfluous the term "employees" as used in Section 533(1) [ECF No. 647 p. 53].   This posits an artificial binary.   It fails to consider the gradient of authority that exists between the lowest-level employees and constitutional "Officers" wielding "significant authority pursuant to the laws of the United States."   *Buckley*, 424 U.S. at 126.   Take the FBI as an example.   An FBI agent is an "employee."   The agent's supervisor—who possesses more responsibility and influence than the agent—may rightly be deemed an "official."   And the FBI Director at the top of the organizational chart is a constitutional "Officer" appointed by the President and confirmed by the Senate.   And among this sliding-scale of authority, context shows that "official" as used in Section 533(1) cannot be fairly read to mean constitutional officer.

### iii.   Congress tracks the language of the Appointments Clause when vesting officer-appointing power in department heads.

Reading "officials" as "officers and employees" would also be contrary to Congress's typical legislative practice.   As indicated above, when Congress "by Law vest[s] the Appointment of such inferior Officers . . . in the Heads of Departments," it does so in a particular way.   Art. II, § 2, cl. 2.   A survey of generalized vesting statutes throughout the United States Code shows that Congress routinely uses the term "officers," or the phrase "officers and employees" when vesting officer-appointing power in department heads.[38]   Consider the following examples, some of which were covered above:

---

[38]   The Court refers to "generalized" vesting statutes as those which concern the appointment of a largely undefined group of individuals.   *See* 49 U.S.C. § 323(a) ("The Secretary of Transportation may appoint and fix the pay of officers and employees of the Department of Transportation and may prescribe their duties and powers.").   These are distinct from position-specific statutes.   *See*

> ➢ "The Secretary of Agriculture may appoint such **officers and employees**, subject to the provisions of chapter 51 and subchapter III of chapter 53 of Title 5, and such experts, as are necessary to execute the functions vested in him by this chapter."  7 U.S.C. § 610(a) (emphasis added).

> ➢ "The Secretary [of Education] is authorized to appoint and fix the compensation of such **officers and employees**, including attorneys, as may be necessary to carry out the functions of the Secretary and the Department."  20 U.S.C. § 3461(a) (emphasis added).

> ➢ "The [HHS] Secretary is authorized to appoint and fix the compensation of such **officers and employees**, and to make such expenditures as may be necessary for carrying out the functions of the Secretary under this chapter."  42 U.S.C.A. § 913 (emphasis added).

> ➢ "The Secretary of Transportation may appoint and fix the pay of **officers and employees** of the Department of Transportation and may prescribe their duties and powers."  49 U.S.C. § 323(a) (emphasis added).

Congress employed this same formulation when vesting officer-appointing power in the Attorney General for the Bureau of Prisons: "The Attorney General may appoint such additional officers and employees as he deems necessary."  18 U.S.C. § 4041.

To be sure, there may be instances in which Congress uses "officials" to confer officer-appointing power [ECF No. 640 p. 3 (supplemental authority)], but in those instances, Congress *still* tracks the constitutional language of the Appointments Clause in a way that reflects officer status—that is, by appending some variation of "appointed by the President, by and with the advice and consent of the Senate" to make explicit that "officials" means "officers."[39]    10 U.S.C. § 137a(a) (authorizing the hiring of six "officials" who "shall be appointed from civilian life by the President, by and with the advice and consent of the Senate"); 22 U.S.C. § 285a(a)(1)(B) (describing "officials required by law to be appointed by and with the advice and consent of the Senate"); 22 U.S.C. § 290g-1(a)(2) (same); 22 U.S.C. § 2651a(d) (authorizing appointment of

---

28 U.S.C. § 542(a) ("The Attorney General may appoint one or more assistant United States attorneys in any district when the public interest so requires.").

[39] The term "officials" appears nowhere in the Appointments Clause or in the Constitution.

officials "who are otherwise authorized to be appointed by the President, by and with the advice

and consent of the Senate"); 28 U.S.C. § 561(c) (describing U.S. marshals as "officials" appointed

by the President "by and with the advice and consent of the Senate"); 50 U.S.C. § 3369d(c)(1)(A)

(authorizing appointment of "officials of such agency or department who occupy a position that is

required to be appointed by the President, with the advice and consent of the Senate").[40][41]

Congress regularly intends certain words and phrases "to be read as terms of art connecting

the congressional exercise of legislative authority with the constitutional provision . . . that grants

Congress that authority." *Scheidler v. Nat'l Org. for Women, Inc.*, 547 U.S. 9, 17–18 (2006)

(collecting cases); *see Hansen*, 599 U.S. at 775 ("Here, the context of these words—the water in

which they swim—indicates that Congress used them as terms of art."); *F.A.A. v. Cooper*, 566

U.S. 284, 292–93 (2012). That seems to be the case in the appointments context, where Congress

adheres closely to the constitutional text, and it would be consistent with the Supreme Court's

---

[40]   The remaining statutes cited in the Special Counsel's notice of supplemental authority are inapplicable for one of two reasons. First are those which do not confer officer-appointing power at all. 10 U.S.C. § 397 (providing that the Secretary "shall designate" an official to serve as principal advisor from "among officials appointed . . . by and with the advice and consent of the Senate")), 10 U.S.C. § 988(c) (definitions section imbedded in statute that does not confer appointing power), 16 U.S.C. § 831e (mandating that appointments of "employees or officials"—which are provided for elsewhere in Chapter 12A (Tennessee Valley Authority)—be nonpolitical). Second are those in which, as best the Court can tell, the term "official" describes a position that lacks the "significant authority" commensurate with a constitutional officer, *Buckley*, 424 U.S. at 126, such that the Appointments Clause is not implicated. 6 U.S.C. § 142(a) (providing for appointment of "senior official" to "assume primary responsibility for privacy policy" at DHS, and requiring said official to obtain approval from Secretary for subpoenas); 50 U.S.C. § 4306 (authorizing "[t]he President to appoint . . . an official to be known as the alien property custodian"). To the extent the "officials" in the second category of examples are deemed somehow to veer into "officer" territory—a proposition untested in caselaw—those statutes would be clear outliers against the weight of contrary statutory language described above.

[41]   The Constitutional Lawyers' *amicus* brief includes a lengthy string citation to provisions in which "official" subsumes "officer" [ECF No. 429 p. 22 n.4]. These provisions, mostly definitional, do not confer officer-appointing power.

demonstrated preference in this realm. *See Edmond*, 520 U.S. at 657–58; *Weiss*, 510 U.S. at 171–72; *Germaine*, 99 U.S. at 510.[42]

In sum, this consistent legislative practice shows that Section 533(1)'s unspecified use of "officials"—as opposed to "officers," or "officers and employees"—"is not merely stylistic." *Edmond*, 520 U.S. at 657. Rather, it is telling of Congress' intent. As the collection of statutes above shows, "had Congress meant to confer 'officer'-appointing power via § 533 or any other provision, 'it easily could have done so.'" *Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 619 (quoting *Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 129 (2015)).

> **iv.    Section 533's placement in the statutory scheme compels a more circumscribed reading.**

As noted above, Section 533 is housed in a chapter concerning the "Federal Bureau of Investigation." 28 U.S.C. §§ 531–540d.[43] It is sandwiched between 28 U.S.C. § 532, a statute

---

[42] The Special Counsel invokes *Edmond* to argue that the Supreme Court found officer-appointing authority in a "default statute" with language more general than that of Section 533 [ECF No. 374 p. 12]. *Edmond* did find statutory appointment authority for Coast Guard judges in 49 U.S.C. § 323(a). 520 U.S. at 656. But merely comparing the statutes' generality ignores a critical, distinguishing feature: unlike Section 533, the statute in *Edmond* expressly uses the word "officer." 49 U.S.C. § 323(a) (authorizing appointment of "officers and employees of the Department of Transportation"). *Edmond* held that a vesting statute need "not specifically mention" a particular officer, so long as the statute's "plain language . . . appears to give the Secretary power to appoint them." *Edmond*, 520 U.S. at 656. The text of 49 U.S.C. § 323(a) passed that test. Section 533 does not.

[43] Special Counsel Smith insists that consideration of Chapter 33's title, "Federal Bureau of Investigation," cannot be considered unless the Court finds that Section 533 is ambiguous [ECF No. 374 p. 13]. It is true that "the title of a statute cannot limit the plain meaning of the text" and should be used "[f]or interpretive purposes . . . only when it sheds light on some ambiguous word or phrase." *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (internal brackets and quotations omitted). Still, however, there can be no dispute that evaluation of a statute's placement in its statutory scheme is a permissible tool of statutory construction. In any event, with respect to consideration of Section 533's "title," the Court sees no legal barrier to consulting the title here given the parties' arguments—although such consideration merely confirms the conclusion that the use of the word "officials" in Section 533(1) does not confer officer-appointing power in the manner claimed by the Special Counsel.

about the appointment of the FBI Director, and 28 U.S.C. § 534, which concerns the acquisition, preservation, and exchange of evidence in criminal cases.  Given Section 533's location, it is exceedingly unlikely that Congress intended to tuck special-counsel-appointing power into a chapter devoted to the FBI.[44]  Several of the surrounding chapters are clearly more natural homes for such a statute.  *See* 28 U.S.C. §§ 501–530D (Attorney General); 28 U.S.C. §§ 561–575 (U.S. Attorneys).  And as mentioned at length above, until 1999, there was an entire chapter in the DOJ Section of Title 28 devoted to such independent counsel figures.   28 U.S.C. §§ 591–599 (Independent Counsel Act).

Section 533's heading, "Investigative and other officials; appointment," provides an additional indicator that the provision is cabined to low- or mid-level FBI personnel.  While "headings are not commanding, they supply clues" of congressional intent.  *Yates*, 574 U.S. at 540. Unlike prior statutes concerning independent counsels, Section 533's heading lacks any indication that it concerns a "Special Counsel," or deals with prosecutorial power at all.  *Compare* 28 U.S.C. § 533 *with* 28 U.S.C. § 592 ("Preliminary investigation and application for appointment of an independent counsel"), *and* 28 U.S.C. § 594 ("Authority and duties of an independent counsel"), *and* 28 U.S.C. § 594 (United States attorneys); *cf.* Pub. L. No. 95–521, § 601, ch. 39 (Special Prosecutor), 92 Stat. 1824 (Oct. 26, 1978).  It would be odd indeed if lawmakers—in establishing an office with the prosecutorial might of a United States Attorney—made no such mention in the

---

[44]  In response, Special Counsel Smith cites two out-of-circuit cases in which courts—both in footnotes—extended Section 533 beyond the FBI context [ECF No. 374 p. 14 (citing *United States v. Hasan*, 846 F. Supp. 2d 541, 546 n.7 (E.D. Va. 2012) and *United States v. Fortuna*, No. 12-cr-636 2013 WL 1737215, at *2 n.8 (D.N.J. Apr. 22, 2013))].   These cases did not involve Appointments Clause challenges.  They did not engage with the text of 28 U.S.C. § 533 or its location in the United States Code.  And they did not authorize appointment of constitutional "officers" with the power of the Special Counsel; rather, they approved appointment of ATF officials (*i.e.*, agents).  Accordingly, the Court does not find them persuasive in this context.

statute's heading.  If Congress had intended to create such a powerful and significant office in

Section 533, it would not have obscurely buried the lede and omitted any such reference from the

statute's heading, or more importantly, from the text of the provision itself.

<div align="center">***</div>

For the reasons stated above, as a matter of plain text, statutory context, and legislative

practice, Section 533—cited in an appointment order for the first time in November 2022 as

purported authority—does not provide a basis in "Law" for the appointment of Special Counsel

Smith.  Art. II, § 2, cl. 2.

### E. Special Counsel Smith's interpretation undermines the separation-of-powers principles that animate the Appointments Clause and destabilizes Congress's carefully crafted statutory structure for the DOJ.

On a more fundamental level, adopting the Special Counsel's untenable interpretation of

Sections 515(b) and 533 erodes the "basic separation-of-powers principles" that "give life and

content" to the Appointments Clause by wresting from Congress its constitutionally prescribed

role in the officer-appointing process.  *Morrison*, 487 U.S. at 715 (Scalia, J., dissenting).  It also

destabilizes Congress's carefully crafted statutory structure for DOJ.

As the discussion in this Order demonstrates, Congress has carefully enacted a statutory

scheme, consistent with the Appointments Clause, governing the appointment of high-level federal

prosecutors.  *See* Calabresi & Lawson, *supra* pp. 113–115.  Most relevant here, United States

Attorneys, the officers most closely resembling Special Counsel Smith, *see* 28 C.F.R. § 600.6,

must be nominated by the President and confirmed by the Senate.  28 U.S.C. § 541.  Adopting the

position of the Special Counsel allows any Attorney General, without Congressional input, to

circumvent this statutory scheme and appoint one-off special counsels to wield the immense power

of a United States Attorney.  This strips from Congress its role in the appointments process, and it

<div align="center">52</div>
<div align="center">229</div>

does so, moreover, in a highly sensitive area involving "life, liberty, and reputation."  Robert H.

Jackson, U.S. Att'y Gen., Address at the Second Annual Conference of United States Attorneys:

The Federal Prosecutor 1 (Apr. 1, 1940) (describing immense power of federal prosecutors over

citizenry).

Absent a statute vesting appointing power elsewhere, the "default manner of appointment

for inferior officers" is Presidential nomination and Senate confirmation.  *Edmond*, 520 U.S. at

660.  And while Congress may "vest the Appointment of such inferior Officers, as they see proper,

in . . . Heads of Departments," Art. II, § 2, cl. 2, it did not do so in the cited statutes.   Such a broad

reading results in precisely the type of diffusion and encroachment that concerned the Framers in

drafting the Appointments Clause.  *Freytag*, 501 U.S. at 883–86; *Weiss*, 510 U.S. at 187–89

(Souter, J., concurring) ("If the structural benefits the Appointments Clause was designed to

provide are to be preserved . . . no branch may aggrandize its own appointment power at the

expense of another.").  The Court thus declines to dilute the appointment power by reading Sections

515(b) and 533(1) as ceding a core legislative function to another branch.  *See Freytag*, 501 U.S.

at 885 ("The Framers recognized the dangers posed by an excessively diffuse appointment power

and rejected efforts to expand that power.  So do we.") (internal citation omitted); *id*. at 884–86.

## IV.    *United States v. Nixon*

The parties disagree about the precedential value of a passage from *United States v. Nixon*,

418 U.S. 683 (1974) [ECF No. 326 pp. 8–9; ECF No. 374 pp. 8–10; ECF No. 414 pp. 3–4;

ECF No. 364-1 pp. 22–23].   That passage is reproduced below.   The Court emphasizes the

statement that serves as the focal point of the parties' dispute.

> Under the authority of Art. II, § 2, Congress has vested in the Attorney General the
> power to conduct the criminal litigation of the United States Government. 28 U.S.C.
> § 516.  *It has also vested in him the power to appoint subordinate officers to assist
> him in the discharge of his duties. 28 U.S.C. §§ 509, 510, 515, 533.*  Acting pursuant

to those statutes, the Attorney General has delegated the authority to represent the United States in these particular matters to a Special Prosecutor with unique authority and tenure. The regulation gives the Special Prosecutor explicit power to contest the invocation of executive privilege in the process of seeking evidence deemed relevant to the performance of these specially delegated duties.

*Id*. at 694–95 (emphasis added and footnote omitted).[45]   Defendants argue that *Nixon*'s statement about the Attorney General's statutory authority is non-binding dictum and thus should not control the Court's statutory analysis (as done above) [ECF No. 326 pp. 8–9; ECF No. 414 pp. 3–4]. The Special Counsel argues that this statement "formed a necessary element of [*Nixon*'s] holding," and therefore constitutes binding precedent [ECF No. 374 p. 9].

Following a comprehensive review of the Supreme Court record,[46] the Court concludes that the disputed statement from *Nixon* is dictum. The issue of the Attorney General's appointment authority was not raised, briefed, argued, or disputed before the *Nixon* Court. *Nixon* is undoubtedly precedential in several areas—for example, in its pronouncements on the justiciability of an intra-branch controversy; the test for issuing Rule 17(c) subpoenas; and application of executive privilege in the face of a valid subpoena. Those issues were presented, argued, and carefully considered. The same is not true of the Attorney General's statutory appointment authority. At most, *Nixon* assumed that antecedent proposition, without deciding it. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990). Thus, *Nixon*'s passing remarks on that point are not binding

---

[45]  For the sake of completeness, the omitted footnote provides, in relevant part, that "[t]he regulation issued by the Attorney General pursuant to his statutory authority, vests in the Special Prosecutor plenary authority to control the course of investigations and litigation related to" Watergate. *Id*. at 694 n.8.

[46]  The Court collected and reviewed all available filings in *United States v. Nixon*, 418 U.S. 683 (1974) (No. 73-1766), and *Nixon v. United States*, 418 U.S. 683 (1974) (No. 73-1834). This includes the applicable cert petitions and merits briefing, along with *amicus* briefs, the full appendix, and the consolidated oral argument transcript. Oral Argument, *United States v. Nixon*, 418 U.S. 683 (1974) (Nos. 73-1766, 73-1834).

precedent in "future cases," as here, "that directly raise the question[]." *Id.* Giving these remarks

precedential weight runs the risk that "stray language" from the *Nixon* opinion "will take on

importance in a new context that its drafters could not have anticipated." *Rudolph v. United States*,

92 F.4th 1038, 1045 (11th Cir. 2024).

This section proceeds in four parts. The Court (1) reviews the terms "holding" and "dicta";

(2) provides context to situate the controversy in *Nixon*; (3) analyzes the disputed passage from

*Nixon*; and (4) discusses the proper weight that nevertheless should be accorded to the *Nixon*

dictum. This section is lengthy because the *Nixon* dictum has taken on significance in related

cases, and a full explication of the record is necessary. *See In re Sealed Case*, 829 F.2d 50 (D.C.

Cir. 1987); *In re Grand Jury Investigation*, 916 F.3d 1047 (D.C. Cir. 2019).

### A.  Legal Standards

"Not all text within a judicial decision serves as precedent." Bryan A. Garner et al., The

Law of Judicial Precedent § 4, at 44 (2016). Thus, distinguishing between precedential "holdings"

and non-binding "dicta" is crucially important. *See Fresh Results, LLC v. ASF Holland, B.V.*, 921

F.3d 1043, 1049 (11th Cir. 2019). A holding "comprises both the result of the case and those

portions of the opinion necessary to that result." *United States v. Caraballo-Martinez*, 866 F.3d

1233, 1244 (11th Cir. 2019) (internal quotation marks and citations omitted); *see* Black's Law

Dictionary (11th ed. 2019) (defining "holding" as "[a] court's determination of a matter of law

pivotal to its decision; a principle drawn from such a decision."). Dictum, on the other hand, is "a

statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is

necessary to the holding of the case." *United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019)

(quotation marks omitted). While courts must dutifully follow precedential holdings, "dicta is not

binding on anyone for any purpose," *Edwards*, 602 F.3d at 1298, although Supreme Court dicta does merit consideration as discussed below.

Statements in an opinion that extend beyond the scope of the issues presented, briefed, and argued generally constitute dicta. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *United States v. Jackson*, 55 F.4th 846, 853 (11th Cir. 2022) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)); *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952) ("The effect of the omission was not there raised in briefs or argument nor discussed in the opinion of the Court. Therefore, the case is not a binding precedent on this point.").

The same is generally true of assumptions that are peripheral to the issues presented. "The Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions—even on jurisdictional issues—are not binding in future cases that directly raise the questions." *Verdugo-Urquidez*, 494 U.S. at 272 (internal citations omitted); Garner et al., *supra* at 84 ("Judicial opinions are always premised on a series of assumptions about what the law is. Yet those assumptions—whether implicit or explicit—aren't generally considered precedential."). As explained by Chief Justice John Marshall:

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Cohens v. State of Virginia*, 19 U.S. 264, 399–400 (1821).

Lastly, "not all dicta are created equal." *Farah v. U.S. Att'y Gen*., 12 F.4th 1312, 1323 (11th Cir. 2021) (Pryor, C.J.) (quoting Garner et al., *supra* at 69).  Dicta from the Supreme Court are entitled to considerable—and in some cases, even precedential—weight.  *Schwab v. Crosby*, 451 F.3d 1308, 1325–26 (11th Cir. 2006) (collecting cases); *Peterson v. BMI Refractories*, 124 F.3d 1386, 1392 n.4 (11th Cir. 1997) (emphasizing that "dicta from the Supreme Court is not something to be lightly cast aside").  Inferior courts must accord Supreme Court dicta appropriate respect and deference.  *United States v. Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980).

## B.  Decisional Context

To discern whether the disputed passage from *Nixon* constitutes part of its holding, it helps to situate it in context, including by ascertaining the precise action taken by the trial court. *Rudolph*, 92 F.4th at 1045 (advising lower courts to "consider opinions in their context, including the questions presented and the facts of the case" in evaluating the precedential value of statements therein); *see Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373–74 (2023) (emphasizing that Supreme Court opinions "dispose of discrete cases and controversies and they must be read with a careful eye to context"); Garner et al., *supra* at 52.

*Nixon* involved Special Prosecutor Leon Jaworski's investigation and prosecution of those involved in the Watergate scandal.  The Special Prosecutor issued a subpoena to President Nixon— an unindicted co-conspirator—requiring the production of certain tapes and documents relevant to the investigation.  *Nixon*, 418 U.S. at 686.  Counsel for President Nixon moved to quash the subpoena, raising three principal arguments.  *United States v. Mitchell*, 377 F. Supp. 1326, 1328– 29 (D.C.C. 1974).

First, President Nixon argued that "courts are without authority to rule on the scope or applicability of executive privilege."  *Id*. at 1329.  The district court found this jurisdictional

argument to be foreclosed by circuit precedent.  *Id*. (citing *Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir.

1973)).   Second—and most important to Defendants' Motion at issue here—President Nixon

argued that the intra-branch dispute presented a nonjusticiable political question.  *Id*.  Referencing

the appointing regulation, which carried "the force of law," the district court found that the Special

Prosecutor possessed sufficient independence to create a justiciable controversy.  *Id*. at 1329 & n.7

(citing 38 Fed. Reg. 30,738).   Third, President Nixon argued on the merits that the requirements

for issuance of a Rule 17(c) subpoena had not been satisfied, also asserting a confidentiality

privilege.  *Id*. at 1329.   The district court disagreed.  *Id*. at 1330–31.   Notably, none of these

arguments (or the district court's resolution thereof) had anything to do with the Attorney

General's statutory appointment authority or the Appointments Clause more generally.

At the Supreme Court, President Nixon re-raised the same challenges.[47]  *Nixon*, 418 U.S.

at 686.   On the justiciability question, President Nixon again asserted that the intra-branch nature

of the dispute presented a nonjusticiable political question outside the purview of the judiciary.  *Id*.

at 691–92.[48]   The Supreme Court ultimately rejected this argument.  *Id*. at 697.   Before doing so,

however, the court offered a prefatory paragraph to contextualize "the nature of the proceeding for

which the evidence is sought."  *Id*. at 694.   The relevant portion of that paragraph—which was

also reproduced above, *supra* pp. 53–54—provides:

---

[47]  There was no intermediate appellate review in *Nixon*; the Supreme Court granted certiorari
before judgment.  *Nixon*, 418 U.S. at 686–87.

[48]  *See* Brief for the Respondent, Cross-Petitioner at 27–48; *id*. at 16–17 ("Under the standards set
forth in *Baker v. Carr*, 369 U.S. 186 (1962), this intra-branch dispute raises a political question
which the federal courts lack jurisdiction to decide.  The district court does not have the power to
substitute its judgement for that of the President on matters exclusively within the President's
discretion."); *id*. at 29–30 (challenging the "authority of the court or any branch of the government
to intervene in a solely intra-branch dispute"); *id*. at 41 (same); Reply Brief for the Respondent,
Cross-Petitioner at 4–13.

Under the authority of Art. II, § 2, Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government. 28 U.S.C. § 516.  It has also vested in him the power to appoint subordinate officers to assist him in the discharge of his duties. 28 U.S.C. §§ 509, 510, 515, 533.  Acting pursuant to those statutes, the Attorney General has delegated the authority to represent the United States in these particular matters to a Special Prosecutor with unique authority and tenure.  The regulation gives the Special Prosecutor explicit power to contest the invocation of executive privilege in the process of seeking evidence deemed relevant to the performance of these specially delegated duties.

*Id*. at 694–95 (footnote omitted).

Following this stage-setting paragraph, the Supreme Court determined that the extant regulation's delegation of authority—both in the independence it created in Special Prosecutor Jaworksi and in the limitations it placed on his removal—established a justiciable case or controversy.  *Id*. at 694–98; *see id*. at 696 (explaining that "[s]o long as this regulation remains in force the Executive Branch is bound by it").  "In light of the uniqueness of the setting in which the conflict arises, the fact that both parties are officers of the Executive Branch cannot be viewed as a barrier to justiciability."  *Id*. at 697.

### C.  Analysis

With this context in mind, the Court proceeds to analyze the disputed statement from *Nixon*, ultimately concluding that it is dictum.

#### i.    The Attorney General's appointment authority was not an issue before the Supreme Court in *Nixon*.

In *Nixon*, the Supreme Court granted certiorari to decide six questions: five from the Special Prosecutor's petition, and one from President Nixon's cross-petition.[49]  *See* Petition and

---

[49]   The *Nixon* Court also ordered the parties to file supplemental briefs on the following two questions: (1) "Is the District Court order of May 20, 1974, an appealable order?" and (2) "Does this Court have jurisdiction to entertain and decide the petition for mandamus transmitted by the Court of Appeals to this Court?"  Docket Sheets (Nos. 73-1766, 73-1834), Neither of those questions—nor the briefing submitted in response—concerned the validity of the Special

Cross-Petition for Writ of Certiorari Before Judgment, *United States v. Nixon*, 418 U.S. 683 (1974)

(Nos. 73-1766, 73-1834).   Those questions are copied verbatim below:

<div align="center">Special Prosecutor's Petition</div>

1. Whether the President, when he has assumed sole personal and physical control over evidence demonstrably material to the trial of charges of obstruction of justice in a federal court, is subject to a judicial order directing compliance with a subpoena *duces tecum* issued on the application of the Special Prosecutor in the name of the United States.

2. Whether a federal court is bound by the assertion by the President of an absolute "executive privilege" to withhold demonstrably material evidence from the trial of charges of obstruction of justice by his own White House aides and party leaders, upon the ground that he deems production to be against the public interest.

3. Whether a claim of executive privilege based on the generalized interest in the confidentiality of government deliberations can block the prosecution's access to evidence material and important to the trial of charges of criminal misconduct by high government officials who participated in those deliberations, particularly where there is a *prima facie* showing that the deliberation occurred in the course of the criminal conspiracy.

4. Whether any executive privilege that otherwise might have been applicable to discussions in the offices of the President concerning the Watergate matter has been waived by previous testimony pursuant to the President's approval and by the President's public release of 1,216 pages of edited transcript of forty-three Presidential conversations related to Watergate.

5. Whether the district court properly determined that a subpoena *duces tecum* issued to the President satisfies the standards of Rule 17(c) of the Federal Rules of Criminal Procedure because an adequate showing has been made that the subpoenaed items are relevant to issues to be tried and will be admissible in evidence.

<div align="center">President Nixon's Cross-Petition</div>

1. Whether, under the Constitution, a grand jury has the authority to charge an incumbent President as an unindicted co-conspirator in a criminal proceeding.

As the *Nixon* opinion reflects, the questions presented—that is, "[t]he questions actually before the Court"—were "investigated with care, and considered in their fullest extent." *Cohens*,

---

Prosecutor.  *See* Supplement Brief for the Petitioner, No. 73-1766; Brief for Respondent, Cross-Petitioner, No. 73-1766.

19 U.S. at 399.  The same is not true of the Attorney General's statutory appointment authority, a peripheral subject that was not raised in the case.  To reiterate, "[t]he Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions—even on jurisdictional issues—are not binding in future cases that directly raise the questions."  *Verdugo-Urquidez*, 494 U.S. at 272; *see Becton*, 632 F.2d at 1296 n.3; *Caraballo-Martinez*, 866 F.3d at 1245; *see also United States v. Manafort*, 321 F. Supp. 3d 640 (E.D. Va. 2018).[50]  Because the statutory-authority question was not before the Supreme Court, the opinion's single prefatory sentence does not amount to a precedential holding.

### ii.    The Special Prosecutor's validity was uncontested.

A case is not "'binding precedent' on points that were not there raised in briefs or argument nor discussed in the opinion."  *Bourdon v. United States Dep't of Homeland Sec*., 940 F.3d 537, 548–49 (11th Cir. 2019) (internal quotation marks omitted); Garner et al., *supra* at 84–85.  The rationale behind such a rule is sensible.  Where "the issue addressed in the passage was not presented as an issue, [and] hence was not refined by the fires of adversary presentation," it is far less likely to constitute a carefully reasoned, essential part of the court's opinion.  *United States v. Crawley*, 837 F.2d 291, 293 (7th Cir. 1988) (Posner, J.) (defining "dictum").

Across hundreds of pages of briefing (and hours of oral argument) in *Nixon*, neither party challenged the Special Prosecutor's validity or the Attorney General's appointment authority.  In fact, on numerous occasions, President Nixon expressly stated that he did *not* contest these points.  Brief for the Respondent at 42 (stating, in reference to the regulation, that "the President has not

---

[50]  In *United States v. Manafort*, 321 F. Supp. 3d 640 (E.D. Va. 2018), the court determined that *Nixon*'s line "[s]o long as this regulation is extant it has the force of law," was dictum.  *Id*. at 659 (quoting *Nixon*, 418 U.S. at 695); *see also id*. ("*Nixon* is inapposite inasmuch as the holding there did not adjudicate the legal authority of a special prosecutor.").

in the past nor does he here challenge those powers that were given to the Special Prosecutor in Watergate-related matters"); Reply Brief for the Respondent at 8 (emphasizing that "[w]e do not contest the Special Prosecutor's assertion that his authority is derived from the Attorney General"); *see* Tr. of Oral Argument, Nos. 73-1766, 73-1834. The Special Counsel acknowledges as much [ECF No. 374 p. 9 (accepting that "President Nixon did not contest that statutory analysis")]. This absence of argument on the appointment-authority point further cements the disputed passage's status as dictum. The parties themselves litigated the entire case without touching the issue.

### iii. The Court's statement on the Attorney General's statutory authority was not "necessary" to its resolution of the justiciability issue.

Even though the statutory-authorization question was not at issue, and despite its absence from the record, Special Counsel Smith still contends that *Nixon*'s comment on this point "formed a necessary element of its holding" [ECF No. 374 p. 9]. He argues that "finding statutory authority for the appointment was thus central to the Court's conclusion that '[s]o long as this regulation [setting forth the Special Prosecutor's authority] is extant it has the force of law'" [ECF No. 374 p. 9 (quoting *Nixon*, 418 U.S. at 695) (alterations in Opposition)]. This "read[s] too much into too little." *Nat'l Pork Producers Council*, 598 U.S. at 373 (stressing that opinions must "be read with a careful eye to context").

The disputed passage is located within a prefatory, stage-setting paragraph which merely served to tee up the case-or-controversy analysis that followed. As recap, President Nixon argued that the case presented a nonjusticiable political question by virtue of the intra-branch nature of the dispute. *See supra* p. 58 n.48. The *Nixon* Court disagreed. "[J]usticiability does not depend on such a surface inquiry." 418 U.S. at 693. Instead, *Nixon* stated that "courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented." *Id*. (citation omitted). In doing so, *Nixon* zoomed out and provided a high-level

background paragraph explaining how the case landed at the Supreme Court. *Id*. at 694 ("Our starting point is the nature of the proceeding for which the evidence is sought—here a pending criminal prosecution."). It is within this overview paragraph that the disputed dictum is located.

Properly situated in this context, therefore, *Nixon*'s remark on the Attorney General's statutory authority is more akin to an "aside like statement" or digression, *United States v. Files*, 63 F.4th 920, 929 & n.7 (collecting similar examples), than a "determination of a matter of law pivotal to its decision," *Holding*, Black's Law Dictionary (11th ed. 2019). *See Georgia Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1119–20 (11th Cir. 2022) (determining an earlier case's "prefatory statement" about a statute's operation was dictum because it wasn't germane to resolving the issues presented).

To be sure, that President Nixon delegated to the Special Prosecutor (via the regulation) the power to "determin[e] whether or not to contest the assertion of 'Executive Privilege' or any other testimonial privilege," 38 Fed. Reg. 30,739, *amended by* 38 Fed. Reg. 32,805, was integral to *Nixon*'s justiciability holding. 418 U.S. at 694–97. This delegation assured the Supreme Court that "concrete adverseness" existed between the parties. *Id*. at 697 (quoting *Baker v. Carr*, 369 U.S. at 204); *see id.* at 696 (explaining that "[s]o long as this regulation remains in force the Executive Branch is bound by it"). In other words, two features were essential to the justiciability holding: (1) the nature of the parties' relationship as defined in the very broad delegation of authority in the regulation; and (2) the fact that the regulation had not been revoked. But *Nixon*'s passing reference to statutory authority was not essential to the analysis, and nothing in the remainder of the decision suggests that the Supreme Court was reasoning from its earlier passing

remark.[51]  *See Sarnoff v. Am. Home Prod. Corp*., 798 F.2d 1075, 1084 (7th Cir. 1986) (Posner, J.) (defining as "dictum" a "statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it").

### D.  As dictum, Nixon's statement is unpersuasive.

Having determined that the disputed passage from *Nixon* is dictum, the Court considers the appropriate weight to accord it.   In this circuit, Supreme Court dictum which is "well thought out, thoroughly reasoned, and carefully articulated" is due near-precedential weight.  *Schwab*, 451 F.3d at 1325–26 (collecting cases); *Peterson*, 124 F.3d at 1392 n.4.  Additionally, courts are bound by Supreme Court dictum where it "is of recent vintage and not enfeebled by any subsequent statement."  *Id*. at 1326 (quoting *McCoy v. Mass. Inst. of Tech*., 950 F.2d 13, 19 (1st Cir. 1991)).  The *Nixon* dictum is neither "thoroughly reasoned" nor "of recent vintage."  *Id*. at 1325–26.  For these reasons, the Court concludes it is not entitled to considerable weight.

### i.   *Nixon* did not analyze the relevant statutes.

First, *Nixon* does not engage in any statutory analysis of the cited provisions.  Although *Nixon* "gave passing reference to the cited statutes," the opinion "provided no analysis of those provisions' text."  *Trump*, 144 S. Ct. at 2351 (Thomas, J., concurring).  Indeed, the extent of *Nixon*'s discussion of the statutes comes in a single sentence: "[Congress] vested in [the Attorney General] the power to appoint subordinate officers to assist him in the discharge of his duties.  28 U.S.C. §§ 509, 510, 515, 533."  418 U.S. at 694.  No more is provided.  Thus, giving *Nixon*'s dictum near-precedential weight in resolving the Motion—which calls for a thorough analysis of

---

[51]  Nor can it be said that the *Nixon* Court's own language—"acting *pursuant* to [statutes]"— contains any substantive commentary on the validity of the cited statutes for appointment purposes [ECF No. 647 pp. 116–117 (Meese *amici* argument)].

the statutory text—runs the risk that the Supreme Court's "language will take on importance in a new context that its drafters could not have anticipated." *Rudolph*, 92 F.4th at 1045.

### ii. *Nixon* was decided prior to the development of recent Appointments Clause jurisprudence.

Second, *Nixon* was decided in 1974. In the subsequent half century, the Supreme Court has placed a renewed emphasis on structural principles underpinning the Appointments Clause, beginning with *Buckley v. Valeo*, 424 U.S. 1 (1976), and continuing through various other important cases. *See generally* Calabresi & Lawson, *supra* at 124–25 (examining the "rebirth of the Appointments Clause"); *Freytag*, 501 U.S. at 878; *Edmond*, 520 U.S. at 659–60; *Weiss*, 510 U.S. at 182–189 (Souter, J., concurring); *Arthrex*, 594 U.S. at 12–14. These post-*Nixon* developments in Appointments Clause jurisprudence, and the Supreme Court's corresponding emphasis on structural principles behind that provision, lessen the force of the disputed dictum.

### iii. The out-of-circuit cases cited by the Special Counsel are equally unpersuasive.

Special Counsel Smith cites two out-of-circuit appellate cases in support of his position that *Nixon*'s statutory-authority statement is binding [ECF No. 374 pp. 9–10]. Both decisions determined that *Nixon* was dispositive on the statutory-authority question. Respectfully, the Court disagrees. Like *Nixon*, neither engaged with the text of the statutes at issue.

The Court starts with *In re Sealed Case*, 829 F.2d 50 (D.C. Cir. 1987), which concerned a challenge to Independent Counsel Lawrence Walsh's prosecution of the Iran-Contra scandal. As authority for creation of the "Office of Independent Counsel: Iran/Contra," the Attorney General cited 28 U.S.C. §§ 509, 510, 515, and 5 U.S.C. § 301. 829 F.2d at 55; *see* 28 C.F.R. § 601. Despite expressly stating that "these provisions"—that is, 28 U.S.C. §§ 509, 510, 515, and 5 U.S.C. § 301—"*do not explicitly authorize* the Attorney General to create an Office of Independent

Counsel virtually free of ongoing oversight," the circuit court nevertheless "read them as *accommodating* the delegation at issue here." *Id*. at 55 (emphasis added). And then the court stated, in an attached footnote, that *Nixon* "*presupposed* the validity of a regulation appointing the Special Prosecutor." *Id*. at 55 n.30 (emphasis added). No analysis of the statutes was provided.[52]

More recently, in *In re Grand Jury Investigation*, 916 F.3d 1047 (D.C. Cir. 2019), the same circuit court addressed a challenge to the authority of Special Counsel Robert Mueller, a contemporary special counsel serving in a role akin to that of Special Counsel Smith. The court characterized the abbreviated statutory-authority remarks from *Nixon* and *In re Sealed Case* as binding, viewing them as necessary "antecedents" to those cases' holdings. *Id*. at 1053–54. And then, relying on those remarks, the court found no further analysis of the statutes to be necessary. *Id*. at 1054 ("Because binding precedent establishes that Congress has 'by law' vested authority in the Attorney General to appoint the Special Counsel as an inferior officer, this court has no need to go further to identify the specific sources of this authority.").

As the foregoing discussion demonstrates, the decisions in *In re Sealed Case* and *In re Grand Jury Investigation* relied on "presuppositions" and "antecedents" to determine that *Nixon*— which *itself* did not engage with the applicable statutory text—was dispositive and foreclosed any statutory challenge. But as explained above, the Supreme Court has cautioned that "presuppositions" and "antecedents" of this sort "are not binding in future cases that directly raise the questions." *Verdugo-Urquidez*, 494 U.S. at 272. Unlike *Nixon*, this case *does* "directly raise"

---

[52] There may be other reasons to doubt the persuasive force of *In re Sealed Case*'s holding. *See* Calabresi & Lawson, *supra* at 125–27 (arguing that the appellant in that case, Lt. Col. Oliver North, focused on the preemptive effect of the Independent Counsel Act, without raising a frontal challenge to the Attorney General's appointment authority under the relied-upon statutes).

the statutory-authority question.  And because neither of the out-of-circuit cases considered this question in a meaningful way, the Court does not find them persuasive here.

In sum, the prefatory, passing remark in *Nixon* about 28 U.S.C. §§ 509, 510, 515, 533, does not stand as binding precedent for a point that was not raised, argued, disputed, or analyzed in that case, even if possibly assumed.  *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J., dissenting) (collecting cases); *Webster*, 266 U.S. at 511.  Nor would such a treatment accord with the tailored manner in which the Supreme Court has defined and described its own Appointments Clause holdings in reference to the questions actually before it in those decisions.[53]

## V.    Principal versus Inferior Officer Designation

This brings the Court to its final point on the Appointments Clause challenge, prior to addressing remedy.  Up to this juncture, the Court has proceeded under the premise, advanced by Special Counsel Smith, that he is an "inferior Officer," not a principal officer requiring Presidential nomination and Senatorial consent [ECF No. 405 pp. 6–12].  Defendants and the Meese *amici* contest this assertion, and it is a point worthy of consideration given the virtually unchecked power given to Special Counsel Smith under the Special Counsel Regulations.  Ultimately, however, after examining the broad language in Supreme Court cases on the subject—and seeing a mixed picture,

---

[53]   *Freytag*, 501 U.S. at 890 ("The appointment authority of the 'Courts of Law' was not before this Court in *Buckley*.  Instead, we were concerned with whether the appointment of Federal Elections Commissioners by Congress was constitutional under the Appointments Clause."); *Weiss*, 510 U.S. at 173 (distinguishing prior cases that "simply do not speak to the issue" before the Court); *Edmond*, 520 U.S. at 665–66 (holding that the implied principal-officer designation in *Freytag* "does not control our decision here" where the question was squarely presented).  The Supreme Court made this very point in a recently decided case, albeit not in the Appointments Clause context.  *See Campos-Chaves v. Garland*, 144 S. Ct. 1637, 1651 (2024) (explaining that a prior opinion's statement on the meaning of a statutory provision was dicta because that point "was not at issue," and the Court "did not reach out to decide today's question in that case").

even if a compelling one in favor of a principal designation—the Court elects, with reservations, to reject the principal-officer submission and to leave the matter for review by higher courts.

### A. Arguments of Parties

The arguments on the Motion, developed further during argument, are as follows. Special Counsel Smith contends that he is an inferior officer because he is "subject to supervision and oversight by other officers appointed by the President with Senate consent" [ECF No. 405 p. 6]. He cites to *Morrison* and *Edmond* for this proposition, stressing the following factors: (1) he is subject to removal by a higher Executive branch official for good cause, as was the case for the now-defunct independent counsel; (2) he is empowered to perform "limited duties" within a "limited" jurisdiction that is temporary and expires when his charge is over; (3) he "reports to and is supervised by the Attorney General" based on the terms of the Special Counsel Regulations; and (4) when all else fails, the Attorney General can remove the extant regulation and create at-will removal by amending or eliminating the regulation, or amending the Appointment Order itself [ECF No. 405 pp. 6–8].

Defendants and the Meese *amici* take the principal-officer view, urging that Special Counsel Smith wields the same authority as a United States Attorney per the Regulations, without a functional superior supervising or directing him, and without the important tool of at-will removal [ECF No. 326 p. 9 ("The authority he attempts to employ as Special Counsel far exceeds the power exercisable by a non-superior officer, authority that Congress has not cloaked him with."); ECF No. 647 p. 7 (adopting Meese principal-officer argument); ECF No. 611 p. 3 ("At bottom, former President Trump and amici argue the appointment of Special Counsel Jack Smith was unconstitutional insofar as Smith is a "principal officer," whose appointment must come from

the President alone with the advice and consent of the Senate."); ECF No. 364-1 pp. 20–22 (citing Calabresi & Lawson, *supra* at 128–134); ECF No. 647 pp. 25–32].

### B.  Legal Standards

The Supreme Court has "not purport[ed] to set forth a definitive test" for distinguishing between principal and inferior officers, although the relevant cases, principally *Morrison* and *Edmond*, provide informative markers.  *Edmond*, 520 U.S. at 661; *Morrison*, 487 U.S. at 671.

In *Morrison v. Olson*, 487 U.S. 654 (1988), the Court considered the status of the now-defunct independent counsel under the former Independent Counsel Act.  The Court was careful "not [to] attempt to decide exactly where the line falls between the two types of officers," but it enumerated the following four factors in route to "clearly" determining that the independent counsel fell on the inferior side of that line: (1) she was "subject to removal by a higher Executive Branch official," even though she was not "subordinate" to the Attorney General given her "independent discretion"; (2) she was "empowered by the Act to perform only certain, limited duties," which did not include formulation of policy; (3) her office was "limited in jurisdiction" as determined by the judicial division; and (4) her office was "limited in tenure" insofar as she was "appointed essentially to accomplish a single task."  *Id.* at 671–672.  Justice Scalia criticized this view in dissent, arguing that the independent counsel was not "subordinate to another officer" and was removable only for good cause.  *Id.* at 723 (Scalia, J., dissenting).

Almost ten years later in *Edmond v. United States*, 520 U.S. 651 (1997), the Supreme Court fleshed out the principal versus inferior officer inquiry in a case involving judges of the Coast Guard Court of Criminal Appeals.  The bulk of the majority's analysis is contained in the passage quoted below, although further important considerations—removability at will and power to render final decisions—feature in the decision too:

> Generally speaking, the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President: Whether one is an "inferior" officer depends on whether he has a superior. It is not enough that other officers may be identified who formally maintain a higher rank, or possess responsibilities of a greater magnitude. If that were the intention, the Constitution might have used the phrase "lesser officer." Rather, in the context of a Clause designed to preserve political accountability relative to important Government assignments, we think it evident that "inferior officers" are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.

*Id.* at 662–63. Continuing forward, the decision stressed that "[t]he power to remove officers . . . is a powerful tool for control," noting the parties' concession that the judicial officer at issue was removable without cause. *Id.* at 664 (citing *Bowsher v. Synar*, 478 U.S. 714, 727 (1986), and *Myers v. United States*, 272 U.S. 52 (1926)). And then, the Supreme Court commented on the degree to which an officer's decisions can be "reverse[d]" or countermanded by a higher entity or officer, ultimately concluding that the judges at issue remained inferior, because their decisions still were reviewed by a higher court, and because they lacked "power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Id.* at 665.

From these two decisions, courts have distilled three key factors in evaluating the inferior-principal question: (1) whether an officer is subject to substantial supervision and direction of a principal officer; (2) whether an officer is removable without cause—perhaps the weightiest factor; and (3) whether an officer's decisions are subject to reversal by a supervisor in the executive branch. *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1338 (D.C. Cir. 2012); *Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 613. Again, however, the Supreme Court "has been careful not to create a rigid test" for discerning between the two types

of officers, instead employing what appears to be a "case-by-case analysis." *Arthrex*, 594 U.S. at 47 (Thomas, J., dissenting).[54]

## C. Discussion

Against this backdrop, the Court examines whether Special Counsel Smith is a principal or inferior officer under the operative regulatory framework and available Supreme Court standards.[55]

### i.      Factual Development

As a preliminary matter, the parties agree that the Court should evaluate the principal versus inferior question, and indeed the entire Appointments Clause dispute, as a matter of law in accordance with the powers and authority delineated in the operative Special Counsel Regulations and applicable statutes [ECF No. 619 p. 1; ECF No. 620 pp. 8–12; *see* ECF No. 617 pp. 7–13]. The Court expresses some hesitation in this regard and lacks a detailed understanding of the actual extent and mechanics of supervision and control over Special Counsel Smith.[56]   Nevertheless,

---

[54] Post-*Edmond*, the viability of *Morrison* has been called into question.  *See, e.g.*, *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 315 (2017) (Thomas, J., concurring) ("Although we did not explicitly overrule *Morrison* in *Edmond*, it is difficult to see how *Morrison*'s nebulous approach survived our opinion in *Edmond*.  *Edmond* is also consistent with the Constitution's original meaning and therefore should guide our view of the principal-inferior distinction."); *Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 617 & n.8 (citing cases and scholarship).  Nonetheless, because it has not been overruled, the Court proceeds to apply the *Morrison* test alongside *Edmond*. *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) (stressing the Supreme Court's "prerogative of overruling its own decisions").  Defendants have not argued for the overruling of *Morrison* in this court, although the matter was raised at argument by the Landmark Legal *amici* [ECF No. 647 p. 112; ECF No. 364-1 (criticizing *Morrison*)].

[55] The Court notes that neither party raises a direct challenge to the validity of the Special Counsel Regulations, which have remained in effect without change since their promulgation in 1999.

[56] *Cf. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 610–612 (appearing to express a similar lack of clarity on degree of Attorney General's countermanding authority and extent to which Department's policies shaped special counsel's actions).

neither party pressed for an evidentiary hearing on the Appointments Clause issue; the Special

Counsel appears to have taken the questionable position that such inquiries intrude upon privileged

Department deliberations; and the Court generally agrees that judicial treatment of Appointments

Clause challenges has tracked the level of supervision and direction by reference to statutes and/or

regulations only.[57]   The Court thus proceeds accordingly, referencing the regulatory framework in

effect at the time of the subject Appointment Order and in force today.   *Nixon*, 418 U.S. at 695

("So long as this regulation is extant it has the force of law.") (citing *United States ex rel. Accardi*

*v. Shaughnessy*, 347 U.S. 260, 265 (1954)); *see Serv. v. Dulles*, 354 U.S. 363, 372 (1957).

> ## ii.   The Special Counsel Regulations impose almost no supervision or direction over the Special Counsel and give him broad power to render final decisions on behalf of the United States.

The Special Counsel Regulations give to the special counsel an exceedingly broad

charge—to "exercise, within the scope of his or her jurisdiction, the full power and independent

authority to exercise all investigative and prosecutorial functions of any United States attorney,"

28 C.F.R. § 600.6—and then impose virtually no mechanism for supervision or control by the

Attorney General.   Several key features inform this view, tracking the regulations on the subjects

of consultation, supervision, and countermanding (with removal to follow later):

*First*, a special counsel is under no regulatory obligation to consult with the Attorney

General "about the conduct of his or her duties and responsibilities."   28 C.F.R. § 600.6.   Quite the

---

[57] What is more, during the hearing, and specifically during questioning about the Special Counsel's degree of direction and supervision vis-à-vis the Attorney General, counsel for the Special Counsel refused to answer the Court's questions regarding whether the Attorney General had played any actual role in seeking or approving the indictment in this case [ECF No. 647 pp. 147–151].   In doing so, counsel appeared to invoke a deliberative process privilege or other "standard Justice Department [policy]," although none of the Court's questions solicited the substance of any internal deliberations [ECF No. 647 pp. 147–151].   Ultimately, counsel for the Special Counsel appeared to acknowledge some degree of actual oversight consistent with the Regulations, but again resisted any further representation [ECF No. 647 p. 148].

opposite, it is up to the special counsel to determine whether to "inform or consult with the Attorney General or others within the Department about the conduct of his or her duties and responsibilities." *Id*.

*Second*, a special counsel must "comply with the rules, regulations, procedures, and practices and policies of the Department," and he shall "consult with appropriate offices within the Department for guidance with respect to [those] established practices." 28 C.F.R. § 600.7(a). But nothing in that general policy-consultation directive—a directive that applies only to consultation with "appropriate offices within the Department" about general Department-wide policies— appears to limit a special counsel's specific decision-making in conducting his investigation and prosecution.

*Third*, still on the subject of consultation, the Regulations give full discretion to the special counsel whether to "consult directly with the Attorney General"—even when the special counsel "conclude[s] that the extraordinary circumstances of any particular decision would render compliance with required review and approval procedures by the designated Departmental component inappropriate." *Id*. § 600.7(a). So even in those difficult circumstances, the special counsel is the one to decide "whether to consult directly with the Attorney General," again leaving no mandatory consultation in the regulations themselves. *Id.*

*Fourth*, turning to mechanisms for "notification" between the special counsel and the Attorney General, the Regulations require the special counsel to "notify the Attorney General of events in the course of his or her investigation in conformity with the Departmental guidelines with respect to Urgent Reports." *Id*. § 600.8. But nothing in that provision actually requires the special counsel to do anything other than to "notify" the Attorney General of certain developments. *See* Justice Manual 1-13.000 (providing non-exhaustive list of "major developments," but

explaining that Urgent Reports impose only a "reporting," "notice requirement" that "should not interrupt, alter, or delay the normal conduct and pursuit of any matter or case").  And nothing in that provision provides the Attorney General with any authority to actually countermand, direct, or supervise those significant decisions.

*Fifth*, and finally, the Regulations expressly remove day-to-day supervision and provide almost no countermanding authority for the Attorney General.  *Edmond*, 520 U.S. at 665 (focusing on judges' power to "render a final decision on behalf of the United States unless permitted to do so by other Executive officers").  The pertinent regulation in this area is the "conduct and accountability" section in 28 C.F.R. § 600.7(b), quoted in full below:

> The Special Counsel shall not be subject to the day-to-day supervision of any official of the Department.  However, the Attorney General may request that the Special Counsel provide an explanation for any investigative or prosecutorial step, and may after review conclude that the action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued.  In conducting that review, the Attorney General will give great weight to the views of the Special Counsel.  If the Attorney General concludes that a proposed action by a Special Counsel should not be pursued, the Attorney General shall notify Congress as specified in § 600.9(a)(3).

*Id.* § 600.7(b).  This provision, reduced to its essence, leaves the Attorney General a very slim route to countermand a decision by the special counsel, but only when the decision is "so inappropriate or unwarranted under established Departmental policies"; only after the Attorney General has given—as a mandatory matter—"great weight to the views of the Special Counsel"; and subject to a strict congressional notification requirement that mandates the Attorney General notify Congress of his "countermanding" decision at the conclusion of the investigation.  *Id*. § 600.7(b); *id.* § 600.9(a)(3) (requiring Attorney General to *describe* and *explain* to Congress "instances" in which he concluded "that a proposed action by a Special Counsel was so inappropriate or unwarranted under established Departmental practices that it should not be

pursued").  It is hard to see how this amounts to any meaningful direction or supervision.  And it certainly does not mean that the Special Counsel lacks the power to render final decisions on behalf of the United States.  *Edmond*, 520 U.S. at 652.

In sum, this framework does not lend itself to a finding that Special Counsel Smith's "work is directed and supervised at some level" by the Attorney General—unless the "at some level" qualifier in *Edmond* is read in an exceedingly broad way.  520 U.S. at 663.

> ### iii. The limitations on the Attorney General's power to remove the Special Counsel support principal status under *Edmond* but maybe not under *Morrison*.

The Court now turns to the Attorney General's power to remove Special Counsel Smith. "The power to remove officers at will and without cause is a powerful tool for control."  *Edmond*, 520 U.S. at 663.  This element features prominently in *Edmond*, which relied heavily on at-will removal in finding inferior-officer status, but it also appears in *Morrison*, where the Supreme Court classified an independent counsel as an inferior officer even without at-will removal.  *Morrison*, 487 U.S. at 671, 691–92 (referring to 28 U.S.C. § 596(a)(1), and concluding that the Act's "good cause" removal provision did not "impermissibly burden[] the President's power to control or supervise the independent counsel").

The particular removal provision in the Special Counsel Regulations reads as follows:

> The Special Counsel may be disciplined or removed from office only by the personal action of the Attorney General. The Attorney General may remove a Special Counsel for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Departmental policies. The Attorney General shall inform the Special Counsel in writing of the specific reason for his or her removal.

28 C.F.R. § 600.7(d).  "Good cause" is a far-reaching term that is difficult to define.  *See Concord*

*Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 613.  What is clear, however, is that the Regulations

do not afford the Attorney General "at will" removal power.[58]

So what to make about the removal limitations in this case?  On this point, the Court agrees

with the United States District Court in *Concord Management* that the Special Counsel

Regulations afford "more substantial protection against removal, and thus risk rendering him a

principal officer," for the reasons stated in that decision and also referenced above.  *Concord*

*Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 613–14 (citing cases).  The Court need not expound

on the analysis further except to underscore the Supreme Court's strong emphasis on at-will

removal as a "powerful tool for control."  *Edmond*, 520 U.S. at 664 (citing *Bowsher*, 478 U.S. at

727; *Myers*, 272 U.S. 52 (1926)).  But of course, *Morrison* deemed the independent counsel an

inferior officer despite a good-cause removal restriction—albeit in the context of a multi-factored

approach that did not purport to delineate the "line" between principal and inferior officers.  487

U.S. at 671.  And so, while it seems the absence of at-will removal is a key feature that—when

combined with the absence of any meaningful supervision or countermanding authority—likely

could transform Special Counsel Smith into a principal officer, the Court holds off on that view to

allow whatever evaluation of this topic may be conducted by higher courts.

> ### iv.  **The possibility of a future rescission of the Special Counsel Regulations to create at-will removal does not change the Appointments Clause inquiry under current law**.

There is one final issue to discuss as relates to removal.  It concerns the Special Counsel's

fall-back position that none of the removal limitations in the Regulations pose an impediment to

inferior-officer status, because the Attorney General can rescind or amend the Regulations at will

---

[58] United States Attorneys are removable at will.  28 U.S.C. § 541(c).

(and without notice-and-comment), or can amend or revoke the Appointment Order.  In a nutshell, the submission is as follows: evaluate the constitutional status of the Special Counsel's position in accordance with the extant regulatory framework, as a matter of law, but if the removal issue gets too sticky, customize that framework and consider the matter under a hypothetical future scenario where the regulation as it stands today (with its removal restrictions) does not exist [*see* ECF No. 405 pp. 11–12; ECF No. 647 pp. 151–52].  In other words, rely on the Regulations for some things, but discard or amend them at least partially should they cast into doubt the Special Counsel's inferior-officer status.

This regulatory cherry-picking seems questionable as a means to resolve the inferior-principal Appointments Clause question, although the Court admits of uncertainty in this regard, and some courts have accepted the revocability piece as "crucial" in permitting an inferior-officer designation in similar contexts.  *Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d at 615 (quoting *In re Sealed Case*, 829 F.2d at 56)).  Of course, regulations can be amended subject to ordinary legal principles and any applicable restraints.  But regulations have the force of law so long as they remain operative, which they are here.  *Nixon*, 418 U.S. at 695 ("So long as this regulation is extant it has the force of law.") (citing *Accardi*, 347 U.S. at 265); *see Dulles*, 354 U.S. at 372 (describing *Accardi* as supporting notion that "regulations validly prescribed by a government administrator are binding upon him as well as the citizen . . . even when the administrative action under review is discretionary in nature").  The question, then, is not whether regulations can be rescinded or amended; they can be.  Rather, the question is whether Special Counsel Smith is a principal or inferior officer under the Appointments Clause.  And that inquiry, it seems to this Court, must operate on the basis of extant law (a point on which the Special Counsel otherwise agrees)—not on some possible future material change to the removal limitations that

has not happened (and that frankly has not happened since the Regulations came into existence in 1999).  If the matter were otherwise, the practical result becomes one of "regulatory shielding" almost, in a figurative sense; an officer without authority to act as a principal officer exercises a principal-officer role, but no means exist to judicially test that constitutional noncompliance because the reviewing court—despite finding principal status in the present tense—must suspend reality and reject the challenge on the basis of something other than the operative regulations.  Such slipperiness would not be permitted if the officer were acting pursuant to statute; the court would review the extant law in a fixed manner, as is normally the case in Appointments Clause challenges with statutory law, not through shifting regulations or appointment orders untied to statutory authority.  All of this simply underscores the need for Congress to enact "Law" in conformity with the Appointments Clause.  Art. II, § 2, cl. 2.

> **v.    The Special Counsel's defined jurisdiction and tenure present a mixed and candidly unhelpful picture**.

The final component of the Court's inferior-officer analysis concerns Special Counsel Smith's jurisdiction and tenure.  While *Edmond* did not stress these features, the *Morrison* court considered them in reaching its inferior-officer conclusion.  *Morrison*, 487 U.S. at 672 (finding the Independent Counsel's office was "limited in jurisdiction" and "limited in tenure").  What they yield here is muddled and likely not dispositive.

Special Counsel Smith's jurisdiction is described in a factual statement in the Appointment Order.[59]  His jurisdiction is thus "limited" in the manner described by the Attorney General—as

---

[59]   Order No. 5559-2022 ("The Special Counsel is further authorized to conduct the ongoing investigation referenced and described in the United States' Response to Motion for Judicial Oversight and Additional Relief, *Donald J. Trump v. United States*, No. 9:22-CV-81294-AMC (S.D. Fla. Aug. 30, 2022) (ECF No. 48 at 5–13), as well as any matters that arose or may arise directly from this investigation or that are within the scope of 28 C.F.R. § 600.4.").  28 C.F.R. § 600.4(a) (adding authority to investigate and prosecute perjury, obstruction of justice, destruction

compared, for example, to a United States Attorney with jurisdiction to investigate any violation of federal criminal law throughout a designated federal district.  But the Special Counsel's powers within his jurisdiction are exceedingly broad, indeed as broad as those possessed by a United States Attorney.  *See* Robert H. Jackson, U.S. Att'y Gen., Address at the Second Annual Conference of United States Attorneys: The Federal Prosecutor 2 (Apr. 1, 1940) (referencing the might and discretion of prosecutors and their ability to "strike at citizens, not with mere individual strength, but with all the force of government itself").  And in some degree, the Special Counsel's powers are arguably broader than a traditional United States Attorney, as he is permitted to exercise his investigatory powers across multiple districts within the same investigation.  So is he really exercising "limited" jurisdiction?  And what is the "unlimited" jurisdictional benchmark to which his work ought to be compared?  The answers are hazy.  In any event, an officer's scope of work, even if limited, is not dispositive of the jurisdictional inquiry.  As Justice Scalia said of the independent counsel in *Morrison*:

> As to the scope of her jurisdiction, there can be no doubt that is small (though far from unimportant). But within it she exercises more than the full power of the Attorney General. The Ambassador to Luxembourg is not anything less than a principal officer, simply because Luxembourg is small. And the federal judge who sits in a small district is not for that reason "inferior in rank and authority." If the mere fragmentation of executive responsibilities into small compartments suffices to render the heads of each of those compartments inferior officers, then Congress could deprive the President of the right to appoint his chief law enforcement officer by dividing up the Attorney General's responsibilities among a number of "lesser" functionaries.

*Morrison*, 487, U.S. at 718 (Scalia, J., dissenting).

---

of evidence, and intimidation of witnesses, along with authority to conduct appeals out of matters "investigated and/or prosecuted").  As noted *supra*, the Appointment Order also authorizes Special Counsel Smith to investigate and prosecute federal crimes arising from an unrelated electoral matter.  Order No. 5559-2022.  That prosecution is the subject of a separate proceeding in the U.S. District Court for the District of Columbia.

As to tenure, while it is true that Special Counsel Smith's position will end "[a]t the conclusion" of his "work," *see* 28 C.F.R. § 600.8(c), whenever that happens, that circumstance does not equate to a "limited tenure" in a meaningful sense.  Nor is it clear what the "unlimited tenure" benchmark is, or how to measure it in real terms.  What is known, however, is that the Special Counsel has been operating since November 2022; he has established a very significant operation in terms of staffing and resources; his direct expenditures exceeded $12.8 million as of close to a year ago (September 2023); and nothing in the Regulations, the Appointment Order, or the record more generally provides a concrete sunset provision for the cessation of his work.

Bringing these factors together—jurisdiction and tenure—the Court attempts to surmise the following: (1) the Special Counsel's jurisdiction is "limited" if "limited jurisdiction" means something less than the general jurisdiction exercised by a United States Attorney to prosecute any federal crime in one district (*but see* unlimited geographical reach in Appointment Order), and (2) the Special Counsel's tenure is "limited" if "limited in tenure" requires an open-ended appointment, perhaps with a fixed number of years.  28 U.S.C. § 541 (United States Attorneys serving four-term terms).  The disposition of these factors is unclear, but they remain in the amalgam of considerations in Supreme Court caselaw.

\*\*\*

For the above reasons, the Court sees compelling reasons to reach a principal-officer designation.  But because the answer under current Supreme Court precedent is not self-evident, and because this Court need not rely on this ground to dispose of the Appointments Clause challenge in the Motion, the Court elects to leave the matter for future review.  Of course, however,

should it be determined that Special Counsel Smith is a principal officer, his appointment would

violate the Appointments Clause without question.  Art. II. § 2, cl. 2.[60]

## VI.    Remedy for Appointments Clause Violation

The Court turns lastly to the remedial question: what to do about the absence of "Law"

authorizing Special Counsel Smith's appointment?  Defendants seek dismissal of the Superseding

Indictment, arguing that "Jack Smith lacks the authority to prosecute this action," and that "any

actions [thus] taken by Smith are *ultra vires*" [ECF No. 326 pp. 1, 9, 13; *see* ECF No. 414 p. 10;

*see* ECF No. 364-1 (Meese *amici*)].  Special Counsel Smith opposes Defendants' request on the

merits but fails to propose any alternative form of relief or to respond on the substance of the

remedial question [*see* ECF No. 374; ECF No. 432 p. 9 n.5 ("Because the Special Counsel is an

officer authorized to carry out the prosecution in this case, the Court has no reason to consider

---

[60] The Landmark Legal *amici* argue that Special Counsel Smith is merely an "employee" not subject to the Appointments Clause [ECF No. 410-2].  This position is based primarily on the view that the Special Counsel's position is not sufficiently "continuous" to warrant treatment as an officer [ECF No. 410-2 pp. 11–15].  Neither party advances this contention, and the Court disagrees with it.  By any measure, Special Counsel Smith is "exercis[ing] significant authority pursuant to the laws of the United States."  *Buckley*, 424 U.S. at 126.  This is clear from the operative regulations, 28 C.F.R. § 600.6, which empower him to act with the full scope and power of a United States Attorney within his jurisdiction.  Although the Supreme Court's decision in *Lucia* does emphasize continuity as a factor distinguishing officers from employees, it does so in the context of a comparison to "occasional" and "temporary duties," and it does not purport to establish bright lines on the degree of continuity.  585 U.S. at 245 (comparing continuing and permanent offices as distinct from temporary and episodic duties).  Moreover, *Lucia* supports the continued vitality of the *Buckley* test, which no one disputes is satisfied by Special Counsel Smith.  For these reasons, although Special Counsel Smith is not "permanent" in the forever sense because his jurisdiction will conclude at whatever unspecified time it concludes, his role clearly is not the sort of episodic, transient position that would make someone an employee under *Germaine*, 99 U.S. at 511–512 (holding that civil surgeons who were hired to perform exams intermittently were employees only).  The Court notes that neither the Regulations nor the Appointment Order sets a time limit on Special Counsel Smith's appointment, which is approaching two years in duration.  And United States Attorneys serve four-year terms, 28 U.S.C. § 541(b), which are continuing even if not permanent.

whether the Special Counsel action's to date are 'salvageable' under the De Factor [sic] Officer doctrine.")].[61]   Because Special Counsel Smith's exercise of prosecutorial power has not been authorized by law, the Court sees no way forward aside from dismissal of the Superseding Indictment.  And the Special Counsel does not propose an alternative course.

"'[O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer . . .' is entitled to relief."  *Lucia*, 585 U.S. at 251 (2018) (quoting *Ryder*, 515 U.S. at 182–83).  In such cases, which necessarily involve a "Government actor's exercise of power that the actor did not lawfully possess," the proper remedy is invalidation of the *ultra vires* action. *Collins v. Yellen*, 594 U.S. 220, 258 (2021) (collecting cases); *see id*. at 276–83 (Gorsuch, J., concurring).  Invalidation "follows directly from the government actor's lack of authority to take the challenged action in the first place.  That is, winning the merits of the constitutional challenge is enough."  *Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc*., 33 F.4th 218, 241 (5th

---

[61] Insofar as the Special Counsel may argue that additional briefing on remedy is warranted, the Court explains the record and notes the Special Counsel's full and fair opportunity to brief the matter of remedy.  This action presents a challenging array of issues, almost all of which are resolutely contested; the parties require no prompting before objecting, opposing, and otherwise engaging in "spirited" exchanges.  With respect to the instant Motion itself, both the Special Counsel and Defendant Trump submitted briefing; *amicus* briefs were received; and a lengthy hearing occurred.  Yet startlingly, the Special Counsel submitted nothing on the topic of the proper remedy for the Appointments Clause issue, despite challenging dismissal as a remedy in the Appropriations Clause context [ECF No. 374 pp. 22–23 (disputing dismissal and referencing alternative sources of funding); *see* ECF No. 671 (response to supplemental authority agreeing to supplemental briefing "on the immunity issue" and nothing more)].  Instead, counsel for the Special Counsel remarked at the hearing, in response to a question about remedy in the Appropriations Clause context, that: "to the extent that the Court is seriously entertaining the notion that there is a constitutional or funding problem, I actually think it would behoove the Court and the parties to have some additional briefing" [ECF No. 648 p. 44].  This last-minute reference to conditional supplemental briefing at the hearing—only if the Court disagreed with the Special Counsel on the merits—in no way signals a lack of a full and fair opportunity given to all parties to brief their positions.  Nor does it establish any prejudice from an alleged deprivation of a chance to respond on the plainly important issue of the proper remedy for the Appointments Clause matter.

Cir. 2022) (Jones, J., concurring).[62]  In light of these remedial principles—and because the Court concludes that Special Counsel Smith's appointment violates the Appointments Clause—the actions of Special Counsel Smith in connection with this proceeding must be set aside.

The Supreme Court's decision in *Lucia v. SEC*, 585 U.S. 237 (2018), serves as the best comparator for remedy purposes.  In *Lucia*, the petitioner—a business owner who had been sanctioned by an administrative law judge for securities violations—raised a timely challenge to the validity of the judge's appointment.  *Id*. at 243–44.  The Supreme Court sided with the petitioner, concluding that the judge's appointment was constitutionally defective under the Appointments Clause.  *Id*. at 251.  Because the judge "heard and decided [the petitioner's] case without the kind of appointment the Clause requires," the Court ruled that "the 'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official."  *Id*. at 251 (quoting *Ryder*, 515 U.S. at 183, 188).  In other words, *Lucia* undid the unlawful action by granting petitioner a new hearing before a constitutionally appointed officer.

Here, as in *Lucia*, the appropriate remedy is invalidation of the officer's *ultra vires* acts.  Since November 2022, Special Counsel Smith has been exercising "power that [he] did not lawfully possess."  *Collins*, 594 U.S. at 258.  All actions that flowed from his defective appointment—including his seeking of the Superseding Indictment on which this proceeding

---

[62]  *Collins* distinguished these situations from other separation-of-powers cases involving laws containing improper removal provisions.  594 U.S. at 257–59.  In those cases, the proper remedy is often to sever the violative removal provision from the rest of the law.  *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 232–38 (2020); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd*., 561 U.S. 477, 508–10 (2010).  Full-scale invalidation is not necessary to rectify the harm in such cases because "the unlawfulness of the removal provision does not strip" a lawfully appointed government actor "of the power to undertake the responsibilities of his office."  *Collins*, 594 U.S. at 258 n.23.  That is not the case here, where the matter goes to the core of appointment.

currently hinges [ECF No. 85]—were unlawful exercises of executive power. Because Special Counsel Smith "cannot wield executive power except as Article II provides," his "[a]ttempts to do so are void" and must be unwound. *Id.* at 283 (Gorsuch, J., concurring). Defendants advance this very argument: "any actions taken by Smith are *ultra vires* and the Superseding Indictment must be dismissed" [ECF No. 326 p. 9]. And the Court sees no alternative course to cure the unconstitutional problem.

It bears noting that Special Counsel Smith's work cannot be salvaged by the *de facto* officer doctrine, which, in some circumstances, "confers validity upon acts performed by a person acting under the color of official title even though it is later discovered that the legality of that person's appointment or election to office is deficient." *Ryder*, 518 U.S. at 180 (citing *Norton v. Shelby County*, 118 U.S. 425, 440 (1886)).

For two reasons, that doctrine does not apply here.[63] First, the doctrine is designed to address "technical defects in title to office." *Ryder*, 518 U.S. at 180 (internal quotations marks omitted); *see Nguyen v. United States*, 539 U.S. 69, 77–78 (2003). Here, the problem is no mere "technical defect"—instead, the problem is the absence of a statutorily created office to fill in the first place. As the Supreme Court has made clear, "there can be no officer, either *de jure* or *de facto*, if there is no office to fill." *Norton*, 118 U.S. at 441. Second, the *de facto* officer doctrine has not been applied in cases, like this one, where a litigant raises a timely constitutional challenge to an officer's appointment. *See Ryder*, 539 U.S. at 182–83 ("We think that one who makes a

---

[63] The *de facto* officer doctrine was covered noncommittally in the Landmark Legal *amici*'s brief [ECF No. 410-2 pp. 23–24]. The Special Counsel offered a non-response in a footnote: "Because the Special Counsel is an officer authorized to carry out the prosecution in this case, the Court has no reason to consider whether the Special Counsel's actions to date are 'salvageable' under the De Factor [stet] Officer doctrine" [ECF No. 432 p. 9 n.5].

timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred."); *Lucia*, 585 U.S. at 251.   "Any other rule would create a disincentive to raise Appointments Clause challenges" in the face of questionable appointments. *Ryder*, 539 U.S. at 183; *see Lucia*, 585 U.S. at 251 n.5.   Because Defendants timely raised their constitutional challenge to Special Counsel Smith's appointment, and because there can be no valid officer without a valid office, the Court sees no basis to resort to the *de facto* officer doctrine.[64]

## APPROPRIATIONS CLAUSE DISCUSSION

The Court turns next to Defendants' Appropriations Clause challenge [ECF No. 326 pp. 9–14].[65]   Since its inception, Special Counsel Smith's office has been funded by "a permanent

---

[64] The Supreme Court's decision in *Off. of United States Tr. v. John Q. Hammons Fall 2006, LLC*, 144 S. Ct. 1588, 1595 (2024), is not to the contrary [*See* ECF No. 648 pp. 42–43].   That case involved how to remedy a "limited" Bankruptcy Clause problem flowing from a federal bankruptcy statute—not the constitutionality of an officer's appointment under the Appointments Clause. *Id.* (focusing on the "short lived and small" nature of the "constitutional problem").   More fundamentally, that case does not detract from the principle that "the nature of the violation determines the scope of the remedy." *Id.* (quoting *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971)).   Here, for all of the reasons stated, the only appropriate remedy for the preserved constitutional challenge under the Appointments Clause—a challenge that implicates separation of powers—is invalidation of the proceeding.

[65]   Defendants have Article III standing to raise their Appropriations Clause challenge.   The Supreme Court has recognized that standing exists in "cases in which individuals sustain discrete, justiciable injury from actions that transgress separation-of-powers limitations." *Bond v. United States*, 564 U.S. 211, 224 (2011); *Collins*, 594 U.S. at 245.   Violations of the Appropriations Clause are one such example. *See United States v. McIntosh*, 833 F.3d 1163, 1173–74 (9th Cir. 2016) (holding that appellants "ha[d] standing to invoke separation-of-powers provisions of the Constitution"—there, the Appropriations Clause—"to challenge their criminal prosecutions" prior to conviction); *see United States v. Stone*, 394 F. Supp. 3d 1, 19 n.13 (D.D.C. 2019).   To the extent that Special Counsel Smith challenged Defendants' standing to raise this argument in his Opposition or attempted to cast the challenge as a non-constitutional claim, he declined to stand by those contentions at the hearing [ECF No. 648 pp. 46–48].

indefinite appropriation . . . established within the Department of Justice to pay all necessary expenses of investigations and prosecutions by independent counsel appointed pursuant to the provisions of 28 U.S.C. 591 et seq. or other law." 101 Stat. 1329. But as discussed above, *supra* pp. 22–52, Special Counsel Smith was not lawfully "appointed pursuant to . . . other law." 101 Stat. 1329. This means that Special Counsel Smith's office—since November 2022—has been drawing funds from the Treasury without statutory authorization, in violation of the Appropriations Clause.

## I.    Background Legal Principles

The Appropriations Clause dictates that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. Art. I, § 9, cl. 7. This "straightforward and explicit command . . . means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (citation omitted). To pass constitutional muster, an appropriation "need only identify a source of public funds and authorize the expenditure of those funds for designated purposes." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 426 (2024) ("CFPB").[66]

---

[66] Defendants do not challenge the Indefinite Appropriation itself—only its applicability to Special Counsel Smith [ECF No. 326 pp. 12–14]. The Court expresses some uncertainty, however, about the legality of the purely "indefinite" nature of the appropriation, which by all accounts is uncapped and includes no monetary threshold or other formulaic limitation. It is not clear whether that feature, on its own, presents a constitutional defect under the Appropriations Clause. *See CFPB*, 601 U.S. at 425–41 (emphasizing repeatedly the "capped" nature of the CFPB's funding scheme in determining it complied with the Appropriations Clause); *but see id*. at 444 (Kagan, J., concurring) (identifying certain statutes that do not "designate specific sums of money"). All that said, the limitless nature of the appropriation, standing alone, was not squarely raised in this proceeding.

The Appropriations Clause plays a critical role in our constitutional scheme of separated powers. It is Congress—not the executive or judicial branches—that controls government spending. "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Id*. at 425. As a historical matter, "Congress's 'power over the purse' has been its 'most complete and effectual weapon' to ensure that the other branches do not exceed or abuse their authority." *CFPB*, 601 U.S. at 448 (Alito, J., concurring) (quoting The Federalist No. 58, p. 359 (C. Rossiter ed. 1961) (J. Madison)). *See also Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc*., 33 F.4th 218, 225–232 (5th Cir. 2022) (Jones, J., concurring) (discussing in detail the historical origins, and separation-of-powers underpinnings of the Appropriations Clause).

## II.   Analysis

By its terms, the Indefinite Appropriation is available only to "independent counsel[s] appointed pursuant to the provisions of 28 U.S.C. § 591 et seq. or other law." 101 Stat. 1329. The Independent Counsel Act expired in 1999, meaning that Special Counsel Smith must identify "other law" authorizing his appointment to access the Indefinite Appropriation. Both sides agree that "other law," for present purposes, is the collection of statutes cited in the Appointment Order [ECF No. 648 pp. 5, 31]. For all of the reasons the Court found no statutory authority for the appointment, *supra* pp. 22–52, Special Counsel Smith's investigation has unlawfully drawn funds from the Indefinite Appropriation.[67]

---

[67]   Nor do the Special Counsel Regulations serve as "other law" for purposes of access to the Indefinite Appropriation [ECF No. 374 p. 18 (arguing that 28 C.F.R. § 600 has "the force of law" for purposes of the Indefinite Appropriation); *but see* ECF No. 648 p. 31 (agreeing that "other law" in the Independent Appropriation refers to statutory law only)].

Having found no "other law," the Court need not determine whether Special Counsel Smith is the type of "independent counsel" referenced in the Indefinite Appropriation [ECF No. 326 pp. 13–14 (arguing Smith is not sufficiently "independent" to access funds)].[68]   Nevertheless, the Court notes the inherent tension in the Special Counsel's position on this issue.   In the Appointments Clause context—specifically, in arguing that he is an inferior (as opposed to principal) officer—Special Counsel Smith emphasizes the Attorney General's supervision and control over his work [ECF No. 374 p. 7 n.1; ECF No. 405].   Yet in the Appropriations Clause context, he asserts that he is sufficiently independent to draw funds from the Indefinite Appropriation [ECF No. 374 pp. 17–18].   In other words, Special Counsel Smith contends he is *independent enough* to access the funds, but not *so* independent to constitute a principal officer.

Perhaps he threads that needle.   But at least one source suggests otherwise.   In 2004, the Government Accountability Office (GAO) approved of Special Counsel Patrick Fitzgerald's use of funds from the Indefinite Appropriation.   Special Counsel and Permanent Indefinite Appropriation, B-302582, 2004 WL 2213560 (Sept. 30, 2024).   The GAO's determination was grounded in Fitzgerald's "express exclusion . . . from the application of 28 C.F.R. Part 600 [*i.e.*, the Special Counsel Regulations]," which allowed him to operate "independent of the supervision or control of any officer of the Department." *Id*. at 3.[69]   Contrast Fitzgerald with Special Counsel

---

[68]   Were the Court required to conduct that analysis, it is unclear precisely how "independent" an "independent counsel" must be to draw from the Indefinite Appropriation. The Court accepts, however, that independent counsels need not be strictly equivalent to the "Independent Counsels" authorized by the now-defunct EGA. *See Stone*, 394 F. Supp. 3d at 20–22.

[69]   Then-Acting Attorney General James Comey directed Special Counsel Fitzgerald to exercise his authority "independent of the supervision or control of any officer of the Department."  Letter from Acting Attorney General James B. Comey to Patrick J. Fitzgerald (Dec. 30, 2003).  In a later letter, Comey clarified that Fitzgerald's position as "Special Counsel" "should not be misunderstood to suggest that [his] position and authorities are defined and limited by 28 CFR Part 600." Letter from Acting Attorney General James B. Comey to Patrick J. Fitzgerald (Feb. 6, 2004).

Smith, who—by the express terms of the Appointment Order and by his own admission—is subject to the Special Counsel Regulations, and subject to the supervision and control of the Attorney General.

As mentioned above, the Court need not decide the "independence" issue given the absence of statutory law authorizing the appointment. But at the very least, the "independence" question raises doubts.

### III.    Remedy

This leaves remedy for the Appropriations Clause violation. Defendants argue that dismissal is the only way to cure the funding violation [ECF No. 326 p. 12; ECF No. 414 p. 9]. Special Counsel Smith opposes dismissal, asserting—without any specificity or even willingness to engage in factfinding [*see* ECF No. 620 p. 3]—that "the Department could readily have funded the Special Counsel from other appropriations that were available" [ECF No. 374 p. 25]. At the hearing, Special Counsel Smith represented, "at a relatively high level of generality," that DOJ "has appropriated, at least in the 2023 appropriation cycle, over a billion dollars," which it is prepared to use to fund the Special Counsel's office [ECF No. 648 pp. 41–42]. The Court need not reach the question of remedy here, having found the Appointments Clause violation to warrant dismissal. *Supra* pp. 81–85. But as discussed below, there is good reason to believe that the Appropriation Clause violation serves as a separate, independent basis to dismiss.

"Across remedial contexts, the nature of the violation determines the scope of the remedy." *John Q. Hammons Fall 2006, LLC*, 144 S. Ct. at 1594 (internal quotation marks omitted). As far as the Court can tell, there is no Supreme Court or Eleventh Circuit precedent that speaks directly to this point. Given the absence of binding precedent on the issue, the Court finds instructive

Judge Edith Jones's concurrence in *Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*, 33 F.4th 218 (5th Cir. 2022) (Jones, J., concurring), a case involving a civil enforcement action brought by the CFPB.  *Id.* at 220–42.[70]  *All American* concerned whether the CFPB's structure violated the Constitution's separation of powers.  *Id.* at 220.  In a per curiam opinion, the court vacated and remanded the district court's order in light of the Supreme Court's decision in *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020).  *Id.*  Judge Jones concurred, writing separately to make the case that the CFPB's funding mechanism violated the Appropriations Clause.  *Id.* at 220–42 (Jones, J., concurring).  Likening an unlawfully funded enforcement action to unauthorized government action, Judge Jones advanced that dismissal was the proper remedy:

> Just as a government actor cannot exercise power that the actor does not lawfully possess, so, too, a government actor cannot exercise even its lawful authority using money the actor cannot lawfully spend.  Indeed, a constitutionally proper appropriation is as much a precondition to every exercise of executive authority by an administrative agency as a constitutionally proper appointment or delegation of authority.

*Id.* at 242.  Surveying cases in which a government actor took action without constitutional authority, Judge Jones concluded that the appropriate remedial course was to "disregard the government action."  *Id.*  "[B]ecause the CFPB funds the instant prosecution using unconstitutional self-funding, I would dismiss the lawsuit."  *Id.*

There is a strong, intuitive appeal to applying Judge Jones's logic here.  The Special Counsel's office has spent tens of millions of dollars since November 2022, all drawn unconstitutionally from the Indefinite Appropriation.  That funding has served as "the very lifeblood that empower[ed] it to act."  *Id.* at 241.  Perhaps, as suggested generally at the hearing,

---

[70] *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*, 51 F.4th 616, 642–43 (5th Cir. 2022), is a related case (overruled on other grounds in *CFPB*), that provides helpful analysis on remedies in the Appropriations Clause context.

DOJ could reallocate funds to finance the continued operation of Special Counsel Smith's office [ECF No. 648 pp. 41–42]. This would require further development of the record. But even if this were prospectively possible, what to make of the prior action? For more than 18 months, Special Counsel Smith's investigation and prosecution has been financed by substantial funds drawn from the Treasury without statutory authorization, and to try to rewrite history at this point seems near impossible. The Court has difficulty seeing how a remedy short of dismissal would cure this substantial separation-of-powers violation, but the answers are not entirely self-evident, and the caselaw is not well developed. For that reason, and given the disposition of this Order on Appointments Clause grounds, the Court leaves the matter of funding remedy for any applicable future review.[71]

## **CONCLUSION**

Upon careful study of the foundational challenges raised in the Motion, the Court is convinced that Special Counsel's Smith's prosecution of this action breaches two structural cornerstones of our constitutional scheme—the role of Congress in the appointment of constitutional officers, and the role of Congress in authorizing expenditures by law.

The Framers gave Congress a pivotal role in the appointment of principal and inferior officers. That role cannot be usurped by the Executive Branch or diffused elsewhere—whether in this case or in another case, whether in times of heightened national need or not. In the case of inferior officers, that means that Congress is empowered to decide if it wishes to vest appointment power in a Head of Department, and indeed, Congress has proven itself quite capable of doing so in many other statutory contexts. But it plainly did not do so here, despite the Special Counsel's

---

[71]  As in the Appointments Clause context, the *de facto* officer doctrine does not apply here. *See supra* pp. 84–85.

strained statutory readings.  Nor does his appeal to inconsistent "historical practice" supplant the absence of textual authorization for his appointment.  The same structural emphases resonate in the context of the Appropriation Clause, which "embodies a fundamental separation of powers principle—subjugating the executive branch to the legislatures power of the purse." *All American*, 33 F.4th at 221 (Jones, J., concurring).

In the end, it seems the Executive's growing comfort in appointing "regulatory" special counsels in the more recent era has followed an ad hoc pattern with little judicial scrutiny.  Perhaps this can be traced back to reliance on stray dictum in *Nixon* that perpetuated in subsequent cases. Perhaps it can be justified practically by the urgency of national crises.  Or perhaps it can be explained by the relative infrequency of these types of investigations, by congressional inattention, or by the important roles that special-counsel-like figures have played in our country's history. Regardless of the explanation, the present Motion requires careful analysis of the statutory landscape to ensure compliance with the Constitution, and the Court has endeavored to do so with care.

The Court thus returns to where it started.  The Appointments Clause is "among the significant structural safeguards of the constitutional scheme." *Edmond*, 520 U.S. at 659.  So too is the Appropriations Clause, which carefully separates Congressional control of the "purse" from Executive control of the "sword."  The Federalist No. 78 (Alexander Hamilton).  The consequences of relaxing either of those critical provisions are serious, both in this case and beyond.  As Justice Frankfurter explained in his opinion in *Youngstown*, "[t]he accretion of dangerous power does not come in a day.  It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594 (1952) (Frankfurter, J., concurring).  "[I]llegitimate

and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure." *Boyd v. United States*, 116 U.S. 616, 635 (1886).

<p style="text-align:center">***</p>

For the reasons set forth above, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Dismiss Superseding Indictment Based on Unlawful Appointment and Funding of Special Counsel Jack Smith is **GRANTED** in accordance with this Order [ECF No. 326].

2. The Superseding Indictment [ECF No. 85] is **DISMISSED**.

3. This Order is confined to this proceeding. The Court decides no other legal rights or claims.

4. This Order shall not affect or weaken any of the protections for classified information imposed in this case or any protective orders pertaining to classified information.

5. The Clerk is directed to **CLOSE** this case. Any scheduled hearings are **CANCELLED**. Any pending motions are **DENIED AS MOOT**, and any pending deadlines are **TERMINATED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 15th day of July 2024.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

TAB 673

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 673

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80101-CR-CANNON(s)

UNITED STATES OF AMERICA,

       Plaintiff,

v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

       Defendants.

_____/

NOTICE OF APPEAL

      The United States of America hereby gives notice that it appeals to the United States Court

of Appeals for the Eleventh Circuit from the order of the District Court entered on July 15, 2024,

Docket Entry 672.

                      Respectfully submitted,

                      JACK SMITH
                      Special Counsel
                      N.Y. Bar No. 2678084

      By:   /s/ *Jay I. Bratt*
                      Jay I. Bratt
                      Counselor to the Special Counsel
                      Special Bar ID #A5502946
                      950 Pennsylvania Avenue, N.W.
                      Washington, D.C. 20530

                      David V. Harbach, II
                      Assistant Special Counsel
                      Special Bar ID #A5503068

July 17, 2024

271

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which in turn serves counsel of record via transmission of Notices of Electronic Filing.

/s/ *Jay I. Bratt*
Jay I. Bratt

TAB 677

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 677

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

November 26, 2024

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

FILED BY _____ JG _____ D.C.

Nov 26, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Appeal Number:  24-12311-SS
Case Style:  USA v. Donald Trump, et al
District Court Docket No:  9:23-cr-80101-AMC

The enclosed copy of this Court's Order of Dismissal is issued as the mandate of this court. See 11th Cir. R. 41-4. Counsel and pro se parties are advised that pursuant to 11th Cir. R. 27-2, "a motion to reconsider, vacate, or modify an order must be filed within 21 days of the entry of such order. No additional time shall be allowed for mailing."

**The dismissal order is for Appellee, Donald J. Trump, only.  The appeal will proceed with the remaining Appellees.**

Clerk's Office Phone Numbers
| | | | |
|---|---|---|---|
| General Information: | 404-335-6100 | Attorney Admissions: | 404-335-6122 |
| Case Administration: | 404-335-6135 | Capital Cases: | 404-335-6200 |
| CM/ECF Help Desk: | 404-335-6125 | Cases Set for Oral Argument: | 404-335-6141 |

Enclosure(s)

DIS-4 Multi-purpose dismissal letter

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————

No. 24-12311

————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

*versus*

DONALD J. TRUMP,
WALTINE NAUTA,
CARLOS DE OLIVEIRA,

Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:23-cr-80101-AMC

————————————

2                          Order of the Court                          24-12311

ORDER:

Appellant's motion to dismiss the appeal as to Donald J.
Trump only is GRANTED.

DAVID J. SMITH
Clerk of the United States Court of
Appeals for the Eleventh Circuit

ENTERED FOR THE COURT - BY DIRECTION

TAB 679

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 679

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Case No. 23-cr-80101- CANNON** |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| WALTINE NAUTA, and | ) | |
| CARLOS DE OLIVEIRA, | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANTS' EMERGENCY MOTION TO PRECLUDE THE GOVERNMENT
FROM ISSUING A PURPORTED SPECIAL COUNSEL REPORT CONTRAVENING
THIS COURT'S DISMISSAL ORDER AND PREJUDICING DEFENDANTS' PRETRIAL
RIGHTS; AND DEFENDANTS' REQUEST FOR A HEARING ON THE MOTION**

John S. Irving, IV
E&W LAW, LLC

Larry Donald Murrell, Jr.
L.D. MURRELL, P.A.

*Counsel for Defendant*
*Carlos De Oliveira*

Stanley E. Woodward, Jr.
BRAND WOODWARD LAW, LP

Richard C. Klugh
KLUGH WILSON, LLC

*Counsel for Defendant*
*Waltine Nauta*

276

## I.    INTRODUCTION

Despite this Court's concluding that Smith is unconstitutionally appointed and funded, and despite ongoing proceedings against Defendants Waltine Nauta and Carlos De Olivera, Special Counsel Smith, in defiance of this Court's rulings, is determined to have the final word by pushing forward with issuing and transmitting a final report under 28 C.F.R. § 608(c) (the "Final Report") which Attorney General Garland is certain to make immediately public.  These Defendants will irreparably suffer harm as civilian casualties of the Government's impermissible and contumacious utilization of political lawfare to include release of the unauthorized Report.  The Final Report relies on materials to which Smith, as disqualified special counsel, is no longer entitled access— making his attempt to share such materials with the public highly improper.

This Court's authority to regulate the participants and attorneys in this matter and to preserve the authority of its orders and the Court's control of the proceedings compels the granting of this emergency motion to preclude this imminent act of defiance of the Court's authority by the Government.  The Defendants request an immediate hearing on this motion, at which they will establish the impropriety of unchecked release; the scope of the resulting prejudice; and the specific materials contained in the Report for which release is impermissible.  Even if *any* version of a Final Report were to be transmitted and released—and the Defendants maintain no such release would be warranted—the Defendants are at the very least entitled to a hearing to demonstrate why certain materials should remain protected.  The Defendants request that this Court enter an Order to preclude Smith from transmitting the Final Report or taking any other action related to it—including sharing it with other persons; editing it; or accessing materials on which it relies—until this Court resolves this emergency motion.

The Final Report promises to be a one-sided, slanted report, relying nearly exclusively on evidence presented to a grand jury and subject to all requisite protections—and which is known to

Smith only as a result of his unconstitutional appointment—in order to serve a singular purpose: convincing the public that everyone Smith charged is guilty of the crimes charged.  But Nauta's and De Oliveira's criminal cases are not over; the appeal of this Court's dismissal order *by Smith* is still pending.  The Government notably continued briefing the appeal even following the dismissal of the appeal as to President Trump.  There remains the threat of future criminal proceedings as to Nauta and De Oliveira, and those proceedings will be irreversibly and irredeemably prejudiced by dissemination of the Final Report.  As the Government knows, the continued operation of the protective order in this case will make the one-sided impermissible Final Report even more unfairly prejudicial; Defendants are strictly precluded form refuting the Report.  The Final Report is meant to serve as a Government verdict against the Defendants contrary to all criminal justice norms and constitutional guideposts.

Critically, the Government never sought a stay of this Court's rulings as to the impermissibility of the Special Counsel appointment and his actions in regard to this prosecution.  The Government never sought clarification of Fed. R. Crim. P. 6(e)(2)(B)'s prohibition of disclosure of grand jury materials by persons not authorized to act as government counsel in the matter, with limited exceptions that clearly do not apply to government attorneys found to have no authority to act in the case.  Given the invalidity of his purported status under the Appointments and Apportionment Clauses, the invalidly appointed Special Counsel lacks authority to write a grand jury report, to file a report, to share information about the report, or to issue a report.

The filing of such a report, by an unauthorized person, is clearly improper in this context and will cause grave harm given the pendency of criminal proceedings, now on appeal, at counsel Smith's own insistence.  Issues of disclosure and use of materials by the Government are matters that this Court assumed jurisdiction over when the parties briefed constitutional and privilege issues that remain, by virtue of the dismissal that is now on appeal, unresolved (if not effectively

decided against the Government). The filing of the Final Report, by an unauthorized Special Counsel, would necessarily implicate the very same unresolved Fourth, Fifth, and Sixth Amendment issues and extensive issues of attorney-client and other privileges, that counsel Smith lost any authority to even take a position on for the Government. The Final Report would constitute an abuse of such constitutional and privilege violations, all of which remain pending in the event of a reversal of the dismissal order. Such sidestepping by the Government of pending constitutional and related issues by revelation and misuse of such matters—including any content of the Final Report that may, as is anticipated, unreasonably and prejudicially disparage defense counsel in their handling of the case—would not only adversely affect any further criminal proceedings, tainting the jury pool, but would render defense of the case unreasonably difficult and cast a pall on the fairness of the criminal process. *See* S.D. Fla. L.R. 77.2(a) (proscribing a lawyer's release of information or opinion for anticipated public dissemination in connection with pending litigation where such dissemination is reasonably likely to interfere with a fair trial or otherwise prejudice the due administration of justice).

This Court need not tolerate this prejudice, which is unconstitutional and which violates the Local Rules. And it *certainly* does not need to tolerate such prejudice when it stems directly from the unconstitutionally funded acts of an unconstitutionally appointed individual whose purported authority stems directly from unlawful regulations. The Final Report itself is also inconsistent with other constitutional, statutory, and regulatory provisions, further illustrating why it must not be released. Indeed, its release would directly infringe on Nauta's and De Oliveira's Fifth Amendment due process rights, taking on the status of a public form of an invalid new indictment, replete with unfairly prejudicial assertions of alleged offenses going well beyond any assertions in the indictment and other public filings. This Court should prevent that constitutional infringement by immediately enjoining the United States, Attorney General Garland, the

Department of Justice ("DOJ"), Smith, and all their officers, agents, and employees (together, the "Government") from issuing the Final Report.

Immediate relief is necessary because there is every reason to believe that the Government will issue the Final Report within the next few days. Thus, Defendants respectfully request that this Court treat this motion as an Emergency Motion under Local Rule 7.1(d)(1) and request a ruling by January 10, 2025.

## II. FACTUAL BACKGROUND

### A. Smith's unconstitutional appointment and funding.

On November 18, 2022, Attorney General Garland issued Order No. 5559-2022 appointing Smith, "an attorney from outside the United States Government, to serve as Special Counsel . . . ." Doc. 672, at 6–7. The Special Counsel Regulations, codified at 28 C.F.R. §§ 600.1–600.10, provide for his appointment, authority, and oversight. *See* Office of Special Counsel, 64 Fed. Reg. 37,038 (July 9, 1999). "Smith was not nominated by the President or confirmed by the President." Doc. 672, at 7. Instead, the Appointment Order pointed to 28 U.S.C. §§ 509, 510, 515, 533. *Id.*

In due course, Defendants filed a motion to dismiss based on "the unlawful appointment of Special Counsel Jack Smith, in violation of the Appointments Clause and the Appropriations Clause." Doc. 326, at 1; *see* Doc. 672, at 5 n.1. On July 15, 2024, the Court ruled in Defendants' favor. *See* Doc. 672 (the "Dismissal Order"). As this Court correctly determined: (1) the statutes cited in the Appointment Order "as purported authorization for his appointment" do not vest "the Attorney General with authority to appoint a Special Counsel like Smith," *id.* at 22; *see also id.* at 19–53; (2) Smith is at least an inferior officer within the meaning of the Appointments Clause, *id.* at 67–81 & n. 60; and (3) because there was no law authorizing Smith's appointment, he could not be funded by the Indefinite Appropriation. *Id.* at 85–89.

On July 17, 2024, Smith filed his notice of appeal. Doc. 673. On November 25, 2024,

Smith asked the Eleventh Circuit to dismiss the appeal in this case as to defendant Trump.  The Eleventh Circuit granted Smith's request.  Order, *United States v. Trump*, No. 24-12311 (11th Cir. Nov. 26, 2024), Doc. 81-2.  The appeal as to Nauta and De Oliveira is still pending, albeit with Smith attempting to relinquish control.  On December 30, 2024, the Special Counsel moved to withdraw from the appeal, asserting it had "referred" the case to the U.S. Attorney for the Southern District of Florida.  *See* Docket, *United States v. Trump*, No. 24-12311 (11th Cir.), Docs. 83, 84.

 **B.**  **The imminent Final Report.**

   **1.**  **Smith's preparation of the Final Report.**

 Despite losing in court and having no valid appointment, Smith is determined to continue litigating this case in the court of public opinion.  In early December, news reports indicated that Smith intends "to submit to the Justice Department a report summarizing the results of his dual investigations into President-elect Trump."  Breanne Deppisch, *Special Counsel Jack Smith Required to Submit Trump Findings to DOJ Before Leaving.  What Happens Next?*, FOX NEWS (Dec. 7, 2024), https://www.foxnews.com/politics/jack-smith-submit-trump-findings-doj-before-leaving-what-happens-next.  In response, counsel for Defendants and President Trump reached out to a member of the Special Counsel's Office, J.P. Cooney.  Counsel were told the Special Counsel's Office would afford the meager courtesy of allowing hard-copy review of the Report at the Special Counsel's office with provision of comments due before 2:00 p.m. on January 6. (President Trump, a former party to this case, has submitted a letter to the Justice Department further explaining the impropriety of the Special Counsel's actions.  *See* Exhibit A, attached.)  Counsel were not permitted to bring electronic devices into the reviewing room, and the Office declined to make the Report available to out-of-town Florida counsel anywhere other than in the Special Counsel's D.C. office (either shortly before or during a significant snowstorm). D.C. counsel for De Oliveira was able to review the Report on Saturday, January 4, and D.C. counsel for Nauta did so yesterday,

Sunday, January 5.   Counsel's limited-access review of the draft Report revealed a one-sided narrative arguing that the Defendants committed the crimes charged in this case.

### 2.      Garland will inevitably release the Final Report to the public.

The Final Report will go to Attorney General Garland, who then can authorize public release of the Final Report.  *See* 28 C.F.R. § 600.9(e).  There is every reason to believe he will do so as fast as possible.  First, he "has opted to release the reports from two other special counsels whose investigations concluded during his tenure."   Deppisch, *Special Counsel Jack Smith Required to Submit Trump Findings to DOJ Before Leaving.  What Happens Next?*, FOX NEWS (Dec. 7, 2024), https://www.foxnews.com/politics/jack-smith-submit-trump-findings-doj-before-leaving-what-happens-next.  Moreover, Garland released those reports quickly.[1]

The review deadline Smith's team gave Defendants' attorneys—providing for review only between January 3 and January 6—reflects that public release is imminent.  Underscoring that is the close cooperation that has existed between Smith and his team and Garland and the DOJ—a cooperation mandated by the Special Counsel Regulations, *see* 28 C.F.R. § 600.7(a), and proven by the Special Counsel's saying in open court that the positions he takes are taken "on behalf of the Justice Department, representing the United States," Transcript of Oral Argument at 110:13–15, *Trump v. United States*, 603 U.S. 593 (2024) (No. 23-939).

### 3.      The need for emergency relief.

As the time frame above shows, relief is warranted immediately.  Smith gave Defendants and President Trump a very brief window in which to review the Final Report.  That window

---

[1] In releasing the report of Special Counsel Robert Hur, Garland said that as to "each Special Counsel who has served since I have taken office, I am committed to making as much of the Special Counsel's report public as possible."  Letter from Merrick B. Garland, Att'y Gen., to Sen. Richard Durbin et al. (Feb. 7, 2024),  https://www.justice.gov/sco-hur/media/1337886/dl?inline  "Hur provided Garland his report on February 5, 2024, and Garland made it public as soon as the White House finished its privilege review" three days later.    Letter from Merrick B. Garland, Att'y Gen. (Feb. 8, 2024), https://www.justice.gov/storage/20240208aggarlandletter.pdf.

expires this week. It is thus fair to assume that once that window expires, the Report soon thereafter will be transmitted to Garland and publicly released days afterward. That is within seven days of this motion. Thus, for Defendants to receive meaningful relief, they need a ruling by January 10, 2025, and their request qualifies as an emergency motion. *See* S.D. Fla. L.R. 7.1(d)(1).

## III.   ARGUMENT

The requested injunction is necessary to prevent Special Counsel Smith from releasing the Report in direct and flagrant violation of: this Court's order disqualifying the Special Counsel; Fed. R. Crim. P. Rule 6(e) (governing grand jury secrecy); and Local Rule 77.2 (governing release of information in criminal and civil proceedings). Imbued in these rules are principles of fundamental fairness, designed to ensure a defendant's Fifth Amendment right to a fair trial. The criminal proceeding against the Defendants is very much still pending, and to allow former Special Counsel Smith to effectively try this case to the media—*after* his involvement therein has been deemed unlawful and unconstitutional by this Court—would be highly prejudicial and highly improper. Enjoining the release of the Final Report is necessary to protect these Defendants' due process rights. At the very least, the Defendants are entitled to injunctive relief pending the conclusion of any and all proceedings in this matter.

Releasing the Final Report is also improper because this is not Smith's case anymore; he has been disqualified by a court of law and is now proceeding as a rogue actor with a personal and political vendetta against the Defendants. Allowing him to release privileged materials and information to the public at large does great harm to these Defendants, who remain at risk of prosecution and against whom the United States is actively pursuing prosecution. In any other case, this Court would have the authority to issue an order to stop him, and the same is true in this case. Our system simply does not allow a disqualified prosecutor to withdraw from an unlawful appeal only then to embark on a media mudslinging tour through the issuance of a highly detailed

and one-sided press release describing the events charged in the superseding indictment and the Government's theory of prosecution as it relates to those events.

Smith's latest tactic, to release a Final Report after being removed from the case, reflects his ongoing and continuous effort to violate this Court's rulings and to disregard the Court's authority.  In this instance, that effort has severe implications for Nauta and De Oliveira, civilian criminal defendants entitled to a fair trial like anyone else in our system.  This Court has previously recognized the Special Counsel's efforts to evade court rules and to selectively communicate privileged material to the public.  *See* Transcript of May 8, 2024, Hearing (DE:533) at 67 (court commenting on government's selective release of grand jury material and noting that it would like a coherent thought process that is objective).  The former Special Counsel's approach is anything but objective.  And the integrity of future proceedings[2] are threatened by release of the Report.

Finally, release should be enjoined because, as this Court has already determined—and as is binding on the Government—Smith is unconstitutionally appointed and unconstitutionally funded.  Issuing the Final Report compounds the constitutional error of his appointment, while also independently violating statutory and regulatory authority and effecting an impermissible evasion of this Court's authority.  Any of these reasons would be enough to justify an injunction; considered cumulatively, they overwhelmingly demonstrate the need for relief or at the very least a hearing where Nauta can establish protection of specific materials.

### A. The Final Report threatens the integrity of future potential proceedings, Local Rule 77.2, and Fed. R. Crim. P. Rule 6(e), and thus must be enjoined.

An order precluding the transmission of the Final Report to the Attorney General Garland is necessary to preserve the integrity of potential future proceedings and is required by this Court's

---

[2] Defendants firmly believe this Court's Dismissal Order reached the correct legal conclusion and will be affirmed.  Until that happens, or until the Government drops the appeal that was unfounded in the first instance, this Court must act to protect against the risk of prejudice in future proceedings.

local rules.  Release of material that was before the grand jury also reflects disregard of Fed. R. Crim. P. 6(e).  Violation of these rules in the manner contemplated here will interfere with the Defendants' due process rights.  A hearing before this Court to address these matters while maintaining the status quo is essential to preservation of the Defendants' fundamental due process rights.

S.D. Fla. Local Rule 77.2(a) provides that attorneys may not "release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which the lawyer or the firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice."  Smith, his team, Garland, and the DOJ all fall squarely within the ambit of this rule. Ethical and related rules also bar the Report. Justice Manual § 1-7.100; *see also* 32 C.F.R. § 776.47 (Unless "necessary to inform the public of the nature and extent of the trial counsel's actions and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused."); Florida Bar Rule 4-3.6 (Trial Publicity) and 4-3.8 (Special Responsibilities of a Prosecutor). Justice Department attorneys are required to follow local ethical rules. *See* 28 U.S.C. 530B.

Any "reasonable person" plainly "would expect" the Final Report "to be disseminated by means of public communication."  And that is an understatement.  The Final Report would not just be disseminated by means of publication but shared *widely*.  Media outlets would be quick to send push notifications to millions of phones across the country; news station talk shows would book pundits and talking heads to give reactions and purported "legal analysis" on events about which they in fact know only Smith's position; and the details of the Government's case *as portrayed only by the disqualified Special Counsel* would blaze across headlines and social media.  The mass

media would become a mass microphone for Smith and his political allies, left to report only the narrative advanced by Smith based on materials as to which the Defendants are not permitted to address, and as to which Smith is no longer permitted access based on this Court's prior Order. The resulting prejudice would be immediate and uncontainable. Indeed, the news media is already rife with reports about the release of the Final Report. *See*, *e.g.*, Katherine Faulders & Peter Charalambous, Special Counsel Jack Smith Withdraws From Appeal of Classified Docs Case Against Trump's Co-Defendants, ABC NEWS (Dec. 30, 2024), abcnews.go.com/US/special-counsel-jack-smith-withdraws-appeal-classified-docs/story?id=117209773; Jesus Mesa, Jack Smith Plans to Release Report Before Donald Trump Is Sworn In: CNN, NEWSWEEK (Nov. 26, 2024), https://www.newsweek.com/jack-smith-deadline-final-donald-trump-report-1991904. Media reporting on this case has been so ubiquitous that the Court could take judicial notice of it.

All of this prejudice would occur in the face of additional litigation that is "pending or imminent," Local Rule 77.2(a), "in the sense that if" the Eleventh Circuit reversed on appeal, "the case would go back as a viable one from the very date of its filing," *Pettway*, 411 F.2d at 1003. The adversarial nature of our court system is fundamental to due process. In this instance, that adversarial system *could not* be captured in public discussion where the protective order still binds Nauta and De Oliveira and their counsel, thereby preventing them from fully responding or attempting to prevent further unwarranted prejudice. Trials must take place in courtrooms, not in newsrooms. Having lost his place in the courtroom, Smith's attempt to release the report reflects an intent to try this case in public, thus destroying the fundamental right to a fair trial.

"The very wo[r]d 'trial' connotes decisions on the evidence and arguments properly advanced in open court"—not in the court of public opinion, where rules to protect constitutional rights do not apply. *Bridges v. State of Cal.*, 314 U.S. 252, 270 (1941). "Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Id*. Having

come face-to-face with the unconstitutional nature of his appointment, that is precisely what Smith seeks to do here: Try his case in the press, taint the jury pool, and worse yet, taint the legal soundness of this Court's decisions.  The Supreme Court has ruled that "no one [is] be punished for a crime without 'a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power.'"  *Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966). Smith's planned Final Report—now that he is unshackled from due process requirements that restrained him as a government actor—would engender the very prejudice, passion, and excitement and be an exercise of the tyrannical power that our court system is designed to insulate against.

In 1966—that is, around the time that "hot type" of the press began to give way to "cold type"[3]—the Supreme Court wrote that "[g]iven the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused."  *Id*. at 362. If that was true in 1966, the principle carries even more weight today; indeed, most printing presses have shuttered as the industrial model of news delivery has been replaced by the instantaneous delivery system enabled by the internet, computers, and smartphones.   These modern developments of course affect the constitutional balancing test, and the Supreme Court has made clear that public dissemination must yield to the due process rights of the accused.

Release of the Final Report would plainly and obviously "interfere with a fair trial or otherwise prejudice the due administration of justice."  S.D. Fla. L.R. 77.2(a).  The Report involves extensive, one-sided discussions about the conduct alleged in the indictment.   The issue is compounded by the inflammatory manner in which the report discusses Nauta's and De Oliveira's

---

[3] "Hot type" was the form of printing technology used for the first half of the 20th century, which involved molten lead being poured into brass molds to create a line of type.  "Cold type" refers to phototypesetting.

former co-defendant, President Trump—further betraying the political motivation behind Smith's planned disclosure.  Throughout this litigation, the Government has tied Nauta and De Oliveira to President Trump, referring to them as "Co-Conspirators" in the indictment.  Doc. 85, at 4.  There is no way at this point to separate Nauta and De Oliveira from President Trump, so that even if the Final Report focuses on the President-elect (again betraying its political motivations), the effect will be to stir up prejudice against the Defendants before the public.  The political motivations here cannot be overlooked: Smith is rushing to release the Final Report prior to a change in control of the Executive Branch.  Smith and his political allies are of course disappointed that his appointment was deemed unlawful, and that President Trump won the 2024 election.  That, however, is not a basis to deny the Defendants due process of law—and indeed, the timing of Smith's actions reveals the impropriety of them.  The court system functions independently of political aims.

Political considerations certainly do not justify the pretrial public release of evidence that has not been made public and is not or may not be admissible at trial.  The Final Report contains such evidence.  This includes grand jury materials, the disclosure of which is prohibited under Rule 6(e)—and aside from certain material that falls squarely under Rule 6(e), the Final Report is flush with material that violates the spirit of the Rule.  Grand jury materials are entitled to the utmost secrecy; indeed, the Supreme Court "consistently ha[s] recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979).  "Since the 17th century, grand jury proceedings have been closed to the public, and records of such proceedings have been kept from the public eye." *Id*. at 218 n. 9 (citation omitted).  "The rule of grand jury secrecy was imported into our federal common law and is an integral part of our criminal justice system." *Id*. (citing *Costello v. United States*, 350 U.S. 359, 362 (1956); *United States v. Johnson*, 319 U.S. 503, 513 (1943)).  "Federal Rule Crim. P. 6(e) codifies the requirement

that grand jury activities generally be kept secret." *Id*.  Smith, through his planned release of the Final Report, seeks to evade this grand jury secrecy requirement by relaying to the public sensitive and privileged grand jury materials, by not specifying that they were, in fact, presented to the grand jury.  Protecting these grand jury materials in this instance is not only important to protect the integrity of the jury, but also essential to protect the Defendants' due process rights.  The impropriety of Smith's actions in this respect is heightened by the fact that Smith only has knowledge of such privileged information via his unconstitutional and unlawful appointment.  Even if Smith once properly had access to grand jury materials,[4] he is no longer permitted to access them, much less disclose them at large.

Smith has proposed recommending redactions of direct quotes from the grand jury but has notably not proposed redacting information provided to the grand jury in direct response to a grand jury subpoena—for example, communications subpoenaed and taken out of context.  This further illustrates the need for a hearing before this Court to determine what material contained in the Final Report cannot be released, at least during the pendency of the criminal case.  A hearing is particularly warranted because, though Smith has recommended certain redactions, his team has not invited *any* further redactions by the defense and has, apparently, ignored the record history of this Court's repeated efforts to carefully identify matters that should remain sealed to protect constitutional rights, privileges, and the interest of the public in a fair adjudicative process.  Smith has not initiated a process by which the defense can properly or effectively assert objections to release of specific material, and then, to the extent there is disagreement, seek resolution in court. Indeed, the defense has not even been provided any more than a limited scope of *access* to the Report prior to its anticipated release; counsel was permitted review in person over a two-business-

---

[4] See Fed. R. Crim. P. 6(e)(2)-(3) (identifying those who typically have access to grand jury materials).

day period without the aid of electronic devices to compare data to its privileged or grand jury source. This further illustrates the need for a hearing at which this Court can address relevant disclosure considerations. A hearing is also warranted because Smith and his team are not ultimately in charge of what is redacted before the Final Report is released to the public; that responsibility lies with the Attorney General's Office. This Court should hold a hearing to determine what content in the Report must be blocked from release and to determine whether Smith has the authority to release any kind of Final Report, given this Court's prior ruling on his appointment and appropriations for his activities.

There are several identifiable and concrete ways in which release of the Final Report will prejudice the defense and the right to a fair trial. In addition to the general prejudice and poisoning of the jury pool that will result from release, due to the inevitable and widespread public dissemination discussed above, release is improper because Smith's Report relies on materials that are or have been the subject of active litigation relating to privilege, the Fourth Amendment, and other constitutional rights over which this Court has exercised, and may continue to exercise, jurisdiction. Smith of course no longer has the authority to litigate such issues. His attempt to release the Final Report is consistent with his pattern of manipulating his purported authority to remain in the case after disqualification—reflected in his recent (and apparently tactical) "referral" of the case to the local United States Attorney's Office. All of these actions demonstrate evasion of this Court's authority and disregard for the rule of law and the rules governing criminal proceedings. Release of the Final Report is yet another example of this evasion—and perhaps the worst yet, as the resulting harm will be irreversible.

"[T]he primary constitutional duty of the Judicial Branch [is] to do justice in criminal prosecutions . . . ." *United States v. Nixon*, 418 U.S. 683, 707 (1974). "Accordingly, courts must take steps to protect the integrity of the criminal justice process." *United States v. Trump*, 88 F.4th

990, 1003 (D.C. Cir. 2023). "Due process demands that 'the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.'" *Id.* at 1004 (quoting *Sheppard*, 384 U.S. at 351 (quoting another source)). Courts have a duty to "'prevent the prejudice' to the trial process 'at its inception,'" *id.* at 1004 (quoting *Sheppard*, 384 U.S. at 363))—a duty this Court can fulfill by issuing the requested injunction here.

The imminent release of the Final Report is also an imminent violation of both the court rules and the constitutional rights of Nauta and De Oliveira to a fair criminal proceeding. That justifies an order prohibiting publication of the Final Report until the appellate process and any subsequent proceedings in the case are over.

### B. The Government cannot lawfully issue the Final Report.

Smith's attempt to prejudice potential future proceedings in this case is particularly improper as it compounds the unconstitutional and unlawful underpinnings of the Final Report, which cannot be released even upon conclusion of the case due to the unconstitutional nature of the appointment. "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996); *see also Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902).

### 1. The Final Report cannot be produced by an unconstitutionally appointed and funded Special Counsel.

#### a. This Court's findings in the Dismissal Order are binding.

This Court held in the Dismissal Order that: no statute authorizes Smith's appointment; Smith is thus an inferior officer whose appointment violates the Appointments Clause, U.S. Const. art. II, § 2, cl. 2; and, accordingly, the continued funding of Smith's activities and office violates

the Appropriations Clause, U.S. CONST. art. I, § 9, cl. 7.  Those holdings are binding here under

principles of law of the case and of estoppel.

> **b.**      **The unconstitutional nature of Smith's appointment and funding bar issuance of the Final Report.**

The constitutional defects this Court identified relating to Smith's appointment and funding

bar him from producing the Final Report, and thus bar Attorney General Garland from producing

it, for three reasons:

> **i.**      ***Smith cannot provide the Final Report because of his unconstitutional appointment***

A precondition to publication of the Final Report is for Smith to "provide" it to the Attorney

General.  28 C.F.R. § 600.8(c).  Smith, however, cannot do that because he was not constitutionally

appointed, as this Court has already determined. *See* Doc. 672, at 19–52.[5]

Because Smith is unconstitutionally appointed, an injunction barring release of the Final

Report is justified for two reasons.  First, and most obviously, the Appointment Order is unlawful.

It purports to appoint an officer of the United States without statutory authority.  The Appointment

Order is thus void.  "An agency … literally has no power to act—including under its regulations—

unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 302 (2022)

(quotations omitted).  And because the Appointment Order is void, Smith is not the Special

Counsel and cannot use the information he has unlawfully acquired to write the Final Report or

claim the ability, under 28 C.F.R. § 600.8(c), to write the Report.

Second, the injunction flows from what this Court has already noted: the proper remedy

for "a 'Government actor's exercise of power' " "is invalidation of the *ultra vires* action."  Doc.

---

[5] The Government did not contest that Smith was at least an inferior officer.  *See id.* at 2.  Any attempt to claim otherwise here would fail; indeed, this Court has already said as much.  *See id.* at 81 n. 60 (addressing such an argument from *amici* Landmark Legal).

672, at 82 (quoting *Collins v. Yellen*, 594 U.S. 220, 258 (2021)).  Smith's creation of the Final

Report, just as much as this prosecution, will flow "from his defective appointment" and is thus

an "unlawful exercise[] of executive power." *Id.* at 83–84.  Indeed, the Final Report must explain

"the prosecution or declination decisions reached by the Special Counsel." § 600.8(c).  Such

decisions are "the special province of the Executive Branch," *Trump v. United States*, 603 U.S.

593, 620 (2024) (quotations omitted), of which Smith, as an unconstitutionally appointed

prosecutor, is not a part.  Moreover, to gather the information, Smith used authority granted to him

under the Appointment Order.  *See* Ex. A, at 1–2 (granting investigatory and prosecutorial authority

to Smith); *see also* §§ 600.4(a), 600.6.  Because he had no right to do so, his actions in gathering

that information are *ultra vires* and thus void; accordingly, there is nothing for Smith to Report.

By issuing the Final Report, Smith would be unlawfully acting as a prosecutorial authority.

A disqualified prosecutor cannot, especially while a case is still pending, issue a memorandum

discussing prosecutorial decisions he was unauthorized to make in the first instance.  The Final

Report's attempted transmission to Attorney General Garland and presumed release is again just

another instance of Smith's unlawfully acting as a super prosecutor.  There are significant

separation of powers issues at stake as well: An unlawfully appointed prosecutor cannot respond

to a disqualification order by disclosing at large privileged material, the release of which will infect

the ongoing criminal proceeding with bias, prejudice, and sensationalism.

### ii. *The Final Report cannot be released because it is the product of unlawful Special Counsel regulations*

The Special Counsel Regulations are unlawful.  The regulations supplied Garland the

purported authority to appoint Smith as "an outside Special Counsel … ." 28 C.F.R. § 600.1(b).

The Special Counsel regulations claim, as authority, 5 U.S.C. § 301 and 28 U.S.C. §§ 509, 510,

and 515–19.  *See* 64 Fed. Reg. 37,042.  For the reasons this Court has explained, 28 U.S.C. §§ 509,

510, and 515 do not authorize the Special Counsel Regulations.  *See* Doc. 672, at 23–41.  The other statutory provisions do not fill the gap.  Section 516 reserves "the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, … to officers of the Department of Justice, under the direction of the Attorney General."  Section 517 authorizes the Attorney General to send "[t]he Solicitor General, or any officer of the Department of Justice" to any court "to attend to the interests of the United States in a suit … ."  Neither gives the Attorney General appointment authority.  Far from an authorization, § 518 is a limitation on who may represent the United States in court—"the Attorney General and the Solicitor General" "[e]xcept when the Attorney General in a particular case directs otherwise."  Section 519, as the Court has noted, *see* Doc. 672, at 30–32, is also about the Attorney General's supervisory power.  Even further afield is 5 U.S.C. § 301, which permits heads of departments to "prescribe regulations for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property."

Not one of those statutes authorizes the Attorney General to appoint officers of the United States, and so none of them can be considered congressional authorization for the Special Counsel Regulations.  The regulations are thus void.  *See*, *e.g.*, *Cruz*, 596 U.S. at 302.  And thus everything Smith does—including creating the Final Report—is void and should be enjoined.

### iii.      *The preparation of the Final Report reflects a misuse of appropriated funds*

[F]or many of the same reasons" that Congress has not authorized Smith's appointment, it "has not authorized the appropriation of money to be drawn for the expenses of his office."  Doc. 672, at 4.  "The Appropriations Clause dictates that '[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.'"  *Id.* at 86 (quoting U.S. CONST. Art. I, § 9, cl. 7).  "This 'straightforward and explicit command ... means simply that no money can be paid

out of the Treasury unless it has been appropriated by an act of Congress.'" *Id.* (quoting *OPM v. Richmond*, 496 U.S. 414, 424 (1990)).

"Since its inception, … Smith's office has been funded by" the Indefinite Appropriation. *Id.* at 85–86.  By its terms, the Indefinite Appropriation authorizes the expenditure of public funds by Smith only if Smith is an "independent counsel appointed pursuant to … *other law*."  101 Stat. 1329.  As with the phrase "by Law" in the Appointments Clause, the phrase "other law" means *statutory* law.  *See* Doc. 672, at 87 ("Both sides agree that 'other law' … is the collection of statutes cited in the Appointment Order.").  Because no statute authorizes Smith's appointment, he is not an "independent counsel appointed pursuant to … other law."  *Id.*  Thus, he cannot be funded by the Indefinite Appropriation.  "When Congress has enacted a legislative restriction" like that, federal courts should "enjoin DOJ from *spending funds*" in violation of those restrictions. *McIntosh*, 833 F.3d at 1172 (discussing a limit on the use of funds for criminal prosecutions); *see Gen. Land Office v. Biden*, 722 F. Supp. 3d 710, 743, 745 (S.D. Tex. 2024) (enjoining the government from spending funds for items besides what they were appropriated for); *see also In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objectives.").

### 2. Issuing the Final Report would violate the Presidential Transition Act, the Executive Vesting Clause, and the Special Counsel regulations.

#### a. The Presidential Records Act & Executive Vesting Clause bar release of the Final Report

There is every indication the Government will issue the Final Report during the Presidential transition.  That violates the Presidential Transition Act, *see* 3 U.S.C. § 102 note, and the imminent vesting of the Executive power in President Trump on January 20, 2025, *see* U.S. CONST. art. II, § 1, cl. 1.

The Presidential Transition Act's purpose is "to promote the orderly transfer of the

executive power in connection with the expiration of the term of office of a President and the inauguration of a new President."  3 U.S.C. § 102 note (§ 2 of the Act).  "Any disruption" of the transition "could produce results detrimental to the safety and well-being of the United States and its people."  *Id.*  And thus "all officers of the Government" are "to avoid or minimize disruptions that might be occasioned by the transfer of the executive power, and otherwise to promote orderly transitions in the office of President."  *Id.*

Disruption is a constitutional issue because "[t]he transition period insures that the candidate will be able to perform effectively the important functions of his or her new office as expeditiously as possible."  Definition of Candidate Under 18 U.S.C. § 207(j), 24 Op. O.L.C. 288, 292 (2000).  Release of the Final Report will disrupt the President-Elect's ability to govern once he takes office.  Like an indictment, the Final Report threatens "public stigma and opprobrium" and so could "compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs."  *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 246 (2000).  That is a burden on the President's constitutional responsibilities, and "a proper balancing of constitutional interests in the criminal context dictates" instructs that the Final Report should not now issue.  *Id.* at 249; *see id.* at 249–51 (discussing reasons).  Such a burden must not be imposed, especially as a result of a prosecution deemed unlawful by an Article III court.  The Final Report threatens the proper balancing of constitutional interests, and is *a fortiori* inconsistent with the Presidential Transition Act.

### b.  Issuing the Final Report is inconsistent with the Special Counsel Regulations

Under § 600.8—which is "applicable to" Smith, Ex. A, at 2—the Final Report is provided only "[a]t the *conclusion* of the Special Counsel's work."  § 600.8(c) (emphasis added).  But

Smith's work has *not* concluded; the appeal as to Nauta and De Oliveira continues.  To be sure, Smith and his team have moved to withdraw from that *appeal*.  They have not withdrawn from their representation of the Government in *this* Court—nor have they sought a stay in this Court or clarification of Rule 6 constraints.

The motion to withdraw from the appeal is a transparent attempt to manufacture a "conclusion" to Smith's work without actually concluding it.  The ordinary meaning of "conclusion" is "[t]he close or last part; the end or finish."  *Conclusion*, AM. HERITAGE DICTIONARY (5th ed. 2022), https://ahdictionary.com/word/search.html?q=conclusion.  Until the prosecution of Nauta and De Oliveira ends, Smith's work has not concluded.

### C.  This Court has the power to provide the requested relief.

This Court acts well within its authority in providing the requested relief.  This is not an issue of discretionary authority; rather, the court rules cited above—as well as the Supreme Court cases addressing the due process right to a fair trial—explicitly contemplate courts' taking such actions to prevent prejudice.  The All Writs Act, and  the Court's ancillary jurisdiction and supervisory power, provide ample authority for the Court to prevent these injustices.  *See, e.g.*, *United States v. DiBernardo*, 775 F.2d 1470, 1475-76 (11th Cir. 1985) ("Federal courts may exercise their supervisory powers to remedy violations of recognized rights, to protect the integrity of the federal courts, and to deter illegal conduct by government officials.").

The All Writs Act authorizes the issuance of "all writs necessary or appropriate in aid of [its] respective jurisdiction[ ] and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).  The Act applies "not only [to] ongoing proceedings, but potential future proceedings, as well as already-issued orders and judgments."  *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004) (footnotes omitted).  "A court may grant a writ under this act whenever it is 'calculated in [the court's] sound judgment to achieve the ends of justice entrusted to it.'"  *Id.*

(quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)). Thus, it "empowers a federal court to employ procedures necessary to promote the resolution of issues in a case properly before it," *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978)[6].

This Court also has "ancillary jurisdiction … 'to adjudicate and determine matters incidental to the exercise of its primary jurisdiction over a cause under review.'" *United States v. McIntosh*, 833 F.3d 1163, 1172 n.2 (9th Cir. 2016) (citing and quoting *United States v. Sumner*, 226 F.3d 1005, 1013–15 (9th Cir. 2000)). That includes enforcement of its local rules as part of its power "to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380 (1994). It also includes prohibiting the federal government from violating constitutional and statutory limits on its authority, such as limits on the spending of funds. *See McIntosh*, 833 F.3d at 1172–72.

District courts can issue injunctions, like the one requested here, that "preserve the status quo and protect [their] proceedings in all germane matters," including by addressing "events transpiring subsequent to the" order on appeal. *EEOC v. Locals 14 & 15, Int'l Union of Operating Eng'rs*, 438 F. Supp. 876, 880 (S.D.N.Y. 1977). That is because the case is "'pending' … in the sense that if" the Eleventh Circuit reverses, "the case would go back as a viable one from the very date of its filing," *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1003 (5th Cir. 1969). This preservation of the status quo allows this Court to provide relief notwithstanding the Government's improper and unlawful appeal of the Dismissal Order. The Court maintains jurisdiction to "act in aid of the appeal," *Shewchun v. United States*, 797 F.2d 941, 942 (11th Cir. 1986), or over "collateral matters not affecting the questions presented on appeal," *Weaver v. Florida Power and Light Co.*, 172 F.3d 771, 773 (11th Cir. 1999). "[A]ctions that a district court

---

[6] Fifth Circuit precedent issued prior to October 1, 1981, is binding in this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

may take in aid of the appellate court's jurisdiction include preserving the status quo pending appeal."  16A Charles A. Wright et al., *Federal Practice and Procedure* § 3949.1 (Sept. 2024 update); *see Newton v. Consol. Gas Co. of N.Y.*, 258 U.S. 165, 177 (1922) ("Undoubtedly, after appeal the trial court may, if the purposes of Justice require, preserve the status quo until decision by the appellate court."); *Pugach v. Dollinger*, 280 F.2d 521, 522–23 (2d Cir. 1960) (Friendly, J., in chambers) (same).  Indeed, the federal appellate rules expressly contemplate that district courts consider such *status quo* injunctions in the first instance.  FED. R. APP. P. 8(a)(1)(C).  (Although the Defendants have also sought relief in the court of appeals by separate filing today, this Court maintains its authority over matters of enforcement of its orders, including the contempt power.)

Moreover, this relief is collateral to the merits of Smith's appointment and funding issues on appeal.  Like any other order "restraining parties' speech during the pendency of a criminal case," this request is "separate from the merits," *United States v. Trump*, 88 F.4th 990, 1000 (D.C. Cir. 2023), and will not require the Court to exercise "control over those aspects of the case involved in the appeal."  *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982).

**CONCLUSION**

The impending issuance by the Special Counsel of the Final Report is in direct violation of this Court's Dismissal Order, which effectively disqualified the Special Counsel as unconstitutionally appointed and funded.  Disclosure of the Final Report would constitute an affront to this Court and a contumacious action, and is an improper attempt to circumvent the Court's authority and prosecute in the court of public opinion on the basis of the same purported authority that this Court ruled the Special Counsel lacks.  The Special Counsel's use of materials is still being litigated with respect to core issues of privilege, Fourth Amendment, and other constitutional rights over which this Court has exercised jurisdiction.  Moreover, the protective order which still applies to Nauta and De Oliveira prevents them from fully responding or

attempting to protect themselves from further prejudice.  The protective order also relates to Rule 6(e) of the Federal Rules of Criminal Procedure, over which this Court retains control in a criminal prosecution.  By placing itself above the Court and the Court's rulings, the Special Counsel seeks to override orderly procedures pursuant to Rule 6, including to determine if the Special Counsel is authorized to release any materials from the grand jury proceedings eventually presided over by this Court, the parameters of which the government has never sought clarification, and Local Rule 77.2, proscribing the dissemination of information or opinion in connection with pending litigation that could interfere with a fair trial or otherwise prejudice the due administration of justice.

For those reasons, Defendants Nauta and De Oliveira respectfully request that the Court issue an Order barring the United States and its officers and agents, including but not limited to Smith and members of the Special Counsel's team, Garland, and the DOJ from issuing the Final Report until this case has reached a final judgment and appellate proceedings are concluded.  The Defendants further respectfully request that this Court grant the Defendants' request for a hearing on this emergency matter.  Finally, the Defendants request that this Court enter an Order to preclude Smith from taking any action related to the Final Report pending resolution of this emergency motion—including but not limited to transmitting it; sharing it with other members of the team; editing it; or accessing the protected materials and evidence upon which it is based.

### REQUEST FOR HEARING AND GOVERNMENT POSITION

The Defendants request a hearing.  A hearing is particularly warranted because this motion identifies highly sensitive and protected matters that Smith seeks to share widely with the public.  The need for sealing, and for continued protection of the relevant rights and interests of the parties, is best addressed with a more fully developed record.  The release of the Final Report implicates the Defendants' due process rights, which should not be infringed without the Defendants having the opportunity to be heard on the matter.  The Final Report also includes several specific

categories of information subject to protection, and these issues are best addressed live at a hearing. The Defendants estimate that the time required for the hearing is three to four hours.

Undersigned counsel conferred telephonically and via electronic correspondence with opposing counsel prior to the filing of this motion. To date, the Government has not consented to the relief requested by the motion. The Government advises that it considers the meet and confer process to be ongoing. However, Defense Counsel requested a reasonable opportunity for the Court to consider the relief requested in the instant motion before the Final Report was transmitted to Attorney General Garland and the Government was unwilling to commit to the same. Specifically, the Government advised that it would connect with Defense Counsel tomorrow, that it was skeptical of any authority of the Court to bar the transmission of the Final Report to Attorney General Garland, and that it could make no representation about the amount of time between the next conferral between Defense Counsel and the Government and when the Final Report would be transmitted to Attorney General Garland. Accordingly, because of the emergency nature and substantial importance of the matter, the issues are ripe for resolution. To the extent that the Government amends its position upon further review and consideration, Defendants will immediately advise the Court.

<div style="text-align:center">

**CERTIFICATION OF EMERGENCY**

</div>

After reviewing the facts and researching applicable legal principles, we certify that this motion in fact presents a true emergency (as opposed to a matter that may need only expedited treatment) and requires an immediate ruling because the Court would not be able to provide meaningful relief to a critical, non-routine issue after the expiration of seven days. I understand that an unwarranted certification may lead to sanctions.

Dated: January 6, 2025          Respectfully submitted:

/s/ Stanley E. Woodward, Jr.                    /s/ John S. Irving, IV
Stanley E. Woodward, Jr. (pro hac vice)         John S. Irving, IV (pro hac vice)
BRAND WOODWARD LAW, LP                           E&W LAW, LLC
400 Fifth Street NW, Ste 350                     1455 Pennsylvania Ave NW, Ste 400
Washington, DC 20001                             Washington, DC 20004
(202) 996-7447 (telephone)                       (301) 807-5670 (telephone)
stanley@brandwoodwardlaw.com                     john.irving@earthandwatergroup.com

/s/ Richard C. Klugh                            /s/ Larry Donald Murrell, Jr.
Richard C. Klugh                                Larry Donald Murrell, Jr.
Fla. Bar No. 305294                             Fla. Bar No. 326641
KLUGH WILSON, LLC                               L.D. MURRELL, P.A.
40 N.W. 3rd Street, PH1                          400 Executive Center Drive, Ste 201
Miami, FL 33128                                 West Palm Beach, FL 33401
(305) 536-1191 (telephone)                       (561) 686-2700 (telephone)
klughlaw@gmail.com                              ldmpa@bellsouth.net

*Counsel for Defendant Waltine Nauta*            *Counsel for Defendant Carlos De Oliveira*

# Exhibit A



**TODD BLANCHE**
ToddBlanche@blanchelaw.com
(212) 716-1250

January 6, 2025

<u>Via Email</u>
The Honorable Merrick Garland
Attorney General of the United States
c/o Brad Weinsheimer
Associate Deputy Attorney General

   **Re: Draft "Final Report" By Jack Smith**

Dear Attorney General Garland:

   We write on behalf of President Trump to demand that Smith terminate all efforts toward the preparation and release of this report (the "Draft Report").[1]

   As you know, Courts in Florida and the District of Columbia have now dismissed both of Jack Smith's failed cases against President Trump.  Rather than acknowledging, as he must, President Trump's complete exoneration, Smith now seeks to disseminate an extrajudicial "Final Report" to perpetuate his false and discredited accusations.  Consistent with the bad-faith crusade that Smith executed on behalf of the Biden-Harris Administration from the moment he was appointed, we were only permitted to review the Draft Report in person in the District of Columbia, including prohibitions on the use of any outside electronic devices in the room where the Draft Report was made available.  Smith's team likewise demanded, in advance of any review, that we delete prior discovery productions, preventing us from reviewing any of those underlying documents cited in the Draft Report.  Nevertheless, it is clear, as has been the case with so many of the other actions of Smith and his staff, that the Draft Report merely continues Smith's politically-motivated attack, and that his continued preparation of the Report and efforts to release it would be both imprudent and unlawful.

   First, Smith lacks authority under our Constitution to issue a report because he was not validly appointed, and the plain terms of the permanent indefinite appropriation that he has pillaged for more than $20 million clearly do not apply to his politically-motivated work.  The preparation and release of a report, therefore, would extend and perpetuate Smith's violations of the Appointments Clause and the Appropriations Clause.

   Second, the Draft Report violates fundamental norms regarding the presumption of innocence, including with respect to third parties unnecessarily impugned by Smith's false claims.  Releasing the report to the public without significant redactions (that would render its release meaningless) would violate prohibitions on extrajudicial statements by prosecutors and Rule 6(e).  This is particularly problematic with respect to ongoing proceedings relating to Waltine Nauta and Carlos De Oliveira, as well as others who Smith and his staff falsely characterize as co-conspirators in the Draft Report.

---

[1] Should these demands be improperly rejected, contrary to law, we respectfully request that this letter be appended to and addressed in any report by Smith that is issued to the public.

January 6, 2025
Page 2

Third, preparing a report and releasing it to the public would violate the Presidential Transition Act and the Presidential immunity doctrine. The Act prohibits *all* officers and those acting as such, including the Attorney General and Smith, at least in his own view of himself, from interfering with the ongoing transition process. Presidential immunity, which Smith conceded required pre-inauguration dismissal of his prosecutions, likewise prohibits criminal processes, including disclosures of any prosecutorial reports or statements, that would exacerbate stigma and public opprobrium surrounding the Chief Executive and otherwise divert from the time and attention that is necessary to complete the transition and run the County. Accordingly, releasing a report regarding Smith's failed and abandoned election-interference efforts would violate the Act and Presidential immunity.

Finally, the release of any confidential report prepared by this out-of-control private citizen unconstitutionally posing as a prosecutor would be nothing more than a lawless political stunt, designed to politically harm President Trump and justify the huge sums of taxpayer money Smith unconstitutionally spent on his failed and dismissed cases. Under such circumstances, releasing Smith's report is obviously not in the public interest—particularly in light of President Trump's commanding victory in the election and the sensitive nature of the ongoing transition process.

Accordingly, because Smith has proposed an unlawful course of action, you must countermand his plan and remove him promptly. If Smith is not removed, then the handling of his report should be deferred to President Trump's incoming attorney general, consistent with the expressed will of the People. Finally, should you disagree with the positions set forth below, we respectfully request notice of that decision prior to the unlawful release of any report so that we can pursue injunctive and other relief to protect the rights of President Trump, others unfairly implicated by Smith's work, and the people of this great Nation who elected President Trump to run the government and put an end to the weaponization of the justice system.

## I. Background

You are no doubt familiar with the history of the unethical election-interference and lawfare by the Special Counsel's Office, as you have publicly commented on some of those efforts while they were ongoing. This letter concerns Smith's most recent improper activities.

During the week of December 9, 2024, we learned from members of the media that Smith was preparing a report, which would include a purported analysis relating to classified information at issue in the dismissed Florida prosecution. We were surprised to learn of such a plan because, among other reasons, Smith had insisted up to that point that his work was not concluded, Smith and his Office refused to disclose details regarding this alleged analysis prior to the dismissal of his Florida prosecution against President Trump, and the Biden-Harris Administration has suggested that they wish to facilitate an orderly and collegial transition process.

On December 11, 2024, we contacted a supervisor with the Special Counsel's Office to express concerns about reports we were hearing from the press. We asked whether the Office was preparing a report and, if so, whether we would be allowed to review it prior to completion. Initially, Smith's position was that: (1) we would only be permitted to access a draft of the report in Washington, D.C. between December 23 and December 29, 2024, the week of Christmas; (2) we would only be permitted to take handwritten notes during our review; and (3) any comments or objections to the draft would have to be

January 6, 2025
Page 3

submitted in writing by the close of business on December 29, 2024.  Aside from all counsel living outside
D.C. and planning on spending time with family that week, as Smith and his team knew, Smith's proposal
afforded zero opportunity for President Trump to assist counsel in reviewing and preparing any response
to the report, given the irrational conditions imposed.  Apparently working under a self-imposed deadline,
Smith's team informed us, implausibly, that permitting defense review of Smith's unlawful Draft Report
during the first week of January 2025 would be "too late to allow us to complete our work."  Subsequently
Smith walked back those now clearly false claims and permitted defense counsel to review the two-volume
Draft Report in a conference room at Smith's office between January 3 and January 6, 2025, without
allowing counsel to access the Internet or use their own electronic devices while in the room with
supposedly sensitive documents that the press has known about for weeks by virtue of Smith's leaks.

## II.    Preparation And Release Of A Report Would Violate Existing Law

Preparation and public release of a report by Smith would violate the Constitution and existing
law, including the Appropriations and Appointments Clauses, the Special Counsel Regulations, the
Presidential Transition Act, and the Presidential immunity doctrine.  Collectively, these considerations
distinguish the circumstances surrounding the release of reports by prior Special Counsels.  Here, release
of an unlawful report would *not* "comply with applicable legal restrictions" or "be in the public interest."
28 C.F.R. § 600.9(c); *see also id.* § 600.7(a) ("A Special Counsel shall comply with the rules, regulations,
procedures, practices and policies of the Department of Justice.").  Therefore, you must countermand
Smith's proposed course of action, *id.* § 600.7(b), and he should be removed for "dereliction of duty" and
"good cause," § 600.7(d).

Smith was not validly appointed, and Congress did not provide funding for his improper mission.
No statute authorized you to deploy a private attorney against President Trump and others, and Smith
functioned as a principal officer acting without the necessary Senate confirmation.  In addition, the DOJ
permanent indefinite appropriation Smith relied upon was—and still is—inapplicable.  The only judge to
have examined the particulars of Smith's appointment reached these conclusions in an extremely thorough
and well-reasoned opinion.  *See generally United States v. Trump*, 2024 WL 3404555, at *46 (S.D. Fla.
July 15, 2024).  On appeal, Smith's prosecutors failed to identify any meritorious reason for questioning
Judge Cannon's treatment of these issues, and then abandoned the appeal as to President Trump.
Therefore, Smith lacks authority to issue a report regarding his activities while masquerading as a
prosecutor, and his Office lacks authority to expend any public funds in furtherance of preparing or issuing
such a report.  Indeed, because Smith abandoned the 11th Circuit appeal as to President Trump, Judge
Cannon's decision is a final judgment with issue-preclusive effect on these issues.  *See, e.g.*, *Bravo-
Fernandez v. United States*, 580 U.S. 5, 7-8 (2016) (cleaned up) ("In criminal prosecutions, as in civil
litigation, the issue-preclusion principle means that when an issue of ultimate fact has once been
determined by a valid and final judgment, that issue cannot again be litigated between the same parties in
any future lawsuit."); *Bobby v. Bies*, 556 U.S. 825, 834 (2009) (same).

Preparation and release of a report would also be improper under the Special Counsel Regulations.
Those Regulations only call for "Closing documentation," in the form of a "confidential report," to be
prepared "[a]t the *conclusion* of the Special Counsel's work."  28 C.F.R. § 600.8(c) (emphasis added).  In
light of the violations of the Appointments Clause and the Appropriations Clause, Smith has no lawful
"work" to conclude.  Moreover, by Smith's own repeated admission, Smith has not concluded his mission.

January 6, 2025
Page 4

Rather, Presidential immunity based on the national mandate arising from President Trump's overwhelming victory in the election has made it impossible for Smith to proceed, and rightly so.

Smith's representations in the District of Columbia regarding his dismissed prosecution of President Trump reinforce these points and make clear that no "Closing documentation" is warranted. 28 C.F.R. § 600.8(c). Smith wrongly relied on the claim that Presidential immunity is "temporary," which is not the case, to ask that the charges against President Trump only be dismissed "without prejudice."[2] The plain implication of Smith's position, which Judge Chutkan adopted, is that he does not believe his work targeting President Trump has reached its "conclusion." 28 C.F.R. § 600.8(c). Thus, taking a contrary position in order to justify preparation of one last long-winded, inaccurate, and unlawful smear of the President-elect and others would violate the Special Counsel Regulations.

Public release of a report by Smith would also disrupt the ongoing transition process and violate the Presidential Transition Act. "[T]he orderly transfer of the executive power is one of the most important public objectives in a democratic society. The transition period insures that the candidate will be able to perform effectively the important functions of his or her new office as expeditiously as possible." Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *Definition of "Candidate" Under 18 U.S.C. §207(j)*, 2000 WL 33716979, at *4 (Nov. 6, 2000) (cleaned up). "One of the top priorities of any presidential administration is to protect the country from foreign and domestic threats. While a challenge at all times, the country is especially vulnerable during the time of presidential transitions . . . ."[3] Thus, the transition process is "an integral part of the presidential administration," in the "national interest," and part of President Trump's "public function," as he prepares to govern. Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *Reimbursing Transition-Related Expenses Incurred Before The Administrator Of General Services Ascertained Who Were The Apparent Successful Candidates For The Office Of President And Vice President*, 2001 WL 34058234, at *3 (Jan. 17, 2001).

Congress passed the Presidential Transition Act to protect these critical functions. The purpose of the Act is "to promote the orderly transfer of the executive power in connection with the expiration of the term of office of a President and the inauguration of a new President." 3 U.S.C. § 102 note, § 2. "Any disruption" of the transition "could produce results detrimental to the safety and well-being of the United States and its people." *Id.* Consequently, under the Act, "all officers of the Government"—including the Attorney General and, according to his claims, Smith—are required to "conduct the affairs of the Government for which they exercise responsibility and authority" in a manner that "promote[s] orderly transitions in the office of President." *Id.* This includes, *inter alia*, "tak[ing] appropriate lawful steps to avoid or minimize disruptions that might be occasioned by the transfer of the executive power." *Id.*

Creating and releasing a prejudicial report to the public would violate these commands by giving rise to a media storm of false and unfair criticism that President Trump would be required to address while preparing to assume his Article II responsibilities. Equally problematic and inappropriate are the draft's

---

[2] ECF No. 281 at 6, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Nov. 25, 2024).

[3] Center for Presidential Transition, *Presidential Transitions are a Perilous Moment for National Security* (Aug. 16, 2023), https://presidentialtransition.org/reports-publications/presidential-transitions-are-a-perilous-moment-for-national-security.

Exhibit A

January 6, 2025
Page 5

baseless attacks on other anticipated members of President Trump's incoming administration, which are an obvious effort to interfere with upcoming confirmation hearings, and Smith's pathetically transparent tirade about good-faith efforts by X to protect civil liberties, which in a myriad other contexts you have claimed are paramount.

A one-sided, improper report by Smith, particularly if publicly released, would also violate the Presidential immunity principles that Smith has conceded foreclose him from proceeding against President Trump. Indeed, footnote 1 of "Volume 1" of the Draft Report concedes that Smith has brazenly included "conduct for which the Supreme Court later held [President] Trump to be immune from prosecution," and subsequently further highlights the incredible hubris that has clouded the judgment of Smith and his staff from the outset by falsely claiming that the Supreme Court's decision is ambiguous with respect to holdings and reasoning that Smith simply does not like. Based on guidance from OLC—which Smith's staff subsequently informed us that the Office improperly failed to document in any way, in violation of, *inter alia*, DOJ policy regarding the handling of exculpatory information—Smith has acknowledged that Presidential immunity is "categorical," and that it applies while President Trump is the President-elect prior to his inauguration.[4] A public report by Smith would unnecessarily and unjustly add to the inappropriate "peculiar public opprobrium" that has resulted from Smith's unlawful activities thus far. *Trump v. United States*, 603 U.S. 593, 613 (2024). OLC explained previously that such "public stigma and opprobrium" could "compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs." Memorandum from Randolph D. Moss, Assistant Attorney General, OLC, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 2000 WL 33711291, at *19 (Oct. 16, 2000). "[T]he stigma arising . . . from the need to respond to such charges through the judicial process would seriously interfere with [the President's] ability to carry out his constitutionally assigned functions." *Id.* at *22. The release of a report would also pose an unconstitutional risk of diverting President Trump's "*personal* time and energy, and [would] inevitably entail a considerable if not overwhelming degree of mental preoccupation." *Id.* at *25 (emphasis in original). A "single prosecutor" such as Smith should not, and must not, be afforded "the practical power to interfere with the ability of a popularly elected President to carry out his constitutional functions." *Id.* at *19. "The Framers' design of the Presidency did not envision such counterproductive burdens on the vigor and energy of the Executive." *Trump*, 603 U.S. at 614 (cleaned up).

In sum, the same legal principles and logic that required Smith to dismiss his prosecutions of President Trump require that his activities be terminated without further action. Preparation and release of "Closing documentation" would violate the Constitution and existing law, harm the activities of the transition, and weaken the federal government that you have sworn an oath to support. The collective application of these circumstances make this situation entirely unlike any prior Special Counsel report. Preparation and release of a report is therefore not "in the public interest." 28 C.F.R. § 600.9(c). To the contrary, the course of action Smith proposes would further solidify the well-founded perception of partisanship created by Smith's violation of DOJ policies in connection with decisions based on his ultimately failed attempt to influence the outcome of the 2024 Presidential election. For all of these reasons, you must countermand Smith's proposed course of action, remove him, and stop the preparation and/or dissemination of the Draft Report.

---

[4] ECF No. 281 at 6, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Nov. 25, 2024) ("[T]he Department's position is that the Constitution requires that this case be dismissed before the defendant is inaugurated.").

January 6, 2025
Page 6

## III.    Smith's Report Violates The Presumption of Innocence

The presumption of innocence is "the undoubted law, axiomatic and elementary." *Coffin v. United States*, 156 U.S. 432, 453 (1895).  It is "vital and fundamental" to our Constitutional system, *id.* at 460, and "its enforcement lies at the foundation of the administration of our criminal law," *id.* at 453; *see also Cool v. United States*, 409 U.S. 100, 104 (1972) (holding violation of defendant's "constitutionally rooted presumption of innocence" required reversal).

"The presumption serves as a reminder to the jury that the prosecution has the burden of proving every element of the offense beyond a reasonable doubt," *United States v. Starks*, 34 F.4th 1142, 1158 (10th Cir. 2022), and thus, may be "extinguished only upon the *jury's* determination that guilt has been established beyond a reasonable doubt," *Mahorney v. Wallman*, 917 F.2d 469, 471 n.2 (10th Cir. 1990) (emphasis in original) (collecting cases).

Consistent with *these* bedrock principles, the Justice Manual prohibits prosecutors from publicly declaring a defendant's guilt prior to a jury verdict, or otherwise disseminating statements inconsistent with the presumption of innocence.  Justice Manual §§ 1.7.500; 1-7.600; 28 C.F.R. § 600.7(a) ("A Special Counsel shall comply with the rules, regulations, procedures, practices and policies of the Department of Justice.").  Rather, prosecutors must limit their statements to "[t]he substance of the charge, as contained in the complaint, indictment, information, or other public documents" and any "release issued before a finding of guilt should state that the charge is merely an accusation, and the defendant is presumed innocent until proven guilty."  Justice Manual § 1.7.500.  Moreover, "DOJ personnel should refrain from disclosing" *inter alia,* "[a]ny opinion as to [a] defendant's guilt" or any other "[o]bservations about a defendant's or party's character" "except as appropriate *in the proceeding or in an announcement after a finding of guilt*."  Justice Manual § 1-7.610 (emphasis added).

These restrictions ensure that the Department's statements do not "prejudice the rights of a defendant; or unfairly damage the reputation of a person."  Justice Manual § 1-7.100; *see also* 32 C.F.R. § 776.47 ("Except for statements that are necessary to inform the public of the nature and extent of the trial counsel's actions and that serve a legitimate law enforcement purpose, refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused."); D.C. Bar Rule 3.8 (same).

The Draft Report violates every one of these core requirements.  Despite Smith's decision to dismiss his cases against President Trump, and his complete failure to obtain a "*jury's* determination that guilt has been established beyond a reasonable doubt," *Mahorney*, 917 F.2d at 471 n.2 (emphasis in original), his Draft Report repeatedly, and falsely, claims that President Trump, Carlos De Oliveria, Waltine Nauta, and others have committed crimes and otherwise engaged in purported "criminal conduct."  For example, Volume I of the Draft Report falsely asserts, without any jury determination, that President Trump and others "engaged in an unprecedented criminal effort," was "the head of the criminal conspiracies," and harbored a "criminal design."  Draft Report, Vol. I at 2, 68, 69.  These false accusations of criminality, which Smith again utterly failed to prove in Court, repeat throughout Volume I.  *See, e.g.*, *id.* at 3, 52, 60, 64,  67, 88, 108.  Likewise, Volume II asserts, without any supporting verdict, "that Mr. Trump violated multiple federal criminal laws," and that he and others engaged in "criminal conduct."  Vol. II at 60, 88; *see also, e.g.*, *id.* at 89, 121.  Moreover, the Draft Report makes these allegations despite

the ongoing prosecutions of DeOliveira and Nauta, which would cause gravely unconstitutional prejudice if released.

Neither the Constitution nor applicable regulations or ethical rules allow Smith to make public, extrajudicial claims that purport to reflect conclusive determinations of guilt backed by the imprimatur of DOJ. It is the role of the jury, not the Special Counsel, to weigh the facts and determine guilt. Other Special Counsels have recognized this foundational fact. For example, Special Counsel Hur carefully cabined his observations to what some "jurors could," "might," "may well," or, at most, "would likely" conclude. *See, e.g., Hur Report* at 4, 5, 9, 10, 204, 206-211, 214, 216, 218, 220, 233, 235, 240-42, 246-47. At all points, Hur's focus was on whether "jurors assessing Mr. Biden's guilt and intent w[ould] be persuaded," *id*. at 241, and not on the Special Counsel's unilateral views or opinions regarding Biden's obvious guilt.

Likewise, Special Counsel Mueller expressly declined to "apply an approach" to his report "that could potentially result in a judgment that the President committed crimes," where, as here, "no charges c[ould] be brought." *Mueller Report*, Vol. II at 2. In Special Counsel Mueller's view, "[f]airness concerns counseled against" any kind of public accusation because:

> [t]he ordinary means for an individual to respond to an accusation is through a speedy and public trial, with all the procedural protections that surround a criminal case. An individual who believes he was wrongly accused can use that process to seek to clear his name. In contrast, a prosecutor's judgment that crimes were committed, but that no charges will be brought, affords no such adversarial opportunity for public name-clearing before an impartial adjudicator.

*Id.* Moreover, Special Counsel Mueller warned that a public disclosure of a prosecutor's unilateral judgment would only heighten these dangers. *Id.* ("[T]he possibility of the report's public disclosure and the absence of a neutral adjudicatory forum to review its findings counseled against potentially determining 'that the person's conduct constitutes a federal offense.' Justice Manual § 9-27.220."). For these reasons, Special Counsel Mueller's report "did not draw ultimate conclusions about the President's conduct," *id*. at 182, but "[i]nstead for each of the relevant actions investigated, . . . set[] out evidence on both sides of the question. . . ." Ltr. from Attorney General William Barr at 3 (Mar. 24, 2019).

To the extent Special Counsel Smith possesses any authority to draft a report (and he does not) he should have applied the same principles as Special Counsels Hur and Mueller, which the Constitution, the Justice Manual, and applicable regulations and ethical rules all require. That is—providing a dispassionate description of the relevant facts, free of any gratuitous commentary regarding President Trump's conduct, let alone direct accusations of guilt. Smith failed to do so. Instead, he chose to construct the Draft Report as a partisan weapon, designed to "unfairly damage the reputation" of President Trump, Justice Manual § 1-7.100, in a manner calculated to "heighten[] public condemnation," 32 C.F.R. § 776.47, while providing "no . . . adversarial opportunity for public name-clearing before an impartial adjudicator," *Mueller Report*, Vol. II at 2. Accordingly, the Department should not, under any circumstances, permit Smith to complete or submit the Draft Report in this form or otherwise disseminate it to the public.

January 6, 2025
Page 8

### IV.    Preparation And Release Of A Report Would Serve No Valid Purpose

There are many practical and prudential reasons to obey the law here. Preparation and release of a report by Smith would not "be in the public interest." 28 C.F.R. § 600.9(c).

In 2023, Smith and his Office levied extremely serious, and entirely false, allegations against President Trump in two separate cases. Smith has now been forced by the rule of law to dismiss both of those cases. It would be highly improper and contrary to the public interest—as well as inconsistent with the reconciliation and public healing process that is necessary following divisive and unconstitutional actions by Smith—to allow him to create and disseminate yet another document recycling politically motivated and inaccurate claims that the law has forced him to abandon. Indeed, "no legitimate governmental interest is served by an official public smear of an individual when that individual has not been provided a forum in which to vindicate his rights." *In re Smith*, 656 F.2d 1101, 1106 (5th Cir. 1981). Smith lacks the credibility that is necessary for such a report to be reliable or valuable to anyone, as his biased and unlawful approach to these cases has been widely-criticized and discredited from the outset.[5] Quite appropriately, he is the subject of an ongoing investigation by the Office of Professional Responsibility, further diminishing any value from a report.[6] Smith's unlawful plan would reinforce the "likely prospect of an Executive Branch that cannibalizes itself, with each successive President free to prosecute his predecessors, yet unable to boldly and fearlessly carry out his duties for fear that he may be next." *Trump*, 603 U.S. at 640. "The enfeebling of the Presidency and our Government that would result from such a cycle of factional strife is exactly what the Framers intended to avoid." *Id.*

At 1999 hearings relating to the Independent Counsel Act, Ted Olson argued that "the final report . . . has turned into an excuse to file long exhaustive expositions which rationalize the investigation," as well as "offer opinions regarding and/or pronounce judgments on the individuals investigated, and generally make the Independent Counsel look good."[7] Attorney General Janet Reno pointed out, more succinctly, that "the price of the final report is often too high."[8] Deputy Attorney General Eric Holder

---

[5] WSJ Editorial Board, *Jack Smith Loses in the People's Court*, WSJ (Nov. 7, 2024, 5:52 PM), https://www.wsj.com/opinion/donald-trump-prosecutions-jack-smith-fani-willis-alvin-bragg-juan-merchan-1c68f640; Jonathan Turley, *Opinion: Donald Trump just won the greatest jury verdict in American history*, The Hill (Nov. 6, 2024, 10:56 AM), https://thehill.com/opinion/campaign/4976533-trump-prosecutions-lawfare-end; Elie Honig, *So What Happens With All the Cases Against Trump Now?*, N.Y. Mag. (Nov. 8, 2024), https://nymag.com/intelligencer/article/what-will-happen-with-the-charges-against-trump.html.

[6] Letter from Chairman Jim Jordan to Jeffrey Ragsdale, DOJ OPR (Dec. 4, 2024) https://www.scribd.com/document/800789357/Judiciary-to-DOJ?secret_password=vphCtDdh3lHj7mTM5Ib8.

[7] *The Future of the Independent Counsel Act: Hearings before the S. Comm. on Governmental Affairs*, 106th Cong. 231 (1999) (prepared statement of Theodore B. Olson).

[8] *The Future of the Independent Counsel Act: Hearings before the S. Comm. on Governmental Affairs*, 106th Cong. 252 (1999) (prepared statement of Attorney General Janet Reno).

January 6, 2025
Page 9

added: "the reporting requirement goes directly against most traditions and practices of law enforcement and American ideals."[9]  Based on this feedback, Congress permitted the Independent Counsel Act to expire, and DOJ promulgated a reporting regulation that was much more restrictive than its statutory predecessor.[10]

For the quarter century that DOJ has operated under these Regulations, DOJ has not released a single Special Counsel report concerning any individual who has mounted a successful defense in court, as President Trump has done with respect to Presidential immunity.  For good reason: the Special Counsel Regulations state that the purpose of a report is to "explain[] the prosecution or declination decisions."  28 C.F.R. § 600.8(c).  When filing and resolving a case in Court, that information, together with the defense's responses, becomes part of the public record.  An additional, one-sided report, would only sow confusion and undermine the judicial process.

Here, Smith has explained himself, and sought unsuccessfully to justify his actions, *ad nauseum*. This has included routinely leaking sensitive details regarding the actions of Smith's Office to the media in violation of DOJ policy.  In October 2024, it was leaked that Smith planned to "pursue his two cases against Mr. Trump for as long as he has the legal authority to do so—including during the period between Election Day and the inauguration, when Mr. Trump, if he prevails, would be president-elect."[11]  A similar July 2024 report cited "a person familiar with Mr. Smith's thinking."[12]  As another example, we first learned from the media, rather than Smith's Office, that they were considering dismissing the prosecutions of President Trump.[13]  And we learned for the first time via private outreach from media sources, rather than Smith's Office, that Smith is working on a report.

---

[9] *Reauthorization of the Independent Counsel Statute, Part I: Hearings Before the H. Comm. on the Judiciary*, 106th Cong. 86 (1999) (prepared statement of Deputy Attorney General Eric Holder )

[10] *Compare* 28 U.S.C. § 594(h)(1)(B) (calling for a "final report . . . setting forth fully and completely a description of the work of the independent counsel, including the disposition of all cases brought"), *with* 28 C.F.R. § 600.8(c) (calling for "a confidential report explaining the prosecution or declination decisions reached by the Special Counsel").

[11] Maggie Haberman et al., *Trump Says He'll Fire Jack Smith, Special Counsel Who Indicted Him, if He Wins Again*, N.Y. Times (Oct. 24, 2024), https://www.nytimes.com/2024/10/24/us/politics/trump-jack-smith.html.

[12] Alan Feuer, *Special Counsel Is Said to Be Planning to Pursue Trump Cases Past the Election*, N.Y. Times (July 2, 2024), https://www.nytimes.com/2024/07/02/us/politics/jack-smith-trump-charges.html.

[13] Pierre Thomas et al., *Special counsel Jack Smith expected to wind down Trump prosecutions: Sources*, ABC News (Nov. 6, 2024, 3:26 PM), https://abcnews.go.com/Politics/special-counsel-jack-smith-expected-to-wind-trump-prosecutions/story?id=115571646; Devlin Barrett, *Jack Smith Assesses How to Wind Down Trump's Federal Cases, Official Says*, N.Y. Times (Nov. 6, 2024), https://www.nytimes.com/2024/11/06/us/politics/doj-trump-federal-cases.html.

January 6, 2025

Page 10

In addition to the leaks, Smith filed four gratuitous speaking indictments, held a lawless press conference before the national media, and filed hundreds of pages of briefing in two district courts, two Courts of Appeals, and the Supreme Court. Smith's inappropriate 165-page "Motion For Immunity Determinations," accompanied by a 1,885-page "Appendix," is an especially egregious example of Smith's proclivity to seize all available opportunities to issue lengthy diatribes attacking President Trump based on Smith's biased view of the law and evidence.[14] Smith insisted on the filing, which even Judge Chutkan characterized as "atypical,"[15] to further publicize his narrative in the lead-up to the Presidential election. Smith's tome was not responsive to a defense motion, had no basis in the Federal Rules of Criminal Procedure, and violated DOJ's election-interference policies and practices. *See, e.g.*, Justice Manual § 9-85.500.[16] Having previously insisted on highly restrictive protective orders that prevented dissemination of discovery, based in part on histrionic, unsupported claims about witness identities, Smith abandoned those arguments and released the contents of protected reports, grand jury material, and accounts from thinly-veiled witnesses whom the media immediately identified.

Under these circumstances, there is no legitimate need for an additional "report" to "explain [Smith's] prosecution or declination decisions." 28 C.F.R. § 600.8(c). His baseless rationales for prosecution are already fully public. So too is the selective description that his Office prepared of the legal basis for the motions to dismiss, which Smith's Office caused OLC not to further memorialize in violation of the *Brady* doctrine and DOJ policy. Moreover, the Draft Report goes far beyond merely explaining Smith's "prosecution or declination decisions," deviating instead into extensive and irrelevant discussions on purported "litigation issues," including post-indictment immunity litigation and Smith's violation of the Department's political non-interference policies. *See* Draft Report Vol. I at 107-37. Although Smith may wish to air his baseless and politically motivated grievances regarding the Constitutional importance of immunity, and otherwise provide feeble and transparent excuses for his plainly political motivations, that is not the purpose of a Special Counsel report under 28 C.F.R. § 600.8(c). A report must simply "explain[]" a Special Counsel's "prosecution or declination decisions" and nothing more. The Draft Report violates this core principle.

The issuance of such a report, in violation of the Constitution, the Transition Act, Presidential immunity, and DOJ's own regulations, would exacerbate the irreparable damage that Smith has already inflicted on DOJ's reputation for non-partisanship through his repeated violations of DOJ policies about election interference. As we noted one year ago in opposing Smith's failed attempt to obtain certiorari before judgment on Presidential immunity, which the Supreme Court rejected, Smith's actions "create[] the compelling appearance of a partisan motivation: To ensure that President Trump . . . will face a months-long criminal trial at the height of his presidential campaign." Br. in Opp. to Pet'n for Writ of

---

[14] ECF No. 252, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Oct. 2, 2024).

[15] ECF No. 243 at 2, *United States v. Trump*, No. 23 Cr. 257 (D.D.C. Sept. 24, 2024).

[16] *See also* A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election, U.S. Dep't of Justice Office of Inspector General (June 2018) at 18 ("[I]n general, the practice has been not to take actions that might have an impact on an election, even if it's not an election case or something like that."), *available at* https://s3.documentcloud.org/documents/4515884/DOJ-OIG-2016-Election-Final-Report.pdf.

Certiorari Before Judgment in *United States v. Trump*, No. 23-624, at 21 (filed Dec. 20, 2024). Smith's nakedly partisan, election-interference motivation was obvious to commentators across the political spectrum. *See id.* (citing many sources). "[T]he best traditions of the U.S. Department of Justice … call for prosecutors to *avoid* the appearance of election interference in the prosecution of political candidates." *Id.* at 23 (emphasis in original). "[F]ederal prosecutors . . . may never make a decision regarding an investigation or prosecution, or select the timing of investigative steps or criminal charges, for the purpose of affecting any election, or for the purpose of giving an advantage or disadvantage to any candidate or political party." *Id.* (citing Justice Manual § 9-27.260). Smith's latest illegal plan to launch yet another partisan attack against President Trump, De Oliveira, and Nauta will have the same injurious effect on DOJ's reputation if not stopped in its tracks.

Further, preparing and releasing a report would be improper for the additional reason that Smith has relied on numerous legal theories that are unprecedented and incorrect as a matter of law. Many of those issues were the subject of ongoing litigation at the time Smith dismissed the cases. To name a few, these issues include the lack of statutory authority for Smith's appointment; Smith's reliance on official-acts allegations in both cases in violation of the Presidential immunity doctrine[17]; Smith's unlawful theory under 18 U.S.C. § 1512(c)(2) in violation of *Fischer v. United States*, 603 U.S. 480 (2024); equal protection violations, based on selective and vindictive prosecution theories[18]; the unprecedented and unlawful raid at Mar-a-Lago; and violations of the Presidential Records Act and NARA's longstanding practices under that Act.[19] There were also numerous discovery disputes in both cases, including unresolved motions in the Southern District of Florida regarding *Brady* obligations, the scope of the prosecution team, and Intelligence Community holdings, which further call into question the reliability of Smith's theories.[20] Smith's Draft Report presents a selective and inaccurate response to only some of these issues, and then proceeds as if his theories are well-founded and undisputed. Nothing could be further from the truth.

Finally, given the status of Smith and his team as the inauguration approaches, using additional taxpayer resources to prepare, review, and disseminate a report is not a legitimate use of taxpayer funds—even if there were a valid appropriation here, which there is not. "The Special Counsel's office has spent tens of millions of dollars since November 2022, all drawn unconstitutionally from the Indefinite Appropriation." *United States v. Trump*, 2024 WL 3404555, at *46 (S.D. Fla. July 15, 2024). For the period preceding March 31, 2024, Smith's Office had used $20 million from a permanent indefinite appropriation and an additional $16 million from other unspecified "DOJ components."[21] The costs of Smith's activities since March 2024 have not yet been released. It is clear, however, that the total figure

---

[17] ECF No. 324, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[18] ECF No. 328, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[19] ECF No. 327, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Feb. 22, 2024).

[20] ECF No. 262, *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla. Jan. 16, 2024).

[21] Special Counsel's Office, DOJ, Statements of Expenditures, https://www.justice.gov/sco-smith.

January 6, 2025
Page 12

will greatly exceed—by an extraordinarily wide margin—what all of this lawfare was actually worth to the public, the operations of the government, and the Country as a whole.

<p style="text-align:center">*    *    *</p>

Smith's proposed plan for releasing a report is unlawful, undertaken in bad faith, and contrary to the public interest.  Smith's conduct also raises grave concerns under Article II because it unlawfully encroaches on the Executive authority of the incoming Administration of President Trump to resolve the issues surrounding Smith's Office in accordance with President Trump's commanding national mandate from the voters.  The time has come to put an end to this weaponization of the justice system and move forward constructively.  No report should be prepared or released, and Smith should be removed, including for even suggesting that course of action given his obvious political motivations and desire to lawlessly undermine the transition.  If you elect to proceed with Smith's plan, we again respectfully request (1) notice of such decision prior to any publication of the Draft Report, allowing us to take appropriate legal action, and (2) that this letter and Smith's meritless responses to the legal arguments set forth herein be incorporated into the Report.

<div style="margin-left:40%">
Respectfully Submitted,

/s/ Todd Blanche / Emil Bove
Todd Blanche
Emil Bove
Blanche Law PLLC

 /s/ John Lauro / Gregory Singer
John Lauro
Gregory Singer
Lauro & Singer

*Attorneys for President Donald J. Trump*
</div>

Cc:    Jack Smith, Special Counsel
       JP Cooney, Deputy Special Counsel
       (Via Email)

Exhibit A

TAB 681

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 681

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### WEST PALM BEACH DIVISION

UNITED STATES OF AMERICA,

vs.

WALTINE NAUTA, *et ano.*,

Defendants.

**Case No. 23-80101-CR
CANNON/REINHART**

---

## PRESIDENT DONALD J. TRUMP'S MOTION FOR LEAVE TO INTERVENE OR, IN THE ALTERNATIVE, PARTICIPATE AS AMICUS CURIAE

President Donald J. Trump respectfully submits this motion for leave to intervene or, in the alternative, participate as *amicus curiae*, with respect to the January 6, 2025 Emergency Motion filed by Waltine Nauta and Carlos De Oliveira for injunctive relief with respect to the "Final Report" proposed by private citizen, and so-called Special Counsel, Jack Smith.  ECF No. 679. For the reasons set forth below, President Trump joins the Emergency Motion and respectfully requests that the Court consider the arguments in President Trump's January 6, 2025 letter to Attorney General Merrick Garland, which is attached as Exhibit A to the Emergency Motion, and which President Trump incorporates by reference.

In the Emergency Motion, Nauta and De Oliveira seek two forms of injunctive relief: (1) prohibiting Smith from *transmitting* the Report to Attorney General Garland, ECF No. 679 at 15-19; and (2) prohibiting Attorney General Garland from *releasing* any report by Smith to the public, *id.* at 8-15.  President Trump's letter establishes the unlawfulness of Smith's planned course of action as to both transmission and release, that Smith's plan would result in irreparable harm, and that injunctive relief is in the public's interest.  The letter also explains why the Attorney General should countermand and remove Smith for proposing a course of action that is illegal and

unethical in several respects. *See* 28 C.F.R. § 600.7(b). As of this filing, the Attorney General has not addressed that necessity.

In a "Notice" document filed early in the morning on January 7, 2025, however, Smith brazenly declared that—notwithstanding the pending Emergency Motion—he planned to transmit one Volume of the Report to Attorney General Garland before even responding to the pending filing. *See* ECF No. 680 at 1-2. Although the Emergency Motion seeks to enjoin transmission and release of the *entire* Report, in a document signed by the same Assistant Special Counsel who "refused" to provide the Court with details regarding the Attorney General's purported oversight of these prosecutors,[1] Smith's "Notice" makes no commitments at all with respect to the other Volume. *See* ECF No. 680 at 1. Accordingly, to preserve the status quo, the Court should immediately enter an interim order forbidding both *transmission* and *release* of the Report until the Court has addressed the Emergency Motion and this Motion. After the full adversarial litigation and careful attention that these issues require, the Court should grant the Emergency Motion.

## I.     President Trump Is Entitled To Participate In These Proceedings

As a former and soon-to-be President, uniquely familiar with the pernicious consequences of lawfare perpetrated by Smith, his Office, and others at DOJ, President Trump should be permitted to participate in these proceedings.

Intervention is appropriate where, as here, "a third party's constitutional or other federal rights are implicated by the resolution of a particular motion, request, or other issue during the course of a criminal case." *United States v. Carmichael*, 342 F. Supp. 2d 1070, 1072 (M.D. Ala.

---

[1] *See United States v. Trump*, 2024 WL 3404555, at *36 n.57 (S.D. Fla. 2024) ("[C]ounsel for the Special Counsel refused to answer the Court's questions regarding whether the Attorney General had played any actual role in seeking or approving the indictment in this case").

2004); *Gravel v. United States*, 408 U.S. 606, 608-09 & n.1 (1972).  President Trump's interest in ensuring a smooth Presidential transition—including as promised under the Presidential Transition Act—and the effective vesting of executive power are interests that are "direct, substantial, and legally protectable." *Georgia v. U.S. Army Corps of Eng'rs*, 302 F.3d 1242, 1249 (11th Cir. 2002). Thus, as the President-elect, President Trump has "a legitimate interest in the outcome and cannot protect that interest without becoming a party."  *United States v. Blagojevich*, 612 F.3d 558, 559 (7th Cir. 2010).  In the alternative, the Court has repeatedly and properly exercised its "inherent authority to appoint *amici curiae*, or 'friends of the court' to assist it in a proceeding."  *Resort Timeshare Resales, Inc. v. Stuart*, 764 F. Supp. 1495, 1500 (S.D. Fla. 1991).  Therefore, whether as an intervener, *amicus curiae*, or both, President Trump's views are entitled to consideration and great weight in connection with the Emergency Motion.

## II.    Emergency Injunctive Relief Is Necessary And Appropriate

Immediate injunctive relief is necessary to preserve the status quo and prevent Smith from flouting this Court's authority to consider the Emergency Motion.  *See United States v. Flint*, 178 F. App'x 964, 969 (11th Cir. 2006) ("Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions." (cleaned up)); *see also SEC v. MCC Int'l Corp.*, 2022 WL 22258596, at *1 (S.D. Fla. 2022) (reasoning that *ex parte* TROs can be used for the "underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing" (cleaned up)).  Specifically, the Court should immediately order Smith and his Office not to transmit any aspect of the Report to the Attorney General before the Emergency Motion is resolved.  Following the adversarial litigation that these issues most certainly require,

more robust injunctive relief will be appropriate to prohibit both the transmission and public issuance of any report relating to Smith's failed lawfare.

There is no basis for Smith to be spending taxpayer dollars to interfere with the Presidential transition process by making false and prejudicial claims about President Trump, Nauta, De Oliveira, and other uncharged parties.  In the most thorough judicial treatment of the issues that exists, this Court explained the myriad reasons that Smith's operations violate the Appointments and Appropriations Clauses.  "The consequences of relaxing either of those critical provisions are serious, both in this case and beyond." *Trump*, 2024 WL 3404555, at *46.  The Court quoted Justice Frankfurter's warning that "'[t]he accretion of dangerous power does not come in a day.  It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority.'"  *Id.* (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594 (1952) (Frankfurter, J., concurring)).  Smith and his Office did not heed the Court's admonitions.  They have displayed exactly the unchecked disregard that the Court noted previously, ignored the practical effect of the ruling, and continued to unlawfully draw on DOJ's permanent indefinite appropriation for politically-motivated and improper activities, even after dismissing the improper prosecutions of President Trump in this District and the District of Columbia.

President Trump joins in full the arguments presented by Nauta and Oliveira in the Emergency Motion.  President Trump's January 6, 2025 letter further establishes the merits showing necessary to justify injunctive relief, and demonstrates that the public interest strongly favors the Defendants here.  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345-46 (2024) (explaining that the "purpose [of injunctive relief] is merely to preserve the relative positions of the parties until a trial on the merits can be held" and requires consideration of whether the movant

"is likely to succeed on the merits," "is likely to suffer irreparable harm in the absence of preliminary relief," "that the balance of equities tips in his favor, and that an injunction is in the public interest"); *see also United States v. Etienne*, 102 F.4th 1139, 1151 (11th Cir. 2024) (Pryor, J., concurring in part and dissenting in part) (noting that the *Flint* injunction was issued in "a criminal case").  Smith's proposal to issue a report violates the Constitution, the Transition Act, the Justice Manual, the Special Counsel Regulations, applicable ethical rules, and Local Rule 77.2. For example, the very same prosecutors who sought an unconstitutional gag order of President Trump with no basis in law or fact, *see, e.g.*, ECF No. 592, now seek to run roughshod over applicable ethical rules and DOJ policies prohibiting extrajudicial statements regarding ongoing proceedings.  *See* Ex. A at 6-7.  Unlike prior Special Counsels who treated the presumption of innocence with tremendous care in their reports, Smith has acted as if the presumption can be removed pursuant to a private citizen's fiat and drafted hundreds of pages seeking to justify his failed crusade.  Ex. A at 6.  Leaving no doubt that Smith's actions are motivated by an intention to interfere with the transition and unfairly attack President Trump, his Office abused the applicable protective orders by requiring counsel to destroy discovery prior to providing access to the Draft Report—in effect, preventing defense counsel from accessing critical evidence necessary to fully respond to the meritless, inaccurate, and bad-faith assertions in the Draft Report.  *See* Ex. A at 1.

Issuance and public release of the Report would cause manifest irreparable harm by disrupting and interfering with President Trump's transition efforts and harming the institution of the Presidency, all to the detriment of the American people.  Smith's activities are yet another transparent effort to target President Trump and his associates.  Smith aims to transmit the Report to the Attorney General, and to cause DOJ to release the Report to the public, outside of judicial proceedings in which the Defendants can respond and vindicate themselves.  Smith has

commenced that plan knowing full well that the Defendants cannot publicly address the purported evidence he wrongly claims to have summarized. In the normal course, a properly appointed prosecutor would never be permitted to pursue such a course of action. Among other requirements, a prosecutor facing a dismissal order such as the one in this case would be required to first establish in the pending appeal that there was a valid appointment and appropriation, which Smith has not done and cannot do for the reasons the Court already set forth at great length. Smith's attempt to skip that step and release false and unproven claims to the public is entirely consistent with other evidence that he is little more than a biased private citizen and partisan tool for the Biden-Harris Administration, and not the type of prosecutor described by former Attorney General Robert Jackson in his famous 1940 speech. Thus, Smith should not be permitted to work with outgoing DOJ personnel to release untested, prejudicial claims regarding the Defendants and uncharged parties. And there is absolutely no valid basis for Smith's efforts to rush to do so ahead of President Trump's inauguration.

This morning's Notice is the most recent example of Smith's glaring lack of respect for this Court and fundamental norms of the criminal justice system. *See, e.g.*, ECF No. 428 at 2, 22 (threatening frivolous interlocutory appeal in response to straightforward inquiry from the Court); ECF No. 580 at 55 (admonishing prosecutor). The Notice essentially declared, without explanation, that Smith believes that the Volumes of his Report are severable. ECF No. 680. With respect to the Volume that Smith says "pertains to this case," he informed Your Honor and the parties that he plans to ignore the pending Emergency Motion, as well as the arguments in the January 6, 2025 letter, by transmitting that Volume to the Attorney General early this afternoon— and then, only after the transmission, filing a "response" to the Emergency Motion. *Id.* at 2.

It also appears to be implied in the Notice that Smith plans to transmit the other Volume of the Report to the Attorney General imminently. While the other Volume addresses the dismissed charges against President Trump in the District of Columbia, the Volumes cross-reference each other and cannot be considered in isolation as Smith suggests. Moreover, the D.C. case pertained to a time period when Nauta and De Oliveira were employees of President Trump, and false extrajudicial claims about those events are also prejudicial and improper in the ongoing case against Nauta and De Oliveira. The D.C. case and this case also involve an overlapping group of third parties and potential witnesses, and the entire Report—both Volumes—is replete with improper claims about those parties that are inconsistent with the presumption of innocence. Finally, and perhaps most importantly, the Defendants' arguments regarding Smith's lack of authority to transmit the Report to the Attorney General based on this Court's dismissal ruling apply with equal force to both Volumes.

In short, the Notice is more of the same from a private citizen masquerading as a prosecutor, too deranged by the outcome of his failed multi-year election-interference war to notice that he is causing his Office and DOJ to act in a manner that is completely detached from the Rule of Law and deeply disrespectful of Article III courts.

## III.   Conclusion

The All Writs Act, as well as the Court's ancillary jurisdiction and supervisory power, all provide ample authority for Your Honor to prevent these injustices. *See, e.g.*, *United States v. DiBernardo*, 775 F.2d 1470, 1475-76 (11th Cir. 1985) ("Federal courts may exercise their supervisory powers to remedy violations of recognized rights, to protect the integrity of the federal courts, and to deter illegal conduct by government officials."). Accordingly, the Court should (1) permit President Trump to intervene, or join as an *amicus curiae*, in order to present the

arguments set forth in the January 6, 2025 letter as a former President and the President-elect responsible for managing the transition and the vesting of Article II power; (2) immediately order Smith not to transmit any part of the Report to the Attorney General while the Emergency Motion is pending; and (3) following full briefing, order Smith not to transmit the Report to the Attorney General, and order the Attorney General not to issue any aspect of Smith's missive to the public.

Dated: January 7, 2025                      Respectfully submitted,

                                            */s/ Todd Blanche / Emil Bove*
                                            Todd Blanche (PHV)
                                            toddblanche@blanchelaw.com
                                            Emil Bove (PHV)
                                            emil.bove@blanchelaw.com
                                            Kendra L. Wharton (Fla. Bar No. 1048540)
                                            k.wharton@whartonlawpllc.com
                                            BLANCHE LAW PLLC
                                            99 Wall Street, Suite 4460
                                            New York, New York 10005
                                            (212) 716-1250

                                            *Counsel for President Donald J. Trump*

323

## CERTIFICATE OF CONFERENCE

Defendants Nauta and De Oliveira consent to this motion.  Counsel for President Trump hereby certify that on January 7, 2025, counsel for President Trump and the Special Counsel's Office conferred in a good faith effort to resolve the issues herein, but were unable to do so with respect to President Trump's motion.

Specifically, following the filing of the Notice by the Special Counsel's Office at approximately 1:46 a.m. this morning, undersigned counsel asked the Office regarding their position on this motion at approximately 7:36 a.m. and indicated that we planned to file the motion at 10:00 a.m.  At approximately 9:51 a.m., the Special Counsel's Office sent an email with the following position statement:

> The Government opposes your motion for intervention.  You have not meaningfully conferred with us and this is not an emergency.  You have known since December 11 that the Special Counsel was drafting a confidential report, and at no point during our discussions to accommodate your request to review it have you ever communicated to us an objection to the Special Counsel transmitting the report to the Attorney General, as required by regulation.  The first time you did so was in your letter to the Attorney General of January 6, which counsel for Waltine Nauta publicly filed last night in violation of our agreement to keep the contents of the draft report confidential.  And, once receiving your letter, the Department apprised you that it would provide you notice of any decision to publish a report from the Special Counsel, affording you the opportunity to take appropriate legal action.  We apprised counsel for Mr. Nauta and Carlos De Oliveira of the same well before they filed their motion last night.

The assertion that "this is not an emergency" is patently false for the reasons explained in the foregoing submission.  The fact that the Office had time to compose the position statement regarding their opposition belies the claim that there has been a lack of meaningful conferral, as does the fact that the email did not ask any questions or seek further discussion of our request.  Like the Notice from earlier this morning, the Office's position statement ignores the pending request that Smith not transmit the Report to the Attorney General, and the Office's discussion of events from last December ignores the fact that we could only raise these objections upon seeing

1

the Draft Report, reviewing its unlawful contents, and learning of the threat of irreparable harm

presented by Smith's planned course of action.  All of that happened starting on January 3, 2025.

**CERTIFICATE OF SERVICE**

I, Kendra L. Wharton, certify that on January 7, 2025, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF.

<u>/s/ Kendra L. Wharton</u>
Kendra L. Wharton

TAB 682

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 682

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON**

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.

**WALTINE NAUTA**, and
**CARLOS DE OLIVEIRA**,

      Defendants.

_____/

**ORDER**

Before the Court is an Emergency Motion filed on January 6, 2025, by Defendants Waltine Nauta and Carlos De Oliveira to Preclude Release of a Final Report by Special Counsel Jack Smith [ECF No. 679]. The Emergency Motion seeks a ruling by January 10, 2025, and contains an appropriate certification under Local Rule 7.1(d) and a request for a hearing. S.D. Fla. L.R. 7.1(d). The Emergency Motion, filed to preserve the status quo, seeks immediate injunctive relief to prevent irreparable injury from the reported imminent release to the public of a Final Report prepared by Special Counsel Smith. This morning, Defendants filed a nearly identical emergency motion before the United States Court of Appeals for the Eleventh Circuit in a pending appeal by the Special Counsel of an Order Granting Defendants' Motion to Dismiss Superseding Indictment Based on Appointments Clause Violation [ECF No. 672]. *See* 11th Cir. Case No. 24-12311 (ECF No. 85). The appellate motion seeks additional specific relief in the form of a stay or injunction pending appeal, Fed. R. App. P. 8, along with an order remanding to this Court for

consideration of the legality of any public release of the Final Report pending resolution of the ongoing appeal.  *See* 11th Cir. Case No. 24-12311 (ECF No. 85).

To preserve the status quo as this Court awaits resolution by the Eleventh Circuit of the similar Emergency Motion, to prevent irreparable harm arising from the circumstances as described in the current record in this emergency posture, and to permit an orderly and deliberative sequence of events, it is **ORDERED AND ADJUDGED** as follows:

1. Pending resolution of the Emergency Motion filed in the Eleventh Circuit and/or any further direction from the Eleventh Circuit, Attorney General Garland, the Department of Justice, Special Counsel Smith, all of their officers, agents, and employees, and all persons acting in active concert or participation with such individuals, *see* Fed. R. Civ. P. 65(d)(2), are **TEMPORARILY ENJOINED** from (a) releasing, sharing, or transmitting the Final Report or any drafts of such Report outside the Department of Justice, or (b) otherwise releasing, distributing, conveying, or sharing with anyone outside the Department of Justice any information or conclusions in the Final Report or in drafts thereof.  This Order remains in effect until **three days** after resolution by the Eleventh Circuit of the Emergency Motion, unless the Eleventh Circuit orders otherwise.

2. Defendants Nauta and De Oliveira shall promptly file a Notice in this Court advising of any activity by the Eleventh Circuit related to the Emergency Motion, and shall thereafter file copies of any such orders or motions in the electronic docket.

3. The Clerk is directed to promptly **TRANSMIT A COPY** of this Order to Attorney General Garland, Special Counsel Smith, the United States Attorney for the Southern District of Florida, and the Clerk of the Eleventh Circuit for filing in 11th Circuit Appeal No. 24-12311.

CASE NO. 23-80101-CR-CANNON

4.  This Order shall not be construed as a final ruling on the merits of the Emergency Motion,

which remains pending before this Court subject to any directives from the Eleventh Circuit.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 7th day of January

2025.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

TAB 697

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 697

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON**

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.

**WALTINE NAUTA**, and
**CARLOS DE OLIVEIRA,**

      Defendants.

_____/

**ORDER DENYING EMERGENCY MOTION AS TO VOLUME I OF SPECIAL
COUNSEL'S REPORT; RESERVING RULING ON VOLUME II; SETTING HEARING
ON UNITED STATES' REQUEST TO RELEASE VOLUME II; AND TEMPORARILY
ENJOINING RELEASE OF VOLUME II PENDING RESOLUTION OF EMERGENCY
<u>MOTION AS TO VOLUME II</u>**

      **THIS CAUSE** comes before the Court upon the "Emergency Motion to Preclude the

Government From Issuing a Purported Special Counsel Report Contravening This Court's

Dismissal Order and Prejudicing Defendants' Pretrial Rights; and Defendants' Request for a

Hearing on the Motion" ("Emergency Motion"), filed by Defendants Nauta and De Oliveira on

January 6, 2025 [ECF No. 679].  The Emergency Motion seeks to enjoin release of the entirety of

Special Counsel Smith's Final Report.  As described by the United States in subsequent filings,

Volume I of the Final Report concerns the "Election Interference Case" as to President-Elect

Trump in the District Court for the District of Columbia, and Volume II concerns this case, the so-

called "Classified Documents Case," which is the subject of a pending appeal of the Court's Order

Granting Defendants' Motion to Dismiss Superseding Indictment Based on Appointments Clause

Violation [ECF Nos. 672, 692].  The United States opposes any restriction on the release of

Volume I; agrees that Volume II should not be released to the public because it concerns the

continuing legal rights of Defendants Nauta and De Oliveira in this criminal proceeding; but

nevertheless seeks permission to make a limited release of Volume II to specified members of Congress, citing generalized congressional interest [ECF Nos. 692, 693].[1]

*** 

Upon review of the Emergency Motion, it is **ORDERED AND ADJUDGED** as follows:

1. The Emergency Motion is **DENIED** as to Volume I.  The United States represents that it "believes that nothing in Volume One of the Final Report . . . directly or indirectly refers, relies, or bears in any respect upon any evidence or argument relevant to any of the charges alleged against Defendants Nauta and De Oliveira in this case" [ECF No. 692 pp. 1–2].  The United States further indicates in the same filing, and reiterates in a sealed addendum (portions of which are properly revealed herein), that Volume I makes two generalized references to this criminal case, but "[w]ithout referencing Defendants Nauta or De Oliveira, any conduct by them, any evidence against them, or the charges against them" [ECF No. 692 p. 2; *see* ECF No. 680 (affirming that only "[o]ne volume of the report pertains to this case"); 11th Cir. Appeal No. 24-12311 (Doc. 90 at 14) (describing Volume I as "unrelated" to this case)].  "Other than these two references," the United States adds, "there are no other references to the Classified Documents Case in Volume One of the Final Report" [ECF No. 693 p. 2].  Based on these representations, the Court sees an insufficient basis to grant emergency injunctive relief as to Volume I.  The Court's Order Granting Defendants' Motion to Dismiss Superseding Indictment Based on Appointments Clause Violation is "confined to this proceeding" [ECF No. 672 p. 1], and hence this

---

[1] In a letter submitted by the United States to this Court, Special Counsel Smith states as follows: "Because Volume Two discusses the conduct of Mr. Trump's alleged co-conspirators in the Classified Documents Case, Waltine Nauta and Carlos De Oliveira, consistent with Department policy, Volume Two should not be publicly released while their case remains pending" [ECF No. 693-1 p. 5].

2

Court's authority to enforce its own orders is similarly confined to this proceeding and to the remaining defendants in this proceeding.[2]

2. The Emergency Motion as to Volume II presents contested factual and legal issues that must be resolved in an orderly, expedited basis, following full briefing and a hearing.[3]  All parties agree that Volume II expressly and directly concerns this criminal proceeding.  All parties also appear to agree that public release of Volume II would be inconsistent with the fair trial rights of Defendants Nauta and De Oliveira and with Department of Justice Policy governing the release of information during the pendency of criminal proceedings.  Despite these concerns, the United States seeks permission to make a "limited disclosure" of Volume II to congressional leadership, citing "public interest in keeping congressional leadership apprised of a significant matter within the Department while safeguarding defendants' interests."  11th Cir. Appeal No. 24-12311 (Doc. 90 p. 14).  Defendants vigorously oppose this request, relying on their due process rights and S.D. Fla. Local Rule 77.2, among other arguments rooted in the threat of public dissemination.

3. In light of these contested issues, a hearing on the Emergency Motion (Volume II) is scheduled to take place on **January 17, 2025**, at **2 p.m.** in the Fort Pierce Division.[4]  Any

---

[2] To the extent counsel for the United States has any doubt about the representations made to this Court regarding the absence of any substantive connection between Volume I and the factual and legal issues pertinent to this case [*see* ECF No. 692 (referencing a "belief" that nothing in Volume I relates to this case); *see also* ECF No. 691 (Court order requiring specific clarifications regarding Volume I)], counsel are reminded of their obligation of full candor to this Court and their duty as officers of the Court to ensure complete accuracy and completeness in their representations [*see generally* ECF No. 694 pp. 9–10 (expressing concerns regarding the United States' "belief" as represented and the extent of understanding supporting the United States' assertions)].

[3] As a result of a similar emergency motion seeking injunctive relief from the Eleventh Circuit, filed on January 7, 2025, and summarily denied on January 9, 2025, *see* 11th Cir. Appeal No. 24-12311, the United States has not responded to the Emergency Motion in this Court, and no hearing has been scheduled in this Court.

[4] Portions of this hearing may need to be conducted under seal to avoid dissemination of the contents of Volume II.

3

response in opposition to the Emergency Motion (Volume II) [ECF No. 679] is due on or before **January 14**, **2025**.  Any reply in support of the Emergency Motion (Volume II) is due on or before **January 16, 2025**.  To the extent the parties, prior to the hearing, reach an agreement as to the release of Volume II, the parties shall promptly notify the Court via a properly filed Joint Notice.

4.  The Court is next bound to consider Defendants' request in the Emergency Motion to immediately enjoin release of Volume II "pending the conclusion of any and all proceedings in this matter" [*see* ECF No. 679 p. 8].  On this point, as narrowed by this Order to Volume II only, the Court agrees with Defendants.  Release of Volume II, even on a limited basis as promised by the United States, risks irreversibly and substantially impairing the legal rights of Defendants in this criminal proceeding.  The Court is not willing to make that gamble on the basis of generalized interest by members of Congress, at least not without full briefing and a hearing on the subject.  Nor has the United States presented any justification to support the suggestion that Volume II must be released to Congress now, as opposed to after a reasonable period for an expedited hearing and judicial deliberation on the subject.  For these reasons, the Court must temporarily enjoin Attorney General Garland, the Department of Justice, its officers, agents, officials, and employees, and all persons acting in active concert or participation with such individuals, from (a) releasing, sharing, or transmitting Volume II of the Final Report or any drafts of Volume II outside the Department of Justice, or (b) otherwise releasing, distributing, conveying, or sharing with anyone outside the Department of Justice any information or conclusions in Volume II or in drafts thereof. **This Order remains in effect pending expedited consideration and resolution of the Emergency Motion, consistent with the briefing and hearing specified herein**.

4

Case 9:23-cr-80101-AMC   Document 697   Entered on FLSD Docket 01/13/2025   Page 5 of 5
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/10/2026   Page: 170 of 237

CASE NO. 23-80101-CR-CANNON

5.   A final word on this Court's jurisdiction to enter this Order.  The Eleventh Circuit's January 9, 2025, summary denial of Defendants' similar motion for emergency injunctive relief as filed in the Eleventh Circuit contains no directive to this Court restricting its authority to adjudicate the properly filed Emergency Motion in this Court [11th Cir. Appeal No. 24-12311 (Doc. 100)].  Nor is the Court persuaded by the United States that it is divested of jurisdiction to consider the Emergency Motion, which concerns the release of information that directly implicates the fair trial rights of Defendants Nauta and De Oliveira and clearly activates this Court's obligation to preserve the integrity of this proceeding should the Eleventh Circuit find error in the Court's Order Dismissing Superseding Indictment Based on Appointments Clause Violation [ECF No. 672].[5]

6.   In light of this Order, the Court **DENIES** the Emergency Motion [ECF No. 679] as to Volume I but **RESERVES RULING** on the Emergency Motion as to Volume II.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this 13th day of January 2025.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

[5] This conclusion is not inconsistent with the United States' pending appeals in 11th Cir. Appeal Nos. 24-12311 or 25-10076.  The principal appeal, Appeal No. 24-12311, challenges this Court's Order Granting Defendants' Motion to Dismiss Superseding Indictment Based on Appointments Clause Violation [ECF No. 672].  The recently initiated separate appeal, Appeal No. 25-10076, challenges this Court's January 7, 2025, Order, which did not resolve the merits of the Emergency Motion filed in this Court and did not implement any procedures for resolving or hearing argument on the Emergency Motion in this Court.  Rather, the January 7, 2025, Order expressly deferred to the Eleventh Circuit and temporarily enjoined public release of the Final Report "[p]ending resolution of the Emergency Motion filed in the Eleventh Circuit and/or any further direction from the Eleventh Circuit" [ECF No. 682].  *See* 11th Cir. Appeal No. 25-10076.  That temporary injunction expires starting at 12:00 a.m. tomorrow, three days after the Eleventh Circuit resolved the emergency motion filed in the Eleventh Circuit [ECF No. 682 ¶ 1].  Fed. R. Crim. P. 45(a)(1).

5

TAB 708

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 708

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

### CASE NO. 23-80101-CR-CANNON(s)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| | ) |
| WALTINE NAUTA, and | ) |
| CARLOS DE OLIVEIRA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

### <u>NOTICE OF COMPLIANCE</u>

The Court has directed the government to provide it Volume Two of Special Counsel Jack Smith's Final Report "to facilitate the Court's review of Defendants' Joint Emergency Motion." ECF No. 705. As the government has indicated, the Attorney General has decided that Volume Two will not be made available to the public while this criminal case remains pending because releasing its contents to the public would risk prejudice to the defendants. The only remaining issue before the Court is therefore whether making Volume Two available to the Chairmen and Ranking Members of the House and Senate Judiciary Committees for in camera inspection upon their request under the conditions identified by the government in its previous filings would risk prejudice to the defendants. A review of the contents of Volume Two is not necessary to make that determination.

As directed, *see* ECF No. 705, the government has provided to the Court for in camera review two hard copies of Volume Two: (1) an unredacted copy, stamped on the first page as "UNREDACTED"; and (2) a redacted copy representing what the Attorney

335

General would make available to the Chairmen and Ranking Members of the House and

Senate Judiciary Committees absent an order from the Court foreclosing those procedures.

The redacted copy protects the secrecy of matters occurring before the grand jury, subject

to Federal Rule of Criminal Procedure 6(e), as well as information sealed by court order.

Neither the redacted nor unredacted copies of Volume Two contain any classified

information.  The government is arranging for defense counsel to inspect unredacted and

redacted copies of Volume Two, identical to those provided to the Court, before

tomorrow's hearing.


Dated:  January 16, 2025                    Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            MARKENZY LAPOINTE
                                            United States Attorney

                                             _s/ Elizabeth J. Shapiro_
                                            ELIZABETH J. SHAPIRO
                                            D.C. Bar No. 418925
                                            Special Bar ID #A5502352
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            P.O. Box 883
                                            Washington, D.C. 20044
                                            Tel: (202) 514-5302 / Fax: (202) 616-8460
                                            E-mail: elizabeth.shapiro@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 16, 2025, I electronically filed the foregoing paper

with the Clerk of the Court using the ECF system, which sends notice to counsel of record.

*/s/ Elizabeth J. Shapiro*
Elizabeth J. Shapiro

TAB 714

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 714

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80101-CR-CANNON

UNITED STATES OF AMERICA,

     Plaintiff,

v.

WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

     Defendants.

_____/

ORDER GRANTING DEFENDANTS' EMERGENCY MOTION TO PRECLUDE
RELEASE OF VOLUME II OF SPECIAL COUNSEL'S REPORT AND DENYING
WITHOUT PREJUDICE PRESIDENT-ELECT TRUMP'S MOTION TO INTERVENE

THIS CAUSE comes before the Court upon the Emergency Motion to Preclude Release

of Volume II of Special Counsel's Report ("Emergency Motion"), filed by Defendants Nauta and

De Oliveira [ECF No. 679], as well as President-Elect Trump's Motion to Intervene or Alternative

Request to Participate as Amicus [ECF No. 681].[1]  As narrowed by the Court's prior Order on

Volume I, which has since been publicly released [ECF Nos. 697, 702], the Emergency Motion

seeks to preclude the Department of Justice ("Department")—prior to the conclusion of proceed-

ings in this criminal action—from releasing a redacted version of Volume II of Special Counsel

Smith's Report for *in camera* review by the Chairmen and Ranking Members of the House and

Senate Judiciary Committees [ECF No. 712].  Volume II contains voluminous and detailed Rule

_____

[1] The motions addressed in this Order were filed prior to President-Elect Trump becoming Presi-
dent on January 20, 2025.

338

16 discovery about the allegations in this criminal case, which remains pending on appeal as to

Defendants Nauta and De Oliveira [ECF Nos. 672, 673].  *See* 11th Cir. Appeal No. 24-12311.[2]

Following a hearing and review of all relevant filings, including an *in camera* review of

Volume II itself, Defendants' Emergency Motion is **GRANTED** as to Volume II [ECF No. 679],

and President-Elect Trump's Motion to Intervene is **DENIED WITHOUT PREJUDICE** as to

Volume II but granted as to the alternative, unopposed request to participate as amicus to challenge

release of Volume II [ECF No. 681; ECF No. 710 p. 9; ECF No. 702 (denying motion to intervene

as to Volume I)].

## PROCEDURAL AND FACTUAL BACKGROUND

1.  In July 2023, now-President Trump and Defendants Nauta and De Oliveira were charged by

    Superseding Indictment with various charges related to the alleged retention of national de-

    fense information [ECF No. 85].

2.  In July 2024, after extensive briefing and a hearing, the Court dismissed the Superseding In-

    dictment as to all Defendants, concluding that Special Counsel Smith's appointment violated

    the Appointments Clause of the United States Constitution [ECF No. 672].[3]

---

[2] Nothing in this Order should be construed as a comment on, or intrusion into, the Eleventh Cir-
cuit's pending review of this Court's Order Granting Defendants' Motion to Dismiss Superseding
Indictment [ECF No. 672].  11th Cir. Appeal No. 24-12311.  The parties have raised arguments
concerning the authority of Special Counsel Smith to prepare or issue Volume II, but the Court
has not considered those arguments in deciding the Emergency Motion, which concerns a discov-
ery disclosure matter collateral to the appeal.

[3] The Court also determined that Special Counsel Smith's use of a permanent indefinite appropri-
ation violated the Appropriations Clause of the Constitution but did not address the proper remedy
for that funding violation [ECF No. 672].

2

Case 9:23-cr-80101-AMC   Document 714   Entered on FLSD Docket 01/21/2025   Page 3 of 14
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/10/2026   Page: 178 of 237

CASE NO. 23-80101-CR-CANNON

3. Special Counsel Smith appealed the Court's dismissal Order to the United States Court of Appeals for the Eleventh Circuit [ECF No. 673]. That appeal remains pending as to Defendants Nauta and De Oliveira. *See* 11th Cir. Appeal No. 24-12311.

4. In November 2024, following the 2024 Presidential Election, the Special Counsel sought leave from the Eleventh Circuit to dismiss its appeal against President-Elect Trump. *Id.* (D.E. 79). The motion stated that dismissal as to President-Elect Trump would "leave in place the district court's order dismissing the indictment without prejudice as to him." *Id.* The Eleventh Circuit granted the motion. *Id.* (D.E. 81-2).[4]

5. On December 30, 2024, attorneys associated with the Special Counsel Office, "which initiated the criminal prosecution from which this appeal arose," moved to withdraw as counsel in the appeal. *Id.* (D.E. 84). The motion to withdraw noted that "the Special Counsel has now referred this case to the United States Attorney's Office for the Southern District of Florida, which has separately entered an appearance." *Id.*[5]

6. On January 6, 2025, Defendants Nauta and De Oliveira filed the instant Emergency Motion seeking to preclude release of both volumes of Special Counsel's Final Report [ECF No. 679]. Volume I concerns the "Election Interference Case" in the District Court for the District of Columbia, and Volume II concerns this case, the so-called "Classified Documents Case," which is the subject of the pending appeal referenced above.

---

[4] Department of Justice counsel at the January 17, 2025, hearing could not speak to the possibility of renewed charges against President-Elect Trump [Tr. 55–56].

[5] On December 30, 2024, U.S. Attorney Markenzy Lapointe of the U.S. Attorney's Office, Southern District of Florida, entered an appearance in the appeal. *Id.* (D.E. 83). U.S. Attorney Lapointe has since resigned from his position, and it appears that no attorney from the Southern District of Florida is noticed in this case or in the pending appeal. *See* https://www.justice.gov/usao-sdfl/pr/us-attorney-markenzy-lapointe-announces-resignation.

7. On January 13, 2025, after a temporary reprieve pending resolution by the Eleventh Circuit of a similar motion docketed in the pending appeal—and after additional filings by the Department affirming the severability of Volumes I and II—the Court denied Defendants' Emergency Motion as to Volume I and also denied President-Elect Trump's Motion to Intervene as to Volume I [ECF Nos. 697, 702]. The Court reserved ruling, however, on the Emergency Motion as to Volume II pending an expedited hearing [ECF No. 697]. That Order, which remains in effect pending expedited consideration and resolution of the instant Emergency Motion, temporarily enjoins Attorney General Garland, the Department of Justice, its officers, agents, officials, and employees, and all persons acting in active concert or participation with such individuals, from (a) releasing, sharing, or transmitting Volume II of the Final Report or any drafts of Volume II outside the Department of Justice, or (b) otherwise releasing, distributing, conveying, or sharing with anyone outside the Department of Justice any information or conclusions in Volume II or in drafts thereof [ECF No. 697].

8. A hearing on the Emergency Motion and Motion to Intervene (as narrowed to Volume II) was held on January 17, 2025 [ECF No. 713].[6] The parties, along with prospective-intervenor President-Elect Trump, presented argument on whether to grant Defendants' emergency request to preclude the Department from releasing Volume II to the Chairmen and Ranking Members of the House and Senate Judiciary Committees for *in camera* review, under proposed conditions of confidentiality [ECF No. 703 (noting that "Chair and Ranking members . . . would be required to agree to specified conditions of confidentiality," "would not be permitted to retain a copy of Volume Two, to take notes, or to bring in any devices that could

---

[6] The hearing was held publicly except for a brief session to discuss specified contents of Volume II with designated counsel.

be used to photograph or communicate about the Volume," and "would have to agree not to share information in Volume Two publicly")].  Beyond the representations of counsel, these conditions of confidentiality are not memorialized in any official documentation and are crafted in prospective terms.

9. All parties agree that Volume II (even in its redacted form[7]) expressly and directly concerns this criminal proceeding and should not be released publicly.  The Court's independent *in camera* review of Volume II confirms this assessment.[8]  Volume II includes detailed and voluminous discovery information protected by the Rule 16(d)(1) Protective Order entered in this case [ECF No. 27].  Much of this information has not been made public in Court filings.  It includes myriad references to bates-stamped information provided by the Special Counsel in discovery and subject to the protective order, including interview transcripts, search warrant materials, business records, toll records, video footage, various other records obtained pursuant to grand

---

[7] The Department represents that the version of Volume II it wishes to present to the Chairmen and Ranking Members of the House and Senate Judiciary Committees, absent a Court order precluding such release, "protects the secrecy of matters occurring before the grand jury subject to Federal Rule of Criminal Procedure 6(e), as well as information sealed by court order" [ECF No. 708].  As noted *infra*, Defendants maintain challenges to disclosure of Volume II on Rule 6(e) grounds.

[8] In its papers, the Department defends its position that immediate review of Volume II by members of Congress is warranted, despite the obvious risks of prejudice to Defendants from that disclosure (addressed below).  Yet the Department simultaneously protests even this Court's own *in camera* review of Volume II for purposes of adjudicating the Emergency Motion as to Volume II [ECF No. 708 p. 1 (claiming *in camera* review of Volume II is "not necessary" to evaluate the prejudice to Defendants from release of Volume II to Congress)].  This objection is startling.  The Court is tasked with determining whether review of substantive case information by Congress, during the pendency of a criminal proceeding, accords with Defendants' constitutional rights, applicable law, and this Court's rules.  Independent judicial review of the information in question is important to make a considered determination on those matters.  It is regrettable that the Department would deem it appropriate to resist this Court's *in camera* review of information directly relevant to a pending motion.  The Department expressed no similar hesitation when offering to transmit Volume I for *in camera* review [ECF No. 693 p. 4 (sealed)].

5

jury subpoena, information as to which President-Elect Trump has asserted the attorney-client privilege in motions in this proceeding [ECF No. 571 (sealed); ECF Nos. 641, 656], potential Rule 404(b) evidence, and other non-public information.

10. Prior to his separation from the Department on January 10, 2025, Special Counsel Smith provided defense counsel with a limited and accelerated opportunity to review Volume II [ECF No. 690 p. 10 n.3; ECF No. 679 pp. 6–7; ECF No. 681 p. 10].[9]  Among the Department's conditions for such review, defense attorneys were required to delete prior discovery productions of material protected by the protective order in this case—and thus were unable to cross-reference the report with the underlying discovery for purposes of lodging specific and meaningful objections to the Report under Fed. R. Crim. P. 6(e).  Defendants maintain general objections under Rule 6(e) and request a hearing to adjudicate any contested Rule 6(e) questions [ECF No. 679 pp. 14–15].

11. Current Department counsel has secondhand information about the process by which Special Counsel Smith made redactions for Rule 6(e), but current counsel was not involved in the Special Counsel's investigation and would need additional time to access discovery databases to engage in a specific discussion of Rule 6(e) as applied to Volume II.  Additionally, the Special Counsel has "referred" the criminal case to the United States Attorney's Office for the Southern District of Florida.  But there appears to be no counsel of record from this District in a position, in this emergency posture, to engage in a detailed discussion of remaining Rule 6(e) material in Volume II (redacted) given new counsel's unfamiliarity with the substantial and complex factual record in this case [Tr. 36–37; 60–63 (sealed)].

---

[9] The Court also directed the Department to give defense counsel an additional opportunity to review Volume II prior to the January 17, 2025, hearing [ECF No. 705].

12. With respect to the Department's assertion of congressional interest in Volume II, there has been no subpoena by Congress for review or release of Volume II.  There is no record of an official request by members of Congress for *in camera* review of Volume II as proposed by the Department in this case.  There is, however, a recent letter by some of those same members urging Attorney General Garland to release Volume II *to the public* immediately, even if doing so requires dismissal of the charges as to Defendants Nauta and De Oliveira.[10]  Finally, although the Department refers generally to "legislative interest" concerning special counsels as a basis to deny Defendants' Emergency Motion as to Volume II [ECF No. 703 p. 3 n.2], the Department has identified no pending legislation on the subject or any legislative activity that could be aided, even indirectly, by dissemination of Volume II to the four specified members whom the Department believes should review Volume II now.

## LEGAL STANDARDS

As a broad proposition whose force depends on the circumstances presented, "[f]ederal courts may exercise their supervisory powers to remedy violations of recognized rights, to protect the integrity of the federal courts, and to deter illegal conduct by government officials."  *United States v. DiBernardo*, 775 F.2d 1470, 1475–76 (11th Cir. 1985).  This authority extends to a court's enforcement of the Federal Rules of Criminal Procedure and its own local rules and orders, *see generally Degen v. United States*, 517 U.S. 820, 827 (1996), subject to any divestiture of jurisdiction over matters before a court of appeals, *see, e.g.*, *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982).  To the extent a court in a criminal case, in the exercise of proper authority, grants relief with injunctive effect, such an order is not treated as a traditional civil injunction, *see*

---

[10] Letter from Ranking Member of House Committee on the Judiciary (Jan. 15, 2025), *available at*  https://democrats-judiciary.house.gov/uploadedfiles/2025-01-15_hjc_dems_to_garland_doj.pdf.

Fed. R. Civ. P. 65, but rather as an order rooted in the substantive protections served by the law, rule, or order implicated in the requested relief.

In opposing Defendants' Emergency Motion as to Volume II, the Department does not challenge the Court's threshold authority to adjudicate the instant Emergency Motion. The Department also does not disagree that the harms and interests to be balanced in considering the Emergency Motion are materially the same, whether measured by the traditional civil injunction factors as framed in the Department's Opposition [ECF No. 703], or viewed more generally as an exercise of supervisory authority in a criminal case [Tr. 37].

A court has an affirmative duty, triggered at the inception of a criminal proceeding, to safeguard the due process rights of the accused. U.S. Const. amend. V; *Gannett Co. v. DePasquale*, 443 U.S. 368, 378 (1979) (citing *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966)). This duty includes taking protective measures to ensure a fair trial and to minimize the effects of prejudicial pretrial publicity, even when such measures are not "strictly and inescapably necessary." *Gannett Co.*, 443 U.S. at 378. It also includes, as further rooted in the Sixth Amendment, the right to a fair trial by a panel of impartial, indifferent jurors. U.S. Const. amend. VI, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 551, 553 (1976) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

The Local Rules of this District aid in a court's fulfillment of its affirmative duty to safeguard defendants' rights. As relevant here, Southern District of Florida Local Rule 77.2 governs the release of information in criminal and civil proceedings. S.D. Fla. L.R. 77.2. It provides, in part, that lawyers involved in any criminal matter shall not:

> release or authorize the release of information or opinion which a reasonable person would expect to be disseminated by means of public communication, in connection with pending or imminent criminal litigation with which the lawyer or the firm is associated, if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice.

*Id.*  This principle is also embodied in the Department's Confidentiality and Media Contacts Policy as written in the Justice Manual, which among other things, directs Department personnel to "refrain from disclosing" substantive case information, including "[s]tatements concerning anticipated evidence or argument in the case," "except as appropriate in the proceeding or in an announcement after a finding of guilt."  Justice Manual § 1-7.610; *see* Justice Manual § 1-7.600 ("DOJ personnel shall not make any statement or disclose any information that reasonably could have a substantial likelihood of materially prejudicing an adjudicative proceeding.").

Rule 16 of the Federal Rules of Criminal Procedure gives district courts authority, for good cause, to grant appropriate relief concerning discovery materials in a criminal case.  Fed. R. Crim. P. 16(d)(1).  As noted, Volume II contains extensive, non-public discovery materials governed by Rule 16, including large quantities of "[s]tatements concerning anticipated evidence or argument in the case."  Justice Manual § 1-7.610(E).

## DISCUSSION

Never before has the Department of Justice, prior to the conclusion of criminal proceedings against a defendant—and absent a litigation-specific reason as appropriate in the case itself—sought to disclose outside the Department a report prepared by a Special Counsel containing substantive and voluminous case information.  Until now.  According to the Department, this *in camera* disclosure to four members of Congress is necessary right now—before the conclusion of criminal proceedings—because Attorney General Garland has "limited time" left in his tenure as the head of the Department and wishes "to comply with the historical practice of all Special Counsel," and also because there is "legislative interest in information about Special Counsel investigations, in order to consider possible legislative reforms regarding the use of special counsels"

[ECF No. 703 p. 3 n.2].[11]  These statements do not reflect well on the Department.  There is no

"historical practice" of providing Special Counsel reports to Congress, even on a limited basis,

pending conclusion of criminal proceedings.  In fact, there is not one instance of this happening

until now [*see* Tr. 21, 26].  During argument before this Court, counsel misleadingly referenced

Congressional testimony by Special Counsel Weiss in 2023 as a purported example of such "his-

torical practice" [Tr. 26].  But Special Counsel Weiss—after opposition by the Department—ulti-

mately agreed to testify on limited matters, repeatedly refusing to answer questions regarding on-

going litigation in order to prevent prejudice to "the rights of defendants or other individuals in-

volved in these matters."[12] [13] [Tr. 40–41].  Here, there has been no subpoena from Congress to the

Department for Volume II.  There is no indication of pending legislative activity that could be

aided by the proposed disclosure of Volume II to the specified members of Congress.  There is no

memorialization of any conditions of confidentiality as referenced by the Department.  Indeed,

there has been no record provided of an official request by members of Congress for review of

---

[11] [Tr. 28 ("I think simply because it is the desire of this Attorney General to comply with the historical practice that there has always been, and his time is limited. And he appointed these Special Counsels, and he would like to see that the -- the historical practice of all Special Counsel, and his commitment to what he said that he would share with Congress is satisfied during his tenure."); Tr. 28 ("[I]t's just the Department's determination that it would like to see this through to conclusion and comply with historical practice.")].

[12] *See* Interview of: David Weiss, Committee on the Judiciary, U.S. House of Representatives, 118th Cong. p. 9 (2023), available at https://judiciary.house.gov/media/press-releases/judiciary-committee-releases-david-weiss-and-other-transcripts-relating-dojs.

[13] In connection with Special Counsel Weiss's testimony, the Department itself explained that "the most appropriate time for providing information about any individual ongoing criminal investiga-tion is after the matter is closed, especially where the matter is pending before a court and subject to judicial supervision, and legal and ethical bars limit what the Department can say."  Letter from Carlos Felipe Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (Sept. 22, 2023).

Volume II in the manner proposed by the Department.[14]  To the contrary, some of the same members to whom the Department wishes to present Volume II have urged Attorney General Garland to release Volume II *to the public* immediately, even if doing so requires dismissal of the charges as to Defendants Nauta and De Oliveira.  *Supra* n.10.  In short, the Department offers no valid justification for the purportedly urgent desire to release to members of Congress case information in an ongoing criminal proceeding.

Meanwhile, on the other side of the balance, there are two individuals in this action, each with constitutional rights to a fair trial, who remain subject to a live criminal appeal of this Court's Order Dismissing the Superseding Indictment.  11th Cir. Appeal No. 24-1231.  The Department has not sought leave to dismiss that appeal, initiated by the Special Counsel, and there has been no indication by any government official in this case that the Department will not proceed on the Superseding Indictment should it prevail in the Eleventh Circuit or in subsequent proceedings.[15]  These Defendants thus retain—as all parties agree—due process rights to a fair trial that would be imperiled by public dissemination of Volume II.  Yet the Department nevertheless insists upon disclosure of Volume II to members of Congress now, promising that conditions of confidentiality, "contingent on their good faith commitment," will protect against the potential for prejudice [ECF No. 703 p.5].  And if Volume II gets released in whole or in part to the public in contravention of those promises, the Department assures, then Defendants need not worry because this Court

---

[14] Special Counsel Smith left no indication in his report or in his transmittal letter to Attorney General Garland that he favored congressional release or review of his report prior to conclusion of criminal proceedings [ECF No. 693-1 p. 5].

[15] The only motion for leave the Special Counsel did file, as to President-Elect Trump, referenced "leav[ing] in place the district court's order dismissing the indictment without prejudice as to him." Counsel during the hearing was unable to answer whether the Department has foreclosed reinitiating criminal charges against President-Elect Trump after he leaves office.

can "cure" any damage caused by crafting jury instructions in the future and/or dismissing the charges [ECF No. 703 pp. 5–6]. These assertions flounder on multiple levels and do nothing to detract from the obvious. Given the very strong public interest in this criminal proceeding and the absence of any enforceable limits on the proposed disclosure, there is certainly a reasonable likelihood that review by members of Congress as proposed will result in public dissemination of all or part of Volume II. *See* S.D. Fla. L.R. 77.2(a). That reasonable likelihood risks substantial prejudice to the due process rights of Defendants, who remain subject to the protective order in this case [ECF No. 27]. This Court lacks any means to enforce any proffered conditions of confidentiality, to the extent they even exist in memorialized form. And most fundamentally, the Department has offered no valid reason to engage in this gamble with the Defendants' rights. The bare wishes of one Attorney General with "limited time" in office to comply with a non-existent "historical practice" of releasing Special Counsel reports in the pendency of criminal proceedings is not a valid reason. And surely it does not override the obvious constitutional interests of Defendants in this action and this Court's duty to protect the integrity of this proceeding. Even less clear is why the Department would defend this position notwithstanding its own Justice Manual, which expressly directs against disclosing substantive case information in a criminal case "except as appropriate in the proceeding or in an announcement after a finding of guilt." Justice Manual § 1-7.610; *see also* Model Rules of Pro. Conduct, r. 3.8 (Am. Bar Ass'n 2024) ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate . . . .").

Accordingly, under any balancing of relative harms and interests, Defendants' Emergency Request to Preclude Dissemination of Volume II must be granted. Whether measured against the traditional factors pertinent to a civil injunction as framed incorrectly by the Department or treated properly as an exercise of supervisory control over the flow of substantive, nonpublic information

to protect Defendants' rights in a criminal case, the balancing of harms and interests yields a clear and decisive answer in the present posture. Release of Volume II to Congress under the proposed conditions—without any enforcement mechanism to prevent public dissemination, and without any valid countervailing reason justifying a break from traditional norms—presents a substantial and unacceptable risk of prejudice to Defendants.

<p style="text-align:center">***</p>

Prosecutors play a special role in our criminal justice system and are entrusted and expected to do justice. *Berger v. United States*, 295 U.S. 78, 88 (1935); *Banks v. Dretke*, 540 U.S. 668, 696 (2004); Robert H. Jackson, Attorney General of the United States, Speech to the U.S. Department of Justice, The Federal Prosecutor (Apr. 1, 1940), available at https://www.justice.gov/ag/speeches-attorney-general-robert-houghwout-jackson. The Department of Justice's position on Defendants' Emergency Motion as to Volume II has not been faithful to that obligation.

## CONCLUSION

1. Defendants' Emergency Motion [ECF No. 679] is **GRANTED** as to Volume II, consistent with this Order.

2. Attorney General Garland or his successor(s), the Department of Justice, its officers, agents, officials, and employees, and all persons acting in active concert or participation with such individuals, are enjoined from (a) releasing, sharing, or transmitting Volume II of the Final Report or any drafts of Volume II outside the Department of Justice, or (b) otherwise releasing, distributing, conveying, or sharing with anyone outside the Department of Justice any information or conclusions in Volume II or in drafts thereof.

3. This Order remains in effect pending further Court order, limited as follows. No later than **thirty days** after full conclusion of all appellate proceedings in this action and/or any continued

<p style="text-align:center">13</p>

proceedings in this Court, whichever comes later, the parties shall submit a joint status report advising of their position on this Order, consistent with any remaining Rule 6(e) challenges or other claims or rights concerning Volume II, as permitted by law. Any disagreements between the parties can be denoted separately.

4. President-Elect Trump's Motion to Intervene as to Volume II [ECF No. 681] is **DENIED WITHOUT PREJUDICE**, to be reasserted if warranted as permitted by law. The Court **GRANTS** President-Elect Trump's alternative unopposed request for amicus participation on the Motion as to Volume II.

**ORDERED** in Chambers at Fort Pierce, Florida, this 21st day of January 2025.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

# TAB 716

# Case No. 23-cr-80101-AMC, S.D. Fla.,

# Doc. 716

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

February 11, 2025

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

FILED BY____AP____ D.C.

Feb 11, 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Appeal Number:  24-12311-SS
Case Style:  USA v. Donald Trump, et al
District Court Docket No:  9:23-cr-80101-AMC

The enclosed copy of this Court's Order of Dismissal is issued as the mandate of this court. See 11th Cir. R. 41-4. Counsel and pro se parties are advised that pursuant to 11th Cir. R. 27-2, "a motion to reconsider, vacate, or modify an order must be filed within 21 days of the entry of such order. No additional time shall be allowed for mailing."

Any pending motions are now rendered moot in light of the attached order.

Clerk's Office Phone Numbers
General Information:     404-335-6100     Attorney Admissions:        404-335-6122
Case Administration:    404-335-6135     Capital Cases:              404-335-6200
CM/ECF Help Desk:       404-335-6125     Cases Set for Oral Argument: 404-335-6141

Enclosure(s)

DIS-4 Multi-purpose dismissal letter

352

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————

No. 24-12311

————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

*versus*

WALTINE NAUTA,
CARLOS DE OLIVEIRA,

Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:23-cr-80101-AMC

————————————

353

2                          Order of the Court                    24-12311

ORDER:

Appellant's "Unopposed Motion to Dismiss Appeal" is GRANTED. This appeal is DISMISSED.

DAVID J. SMITH
Clerk of the United States Court of
Appeals for the Eleventh Circuit

ENTERED FOR THE COURT - BY DIRECTION

TAB 717

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 717

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 23-cr-80101-AMC

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

      Defendants.

_____/

FILED BY _____ D.C.

FEB 1 4 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## AMERICAN OVERSIGHT'S *EXPEDITED MOTION* TO INTERVENE AND FOR CLARIFICATION OR, ALTERNATIVELY, DISSOLUTION OF JANUARY 21, 2025 ORDER GRANTING DEFENDANTS' EMERGENCY MOTION TO PRECLUDE RELEASE OF VOLUME II OF SPECIAL COUNSEL'S REPORT

### Expedited Ruling Requested by February 18, 2025[1]

American Oversight, a non-partisan nonprofit committed to promoting transparency and ensuring accountability of government officials, seeks to intervene in this case to (1) confirm that the Court's January 21, 2025 Order barring disclosure of Volume II of the Special Counsel's Report, dissolved when the criminal charges on which the Court based its injunctive protective order were finally dismissed; or in the alternative, (2) move the Court to immediately lift that Order.

The January 21, 2025 Order in this case directly implicates American Oversight's rights in a Freedom of Information Act ("FOIA") case against the Department of Justice ("DOJ")

---

[1] An expedited ruling by February 18, 2025 is needed because a hearing is set on Prospective Intervenor's motion for a preliminary injunction in *American Oversight v. U.S. Dep't of Justice*, No. 25-cv-383 (D.D.C. Feb. 10, 2025), on February 20, 2025 in the District of Columbia. As detailed herein, the Defendant in that case, the Department of Justice, has asserted it cannot provide the relief request by American Oversight in that action because this Court's January 21, 2025 Order bars disclosure of Volume II of the Special Counsel's report.

concerning Volume II that is pending in the U.S. District Court for the District of Columbia (the "FOIA Action")[2]. Upon the Eleventh Circuit's grant of the government's voluntary dismissal of the appeal in this matter, the Order ceased to operate. While this motion to intervene comes at an admittedly unusual juncture—when no criminal defendants or possibilities of appeals remain—it is necessary because the DOJ has taken the position in the FOIA Action that the Order remains in effect. Having exhausted efforts to have DOJ take steps to clarify whether the Order remains in effect, or alternatively to lift the Court's January 21, 2025 Order, American Oversight has no choice but to take those steps itself—the urgency of the public's right to access Volume II demands it. Volume II contains information of critical and urgent importance to the public pertaining to Kash Patel, President Trump's nominee for Director of the Federal Bureau of Investigation ("FBI"). In a matter of days, the U.S. Senate is expected to vote on Patel's confirmation. The American people—and their Senators, who have repeatedly demanded the release of the report—have a right to know the non-exempt information relating to Patel's involvement in the classified documents investigation before that vote happens.

The relief American Oversight is seeking about this significant and urgent matter is limited—clarity that an order barring the release of a report which includes information pertaining to the activities of the federal government and the President's nominee to lead the nation's top law enforcement agency is dissolved. It's against this backdrop that American Oversight respectfully requests this Court grant its expedited motion to intervene and provide clarity on, or in the alternative, order the immediate dissolution of, its January 21, 2025 Order barring disclosure of Volume II of the Special Counsel's Report.

---

[2] *See Am. Oversight v. U.S. Dep't of Justice*, No. 25-cv-383 (D.D.C. Feb. 10, 2025).

# MEMORANDUM OF LAW

## I.     BACKGROUND

### A.     The Special Counsel's Report

On January 7, 2025, then-Special Counsel Jack Smith delivered to DOJ the Special Counsel's Report, bifurcated into two volumes and reflecting his investigations into then President-elect Trump's potential interference with the lawful transfer of power following the 2020 election ("Volume I") and allegations of mishandling of a trove of classified documents after Trump left office in 2021 ("Volume II").[3] Notably, Volume II contains information of significant urgent importance to the public, not only pertaining to President Trump, but to Kash Patel, Trump's nominee for Director of the Federal Bureau of Investigation.[4]  Smith provided a redacted version of Volume II, which relates information pertaining to the instant case, to DOJ noting that "consistent with Department policy, Volume Two should not be publicly released while [the instant case] remains pending."[5] Volume I was released to the public on January 14, 2025.[6]

---

[3] Letter from Jack Smith, Special Couns., Dep't of Justice, to Merrick Garland, Att'y Gen., Dep't of Justice (Jan. 7, 2025) ("Smith Letter to Garland"), https://www.justice.gov/storage/Report-of-Special-Counsel-Smith-Volume-1-January-2025.pdf.

[4] *See* Rebecca Beitsch, *Raskin Demands DOJ Release Smith Mar-a-Lago Report*, The Hill (Feb. 3, 2025, 4:50 AM) https://thehill.com/homenews/5122053-raskin-demands-doj-release-smith-mar-a-lago-report/; *see also* Eric Tucker, *AP source: Trump Ally Appears Before Mar-a-Lago Grand Jury*, Assoc. Press (Nov. 4, 2022, 10:17 PM), https://apnews.com/article/donald-trump-mar-a-lago-government-and-politics-8a51290da3e8f59c83edbfc2898f547d; Alex Leary et al., *Ex-White House Aide Kash Patel Presses View Trump Broadly Declassified Documents*, Wall St. J. (Aug. 21, 2022, 8:00 AM), https://www.wsj.com/articles/ex-white-house-aide-kash-patel-presses-view-trump-broadly-declassified-documents-11661083201; Tierney Sneed, *Trump Claims He Declassified Mar-a-Lago Docs, but His Lawyers Avoid Making that Assertion*, CNN (Sept. 16, 2022, 8:20 AM), https://www.cnn.com/2022/09/15/politics/trump-mar-a-lago-docs-declassified-claim/index.html.

[5] *See* Smith Letter to Garland, *supra* n.3, at 4.

[6] *Read the Special Counsel's Report on the Trump Election Case*, N.Y. Times, Jan. 14, 2025, https://www.nytimes.com/interactive/2025/01/14/us/report-of-special-counsel-smith-volume-1-january-2025.html.

3

**B.      Relevant History of the Case**

In June 2023, a grand jury returned indictments charging then former President Donald Trump, Waltine Nauta, and Carlos De Oliveira with multiple criminal offenses relating to alleged mishandling of classified national defense documents. ECF Nos. 3, 85.

On July 15, 2024, this Court entered an Order dismissing the superseding criminal indictments of then Presidential Nominee Trump, Nauta, and De Oliveira. ECF No. 672. The government appealed the Court's dismissal Order as to all defendants to the United States Court of Appeals for the Eleventh Circuit. ECF No. 673, *See also* 11th Cir. Appeal No. 24-12311. Following the 2024 Presidential Election, on November 25, 2024, the government filed an unopposed motion to dismiss its appeal against then President-elect Trump. App. Doc. 79. The Eleventh Circuit entered an Order granting the motion and dismissing the appeal the following day. App. Doc. 81. On January 6, 2025, Mr. Nauta and Mr. De Oliveira filed an emergency motion seeking to preclude the government from releasing the entirety of the Special Counsel's Report. ECF No. 679.   President-elect Donald Trump filed a motion to intervene, or in the alternative, participate as amicus curiae in Mr. Nauta and Mr. De Oliveira's motion for emergency relief. ECF No. 681. On January 13, 2025, this Court, noting that the government had affirmed that the Report could be severed into two volumes, denied emergency motion as to Volume I of the Report. ECF No. 697. On January 21, 2025, after hearing arguments as to Volume II, this Court entered an Order denying President-Elect Trump's Motion to Intervene as to Volume II, but granting his "alternative, unopposed request to participate as amicus to challenge [its] release," and barring the government from releasing Volume II pursuant to the Court's duty to "safeguard the due process rights of the accused," because it "contains voluminous and detailed Rule 16 discovery about the

allegations in this criminal case, which remains pending on appeal as to Defendants Nauta and De Oliveira." ECF No. 714.

On January 29, 2025, the government moved to voluntarily dismiss the appeal as to the remaining two defendants with prejudice. App. Doc. No. 111. On February 11, 2025, the Eleventh Circuit granted the motion and dismissed the appeal. App. Doc. No. 113-2.

### C.    American Oversight's FOIA Request and Subsequent Action Against the Department of Justice Relating to Volume II of the Special Counsel's Report

On January 8, 2025, one day after DOJ received the Special Counsel's report, Prospective Intervenor American Oversight submitted a request pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.*, to DOJ seeking expedited production of both volumes of the Special Counsel's report. *See* Decl. of Elizabeth Haddix, Feb. 14, 2025, at ¶ 4, attached as Exhibit 1. Having received no final determination from DOJ relating to its FOIA request or request for expedited processing, American Oversight filed a lawsuit against DOJ on February 10, 2025, seeking declaratory and injunctive relief under FOIA as to Volume II, which has not been publicly released. *See* Compl., *Am. Oversight v. U.S. Dep't of Justice*, No. 25-cv-383 (D.D.C. Feb. 10, 2025); Haddix Decl. ¶ 5. American Oversight contemporaneously filed a motion for a preliminary injunction, citing the urgent need for information contained in the report to inform Kash Patel's confirmation proceedings, and seeking release of the non-exempt materials in Volume II by February 21, 2025. *See* Mot. Prelim. Inj., *id.* The day after American Oversight filed its motion, DOJ provided a purportedly final response to the FOIA request, stating: "At this time, I have determined that Volume II of the Report should be withheld in full because it is protected from disclosure by a court injunction issued by the United States District Court for the Southern District of Florida, West Palm Beach Division. In this instance, the Office of Information Policy lacks authority to consider the releasability of this information under the FOIA." Haddix Decl. ¶ 5. After

a status conference that same afternoon, the Court entered an expedited briefing order, with a hearing set for February 20, 2025. *See* Minute Order, *id.* (D.D.C. Feb. 11, 2025).

## II.   ARGUMENT

### A.   The Court Should Permit American Oversight to Intervene

American Oversight should be permitted to intervene in this case because its rights to non-exempt responsive documents and information under FOIA are affected by this Court's January 21, 2025 Order precluding the release of Volume II. ECF No. 714.

Although "[i]ntervention in criminal cases is generally limited," it is appropriate in "instances in which a third party's constitutional or other federal rights are implicated by the resolution of a particular motion, request, or other issue during the course of a criminal case." *U.S. v. Carmichael*, 342 F. Supp. 2d 1070, 1072 (M.D. Ala. 2004); *see also Gravel v. U.S.*, 408 U.S. 606, 608–09 n.1 (1972) (noting that district court permitted Senator to intervene to move to quash grand jury subpoenas of witnesses where testimony would implicate his privilege under the Speech and Debate Clause of the U.S. Constitution); *U.S. v. Hernandez*, 124 F. Supp. 2d 698, 701 (S.D. Fla. 2000) (permitting press to intervene for access to court proceedings); *U.S. v. Baez-Alcaino*, 718 F. Supp. 1503, 1505, 1508 (M.D. Fla. 1989) (granting media limited intervention in criminal proceeding).

Here, American Oversight's federal rights under FOIA are directly implicated by the Court's January 21, 2025 Order. American Oversight requested Volume II from DOJ pursuant to FOIA more than a month ago, as soon as the report was available. American Oversight was entitled under FOIA to a determination as to whether DOJ would comply with the FOIA request within 20 working days. 5 U.S.C. § 552(a)(6)(A)(i). DOJ failed to provide such a determination in response to that request as required by FOIA, until after American Oversight filed its complaint and

preliminary injunction motion in the District Court for the District of Columbia on February 10, 2025. That motion seeks release of non-exempt materials in Volume II by February 21, 2025, citing urgency connected to confirmation proceedings of Kash Patel, President Trump's nominee to lead the FBI. Those proceedings are moving quickly,[7] and information relating to Patel's reported testimony before the grand jury relating to President Trump's potential mishandling of highly classified documents[8] is of significant interest to the public and the senators who are charged with providing "advice and consent" on federal nominees in the confirmation process.[9] The government's position in the ongoing FOIA proceeding is that it cannot comply with American Oversight's request because this Court's January 21, 2025 Order precludes DOJ from releasing Volume II. Haddix Decl. ¶ 5. Because American Oversight has the right to prompt disclosure of non-exempt public records under FOIA, a federal statute, and because the government has cited this Court's Order as the reason it cannot comply with American Oversight's request, intervention in this case is appropriate for the limited purpose of permitting American Oversight to seek clarification that the Court's January 21, 2025 Order dissolved upon the government's voluntary dismissal of the appeals in this matter, or in the alternative, move for immediate dissolution of this Court's January 21, 2025 Order. The Court should grant American Oversight's Motion to Intervene.

---

[7] *See* Devlin Barret, *Senate Panel Advances Kash Patel's Bid for F.B.I. Director Amid Agency Turmoil*, N.Y. Times, Feb. 13, 2025, https://www.nytimes.com/2025/02/13/us/politics/kash-patel-fbi-senate-judiciary-confirmation-trump.html.

[8] *See* Tucker, Leary, Sneed, *supra* n.4.

[9] *See, e.g.*, Letter from U.S. Sen. Committee on the Judiciary, to James McHenry, Acting Atty' Gen., Dep't of Justice (Jan. 29, 2025), https://www.judiciary.senate.gov/imo/media/doc/2025-01-29%20SJC%20Dems%20Letter%20-%20Smith%20Report%20Vol%20II.pdf.

**B.**     **The Court Should Clarify, or, in the Alternative, Order the Dissolution of the Order Barring the Release of Volume II**

     *1.*     *There Are No Remaining 'Live' Criminal Appeals to the Court's Dismissal of Superseding Indictment*

The Court should clarify the automatic dissolution, or, in the alternative, order the immediate dissolution of, its January 21, 2025 Order barring the release of Volume II, because the Eleventh Circuit's entry of dismissal of all appeals means no prospect of a trial of any of the former Defendants remains in the case. On July 15, 2024, this Court granted then-Defendants' Motion to Dismiss Superseding Indictment, dismissed the indictment, directed the Clerk to close the case and denied any pending motions as moot. ECF No. 672 at 93. The United States filed a notice of appeal as to all defendants two days later. ECF No. 673. Following the presidential election, DOJ filed a motion to voluntarily dismiss its appeal against then President-elect Trump, and on November 26, 2024, the Eleventh Circuit granted the motion. ECF No. 677. On January 29, 2025, DOJ moved to voluntarily dismiss the appeal as to the remaining two defendants with prejudice. App. Doc. 111. On February 11, 2025, the Eleventh Circuit granted the motion and dismissed the appeal. App. Doc. 113-2. With no appeals remaining, all that is left to effect is the directives ordered by the Court on July 15, 2024.

Notably, the Order deals with issues raised *after* the Court's dismissal of the superseding indictment that primarily stemmed from concerns that materials contained in Volume II could affect Mr. Nauta and Mr. De Oliveira's rights to a fair trial given that, at the time of the Order, the two remained "subject to a live criminal appeal of this Court's Order Dismissing the Superseding Indictment." ECF No. 714 at 11.[10] Now, there are no live criminal appeals.[11] The Court's concern

---

[10] This Court denied a motion to intervene filed by then President-elect Trump, who was at that time no longer a Defendant in the case, as to the release of both volumes of the Special Counsel's Report but granted his request in the alternative to participate as an amicus to challenge the release of Volume II. ECF Nos. 702, 714 at 2.

[11] *See* ECF Docket, No. 23-cr-80101, at 1 (describing case as "terminated").

that "there has been no indication by any government official in this case that the Department will not proceed on the Superseding Indictment should it prevail in the Eleventh Circuit or in subsequent proceedings," *id.,* has been obviated by both the government's voluntary dismissal as well as the Eleventh Circuit's entry of dismissal of appeals. Thus, a clarification or order rendering the injunctive relief barring disclosure of Volume II on that basis dissolved is appropriate.

### 2.   *An Order Entered Pursuant to a District Court's Supervisory Power is Limited to Ongoing Criminal Proceedings*

Clarification on the dissolution of the Court's Order barring the release of Volume II is further warranted because a district court's supervisory power cannot extend beyond prospective criminal proceedings before it.

This Court granted injunctive relief precluding the release of Volume II pursuant to its "supervisory powers to remedy violations of recognized rights, to protect the integrity of the federal courts, and to deter illegal conduct by government officials." ECF No. 714 at 7 (quoting *U.S. v. DiBernardo*, 775 F.2d 1470, 1475–76 (11th Cir. 1985)).[12] Such powers may enable a court to fulfill its "affirmative duty, triggered at the inception of a criminal proceeding, to safeguard the due process rights of the accused." *See id.* at 8 (citing U.S. Const. amend. V; *Gannett Co. v DePasquale*, 443 U.S. 368, 378 (1979)). However, to the extent that the Order barring disclosure of Volume II served as a "protective measure[] to ensure a fair trial and to minimize the effects of prejudicial pretrial publicity," *id.*, the protection is no longer warranted as there is no prospective trial before this Court.

Relatedly, any prejudice to defendants that led the Court to exercise its supervisory powers in entering the Order has extinguished, further supporting the conclusion that the Order dissolved

---

[12] As the Court noted, the Order is separate from the Rule 16(d)(1) Protective Order, ECF No. 27, governing the exchange of discovery in this case.

by operation of entry of dismissal of the appeals. The injunctive relief effectuated by the Order was triggered by a motion filed by then-Defendants Nauta and De Oliveira requesting the Court use its power to prevent unfair prejudice to their case. *See* ECF No. 679 at 3. "[P]rejudice to the defendant is an essential element" when a criminal defendant is requesting that a court exercise its supervisory power. *See U.S. v. Moss*, No. 10-60264-CR-COHN, 2011 WL 2669159, at *9 (S.D. Fla. Mar. 21, 2011) (quoting *U.S. v. O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987)). Here, Mr. Nauta and Mr. De Oliveira are no longer defendants who may suffer prejudice; they are no longer defendants at all. After the Eleventh Circuit's entry of an order dismissing the appeals against them, they are two individuals who no longer have any charges against them to be considered by this Court. As there is no defendant who may suffer prejudice if the release of Volume II is not barred, the Court's January 21, 2025 Order should be clarified to confirm it dissolved upon entry of the dismissal, or now ordered to be dissolved.

Further, the limits on a court's supervisory power mean that exercise of that power should not be used when more narrowly tailored options are available to deter violative conduct. *See U.S. v. Hasting*, 461 U.S. 499, 506 (1983). Here, any continuation of the relief to safeguard due process interests—a full bar on the disclosure of Volume II—that was ordered *prior* to dismissal of appeals is not narrowly tailored to deter violative conduct. Instead, more narrowly tailored alternatives already exist that would permit the disclosure of non-exempt materials included in Volume II. Counsel at DOJ remain bound by the requirements of Federal Rule of Criminal Procedure Rule 6(e), and FOIA Exemption 3 permits a government agency to withhold material that is "'specifically exempted from disclosure by statute' so long as (1) the statute 'requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue,' and (2) the statute relied on was 'enacted after the date of enactment of the OPEN FOIA Act of 2009.'"

*See Boehm v. F.B.I.*, 983 F. Supp. 2d 154, 157 (D.D.C. 2013) (quoting 5 U.S.C. § 552(b)(3)(A)(i), (b)(3)(B)). Rule 6(e) is one of the statutes covered by FOIA's Exemption 3. *Id.* (citing *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1113 (D.C. Cir. 2007)). Although Exemption 3 does not permit an interpretation of Rule 6(e) that would provide "a veil of secrecy . . . over all matters occurring in the world that happen to be investigated by a grand jury," it does permit withholding material that "elucidate the inner workings of the grand jury." *Id.* <u>at 157, 160.</u> A clarification that the Court's Order was dissolved upon dismissals of the appeals or, in the alternative, an Order dissolving the injunctive relief now would simply mean that the materials in Volume II would be treated as any other materials in DOJ's possession and related to criminal cases brought by the Department of Justice would be: subject to appropriate Rule 6(e) withholdings via Exemption 3 of FOIA. Thus, clarification that the Order has been dissolved, or an order that it is now dissolved, is entirely appropriate because safeguards through FOIA exemptions will still protect against disclosure of exempt information.

## III.   CONCLUSION

For the foregoing reasons, this Court should grant American Oversight's Motion to Intervene, and clarify, or, in the alternative, order the dissolution of the January 21, 2025 Order barring the release of Volume II.

## CERTIFICATION OF CONFERRAL

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that counsel for the movant has sought conferral with all parties or non-parties who may be affected by the relief sought in this motion— including counsel for the United States and for the three former Defendants—in a good faith effort to resolve the issues but has been unable to resolve the issues.

On February 13, 2025, counsel for movant emailed counsel for the United States and for the three former Defendants, advising them of the nature of Prospective Intervenor's motion and the relief sought, and requested that counsel respond by 12 p.m. on Friday, February 14, with any position their clients take on the motion or if there was any possibility the issue could "be resolved expeditiously without requiring American Oversight's intervention in the proceeding."

Counsel for Mr. Nauta responded: "On behalf of Waltine Nauta, we oppose your application for intervention or for other relief, and we intend to file a response in opposition on behalf of Mr. Nauta following the filing of, and opportunity to review, any such motion.  We otherwise reserve all rights in relation to your actions in connection with this matter."

Counsel for Mr. De Oliveira responded shortly after: "Hello, all. On behalf of Carlos De Oliveira, we join in Mr. Klugh's position. Thank you."

Counsel for movant has received no response from counsel for the United States or counsel for former Defendant President Donald Trump.

Dated: February 14, 2025

Respectfully Submitted,

*/s/ Barbara R. Llanes*
ADAM M. SCHACHTER
Florida Bar No. 647101
aschachter@gsgpa.com
BARBARA R. LLANES
Florida Bar No. 1032727
bllanes@gsgpa.com
GELBER SCHACHTER & GREENBERG, P.A.
One Southeast Third Avenue, Suite 2600
Miami, Florida 33131
Telephone: (305) 728-0950
E-service: efilings@gsgpa.com


ELIZABETH HADDIX *(pro hac vice forthcoming)*
elizabeth.haddix@americanoversight.org
LOREE STARK *(pro hac vice forthcoming)*
loree.stark@americanoversight.org
AMERICAN OVERSIGHT
1030 15th Street, NW, B255
Washington, D.C. 20005
Telephone: 202-869-5246

*Counsel for Non-Party American Oversight*

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 23-cr-80101-CANNON

UNITED STATES OF AMERICA,

Plaintiff,

v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

Defendants.

_____/

## DECLARATION OF ELIZABETH HADDIX

I, ELIZABETH HADDIX, hereby declare as follows:

1.      I am Senior Counsel at American Oversight, and lead counsel for American Oversight in *American Oversight v. U.S. Department of Justice*, Case No. 1:25-cv-00383-TJK (D.D.C.). I make this declaration based on my personal knowledge, through consultation with my colleagues at American Oversight, and through a review of American Oversight's business records.

2.      American Oversight is a non-partisan, nonprofit organization primarily engaged in disseminating information to the public and committed to ensuring transparency in government and promoting accountability for government officials. American Oversight's primary professional activity or occupation is information dissemination.

3.      American Oversight analyzes the records it receives and creates explanatory and editorial content on the basis of its findings, and the organization highlights its findings for other media to ensure wide public dissemination. American Oversight also typically posts records it

receives from public records requests for free, public viewing on its website. American Oversight disseminates the information it receives in order to facilitate the informed participation of the American public in self-government, including by ensuring the public has the information it needs to effectively petition its representatives in Congress.

4.      On January 8, 2025, American Oversight submitted a FOIA request bearing internal tracking number DOJ-25-0036 to the U.S. Department of Justice ("DOJ") seeking expedited production of both volumes of then-Special Counsel Jack Smith's two-volume report on his investigations into President Trump's potential interference with the lawful transfer of power following the 2020 election (Volume I) and allegations of mishandling of a trove of classified documents after Trump left office in 2021 (Volume II). A true and correct copy of the request is attached as Exhibit 1.

5.      After acknowledging receipt of American Oversight's request, DOJ did not communicate further with American Oversight about the request until 12:34pm on February 11, 2025. *See* attached Exhibit 2. In that correspondence, DOJ stated that it was withholding Volume II of the Report in full "because it is protected from disclosure by a court injunction issued by the United States District Court for the Southern District of Florida, West Palm Beach Division." *Id.*

6.      American Oversight's ability to obtain public records on a prompt basis is crucial to its mission of ensuring transparency of government actions, promoting accountability of government officials, and disseminating information about government activities to the public. Prompt responses to public records requests and timely production of relevant documents are crucial to American Oversight's ability to fulfill its mission. American Oversight intends to rapidly disseminate the non-exempt records it receives in response to its FOIA request to DOJ for Volume II of the Special Counsel's report ("Volume II").

7.      Volume II contains information of tremendous national importance, about which there is an urgent need to inform the public. American Oversight requested a copy of Volume II to shed light not only on the investigation of President Trump's alleged actions and conduct, but also on Kash Patel, Trump's nominee for Director of the Federal Bureau of Investigation ("FBI"). American Oversight seeks a copy of Volume II to ensure the public has as much information as possible on a matter of great public importance—Patel's expected confirmation to lead the FBI— so that the American people and their senators can make informed decisions. American Oversight and the public will be irreparably harmed if Volume II is withheld until after Patel is confirmed.

8.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  February 14, 2025                    /s/ Elizabeth Haddix
                                             Elizabeth Haddix

3

# EXHIBIT 1



<div align="right">January 8, 2025</div>

**VIA ONLINE PORTAL**

Douglas Hibbard
Chief, Initial Request Staff
Office of Information Policy
441 G St NW
6th Floor
Washington, DC 20530
Via Online Portal

Arla Witte-Simpson
FOIA Public Liaison
Executive Office for United States Attorneys
175 N Street, N.E.
Suite 5.400
Via Online Portal

**Re: Expedited Freedom of Information Act Request**

Dear FOIA Officer:

Pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and the implementing regulations of the Department of Justice, 28 C.F.R. Part 16, American Oversight makes the following request for records.

On January 7, 2025, United States District Court Judge Aileen Cannon blocked the release of Special Counsel Jack Smith's report on his investigations into President Trump's potential election interference[1] and mishandling of a trove of classified documents after he left office in 2021.[2] American Oversight seeks the release of this two-volume report.

---

[1] Rebecca Beitsch, *Trump Asks Garland to Block Jack Smith from Releasing Final Report*, THE HILL (Jan. 7, 2023, 8:23 AM), https://thehill.com/homenews/administration/5070960-donald-trump-merrick-garland-jack-smith-report/.
[2] Alan Feuer, *Judge Cannon Blocks Release of Special Counsel's Final Report on Trump Documents Investigation*, N.Y. TIMES (Jan. 7, 2025, updated 3:07 PM), https://www.nytimes.com/2025/01/07/us/politics/trump-documents-case-jack-smith-report.html.

**Requested Records**

American Oversight seeks expedited processing of this request for the reasons
identified below and requests that the DOJ Office of the Special Counsel (OSC) produce
the following records as soon as practicable, and at least within twenty business days:

> A copy of Jack Smith's two-volume report of his investigations into President
> Trump's handling of classified documents and potential election interference.[3]

> Because this request is limited to a specific, recent, and readily identifiable
> document or documents, American Oversight expects this request can be
> processed on the Simple processing track and result in a prompt agency
> response.

**Fee Waiver Request**

In accordance with 5 U.S.C. § 552(a)(4)(A)(iii) and your agency's regulations, American
Oversight requests a waiver of fees associated with processing this request for records.
The subject of this request concerns the operations of the federal government, and the
disclosures will likely contribute to a better understanding of relevant government
procedures by the general public in a significant way. Moreover, this request is for non-
commercial purposes.

American Oversight requests a waiver of fees because disclosure of the requested
information is "in the public interest because it is likely to contribute significantly to
public understanding of operations or activities of the government."[4] The public has a
significant interest in a report concerning President Trump's handling of classified
documents and potential election interference. Records with the potential to shed light
on these matters would contribute significantly to public understanding of operations
of the federal government, including what the Special Counsel's investigation revealed
about how President Trump handled classified documents and may have interfered in
the 2020 elections. American Oversight is committed to transparency and makes the
responses agencies provide to FOIA requests publicly available, and the public's
understanding of the government's activities would be enhanced through American
Oversight's analysis and publication of these records.

This request "is not primarily in the commercial interest of the requester."[5] In fact, as a
501(c)(3) nonprofit, American Oversight does not have a commercial purpose, and the
release of the information requested is not in American Oversight's commercial interest.
American Oversight's mission is to promote transparency in government, to educate the
public about government activities, and to ensure the accountability of government
officials. American Oversight uses the information gathered, and its analysis of it, to
educate the public through reports, press releases, or other media. American Oversight

---

[3] For further identifying information, please *see id.*
[4] 5 U.S.C. § 552(a)(4)(A)(iii).
[5] *Id.*

DOJ-25-0036

also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and X (formerly Twitter).[6]

American Oversight has also demonstrated its commitment to the public disclosure of documents and creation of editorial content through regular substantive analyses posted to its website.[7] Examples reflecting this commitment include the posting of records related to the first Trump Administration's contacts with Ukraine and analyses of those contacts;[8] posting records and editorial content about the federal government's response to the Coronavirus pandemic;[9] posting records received as part of American Oversight's "Audit the Wall" project to gather and analyze information related to the first Trump administration's proposed construction of a barrier along the U.S.-Mexico border, and analyses of what those records reveal;[10] the posting of records related to an ethics waiver received by a senior Department of Justice attorney and an analysis of what those records demonstrated regarding the Department's process for issuing such waivers;[11] and posting records and analysis of federal officials' use of taxpayer dollars to charter private aircraft or use government planes for unofficial business.[12]

---

[6] American Oversight currently has approximately 16,000 followers on Facebook and 97,900 followers on X (formerly Twitter). American Oversight, Facebook, https://www.facebook.com/weareoversight/ (last visited Jan. 7, 2025); American Oversight (@weareoversight), X (formerly Twitter), https://x.com/weareoversight (last visited Jan. 7, 2025).

[7] *See generally News*, American Oversight, https://www.americanoversight.org/blog.

[8] *Trump Administration's Contacts with Ukraine*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-contacts-with-ukraine.

[9] *See generally The Trump Administration's Response to Coronavirus*, American Oversight, https://www.americanoversight.org/investigation/the-trump-administrations-response-to-coronavirus; *see, e.g., 'We've All Given Up Getting a Straight Answer From You Guys: Frustrated Emails Between Illinois Governor's Office and White House*, https://www.americanoversight.org/weve-all-given-up-getting-a-straight-answer-from-you-guys-frustrated-emails-between-illinois-governors-office-and-white-house.

[10] *See generally Audit the Wall*, American Oversight, https://www.americanoversight.org/investigation/audit-the-wall; *see, e.g., Border Wall Investigation Report: No Plans, No Funding, No Timeline, No Wall*, American Oversight, https://www.americanoversight.org/border-wall-investigation-report-no-plans-no-funding-no-timeline-no-wall.

[11] *DOJ Records Relating to Solicitor General Noel Francisco's Recusal*, American Oversight, https://www.americanoversight.org/document/doj-civil-division-response-noel-francisco-compliance; *Francisco & the Travel Ban: What We Learned from the DOJ Documents*, American Oversight, https://www.americanoversight.org/francisco-the-travel-ban-what-we-learned-from-the-doj-documents.

[12] *See generally Swamp Airlines: Chartered Jets at Taxpayer Expense*, American Oversight, https://www.americanoversight.org/investigation/swamp-airlines-private-jets-taxpayer-expense; *see, e.g., New Information on Pompeo's 2017 Trips to His Home State*, American Oversight, https://www.americanoversight.org/new-information-on-pompeos-2017-trips-to-his-home-state.

- 3 -

DOJ-25-0036

Accordingly, American Oversight qualifies for a fee waiver.

**Application for Expedited Processing**

Pursuant to 5 U.S.C. § 552(a)(6)(E)(1) and 28 C.F.R. § 16.5(e)(1)(ii), American Oversight requests that your agency expedite the processing of this request.

I certify to be true and correct to the best of my knowledge and belief that the information requested is urgently needed to inform the public concerning actual or alleged government activity. There is an urgent need to inform the public regarding the results of investigations into President Trump ahead of his inauguration and renewed authority over the Department of Justice – the very entity that investigated him and produced the report at issue.

I also certify to be true and correct to the best of my knowledge and belief that there is widespread and exceptional media interest and there exist possible questions concerning the government's integrity, which affect public confidence.[13] The release of this report is currently being blocked by a judge appointed by President Trump just days ahead of his inauguration and assumption of authority over the Department of Justice.

Moreover, I certify to be true and correct to the best of my knowledge and belief that there exist possible questions concerning the government's integrity regarding Special Counsel Jack Smith's report and whether it would be released after President Trump is reinaugurated.

I further certify that American Oversight is primarily engaged in disseminating information to the public. American Oversight's mission is to promote transparency in government, to educate the public about government activities, and to ensure the

---

[13] *See id*; Beitsch *supra* note 1; Katherine Faulders et al, *Judge in Trump's Classified Docs Case Temporarily Blocks Release of Special Counsel's Final Report*, ABC NEWS (Jan. 7, 2025, 12:18 PM), https://abcnews.go.com/US/special-counsel-responds-after-trump-defendants-judge-block/story?id=117413916; Eric Tucker, *Judge Temporarily Blocks Release of Special Counsel Report on Trump Cases as Court Fight Simmers*, AP NEWS (Jan. 7, 2025, 1:21 PM), https://apnews.com/article/trump-jack-smith-maralago-jan-6-justice-department-e73a42b03cc6dc807de32c42dc824f3d; Josh Gerstein & Kyle Cheney, *Cannon temporarily blocks release of Jack Smith report*, POLITICO (Jan. 7, 2025, 12:20 PM), https://www.politico.com/news/2025/01/07/aileen-cannon-blocks-jack-smith-report-release-00196863; Perry Stein & Jeremy Roebuck, *Cannon temporarily blocks report on Trump classified-documents probe*, WASH. POST (Jan. 7, 2025, updated 2:08 PM), https://www.washingtonpost.com/national-security/2025/01/07/jack-smith-trump-special-counsel-report-garland/; C. Ryan Barber & Corinne Ramey, *Judge Temporarily Blocks Release of Special Counsel Report on Trump*, WALL STREET. J. (Jan. 7, 2025, 2:29 PM), https://www.wsj.com/us-news/law/trump-lawyers-seek-to-block-release-of-special-counsel-report-5c855e8b?mod=hp_lead_pos8.

DOJ-25-0036

accountability of government officials.[14] Similar to other organizations that have been found to satisfy the criteria necessary to qualify for expedition,[15] American Oversight "'gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience.'"[16] American Oversight uses the information gathered, and its analysis of it, to educate the public through reports, press releases, and other media. American Oversight also makes materials it gathers available on its public website and promotes their availability on social media platforms, such as Facebook and X (formerly Twitter).[17] As discussed previously, American Oversight has demonstrated its commitment to the public disclosure of documents and creation of editorial content.[18]

Accordingly, American Oversight's request satisfies the criteria for expedition.

---

[14] Oct. 21, 2024 Mot. Hr'g Tr., *Am. Oversight v. U.S. Dep't of Just.*, U.S. D.D.C. Case No. 1:24-cv-02789-PLF. Attached as Exhibit A are true and correct copies of the cover page and pages 36–47 excerpted from the transcript of a motion hearing before United States District Court for the District of Columbia Judge Paul L. Friedman, wherein the court expressly found that American Oversight is an organization that is primarily engaged in disseminating information.

[15] *See ACLU v. U.S. Dep't of Justice*, 321 F. Supp. 2d 24, 30–31 (D.D.C. 2004); *EPIC v. Dep't of Defense*, 241 F. Supp. 2d 5, 15 (D.D.C. 2003).

[16] *ACLU*, 321 F. Supp. 2d at 29 n.5 (quoting *EPIC*, 241 F. Supp. 2d at 11).

[17] American Oversight currently has approximately 16,000 followers on Facebook and 97,900 followers on Twitter.com. American Oversight, Facebook, https://www.facebook.com/weareoversight (last visited Jan. 7, 2025), American Oversight (@weareoversight), Twitter.com, https://twitter.com/weareoversight (last visited Jan. 7, 2025).

[18] *See generally News*, American Oversight, https://www.americanoversight.org/blog; *see, e.g., Emails and Resume of Trump's Pick to Head Government Personnel Office*, American Oversight, https://www.americanoversight.org/emails-and-resume-of-trumps-pick-to-head-government-personnel-office; *CDC Calendars from 2018 and 2019: Pandemic-Related Briefings and Meetings*, American Oversight, https://www.americanoversight.org/cdc-calendars-from-2018-and-2019-pandemic-related-briefings-and-meetings; *State Department Releases Ukraine Documents to American Oversight*, American Oversight, https://www.americanoversight.org/state-department-releases-ukraine-documents-to-american-oversight; *Documents Reveal Ben Carson Jr.'s Attempts to Use His Influence at HUD to Help His Business*, American Oversight, https://www.americanoversight.org/documents-reveal-ben-carson-jr-s-attempts-to-use-his-influence-at-hud-to-help-his-business; *Investigating the Trump Administration's Efforts to Sell Nuclear Technology to Saudi Arabia*, American Oversight, https://www.americanoversight.org/investigating-the-trump-administrations-efforts-to-sell-nuclear-technology-to-saudi-arabia; *Sessions' Letter Shows DOJ Acted On Trump's Authoritarian Demand to Investigate Clinton*, American Oversight, https://www.americanoversight.org/sessions-letter.

- 5 -

DOJ-25-0036

### Guidance Regarding the Search & Processing of Requested Records

In connection with its request for records, American Oversight provides the following guidance regarding the scope of the records sought and the search and processing of records:

- Please search all locations and systems likely to have responsive records, regardless of format, medium, or physical characteristics.

- In the event some portions of the requested records are properly exempt from disclosure, please disclose any reasonably segregable non-exempt portions of the requested records. If a request is denied in whole, please state specifically why it is not reasonable to segregate portions of the record for release.

- Please take appropriate steps to ensure that records responsive to this request are not deleted by the agency before the completion of processing for this request. If records potentially responsive to this request are likely to be located on systems where they are subject to potential deletion, including on a scheduled basis, please take steps to prevent that deletion, including, as appropriate, by instituting a litigation hold on those records.

### Conclusion

If you have any questions regarding how to construe this request for records or believe that further discussions regarding search and processing would facilitate a more efficient production of records of interest to American Oversight, please do not hesitate to contact American Oversight. American Oversight welcomes an opportunity to discuss its request with you before you undertake your search or incur search or duplication costs. By working together at the outset, American Oversight and your agency can decrease the likelihood of costly and time-consuming litigation in the future.

Where possible, please provide responsive material in an electronic format by email. Alternatively, please provide responsive material in native format or in PDF format on a USB drive. Please send any responsive material being sent by mail to American Oversight, 1030 15th Street NW, Suite B255, Washington, DC 20005. If it will accelerate release of responsive records to American Oversight, please also provide responsive material on a rolling basis.

We share a common mission to promote transparency in government. American Oversight looks forward to working with your agency on this request. If you do not understand any part of this request, please contact Elizabeth Haddix at foia@americanoversight.org or (252) 359-7424 ext. 1031. Also, if American Oversight's

- 6 -

DOJ-25-0036

request for expedition is not granted or its request for a fee waiver is not granted in full, please contact us immediately upon making such a determination.

Sincerely,

*/s/ Elizabeth Haddix*
Elizabeth Haddix
on behalf of
American Oversight

DOJ-25-0036

# EXHIBIT A

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 27 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 221 of 237

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN OVERSIGHT,          )
                             )
          Plaintiff,         )
                             )
     vs.                     ) CASE NO. 1:24-cv-02789-PLF
                             )
U.S. DEPARTMENT OF DEFENSE,  )
et al.,                      )
                             )
          Defendants.        )
_____)

TRANSCRIPT OF MOTION HEARING
**BEFORE THE HONORABLE PAUL L. FRIEDMAN, DISTRICT JUDGE**
Monday - October 21, 2024
2:36 p.m. - 4:18 p.m.
Washington, DC

**FOR THE PLAINTIFF:**
American Oversight
BY:  DANIEL H. MARTINEZ and ELIZABETH HADDIX
1030 15th Street, NW, Suite B255
Washington, DC 20005
(202) 897-2465

**FOR THE DEFENDANTS:**
United States Attorney's Office, Civil Division
BY:  DEDRA S. CURTEMAN
601 D Street, NW
Washington, DC 20530
(202) 252-2550

**SONJA L. REEVES**
**Registered Diplomate Reporter**
**Certified Realtime Reporter**
**Federal Official Court Reporter**
333 Constitution Avenue, NW
Washington, DC 20001
Transcript Produced from the Stenographic Record

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 28 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 222 of 237

36

1          And finally, the discussion about the failure to

2    allocate resources, again, this is a narrow request long past

3    since the 20 days, and for those reasons we believe that the

4    preliminary injunction is justified.

5          THE COURT:  Thank you.  Why don't we take about ten

6    minutes and then we'll come back.  Maybe 15.

7       (Recessed from 3:30 p.m. to 3:44 p.m.)

8          THE COURT:  Anybody else have anything else they want

9    to say?

10         MS. CURTEMAN:  No, Your Honor.

11         MR. MARTINEZ:  No, Your Honor.

12         THE COURT:  Give me a minute, please.  I have

13   something I want to say.

14      (Pause)

15         THE COURT:  Okay.  So I'm going to give you an opinion

16   now.  Hopefully, it will be reasonably articulate.  It's always

17   more articulate if you write an opinion, but it takes longer.

18         So the plaintiff is asking for a preliminary

19   injunction, and they are asking for expedited processing and

20   asking me to direct the defendants, the Department of Defense

21   and the Department of the Army, to expedite their FOIA request.

22         And secondly, they are asking for a decision on their

23   FOIA request, which, as I understand it is a request for a

24   mandatory injunction to require the defendants to produce any

25   nonexempt records by the date certain that they have asked for,

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 29 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 223 of 237

37

1    which is later this week, October 26th [sic].

2         And their assumption is that it's a narrow request,

3    that there may only be one document or a few documents, because

4    what is requested is any report, including, but not limited to,

5    an incident report filed with U.S. Army Military Police Corps

6    officials and/or any other military officials that are at

7    Arlington National Cemetery regarding the alleged incident

8    reported to have taken place during the August 26, 2024 visit

9    by former President Trump to Arlington National Cemetery.

10        And originally they said, "Given that this request is

11   limited to a specific, recent, and readily identifiable

12   document or documents, American Oversight expressed that this

13   request can be processed very quickly and promptly."  That was

14   what they asked for on August 29th.

15        When they basically heard nothing, perhaps in part

16   because of the Arlington National Cemetery website or some

17   other kerfuffles that are outlined in the plaintiff's

18   September 25th document, letter, asking for expedited

19   processing of their request, they didn't hear anything in the

20   month between August 29th and September 29th, and so they then

21   made a request for expedition.

22        Of course, the government says that they waited a

23   month to ask for expedition.  The plaintiff's response is we

24   only waited a month because we thought they would respond and

25   instead we got all these things that now indicate that the

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 30 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 224 of 237

38

1    Arlington National Cemetery website was all messed up or

2    whatever else.

3            So the argument is being made by the government that

4    the plaintiffs cannot and have not met the requisites for

5    expedition.  As we know, the legal standard for preliminary

6    injunction is that the moving party, the plaintiffs, must

7    establish the likelihood of success on the merits first, then

8    likely irreparable harm in the absence of preliminary relief,

9    and the balance of the equities in its favor in accord with the

10   public interest.  That's the *Winter* case from the Supreme Court

11   and numerous cases from this circuit applying the *Winter* case.

12           So have the plaintiffs met their burden for expedition

13   and for the immediate release of any nonexempt records, which

14   they assume and I assume are limited in number?  So I'm going

15   to grant the motion for preliminary injunction for these

16   reasons:

17           The Freedom of Information Act itself in Title 5

18   United States Code Section 552 in subpart, I think it's

19   (a)(1)(D)(i) and (a)(1)(E)(i), but I may be wrong.  I know it's

20   a subpart (D)(i) and subpart (E)(i).  And (D)(i) says that each

21   agency may promulgate regulations concerning FOIA requests.

22           More importantly, as relevant here, the statute says,

23   "Each agency shall promulgate regulations pursuant to notice

24   and receipt of public comment, providing for expedited

25   processing of requests for records in cases in which the person

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 31 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 225 of 237

39

1    requesting the records demonstrates compelling need."

2          The Department of Defense has promulgated such

3    regulations, and they are found at Title 32 C.F.R. Section

4    286.8.   And they say that, "FOIA requests shall be processed

5    with expedition where there is compelling need and where the

6    persons or requester requests expedition and demonstrates a

7    compelling need."   So everybody agrees the burden is on the

8    requester to show compelling need.

9          The regulation says, "A compelling need exists for a

10   variety of reasons," but the most relevant one here is "if the

11   information is urgently needed by an individual primarily

12   engaged in disseminating information in order to inform the

13   public concerning actual or alleged governmental activity."

14         It goes on to say -- that DOD regulation goes on to

15   say, "For requester seeking expedited processing under

16   paragraph (e)(i)(B), a requester who is not a full-time member

17   of the news media must establish that the requester is a person

18   whose primary professional activity or occupation is

19   information dissemination and not an incidental or secondary

20   activity."

21         So American Oversight is not a full-time member of the

22   news media.   They say that they are showing compelling need

23   because their primary activity is disseminating of

24   information -- the dissemination of information.

25         The government says that there is no compelling need,

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 32 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 226 of 237

40

1    there is no urgency, there is no current exigency or interest

2    in these documents because in part one of the arguments is that

3    the plaintiff waited a month to make the expedition request,

4    but I don't find that troubling, because they couldn't get an

5    answer from the Veterans Administration by asking for prompt

6    processing, so that's when they filed the expedition request.

7         In fact, one could argue that to the extent there is a

8    public interest in this material, that it's even more important

9    and more exigent now as we get closer to the election.  The

10   government says the media has not been reporting on this, the

11   public is not clamoring for this, there are only three NPR

12   articles.

13        Well, a quick Google search says that's not true.

14   There were reports on this incident on CNN, on Al Jazeera, on

15   MSNBC, all the major outlets.  And so out of the likelihood of

16   success argument, we have to show -- or the plaintiffs have to

17   show a compelling need, urgency, which is part of compelling

18   need, urgent public interest, and that there is a substantial

19   public interest still, and in order to show those things, they

20   have to show that their primary activity is disseminating

21   information.

22        So we discussed a lot of cases here today, and among

23   the cases the government relies on is Judge Kotelly's opinion,

24   *Allied Progress*.  The plaintiffs rely on a number of cases that

25   I think are more relevant.  And I mean, I would start, despite

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 33 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 227 of 237

41

1   the government's correct observation with Judge Cooper's

2   opinion on *American Oversight versus U.S. Department of State*,

3   in which he granted expedition, granted a preliminary

4   injunction on expedition, and that's 414 F.Supp. 3d, page 182.

5           The government is correct that Judge Cooper did not

6   explicitly make the findings that are required, but it's

7   implicit in that opinion that he did when he found the

8   substantial likelihood of success.  What was sought there is

9   information about the government's -- Mr. Trump's former legal

10   advisor, the now disbarred Rudy Giuliani, in connection with

11   the January 6th Committee.  And Judge Cooper found that there

12   was a likelihood of success on the merits.

13           And as for irreparable harm, he said that -- and this

14   had to do with Mr. Giuliani's alleged efforts to enlist

15   Ukraine's assistance in furthering the president's reelection

16   prospect.  On the irreparable harm front, Judge Cooper said,

17   "Time is clearly of the essence.  The impeachment inquiry is in

18   full swing, and, as noted above, congressional leaders expect

19   it to conclude by Christmas, so it's time."

20           Implicit in this is that American Oversight is

21   primarily engaged in disseminating information, or else Judge

22   Cooper wouldn't have reached these other questions, but he

23   didn't specifically say that, I get that.

24           So let's look at some other cases.  In *Protect

25   Democracy versus U.S. Department of Defense*, 263 F.Supp. 3d

387

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 34 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 228 of 237

42

1   293, Judge Cooper granted preliminary injunction for processing

2   because it related to cruise missile strikes on a Syrian air

3   base, and he found that, "Protect Democracy has shown it's

4   entitled to expedited processing," for reasons he discussed in

5   that opinion, and the timing of all of this.  He did not find

6   all the other requisites; he only found some of them.

7        However, in *Brennan Center for Justice versus*

8   *Department of Commerce*, Judge Kelly was dealing with the 2020

9   U.S. Census, and he found there was a lot of dispute and debate

10  about whether the Commerce Department had done some

11  inappropriate things in counting or not counting certain people

12  with respect to the 2020 census that would affect people's

13  right to vote or not.

14       And Judge Kelly found that there was an urgency to

15  inform the public before the election because people want to

16  know if the Commerce Department under Secretary Ross and the

17  Trump administration had messed around with the census before

18  they went to the polls in 2020.  And he found there was a

19  likelihood of success on the merits of expedition, that there

20  was widespread and exceptional interest in the matter, there

21  were numerous articles about the matter which raised questions

22  about the government's integrity, and that there was an urgency

23  to inform the public by the Brennan Center, which it said is a

24  person or entity primarily engaged in disseminating

25  information.

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 35 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 229 of 237

43

1         While the Brennan Center had lots of other things as

2    well, it regularly writes and publishes and disseminates

3    information and maintains an online library of numerous

4    articles.  That's a quote from their website, I believe.  That

5    there was an urgency to inform the public of these matters.  He

6    decided this on October 30, 2020, as we were approaching the

7    2020 election.

8         *Center for Public Integrity versus U.S. Department of*

9    *Defense*, Judge Kotelly, "We need an informed electorate," she

10   said.  Expedited processing was approved by Judge Kotelly on a

11   motion for preliminary injunction.  "Only an informed

12   electorate can develop its opinions of its elected officials,"

13   she said.

14        And this related to the administration's policy of

15   conducting surveillance or alleged policy of domestic

16   communications about prior judicial -- or maybe that's not this

17   case.  She was quoting electronic privacy and phone, and that's

18   what she was talking about.  In this case, this had to do with

19   the Defense Department's handling of the Ukraine security

20   assistance program.  She said, "This is a matter of immediate

21   concern to the American public, given extensive media interest

22   in the fate of the program and pressure placed upon the

23   Department regarding this program."

24        As to irreparable harm, this was during the time of

25   the impeachment proceedings relating to Ukraine, and she

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 36 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 230 of 237

44

 1    thought and said that, "The public should be informed about

 2    matters relating to the impeachment proceeding.  The

 3    dissemination of information relating to the ongoing

 4    impeachment proceedings contributes to an informed electorate

 5    capable of developing knowledge of opinions and sharing those

 6    knowledge of opinions with their elected leaders.  Absent

 7    expedited responses, it's not clear that the public would

 8    otherwise have access to this relevant information."

 9         All of these courts were applying the *Al-Fayed*

10    factors.  And then there is Judge Sullivan's opinion in *Protect*

11    *Democracy versus United States Department of Justice*, 498

12    F.Supp. 3d 132, relating to voter fraud in the 2020 election,

13    and specifically the investigation of mail-in voter fraud,

14    getting close to the election.

15         So those are all the cases -- those are not all of the

16    cases.  Those are some of the cases that support the

17    plaintiff's position.

18         The government relies on *Allied Progress*, Judge

19    Kotelly's opinion, 2017 Westlaw 1750263 in 2017 where she

20    denied preliminary injunction because she found that they were

21    not primarily engaged in the dissemination of information and

22    urgency, both.

23         Again, those were the facts of that case as she found

24    them, but as I just cited in another Judge Kotelly opinion,

25    clearly each of these cases is very fact specific in whether

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 37 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 231 of 237

45

1    someone has met their burden.

2          So I find that the defense has shown -- plaintiffs

3    have shown compelling need and an urgency.  The question that

4    is a part of this is whether American Oversight is primarily

5    engaged in disseminating information, and the government says

6    -- they make the statement that it's very conclusory.

7          The plaintiffs in a number of places, but particularly

8    I think in their September 25, 2024 request for expedition,

9    say, "I further certify that we are primarily engaged in

10   disseminating information to the public.  Our mission is to

11   promote transparency in government, to educate the public about

12   government activities and ensure the accountability of

13   government officials."

14         "American Oversight gathers information of potential

15   interest to a segment of the public, uses its editorial skills

16   to turn the raw material into distinct work and distributes

17   that work to an audience.  It educates the public through

18   reports, press releases and other media.  American Oversight

19   also makes the materials it gathers available on its public

20   website and promotes their availability on social media

21   platforms."

22         Putting it on a public website is disseminating it to

23   the public.  Writing and issuing reports and press releases is

24   disseminating it to the public.  It's not conclusory.  They

25   have made that representation.  And as they point out in their

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 38 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 232 of 237

46

1  reply memorandum at page 11, there are other organizations that

2  have similar missions and similar ways to disseminate

3  information and expedition has been granted to them.

4       And they cite in particular the *Protect Democracy* case

5  that I discussed a little while ago, 263 F.Supp. 3d at 293, but

6  the particular discussion and conclusion about dissemination is

7  at page 298 of that opinion.  I think the *Brennan Center*

8  opinion is another one.

9       So we are now two weeks before the election, and I

10 think that there are segments of the public that would like to

11 know and there is even more urgency to the request now than

12 there may have been in August or September.  The request is

13 narrow.  It may only be one report or a number of documents.

14      Presumably, even though the Department of Defense and

15 the Department of the Army will have to do a search in order to

16 look, "Arlington National Cemetery," can do a search term.  You

17 can do "Arlington National Cemetery, August 26, 2024."

18      So I think I have discussed likelihood of success on

19 the merits and irreparable harm.  And the other two prongs for

20 preliminary injunction, the public interest and equitable

21 concerns, I think that the balance of the equities and whether

22 it's in accordance with the public interest, as was said during

23 the oral argument, I think once I find irreparable harm, seems

24 to me that, and the urgency in the public interest also

25 effectively answers the public interest in balance of the

Case 9:23-cr-80101-AMC   Document 717   Entered on FLSD Docket 02/18/2025   Page 39 of 43
USCA11 Case: 25-14507   Document: 42-2   Date Filed: 02/16/2026   Page: 233 of 237

47

1    equity prongs.

2           So I think I have covered what I want to say.  And to

3    me, that is sufficient, but I'll ask either side if they want

4    to say anything further to deal with the question of the right

5    to a preliminary injunction directing expedition under the

6    statute and regulations, but given what I have said about that,

7    and the fact that the election is two weeks away, it seems to

8    me -- and the fact that it's a narrow request for nonexempt

9    records and it may only be one report or a few documents, that

10   what I have said also is sufficient to grant the request for

11   release of nonexempt documents.

12          Let me first ask the plaintiffs if there is anything

13   you think I have missed or need to address, and then I'll ask

14   the government a similar question.

15          MR. MARTINEZ:  Thank you, Your Honor.  I just want to

16   be clear.  What is the date that you are --

17          THE COURT:  What is it you're requesting?

18          MR. MARTINEZ:  We requested Friday, October 25th.

19          THE COURT:  For release.

20          MR. MARTINEZ:  For release.

21          THE COURT:  So I order expedition, which means start

22   tomorrow looking for the stuff, and so I'll order release by

23   Friday, October 25th.

24          MR. MARTINEZ:  Thank you, Your Honor.

25          MS. CURTEMAN:  Your Honor, the government would just

# EXHIBIT 2

**Friday, February 14, 2025 at 10:46:45 Eastern Standard Time**

| | |
|---|---|
| **Subject:** | FW: Your FOIA Request FOIA-2025-01746 |
| **Date:** | Tuesday, February 11, 2025 at 1:14:23 PM Eastern Standard Time |
| **From:** | AO Records |
| **To:** | FOIA |
| **Attachments:** | OIP Final Response 2.11.25.pdf |

**From:** OIP-NoReply <OIP-NoReply@usdoj.gov>
**Date:** Tuesday, February 11, 2025 at 12:34 PM
**To:** AO Records <records@americanoversight.org>
**Cc:** Littman, Jared (USADC) <Jared.Littman@usdoj.gov>
**Subject:** Your FOIA Request FOIA-2025-01746

Attached is correspondence from the Department of Justice's Office of Information Policy, which is associated with the above-referenced Freedom of Information Act (FOIA) request.

**Please do not reply to this e-mail, as this account is not monitored.**

Thank you,

------------------------------------------
Initial Request Staff
Office of Information Policy
U.S. Department of Justice

202-514-3642 (Main Line)

395



**U.S. Department of Justice**

Office of Information Policy

*Sixth Floor*
*441 G Street, NW*
*Washington, DC  20530-0001*

*Telephone: (202) 514-3642*

February 11, 2025

Elizabeth Haddix
American Oversight
Suite B255
1030 15th Street, NW
Washington, DC  20005                Re:  FOIA-2025-01746
records@americanoversight.org

Dear Elizabeth Haddix:

  This responds to your Freedom of Information Act (FOIA) request dated and received in this Office on January 8, 2025, seeking a copy of the Report of Special Counsel Jack Smith (the Report).

  Please be advised that Volume I of the Report is publicly available on the Department's website at: https://www.justice.gov/storage/Report-of-Special-Counsel-Smith-Volume-1-January-2025.pdf.

  At this time, I have determined that Volume II of the Report should be withheld in full because it is protected from disclosure by a court injunction issued by the United States District Court for the Southern District of Florida, West Palm Beach Division.  In this instance, the Office of Information Policy lacks authority to consider the releasability of this information under the FOIA.  See GTE Sylvania, Inc. v. Consumers Union, 445 U.S. 375, 384-86 (1980) (finding "no discretion for the agency to exercise" where records are subject to injunction issued by federal district court).  In making this determination, we have considered the foreseeable harm standard.

  For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA.  See 5 U.S.C. § 552(c) (2018).  This response is limited to those records that are subject to the requirements of the FOIA.  This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

-2-

     If you have any questions regarding this response, Jared Littman of the United States Attorney's Office for the District of Columbia at (202) 252-2523.

Sincerely,

Vanessa R. Brinkmann
Senior Counsel

397