No. 25-14507

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE ELEVENTH CIRCUIT

---

United States of America,

*Plaintiff-Appellee*,

v.

Knight First Amendment Institute at Columbia University*,* American Oversight,

*Interested Parties-Appellants*

Donald J. Trump; Waltine Nauta; Carlos de Oliveira,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of Florida

No. 9:23-cr-80101-AMC

---

### JOINT APPENDIX TO APPELLANTS' OPENING BRIEFS, VOLUME III

---

Scott Wilkens
Jameel Jaffer
Alex Abdo
 Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
Tel: (646) 745-8500
scott.wilkens@knightcolumbia.org

Loree Stark
Daniel Martinez
Ronald Fein
AMERICAN OVERSIGHT
1030 15th Street NW, B255
Washington, DC 20005
Tel: (304) 913-6114
loree.stark@americanoversight.org

David Buckner
Buckner + Miles
2020 Salzedo Street
Suite 302
Coral Gables, FL 33134
Tel: (305) 964-8003

*Attorneys for Interested Party-Appellant Knight First Amendment Institute at Columbia University*

Barbara R. Lllanes
Gelber Schachter & Greenberg, P.A.
One Southeast Third Avenue, Ste. 2600
Miami, FL 33131
Tel: (305) 728-0950
bllanes@gsgpa.com

*Attorneys for Interested Party-Appellant American Oversight*

## INDEX OF APPENDIX

Volume I

Docket/Tab #

District Court Docket Sheet ...................................................................... A

Indictment, filed June 8, 2023 ................................................................... 3

Superseding Indictment, filed July 27, 2023 ........................................... 85

## INDEX OF APPENDIX

Volume II

Docket/Tab #

District Court's Dismissal of Superseding Indictment, filed July 15, 2024 ................................................................................................... 672

Notice of Appeal by Special Counsel, filed July 17, 2024 ................................... 673

Dismissal of Trump, filed July 17, 2024 ............................................................. 677

Defendants' Motion to Preclude Dissemination of Special Counsel Report, filed Jan. 6, 2025 ...................................................................... 679

President Donald J. Trump's Motion for Leave to Intervene or Participate as Amicus Curiae, filed Jan. 7, 2025 ................................... 681

Order Temporarily Enjoining Dissemination of Special Counsel Report, filed Jan. 7, 2025 ...................................................................... 682

Order, filed Jan. 13, 2025 .................................................................................... 697

Notice of Compliance to Jan. 15, 2025 Order, filed Jan. 16, 2025 ..................... 708

Order Granting Defendants' Emergency Motion to Preclude Release of Volume II of Special Counsel's Report, filed Jan. 21, 2025 ............................ 714

Dismissal of Nauta and De Oliveira, filed Feb. 11, 2025 ..................................... 716

American Oversight's Motion to Intervene, filed Feb. 14, 2025 .......................... 717

## INDEX OF APPENDIX

### Volume III

Docket/Tab #

Knight First Amendment Institute at Columbia University's Motion to
Intervene, filed Feb. 24, 2025 ...................................................................721

Joint Status Report, filed Mar. 14, 2025 .................................................738

Defendants' Waltine Nauta and Carlos De Oliveira's Opposition to
Motions to Intervene, filed Mar. 14, 2025 ..............................................739

United States' Response in Opposition to Motions to Intervene, filed
Mar. 24, 2025 ...........................................................................................740

Reply by Knight First Amendment Institute in Support of Motion to
Intervene, filed Mar. 31, 2025 .................................................................745

American Oversight's Consolidated Reply in Support of Motion to
Intervene, filed Mar. 31, 2025 .................................................................746

Joint Status Report and Exhibit A (Order Holding Mandamus Petition
in Abeyance), filed Dec. 1, 2025 .............................................................753

Order Denying Non-Party Motions to Intervene, filed Dec. 22, 2025 .................760

Order Following Joint Status Report Addressing January 21, 2025
Order, filed Dec. 22, 2025 .......................................................................761

Notice of Appeal by Knight First Amendment Institute, filed Dec. 23,
2025 ..........................................................................................................762

Notice of Appeal by American Oversight, filed Dec. 29, 2025 ...........................763

Transcript of Jan. 17, 2025 Hearing on Defendants' Emergency
Motion to Preclude Release of Volume II of Special Counsel's Report,
filed Jan. 12, 2026 ...................................................................................768

## INDEX OF APPENDIX

Volume IV

Docket/Tab #

President Trump's Unopposed Motion for an Order Prohibiting the
Release of Volume II, filed Jan. 20, 2026.................................................772

United States' Response to December 22, 2025 Order, filed Jan. 23,
2026 ..........................................................................................................773

Waltine Nauta's and Carlos De Oliveira's Expedited Motion For, and
Response in Support of, an Order Permanently Prohibiting Release of
Volume II of the Final Report Unlawfully Prepared by Jack Smith,
filed Jan. 30, 2026 ....................................................................................774

Joint Expedited Motion of the Knight First Amendment Institute at
Columbia University and American Oversight to Intervene for the
Purpose of Seeking a Stay of Proceedings, filed Feb. 9, 2026...............775

TAB 721

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 721

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

### CASE NO.: 23-CR-80101-AMC

UNITED STATES OF AMERICA,

Plaintiff,

v.

DONALD J. TRUMP, WALTINE NAUTA,
and CARLOS DE OLIVEIRA,

Defendants.

FILED BY _____ D.C.

FEB 24 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

### MOTION OF THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY TO INTERVENE TO SEEK RESCISSION OF THE COURT'S JANUARY 21, 2025 ORDER AND PUBLIC RELEASE OF VOLUME II OF THE SPECIAL COUNSEL'S REPORT

The Knight First Amendment Institute at Columbia University ("Knight Institute" or "Institute") is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, policy analysis, and public education. Pursuant to Local Rules 7.1 and 88.9, the Institute respectfully moves to intervene in this case to seek (1) rescission of the Court's January 21, 2025 Order enjoining release of Volume II of the Special Counsel's Report ("January 21 Order"); and (2) public release of the redacted version of Volume II that DOJ submitted to the Court in advance of a hearing held on January 17, 2025.[1]

The Knight Institute has standing to intervene to seek rescission of the January 21 Order because the Court's injunction barring the release of Volume II directly implicates the Institute's

---

[1] The Institute does not oppose the Court making additional redactions if the redactions satisfy the requirements of the First Amendment, as described below.

federal rights under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq*. Specifically, the Institute submitted a FOIA request to the Department of Justice ("DOJ") seeking the release of Volume II, and DOJ has cited this Court's January 21 Order, and the injunction it imposes on the public release of Volume II, as grounds for denying the Institute's request. The Institute asks that the Court rescind its January 21 Order because it prevents the Institute from pursuing its rights under FOIA, and because there is no longer any legitimate reason to enjoin the report's release. The Court will recall that it enjoined release of the report to protect Defendants' due process and fair trial rights. Since the Court issued its injunction, however, the charges against Defendants have been dismissed with prejudice. Accordingly, there is no longer any justification for the injunction, and it no longer reflects a necessary or appropriate exercise of the Court's supervisory authority. The Court should lift the injunction immediately.

The Knight Institute also has standing to intervene to assert common law and First Amendment rights of access to the redacted version of Volume II submitted to the Court by DOJ in advance of the January 17, 2025 hearing. Volume II is a "judicial record" subject to a common law right of access because it was submitted in connection with a motion that invoked the Court's powers and was reviewed and considered by the Court in ruling on the motion. The common law right that attaches to this judicial record is not overcome by good cause. Indeed, all of the factors that courts in this Circuit consider in assessing whether good cause exists in this context weigh in favor of upholding the access right.

Volume II is also subject to a qualified right of access under the First Amendment, because it is a judicial document inextricably intertwined with a proceeding that is itself subject to the constitutional access right, and because it is the type of document whose disclosure promotes the proper functioning of that proceeding and allows the public to know that justice is being done. The

qualified constitutional access right can be limited only to the extent essential to protect a compelling government interest, and even then, any limitation must be narrowly tailored to that interest. Volume II must be released because its suppression is no longer needed to protect any governmental interest and is not narrowly tailored. Moreover, release of the document would serve an important societal interest by informing the public about the character and actions of the nation's highest official, about one of the most significant criminal investigations in American history, and about DOJ's understanding of the Espionage Act, a statute with broad implications for free speech. For all of these reasons, and the further reasons discussed below, the Knight Institute respectfully requests that the Court rescind its January 21 Order and direct the clerk to file on the public docket the redacted version of Volume II that DOJ submitted to the Court.[2]

## **MEMORANDUM OF LAW**

**I.      Background**

> **A.      The Special Counsel's Investigation, Charges, and Report**

The FBI opened a criminal investigation on March 30, 2022 into then-former President Donald J. Trump's retention of classified documents at the Mar-a-Lago Club, and a federal grand jury was convened shortly thereafter. On November 18, 2022, Attorney General Merrick B. Garland appointed Jack Smith as Special Counsel to oversee the ongoing DOJ investigations into President Trump's role in the January 6, 2021 attack on the United States Capitol as well as his alleged unlawful retention of classified government records.

---

[2] Some (but not all) of the relief sought by the Knight Institute here was also sought by American Oversight in a motion filed on February 14, 2025. ECF No. 717. The Court issued an order on February 18, 2025 denying American Oversight's request for emergency relief but stating that it would "await briefing . . . in the normal course, according to the standard deadlines set forth in Local Rules 88.9 and 7.1." ECF No. 718.

On June 8, 2023, the Special Counsel filed an indictment charging President Trump with thirty-seven felony charges, including thirty-one violations of the Espionage Act. ECF No. 3. The indictment alleged that, upon leaving the White House on January 20, 2021, President Trump instructed aides to transport boxes containing classified documents—including highly sensitive military and intelligence secrets—to Mar-a-Lago; that Trump stored these boxes in various locations at the Club that were potentially accessible to thousands of members and guests; that he showed classified documents to non-security-cleared members of his Club staff and others; that he failed to return classified documents to the government after having been served with a subpoena requiring their immediate return; and that he made false statements and conspired with others to "obstruct the FBI and grand jury investigations and conceal his continued retention of classified documents." *Id.* at 2–3. The June 2023 indictment also charged one of Trump's associates, Walt Nauta, as a co-conspirator, alleging that he had conspired with Trump to conceal the presence of documents at the Club. *Id.* at 3. On July 27, 2023, a superseding indictment added a second Trump associate, Carlos De Oliveira, as a co-conspirator. The superseding indictment also added additional charges against Trump and Nauta. ECF No. 85.

On July 15, 2024, this Court entered an Order dismissing the superseding indictment on the grounds that Smith's appointment as Special Counsel was unconstitutional. ECF No. 672. Smith filed a Notice of Appeal two days later. ECF No. 673. Following President Trump's victory in the 2024 presidential election, however, Smith moved to dismiss the appeal as to Trump in light of longstanding DOJ policy that "the United States Constitution forbids the federal indictment and subsequent criminal prosecution of a sitting President." *See* Mot. to Dismiss the Appeal as to Donald J. Trump, *United States v. Trump*, No. 24-12311-J (11th Cir. Nov. 25, 2024), ECF No. 79 (incorporating the reasoning given in Gov't's Mot. to Dismiss, *United States v. Trump*, No. 1:23-

cr-00257-TSC (D.D.C. Nov. 25, 2024), ECF No. 281). The Eleventh Circuit granted the motion on November 26, 2024. ECF No. 677.

On January 7, 2025, Smith submitted a final report relating to both of his investigations to Attorney General Garland.[3] The report comprised two volumes, with Volume I addressing the January 6 investigation and Volume II addressing the investigation relating to classified records.[4] In a cover letter accompanying the report, Smith expressed his understanding that the Attorney General was considering releasing the report to the public "consistent with applicable legal restrictions."[5] He assured the Attorney General that in each of the report's two volumes, he had "minimize[d] the identification of witnesses and co-conspirators, consistent with accepted Department practice," and he noted that he was providing a redacted version of Volume II "that identifies certain information that remains under seal or is restricted from public disclosure by Federal Rule of Criminal Procedure 6(e)."[6] He also wrote: "Because Volume II discusses the conduct of Mr. Trump's alleged co-conspirators in the Classified Documents Case, Waltine Nauta and Carlos De Oliveira, consistent with Department policy, Volume II should not be publicly released while their case remains pending."[7]

### B.     The Injunction

On January 6, 2025, the day before Smith transmitted his report to Attorney General Garland, Nauta and De Oliveira filed an "Emergency Motion" requesting that the Court enjoin the

---

[3] Letter from Special Couns. Jack Smith, to Att'y Gen. Merrick Garland, Re: Final Report of the Special Counsel Under 28 C.F.R. § 600.8 (Jan. 7, 2025), available at https://perma.cc/8SWU-PKL7.

[4] *Id.* at 4.

[5] *Id.*

[6] *Id.*

[7] *Id.*

government from sharing or releasing the report. ECF No. 679.[8] The Court granted a temporary injunction on January 7, 2025, prohibiting DOJ, Attorney General Garland, Special Counsel Smith, and all of their officers, agents, and employees from releasing, sharing, or transmitting the report outside of the DOJ. ECF No. 682. In a letter to the Chairmen of the House and Senate Judiciary Committees on January 8, 2025, Attorney General Garland noted that the Court had temporarily enjoined the government from releasing the report, including to congressional leaders, but that Garland himself felt committed to making as much of the report public as possible.[9] He also stated, however, that he agreed with the Special Counsel's recommendation against making Volume II public so long as Nauta and De Oliveira's criminal proceedings were ongoing.[10]

This Court denied the Emergency Motion with respect to Volume I of the report on January 13, 2025. ECF No. 697. On January 15, 2025, this Court ordered DOJ to "hand deliver a copy of Volume II to the Court to be reviewed in camera." ECF No. 705. On January 21, 2025, after reviewing Volume II and hearing argument, the Court granted the injunction with respect to Volume II, prohibiting the government from sharing or disclosing it out of concern for the fair trial and due process rights of Nauta and De Oliveira. The Order emphasized that Volume II contained voluminous and detailed information "protected by the Rule 16(d)(1) Protective Order entered in this case . . . [m]uch of [which] has not been made public in Court filings." ECF No. 714.

---

[8] On January 7, 2025, President Trump submitted a "Motion for Leave to Intervene or, in the Alternative, Participate as Amicus Curiae." ECF No. 681. The Court denied Trump's request to be allowed to intervene but granted his alternative request to participate as amicus curiae. ECF No. 714.

[9] Letter from Attorney General Merrick Garland to Senate Judiciary Committee Chairman Charles Grassley, House Judiciary Committee Chairman Jim Jordan, Ranking Member Dick Durbin, and Ranking Member Jamie Raskin (Jan. 8, 2025), available at https://perma.cc/XQS8-SCTY.

[10] *Id.*

### C.     Subsequent Developments

After President Trump was sworn in as the forty-seventh President of the United States,

DOJ moved in the Eleventh Circuit to voluntarily dismiss the appeal as to Nauta and De Oliveira.

The Eleventh Circuit granted the motion on February 11, 2025. ECF No. 716.

### D.     The FOIA Request

On January 26, 2025, the Knight Institute submitted a Freedom of Information Act request

("the Request") seeking "a copy of Volume II of the Final Report on the Special Counsel's

Investigations and Prosecutions, referenced in Special Counsel Jack Smith's January 7, 2025 letter

to Attorney General Merrick B. Garland." Declaration of Anna Diakun ("Diakun Decl.") ¶ 3 (filed

herewith). A copy of the Request is attached as Exhibit 1 to the Diakun Declaration. The Knight

Institute requested expedited processing of the Request on the grounds that it is an organization

"primarily engaged in disseminating information" and that there is a "compelling need" for the

records sought because they contain information "urgent[ly]" needed to "inform the public

concerning actual or alleged Federal Government Activity," citing 5 U.S.C. § 552(a)(6)(E)(v)(II).

Diakun Decl. ¶ 3.

DOJ denied the Knight Institute's request for expedited processing by letter dated January

28, 2025, explaining that "[t]his Office cannot identify a particular urgency to inform the public

about an actual or alleged federal government activity beyond the public's right to know about

government activities generally." Diakun Decl. ¶ 4. A copy of the denial is attached as Exhibit 2

to the Diakun Declaration.

On February 6, 2025, however, DOJ informed the Knight Institute that:

Volume II of the Report should be withheld in full because it is protected from
disclosure by a court injunction issued by the United States District Court for the
Southern District of Florida, West Palm Beach Division. In this instance, the Office
of Information Policy (OIP) lacks authority to consider the releasability of this

information under the FOIA. *See GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 384–86 (1980) (finding "no discretion for the agency to exercise" where records are subject to injunction issued by federal district court).

Furthermore, please be advised that the records you have requested, in particular, Volume II of the Report, relate to the proceedings in *USA v. Waltine Nauta & Carlos De Oliveira*, No. 23-cr-80101 (S.D.F.L. filed June 8, 2023) and *USA v. Trump, et al.*, No. 24-12311 (11th Cir. docketed July 18, 2024), both of which are still pending before those respective courts at this time. As such, Volume II of the Report is currently also being withheld in full pursuant to Exemption 7(A) of the FOIA, 5 U.S.C. §552(b)(7)(A). Exemption 7(A) pertains to records or information compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement proceedings.

Diakun Decl. ¶ 5. A copy of the letter is attached as Exhibit 3 to the Diakun Declaration.[11]

## II.   The Knight Institute Has Standing to Intervene.

The Knight Institute has standing to intervene in this case because this Court's injunction barring the release of Volume II directly implicates the Institute's federal rights under FOIA. *See, e.g.*, *United States v. Atesiano*, Case No. 18-20479-CR-Moore/Simonton, 2018 WL 5831092, at *2–4 (S.D. Fla. Nov. 7, 2018) (intervention in a criminal case is proper when "a third party's constitutional or other federal rights are implicated by the resolution of a particular motion, request, or other issue during the course of a criminal case" (cleaned up)); *United States v. Cox*, Case No. 8:14-cr-0140-T-23MAP, 2015 WL 13741738, at *3 (M.D. Fla. Oct. 7, 2015) ("When intervention is allowed in a criminal action, it is limited to instances where the third party's constitutional rights or other federal rights are implicated during the course of the prosecution."). Because DOJ denied the Knight Institute's FOIA request on the basis that this Court's injunction

---

[11] Others have filed FOIA requests for Volume II as well. *See, e.g.*, *N.Y. Times Co. v. U.S. Dep't of Justice*, 1:25-cv-00562 (S.D.N.Y. Jan. 21, 2025); American Oversight's Expedited Mot. to Intervene and for Clarification or, Alternatively, Dissolution of January 21, 2025 Order [] Preclud[ing] Release of Volume II of Special Counsel's Report (ECF No. 717); Letter from Chun Hin Jeffrey Tsoi, Senior Legal Fellow & Alex Goldstein, Assoc. Couns., Citizens for Responsibility & Ethics in Washington, to FOIA Officers, Dep't of Just., Re: Expedited Freedom of Information Act Request (Jan. 10, 2025), https://perma.cc/2JPL-ALKY.

deprives the agency of "authority to consider the releasability of this information," the injunction has the effect of blocking the Knight Institute from vindicating its rights under FOIA. This in turn compromises the Institute's ability to fulfill a core part of its mission: to ensure that the public has access to important information about government. Diakun Decl. ¶ 2. The Institute accordingly has standing to intervene in this case for the purpose of seeking rescission of the January 21 Order. *Id.*

The Knight Institute also has standing to intervene to assert the public's First Amendment and common law rights of access to criminal proceedings and related documents. *See In re Petition of the Trib. Co.*, 784 F.2d 1518, 1521 (11th Cir. 1986) (permitting a newspaper publisher to intervene post-trial in criminal proceeding in order to obtain transcripts of bench conferences); *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008) (holding that "a motion to intervene to assert the public's First Amendment right of access to criminal proceedings is proper").

**III.     This Court Should Lift the Injunction.**

This Court should lift the injunction barring the public release of Volume II because there is no longer any justification for it, and accordingly it no longer reflects a necessary or appropriate exercise of the Court's supervisory authority.

On January 6, 2025, when Defendants Nauta and De Oliveira filed their Emergency Motion to preclude release of the Special Counsel's report, the DOJ was appealing the dismissal of the cases against them. In their motion, they argued that their criminal "proceedings [would] be irreversibly and irredeemably prejudiced by dissemination of the Final Report," ECF No. 679 at 2, and it was on this basis that the Court ruled in their favor. In its ruling, the Court emphasized its "affirmative duty" under the Fifth Amendment "to safeguard the due process rights of the accused," including "taking protective measures to ensure a fair trial and to minimize the effects

of prejudicial pretrial publicity." ECF No. 714 at 8. It also cited Defendants' Sixth Amendment "right to a fair trial by a panel of impartial, indifferent jurors." *Id.* Finally, the Court pointed to Southern District of Florida Local Rule 77.2, which states that lawyers in a criminal case shall not release information "if there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice." *Id.* (quoting S.D. Fla. L.R. 77.2). Ultimately, the Court concluded that because "[t]he Department has not sought leave to dismiss the appeal . . . and there has been no indication by any government official in this case that the Department will not proceed on the Superseding Indictment should it prevail in the Eleventh Circuit or in subsequent proceedings," public dissemination of Volume II would "imperil[]" Defendants' right to a fair trial. *Id.* at 11.

Circumstances have now changed. As noted above, the Eleventh Circuit dismissed the appeal with prejudice on February 11, 2025. ECF No. 716. Defendants Nauta and De Oliveira no longer face criminal charges. Accordingly, the injunction barring release of the report is no longer a necessary or appropriate exercise of this Court's supervisory authority. *See United States v. Moss*, No. 10-60264-CR-COHN, 2011 WL 2669159, at *9 (S.D. Fl. Mar. 21, 2011) (explaining that a defendant must "show that he has been prejudiced by the conduct of which he complains before he would be entitled to relief" through the Court's exercise of its supervisory powers) (citing *United States v. O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987)).[12]

---

[12] To be clear, lifting the injunction would not necessarily result in the release of the entirety of Volume II through FOIA. If DOJ believes that some of the report should be withheld on the grounds that it is Rule 6(e) material, it will presumably seek to withhold that information from disclosure through FOIA's Exemption 3. *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1113 (D.C. Cir. 2007) ("Federal Rule of Criminal Procedure 6(e) . . . prohibits certain persons from 'disclos[ing] a matter occurring before [a] grand jury,' . . . and that rule counts as a statute for purposes of Exemption 3, as it has been positively enacted by Congress." (citations omitted)).

There is no longer any basis for the injunction imposed by the January 21 Order, and the injunction prevents the Knight Institute from pursuing its rights under FOIA. The Court should rescind the Order and thereby lift the injunction.

## IV.     The Public Has a Right of Access to Volume II Under the Common Law.

Volume II is subject to a presumptive right of access under the common law. The common law guarantees the public's right of access to judicial proceedings, which includes the right to "inspect and copy . . . judicial records," *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978), because such access is "crucial to our tradition and history, as well as to continued public confidence in our system of justice," *Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1358–59 (11th Cir. 2021). "The operations of the courts and the judicial conduct of judges are matters of utmost public concern, and the common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." *Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007) (cleaned up).

A document is a "judicial record" subject to the common law right of access if it is submitted to the court in connection with a motion that "invoke[s] [the court's] powers or affect[s] its decisions, whether or not [the motion is] characterized as dispositive." *Id.* at 1246. A document need not be filed on the court's docket to become a judicial record. "[A] document may still be construed as a judicial record, absent filing, if a court interprets or enforces the terms of that document, or requires that it be submitted to the court under seal." *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001); *see also Comm'r, Ala. Dep't of Corr. v. Advance Local Media LLC*, 918 F.3d 1161, 1167–68 (11th Cir. 2019) (holding that a document submitted to the court for *in camera* review but not filed with the court was a judicial record).

Volume II is a judicial record subject to the common law right of access. As explained above, the Court directed the government to deliver a copy of Volume II to the Court for *in camera* review in order to "facilitate" its consideration of the Emergency Motion. ECF No. 705. The Court and designated counsel for the parties discussed "specified contents of Volume II" during a closed portion of the hearing, ECF No. 714 at 4 n.6.[13] And in issuing the January 21 Order, the Court made clear that its *in camera* review of Volume II was integral to deciding the motion. ECF No. 714 at 2, 5 n.8 (dismissing as "startling" the argument that the Court's review of Volume II was unnecessary). Volume II is a judicial document for purposes of the common law right of access because it was submitted to the Court in connection with a motion that invoked the Court's powers. The fact that the Court's adjudication of the motion was based on its review of the document, and on its exchange with the parties about the document, only underscores that the document is a judicial record.

That Volume II includes some Rule 16 discovery material is not determinative of whether a right of access attaches. First, the report was submitted to the Court "in connection with [a] pretrial motion that required judicial resolution on the merits." *Callahan*, 17 F.4th at 1361–62; *id.* at 1362 (explaining that "though discovery materials do not automatically qualify as judicial records subject to the common-law right of access, they take on that status once they are filed in connection with a substantive motion"). Second, discovery material provided by the government to a defendant in a criminal case is subject to a right of access in the circumstances presented here. *See United States v. Wecht*, 484 F.3d 194, 210 (3d Cir. 2007) ("The process by which the

---

[13] That part of the hearing was properly closed to the public in order to "preserve Defendants' fair trial rights and to fully respect protective orders previously entered in this case." ECF No. 705. But, as explained above, the reasons cited for the closure of the hearing and the injunction against disclosure of the report do not justify suppression of Volume II today.

government investigates and prosecutes its citizens is an important matter of public concern," which distinguishes discovery in criminal cases from "traditional civil discovery between private parties."); *Comm'r, Ala. Dep't of Corr.*, 918 F.3d at 1167 (explaining that material submitted with civil discovery motions is excluded from the common law right of access, because civil discovery is "essentially a private process meant to assist trial preparation" (cleaned up)).

Where the presumptive right of access attaches, it can be overcome only by "a showing of good cause, which requires balancing . . . the public interest in accessing court documents against a party's interest in keeping the information confidential." *Romero*, 480 F.3d at 1246. The showing required is substantial, because the Eleventh Circuit is "resolute in [its] enforcement of the presumption." *Callahan*, 17 F.4th at 1359. In other words, the "balance of competing interests" must take into account the "historic presumption of access to judicial records." *Newman v. Graddick*, 696 F.2d 796, 803 (11th Cir. 1983). To assess whether good cause exists, "courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." *Romero*, 480 F.3d at 1246. Courts also consider whether the records are sought for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage, whether access is likely to promote public understanding of historically significant events, and whether the press has already been permitted substantial access to the contents of the records." *Newman*, 696 F.2d at 803.

The public's right of access to Volume II is not overcome by good cause. Indeed, now that the charges against Defendants have been dismissed with prejudice, all of the factors weigh in

favor of release. First, Volume II concerns a public official of the highest rank—the current and former president. Second, Volume II addresses a matter of public concern—the investigation and prosecution of a former president for the alleged willful retention of military secrets in violation of the Espionage Act. Third, public access to Volume II would "promote public understanding of historically significant events," because it contains a wealth of information about the investigation and prosecution of President Trump that has not been made public. *Newman*, 696 F.2d at 803. Fourth, the Knight Institute is not seeking public access to Volume II for "illegitimate purposes," such as "promot[ing] public scandal"; it seeks the report to further its own organizational mission and to inform the public about matters that are of manifest public importance and historical significance. *Newman*, 696 F.2d at 803; Diakun Decl. ¶ 2.[14] Finally, it is unlikely that the release of Volume II will cause significant injury to Defendants' reputation or public standing beyond the injury that has already resulted from the publicly filed indictment, which accused Defendants of a profound betrayal of public trust and included copious information to justify the accusation. If Defendants wish to respond to the report when it is released, President Trump possesses a singularly powerful platform from which to do so on his own behalf and that of his former-and-still-current employees. In these circumstances, any concerns about private injury are vastly outweighed by the public interest in Volume II's disclosure.

## V.   The Public Also Has a First Amendment Right of Access to Volume II.

The Supreme Court has repeatedly recognized a qualified First Amendment right of access to criminal trials and pretrial proceedings. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555

---

[14] It bears emphasis that the Institute is seeking a version of Volume II redacted to remove any grand jury material protected by Fed. R. Crim. P. 6(e). The Special Counsel created a redacted version of Volume II to remove Rule 6(e) material, and the Institute does not oppose the Court making additional redactions to the report if those redactions are necessary to protect a compelling governmental interest and otherwise consistent with the requirements of the First Amendment.

(1980); *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982) (criminal

trials); *Press-Enterprise Co. v. Superior Ct. of Cal.* (*Press-Enterprise I*), 464 U.S. 501 (1984) (jury

*voir dire* hearings); *Press-Enterprise Co. v. Superior Ct. of Cal.* (*Press-Enterprise II*), 478 U.S. 1

(1986) (preliminary hearings). Underlying this right of access, the Court has explained, is "the

common understanding that a major purpose of [the First] Amendment was to protect the free

discussion of governmental affairs," so that "the individual citizen can effectively participate in

and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604.

Applying these decisions and the Supreme Court's "experience and logic" test, lower

federal courts have recognized a qualified First Amendment right of access to pretrial criminal

proceedings, and to court documents submitted in connection with those proceedings. *See David

S. Ardia, Court Transparency and the First Amendment*, 38 Cardozo L. Rev. 835, 909 (2017)

("lower courts have held that a First Amendment right of access applies to almost all pretrial, mid-

trial, and post-trial criminal proceedings" (collecting cases)); *see also In re Hearst Newspapers,

L.L.C.*, 641 F.3d 168, 176 (5th Cir. 2011) ("The courts of appeals have . . . recognized a First

Amendment right of access to various proceedings within a criminal prosecution," including bail,

suppression, due process, entrapment, plea, and sentencing hearings. (collecting cases)); *United

States v. Slough*, 677 F. Supp. 2d 296, 298 (D.D.C. 2010) (holding that the First Amendment right

of access attaches "to many pretrial hearings in criminal matters . . . [and] extends to documents

and other materials submitted in connection with such hearings"); *Bennett v. United States*, No.

12-61499-CIV, 2013 WL 3821625, at *3 (S.D. Fla. July 23, 2013) ("Most courts, including the

Eleventh Circuit, have found a qualified First Amendment right of access to court documents" (citing *Brown v. Advantage Eng'g*, 960 F.2d 1013, 1015–16 (11th Cir. 1992))).[15]

The qualified First Amendment right of access serves essentially the same interests that the common law right of access serves. First, as noted above, it facilitates an informed discussion of governmental affairs by providing the public with a more complete understanding of the judicial system. *Globe Newspaper*, 457 U.S. at 604–05. Second, it acts as "an effective restraint on possible abuse of judicial power" by subjecting the proceedings "to contemporaneous review in the forum of public opinion." *Richmond Newspapers*, 448 U.S. at 596 (Brennan, J., concurring in the judgment). Third, it "fosters an appearance of fairness, thereby heightening public respect for the judicial process," *Globe Newspaper*, 457 U.S. at 606, because "people not actually attending [the hearings] can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press-Enterprise I*, 464 U.S. at 508 (emphasis in original).

Once the qualified access right attaches, a proceeding may be closed or a document sealed only when "the party requesting closure . . . demonstrate[s] that such action is 'necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.'" ECF No. 283 at 4 (quoting *Globe Newspaper*, 457 U.S. at 607). Thus, "a party seeking to seal or redact court filings . . . carries a heavy burden." *Id.* at 3. "Further, in ordering that documents be sealed from public view, a district court must set forth the specific legal and factual basis for such an order." *Id.* at 5; *see also Press-Enterprise II*, 478 U.S. at 13 (requiring a court to make "specific, on-the-

---

[15] Grand jury proceedings are the exception, *In re Subpoena to Testify Before Grand Jury Directed to Custodian of Records*, 864 F.2d 1559, 1561–63 (11th Cir. 1989), but that exception is not relevant here because the Knight Institute is not seeking release of information properly protected by Rule 6(e).

record findings" justifying closure). The court must consider whether reasonable alternatives to closure would adequately protect the compelling interest at issue. *Press-Enterprise II*, 478 U.S. at 14. When court documents are at issue, one such alternative courts must consider is redaction. *See, e.g.*, *Oregonian Pub. Co. v. U.S. Dist. Court for Dist. of Or.*, Nos. 91-70622 & CV-86-961-MA,1991 WL 321057, at *1 (9th Cir. Dec. 5, 1991).

There is no compelling interest in keeping the redacted version of Volume II from the public, for reasons already explained. While the Supreme Court has recognized that the Sixth Amendment right to a fair trial is a compelling interest that can justify closure in some circumstances, *Press–Enterprise I*, 464 U.S. at 510–11, Defendants no longer have any such interest given that all criminal charges against them have been dismissed with prejudice. Further, release of Volume II would inform the public about the character and actions of the nation's highest official, about one of the most significant criminal investigations in American history, and about DOJ's understanding of the Espionage Act, a statute with broad implications for free speech. In other words, public access would facilitate the "free discussion of governmental affairs" and enhance the public's ability to "participate in and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604.

## CONCLUSION

For the foregoing reasons, the Court should grant the Knight Institute's Motion to Intervene, rescind the January 21 Order, and direct the clerk to file on the public docket the redacted version of Volume II that DOJ submitted to the Court in advance of the January 17, 2025 hearing on Defendants' Emergency Motion.

## CERTIFICATE OF CONFERRAL

Pursuant to Local Rule 7.1(a)(2), I hereby certify that counsel for the movant has sought conferral with all parties or nonparties who may be affected by the relief sought in this motion—including counsel for the United States, the three former Defendants, and prospective intervenor American Oversight—in a good faith effort to resolve the issues but has been unable to resolve them.

On February 20, 2025, at 6:18 p.m., counsel for movant emailed counsel for the United States, counsel for the three former Defendants, and counsel for American Oversight, advising them of the nature of Prospective Intervenor's motion and the relief sought. Counsel for movant requested responses by the end of the day on Friday, February 21, with any position their clients took on the motion or if there was any possibility that the issue could "be resolved expeditiously without requiring the Knight Institute's intervention in the proceedings."

On February 21, at 7:24 a.m., counsel for Mr. Nauta informed counsel for movant that the email addressee list did not include present counsel for the United States. On February 21, at 10:22 a.m., counsel for movant added to the email chain present counsel for the United States Hayden O'Byrne, the United States Attorney for the Southern District of Florida, informing him of the motion to intervene. At 11:11 a.m. that same day, counsel for movant also added Peter Forand, the Chief of the Criminal Division in the U.S. Attorney's Office in the Southern District of Florida, to the email chain.

On February 21, at 10:32 a.m., Counsel for Mr. Nauta responded: "On behalf of Waltine Nauta, we oppose your application to intervene in this case and to seek other relief. We will respond in full and reserve all rights. We do not agree with your characterization of the Court's Order of January 21, 2025 and we refer you to the Court's Order of February 18, 2025, addressing

the application by American Oversight. Counsel for Carlos De Oliveira have authorized me to state that they join in this conferral statement concerning your motion."

Counsel for movant have received no response from counsel for the United States or counsel for former Defendant President Donald Trump.

Dated: February 24, 2025     Respectfully submitted,

_David M. Buckner Esq._
David M. Buckner Esq.
Florida Bar No.: 60550
Buckner + Miles
2020 Salzedo Street
Suite 302
Coral Gables FL 33134
Phone: (305) 964-8003
david@bucknermiles.com

Scott Wilkens (*pro hac vice* pending)
Anna Diakun (*pro hac vice* pending)
Jameel Jaffer (*pro hac vice* pending)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, N.Y. 10115
Phone: (646) 745-8500
scott.wilkens@knightcolumbia.org

*Counsel for Prospective Intervenor Knight*
*  First Amendment Institute at Columbia*
*  University*

## CERTIFICATE OF SERVICE

I, David Buckner, do hereby certify that I have filed the foregoing Motion of the Knight

First Amendment Institute at Columbia University to Intervene to Seek Rescission of the Court's

January 21, 2025 Order and Public Release of Volume II of the Special Counsel's Report by hand

with the Clerk of the Court for the United States District Court for the Southern District of Florida

on February 24, 2025.

Dated: February 24, 2025

Respectfully submitted,

David M. Buckner, Esq.
Florida Bar No. 60550
Buckner + Miles
2020 Salzedo Street
Suite 302
Coral Gables FL 33134
(305) 964-8003

*Counsel for Prospective Intervenor*

# Exhibit A

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

### CASE NO.: 23-CR-80101-AMC

UNITED STATES OF AMERICA,

    Plaintiff,

 v.

DONALD J. TRUMP, WALTINE NAUTA,
and CARLOS DE OLIVEIRA,

    Defendants.

---

## DECLARATION OF ANNA DIAKUN
## IN SUPPORT OF MOTION BY PROSPECTIVE INTERVENOR THE KNIGHT FIRST
## AMENDMENT INSTITUTE AT COLUMBIA UNIVERISTY

I, Anna Diakun, a member of the Bar of the State of New York, declare under penalty of perjury as follows.

1.  I am an attorney with the Knight First Amendment Institute at Columbia University ("Knight Institute" or "Institute"). I submit this declaration in support of the Knight Institute's Motion to Intervene to Seek Rescission of the Court's January 21, 2025 Order and Public Release of Volume II of the Special Counsel's Report. I make this declaration based on my personal knowledge.

2.  The Knight Institute is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, policy analysis, and public education. One of the Knight Institute's core priorities is ensuring access to information necessary for self-government, allowing the public to hold the powerful to account.

1

3.      On January 26, 2025, the Knight Institute submitted a Freedom of Information Act

Request to the Department of Justice ("DOJ") seeking "a copy of Volume Two of the Final Report

on the Special Counsel's Investigations and Prosecutions, referenced in Special Counsel Jack

Smith's January 7, 2025 letter to Attorney General Merrick B. Garland." The Knight Institute

requested expedited processing on the grounds that it is an organization "primarily engaged in

disseminating information" and there is a "compelling need" for Volume II because it contains

information "urgent[ly]" needed to "inform the public concerning actual or alleged Federal

Government activity," citing 5 U.S.C. § 552(a)(6)(E)(v)(II). A true and correct copy is attached as

Exhibit 1.

4.      By letter dated January 28, 2025, DOJ acknowledged receipt of the request and

assigned it tracking number FOIA-2025-02206. DOJ denied the Knight Institute's request for

expedited processing, explaining that "[t]his Office cannot identify a particular urgency to inform

the public about an actual or alleged federal government activity beyond the public's right to know

about government activities generally." A true and correct copy of DOJ's letter denying expedited

processing is attached as Exhibit 2.

5.      On February 6, 2025, DOJ responded to the Knight Institute's request. In relevant

part, DOJ stated that:

> Volume II of the Report should be withheld in full because it is protected from
> disclosure by a court injunction issued by the United States District Court for
> the Southern District of Florida, West Palm Beach Division. In this instance,
> the Office of Information Policy (OIP) lacks authority to consider the
> releasability of this information under the FOIA. *See GTE Sylvania, Inc. v.
> Consumers Union*, 445 U.S. 375, 384-86 (1980) (finding "no discretion for the
> agency to exercise" where records are subject to injunction issued by federal
> district court).
>
> Furthermore, please be advised that the records you have requested, in
> particular, Volume II of the Report, relate to the proceedings in *USA v. Waltine
> Nauta & Carlos De Oliveira*, No. 23-cr-80101 (S.D.F.L. filed June 8, 2023) and

*USA v. Trump, et al.*, No. 24-12311 (11th Cir. docketed July 18, 2024), both of which are still pending before those respective courts at this time. As such, Volume II of the Report is currently also being withheld in full pursuant to Exemption 7(A) of the FOIA, 5 U.S.C. §552(b)(7)(A). Exemption 7(A) pertains to records or information compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement proceedings.

A true and correct copy of DOJ's response denying the Knight Institute's FOIA request is attached as Exhibit 3.

      6.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 22, 2025.

Respectfully submitted,

/s/ Anna Diakun
Anna Diakun (*pro hac vice* pending)
Knight First Amendment Institute at
  Columbia University
475 Riverside Drive, Suite 302
New York, N.Y. 10115
(646) 745-8500
anna.diakun@knightcolumbia.org

*Counsel for Prospective Intervenor Knight
First Amendment Institute at Columbia
University*

3

421

# Exhibit 1



**KNIGHT
FIRST AMENDMENT
INSTITUTE at
COLUMBIA UNIVERSITY**

475 Riverside Drive, Suite 302
New York, NY 10115

(646) 745-8500
info@knightcolumbia.org

January 26, 2025

FOIA/PA Mail Referral Unit
Justice Management Division
Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530-0001
MRUFOIA.Requests@usdoj.gov

Office of the Attorney General
c/o Douglas Hibbard
Chief, Initial Request Staff
Office of Information Policy
Department of Justice
6th Floor
441 G St NW
Washington, DC 20530

      Re:    **Freedom of Information Act Request**
              **Expedited Processing Requested**

To whom it may concern,

    The Knight First Amendment Institute at Columbia University ("Knight Institute" or "Institute")[1] submits this request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for a copy of Volume Two of the January 7, 2025 Final Report on the Special Counsel's Investigations and Prosecutions, which concerns the classified documents case brought against President Trump and two of his associates, Walt Nauta and Carlos De Oliveira.

---

    [1] The Knight First Amendment Institute is a New York not-for-profit corporation based at Columbia University that works to preserve and expand the freedoms of speech and the press through strategic litigation, research, and public education.

## I. Background

On June 8, 2023, President Trump was indicted on thirty-seven felony charges, including thirty-one alleged violations of the Espionage Act, 18 U.S.C. § 793(e).[2] The charges stemmed from Trump's alleged willful retention of classified documents at Mar-a-Lago long after he left office on January 20, 2021, despite repeated requests by the National Archives and Records Administration for their return.[3] Prosecutors also charged one of Trump's associates, Walt Nauta, as a co-conspirator.[4] They later added a second Trump associate, Carlos De Oliveira, along with additional charges, in a superseding indictment.[5]

This unprecedented case was brought by Department of Justice ("DOJ") Special Counsel Jack Smith. Though the FBI first opened its investigation on March 30, 2022,[6] Attorney General Merrick B. Garland appointed Smith to lead the investigation—along with another investigation related to election interference—on November 18, 2022, soon after Trump announced that he would be running for reelection.[7] According to the Attorney General, Smith's appointment "underscore[d] the Department's commitment to both independence and accountability in particularly sensitive matters" and would "allow[] prosecutors and agents . . . to make decisions indisputably guided only by the facts and the law."[8]

DOJ regulations require those appointed as Special Counsel, once their work is complete, to provide a report to the Attorney General explaining the ultimate decision to prosecute or not to prosecute. 28 C.F.R. § 600.8(c). Smith submitted his final report relating to both of

---

[2] Michael R. Sisak, Jill Colvin & Lindsay Whitehurst, *A Timeline of Events Leading to Donald Trump's Indictment in the Classified Documents Case*, Associated Press, https://apnews.com/article/trump-documents-investigation-timeline-087f0c9a8368bb983a16b67dd31dcd4c (June 10, 2023); Indictment at 28–41, *U.S. v. Trump*, 736 F. Supp. 3d 1206 (S.D. Fl. 2024) (No. 23-80101-AMC), ECF No. 3.

[3] *Id.*

[4] Alan Feuer, Maggie Haberman & Glenn Thrush, *Trump Faces Major New Charges in Documents Case*, N.Y. Times (July 27, 2023), https://www.nytimes.com/2023/07/27/us/politics/trump-documents-carlos-de-oliveira-charged.html.

[5] Superseding Indictment, *U.S. v. Trump*, 736 F. Supp. 3d 1206 (S.D. Fl. 2024) (No. 23-80101-AMC), ECF No. 85.

[6] Sisak et al., *A Timeline of Events Leading to Donald Trump's Indictment in the Classified Documents Case*, supra n.2.

[7] Press Release, Off. of Pub. Affs., U.S. Dep't of Just., Appointment of a Special Counsel (Nov. 18, 2022), https://www.justice.gov/opa/pr/appointment-special-counsel-0.

[8] *Id.*

2

424

his investigations to the Attorney General on January 7, 2025.[9] Though DOJ has publicly released Volume One of the report, about the election interference case against Trump, it has not released Volume Two, about the classified documents case. In a January 8 letter to the House and Senate Judiciary Committees, Attorney General Garland explained that he had determined that Volume Two should not be made public while the criminal cases against Nauta and Oliveira were pending, but that it would "be in the public interest" to publish that volume once the criminal proceedings concluded.[10]

The information contained within Volume Two is of profound importance to the public. The public has a compelling interest in knowing the full results of the Special Counsel's investigation, including the factual findings and legal and policy considerations that led the Special Counsel to charge President Trump, who has recently reassumed office. The report may also shed light on DOJ's interpretation of the Espionage Act, a statute that has shaped public discourse about national security for more than a century.[11] The Knight Institute seeks Volume Two of the report to inform the public about these critical issues.

## II.  Record requested

The Knight Institute requests a copy of Volume Two of the Final Report on the Special Counsel's Investigations and Prosecutions, referenced in Special Counsel Jack Smith's January 7, 2025 letter to Attorney General Merrick B. Garland.[12]

We ask that you disclose all segregable portions of the record sought. *See* 5 U.S.C. § 552(b). We also ask that you provide the record in its native file format. *See* 5 U.S.C. § 552(a)(3)(B). Alternatively, please provide the record electronically in a text-searchable, static-image format (e.g., PDF), in the best image quality in the agency's possession.

---

[9] Letter from Jack Smith, Special Counsel, U.S. Dep't of Just., to Merrick B. Garland, Attorney General, U.S. Dep't of Justice (Jan. 7, 2025), https://www.justice.gov/storage/Report-of-Special-Counsel-Smith-Volume-1-January-2025.pdf.

[10] Letter from Merrick B. Garland, Attorney General, U.S. Dep't of Just., to Sen. Charles Grassley, Chairman, Committee on the Judiciary, et al. (Jan. 8, 2025), https://www.justice.gov/sco-smith/media/1383641/dl.

[11] *See, e.g.*, Jameel Jaffer, *The Espionage Act Has Been Abused—But Not in Trump's Case*, Politico (Aug. 17, 2022), https://www.politico.com/news/magazine/2022/08/17/the-espionage-act-has-a-dark-history-prosecuting-trump-would-be-legit-00052376.

[12] Letter from Jack Smith to Merrick B. Garland, *supra* n.8.

3

### III. Application for expedited processing

The Knight Institute requests expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E). There is a "compelling need" for the document sought because the information it contains is "urgent[ly]" needed by an organization primarily engaged in disseminating information "to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(II).

> A. *The Knight Institute is primarily engaged in disseminating information in order to inform the public about actual or alleged government activity.*

The Knight Institute is "primarily engaged in disseminating information" within the meaning of FOIA. 5 U.S.C. § 552(a)(6)(E)(v)(II).

The Knight First Amendment Institute was established at Columbia University to defend and strengthen the freedoms of speech and the press in the digital age. Research and public education are essential to the Institute's mission.[13] Obtaining information about government activity, analyzing that information, and publishing and disseminating it to the press and public are among the core activities the Institute performs. *See ACLU v. DOJ*, 321 F. Supp. 2d 24, 29 n.5 (D.D.C. 2004) (finding non-profit public interest group that "gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw material into a distinct work, and distributes that work to an audience" to be "primarily engaged in disseminating information" (citation omitted)).

> B. *The record sought is urgently needed to inform the public about actual or alleged government activity.*

The document sought is urgently needed to inform the public about actual or alleged government activity. *See* 5 U.S.C. § 552(a)(6)(E)(v)(II). Specifically, the requested record provides a detailed explanation of the Special Counsel's investigation of Trump's alleged unlawful retention of classified documents. It also discusses DOJ's interpretation of relevant law, including the Espionage Act, and the legal and policy considerations that led the Special Prosecutor to bring these charges.[14]

---

[13] Mike McPhate, *Columbia University to Open a First Amendment Institute*, N.Y. Times (May 17, 2016), https://perma.cc/YC9M-LUAD; James Rosen, *New Institute Aspires to Protect First Amendment in Digital Era*, McClatchy DC (May 20, 2016), https://perma.cc/ZS2K-FPED.

[14] *See generally* Special Counsel Jack Smith, Volume One: The Election Case, Final Report on the Special Counsel's Investigations and Prosecutions (Jan. 7, 2025), https://www.justice.gov/storage/Report-of-Special-Counsel-Smith-Volume-1-January-2025.pdf (supplying analogous information about Special Counsel's investigation into election interference).

Disclosure of Volume Two of the report is urgently needed to help the public more fully understand the Special Counsel's decision to charge Trump with violations of the Espionage Act.[15] Volume Two will also illuminate DOJ's understanding of the scope and application of the Espionage Act, which has been used in recent years to prosecute government employees who disclose national security information to members of the press. Understanding DOJ's interpretation of this law is especially urgent now, given widespread fear that the Trump administration will use the Espionage Act with even greater frequency against government leakers, and perhaps even against journalists themselves.[16]

The public interest would be served by the disclosure of Volume Two of the report, as Attorney General Garland observed in his January 8 letter to the House and Senate Judiciary Committees.

For these reasons, the Knight Institute is entitled to expedited processing.

## IV. Application for waiver or limitation of fees

The Knight Institute requests a waiver of document search, review, and duplication fees on the grounds that disclosure of the requested record "is in the public interest because it is likely to contribute significantly to the public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

For the reasons explained above, disclosure of the record would be in the public interest. Moreover, disclosure would not further the Knight Institute's commercial interest. The Institute will make any information disclosed available to the public at no cost. Thus, a fee waiver would further Congress's legislative intent in amending FOIA to ensure "that it [is] liberally construed in favor of waivers for noncommercial requesters." *See Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003).

The Knight Institute also requests a waiver of search and review fees on the grounds that it qualifies as an "educational . . . institution" whose purposes include "scholarly . . . research" and the record is not

---

[15] Julian E. Barnes, *What Is the Espionage Act and How Has It Been Used?*, N.Y. Times (Aug. 15, 2022), https://www.nytimes.com/2022/08/15/us/politics/espionage-act-explainer-trump.html.

[16] *See, e.g.*, Gabe Rottman, *How Press Freedoms Could Fare Under the Second Trump Administration*, L.A. Times (Dec. 26, 2024), https://www.latimes.com/opinion/story/2024-12-26/journalist-leak-investigations-donald-trump.

sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II). The Institute has a substantial educational mission. Situated within a prominent academic research university, the Institute performs scholarly research on the application of the First Amendment in the digital era. The Institute's research program brings together academics and practitioners of different disciplines to study contemporary First Amendment issues and offer informed, non-partisan commentary and solutions. It publishes that commentary in many forms, including in scholarly publications and in short-form essays.

Finally, the Knight Institute also requests a waiver of search and review fees on the grounds that it is a "representative[] of the news media" within the meaning of FOIA and the record is not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(II).

The Institute meets the statutory definition of "a representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii); *see also Nat'l Sec. Archive v. DOD*, 880 F.2d 1381, 1387 (D.C. Cir. 1989) (finding that an organization that gathers information, exercises editorial discretion in selecting and organizing documents, "devises indices and finding aids," and "distributes the resulting work to the public" is a "representative of the news media" for purposes of the FOIA). Courts have found other non-profit organizations, whose mission of research and public education is similar to that of the Knight Institute, to be "representatives of the news media." *See, e.g., Serv. Women's Action Network v. DOD*, 888 F. Supp. 2d 282, 287–88 (D. Conn. 2012) ("[O]rganizations like the ACLU are regularly granted news representative status."); *Judicial Watch, Inc. v. DOJ*, 133 F. Supp. 2d 52, 53–54 (D.D.C. 2000) (finding Judicial Watch, self-described as a "public interest law firm," a news media requester).

For these reasons, the Knight Institute is entitled to a fee waiver.

*     *     *

Thank you for your attention to this request. I would be happy to discuss its terms with you over the phone or via email to clarify any aspect of it.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

/s/ Anna Diakun
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115

6

(646) 745-8500
anna.diakun@knightcolumbia.org

7

# Exhibit 2



**U.S. Department of Justice**

Office of Information Policy

*Sixth Floor*
*441 G Street, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

January 28, 2025

Anna Diakun
Knight First Amendment Institute at Columbia University
475 Riverside Drive
Suite 302
New York, NY 10115                        Re:      FOIA-2025-02206
anna.diakun@knightcolumbia.org                    DRH:ERH:GMG

Dear Anna Diakun:

        This is to acknowledge receipt of your Freedom of Information Act (FOIA) request
dated January 26, 2025, and received in this Office on January 27, 2025, in which you
requested a copy of Volume II of the Report of Special Counsel Jack Smith.

        You have requested expedited processing of your request pursuant to the Department's
standard permitting expedition for requests involving "[a]n urgency to inform the public about
an actual or alleged federal government activity, if made by a person primarily engaged in
disseminating information." See 28 C.F.R. § 16.5(e)(1)(ii) (2018). Based on the information
you have provided, I have determined that your request for expedited processing under this
standard should be denied. This Office cannot identify a particular urgency to inform the
public about an actual or alleged federal government activity beyond the public's right to know
about government activities generally. Please be advised that, although your request for
expedited processing has been denied, it has been assigned to an analyst in this Office and our
processing of it has been initiated.

        To the extent that your request requires a search in another Office, consultations with
other Department components or another agency, and/or involves a voluminous amount of
material, your request falls within "unusual circumstances." See 5 U.S.C. § 552 (a)(6)(B)(i)-
(iii) (2018). Accordingly, we will need to extend the time limit to respond to your request
beyond the ten additional days provided by the statute. For your information, we use multiple
tracks to process requests, but within those tracks we work in an agile manner, and the time
needed to complete our work on your request will necessarily depend on a variety of factors,
including the complexity of our records search, the volume and complexity of any material
located, and the order of receipt of your request. At this time we have assigned your request to
the complex track. In an effort to speed up our process, you may wish to narrow the scope of
your request to limit the number of potentially responsive records so that it can be placed in a
different processing track. You can also agree to an alternative time frame for processing,
should records be located, or you may wish to await the completion of our records search to

-2-

discuss either of these options.  Any decision with regard to the application of fees will be made only after we determine whether fees will be implicated for this request.

If you have any questions, wish to discuss reformulation or an alternative time frame for the processing of your request, or if you require further assistance regarding any aspect of your request, you may contact our FOIA Public Liaison, Valeree Villanueva, at: Office of Information Policy, United States Department of Justice, Sixth Floor, 441 G Street, NW, Washington, DC 20530-0001; telephone at 202-514-3642.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, MD 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with this Office's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy, United States Department of Justice, Sixth Floor, 441 G Street, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.  Your appeal must be postmarked or electronically submitted within ninety days of the date of my response to your request.  If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."  If possible, please provide a copy of your original request and this response letter with your appeal.

Sincerely,

Douglas R. Hibbard
Chief, Initial Request Staff

# Exhibit 3



**U.S. Department of Justice**

Office of Information Policy

*Sixth Floor*
*441 G Street, NW*
*Washington, DC 20530-0001*

*Telephone: (202) 514-3642*

February 6, 2025

Anna Diakun
Knight First Amendment Institute at Columbia University
Suite 302
475 Riverside Drive
New Yor, NY 10115                    Re:  FOIA-2025-02206
anna.diakun@knightcolumbia.org              DRH

Dear Anna Diakun:

This responds to your Freedom of Information Act (FOIA) request dated January 26, 2025, and received in this Office on January 27, 2025, seeking a copy of Volume II of the Report of Special Counsel Jack Smith (the Report).

At this time, I have determined that Volume II of the Report should be withheld in full because it is protected from disclosure by a court injunction issued by the United States District Court for the Southern District of Florida, West Palm Beach Division. In this instance, the Office of Information Policy (OIP) lacks authority to consider the releasability of this information under the FOIA. See GTE Sylvania, Inc. v. Consumers Union, 445 U.S. 375, 384-86 (1980) (finding "no discretion for the agency to exercise" where records are subject to injunction issued by federal district court).

Furthermore, please be advised that the records you have requested, in particular, Volume II of the Report, relate to the proceedings in USA v. Waltine Nauta & Carlos De Oliveira, No. 23-cr-80101 (S.D.F.L. filed June 8, 2023) and USA v. Trump, et al., No. 24-12311 (11th Cir. docketed July 18, 2024), both of which are still pending before those respective courts at this time. As such, Volume II of the Report is currently also being withheld in full pursuant to Exemption 7(A) of the FOIA, 5 U.S.C. §552(b)(7)(A). Exemption 7(A) pertains to records or information compiled for law enforcement purposes, the release of which could reasonably be expected to interfere with enforcement proceedings.

In making the above determinations, we have considered the foreseeable harm standard.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S.C. § 552(c) (2018). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

-2-

You may contact our FOIA Public Liaison, Valeree Villanueva, for any further assistance and to discuss any aspect of your request at: Office of Information Policy, United States Department of Justice, Sixth Floor, 441 G Street, NW, Washington, DC 20530-0001; telephone at 202-514-3642.

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer.  The contact information for OGIS is as follows:  Office of Government Information Services, National Archives and Records Administration, Room 2510, 8601 Adelphi Road, College Park, MD 20740-6001; e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448.

If you are not satisfied with this Office's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy, United States Department of Justice, Sixth Floor, 441 G Street, NW, Washington, DC 20530-0001, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal.  Your appeal must be postmarked or electronically submitted within ninety days of the date of my response to your request.  If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."  If possible, please provide a copy of your original request and this response letter with your appeal.

Sincerely,

Douglas Hibbard
Chief, Initial Request Staff

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON(s)**

UNITED STATES OF AMERICA,

Plaintiff,

v.

DONALD J. TRUMP, WALTINE NAUTA,
and CARLOS DE OLIVEIRA,

Defendants.

---

**[PROPOSED] ORDER**

Upon consideration of prospective intervenor Knight First Amendment Institute at Columbia University's Motion to Intervene to Seek Rescission of the Court's January 21, 2025 Order and Public Release of Volume II of the Special Counsel's Report, it is this ___ day of _____, 2025, hereby:

**ORDERED** that the Motion to Intervene is **GRANTED**, and it is further

**ORDERED** that this Court's January 21, 2025 Order is rescinded, and

The Clerk is directed to file on the public docket the redacted version of Volume II that Plaintiff submitted to the Court in advance of the Court's January 17, 2025 hearing.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this ____ day of _____ ___, 2025.

_____
The Honorable Aileen M. Cannon
United States District Court Judge

436

TAB 738

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 738

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.   9:23-CR-80101-CANNON**

UNITED STATES OF AMERICA,

v.

WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

                        **Defendants.**
_____/

**JOINT STATUS REPORT**

The remaining parties to this litigation, the United States, Waltine Nauta, and Carlos De

Oliveira, hereby file this Joint Status Report with the Court.

***Agreed Upon Positions of the Parties Regarding the Release of Volume II***

The United States does not object to the Court keeping its order enjoining the Attorney

General of the United States and the Department of Justice from releasing Volume II outside the

Department of Justice, or sharing any information contained in Volume II with anyone outside the

Department of Justice, in place.  The United States understands and appreciates the arguments

made by Waltine Nauta and Carlos De Oliveira regarding the prejudice they would suffer if

Volume II were to be released.

The United States, Waltine Nauta, and Carlos De Oliveira also agree that under no

circumstances should the Court *order* the release of Volume II of Jack Smith's confidential Final

Report.[1]

_____

[1] The United States, Waltine Nauta, and Carlos De Oliveira also agree that the pending motions
to intervene filed by American Oversight and Knight Institute should be denied.  The United
States, Waltine Nauta, and Carlos De Oliveira will address the arguments presented by American
Oversight and Knight Institute in their respective responses to the pending motions to intervene.

1

437

The United States, Waltine Nauta, and Carlos De Oliveira further agree that *if* the Court lifts its Injunction Order, the Court should require the Department of Justice to provide written notice to counsel for Waltine Nauta and counsel for Carlos De Oliveira sixty days prior to releasing a redacted version of Volume II outside the Department of Justice. This would allow the defendants to seek appropriate relief from this Court, if the Attorney General ever expresses an intention to release Volume II outside the Department of Justice.

### United States' Positions Regarding the Release of Volume II

In the event the Court is inclined to lift the Injunction Order, the United States submits the decision to release Volume II to outside the Department of Justice should rest with the sound discretion of the Attorney General of the United States. *See* 28 C.F.R. §§ 600.8(c), 600.9(c). The United States recognizes that when the Court entered its Injunction Order, Waltine Nauta and Carlos De Oliveira still faced the prospect of criminal trials on the charges contained in the Superseding Indictment. The Court's Injunction Order was necessary and appropriate. At this juncture, the United States Attorney's Office for the Southern District of Florida does not intend to revive the charges brought by Special Counsel Smith, and the Attorney General of the United States has not expressed an intent to release Volume II outside the Department of Justice. If the Court is inclined to lift the Injunction Order, it is the Attorney General's prerogative to determine whether the release of Volume II "would be in the public interest[.]" 28 C.F.R. § 600.9(c).

The Court should also decline any invitation to conduct an *in camera* review of the grand jury materials related to this prosecution. The Attorney General has not ordered the release of Volume II, nor has any court of competent jurisdiction ordered the Department of Justice to release Volume II. Unless and until either of those contingencies comes to fruition, it would be premature for the Court to engage in a Rule 6(e) analysis. Moreover, this Court has held that Jack Smith's

2

438

appointment violated the Appointments Clause of the United States Constitution, and therefore his investigation was invalid.  Finaly, the Department of Justice, not the Court, is responsible for redacting any grand jury material in Volume II.

### *Positions of Waltine Nauta and Carlos De Oliveira Regarding the Release of Volume II*

Mr. Nauta and Mr. De Oliveira agree that a desirable resolution is one that would avoid the arduous task of dissecting Volume II of the unconstitutional Special Counsel's report to identify and seek protection for additional 6(e) and other confidential information.  They also agree that the Court should not order the Attorney General to release the Report.   They agree that if the Court decides to dissolve its Order enjoining the release of the Report, it would be appropriate to require the Justice Department to first provide them with sixty days' notice in the event of any form of release of the Report, so that they could seek appropriate relief from this Court.   They appreciate and do not dispute that the Attorney General has given no indication that she intends to release the Report, and that the United States Attorney's Office for the Southern District of Florida does not intend to revive the charges brought by former alleged Special Counsel Jack Smith.

However, the statute of limitations has not yet expired in this matter, and Mr. Nauta and Mr. De Oliveira respectfully request that the Court maintain its supervision over this exceptionally complex case and continue to enjoin the release of the Report, and that doing so would not be a usurpation of the Attorney General's authority to release or withhold the Report under DOJ's Special Counsel regulations.   To start, permitting the release of the one-sided Report would also amount to an unjust use of court-controlled grand jury processes to effect further disparagement of Mr. Nauta and Mr. De Oliveira, who remain bound by the Court's Rule 16 Protective Order (ECF No. 27) precluding them from effectively defending themselves against the recently-evaporated Special Counsel's allegations and who now lack the protections afforded by trial rights

3

including compulsory process.[2]   They endured approximately a year-and-a-half of rampant pretrial publicity and vilification after their indictments were sought by an unconstitutionally appointed prosecutor with unconstitutionally limitless funding, who then went on to use the materials he collected in his unlawful investigation (at continued unconstitutional expense) to craft the Report intended to justify his actions.   Allowing the Government to release a one-sided defense of such an impermissible prosecution while effectively tying the hands of the defense at this stage of the matter would violate Mr. Nauta's and Mr. De Oliveira's due process rights and Local Rule 77.2's prohibition against releasing information or opinion where there is "a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice."   S.D. Fla L.R. 77.2. (emphasis added), *see also* ECF No. 714 at 9.   The Report should be relegated to the dustbin of history, where it belongs, in order to prevent further unjust prejudice to Mr. Nauta and Mr. De Oliveira. Should the Court decide otherwise, it should absolve the defense counsel of all of their obligations under its Rule 16 Protective Order, although even that would leave the interests of other innocent third parties unprotected.

Mr. Nauta and Mr. De Oliveira remain concerned that the Freedom of Information Act (FOIA), 5 U.S.C. § 522, presents opportunities for mischief that might one day force the Attorney General's hand, despite her good faith intention to maintain the Report's confidential status.   As the Court has seen in recent weeks, the Justice Department's decision on the Report's release is not simply contingent on the Government's position.   Several parties have sought public release of the Report through the FOIA, and thus far, two of those parties have sought to intervene in this

---

[2] Importantly, defendants were litigating additional constitutional violations at the time of the dismissal of the indictment, including motions for suppression as to unlawful seizures.   Release of the Report, including to the extent premised on illegally seized material, would compound the asserted constitutional violations.

case asking the Court to rescind its January 21, 2025, Order.   *See* American Oversight's Expedited Motion to Intervene and for Clarification or, Alternatively, Dissolution of January 21, 2025 Order Granting Defendants' Emergency Motion to Preclude Release of Volume II of the Special Counsel's Report (ECF No. 717); Motion of the Knight First Amendment Institute at Columbia University to Intervene and Seek Rescission of the Court's January 21, 2025 Order and Public Release of Volume II of the Special Counsel's Report (ECF No. 721) (noting at least two additional FOIA requests at n. 11).

The Court should also retain jurisdiction and continue to enjoin the Report's release because it is not at all clear that its dismissal of the Superseding Indictment, or the Eleventh Circuit's dismissal of the appeal, extinguishes jeopardy for any of the three former co-defendants. The Government's Motion to Dismiss the Appeal as to Donald J. Trump (11th Cir. ECF No. 79) states that, "[d]ismissing the appeal as to defendant Trump will leave in place the district court's order dismissing the indictment without prejudice to him."   *Id.*   This Court noted in its January 21, 2025, Order that "Counsel [for the Government] during the hearing was unable to answer whether the Department has foreclosed reinitiating criminal charges against President-Elect Trump after he leaves office" (ECF No. 714 at n.15).   With respect to Mr. Nauta and Mr. De Oliveira, the Eleventh Circuit's dismissal of the appeal "with prejudice" simply precludes the Government from initiating a new appeal of this Court's July 15, 2024, Order dismissing the Superseding Indictment and directing the Clerk to close the case.   The Order did not state that the dismissal was with prejudice, and it did not preclude the Government from re-indicting the case through a constitutionally valid officer, notwithstanding the fact that the current occupants of those positions do not intend to proceed.   It is also clear that the offenses charged here, which are alleged to have occurred in 2022, are not time-barred by the relevant statutes of limitations (ten-years for violations

of 18 U.S.C. § 793(e) (64 Stat. 1005), five-years for 18 U.S.C. §§ 1512, 1519, 1001 (18 U.S.C. § 3282)).   Because jeopardy arguably remains for all three former co-defendants, their due process rights remain a serious concern that strongly outweighs any interest that the Government or the public might have in the release of the Special Counsel's Report.

This Court's concerns about protecting confidential information in the Report are also left unaddressed by the dismissal of the appeal, and newly involved (and now gone) Government counsel were unprepared to address that issue at the January 17, 2025, hearing (*see* ECF No. 714 at 6). Mr. Nauta and Mr. De Oliveira maintain that the Government's proposed redactions of transcribed statements before the grand jury too narrowly apply the prohibitions of Rule 6(e) and fail to protect information presented to the grand jury from disclosure, including information over which President Trump asserted Attorney-Client Privilege that this Court did not have an opportunity to consider.   Grand jury secrecy not only "encourages full and frank testimony on the part of witnesses, and prevents interference with the grand jury's deliberations," it also "helps to protect the innocent accused from facing unfounded charges …." *Pitch v. United States*, 953 F.3d 1226, 1229 (11th Cir. 2020) (en banc) (citing *Douglas Oil Co. v. Petrol Stops Nw*, 441 U.S. 211, 219 (1979)).   The Report also contains argument and information that would have been the subject of motions in limine and pursuant to Fed. R. Crim. P. 404(b), that are inappropriate for disclosure.

Because jeopardy arguably remains for the defendants in this highly publicized and political case, the Report itself contains Rule 6(e) and other confidential information, and the Report's release would unfairly prejudice Mr. Nauta and Mr. De Oliveira, who are prohibited from defending themselves, Mr. Nauta and Mr. De Oliveira respectfully request that this Court maintain its January 21, 2025 Order prohibiting the release of Volume II of the Special Counsel's Final Report.

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By:   **/s/Michael D. Porter**
      Michael D. Porter
      Assistant United States Attorney
      Florida Bar# 0031149
      101 South U.S. Highway 1
      Suite 3100
      Fort Pierce, Florida 34950
      Telephone: (772) 293-0950
      Email: michael.porter2@usdoj.gov


By:   **s/Richard Carroll Klugh, Jr.**
      Richard Carroll Klugh, Jr.
      25 SE 2nd Avenue Suite 1100
      Miami, Florida 33131
      Tel:   305-536-1191
      Email: rickklu@aol.com
      Counsel for Waltine Nauta


By:   **/s Larry Donald Murrell, Jr.**
      LARRY DONALD MURRELL, JR.
      FLORIDA BAR NO: 326641
      400 Executive Center Drive
      Suite 201—Executive Center Plaza
      West Palm Beach, FL 33401
      Telephone: 561.686.2700
      Facsimile: 561.686.4567
      Email: ldmpa@bellsouth.net


By:   **s/John S. Irving**
      John S. Irving
      E & W Law
      1455 Pennsylvania Ave., NW, Suite 400
      Washington, D.C. 20004
      Tel:   301-807-5670
      John.Irving@earthandwatergroup.com
      Counsel for Carlos De Oliveira

### CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2025, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by operation of the Court's electronic filing system to all parties

indicated on the electronic filing receipt.   All other parties will be served by either regular U.S.

mail or inter-office delivery.

**/s/Michael D. Porter**
Michael D. Porter
Assistant United States Attorney

TAB 739

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 739

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *Plaintiff*, | ) | |
| | ) | **Case No. 23-cr-80101- CANNON** |
| v. | ) | |
| | ) | |
| WALTINE NAUTA, and | ) | |
| CARLOS DE OLIVEIRA, | ) | |
| | ) | |
| *Defendants*. | ) | |

## OPPOSITION BY DEFENDANTS WALTINE NAUTA AND CARLOS DE OLIVEIRA TO MOTIONS TO INTERVENE BY AMERICAN OVERSIGHT AND THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY

Defendants Waltine Nauta and Carlos De Oliveira respectfully submit the following opposition to (a) American Oversight's February 14, 2025 Expedited Motion to Intervene and for Clarification or, Alternatively, Dissolution of January 21, 2025 Order Granting Defendants' Emergency Motion to Preclude Release of Volume II of Special Counsel's Report (ECF No. 717); and (b) the February 24, 2025 Motion by The Knight First Amendment Institute at Columbia University ["Knight Institute"] to Intervene to Seek Rescission of the Court's January 21, 2025 Order and Public Release of Volume II of the Special Counsel's Report (ECF No. 721).

On February 18, 2025, the Court declined expedited or emergency treatment of American Oversight's Motion (ECF No. 718), noting that this Court's January 21, 2025 Order (ECF No. 714) directed the parties to file "a joint status report advising of their position on this Order no later than thirty days after full conclusion of all appellate proceedings in this action and/or any continued proceedings in this Court, whichever comes later." The United States Court of Appeals for the Eleventh Circuit dismissed the Government's appeal in appellate case number 24-12311

as to President Trump on November 26, 2024 (11th Cir. ECF No. 81), and it granted the Government's motion to dismiss the appeal as to remaining defendants Waltine Nauta and Carlos De Oliveira on February 11, 2025. The parties' joint status report and this opposition to prospective intervenors' motions are being filed concurrently on March 14, 2025, pursuant to the Court's February 28, 2025 Order (ECF No. 726).

American Oversight and the Knight Institute should not be permitted to intervene. Intervention is a privilege that this Court recently denied even as to President Donald J. Trump as a former codefendant in this case, opting instead to grant him *amicus* status (*see* ECF No. 714 at 14). The Court similarly declined to grant intervenor status to a long list of press organizations seeking access to sealed filings and proceedings in this case, instead granting them *amicus* status (*see* ECF Nos. 353, 355, 370). American Oversight and the Knight Institute should fare no better, and neither asks to be granted *amicus* status in the alternative.

**I.   Prospective Intervenors' Motions Should Be Denied on Procedural Grounds.**

**A.   American Oversight's Motion Warrants Dismissal on the Ground of Mootness.**

As a threshold jurisdictional matter, American Oversight's motion to intervene is moot, and thus nonjusticiable under Article III of the Constitution, because there remains no meaningful relief that can be granted to American Oversight. *See, e.g., Everglades v. South Florida Water Management Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009) ("An issue is moot 'when it no longer presents a live controversy with respect to which the court can give meaningful relief.' ... To decide a moot issue is to issue an advisory opinion, one unnecessary to the judicial business at hand and outside the authority of Article III courts.") (internal citations omitted).

American Oversight sought intervention on the limited and expedited basis that Volume II was needed to enable full evaluation by Congress and the public of the nomination of Kash Patel as Director of the FBI during Mr. Patel's Senate confirmation proceedings "before that vote happens." DE:717:2 ("Volume II contains information of critical and urgent importance to the public *regarding Kash Patel*, President Trump's nominee for Director of the Federal Bureau of Investigation ("FBI").  In a matter of days, the U.S. Senate is expected to vote on Patel's confirmation.  *The American people and their Senators, who have repeatedly demanded the release of the report—have a right to know the non-exempt information relating to Patel's involvement in the classified documents investigation before that vote happens*.") (emphasis added).  *See also* DE:717:7 ("[I]nformation relating to Patel's reported testimony before the grand jury relating to President Trump's potential mishandling of highly classified documents *is of significant interest to the public and the senators who are charged with providing 'advice and consent' on federal nominees in the confirmation process*.") (emphasis added).

Given the confirmation, on February 20, 2025, of Mr. Patel as FBI Director, and in light of American Oversight's failure to articulate in its motion any other meaningful reason for its request for relief, this Court should deny American Oversight's motion to intervene as moot. *See Everglades v. South Florida Water Management Dist.*, 570 F.3d at 1216*; see also Powell v. McCormack*, 395 U.S. 486, 496 (1969) (recognizing that a case becomes non-justiciable and must be dismissed as moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."); *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (a case becomes moot if, while a case is pending, an event occurs precluding the grant of effectual relief).  *See also Miccosukee Tribe of Indians v. United States*, Case No.

04–21448–civ–Gold, 2010 WL 11442638, at **2, 3 (S.D. Fla. 2010) (ruling that motion to intervene was moot as a matter of law where no meaningful relief could be afforded to movant).

**B.   Prospective Intervenors Are Not Entitled to the Work Product of an Unconstitutional Prosecutor.**

This Court has ruled that the purported Special Counsel, Jack Smith, was improperly appointed and funded in violation of the United States Constitution.  As a consequence, Smith lacked authority to investigate and prosecute the defendants in the underlying, now-dismissed criminal proceedings. This ruling, having been resolved pursuant to a dismissal of the appeal proceedings, is now the law of the case.  *See, e.g.*, *United States v. Tamayo*, 80 F.3d 1514, 1520 (11th Cir. 1996) (pursuant to the law of the case doctrine, "[a]n appellate decision binds all subsequent proceedings in the same case not only as to explicit rulings, but also as to issues decided necessarily by implication on the prior appeal.").  As to Nauta and De Oliveira and their assertion of rights in this matter, therefore, it is the law of this case that the individual who prepared Volume II was unconstitutionally appointed and the appropriations used to prepare Volume II were expended in violation of the Constitution. Movants' claimed right of intervention is thus premised on a supposed Congressional and public right to information gathered and prepared by an unauthorized individual pursuant to a wholly illegitimate investigation.  There is no entitlement to the disclosure of a one-sided report prepared in derogation of the law and the Constitution.  The proposed intervenors have cited no authority in support of such a proposition and have, instead, effectively ignored the constitutional violations that have led to the creation of the Report in the first instance.

There is no entitlement to the disclosure of a one-sided report, containing grand jury and privileged material, that was prepared in derogation of the law and the Constitution, and the proposed intervenors have cited no authority in support of such a proposition, which is devoid of

historical or structural precedent. *Cf. PG Pub. Co. v. Aichele*, 705 F.3d 91, 107(3d Cir. 2013) (ruling publisher lacked right of access to voting process, based on consideration of lack of historical and structural support, under "experience and logic" test of *Richmond Newspapers, Inc. v. Virginia*, 488 U.S. 555 (1980); "Where both historical and structural considerations militate against a presumption of openness, the press and public enjoy no constitutionally protected right of access. In such cases, the words of Justice Stewart ring true: The press and public 'must rely, as so often in our system we must, on the tug and pull of the political forces in American society.'") (internal citation omitted). *See also Delaware Coalition for Open Government, Inc. v. Strine*, 733 F.3d 510, 514 (3d Cir. 2013) ("[W]e have declined ... to extend the right of [public] access to the proceedings of judicial disciplinary boards, the records of state environmental agencies, deportation hearings, or the voting process").

### C.   Intervention Should be Denied as Untimely.

The Knight Institute's motion is untimely, having been made two months after Nauta and De Oliveira's filing of their motion to enjoin release of Volume II and this Court's consideration of that motion, including at a public hearing, and ensuing ruling on the motion.  Having chosen not to seek intervention in those proceedings (much less the original or appellate proceedings on the impropriety of the prosecutorial pursuit by Jack Smith), the proposed intervenors have waived any basis to do so at this late date.  *See, e.g., Miccosukee Tribe*, 2010 WL 11442638, at 2 & n.6 (denying motion to intervene as untimely in circumstances where movants—who bear the burden to establish the right to intervene—were "aware of their interests" earlier in the proceedings yet chose not to seek intervention at that earlier time).  The prejudice to Nauta and De Oliveira, were movant permitted to intervene as this belated stage, would be significant.

Courts consider four factors in assessing timeliness: (1) the length of time during which the would-be intervenor knew or reasonably should have known of his interest in the case before petitioning for leave to intervene; (2) the extent of the prejudice that existing parties may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest; (3) the extent of the prejudice that the would-be intervenor may suffer if denied the opportunity to intervene; and (4) the existence of unusual circumstances weighing for or against a determination of timelines. *Commissioner, Ala. Dep't of Corrections v. Advance Local Media, LLC*, 918 F.3d 1161, 1171 (11th Cir. 2019) ("*Advance Loc. Media*").

These factors counsel against intervention here. Proposed intervenors have long been aware of their interest in the case and should have intervened back in January; indeed, the Attorney General's office then did not represent proposed intervenors' interests as it was seeking only release to Congress and not to the public. Existing parties will suffer substantial prejudice as a result of the delay that will require *criminal defendants whose case has been dismissed* to spend additional time and money litigating this issue to block release of a highly prejudicial, defamatory, and illegally prepared special counsel report. There is no public right of access to privileged, evidentiary material in an illegally prepared special counsel report, so there is no prejudice to proposed intervenors that will result. The unusual circumstances here,where the Special Counsel was unconstitutionally appointed, weigh against a determination of timeliness.

**II.   Prospective Intervenors Lack Standing and Should Not be Permitted to Litigate Their FOIA Actions Before This Court.**

The Federal Rules of Criminal Procedure do not provide for third-party intervention in criminal cases. *United States v. Atesiano*, Case No.18-20479-CR, 2018 WL 5831092, at *5 (S.D. Fla. 2018). "Intervention is generally limited to those instances in which a third party's

constitutional or other federal rights are implicated by the resolution of a particular motion, request, or other issue during the course of a criminal case." *Id*. Examples include intervention by the press where a court seals criminal proceedings, and intervention to prevent the disclosure of privileged information. *Id*. (citing cases). The *Atesiano* court distinguished "offensive" intervenors, who should not be permitted to intervene, from "defensive" intervenors who perhaps should. Offensive intervenors include civil litigants improperly seeking discovery to support their civil actions. Defensive intervenors include members of the press seeking access to court records and parties seeking to protect lawful privileges. *Id*. at 8-9.

Movants argue, essentially, that they deserve Intervenor status because their access rights to government documents under the Freedom of Information Act (FOIA), 5 U.S.C. §§ 552, *et seq*., are federal rights implicated by this Court's standing Order precluding release of Volume II of the Special Counsel's Report. However, prospective intervenors fail to cite a single case in support of the proposition that an unrelated third party has standing to intervene in a closed criminal case in order to facilitate their FOIA litigation in another district. Indeed, many of their cited cases involve courts denying, not granting, motions to intervene in criminal cases. *See, e.g*., *Atesiano*, 2018 WL 5831092, at *4 (denying intervention in a criminal case by a civil litigant seeking discovery in a related civil lawsuit); *United States v. Cox*, Case No.8:14-cr-0140, 2015 WL 13741738 (M.D. Fla. 2015) (Magistrate Judge recommendation to deny intervention by a defunct company owned by a criminal defendant to assert attorney-client privilege over witness statements in the owner's criminal case); *United States v. Hamdan*, 2021 U.S. Dist. LEXIS 39599 (E.D. La. 2021) (denying intervention by the court's own clerk's office to defend its jury selection process); *United States v. Aref*, 533 F.3d 72 (2d Cir. 2008) (denying intervention by the New York Civil Liberties Union seeking classified pleadings in a CIPA terrorism case). Even *In*

*re Petition of the Trib.Co.*,784 F.2d 1518 (11th Cir.1986), which the Knight Institute describes as "permitting a newspaper publisher to intervene post-trial in criminal proceeding in order to obtain transcripts of bench conferences" (ECF No. 721 at 9) focused instead on affirming a district court's refusal to release sealed transcripts.  Nor are bench conferences during a public trial remotely comparable to the pretrial, investigatory materials encompassing protected grand jury and privileged matters (and matters arising from seizures defendants challenged as unconstitutional), and particularly not where such material was selected and prepared by an unauthorized, unconstitutionally-appointed and unconstitutionally-funded individual as here.

American Oversight and the Knight Institute are not media organizations, and they deserve less, not more, privilege than the legitimate press entities to which this Court already declined to grant intervenor status. They are more akin to the "offensive" intervenors discussed in *Atesiano* and are undeserving of the limited exception that might allow press organizations to intervene. American Oversight describes itself as "a non-partisan nonprofit committed to promoting transparency and ensuring accountability of government officials" (ECF No. 717 at 1). On its website, however, it states, "We were founded in 2017 in response to the unprecedented challenges that the Trump administration posed to our nation's democratic ideals and institutions."[1] Its "Investigations & Topics" webpage describes a long list of anti-Trump efforts, including "Donald Trump and Elon Musk's Illegal Dismantling of USAID," "Trump's Hostile Takeover of the National Archives – and our Nations's History," "Anti-Immigrant Rhetoric and Election Denialism," and the like. To its credit, the Knight Institute, at least at first glance, appears to take its "non-partisan" descriptor more seriously and actually lists its Board and staff members on its website (unlike American Oversight).[2] Nonetheless, neither

---

[1] American Oversight, "About", available at https://americanoversight.org/about/.
[2] Knight First Amendment Institute at Columbia University, available at https://knightcolumbia.org/.

organization is or claims to be a media organization, and neither should be permitted to intervene in this closed criminal case to obtain access to a record that, as discussed below, is very different from the typical sealed motion or hearing transcript that is the subject of a press intervention motion.

The issue properly before this Court is whether it should rescind its January 21, 2025, Order in light of the Eleventh Circuit's dismissal of the Government's appeal. For the reasons stated by Mr. Nauta and Mr. De Oliveira in the concurrently filed joint status report, the answer to that question is no. The Government might later argue that the case was dismissed without prejudice, and that Jeopardy therefore remains for all three defendants. Volume II of the Special Counsel's Report (which should not have been created by an unconstitutional official in the first place) is a lengthy, one-sided diatribe about a complex investigation that includes confidential information protected by Fed. R. Crim. P. 6(e), Local Rule 77.2, and other protections against further unjust damage to defendants' reputations. As this Court has recognized, Volume II contains "extensive, non-public discovery materials governed by Rule 16, "including large quantities of '[s]tatements concerning anticipated evidence or argument in the case.'" DE:714:5. To allow the public airing of such confidential discovery, which also includes large amounts of grand jury and privileged matter, would improperly further a one-sided, biased narrative prepared by an unauthorized and illegitimate individual as to which fundamental fair trial rights, including the rights of confrontation and of due process, would be wholly absent and unavailable, to the overwhelming and irreparable prejudice of Nauta and De Oliveira.  Any opportunity to respond would thus be constricted unfairly and without the benefit of normal constitutional protections afforded to criminal defendants.  Moreover, the reliability of the

information is deeply questionable, where Volume II was prepared by an unauthorized individual.

Defendants remain bound by the Court's Rule 16 Protective Order prohibiting them from publicly defending themselves. From what defense counsel can discern, none of the individuals involved in the Report's creation, and who have the historical understanding necessary to even litigate confidentiality issues, even remain at the Justice Department, leaving the U.S. Attorney's Office for the Southern District of Florida to address the disarray left by the unauthorized Special Counsel. For all of these reasons, the Court should retain control over the Report's ultimate disposition.

Conversely, the merits of FOIA demands by American Oversight and the Knight Institute are not properly before this Court, and those non-parties should not be permitted to intervene in order to bootstrap their FOIA litigation into this closed criminal case. Both entities submitted FOIA demands to DOJ, which denied the demands because this Court's Order precluded them from releasing the Report. American Oversight sought an order from the United States District Court for the District of Columbia compelling the Justice Department to release non-exempt portions of the Report pursuant to American Oversight's FOIA demand. *See American Oversight v. U.S. Dept. of Justice*, D.D.C. Case No. 1:25-cv-00383 at ECF Nos. 1-2. That Court denied American Oversight's request because this Court's Order prohibited the Justice Department from releasing the Report "in no uncertain terms" (D.D.C. ECF No. 11 at 13).[3] American Oversight and the Knight Institute may resubmit their FOIA requests for the Justice Department, or seek

---

[3] Unlike American Oversight, the Knight Institute apparently did not even bother appealing DOJ's denial of its FOIA demand to the United States District Court for the District of Columbia, as provided for by FOIA at 5 U.S.C. § 552(a)(4)(B) ("On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant….").

reconsideration of their earlier demands depending on what this Court decides with respect to its January 21, 2025 Order. They may appeal to the U.S. District Court for the District of Columbia whatever position the Justice Department takes with respect to releasing all or part of the Report. They do not, however, deserve intervenor status in this case—which the Court declined to extend to President Trump and to several media organizations—and they are not equipped to opine, given their lack of familiarity with this case and with the Report itself.

### III.   Intervention is Inappropriate Because the Special Counsel's Report is Not a Judicial Record.

While members of the public generally are allowed to intervene to seek access to judicial records, proposed intervenors here seek to broaden that general rule to seek access to an illegally prepared executive branch document that does not fall under the right of access to judicial records.  The "right of access is not absolute" and "does not apply to discovery."  *Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1246 (11th Cir. 2007).  Relatedly, judicial "[d]ecisions less central to merits resolutions implicate lesser right-to-access considerations."  *Id.* (citation omitted).  The Special Counsel's Report here is *wholly* unrelated to the merits of the case, and the public already has access to this Court's *decision* on why the release of the Report was inappropriate.  The Report itself, however, is not a judicial record to which members of the public may intervene in order to seek access.  The Special Counsel's Report was never filed as part of the public record, and it was only submitted to this Court on an *ex parte*, *in camera* basis for the sole purpose of this Court's enjoining its improper release.  It is absurd to suggest that by invoking a Court's powers to keep a document private, a document must become public.  *See Pepsico Inc. v. Redmond*, 46 F.3d 29, 31 (7th Cir. 1995) (Easterbrook, J.) (discussing right of access in context of trade secret cases, and observing that "legitimate trade secrets should be protected from disclosure" because "[d]isclosing the secrets to the world is not an appropriate

price for enjoining one person's use of them"). But that is the extent of proposed intervenors' arguments here: if a party invokes a court's powers to keep a document private that should be private, then in so doing, the party effectuates public release of the document.  Intervenors here seek to function as private prosecutors, continuing to prosecute in the court of public opinion the case that has been dismissed in this Court due to the unconstitutional appointment of Jack Smith.

## IV.    The Dismissal of the Appeal Does Not Divest the Court of Its Supervisory Authority.

In granting defendants' motion to preclude the release of the Report, the Court exercised its supervisory authority "to protect the integrity of the federal courts, and to deter illegal conduct by government officials" (ECF No 714 at 7 (*quoting United States v. DiBernardo*, 775 F.2d 1470, 1475-76 (11th Cir. 1985))). The Court explained its affirmative duty to safeguard the Fifth Amendment due process rights of the accused, and their Sixth Amendment right to a fair trial in a criminal case then pending appeal. *Id*. at 8. It also noted its obligation under S.D. Fla. L.R. 77.2 not to allow the release of information where "there is a reasonable likelihood that such dissemination will interfere with a fair trial *or otherwise prejudice the due administration of Justice*." *Id*. at 8 (emphasis added). The Court also noted its authority to grant appropriate relief concerning discovery materials in a criminal case under Fed. R. Crim. P. 16, and that the Report "contains extensive, non-public discovery materials governed by Rule 16, including large quantities of '[s]tatements concerning anticipated evidence or argument in the case.'" *Id*. at 9 (quoting Justice Manual § 1-7.610(E)).

While the Eleventh Circuit has dismissed the appeals, nothing has changed for the reasons articulated in the Joint Status Report with respect to the nature of the Special Counsel's Report, its extensive inclusion of information protected by Rules 6(e) and 16, attorney-client privilege, or the Court's interest in preventing disclosures that would severely prejudice

defendants and interfere with the due administration of justice. The Court retains supervisory authority over the discovery materials in this case, and it has the same obligation to protect Mr. Nauta and Mr. De Oliveira from the release of a report containing information they are prohibited from effectively responding to.

## V.  The Report is Not Subject to First Amendment or Common Law Right to Access.

Unlike the common situation, including in this case, where members of the public seek access to sealed court proceedings, unredacted transcripts, and similar "judicial records," the movants in this case seek access to an unprecedented one-sided report by an unconstitutional prosecutor and his unauthorized staff that contains, as the Court stated in its January 21, 2025 Order (ECF No. 714):

> … detailed and voluminous discovery information protected by the Rule 16(d)(1) Protective Order entered in this case [ECF No. 27]. Much of this information has not been made public in Court filings. It includes myriad references to bates-stamped information provided by the Special Counsel in discovery and subject to the protective order, including interview transcripts, search warrant materials, business records, toll records, video footage, various other records obtained pursuant to grand jury subpoena, information as to which President-Elect Trump has asserted the attorney-client privilege in motions in this proceeding [ECF No. 571 (sealed); ECF Nos. 641, 656], potential Rule 404(b) evidence, and other non-public information.

Courts, including the Eleventh Circuit, have held that discovery materials not admitted at trial are not subject to public disclosure. *See Atesiano* at 10-11 (citing cases). It is inconceivable, then, that proposed intervenors or the public have a right to see the biased ramblings of an unconstitutional prosecutor who had at least one federal grand jury at his disposal to coerce evidence and witness testimony to the severe reputational prejudice of Mr. Nauta and Mr. De Oliveira, who have been convicted of nothing, and who are precluded from publicly defending themselves. The fact that the Report was the subject of a hearing on January 17, 2025 leaves proposed intervenors in no better position. The Report was never intended to be evidence in the

case and was never introduced at a hearing or at trial. Even assuming that the Court retained the copy of the Report that it reviewed *in camera* (and there is no evidence that is the case), the Court's mere review—for the sole purpose of determining whether to allow its public release—does not magically render the document a public record that must be released. To argue otherwise would be absurd. For example, discovery materials are often submitted to a court in litigation over the scope of a protective order. If a court finds that the discovery materials warrant a broad protective order, then the protective order becomes part of the public record but the discovery materials stay private unless and until they are used at trial or attached to a motion to suppress. The public's right of access "attaches only to 'items which may properly be considered public or judicial records'—not to any and all materials produced during discovery—and it can be outweighed by competing interests." *Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1363 (11th Cir. 2021). Even when the public's right of access attaches, it is 'not absolute." *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978). Courts must balance "the asserted right of access against the other party's interest in keeping the information confidential." *Romero*, 480 F.3d at 246.

A court weighing these competing interests will consider a "number of important questions, including 'whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." Courts likewise should consider "whether the records are sought for such illegitimate purposes as to promote public scandal." *Advance Loc. Media*, 918 F. 3d at 1169.

These factors clearly weigh against access. First, release of the Special Counsel Report would impair court functions and harm privacy interests. This is a Report that was prepared *following* this Court's dismissal of the Special Counsel as unconstitutionally appointed. If notwithstanding the Court's clear ruling, a disqualified Special Counsel may continue to access classified materials and to abuse the grand jury process to improperly release a host of prejudicial and confidential information to the public, then the Court's functions are clearly impaired. This Report was prepared by an unconstitutional prosecutor who had no business being in the grand jury room due to his unconstitutional appointment. The entire case is the result of illegal investigation; for Smith, post-disqualification, to be able to publicly release his version of the facts would cause significant harm to Nauta and De Oliveira.

Release would also harm legitimate privacy interests of Mr. Nauta and Mr. De Oliveira, by sharing with the public at large a one-sided Report of confidential and prejudicial information that may never have been admissible at trial. The degree and likelihood of the injury to Nauta and De Oliveira is substantial if this Report is released to the public. The Report will be shared widely; it contains confidential discovery material and evidence that was unconstitutionally obtained. Nauta and De Oliveira moved to suppress such evidence at trial and it would be improper for this Court to release it now. The Report carries the imprimatur of government authority but in fact was prepared by an unconstitutional prosecutor, further contributing the harm that would be suffered.

Third, the information in the Report is highly unreliable. It presents an entirely one-sided view of the circumstances and facts surrounding the charges in this case. The facts in the Report are presented out of context and the allegations in the Report have not been tested in court. Introducing these unproven and unreliable allegations into the public domain would be improper.

Fourth, Mr. Nauta and Mr. De Oliveira are limited in their ability to respond.  Responding to each and every allegation in the Report would essentially be akin to defending the case at trial.  Moreover, the Report, as this Court recognized, includes myriad reference to discovery.   In addition to the issue already mentioned, that discovery materials are ordinarily private, Nauta and De Oliveira would be required to continue accessing discovery to adequately respond to the unfounded and untrue allegations in the Report.  The discovery in this case was massive and is stored on a database; it will cost Mr. Nauta and Mr. De Oliveira money to continue to access it, and it is unreasonable to ask them to now expend funds to defend against an unconstitutional and dismissed prosecution.  Additionally, it is likely that counsel would need security clearances to access portions of the discovery, further illustrating the hurdles posed in responding.  As a result of these hurdles, immediate response will be difficult if not impossible—and it is unlikely that a response could ever mitigate the harm created by release of the Report.

The Special Counsel's Report was prepared by a disqualified public official; it was illegally prepared and thus cannot be deemed a matter of public concerns.   Mr. Nauta and Mr. De Oliveira are civilian casualties of this unconstitutional prosecution.   There is no less restrictive alternative to keeping the document private; this Court has already identified the reasons that redaction is inappropriate.

Proposed intervenors seek to act as private prosecutors, and to generate public scandal and bad press against President Trump.  This is an improper reason to seek access to a Report that never became part of the record in this case and that was only submitted to this Court so that this Court could review the highly confidential grand jury and discovery materials it references to determine that closure was appropriate.  Closure was appropriate in January, and it remains appropriate now.  The requests for intervention and access should be denied.

**CONCLUSION**

The Court should decline to grant American Oversight and the Knight Institute intervenor status in this case to opine about the release of a lengthy and unauthorized Report that they have not read in a case where they could not possibly understand the details of the Government's investigation or the scope of the information in the Report that is protected by Federal Rules and privileges and directly implicates defendants' due process rights. Even if the Court decides to grant intervenor status, it should exercise its supervisory authority to maintain its January 25, 2025, Order and prevent the disclosure of the Report.

Dated: March 14, 2025          Respectfully submitted:

/s/ Richard C. Klugh
Richard C. Klugh
Fla. Bar No. 305294
KLUGH WILSON, LLC
40 N.W. 3rd Street, PH1
Miami, FL 33128
(305) 536-1191 (telephone)
klughlaw@gmail.com

s/ Jenny Wilson
Jenny Wilson
Fla. Bar No. 1031758
KLUGH WILSON, LLC
40 N.W. 3rd Street, PH1
Miami, FL 33128
(305) 536-1191 (telephone)
jw.klughlaw@gmail.com

*Counsel for Defendant Waltine Nauta*

/s/ John S. Irving, IV
John S. Irving, IV (pro hac vice)
E&W LAW, LLC
1455 Pennsylvania Ave NW, Ste 400
Washington, DC 20004
(301) 807-5670 (telephone)
john.irving@earthandwatergroup.com

/s/ Larry Donald Murrell, Jr.
Larry Donald Murrell, Jr.
Fla. Bar No. 326641
L.D. MURRELL, P.A.
400 Executive Center Drive, Ste 201
West Palm Beach, FL 33401
(561) 686-2700 (telephone)
ldmpa@bellsouth.net

*Counsel for Defendant Carlos De Oliveira*

# TAB 740

# Case No. 23-cr-80101-AMC, S.D. Fla.,

# Doc. 740

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 23-CR-80101-CANNON

**UNITED STATES OF AMERICA**

**v.**

**WALTINE NAUTA, and**
**CARLOS DE OLIVEIRA**

     **Defendants.**
_____/

## UNITED STATES' RESPONSE TO AMERICAN OVERSIGHT'S AND KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY'S MOTIONS TO INTERVENE

The United States respectfully submits that the Court should deny the motions to intervene filed by American Oversight and Knight Institute in this closed criminal case. First, neither American Oversight nor Knight Institute has shown that this case fits within the narrow class of circumstances in which courts have previously allowed third parties to intervene in criminal cases. This Court should not expand that class. Second, neither American Oversight nor Knight Institute has shown it has a common law or First Amendment right of access to Volume II of Jack Smith's confidential Final Report. Third, the primary reason offered by American Oversight in support of gaining access to Volume II—to assist the United States Senate in assessing the nomination of the Federal Bureau of Investigation ("FBI") Director Kashyap Patel—is moot because the Senate has already confirmed Director Patel.

If the Court does permit American Oversight and Knight Institute to intervene, the Court should not *order* the release of Volume II. In the event the Court is inclined to lift its Injunction Order, the United States submits the decision to release Volume II outside the Department of Justice should rest solely with the Attorney General of the United States.

1

Finally, the Court should decline Knight Institute's invitation to conduct an *in camera* review of the grand jury materials related to this case. The Attorney General has not ordered the release of Volume II, nor has any court of competent jurisdiction ordered the Department of Justice to release Volume II. Unless and until either of those contingencies comes to fruition, it would be premature for the Court to engage in a Rule 6(e) analysis. *In any event, the United States submits the Department of Justice, not the Court, is responsible for redacting any grand jury material contained in Volume II.*[1]

## BACKGROUND

On July 27, 2023, at Jack Smith's request, a federal grand jury in the Southern District of Florida returned a Superseding Indictment charging the defendants with various crimes related to the alleged retention of national defense information [ECF No. 85].

On July 15, 2024, the Court dismissed the Superseding Indictment, after determining that Jack Smith's appointment violated the Appointments Clause of the United States Constitution [ECF No. 672].

Jack Smith timely appealed the Court's order dismissing the Superseding Indictment to the United States Court of Appeals for the Eleventh Circuit [ECF No. 673].

On November 26, 2024, at Jack Smith's request, the Eleventh Circuit dismissed the appeal as to then President-Elect and now President Trump (D.E. 81-2).

On or about December 30, 2024, Jack Smith referred this case to the United States Attorney's Office for the Southern District of Florida [ECF No. 714, at ¶¶ 5, 11].

---

[1] Notably, neither American Oversight nor Knight Institute seek the disclosure of grand jury material under Federal Rule of Criminal Procedure 6(e).

2

On January 7, 2025, Jack Smith delivered a two-volume confidential Final Report to the Attorney General of the United States.  The first volume (Volume I) concerns the investigation and prosecution of criminal charges that were brought in the District of Columbia regarding alleged interference with the lawful transfer of power following the 2020 United States presidential election.  Volume I has been released to the public.  The second volume (Volume II) concerns the investigation and prosecution of the criminal charges that were brought against the President of the United States, Waltine Nauta, and Carlos De Oliveira in this matter.  Volume II has not been released outside the Department of Justice.

When Jack Smith delivered his confidential Final Report to the Attorney General, Waltine Nauta and Carlos De Oliveira filed an Emergency Motion to preclude the release of Volume II [ECF No. 679].

On January 8, 2025, American Oversight submitted a request to the Department of Justice under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking access to Volume II.

On January 10, 2025, Jack Smith resigned his post.  On January 17, 2025, the United States Attorney for the Southern District of Florida, Markenzy Lapointe, resigned his post.  On January 20, 2025, Merrick Garland concluded his term as the Attorney General of the United States.

On January 21, 2025, this Court issued an order enjoining the Attorney General of the United States and the Department of Justice from releasing Volume II outside the Department of Justice, or sharing any information contained in Volume II with anyone outside the Department of Justice ("Injunction Order") [ECF No. 714].

On January 26, 2025, Knight Institute submitted a FOIA request to the Department of Justice seeking access to Volume II.

On February 5, 2025, Pamela Jo Bondi was sworn in as the 87th Attorney General of the United States.

On February 6, 2025, the Department of Justice notified Knight Institute that it was prohibited from disclosing Volume II in its entirety based on the Court's Injunction Order.

On February 10, 2025, American Oversight filed a FOIA action in the United States District Court for the District of Columbia, seeking declaratory and injunctive relief as to Volume II. *See American Oversight v. Department of Justice*, Civil Action No. 25-cv-383 (D.D.C. 2025) (ECF No. 1).

On February 11, 2025, at the request of the current United States Attorney for the Southern District of Florida, Hayden P. O'Byrne, the Eleventh Circuit dismissed the appeal as to Waltine Nauta and Carlos De Oliveira (D.E. 113-2).

On February 14, 2025, American Oversight filed an Expedited Motion to Intervene and for Clarification or, Alternatively, Dissolution of January 21, 2025 Order Granting Defendants' Emergency Motion to Preclude Release of Volume II of Special Counsel's Report ("Emergency Motion to Preclude Release of Volume II"), seeking to intervene in this matter, ostensibly on behalf of the public, to gain access to Volume II of Jack Smith's confidential Final Report [ECF No. 717].

On February 20, 2025, the Judge presiding over American Oversight's FOIA litigation in the District of Columbia denied American Oversight's motion for injunctive relief based on the Court's Injunction Order. *See American Oversight v. Department of Justice*, Civil Action No. 25-cv-383 (D.D.C 2025) (ECF No. 11).

On February 24, 2025, Knight Institute filed a Motion to Intervene to Seek Rescission of the Court's January 21, 2025 Order and Public Release of Volume II of the Special Counsel's Report [ECF No. 721].

On March 14, 2025, the United States, Waltine Nauta, and Carlos De Oliveira filed a Joint Status Report with the Court, in which the United States advised the Court, among other things, that it does not object to the Court keeping its order enjoining the Attorney General of the United States and the Department of Justice from releasing Volume II outside the Department of Justice, or sharing any information contained in Volume II with anyone outside the Department of Justice, in place [ECF No. 738].

The Department of Justice recently created a Weaponization Working Group to examine, among other things, the investigation and handling of this prosecution by Jack Smith.

To date, the Attorney General of the United States has not expressed a desire or intention to release Volume II of Jack Smith's confidential Final Report outside the Department of Justice.

The United States Attorney's Office for the Southern District of Florida does not intend to revive the charges brought by Jack Smith.

## ARGUMENT

### A.    Neither American Oversight nor Knight Institute has standing to intervene.

Neither American Oversight nor Knight Institute has a right to intervene in this closed criminal case. The Federal Rules of Criminal Procedure do not provide for third-party intervention in criminal cases. *See, e.g., United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008) ("The Federal Rules of Criminal Procedure make no reference to a motion to intervene in a criminal case.").

At best, there is a narrow class of exceptions allowing intervention in a criminal case that do _not_ apply to American Oversight or Knight Institute. That narrow class of exceptions covers

circumstances in which a district court overseeing a criminal matter may directly decide the rights of third parties.  For instance, a non-party may sometimes intervene to assert a privilege in response to a subpoena.  Similarly, district courts have recognized that if they close the courtroom, it effectively terminates non-parties' First Amendment rights to access those proceedings—and thus the press may intervene to vindicate their rights.  *See United States v. Atesiano*, No. 18-20479-CR, 2018 WL 5831092, at *2 (S.D. Fla. Nov. 7, 2018) (quoting *United States v. Carmichael*, 342 F. Supp. 2d 1070, 1072 (M.D. Ala. 2004)) (citations omitted).

This narrow class of exceptions does not apply in this case.  Notably, neither American Oversight nor Knight Institute ask the Court to adjudicate its FOIA rights.  As to American Oversight, that question is the subject of ongoing litigation in a different federal district court, *see American Oversight v. Department of Justice*, Civil Action No. 25-cv-383 (D.D.C. 2025), while Knight Institute has not even filed suit.  Instead, American Oversight and Knight Institute ask the Court to intervene to expeditiously rescind an order with some collateral consequences related to the merits of their FOIA claims.  Yet, American Oversight and Knight Institute fail to cite a case in which a district court has allowed a third party to intervene in a criminal case to contest an order that might have some secondary or collateral implications for that party's FOIA claims in another lawsuit.

This Court should be cautious about expanding the class of permissible interventions to encompass this type of knock-on or indirect-effect claim.  Many decisions that a district court makes in a criminal case may come with second-order consequences or negative effects on third parties.  That reality does not entitle *any* third party, whose rights might be incidentally affected by a lawful order in a criminal proceeding, to intervene in that criminal matter.  The existing examples of permissible interventions favor the contrary view—that, to intervene, a third party

must be seeking a ruling from the district court that directly affects their constitutional or federal rights, such as a ruling on a disputed First Amendment access or privilege issue. *See Carmichael*, 342 F. Supp. 2d at 1072 ("[C]ourts sometimes permit the press to intervene in a criminal case where a decision to close criminal proceedings to the public may affect its First Amendment rights. In addition, third parties are occasionally allowed to intervene in a criminal trial to challenge a request for the production of documents on the ground of privilege[.]") (citations omitted).

At bottom, third-party intervention in criminal cases is a judicial doctrine, not a creature of statute or the Federal Rules. *See Aref*, 533 F.3d at 81. And, like with other judge-made doctrines, courts should tread cautiously and recognize that expanding a doctrine in novel ways is often disfavored. *Cf. Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) (observing that "expanding the Bivens remedy"—another area of judge-made law—"is now a 'disfavored' judicial activity").

No precedent establishes (or even strongly suggests) that a third party may intervene in a criminal case to remove a barrier to that party vindicating its rights in another forum or another unrelated proceeding. Thus, the Court should deny American Oversight's and Knight Institute's motions to intervene.

**B.    Neither American Oversight nor Knight Institute has a Common Law or First Amendment right to access Volume II.**

Knight Institute insists it has a common law and First Amendment right to access Volume II [ECF No. 721 at pgs. 11-17].[2] Knight Institute fails to recognize that Volume II is not a judicial record or document. As such, the public has no presumptive right of access to Volume II.

---

[2] American Oversight does not attempt to assert a common law or First Amendment right to access Volume II.

In *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978), the Supreme Court recognized that in criminal proceedings, the press has a historically-based, common law right to copy and inspect "judicial records and documents."[3]  That is to say, judicial records and documents are deemed presumptively available to the public.  Federal courts have permitted limited intervention by the media to pursue a request for access to material made part of the record during court proceedings.  *See, e.g., In re Associated Press*, 162 F.3d 503, 507 (7th Cir. 1998) (collecting cases).

Against this backdrop, parties may intervene in criminal cases to gain access to judicial records and documents, and the right to intervene is often keyed to the public's presumptive right of access to such material.  But "[j]udicial records and documents" are those "materials on which a court relies in determining the litigants' *substantive rights*."  *United States v. Kravetz*, 706 F.3d 47, 54 (1st Cir. 2013) (internal marks and citation omitted; emphasis added).  Put another way, "judicial records and documents" are those that may help a court to resolve the merits of an action.  *Comm'r, Ala. Dep't of Corr. v. Advance Local Media, LLC*, 918 F.3d 1161, 1167 (11th Cir. 2019); *see also Locke v. Warren*, 611 F. Supp. 3d 1375, 1381 (S.D. Fla. 2020) ("[T]he common law right

---

[3] The press also has a First Amendment right to access judicial proceedings.  This First Amendment right, however, is a "right to attend" trial, *United States v. Hastings*, 695 F.2d 1278, 1280 (11th Cir. 1983), rather than a license allowing "physical access to courtroom exhibits introduced into evidence at a criminal trial."  *Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 426–27 (5th Cir. 1981).  "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally."  *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972); *see also Warner Commc'ns, Inc.*, 435 U.S. at 589 ("The First Amendment generally grants the press no right to information about a trial superior to that of the general public.  Once beyond the confines of the courthouse, a news-gathering agency may publicize, within wide limits, what its representatives have heard and seen in the courtroom. But the line is drawn at the courthouse door; and within, a reporter's constitutional rights are no greater than those of any other member of the public.") (internal marks and citation omitted).  "For a right of access to a document to exist under either the First Amendment or the common law, the document must be a judicial record."  *In re Application of United States for an Order Pursuant to 18 U.S.C. Section 2703(D)*, 707 F.3d 283, 290 (4th Cir. 2013) (internal marks and citation omitted).

of access applies *only* to judicial documents that are integral to judicial resolution of the merits.") (internal marks and citation omitted; emphasis in original).  Merely filing a document does not turn it into a judicial record or document subject to the right of public access.  *Advance Local Media, LLC*, 918 F.3d at 1167-68.  Generally, the "common-law right of access does not extend to information collected through discovery which is not a matter of public record." *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 355 (11th Cir. 1987).

Volume II is not a judicial record or document.  Volume II is a detailed report of Jack Smith's investigation and prosecution of the criminal charges that were brought against the President of the United States, Waltine Nauta, and Carlos De Oliveira, which includes myriad references to discovery that Jack Smith provided, such as interview transcripts, business records, toll records, video footage, records obtained by grand jury subpoenas, information over which the President has asserted attorney-client privilege, potential Rule 404(b) evidence, and other non-public information [ECF No. 714, at ¶ 9].[4]  Undersigned counsel has no knowledge that Volume II was ever filed with the Court, made part of the public record, or admitted into evidence at any court proceeding.  Undersigned counsel understands Volume II was presented to the Court *in camera* solely to adjudicate Defendants' Emergency Motion to Preclude Release of Volume II [ECF No. 708].  Undersigned counsel does not know whether the Court retained a copy of Volume II, and if so, to what extent the version retained by the Court was redacted.[5]

---

[4] Absent permission from the Attorney General, undersigned counsel has no authority to access, review, or disclose the contents of Volume II.  To that end, undersigned counsel has not reviewed Volume II in any form.  Likewise, undersigned counsel is not privy to the content of any *in camera* proceedings.

[5] No one currently at the United States Attorney's Office for the Southern District of Florida, including undersigned counsel, was part of the investigation or corresponding prosecution related to this case.

Under these circumstances, the public has no presumptive right to access Volume II.  There is no general right of access to information a government official knows but has not released to the public, such as information contained in investigative reports or prosecution memoranda.  *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984) ("[R]estraints placed on discovered, but not yet admitted, information are not a restriction on a traditionally public source of information."); *In re Alexander Grant & Co. Litig.*, 820 F.2d at 355 ("[W]hile appellants may enjoy the right of access to pleadings, docket entries, orders, affidavits or depositions *duly filed*, appellants' common-law right of access does not extend to information collected through discovery which is not a matter of public record.") (internal marks and citation omitted; emphasis in original); *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1312-313 (11th Cir. 2001) ("The Press contends, and the district court agreed, that because the documents were filed with the court they are judicial records and therefore subject to the common-law right of access. . . .  We think a more refined approach is called for, one that accounts both for the tradition favoring access, as well as the unique function discovery serves in modern proceedings.  The better rule is that material filed with discovery motions is not subject to the common-law right of access, whereas discovery material filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right, and we so hold."); *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) ("Discovery is neither a public process nor typically a matter of public record.  Historically, discovery materials were not available to the public or press. . . . [D]ocuments collected during discovery are not 'judicial records.'  Discovery, whether civil or criminal, is essentially a private process because the litigants and the courts assume that the sole purpose of discovery is to assist trial preparation.") (citations omitted).

The type of information contained in Volume II (investigative and discovery materials) stands in stark contrast to the cases where courts have granted the press access to judicial records and documents.  *See Advanced Local Media, LLC*, 918 F.3d at 1164-68 (lethal injection protocol submitted to court for *in camera* review in litigation by death row inmate challenging the constitutionality of same protocol as applied to him); *Kravetz*, 706 F.3d at 56-59 (sentencing memoranda and sentencing letters filed under seal); *In re Search Warrant for Secretarial Area Outside of Gunn*, 855 F.2d 569, 572-575 (8th Cir. 1988) (search warrants filed under seal); *Oregonian Pub. Co. v. U.S. District Court*, 920 F.2d 1462, 1463 (9th Cir. 1990) (plea agreement filed under seal).

More importantly, Volume II was not critical to the Court's resolution of any of the underlying charges against the defendants.  Indeed, the Court dismissed the criminal charges against the defendants well before the issuance of Volume II.  As a result, Volume II was not "integral to judicial resolution of the merits."  *Warren*, 611 F. Supp. 3d at 1381 (internal marks and citation omitted); *see also Seattle Times Co.*, 467 U.S. at 33; *In re Alexander Grant & Co. Litig.*, 820 F.2d at 355; *Anderson*, 799 F.2d at 1441.

To the extent Knight Institute seeks to rely on *In re Petition of the Tribune Co.*, 784 F.2d 1518, 1521 (11th Cir. 1986), for the proposition that the media can intervene in a concluded criminal case to obtain an investigative report prepared by a prosecution team, such reliance is misplaced.  That case involved a request by the media to obtain transcripts of bench conferences, which were held in open court but out of the hearing of the attending press and public.  748 F.2d at 1519.  Transcripts of bench conferences held in open court are a far cry from an investigative report prepared by a prosecution team that contains, among other things, records obtained by grand jury subpoenas, information over which the President of the United States has asserted attorney-

client privilege, potential Rule 404(b) evidence, and other *non-public information*.  *Cf. United States v. Santarelli*, 729 F.2d 1388, 1390 (11th Cir. 1984) ("[T]he public has a First Amendment right to see and hear that which is admitted in evidence in a public sentencing hearing.").

Knight Institute's attempt to analogize Volume II to the lethal injection protocol at issue in *Advance Local Media* also falls short.  That "appeal arose under a unique set of circumstances," and the Court kept its "holding narrow in comporting with [its] own precedent."  918 F.3d at 1168.  Because the heart of that dispute was a death row inmate's claim that the lethal injection protocol was unconstitutional, the protocol was central to the litigation—even though it was never formally filed on the docket.  Here, in contrast, Volume II was not the main subject of this (now closed) criminal case; it was instead the subject of discrete, post-dismissal, collateral litigation.  To endorse Knight Institute's broad reading of *Advance Local Media, LLC* would be to accept that virtually any document the Court reviews *in camera*—including, for instance, privileged materials the Court reviews while deciding a discovery motion—automatically becomes a judicial record subject to the public right of access.  But *Advance Local Media, LLC*'s "narrow" ruling does not endorse that illogical proposition, which would undermine both the procedure and purpose of *in camera* review.  918 F.3d at 1168.

## C.     American Oversight's motion to intervene is moot.

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies."  U.S. Const. art. III, § 2.  "The doctrine of mootness is derived from this limitation because an action that is moot cannot be characterized as an active case or controversy."  *Adler v. Duval Cty. Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997).  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Powell v. McCormack*, 395 U.S. 486, 496 (1969).  "To decide a moot issue is to issue an advisory

opinion, one unnecessary to the judicial business at hand and outside the authority of Article III courts." *Friends of Everglades v. S. Fla. Mgmt. Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009).

Measured against these considerations, American Oversight's proffered reason for wanting access to Volume II is moot. American Oversight insists that Volume II contains material relevant to the U.S. Senate's assessment of the nomination of Kash Patel to become FBI Director [ECF No. 717, at pg. 2 ("Volume II contains information of critical and urgent importance to the public regarding Kash Patel, President Trump's nominee for Director of the Federal Bureau of Investigation . . . .  In a matter of days, the U.S. Senate is expected to vote on Patel's confirmation. The American people and their Senators, who have repeatedly demanded the release of the report—have a right to know the non-exempt information relating to Patel's involvement in the classified documents investigation *before that vote happens*" (emphasis added))]. But the Senate confirmed Director Patel on February 20, 2025.

Accordingly, the Court should deny American Oversight's motion to intervene as moot, as there is no meaningful relief that the Court can provide. *Friends of Everglades*, 570 F.3d at 1216 ("To decide questions that do not matter to the disposition of a case is to separate Lady Justice's scales from her sword. That we will not do.").

**D.     Even if American Oversight or Knight Institute is permitted to intervene, the Court should not *order* the release of Volume II.**

When the Eleventh Circuit dismissed the appeal as to Waltine Nauta and Carlos De Oliveira, the *criminal case* ended. There is nothing left for the Court to resolve regarding the *criminal charges* brought by Jack Smith. The United States Attorney's Office for the Southern District of Florida does not intend to revive the charges brought by Jack Smith.[6]

---

[6] The United States understands and appreciates the arguments made by Waltine Nauta and Carlos De Oliveira regarding the prejudice they may suffer if Volume II were to be released to the public.

In the event the Court is inclined to lift the Injunction Order, it should decline to *order* the release of Volume II.  Rather, the ultimate decision regarding whether to release Volume II outside the Department of Justice rests within the sound discretion of the Attorney General of the United States.  *See* 28 C.F.R. § 600.8(c) ("Closing documentation. At the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a *confidential* report explaining the prosecution or declination decisions reached by the Special Counsel.") (emphasis added); 28 C.F.R. § 600.9(c) ("The Attorney General *may determine* that public release of these reports would be in the public interest, to the extent that release would comply with applicable legal restrictions. All other releases of information by any Department of Justice employee, including the Special Counsel and staff, concerning matters handled by Special Counsels shall be governed by the generally applicable Departmental guidelines concerning public comment with respect to any criminal investigation, and relevant law.") (emphasis added).

The United States recognizes that when the Court entered its Injunction Order, Waltine Nauta and Carlos De Oliveira still faced the prospect of criminal trials on the charges contained in the Superseding Indictment.  The Court's Injunction Order was necessary and appropriate.  If the Court is now inclined to lift the Injunction Order, it is the Attorney General's prerogative to determine whether release of Volume II "would be in the public interest[.]" 28 C.F.R. § 600.9(c).

---

The United States also recognizes that "[f]ederal courts may exercise their supervisory powers to remedy violations of recognized rights, to protect the integrity of the federal courts, and to deter illegal conduct by government officials."  *United States v. DiBernardo*, 775 F.2d 1470, 1475-76 (11th Cir. 1985).  To that end, the United States does not object to the Court keeping its order enjoining the Attorney General of the United States and the Department of Justice from releasing Volume II outside the Department of Justice, or sharing any information contained in Volume II with anyone outside the Department of Justice, in place.

**E.      An *in camera* review by the Court of the grand jury materials related to this prosecution is not warranted.**

The Court should decline any invitation to conduct an *in camera* review of the grand jury materials related to this prosecution.  The Attorney General has not ordered the release of Volume II, nor has any court of competent jurisdiction ordered the Department of Justice to release Volume II.  Unless and until either of those contingencies comes to fruition, it would be premature for the Court to engage in a Rule 6(e) analysis.

"The Supreme Court has long recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings."  *Pitch v. United States*, 953 F.3d 1226, 1232 (11th Cir. 2020) (internal marks and citations omitted).  Grand jury proceedings and records have been "kept from the public eye" since the 17th Century.  *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218 n.9 (1979).  Rule 6 of the Federal Rules of Criminal Procedure, which governs matters related to the grand jury, codifies this traditional practice of secrecy.

Rule 6(e)(1) mandates that "[u]nless the court orders otherwise, an attorney for the government will retain control of the recording, the reporter's notes, and any transcript prepared from those notes."  Given this responsibility, "as a practical matter, it is the government—and not the district court—that actually discloses the grand jury records."  *Pitch*, 953 F.3d at 1234.  "When the district court authorizes disclosure under Rule 6(e)(3)(E), then, it must do so by ordering a government attorney to disclose the grand jury records that are in his or her possession."  *Id*. at 1237 n.10.

Rule 6(e)(2) delineates those persons who are prohibited from disclosing matters occurring before the grand jury.  Fed. R. Crim. P. 6(e)(2)(B)(i-vii).  That list includes attorneys for the government, and persons to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii).  Fed. R. Crim. P. 6(e)(2)(B)(vi-vii).

Rule 6(e)(3), in turn, governs the exceptions to grand jury secrecy, and provides, in relevant part, as follows:

(3) Exceptions.

> (A) Disclosure of a grand-jury matter--other than the grand jury's deliberations or any grand juror's vote--may be made to:
>
> > (i) an attorney for the government for use in performing that attorney's duty;
> >
> > (ii) any government personnel--including those of a state, state subdivision, Indian tribe, or foreign government--that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law; or
> >
> > (iii) a person authorized by 18 U.S.C. § 3322.
>
> (B) A person to whom information is disclosed under Rule 6(e)(3)(A)(ii) may use that information only to assist an attorney for the government in performing that attorney's duty to enforce federal criminal law. An attorney for the government must promptly provide the court that impaneled the grand jury with the names of all persons to whom a disclosure has been made, and must certify that the attorney has advised those persons of their obligation of secrecy under this rule.
>
> (C) An attorney for the government may disclose any grand-jury matter to another federal grand jury.
>
> (D) An attorney for the government may disclose any grand-jury matter involving foreign intelligence, counterintelligence (as defined in 50 U.S.C. § 3003), or foreign intelligence information (as defined in Rule 6(e)(3)(D)(iii)) to any federal law enforcement, intelligence, protective, immigration, national defense, or national security official to assist the official receiving the information in the performance of that official's duties. An attorney for the government may also disclose any grand-jury matter involving, within the United States or elsewhere, a threat of attack or other grave hostile acts of a foreign power or its agent, a threat of domestic or international sabotage or terrorism, or clandestine intelligence gathering activities by an intelligence service or network of a foreign power or by its agent, to any appropriate federal, state, state subdivision, Indian tribal, or foreign government official, for the purpose of preventing or responding to such threat or activities.
>
> . . . .

16

477

(E) The court may authorize disclosure--at a time, in a manner, and subject to any other conditions that it directs--of a grand-jury matter:

> (i) preliminarily to or in connection with a judicial proceeding;
>
> (ii) at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury;
>
> (iii) at the request of the government, when sought by a foreign court or prosecutor for use in an official criminal investigation;
>
> (iv) at the request of the government if it shows that the matter may disclose a violation of State, Indian tribal, or foreign criminal law, as long as the disclosure is to an appropriate state, state-subdivision, Indian tribal, or foreign government official for the purpose of enforcing that law; or
>
> (v) at the request of the government if it shows that the matter may disclose a violation of military criminal law under the Uniform Code of Military Justice, as long as the disclosure is to an appropriate military official for the purpose of enforcing that law.

Fed. R. Crim. P. 6(e)(3).

Rule 6(e)(3) contains an exhaustive list of exceptions to grand jury secrecy. *Pitch*, 953 F.2d at 1234 ("The rule . . . leaves no room for district courts to fashion new exceptions beyond those listed in Rule 6(e). . . . Rule 6(e) by its plain terms limits disclosures of grand jury materials to the circumstances enumerated therein.").

Any attorneys representing the United States, including the Attorney General, are bound by the grand jury secrecy requirements and exceptions contained in Rule 6(e). *See* Fed. R. Crim. P. 1(b) (defining "attorney for the government" as the Attorney General or an authorized assistant; a United States attorney or an authorized assistant; when applicable to cases arising under Guam law, the Guam Attorney General or other person whom Guam law authorizes to act in the matter; and any other attorney authorized by law to conduct proceedings under these rules as a prosecutor); *United States v. Sells Eng'g*, 463 U.S. 418, 427 (1983) (noting that under Rule 6(e)(2) "grand

jurors, government attorneys and their assistants, and other personnel attached to the grand jury are forbidden to disclose matters occurring before the grand jury."); *In re Grand Jury Investigation*, 610 F.3d 202, 219 (5th Cir. 1980) (recognizing that the Court can impose contempt sanctions against Department of Justice attorneys for violating Rule 6(e)).

In summary, the United States submits the Department of Justice, not the Court, is responsible for redacting any grand jury material in Volume II. This is consistent with historical grand jury practice. "The grand jury is by design an institution independent from the Judicial Branch . . . the district court neither presides over the grand jury nor monitors its proceedings." *Pitch*, 953 at 1237 (citations omitted).

If the Court is concerned that the release of Volume II outside the Department of Justice at some point in the future might implicate Waltine Nauta's and Carlos De Oliveira's constitutional rights to a fair trial, the Court can require the Department of Justice to provide written notice to counsel for Waltine Nauta and counsel for Carlos De Oliveira sixty days before releasing a redacted version of Volume II outside the Department of Justice. This would allow the defendants to seek appropriate relief from this Court, only if the Attorney General decides to release Volume II outside the Department of Justice.

## CONCLUSION

For these reasons, the United States respectfully requests the Court to deny American Oversight's Motion to Intervene and for Clarification or, Alternatively, Dissolution of January 21, 2025 Order Granting Defendants' Emergency Motion to Preclude Release of Volume II of Special Counsel's confidential Final Report [ECF No. 717], and Knight Institute's Motion to Intervene to Seek Rescission of the Court's January 21, 2025 Order and Public Release of Volume II of the Special Counsel's Report [ECF No. 721].

Respectfully submitted,

HAYDEN P. O'BYRNE
UNITED STATES ATTORNEY

By:     **/s/Michael D. Porter**
Michael D. Porter
Assistant United States Attorney
Florida Bar# 0031149
101 South U.S. Highway 1
Suite 3100
Fort Pierce, Florida 34950
Telephone: (772) 293-0950
Email: michael.porter2@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by either regular U.S. mail or inter-office delivery.

**/s/Michael D. Porter**
Michael D. Porter
Assistant United States Attorney

# TAB 745

# Case No. 23-cr-80101-AMC, S.D. Fla.,

# Doc. 745

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

**CASE NO.: 23-CR-80101-AMC**

FILED BY_____ D.C.

MAR 3 1 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES OF AMERICA,

　　　　Plaintiff,

v.

DONALD J. TRUMP, WALTINE NAUTA,
and CARLOS DE OLIVEIRA,

　　　　Defendants.

---

**REPLY BY THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA**
**UNIVERSITY IN SUPPORT OF ITS MOTION TO INTERVENE**

The Knight Institute's motion to intervene is proper, both to seek rescission of this Court's

January 21, 2025 Order and to seek the public release of Volume II under the First Amendment

and the common law. The parties—Waltine Nauta and Carlos De Oliveira ("Ex-Defendants") and

the government—agree with the Knight Institute that intervention in a criminal case is proper to

assert a public right of access to judicial records. They dispute that Volume II is a judicial record,

but that goes to the merits of the Institute's First Amendment and common law arguments, not the

Court's authority to reach the merits. The Knight Institute's motion to intervene to seek rescission

of the Court's January 21, 2025 Order is also proper, because the Order stands directly in the way

of the Institute's ability to vindicate its rights under the Freedom of Information Act ("FOIA").

The Order's impact on the Institute's FOIA request is not "secondary" or "collateral," as the

government claims. By its terms, the Order enjoins the Department of Justice ("DOJ") from

"releasing, sharing, or transmitting Volume II . . . outside the Department of Justice." Order

Granting Defs.' Emergency Mot. to Preclude Release of Volume II of Special Counsel's Report ("January 21 Order") 13, ECF No. 714.

Ex-Defendants' assertion that the Institute's motion is untimely is without merit. There is no statute of limitations for a common law or constitutional right of access. More broadly, Ex-Defendants' attempt to rely on Federal Rule of Civil Procedure 24 is misplaced, because as the cases they cite show, timeliness under that rule is often measured in *years*, and intervention can be timely even if it occurs long after a case has concluded. The Knight Institute filed its motion to intervene shortly after DOJ informed the Institute that this Court's Order prevented the Department from taking action on the Institute's FOIA request, and shortly after the Eleventh Circuit dismissed the appeals with respect to Ex-Defendants.

This Court should lift the injunction because Ex-Defendants no longer face any jeopardy. The government has said that it "does not intend to revive the charges," and thus Ex-Defendants face no risk of prosecution during the current administration. Joint Status Report ("JSR") 2, ECF No. 738; United States's Resp. in Opp'n to Mots. to Intervene ("Gov't Br.") 5, ECF No. 740. There is also no risk that a future administration will re-file these charges against them, because the statute of limitations would bar it from doing so. The applicable five-year statute of limitations will run in 2028, during the present administration. Any risk of prejudicing Ex-Defendants in a future prosecution is not substantial enough to justify the Court leaving the injunction in place.

Volume II is subject to a strong presumption of public access under the First Amendment and the common law because it was submitted to the Court for *in camera* review in connection with Ex-Defendants' Emergency Motion, which invoked the Court's powers. The Court also stated in its January 21 Order that its review of Volume II was integral to deciding the motion. That Volume II contains references to Rule 16 discovery material has no bearing on its status as a

judicial record. Although the production of material in discovery does not generally give rise to a presumptive right of access, this does not mean that material that would otherwise be subject to a presumptive right of access loses that character because some parts of it were once produced to a party in discovery.

Ex-Defendants have not met their burden of showing good cause or a compelling interest sufficient to overcome the presumption of access. The public interest in the release of Volume II is paramount, because it concerns a public official of the highest rank and addresses a matter of public concern—the investigation and prosecution of a former president for the alleged willful retention of military secrets. Public access to Volume II will also promote public understanding of historically significant events and of our judicial system. Ex-Defendants' asserted interests in keeping Volume II confidential cannot overcome this extraordinary interest in access. Public release of Volume II will enhance rather than impair court functions by heightening public respect for the judicial process, and will not cause significant harm to Ex-Defendants' privacy interests, because, by their own account, the detailed allegations against them have received more than a year-and-a-half of publicity. Ex-Defendants' efforts to paint Volume II as "unreliable" is nothing more than a denial of the allegations against them, which is not a valid basis for keeping Volume II confidential. Finally, Ex-Defendants greatly exaggerate the burdens they would face in responding to the allegations in Volume II.

## I.    The Knight Institute's Motion to Intervene is Proper.

### A.    Intervention is Proper to Assert a Public Right of Access to Volume II.

The parties agree with the Knight Institute that intervention in a criminal case is proper in order to assert a First Amendment or common law right of access to judicial proceedings or records. Ex-Defs.' Resp. in Opp'n to Mots. to Intervene ("Ex-Defs.' Br.") 11, ECF No. 739

("[M]embers of the public generally are allowed to intervene to seek access to judicial records . . . ."); Gov't Br. 6–7 ("[T]o intervene, a third party must be seeking a ruling from the district court that directly affects their constitutional or federal rights, such as a ruling on a disputed First Amendment access or privilege issue."). The Eleventh Circuit made that clear in *In re Petition of the Tribune Co.*, which concerned a newspaper publisher's "post-trial petition to intervene in a criminal case in order to obtain transcripts of bench conferences which were held in open court but out of the hearing of the attending press and public." 784 F.2d 1518, 1519 (11th Cir. 1986). The court held that "[t]he press has standing to intervene in actions to which it is otherwise not a party in order to petition for access to court proceedings and records." *Id.* at 1521. The same is true of organizations like the Knight Institute, because the press's right of access under the First Amendment and the common law is in this context no greater than the public's right of access. *See, e.g.*, *Nixon v. Warner Commc'ns*, 435 U.S. 589, 609 (1978).

Ex-Defendants argue, however, that because the Knight Institute is not a "media organization," it "deserve[s] less, not more, privilege than the legitimate press entities to which this Court already declined to grant intervenor status." Ex-Defs.' Br. 8. That assertion misstates the law and misconstrues the record. As noted, the press has no greater right of access than the public to judicial records under the First Amendment or the common law. And although the Court did not grant the Press Coalition's motions to intervene in this case, neither did the Court hold that intervention was improper. ECF Nos. 196, 283, 370. Instead, the Court *denied the motions as moot*, because the Court granted the relief the Press Coalition was seeking for other reasons, or because the premise for the motion—the possible closure of a hearing—did not occur. *Id.*

**B.     Intervention is Also Proper to Seek Rescission of the Court's January 21 Order.**

The Knight Institute also has standing to intervene in this case because this Court's January 21 Order barring the release of Volume II implicates the Institute's federal rights under FOIA. *See, e.g., United States v. Atesiano*, Case No. 18-20479-CR-Moore/Simonton, 2018 WL 5831092, at *2–4 (S.D. Fla. Nov. 7, 2018) (explaining that intervention in a criminal case is proper when "a third party's constitutional or other federal rights are implicated by the resolution of a particular motion, request, or other issue during the course of a criminal case" (citation omitted)); *United States v. Cox*, Case No. 8:14-cr-0140-T-23MAP, 2015 WL 13741738, at *3 (M.D. Fla. Oct. 7, 2015) (same).

The government argues that the Knight Institute's intervention to seek rescission of the Court's January 21 Order is improper, because "to intervene, a third party must be seeking a ruling from the district court that directly affects their constitutional or federal rights." Gov't Br. 6–7. But that is precisely what the Knight Institute is seeking here. Although the government describes the Court's January 21 Order as having only a "knock-on," "indirect," "secondary," "collateral," or "second-order" impact on the Knight Institute's rights under FOIA, Gov't Br. 6, that description cannot be squared with the plain text of the Court's Order: "the Department of Justice . . . [is] enjoined from . . . releasing, sharing, or transmitting Volume II of the Final Report . . . outside the Department of Justice." January 21 Order 13. The Court's injunction blocks the Institute from exercising its federal rights under FOIA. That is more than sufficient to satisfy the standard for intervention in a criminal case. *See, e.g., Atesiano*, 2018 WL 5831092, at *2–4; *Cox*, 2015 WL 13741738, at *3.

The Second Circuit's decision in *LaRouche v. FBI*, 677 F.2d 256 (2d Cir. 1982), is instructive. In that civil case, the district court entered an order enjoining public disclosure of

certain FBI documents, and a third party seeking those documents through FOIA moved to intervene. *Id.* at 257. The Second Circuit found that the intervenor had demonstrated "a recognizable interest in the litigation" because FOIA "creates in clear language a judicially enforceable public right to secure such information from possibly unwilling official hands." *Id.* at 258 (cleaned up). The court concluded that "[w]here, as here, a member of the public is being foreclosed from exercising that right by an order entered . . . in litigation to which she is not a party, her effective remedy, perhaps her only one, is by way of intervention." *Id.* (citing *GTE Sylvania, Inc. v. Consumers Union*, 445 U.S. 375, 378 (1980)). So too here.

Ex-Defendants and the government suggest that the Knight Institute's motion to intervene is improper because the Institute has not filed suit to enforce its FOIA request. Ex-Defs.' Br. 10 n.3 (faulting the Knight Institute for "not even bother[ing]" to "appeal[] DOJ's denial of its FOIA demand to the United States District Court for the District of Columbia"); Gov't Br. 6 (noting that the "Knight Institute has not even filed suit"). Under the applicable regulations, however, the Institute must administratively appeal DOJ's denial of its FOIA request before filing suit, and it has 90 days—or until May 7, 2025—to do so. *See* Ex. 3 at 2, Declaration of Anna Diakun, ECF No. 721. Because an administrative appeal would be futile while this Court's injunction remains in place, the Knight Institute has sought to intervene in this case to urge the Court to lift the injunction.

Taking a different tack, Ex-Defendants claim that the Knight Institute is an "offensive," and thus improper, intervenor under *Atesiano*. Ex-Defs.' Br. 7–8. But that is plainly incorrect, too. "Offensive" intervenors are "civil litigants [who seek] to advance their own civil action by intervening in a criminal action for purposes of obtaining discovery," even though they likely could obtain the information through the normal discovery process. *Atesiano*, 2018 WL 5831092 at *3–

4. But by asking the Court to lift its injunction, the Knight Institute is not asking the Court to affirmatively provide information the Institute could obtain elsewhere; the Institute is asking the Court to remove a barrier to the Institute vindicating its rights under FOIA. The Institute is thus much more akin to what *Atesiano* calls a "defensive" and thus proper intervenor—"a member of the public with an interest in open access to court records." *Id.* at *2.

### C. The Knight Institute's Motion to Intervene is Timely.

Ex-Defendants make the baseless assertion that the Knight Institute's motion to intervene is untimely. Ex-Defs.' Br. 5–6. Ex-Defendants rely on the timeliness requirement of Federal Rule of Civil Procedure 24, but as the cases they cite make clear, timeliness under Rule 24 is often measured in *years*, and "[i]ntervention may be timely filed even if it occurs after a case has concluded." *Comm'r, Ala. Dep't of Corrs. v. Advance Loc. Media, LLC*, 918 F.3d 1161, 1171 (11th Cir. 2019); *see also Miccosukee Tribe of Indians v. United States*, Case No. 04–21448–civ–Gold/McAliley, 2010 WL 11442638, at *2 (S.D. Fla. Aug. 2, 2010) (finding motion to intervene untimely because it was filed "approximately two years" after the intervenors became aware of their interests in the case).

Ex-Defendants fail to acknowledge the "special nature" of a motion to intervene for the limited purpose of asserting a public right of access to a document under seal, which weighs in favor of granting intervention even long after a case has been dismissed. *Pub. Citizen v. Liggett Grp., Inc.*, 858 F.2d 775, 786 (1st Cir. 1988) ("[O]rdinary principles applicable to intervention do not work well here" because "to the extent [a right of access] exists, it exists today for the records of cases decided a hundred years ago as surely as it does for lawsuits now in the early stages of

motions litigation." (alterations in original) (citation omitted)).[1] Ex-Defendants also ignore the actual timeline of the Knight Institute's intervention. It was not until the Court issued its January 21 Order enjoining the Department of Justice from releasing Volume II that anyone could have learned that the Court relied on the copy of Volume II that was delivered to the Court for *in camera review* in issuing the injunction. Knight First Amendment Institute Mot. to Intervene ("Knight Mot.") 6, 12, ECF No. 721. It was not until February 6, 2025, that DOJ informed the Knight Institute that the Court's January 21 Order prevented DOJ from acting on the Institute's FOIA request. *Id.* at 7–8. And it was not until February 11, 2025, that the Eleventh Circuit dismissed the appeals, ensuring that Ex-Defendants were no longer in jeopardy and there was no longer any reason for the injunction. *Id.* at 7. The Institute filed its motion to intervene shortly thereafter, on February 24, 2025. Ex-Defendants' assertion that the Knight Institute "should have intervened back in January," and that Ex-Defendants will suffer prejudice from the "delay" thus makes no sense. *See* Ex-Defs.' Br. 6.

## II.   The Court Should Lift the Injunction Because Ex-Defendants Face No Risk of Future Prosecution.

The Court should lift the injunction because Ex-Defendants do not face any risk of future prosecution. Ex-Defendants urge the Court to "maintain its supervision" over this case and "continue to enjoin the release of the Report" because "the statute of limitations has not yet expired in this matter." JSR 3, 5. But as Ex-Defendants concede, "the United States Attorney's Office for the Southern District of Florida does not intend to revive the charges." *Id.* at 2, 3. They thus face

---

[1] The Eleventh Circuit has recognized that "timeliness concerns may be less significant when intervention is 'not on the merits, but for the sole purpose of challenging a protective order.'" *Advance Loc. Media*, 918 F.3d 1161, 1171 n.9 (11th Cir. 2019) (quoting *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) (allowing intervention three years after a case was settled)).

488

no risk of prosecution during the current administration. There is also no risk that a future administration will re-file these charges against them because the statute of limitations would bar it from doing so. The alleged criminal conduct in the Superseding Indictment took place in 2022 and 2023, *see* Superseding Indictment 38–43, 46–53, ECF No. 85, and each crime with which Ex-Defendants are charged has a five-year statute of limitations, *see* 18 U.S.C. §§ 1001, 1512, 1519, 3282; JSR 5–6. This means that the statute of limitations will run in 2028, during the present administration.

It is thus disingenuous for Ex-Defendants to represent that they remain in "jeopardy" and that as a result "their due process rights remain a serious concern that strongly outweighs any interest that the Government or the public might have in the release of the Special Counsel's Report." JSR 6. Lifting the injunction will not violate Ex-Defendants' due process or fair trial rights, nor will it violate Local Rule 77.2's prohibitions against releasing "information or opinion," because that prohibition only applies when there is a trial to protect. *See* S.D. Fla. 77.2(a) (limiting the rule to information released "in connection with pending or imminent criminal litigation"). The Knight Institute knows of no case in which a court has enjoined the government from releasing information on the grounds that the information might prejudice individuals who might be charged with crimes at some future date.

Accordingly, the injunction barring release of the report is no longer a necessary or appropriate exercise of this Court's supervisory authority. *See United States v. Moss*, No. 10-60264-CR-COHN, 2011 WL 2669159, at *9 (S.D. Fl. Mar. 21, 2011) (explaining that a defendant must "show that he has been prejudiced by the conduct of which he complains before he would be entitled to relief" through the Court's exercise of its supervisory powers) (citing *United States v. O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987)). That Ex-Defendants "remain concerned that [FOIA]

presents opportunities for mischief that might one day force the Attorney General's hand, despite
her good faith intention to maintain the Report's confidential status," JSR 4, does not provide this
Court with grounds to keep the injunction in place. The Knight Institute can find no case in which
a court has enjoined the release of a document on the ground that someone might seek or obtain
the document under FOIA—and an injunction issued for that purpose would be flagrantly
improper. The same is true of Ex-Defendants' characterization of Volume II as "the biased
ramblings of an unconstitutional prosecutor," Ex-Defs.' Br. 13, and their desire to "avoid the
arduous task of dissecting Volume II . . . to identify and seek protection for additional 6(e) and
other confidential information." JSR 3.

## III.   The Public Has a Right of Access to Volume II Under the First Amendment and the Common Law.

### A.   Volume II is Subject to a Presumptive Right of Access.

Ex-Defendants argue that Volume II is not a judicial record because it "was never filed as
part of the public record, and it was only submitted to this Court on an *ex parte*, *in camera* basis."
Ex-Defs.' Br. 11. As explained in the Knight Institute's opening brief, however, a document need
not be filed on the docket to be a judicial record. Knight Mot. 11–12. It is sufficient when, as here,
a document is submitted for *in camera* review in connection with a motion that invokes the Court's
powers. *Id.* Ex-Defendants cite no case to the contrary. Volume II in fact played a much more
significant role. The Court directed that Volume II be submitted *in camera* to "facilitate" the
Court's consideration of the motion, the Court discussed Volume II's contents with the parties'
designated counsel during a closed portion of the hearing on the motion, and the Court stated in
its January 21 Order that its review of Volume II was integral to deciding the motion. ECF Nos.
705; 714 at 2, 4 n.6, 5 n.8. Volume II is therefore a judicial record.

The government is thus simply incorrect in claiming that judicial records are limited to documents "that may help a court to resolve the merits of an action." Gov't Br. 8; *see also id.* at 11 (arguing that "Volume II was not critical to the Court's resolution of any of the underlying charges against the defendants"). In *Romero v. Drummond Co.*, for example, the Eleventh Circuit held that a presumptive right of access attached to declarations filed in connection with a motion that had nothing whatsoever to do with the court's resolution of the merits—a "Motion To Submit Pertinent Information To U.S. State & Justice Departments." 480 F.3d 1234, 1240, 1245–48 (11th Cir. 2007).

For similar reasons, there is no merit to Ex-Defendants' argument that Volume II is not a judicial record because it "was never filed as part of the public record, and it was only submitted to this Court on an *ex parte*, *in camera* basis for the sole purpose of this Court's enjoining its improper release." Ex-Defs.' Br. 11. That argument, however, was squarely and appropriately rejected in *United States v. Noriega*, 752 F. Supp. 1037 (S.D. Fla. 1990). In that case, the court held that transcripts of jailhouse recordings of the defendant speaking to his legal team were judicial records, even though the recordings were submitted to the court for *in camera* review for the sole purpose of determining whether their public release would impair the defendant's fair trial rights. *Id.* at 1038–42. The court reasoned as follows:

> [W]hether the transcripts were formally entered on the docket or placed in the court file is not dispositive as to whether they are judicial records to which the press has a right of access. The transcripts of Noriega's conversations were relied on by this court in reaching its determination as to whether disclosure of their contents would impair Noriega's right to a fair trial. Indeed, the entire purpose of requiring CNN to produce the tapes was to enable this court to make the factual findings necessary to rule on the merits of Noriega's motion for an injunction on publication. The tapes' contents therefore provided the basis for the court's decision to lift its restraining order on the tapes' broadcast. In this function, the transcripts served as an important part of the record before this court, and would have been submitted to the Eleventh Circuit and the Supreme Court as part of the record had this court's order vacating its restraint been appealed.

*Id.* at 1042 (citation omitted). Like the recordings at issue in *Noriega*, Volume II was submitted to the court for *in camera* review in connection with a motion to prevent its public release. It is a judicial record for this reason. That Volume II was not "used at trial or attached to a motion to suppress" makes no difference. Ex-Defs.' Br. 14.

Ex-Defendants claim that the Knight Institute is "suggest[ing] that by invoking a Court's powers to keep a document private, a document must become public." Ex-Defs.' Br. 11. This is incorrect. When Ex-Defendants submitted Volume II to the Court for *in camera* review in connection with their Emergency Motion, Volume II became subject to a *presumptive* right of access.[2] At that time, however, the criminal case against Ex-Defendants was ongoing and they faced the prospect of a criminal trial, and the necessity of protecting their due process and fair trial rights overcame the presumption of access. But "[w]hen the Eleventh Circuit dismissed the appeal as to [Ex-Defendants], the criminal case ended," Gov't Br. 13, and there was no longer good cause or a compelling reason for keeping Volume II confidential.

The parties argue, without merit, that the public has no presumptive right of access to Volume II, because it contains "myriad references" to pre-trial discovery material, which they claim is exempt from the First Amendment and common law rights of access unless it is filed on the docket in connection a substantive motion. Gov't Br. 9–10; *see also* Ex-Defs.' Br. 13–14. The Special Counsel's final report is not a discovery document and should not be treated like one. It has nothing to do with the pre-trial discovery process. Indeed, as the government emphasizes, "the

---

[2] In *Noriega*, the court at one point observed that several cases stand for the "sound proposition" that the presumption of access to judicial records does not apply to materials "properly submitted to the court under seal" or *in camera*. *Id.* at 1042–43. Besides being dicta—the court said that those cases were "irrelevant" to its decision—the Eleventh Circuit has rejected that proposition in holding that a document submitted to the court for *in camera* review but not filed with the court was a judicial record. *See Advance Local Media*, 918 F.3d at 1167–68.

Court dismissed the criminal charges against the defendants well before the issuance of Volume II." Gov't Br. 11. The report was prepared to be released to the public, as has been the case with other Special Counsels' final reports, including the Mueller Report and, more recently, Special Counsel Hur's and Special Counsel Durham's final reports.[3]

In the civil discovery context, the rule is that the production of material in discovery does not give rise to a presumptive right of access. But this does not mean that material that would otherwise be subject to a presumptive right of access loses that character because some parts of it were once produced to a party in discovery. The parties also fail to recognize the distinction courts draw between civil discovery and Rule 16 discovery for purposes of the First Amendment and common law rights of access. "The process by which the government investigates and prosecutes its citizens is an important matter of public concern," which distinguishes discovery in criminal cases from "traditional civil discovery between private parties." *United States v. Wecht*, 484 F.3d 194, 210 (3d Cir. 2007) (holding that *Brady* materials submitted to the court for *in camera* review were subject to the common law right of access).

### B.      The Presumptive Right of Access Cannot Be Overcome.

The public interest in Special Counsel Jack Smith's investigation and prosecution of President Trump is extraordinary. Ex-Defendants cannot meet their burden of showing that their interests in keeping Volume II confidential outweigh the public interest in disclosure. The criminal

---

[3] Special Couns. Robert S. Mueller, III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election* (2019), https://perma.cc/2K8N-Y4ZU; Special Couns. Robert K. Hur, *Report on the Investigation Into Unauthorized Removal, Retention, and Disclosure of Classified Documents Discovered at Locations Including the Penn Biden Center and the Delaware Private Residence of President Joseph R. Biden, Jr.* (2024), https://perma.cc/MSN6-XTVF; Special Couns. John H. Durham, *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns* (2023), https://perma.cc/N9DN-HGJW.

case against Ex-Defendants is over, and they face no risk of future prosecution. None of the other interests Ex-Defendants assert could justify keeping Volume II confidential.

First, release of Volume II would not "impair court functions." Ex-Defs.' Br. 15. In fact, denying access to Volume II "may well diminish the public's regard for the court's role in an open society." *Kearney v. Auto–Owners Ins. Co.*, Case No. 8:06–cv–00595–T–24, 2009 WL 10664317, at *3 (M.D. Fla. Sept. 8, 2009). This Court's ruling that Jack Smith was unconstitutionally appointed does not change the calculus. Indeed, it underscores the public interest in Volume II, because releasing Volume II will assist the public in determining whether special counsels play a sufficiently important role in our system of justice to warrant "Congress . . . authoriz[ing] [their] appointment through enactment of positive statutory law consistent with the Appointments Clause." *United States v. Trump*, 740 F. Supp. 3d 1245, 1253 (S.D. Fla. 2024). And although Ex-Defendants repeatedly suggest that Jack Smith engaged in misconduct, the Eleventh Circuit has held that even if a court finds that an attorney engaged in misconduct in preparing or filing a judicial record, withholding the document from the public is not a proper sanction. *Romero*, 480 F.3d at 1247.

Second, Ex-Defendants' assertion that the release of Volume II would harm their privacy interests is undermined by the fact that the detailed allegations against them have already received "a year-and-a-half of rampant pretrial publicity." JSR at 4. The Eleventh Circuit has held that even "court files that instigate public scandal or libel" should not be sealed when they "support the already-public" allegations against the defendant. *Romero*, 480 F.3d at 1247. Moreover, "in cases involving public concerns like 'the citizen's desire to keep a watchful eye on . . . the operation of government,' documents—even sensitive ones—may speak to the 'heart of the interest protected

by the right of access,' making public disclosure paramount." *Gubarev v. Buzzfeed, Inc.*, 365 F. Supp. 3d 1250, 1257 (S.D. Fla. 2019) (quoting *Romero*, 480 F.3d at 1246).

Third, Ex-Defendants' assertion that Volume II is filled with "unreliable allegations," Ex-Defs.' Br. 15, is not a valid reason for withholding Volume II from the public. *Romero*, 480 F.3d at 1247 (holding that a party's "denial" of the allegations in a judicial record "is not a legitimate basis" for keeping the record confidential). Finally, Ex-Defendants greatly exaggerate the "hurdles" they would face in responding to the allegations in Volume II. Ex-Defs.' Br. 16. Responding to the report would not be "akin to defending the case at trial," nor would it require counsel to access and review the "massive" amounts of discovery that are "stored on a database." *Id.* at 15. Defendants cite no case for the proposition that the burdens of responding to allegations in a judicial record can overcome the strong presumption of access.

## CONCLUSION

For the foregoing reasons, the Court should grant the Knight Institute's Motion to Intervene, rescind the January 21 Order, and direct the clerk to file on the public docket the redacted version of Volume II that DOJ submitted to the Court in advance of the January 17, 2025 hearing on Defendants' Emergency Motion.

Dated: March 31, 2025

Respectfully submitted,

David M. Buckner, Esq.
Florida Bar No. 60550
Buckner + Miles
2020 Salzedo Street
Suite 302
Coral Gables FL 33134
Phone: (305) 964-8003
david@bucknermiles.com

Scott Wilkens (*pro hac vice* pending)
Anna Diakun (*pro hac vice* pending)
Jameel Jaffer (*pro hac vice* pending)
Knight First Amendment Institute
  at Columbia University
475 Riverside Drive, Suite 302
New York, N.Y. 10115
Phone: (646) 745-8500
scott.wilkens@knightcolumbia.org

*Counsel for Prospective Intervenor Knight
First Amendment Institute at Columbia
University*

496

## CERTIFICATE OF SERVICE

I, David Buckner, do hereby certify that I have filed the foregoing Reply by the Knight

First Amendment Institute at Columbia University in Support of its Motion to Intervene with the

Clerk of the Court for the United States District Court for the Southern District of Florida on March

31, 2025.

Respectfully submitted,

David M. Buckner, Esq.
Florida Bar No. 60550
Buckner + Miles
2020 Salzedo Street
Suite 302
Coral Gables FL 33134
(305) 964-8003

*Counsel for Prospective Intervenor*

497

TAB 746

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 746

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 23-cr-80101-CANNON

UNITED STATES OF AMERICA,

     Plaintiff,

v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

     Defendants.



/

---

## AMERICAN OVERSIGHT'S CONSOLIDATED REPLY
## TO FORMER DEFENDANTS' AND THE UNITED STATES' OPPOSITION TO ITS
## MOTION TO INTERVENE AND LIFT INJUNCTION

### <u>INTRODUCTION</u>

This Court should grant American Oversight's motion to intervene and dissolve the

January 21, 2025 Order ("the Order") barring the release of Volume II of the Final Report of the

Special Counsel ("the Report"). Prospective intervenor American Oversight properly requested

access to the Report, a document of significant national importance, under the Freedom of

Information Act ("FOIA"), yet has been denied that access solely because of this Court's Order,

and now seeks intervention in this matter for the limited purpose of seeking dissolution of the

Order so that it may enforce its own federal rights under FOIA.[1]

The Order was entered to protect the rights of individuals who were then facing a live

criminal appeal and possible trial; they no longer face either. The concerns of individuals who no

---

[1] American Oversight incorporates in this reply as background the procedural history of this case and its case in the District of Columbia, *American Oversight v. U.S. Dep't of Justice*, No. 25-cv-383 (D.D.C. Feb. 10, 2025), provided in its initial Motion, ECF No. 717.

longer have the prospect of a criminal case before this Court cannot be used to justify the extension of an injunction barring the release of an executive branch agency report when all risks of pre-trial publicity or prejudice have been extinguished. That would shield these *former* defendants, who face *no* criminal jeopardy, far beyond what *actual* criminal defendants are entitled to at the conclusion of a proceeding.

Denying American Oversight's motion to intervene and extending the injunction obstructs American Oversight from exercising its federal rights. Meanwhile, the Department of Justice ("DOJ") speaks from both sides of its mouth, telling another federal district court that the Order prohibits it from fulfilling its FOIA obligations, but telling *this* Court it takes no position on continuing that injunction. Extending the injunction would contradict the Court's reasoning supporting its earlier orders on both volumes of the Report, exceed the scope of its supervisory powers and Article III jurisdiction, interfere with American Oversight's federal rights, and obstruct the public's right to review the non-exempt portions of a report of significant national importance. As further explained below, this Court should grant American Oversight's Motion to Intervene and immediately lift the injunction barring the release of Volume II of the Report.

## MEMORANDUM OF LAW

**I.      American Oversight Should be Permitted to Intervene.**

  A. American Oversight Has Established Standing Because Its Federal Rights Are Implicated and It Has No Option Outside of Intervention to Enforce those Rights.

American Oversight has a federal right to seek federal agency records under FOIA, and so long as the Order remains in effect and DOJ refuses to contest it, no option remains outside of intervention to enforce that right.

Although intervention in criminal cases is limited, it is permitted when "a third party's constitutional *or other federal rights* are implicated by the resolution of a particular motion,

request, or other issue during the course of a criminal case." *United States v. Carmichael*, 342 F.

Supp. 2d 1070, 1072 (M.D. Ala. 2004) (emphasis added); *see also United States v. Aref*, 533

F.3d 72, 81 (2d Cir. 2008) (holding that motion to intervene by a non-profit organization to

assert right to access is procedurally proper despite the "Federal Rules of Criminal Procedure

mak[ing] no reference to a motion to intervene in a criminal case").[2]

American Oversight's federal rights are implicated by this Court's order barring the

release of Volume II of the report. Under FOIA, "[a]n agency must disclose agency records to

any person under [5 U.S.C.] § 552(a), 'unless they may be withheld pursuant to one of the nine

enumerated exemptions listed in § 552(b).'" *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136,

150–51 (1989) (*quoting U.S. Dep't of Just. v. Julian*, 486 U.S. 1, 8 (1988)); *see also Sikes v.*

*United States Dep't of Navy*, 896 F.3d 1227, 1234 (11th Cir. 2018); *Citizens for Resp. & Ethics*

*in Washington v. U.S Dep't of Just.*, 728 F. Supp. 3d 113, 121 (D.D.C. 2024) (internal citations

omitted) (noting that FOIA "seeks to permit access to official information long shielded

unnecessarily from public view and attempts to create a judicially enforceable public right to

secure such information form possibly unwilling hands").

The DOJ dismissively characterizes the implication of American Oversight's federal

rights in this matter as "some secondary or collateral implications to [its] FOIA claims," United

States Opp'n Mots. to Intervene ("Gov. Opp'n"), ECF No. 740, at 6, while at the same time

ignoring its own transparency obligations[3] and wielding the Order to justify non-disclosure of

---

[2] Although the court in *Aref* ultimately affirmed the district court's denial of the prospective
intervenor's motion to intervene because the lower court had "fully consider[ed] the issue that
the [prospective intervenor] raised," it held that the prospective intervenor's motion to intervene
in a criminal case was the proper vehicle to raise its issues before that court. *Aref*, 533 F.3d at 81.
[3] *See* U.S. Dep't of Justice, Guide to the Freedom of Information Act (Dec. 3, 2024),
https://www.justice.gov/oip/page/file/1248371/dl?inline#page=11 ("The Guidelines make clear

Volume II in American Oversight's FOIA action. *See* Ex. 1, ¶¶ 9–10 to Def.s' Mot. to Dismiss in

*Am. Oversight v. Dep't of Justice*, No. 25-cv-383 (D.D.C. filed March 11, 2025), ECF No. 12-1

(stating that the DOJ informed American Oversight that it "lacks the authority to consider the

releasability of [Volume II]" under FOIA "because it is protected from disclosure by a court

injunction issued by the United States District Court for the Southern District of Florida, West

Palm Beach Division.").

 The necessity of intervention here is demonstrated by DOJ's position in this proceeding.

Here, DOJ does not object to this Court extending its injunction and exercising jurisdiction,

*potentially indefinitely*, over a report created by an executive branch agency pertaining to issues

in this closed case but not drafted *for use* in this case. *See* J. Status Report, ECF No. 738, at 1.

The fact that Volume II is an important federal record which American Oversight and the public

it serves have a federal right to access distinguishes this case from all others involving extension

of a court seal or protective order beyond conclusion of a criminal case. Former defendants, for

their part, actively oppose dissolving the injunction. *See id.* at 3-6. No parties, other than the

prospective intervenors, are advocating for federal rights relating to government transparency

and access to otherwise public documents. American Oversight's federal "right of access,

enforceable in court, to federal agency records," *Hull v. I.R.S., U.S. Dep't of Treasury*, 656 F.3d

1174, 1177 (10th Cir. 2011), is not just implicated but, as a practical matter, extinguished by the

enforcement of an injunction barring disclosure of Volume II.

 Despite the clear implication of American Oversight's federal right to non-exempt

agency records and the fact that no party before the bar seeks to defend those rights, DOJ and

---

that the Justice Department will apply the presumption of openness when determining whether to
defend an agency's nondisclosure decision and it will not defend . . . decisions that are
inconsistent with the FOIA or with these guidelines") (internal quotations omitted).

former defendants argue that American Oversight is an "offensive" prospective intervenor, relying heavily on an unreported magistrate judge opinion in *United States v. Atesiano*, 2018 WL 5831092 (S.D. Fla. 2018). Former defendants' laser focus on the judge's classification of "offensive" versus "defensive" prospective intervenors ignores almost wholly the rationale underpinning those characterizations. Former Defs.' Opp'n to Mots. to Intervene ("Former Defs.' Opp'n"), ECF No. 739, at 6-7. The *Atesiano* analysis does not support the categorization of American Oversight as an "offensive" prospective intervenor.

The cases that the *Atesiano* magistrate judge examined wherein the prospective intervenor was not entitled to intervention largely shared one common thread: the prospective intervenor would be able to obtain the relief sought through intervention in another forum. *Atesiano*, 2018 WL 5831092 at *2-4. For example, the magistrate highlighted *United States. v. Couch*, 2017 WL 3016923 (S.D. Ala. 2017), where a prospective intervenor was denied intervention in a criminal action that resulted in forfeited assets. *Id.* at *2. In that case, the prospective intervenor had previously brought her own *qui tam* action against the *Couch* defendants seeking recovery under the False Claims Act. *Id.* at *1. The court's decision rested on a question of statutory interpretation, *id.* at *1-2, but the court also noted that the prospective intervenor was a party seeking intervention "to pursue her FCA claims"—claims which she could pursue in another forum—as opposed to a "member of the public with an interest in open access to court records or as a private party to defend against the production of confidential or privileged documents," *id.* at *2 n.1.

The *Atesiano* opinion also examined *United States v. Moussaoui*, 483 F. 3d 220 (4th Cir. 2007), in which the Fourth Circuit reversed and vacated a lower court decision allowing victims of the September 11 terrorist attacks to intervene to "to access non-public discovery materials

related to the prosecution for use in their own civil action." *Atesiano*, 2018 WL 5831092 at *3. As the magistrate in *Atesiano* noted, the *Moussaoui* decision relied in part on the observation "that the materials sought by the plaintiffs in that case were in the Government's possession and were capable of being obtained by the civil plaintiffs in their federal civil action through the normal course of third-party civil discovery." *Id.* Similarly, when the *Atesiano* magistrate reviewed *United States v. Sikes*, 2017 WL 25460 (D. Neb. Jan. 3, 2017), a case in which a federal district judge affirmed a magistrate's recommendation to deny intervention in a criminal proceeding to a prospective intervenor who had a separate state civil action against the defendant and sought intervention to gain access to discovery documents, she highlighted that the prospective intervenor in that case "sought to eliminate an impediment to discovery, and had other means to obtain that information through the civil case." *Id.*

The magistrate judge distinguished these prospective intervenors from those she considered "defensive" intervenors, such "as a member of the public with an interest in open access to court records," or a party seeking intervention to "vindicate . . . privacy or privilege rights" whose federal rights reflected entitlement to intervention. *Id.* at *2-3. The magistrate judge considered the prospective intervenor in *Atesiano*, an individual with a civil case against the defendants seeking access to discovery materials covered by a protective order in the criminal case, to be "offensive" because "[s]uch information, to the extent it is relevant to his civil action, is likely available to him through civil discovery procedures." *Id.* at *4.

That does not apply here. American Oversight is more akin to the "defensive" intervenors seeking "open access to court records." *See id.* at *2. American Oversight is not seeking to access discovery materials in a criminal case that it could get later through a civil discovery

process. Nor is it, as former defendants suggest, requesting to intervene to "bootstrap [its] FOIA litigation into this closed criminal case." Former Defs' Opp'n, ECF No. 739, at 10.

Rather, American Oversight seeks limited intervention in this case as a matter of sheer necessity to lift an injunction barring access to a public record. The DOJ, while not objecting to the continued withholding of Volume II, has explicitly relied on this Court's injunction in response to American Oversight's request for release of non-exempt portions of the Report— which, but for this Court's order, would be required to be released under FOIA[4]—as a bar preventing the government from releasing it. *See* Ex. 1, ¶¶ 9–10 to Def.s' Mot. to Dismiss in *Am. Oversight v. Dep't of Justice*, No. 25-cv-383 (D.D.C. filed March 11, 2025), ECF No. 12-1 (DOJ asserting it "lacks authority to consider the releasability of [Volume II] under the FOIA," because it is "protected from disclosure by a court injunction issued by the United States District Court for the Southern District of Florida, West Palm Beach Division."). So long as the

---

[4] For example, in 2019 the federal government released a redacted version of former Special Counsel Robert Mueller's investigative report following a FOIA lawsuit by the Electronic Privacy Information Center ("EPIC"). *Elec. Priv. Info. Ctr. v. United States Dep't of Just.*, 18 F.4th 712, 715 (D.C. Cir. 2021). Although EPIC challenged redactions in the released report, the Court found that some redactions were appropriate. *Id* at *722. *See also* Special Couns. Off., U.S. Dep't of Just., Report on the Investigation into Russian Interference in the 2016 Presidential Election (Mueller Report), (April 18, 2019), https://www.govinfo.gov/app/details/GPO-SCREPORT-MUELLER. Additionally, the federal government routinely voluntarily releases documents and reports relating to investigations of national importance. *See e.g.,* U.S. Dep't of Justice, FBI Releases Documents in Hillary Clinton E-Mail Investigation (Sept. 2, 2016), https://www.fbi.gov/news/press-releases/fbi-releases-documents-in-hillary-clinton-e-mail-investigation (making publicly available documents related to investigation into former Secretary of State Hillary Clinton's use of a personal e-mail server "in the interest of transparency and in response to numerous Freedom of Information Act (FOIA) requests," with "[a]ppropriate redactions" pertaining to "classified information or other material exempt from disclosure under FOIA"; *See also* Off. of Inspector Gen., U.S. Dep't of Just., A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election (June 2018), https://oig.justice.gov/sites/default/files/reports/18-04.pdf (publishing a 568-page report detailing the Office of the Inspector General's review of federal investigations into former Secretary Clinton's use of a private email server).

government can continue to invoke this Court's order to justify continuing to withhold the Report in full, American Oversight has no opportunity to vindicate its federal right to access information subject to FOIA.

      B.      American Oversight is Distinguishable from Prior Prospective Intervenors.

The former defendants point to this Court's denial of requests to intervene by the press and President Trump in this proceeding, and suggest, with scarce supporting analysis, that prospective intervenors "should fare no better," Former Defs.' Opp'n, ECF No. 739, at 2. But American Oversight is wholly distinguishable from prior prospective intervenors. For example, the Press Coalition sought intervention on the potential closure of the courtroom for upcoming hearings, which the Court had not yet ordered. ECF Nos. 175, 177. The Court decided that, "should a basis arise to warrant consideration of a temporary closure of the courtroom . . . Movant, through counsel, will be given an opportunity to be heard prior to any decision on closure." ECF No. 177. The motion was denied as moot after the hearings were held publicly. ECF No. 196. When the Press Coalition later sought intervention to be heard on issues relating to potential sealing and redactions in pre-trial documents, ECF No. 353, its motion was filed after the DOJ filed its motion for sealing and redactions, but before the Court decided the issue. *See id.* The former defendants then filed a response opposing the DOJ's motion and arguing for transparency. ECF No. 358. The Court permitted the Press Coalition to appear as amicus curiae at a hearing on the motion and present arguments, ECF No. 361,[5] and denied the motion as moot when those arguments were considered, ECF No. 370. Finally, when President Trump filed a motion to intervene to oppose the release of both volumes of the Report, the Court denied those

---

[5] A full transcript of the hearing, including amicus curiae's participation in the argument, is available at ECF No. 369.

motions, ECF Nos. 702, 714. At the time the motions were filed, the DOJ had dismissed its

appeal as to President Trump. ECF No. 677. The denial of President Trump's request to

intervene was included in the Court's opinion enjoining the government from releasing Volume

II, during which the Court relied on its "duty to safeguard the accused," ECF No. 714 at 8, noting

that "there are two individuals in this action, each with constitutional rights to a fair trial, each

who remain subject to a live criminal appeal of this Court's Order Dismissing the Superseding

Indictment," *id.* at 11.

Here, American Oversight is in a different position than the Press Coalition and President

Trump. American Oversight has a federal right that is currently abridged by the Court's January

21, 2025 Order. American Oversight is not seeking intervention *prior* to the Court's decision to

enjoin the release of Volume II, like the Press Coalition when it sought to be heard on closed

proceedings when the Court had not made any such order, ECF No. 177, or in a circumstance

where another party is already advocating for a position that would preserve the prospective

intervenor's federal right, such as when the Press Coalition was granted amicus status at an

argument where former defendants proffered similar arguments in support of transparency, ECF

No. 361. Nor is American Oversight in a similar position to President Trump, whose

constitutional rights to a fair trial were no longer at issue before the Court following the

dismissal of his appeal, and whose position, like that of the Press Coalition's, was represented by

other parties before the bar. American Oversight has a right to intervene because it has a federal

right that is currently implicated by this Court's Order.

C.       American Oversight's Motion to Intervene Has Not Been Mooted by the Senate
         Confirmation of Kash Patel.

American Oversight's Motion to Intervene is not moot. Former defendants and the

government mistakenly conflate American Oversight's stated reasons for requesting *expedited*

proceedings here and in the FOIA action—the then-approaching Senate confirmation vote on Kash Patel—with the *basis* for American Oversight's request to intervene in these proceedings. *See* Former Defs.' Opp'n, ECF No. 739, at 2-4; Gov. Opp'n, ECF No. 740, at 12-13.

The Senate's confirmation of Patel does not affect American Oversight's federal right implicated by this Court's enjoinment of the release of Volume II. The Report remains of vital national interest, and FOIA does not require a requester to justify its requests for non-exempt public documents. *See generally* 5 U.S.C. § 552.[6]

The only actions that could moot American Oversight's motion to intervene would be (1) American Oversight's rescission of its FOIA request, or (2) the full production of non-exempt documents by the federal government responsive to that request (i.e., Volume II). *See, e.g.,* *Bagwell v. U.S. Dep't of Just.*, 311 F. Supp. 3d 223, 231 (D.D.C. 2018) (finding requester's action mooted when agencies produced the documents or asserted exemptions to justify withholdings, and when the requester "received [the] records or was in a position to challenge the basis for their withholding"). Neither event has occurred here.

## II.     The Court Should Lift the Injunction Barring Release of Volume II.

### A.     Extending the Injunction Would Be Inconsistent with the Court's Previous Opinions as to Both Volumes of the Special Counsel's Report.

In denying a request to bar the release of Volume I, this Court noted that its authority "to enforce its own orders is . . . confined to this proceeding and to the *remaining* defendants in this proceeding." ECF No. 697 at 2 (emphasis added). Similarly, when the Court *did* enjoin the release of Volume II, it simultaneously denied the motion to intervene of a former defendant

---

[6] A request for *expedited* processing of a FOIA request requires a demonstration of urgency. *See* 5 U.S.C. § 552(a)(6)(E). But that only applies to requests for expedited processing, not the underlying FOIA request itself.

whose appeal had already been dismissed by the DOJ and invoked its supervisory powers to "remedy violations of recognized rights, to protect the integrity of the federal courts, and to deter illegal conduct by government officials" as authority to enjoin Volume II's release. ECF No. 714 at 7 (internal citations omitted). The Court highlighted its obligations pertaining exclusively to then-Defendants Nauta and De Oliveira, including the duty to "tak[e] protective measures to ensure a fair trial and to minimize the effects of prejudicial pretrial publicity, even when such measures are not strictly and inescapably necessary," *id.* at 8 (internal citations omitted), and the significance that the release of Volume II could have on "two individuals in this action, each with constitutional rights to a fair trial, who remain subject to a live criminal appeal of this Court's Order Dismissing the Superseding Indictment," *id.* at 11. Further, the Court noted, the government had "not sought leave to dismiss that appeal, initiated by the Special Counsel, and there has been no indication by any government official in this case that the Department will not proceed on the Superseding Indictment should it prevail in the Eleventh Circuit or in subsequent proceedings." *Id.*

Those considerations are now moot. The DOJ moved to voluntarily dismiss the appeal as to the remaining two defendants with prejudice. 11th Cir. Appeal No. 24-12311, App. Doc. No. 111. The Eleventh Circuit granted the motion and dismissed the appeal. App. Doc. No. 113-2. Neither the Attorney General nor the Southern District of Florida intend to revive charges brought by the now-departed former Special Counsel. Gov. Opp'n, ECF No. 740, at 5. The Local Rule that the Court cited in its reasoning underlying the necessity of the Order applies

specifically to "*pending or imminent criminal litigation.*" Order, ECF No. 714, at 8 (citing S.D. Fla. L.R. 77.2) (emphasis added).[7] Neither exists here.

Lifting the injunction would also be consistent with the Court's supervisory powers, which are limited to the supervision of "the administration of criminal justice among the parties before the bar." *United States v. Payner*, 447 U.S. 727, 735 n.7 (1980) (internal citations omitted); *see also United States v. Hasting*, 461 U.S. 499, 505 (1983) ("The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury; and finally, as a remedy designed to deter illegal conduct") (internal citations omitted). Because there are no current defendants before the bar facing trial or the prospect of a live criminal appeal, the Court should lift the injunction.

Finally, because the Court's considerations justifying enjoining the release of Volume II are moot, and the criminal proceeding has completely and finally concluded, this Court lacks jurisdiction to extend the injunction. No one is on trial; no one *will be* on trial. Federal courts have limited jurisdiction. *See* U.S. Const., art. III; *see also Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 28 (2025). Once a prosecution has been dismissed, it has been *dismissed. See* Fed. R. Crim. P. 48; *cf. Absolute Activist Value Master Fund Ltd. v. Devine,* 998 F.3d 1258, 1265 (11th Cir. 2021) (under analogous civil procedure rule, "voluntary dismissal disposes of the *entire* action") (emphasis in original). Now that the indictments have been dismissed, with appeals exhausted, this Court lacks jurisdiction to ban release of agency records.

---

[7] Local Rule 77.2(c) further outlines the subject matter on which counsel is expected to refrain from disseminating information, and provides that the timeline under which attorneys are expected to comply with the Rule is "[f]rom the time of arrest, issuance of an arrest warrant, or the filing of a complaint, information, or indictment in any criminal matter until the commencement of trial or disposition without trial."

B.  Former Defendants' Concerns Cannot Overcome the Court's Obligation to Lift the Injunction.

The former defendants' arguments for extending the injunction are unpersuasive. First, former defendants claim that "[t]he Government might later argue that the case was dismissed without prejudice, and that Jeopardy therefore remains for all three defendants." Former Defs.' Opp'n, ECF No. 739, at 9. But the DOJ specifically sought dismissal as to the former defendants *with* prejudice, App. Doc. No. 111, and the DOJ represents now that neither the Attorney General nor the Southern District of Florida intend to revive the charges, Gov. Opp'n, ECF No. 740, at 5. Any concern that former defendants could face charges again before the statute of limitations runs out is therefore entirely speculative and contradicted by the undisputed record. Their concerns about the "public airing of such confidential discovery, which also includes large amounts of grand jury and privileged matter," Former Defs.' Opp'n, ECF No. 739, at 9, are also misplaced, given that American Oversight seeks only *non-exempt public documents* pursuant to FOIA—not "confidential" materials. In reviewing the Report under FOIA, the government would be permitted—and in some cases *obligated*, *see* 5 U.S.C. § 552(b)(3)—to redact any information subject to privilege or Rule 6(e).

Nor do former defendants' claims about the Rule 16 protective order governing discovery, ECF No. 27, provide any basis to extend the injunction. They claim the order has the effect of "prohibiting them from publicly defending themselves." Former Defs.' Opp'n, ECF No. 739, at 10. But, far from prohibiting former defendants from publicly defending themselves, the

order limits use of materials provided by the government to defendants, including the destruction or return of the materials following the conclusion of criminal proceedings. ECF No. 27.[8]

Finally, the former defendants' concerns about the "disclosure of a one-sided report," Former Defs.' Opp'n, ECF No. 739, at 4, are irrelevant. Agency records are subject to release under FOIA, except for "the nine enumerated exemptions listed in § 552(b)." *Tax Analysts*, 492 U.S. at 151 (cleaned up). These nine exemptions are "explicitly exclusive." *Id.* (cleaned up). The fact that an agency record may be embarrassing or "one-sided" is not one of the exemptions.[9]

Ultimately, regardless of the merits of any of these arguments, the former defendants' concerns are simply that—the concerns of *former* defendants—and cannot provide a basis for this Court to invoke its supervisory power to extend the Order barring release of Volume II.

American Oversight does not ask this Court to order the release of the Report or any part of it. Rather, American Oversight simply asks this Court to grant its limited motion to intervene and dissolve the injunction so that DOJ, and *other* courts, may determine which portions of the Report may be released.

---

[8] Notably, the entry of the protective order was not opposed by the former defendants, ECF No. 23, nor have former defendants appear to have sought at any time to modify the order, which expressly allows for modification upon agreement of the parties, ECF No. 27. In a hearing related to the government's request for sealing and redaction of pre-trial materials, the Court specifically inquired as to then-defendants complaints about the Rule 16 order, noting that a complaint about the order "was lukewarm," that it "didn't result in a motion before the Court," and that the Court was "left, at the end of the day, with a protective order that was entered without any opposition, as far as I can tell." Hearing Tr., ECF No. 369, 156:9-13.

[9] Of course, nothing in FOIA would prevent DOJ from releasing *additional* material beyond the Report itself, if it so chose. *See e.g.*, Letter from Attorney General William Barr to the Senate Committee on the Judiciary (April 18, 2019), https://www.justice.gov/d9/pages/attachments/2021/01/20/ag_letter_4.18.19.pdf (providing a synopsis of the Mueller Report and thoughts on the merits and conclusions of the investigation).

## **CONCLUSION**

For the foregoing reasons, American Oversight respectfully requests this Court grant its

motion to intervene and to lift the injunction.

Dated: March 31, 2025                                   Respectfully Submitted,

                                                        /s/

                                                        ADAM M. SCHACHTER
                                                        Florida Bar No. 647101
                                                        aschachter@gsgpa.com
                                                        BARBARA R. LLANES
                                                        Florida Bar No. 1032727
                                                        bllanes@gsgpa.com
                                                        GELBER SCHACHTER & GREENBERG, P.A.
                                                        One Southeast Third Avenue, Suite 2600
                                                        Miami, Florida 33131
                                                        Telephone: (305) 728-0950
                                                        E-service: efilings@gsgpa.com


                                                        ELIZABETH HADDIX *(pro hac vice forthcoming)*
                                                        elizabeth.haddix@americanoversight.org
                                                        LOREE STARK *(pro hac vice forthcoming)*
                                                        loree.stark@americanoversight.org
                                                        AMERICAN OVERSIGHT
                                                        1030 15th Street, NW, B255
                                                        Washington, D.C. 20005
                                                        Telephone: 202-869-5246

                                                        *Counsel for Non-Party American Oversight*

TAB 753

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 753

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

UNITED STATES OF AMERICA,

vs.

WALTINE NAUTA, *et ano.*,

          Defendants.

**Case No. 23-80101-CR**
**CANNON/REINHART**

**JOINT STATUS REPORT**

The parties to this litigation, the United States and former Defendants Waltine Nauta and Carlos De Oliveira, submit this Joint Status Report with the Court.[1]

***Appellate Proceedings In The Eleventh Circuit Court Of Appeals***

On September 30, 2025, Petitioners American Oversight and the Knight First Amendment Institute at Columbia University petitioned the Eleventh Circuit Court of Appeals for writs of mandamus directing this Court to resolve their motions to intervene, ECF Nos. 717 & 721, and vacate the Court's January 21, 2025 Order, ECF No. 714. The petitions were docketed in the Eleventh Circuit as Case Numbers 25-13400 and 25-13403, respectively. On November 3, 2025, a panel of the Court of Appeals issued an order in each matter holding those petitions in abeyance for a period of 60 days to permit the Court to resolve the motions to intervene.[2]

---

[1] The Court's January 21, 2025 Order barring the release of Volume II of the Special Counsel's Report, ECF No. 714, directed the parties to submit a joint status report no later than thirty days after the conclusion of "all appellate proceedings in this action and/or any continued proceedings in this Court," advising the Court of their positions on the January 21, 2025 Order.

[2] A copy of the November 3, 2025 Order is attached hereto as Exhibit A. Defendants further note that the Court of Appeals issued its November 3, 2025 Order holding Petitioners' mandamus requests in abeyance without ordering an answer from the Respondents pursuant to Fed. R. App. P. 21(b)(1).

### *Positions Of The Parties Regarding The January 21, 2025 Order*

The United States, Mr. Nauta and Mr. De Oliveira respectfully submit that intervention is improper and this Court should deny the pending motions without reaching the merits of Petitioners' requests for vacatur.   Further, the parties maintain and hereby incorporate the positions articulated in their Joint Status Report filed on March 14, 2025, ECF No. 738.   For the reasons enumerated in the Joint Status Report, the United States understands and appreciates the arguments made by Mr. Nauta and Mr. De Oliveira regarding the extraordinary prejudice they would suffer if Volume II of the Special Counsel's Report ("Volume II") were to be released and does not object to their positions that the January 21, 2025 Order should remain in effect.   The parties further agree that, should the Court lift its January 21, 2025 Order, the Court should require the Department of Justice to provide written notice to counsel for Mr. Nauta and Mr. De Oliveira sixty days prior to releasing a redacted version.   This would allow the defendants to seek appropriate relief from this Court if the Attorney General expressed an intention to release Volume II outside the Department of Justice.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By:      */s/Manolo Reboso*
         Manolo Reboso
         Assistant United States Attorney
         Florida Bar No. 75397
         99 Northeast 4th Street
         Miami, Florida 33132 2111
         Tel: (305) 961 9318
         Email: Manolo.Reboso@usdoj.gov

By:     */s/Richard C. Klugh*
        Richard C. Klugh
        40 N.W. 3rd St., PH1
        Miami, Florida 33128
        Telephone: (305) 536-1191
        Email: rklugh@klughwilson.com
        *Counsel for Waltine Nauta*


By:     */s/ Larry Donald Murrell, Jr.*
        Larry Donald Murrell, Jr.
        Florida Bar No: 326641
        400 Executive Center Drive
        Suite 201—Executive Center Plaza
        West Palm Beach, FL 33401
        Telephone: (561) 686-2700
        Facsimile: (561) 686-4567
        Email: ldmpa@bellsouth.net
        *Counsel for Carlos De Oliveira*


By:     */s/ John S. Irving*
        John S. Irving
        SECIL Law PLLC
        1701 Pennsylvania Avenue, N.W.
        Suite 200
        Washington, D.C. 20006
        Telephone: (301) 807-5670
        Email: John.Irving@SECILLaw.com
        *Counsel for Carlos De Oliveira*

3

515

# EXHIBIT A

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 25-13400

_____

In re: AMERICAN OVERSIGHT,

*Petitioner.*

_____

On Petition for Writ of Mandamus to the
United States District Court for the
Southern District of Florida
D.C. Docket No. 9:23-cr-80101-AMC-1

_____

_____

No. 25-13403

_____

In re: KNIGHT FIRST AMENDMENT INSTITUTE
AT COLUMBIA UNIVERSITY,

*Petitioner.*

2                        Order of the Court                    25-13400

————————————————

On Petition for Writ of Mandamus to the
United States District Court for the
Southern District of Florida
D.C. Docket No. 9:23-cr-80101-AMC-1

————————————————

Before JILL PRYOR, GRANT, and ABUDU, Circuit Judges.

BY THE COURT:

Before the Court are related petitions for writs of manda-
mus, which request relief in relation to Petitioners' pending mo-
tions to intervene to seek vacatur of the district court's January 21,
2025, order barring release of Volume II of the Special Counsel's
Final Report.

Petitioners filed their motions on February 14 and February
24, 2025, and filed notification on July 7 and July 10, 2025, inform-
ing the district court that their motions had been fully briefed for
more than 90 days.  To date, the district court has not ruled or con-
ducted any other further proceedings on the pending motions.

Accordingly, Petitioners have established undue delay in res-
olution of their motions to intervene and the petitions for writs of
mandamus are HELD IN ABEYANCE for a period of 60 days to
allow the district court to fully resolve the motions.

TAB 760

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 760

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

CASE NO. 23-80101-CR-CANNON

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

        Defendants.

_____/

## ORDER DENYING NON-PARTY MOTIONS TO INTERVENE

     **THIS CAUSE** comes before the Court upon the following two Non-Party Motions to Intervene to Seek Rescission of the Court's January 21, 2025, Order Enjoining Release of Volume II of the Special Counsel's Final Report [ECF Nos. 717, 721]. The first Motion is filed by American Oversight, a "non-partisan nonprofit committed to promoting transparency and ensuring accountability of government officials" [ECF No. 717 p. 1 ("American Oversight Motion")]. The second Motion is filed by the Knight First Amendment Institute, a "non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, policy analysis, and public education" [ECF No. 721 p. 1 ("Knight First Amendment Institute Motion")]. These Non-Parties seek to intervene in this closed criminal action to cause public release of Volume II of the Special Counsel's Final Report, the work product of a prosecutor appointed and funded in violation of the Appointments and Appropriations Clauses of the United States Constitution [ECF No. 672]. *See* U.S. Const. Art. II, § 2, cl. 2; Art. I, § 9, cl. 7.

The Motions are opposed by the United States, Waltine Nauta, and Carlos De Oliveira [ECF Nos. 739, 740]. President Donald Trump also opposes the Motions as amicus curiae in his individual capacity [ECF Nos. 755, 759].

Upon review of the Motions, Responses, and Replies [ECF Nos. 717, 721, 739, 740, 745, 746], and fully advised in the premises, the Motions to Intervene are **DENIED**. The Court's January 21, 2025, Order is addressed in a separate order to follow, directed to the parties in this action.

## RELEVANT BACKGROUND

The Court recounts the relevant background of this closed criminal case only as necessary to resolve the instant motions.

1. In July 2024, this Court dismissed the Superseding Indictment in this case against all three defendants based on the unlawful appointment of Special Counsel Jack Smith, in violation of the Appointments Clause [ECF No. 672 ("Dismissal Order")].[1] The Special Counsel appealed that Dismissal Order as to all three defendants [ECF No. 673] but then moved to dismiss the appeal as to Donald J. Trump only, without prejudice, following the results of the 2024 Presidential Election [ECF No. 677; *see* 11th Cir. No. 24-12311 (Doc. 79)]. The Special Counsel maintained his appeal as to Waltine Nauta and Carlos De Oliveira [ECF No. 677 p. 1].

2. In early January 2025, weeks before the presidential transition—and with the criminal appeal as to Nauta and De Oliveira still pending before the Eleventh Circuit—the Special Counsel accelerated efforts to prepare and finalize a Final Report on his investigation and

---

[1] Special Counsel Smith's use of a permanent indefinite appropriation also violated the Appropriations Clause, U.S. Const. Art. I, § 9, cl. 7, but the Court had no occasion to address the proper remedy for that violation given the dismissal on Appointments Clause grounds [ECF No. 672 p. 1].

CASE NO. 23-80101-CR-CANNON

work in this case, for transmission to then-Attorney General Garland by January 7, 2025, and release to Congressional leadership by January 10, 2025 [ECF No. 679 pp. 6–7; ECF No. 680 ("Government's Notice"); ECF No. 685 p. 2].[2]

3.  In response, Nauta and De Oliveira moved for emergency injunctive relief, both in this Court and in the Eleventh Circuit, to preclude transmission and release of the Final Report ("Emergency Motion") [ECF No. 679].  The Emergency Motion cited the unconstitutional appointment and funding of the Special Counsel and the corresponding *ultra vires* nature of the Special Counsel's preparation and transmission of the Final Report [ECF No. 679]. The Emergency Motion also relied on Nauta and De Oliveira's rights to due process and a fair trial; the importance of maintaining grand jury secrecy and affording a process for review of such material, *see* Fed. R. Crim. P. 6(e); the prohibitions on release of information as outlined in Local Rule 77.2(a); and various other arguments related to, *inter alia*, undue prejudice to presumptively innocent defendants caused by disclosure of a prosecutorial discovery material subject to a Rule 16 protective order; still-contested assertions of attorney-client privileged material contained within Volume II; and the Department of Justice's Justice Manual, *see* Department of Justice, Justice Manual §§ 1-7.610 (2018) ("Concerns of Prejudice"), 1-7.600 ("Release of Information in Criminal, Civil, and Administrative Matters–Non-Disclosure") [ECF No. 679; *see* ECF No. 27 (protective order); ECF No. 681].

4.  The Emergency Motion did not attach any part of the Final Report or quote from its contents, as neither Nauta nor De Oliveira (nor Trump) had been given authority to retain the report or reproduce any part of it [*see* ECF No. 714 p. 6].

---

[2] The Special Counsel provided defense counsel for Nauta and De Oliveira limited-access review of the Final Report between January 3–6, 2025, as a courtesy, with strict limitations [ECF No. 679 pp. 6–7, 13–15; ECF No. 690 p. 10 n.3; ECF No. 681 p. 10].

5. To preserve the status quo pending the Eleventh Circuit's consideration of the analogous Emergency Motion, the Court temporarily enjoined release of the Final Report outside the Department of Justice [ECF No. 682]. Soon after, the Eleventh Circuit denied Defendants' parallel Emergency Motion and dismissed as moot the United States' appeal of this Court's already expired temporary injunction, *see* 11th Cir. 24-12311 (Docs. 100-2, 104)—leading to continued litigation in this Court on release of the Final Report.

6. Following clarification from the United States regarding the two volumes comprising the Final Report [ECF Nos. 680, 692], this Court entered an order: (1) denying Defendants' Motion to bar release of Volume I concerning the "Election Interference" Case in D.C., in keeping with the scope of this Court's authority and the confines of the Dismissal Order; (2) setting a hearing and briefing schedule for resolution of Defendants' Emergency Motion as to Volume II concerning the "Classified Documents" matter litigated in this Court; and (3) temporarily enjoining the Department of Justice and its officers/employees, etc., from releasing or sharing Volume II (and any information contained therein) outside the Department of Justice pending expedited consideration and resolution of the Emergency Motion [ECF No. 697].

7. More activity followed, including furious, close-to-midnight litigation regarding the imminent release of Volume I [ECF Nos. 696, 700, 701]—which the Court ultimately resolved by denying President-Elect Trump's Motion to Intervene as to Volume I and permitting expiration of the temporary injunction on release of Volume I on January 14, 2025 [ECF No. 702; *see* ECF No. 704, 706].

8. With Volume I released, the Court received expedited briefing on the United States' request to release Volume II to Congressional Leadership pending ongoing criminal proceedings against Nauta and De Oliveira [ECF Nos. 697, 698, 703, 705, 710, 711, 712,

CASE NO. 23-80101-CR-CANNON

713].[3]  Neither party attached Volume II to any filing related to the Emergency Motion or otherwise quoted from it.

9. To facilitate the Court's review of the Emergency Motion, the Court directed the United States, prior to the hearing, to submit a copy of Volume II for *ex parte*, *in camera* review [ECF No. 705].  The United States complied under protest, agreeing that public disclosure of Volume II was unwarranted given the ongoing criminal proceeding as to Nauta and De Oliveira—but nevertheless insisting upon immediate disclosure to four members of Congressional leadership [ECF Nos. 703, 708; *see* ECF No. 714 p. 5 n.8].

10. A public hearing on the Emergency Motion took place on January 17, 2025, with a brief, sealed follow-up session to hear from the parties in an attempt to understand the extent of grand jury material contained within Volume II [ECF No. 713 (minute entry); ECF Nos. 672–673].[4] [5]  Volume II was not made a part of the record during the non-evidentiary hearing or moved into evidence as an exhibit by either party.

11. On January 21, 2025, the Court granted Defendants' Emergency Motion as to Volume II and denied without prejudice President-Elect Trump's Motion to Intervene (but allowed his participation as amicus) [ECF No. 714 ("January 21, 2025 Order")].  In doing so, the Court noted various troubling aspects of the Attorney General's unprecedented insistence

---

[3] Special Counsel Smith withdrew as counsel in this action prior to the hearing, having "referred" the case to the United States Attorneys' Office for the Southern District of Florida, and then officially withdrew from the Department on January 10, 2025 [ECF No. 714 p. 3 n.5].

[4] The transcript of the public hearing is not on the docket because no party ordered it, but any party can order the transcript of the public hearing it in the normal course.  No party objected to the Court's brief sealed hearing, which was announced publicly in advance and accompanied by judicial findings [ECF No. 697 p. 3 n.4; ECF No. 706].

[5] During the January 17, 2025, hearing, government counsel was "unable to answer whether the Department has foreclosed reinitiating criminal charges against President-Elect Trump after he leaves office" [ECF No. 714 p. 11 n.15].

on release of a Special Counsel report to Congress pending a finding of guilt and/or conclusion of criminal proceedings [ECF No. 714]. These included (1) the lack of any "valid justification for the purportedly urgent desire to release to members of Congress case information" [ECF No. 714 p. 11]; (2) the importance of safeguarding the due process of the accused [ECF No. 714 p. 11]; (3) the absence of any enforceable means to ensure confidentiality if released as requested [ECF No. 714 p. 12]; and (4) the unexplained inconsistency between the Department's position and the directives in the Justice Manual not to disclose substantive case information in a criminal case except "'as appropriate in the proceeding or in an announcement after a finding of guilt'" [ECF No. 714 p. 12 (quoting Justice Manual § 1-7.610)]. Ultimately, without addressing Defendants' argument regarding the *ultra vires* nature of Volume II given Special Counsel's unconstitutional appointment and funding—an issue on appeal to the Eleventh Circuit at that time—the Court enjoined release of Volume II, noting as follows:

> Whether measured against the traditional factors pertinent to a civil injunction as framed incorrectly by the Department or treated properly as an exercise of supervisory control over the flow of substantive, nonpublic information to protect Defendants' rights in a criminal case, the balancing of harms and interests yields a clear and decisive answer in the present posture. Release of Volume II to Congress under the proposed conditions—without any enforcement mechanism to prevent public dissemination, and without any valid countervailing reason justifying a break from traditional norms—presents a substantial and unacceptable risk of prejudice to Defendants.

[ECF No. 714 pp. 12–13].

12. In the same January 21, 2025, Order, the Court required the parties, within thirty days "after conclusion of all appellate proceedings and/or continued proceedings in this Court, to submit a joint status report advising of their position on this Order, consistent with any

remaining Rule 6(e) challenges or other claims or rights concerning Volume II, as permitted by law."[6]

13. The Special Counsel's appeal of the Dismissal Order remained pending before the Eleventh Circuit until February 11, 2025, when the Eleventh Circuit, on motion by the United States to dismiss with prejudice, dismissed the appeal as to Nauta and De Oliveira [ECF No. 716; *see* 11th Cir. No. 24-12311 (D.E. 111)].

14. The instant Motions to Intervene followed soon after the Eleventh Circuit's dismissal of the pending appeal [ECF Nos. 717, 721], and became fully ripe on March 31, 2025, with additional filings [ECF Nos. 726, 728, 735, 736, 737, 739, 740].

15. On November 3, 2025, following related petitions for writs of mandamus, the Eleventh Circuit held the petitions in abeyance for sixty days to permit this Court to fully resolve the Motions to Intervene.  *See* 11th Cir. Nos. 25-13400, 13403.

## LEGAL STANDARDS ON INTERVENTION AND JUDICIAL RECORDS

Unlike the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure do not provide for a non-party to intervene in a criminal proceeding.  *See United States v. Ruan*, 814 F. App'x 439, 442 (11th Cir. 2020) (citing *United States v. Kollintzas*, 501 F.3d 796, 800 (7th Cir. 2007)); *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008).  The absence of such a procedural mechanism accords with the rule that private parties lack standing to intervene in the prosecution of another.  *See Linda R. S. v. Richard D. and Texas*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also United States v. Alcatel-Lucent France, SA*, 688 F.3d 1301, 1307 (11th Cir. 2012) (holding a third party lacked standing to appeal a sentence); *United States v. Laraneta*, 700 F.3d 983, 986 (7th Cir.

---

[6] The parties since have filed the Joint Status Report, in which they oppose any order directing release of Volume II and make additional requests and observations [ECF No. 738 pp. 3–8].

CASE NO. 23-80101-CR-CANNON

2012) (disallowing intervention by crime victims in district court).  It also reflects, more generally, judicial caution against expansion of non-party intervention in criminal cases.  *United States v. Couch*, 906 F.3d 1223, 1227 (11th Cir. 2018) (permitting intervention in criminal forfeiture proceedings to claim statutory interest in forfeited property tied to criminal proceeding itself); *Ruan*, 814 F. App'x at 442 ("Absent a procedural mechanism for intervention, we analyze the participatory rights of non-parties to criminal proceedings in light of the statutes governing those proceedings."); *United States v. Crawford Enters., Inc.*, 735 F.2d 174, 176 (5th Cir. 1984) (allowing person adversely affected by disclosure of grand jury material to intervene in pending criminal case to bar release of grand jury material to other parties).

Despite the cabined nature of nonparty intervention in criminal cases, the law is settled that "[t]he press has standing to intervene in actions to which it is otherwise not a party in order to petition for access to court proceedings and records."  *Petition of Trib. Co.*, 784 F.2d 1518, 1521 (11th Cir. 1986).  In *Petition of Tribune Company*, for example, the Eleventh Circuit permitted a newspaper publisher to intervene after a criminal trial to seek access to transcripts of *in camera* bench conferences held during the trial—although it ultimately affirmed the district court's nondisclosure decision, citing the "'scrupulous protection'" to be given to *in camera* inspections and to the confidential nature of the materials discussed during the disputed conferences.  *Id.* at 1522 (quoting *United States v. Nixon*, 418 U.S. 683, 714 (1974)).   Likewise, in *United States v. Valenti*, 987 F.2d 708 (11th Cir. 1993), the Eleventh Circuit authorized a newspaper's request to intervene to obtain transcripts of closed bench conferences and to challenge the district court's "dual-docketing system" as a violation of the qualified right of access to criminal proceedings.  *Id.* at 715.  Through these decisions, and others, the Eleventh Circuit has emphasized the presumption

CASE NO. 23-80101-CR-CANNON

in favor of open access to judicial proceedings and judicial records—a presumption rooted in both

the common law and the First Amendment, to varying degrees.[7]

Importantly, however, when a prospective intervenor seeks material under a theory of

access to "judicial records," as is the case here, courts need not allow non-party intervention to

vindicate such an interest if the material sought is not properly considered a "judicial record" to

begin with. Thus, courts must "distinguish between those items which may properly be considered

public or judicial records and those that may not; the media and public presumptively have access

to the former, but not to the latter." *Chicago Trib. Co*., 263 F.3d at 1311; *Press-Enter. Co.*, 478

U.S. at 8–9 (emphasizing presumptive openness of criminal proceedings and calling for

assessment of "experience and logic" to determine "whether the place and process [like trials,

preliminary hearings, and jury selection] have historically been open to the press and general

public").

To determine whether a given item qualifies as a "judicial record" subject to the public

right of access, the Eleventh Circuit has offered substantial guidance, much of it categorical. *See*

*Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1362 (11th Cir. 2021). For starters,

"documents collected during discovery" and "discovery motions," like motions to compel

discovery, are not "judicial records." *Anderson*, 799 F.2d at 1441 ("[D]ocuments collected during

---

[7] *See, e.g.*, *Press-Enter. Co. v. Superior Ct.*, 478 U.S. 1, 8 (1986); *Press-Enter. Co. v. Superior Ct.*, 464 U.S. 501, 508 (1984) ("Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569–571 (1980))); *Nixon v. Warner Commc'ns, Inc*., 435 U.S. 589, 597 (1978) (discussing qualified common law right "to inspect and copy public records and documents, including judicial records and documents." (footnotes omitted)); *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1028 (11th Cir. 2005) ("The press and public enjoy a qualified First Amendment right of access to criminal trial proceedings."); *Perez-Guerrero v. U.S. Atty. Gen*., 717 F.3d 1224, 1235 (11th Cir. 2013) ("We have discretion to determine which portions of the record should be placed under seal, but our discretion is guided by the presumption of public access to judicial documents.") (first citing *Craig v. Harney*, 331 U.S. 367, 374 (1947); and then citing *Chicago Tribune Co. v. Bridgestone/Firestone, Inc*., 263 F.3d 1304, 1311 (11th Cir. 2001)).

9

discovery are not "judicial records.'"); *Chicago Tribune*, 263 F.3d at 1311 (referencing the "unique function discovery serves in modern proceedings"); *F.T.C. v. AbbVie Prods. LLC*, 713 F.3d 54, 63 (11th Cir. 2013). This is because "[d]iscovery is neither a public process nor typically a matter of public record," and "[h]istorically, discovery materials were not available to the public or press." *Anderson*, 799 F.2d at 1441. Accordingly, "[c]ourts generally should not permit public access to discovery materials that are not filed with substantive motions because discovery is 'essentially a private process' meant to 'assist trial preparation.'" *Comm'r, Ala. Dep't of Corr. V. Advance Loc. Media, LLC*, 918 F.3d 1161, 1167 (11th Cir. 2019) (quoting *Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986)); *Chicago Tribune*, 263 F.3d at 1312–13 (differentiating between "material filed with discovery motions and material field in connection with more substantive motions").

By contrast, discovery material filed in connection with substantive pretrial motions that require "judicial resolution of the merits"—like a motion to dismiss and its attachments—*does* trigger the common-law right of access, regardless of whether the substantive pretrial motion is deemed "dispositive" or not. *Id.* at 1312; *AbbVie Prods. LLC*, 713 F.3d at 63 (explaining exemption of discovery motions and discovery from public access as compared to "materials that invoke 'judicial resolution of the merits,' such as complaints, motions to dismiss, or motions for summary judgment" (quoting *Chicago Tribune*, 263 F.3d at 1312)); *Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1362 (11th Cir. 2021). Accordingly, "[a]lthough discovery materials do not automatically qualify as judicial records subject to the common-law right of access, they take on that status once they are filed in connection with a substantive motion." *Callahan*, 17 F.4th at 1362.

Ultimately, the Eleventh Circuit has "consistently rejected any test that would make a document's status as a judicial record dependent upon whether it played a discernible role in the resolution of the case" or that would require figuring out "the actual role the document played."

*Id.* (internal quotation marks omitted) (describing such a "functional approach" as a "distort[ion]" of Eleventh Circuit caselaw).  "What matters is how the document was used by the parties—to support an argument before the court—and not whether the court itself used the document to resolve that argument."  *Id.* at 1363.  Nor is it dispositive to the judicial-record inquiry whether the item is formally filed on the docket.  *Comm'r, Ala. Dep't of Corr.*, 918 F.3d at 1166.  Again, the focus remains on whether the material in question was "submitted by litigants" for "judicial resolution of the merits" in a substantive motion.  *Id.* (internal quotation marks omitted); *Chicago Tribune Co.*, 263 F.3d at 1312, 1315 (subjecting material submitted by parties in connection with summary-judgment motion in civil case to common law right of access); *Callahan*, 17 F.4th at 1363 (emphasizing "commitment to the principle that public access is presumed for documents 'filed with pretrial motions that require judicial resolution of the merits of an action'" (quoting *Comm'r, Ala. Dep't of Corr.*, 918 F.3d at 1167)).

## DISCUSSION

Before the Court are two Motions to Intervene by nonparties in this closed criminal case, one filed by American Oversight [ECF No. 717], and the other filed by Knight First Amendment Institute [ECF No. 721].  The American Oversight Motion relies on its "federal rights under FOIA [Freedom of Information Act]" as a basis to intervene to seek rescission of the Court's Order Enjoining Release of Volume II, without reference to the common law or the First Amendment [ECF No. 717 p. 6; ECF No. 746].[8]  The First Knight Motion also relies on the Freedom of Information Act but asserts, in addition, a right of access under the common law and the First Amendment [ECF No. 721 p. 2; *see* ECF No. 745 p. 1].

---

[8] American Oversight materially expanded its theory in its Petition for Mandamus, relying for the first time on the common law and First Amendment right of access.  *See* 11th Cir. No. 25-13400 (Doc. 1, Petition for Mandamus pp. 28–32).

All of the former or current parties to this action—the United States, Donald Trump, Waltine Nauta, and Carlos De Oliveira—oppose intervention on various grounds [ECF Nos. 738, 739, 740, 753, 755].[9]   As relevant to the intervention question specifically, they emphasize that no authority permits third-party intervention in criminal cases to assert a FOIA interest raised in another forum [ECF No. 739 p. 7 ("[P]rospective intervenors fail to cite a single case in support of the proposition that an unrelated third party has standing to intervene in a closed criminal case in order to facilitate their FOIA litigation in another district."); ECF No. 740 p. 6 ("Yet, American Oversight and Knight Institute fail to cite a case in which a district court has allowed a third party to intervene in a criminal case to contest an order that might have some secondary or collateral implications for that party's FOI claims in another lawsuit.")].   They also challenge the notion, implicit in the Knight First Amendment Motion, that Volume II qualifies as "judicial record" to which the common law and/or the First Amendment even applies [ECF No. 740 pp. 7–12; ECF No. 739 pp. 11–14].

Upon careful review of the Motions and the related filings, and fully advised in the premises, the Court sees no basis to authorize nonparty intervention in this closed criminal proceeding—either on the unprecedented and unsupported theory of FOIA access or on the flawed assumption that Volume II qualifies as a judicial record triggering the common law or First Amendment right of access.

I.    **Prospective Intervenors' statutory FOIA interest does not provide a basis to authorize intervention in this criminal case**.

The Court begins with the FOIA theory, raised by both prospective intervenors [ECF No. 717 pp. 1–2, 5–7; ECF No. 721 pp. 7–9].   As best the Court can discern, the argument proceeds like this: we have rights under FOIA to seek nonexempt information that we believe is being

---

[9] President Trump was authorized to participate as amicus curiae in opposing the Motions to Intervene [ECF Nos. 755, 759].

improperly withheld by a federal government agency, *see* 5 U.S.C. § 552; we have tried to exercise those rights by, in the case of American Oversight, initiating a FOIA suit in the United States District Court for the District of Columbia to obtain Volume II, *see* D.D.C. Case No. 25–383, or in the case of Knight First Amendment, by submitting requests for Volume II to the Department of Justice [ECF No. 721 pp. 22–35]; we have been unsuccessful in those efforts because the January 21, 2025, Order bars release of Volume II outside the Department of Justice, *see Am. Oversight v. U.S. Dep't of Just.*, 779 F. Supp. 3d 40, 48 (D.D.C. 2025) (citing *GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 384–86 (1980)); our FOIA rights are therefore "implicated" by the January 21, 2025, Order; and that means we should be permitted to intervene in this action to assert the FOIA interests we have advanced in other fora.

This theory of FOIA intervention in a criminal case is unsupported in law and unprecedented in scope. To begin, "prospective intervenors fail to cite a single case in support of the proposition that an unrelated third party has standing to intervene in a closed criminal case in order to facilitate their FOIA litigation in another district" [ECF No. 739 p. 7; *see* ECF No. 740 p. 6 ("Yet, American Oversight and Knight Institute fail to cite a case in which a district court has allowed a third party to intervene in a criminal case to contest an order that might have some secondary or collateral implications for that party's FOI claims in another lawsuit.")]. This is a telling and unsurprising comment on prospective intervenors' FOIA theory—which defies the limits of third-party intervention in criminal cases. As noted, recognizing the absence of a procedural mechanism for nonparty intervention, courts have proceeded with caution in this area—authorizing intervention to protect *against* disclosure of protected information by affected persons with obvious legal interests, to seek forfeiture under statutes governing the criminal proceeding itself, and to vindicate the common law and First Amendment right of access to judicial proceedings and court records. *See Couch*, 906 F.3d 1227; *Ruan*, 814 F. App'x at 442 ("Absent a

procedural mechanism for intervention, we analyze the participatory rights of non-parties to criminal proceedings in light of the statutes governing those proceedings."); *Crawford Enters., Inc.*, 735 F.2d at 176; *Feeney*, 641 F.2d at 824.  But never has nonparty intervention in a criminal case been allowed merely on the theory that a prospective intervenor has a statutory right somewhere that is "implicated" by a ruling in the criminal case.  Indeed, if that were the rule, any party seeking to obtain public records through a civil FOIA suit in another forum (or via FOIA requests to the Department of Justice) conceivably could attain party status in a criminal case to pursue that FOIA interest.  Yet no court has endorsed such a view.[10]  Nor is it even clear that FOIA litigants have ever attempted that type of criminal-case-intervention strategy before now.  In the end, while prospective intervenors may not fully admit the implications of their theory of FOIA intervention, their proposal is unsupported in law; disregards the limits of intervention in criminal cases; and risks havoc in criminal proceedings through FOIA-interested parties.

The Court recognizes that prospective intervenors have attempted, via separate litigation and agency efforts, to vindicate their FOIA interests and have been unsuccessful in those efforts due to the Department of Justice's compliance with the January 21, 2025, Order entered in this criminal case.  But that reality does not bestow upon them party status to pursue that FOIA interest in this separate criminal forum.  Nor is it a basis to judicially break open the limits on nonparty intervention in criminal cases, which, again, is not a mechanism recognized in the Federal Rules of Criminal Procedure.

---

[10] Knight Institute's citation to *La Rouche v. FBI*, 677 F.2d 256 (2d Cir. 1982), does not guide the outcome here, even if it were binding, because it is a civil case concerning intervention under Fed. R. Civ. P. 24(a)(2) [*see* ECF No. 745 p. 5].

14

CASE NO. 23-80101-CR-CANNON

**II.    Prospective Intervenors lack a basis to intervene to seek access to Volume II because Volume II is not a judicial record under governing precedent**.

The Court now turns to the second argument in support of nonparty intervention, raised by Knight First Amendment Institute only, and it concerns the public right of access to court records under the common law and the First Amendment [ECF No. 721].[11]  This theory rests on the necessary assumption that Volume II is a "judicial document" or a "judicial record" subject to the public right of access under the common law and the First Amendment.  It is not.  No part of Volume II was attached by any party to a substantive motion for resolution on the merits.  It was not admitted into evidence or attached as an exhibit to any motion or pleading.  It was not filed on the docket (although failure to docket is not alone dispositive in the judicial-document query, to be sure).  *And no defendant ever maintained Volume II or retained it for submission to this Court as part of their substantive motion*.[12]  Likewise, counsel for the United States, in opposing the instant Motions, never reviewed Volume II [ECF No. 740 p. 9 n.4], and counsel for the United States during the proceedings on the Emergency Motion emphasized that review of the contents of Volume II was not necessary to decide the Emergency Motion [ECF No. 708 p. 1].

Equally importantly, Volume II contains large swaths of nonpublic discovery information (subject to a protective order) that is unattached to a substantive motion for judicial relief

---

[11] To the extent a court of higher review were to ascribe this theory of intervention to American Oversight, raised by American Oversight for the first time in a Petition for Writ of Mandamus, the analysis in this Order would apply equally to American Oversight.

[12] From January 3 through January 6, 2025, during the Special Counsel's finalization of efforts to transmit the Final Report to Attorney General Garland, defense counsel received very limited review of the Final Report under strict conditions barring reproduction or preservation, and effectively precluding substantive objections [*see* ECF No. 714 p. 6 ("Prior to his separation from the Department on January 10, 2025, Special Counsel Smith provided defense counsel with a limited and accelerated opportunity to review Volume II [ECF No. 690 p. 10 n.3; ECF No. 679 pp. 6–7; ECF No. 681 p. 10].  Among the Department's conditions for such review, defense attorneys were required to delete prior discovery productions of material protected by the protective order in this case. . . .")].

15

[ECF No. 714 ¶ 9; ECF No. 27].[13]  This is significant under the binding Eleventh Circuit authorities cited above.  *Supra* pp. 9–10.  Pursuant to those authorities, discovery materials constitute judicial records only if filed by a party in connection with a pretrial motion "that require[s] judicial resolution of the merits."  *Chicago Trib. Co.*, 263 F.3d at 1312.  Yet no party attached such discovery to the Emergency Motion or in opposition to it, as noted above, or in any of the many associated filings before the Court regarding the issues raised in the Emergency Motion [ECF Nos. 679, 690, 692, 699–701, 703, 708, 710–712].  Again, the Eleventh Circuit has made clear that courts should not permit public access to discovery materials that are not filed with substantive motions because discovery is "essentially a private process" meant to "assist trial preparation."  *Anderson*, 799 F.2d at 1441.  That principle holds here.[14]

Nor are prospective intervenors correct to suggest that the Court's *in camera* review of Volume II to facilitate its review of Defendants' Emergency Motion somehow converted Volume II into a "judicial document" [ECF No. 705 (directing government counsel to hand delivery Volume II to Chambers for *in camera* review)].  "It is elementary that *in camera* inspection of evidence is always a procedure calling for scrupulous protection against any release or publication

---

[13] [ECF No. 714 pp. 5–6 ("Volume II includes detailed and voluminous discovery information protected by the Rule 16(d)(1) Protective Order entered in this case [ECF No. 27]. Much of this information has not been made public in Court filings. It includes myriad references to bates-stamped information provided by the Special Counsel in discovery and subject to the protective order, including interview transcripts, search warrant materials, business records, toll records, video footage, various other records obtained pursuant to grand jury subpoena, information as to which President-Elect Trump has asserted the attorney-client privilege in motions in this proceeding [ECF No. 571 (sealed); ECF Nos. 641, 656], potential Rule 404(b) evidence, and other non-public information.")].

[14] The Court has assumed in this analysis that the Eleventh Circuit precedents governing the public right of access also apply with equal force to post-trial substantive motions; the key authorities in this area focus on pretrial and trial proceedings and the right of the press and public to gain access to such proceedings, without addressing the applicability of these doctrines to post-trial motions. There may be reasons to consider that question more closely, but no party has relied on that distinction, and it is not clear whether the post-trial nature of the Emergency Motion alters the legal inquiry in any respect.

of material not found by the court, at that stage, probably admissible in evidence and relevant to the issues of the trial for which it is sought." *Nixon*, 418 U.S. at 714.  Likely because of that "scrupulous protection" given to *in camera* review, prospective intervenors offer no authority supporting the flawed suggestion that a court's mere *in camera* review of material, without a party filing the material as part of a substantive motion for resolution on the merits, transforms an otherwise non-judicial document into a judicial one.[15]  Again, "[w]hat matters is how the document was used by the parties—to support an argument before the court—and not whether the court itself used the document to resolve that argument."  *Callahan*, 17 F.4th at 1362–63 (rejecting "functional" approach in favor of "categorical" status as judicial records).  And here, as the record makes obvious, no party attached Volume II to a substantive motion or sought to have it made part of the record on the Emergency Motion.[16]  And never did the Court ever suggest, much less rule, that Volume II was admissible as evidence in the criminal case.  *Nixon*, 418 U.S. at 714.

---

[15] Knight First Amendment cites *Comm'r, Ala. Dep't of Corr.*, 918 F.3d at 1168, to suggest that submission of a document *in camera* is sufficient to make a document a judicial record [*see* ECF No. 721 p. 11].  Nothing in that case suggests that mere *in camera* review of a document makes it a judicial document.  To the contrary, the material in question in that case, although never formally filed with the court "under the rushed timeline" of an "approaching execution," *id.* at 1168, was subjected to expert testimony, debated during an *in camera* evidentiary hearing in connection with a summary judgment motion and a preliminary injunction motion filed by the parties, and possessed by the parties debating the legality of the protocol.  *Id.* at 1164–65.  None of these features is present here; defendants never had Volume II (and still do not have it); Volume II was never the subject of an evidentiary hearing or otherwise made an exhibit to a hearing; and Volume II certainly was not filed by the parties in connection with the Emergency Motion.

[16] The Court referenced Volume II briefly in a closed session following a public hearing on January 17, 2025, to better understand the scope of grand jury material potentially still contained within Volume II [ECF No. 713], but no party moved to make Volume II an exhibit to the hearing; there has been no challenge by any party or by the prospective intervenors to the Court's procedure on January 17, 2025; and the Motions to Intervene seek no relief beyond rescission of the January 21, 2025 Order [ECF Nos. 717, 721].

CASE NO. 23-80101-CR-CANNON

For all of these reasons, Volume II is not a judicial record subject to the common law or First Amendment right of access. Prospective intervenors therefore lack a basis to intervene in this criminal suit to obtain access to it or to seek rescission of a court order related to it.

## CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. American Oversight's Motion to Intervene to Seek Dissolution of January 21, 2025, Order is **DENIED** [ECF No. 717].

2. Knight First Amendment's Motion to Intervene to Seek Rescission of January 21, 2025, Order is **DENIED** [ECF No. 721].

3. Nothing in this Order should be deemed to be inconsistent with Prospective Intervenors' right to challenge this Order on appeal.

4. This Order fully resolves the Motions to Intervene. American Oversight and Knight First Amendment lack a basis to intervene as parties in this action. Accordingly, no further analysis regarding the merits of releasing Volume II is warranted in this Order.

**ORDERED** in Chambers in Fort Pierce, Florida this 22nd day of December 2025.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

18

536

TAB 761

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 761

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

**CASE NO. 23-80101-CR-CANNON**

**UNITED STATES OF AMERICA,**

            Plaintiff,

vs.

**WALTINE NAUTA**, and
**CARLOS DE OLIVEIRA**,

            Defendants.

_____/

**ORDER FOLLOWING JOINT STATUS REPORT
AND ADDRESSING JANUARY 21, 2025 ORDER**

        **THIS CAUSE** comes before the Court upon the Joint Status Report Regarding Release

of Volume II, filed by the parties on March 14, 2025, pursuant to the Court's January 21, 2025,

Order [ECF No. 738].  The Court's January 21, 2025, Order granted Defendants' Emergency

Request to Preclude Dissemination of Volume II and enjoined release of Volume II outside the

Department of Justice in light of the then-pending ongoing criminal proceedings against Nauta and

De Oliveira [ECF No. 714 p. 13].  The Court's January 21, 2025, Order also directed the parties

to file a Joint Status Report within thirty days of the conclusion of all appellate proceedings and/or

any continued proceedings in this Court [ECF No. 714 pp. 13–14].  The criminal appeal as to

Nauta and De Oliveira has since been dismissed on motion of the United States, and hence the

immediate basis underlying the Court's January 21, 2025, appears to no longer apply.

Nevertheless, Nauta and De Oliveira (and President Trump as amicus in his individual capacity)

maintain the view—unaddressed in the January 21, 2025, Order due to a then-pending appeal of

537

this Court's Dismissal Order—that Volume II should not be released because it constitutes the *ultra vires* investigatory work product of a Special Counsel appointed in violation of the Appointments and Appropriations Clauses of the United States Constitution and contains other privileged and protected information [ECF Nos. 679, 681, 700, 711, 712, 738, 755]. They also jointly oppose an order releasing Volume II and request, at a minimum, a period of sixty days to allow defendants to seek appropriate relief from this Court [ECF No. 738].

In light of these developments and requests, it is **ORDERED AND ADJUDGED** as follows:

1. The restriction on release of Volume II outside the Department of Justice as set forth in the Court's January 21, 2025, Order [ECF No. 714] will hereby automatically expire, without further order of this Court, on **February 24**, **2026**.

2. Nothing in this Order prohibits any former or current party to this action from moving for leave to intervene, if warranted, and/or from timely seeking appropriate relief before that deadline.

**ORDERED** in Chambers in Fort Pierce, Florida this 22nd day of December 2025.

**AILEEN M. CANNON**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record

TAB 762

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 762

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISON**

**CASE NO.: 23-CR-80101-AMC**

**UNITED STATES OF AMERICA,**
     **Plaintiff,**

v.

**DONALD J. TRUMP, WAULTINE NAUTA,**
**and CARLOS DE OLIVEIRA**
_____/

**<u>NOTICE OF APPEAL</u>**

Notice is hereby given that the Knight First Amendment Institute at Columbia University, Prospective Intervenor in the above-captioned matter, appeals to the United States Court of Appeals for the Eleventh Circuit from this Court's Order Denying Non-Party Motions to Intervene, entered on December 22, 2025 (Docket Entry 760).

Date: December 23, 2025

Respectfully submitted,

*/s/ David Buckner*
David M. Buckner Esq.
Florida Bar No.: 60550
Buckner + Miles
2020 Salzedo Street
Suite 302
Coral Gables FL 33134
Phone: (305) 964-8003
david@bucknermiles.com

Scott Wilkens*
Jameel Jaffer*
Alexander Abdo*
Knight First Amendment Institute
    at Columbia University
475 Riverside Drive, Suite 302–304
New York, NY 10115
scott.wilkens@knightcolumbia.org
(646) 745-8500

*admitted pro hac vice

*Counsel for Prospective Intervenor*

**<u>CERTIFICATE OF SERVICE</u>**

I, David Buckner, do hereby certify that I have filed the foregoing Notice of Appeal electronically with the Clerk of the Court using CM/ECF for the United States District Court for the Southern District of Florida on December 23, 2025.

<u>      */s/ David Buckner*                    </u>
David M. Buckner Esq.

TAB 763

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 763

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 23-cr-80101-AMC**

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DONALD J. TRUMP,
WALTINE NAUTA, and
CARLOS DE OLIVEIRA,

      Defendants.

_____/

## NOTICE OF APPEAL

Notice is hereby given that American Oversight, Prospective Intervenor in the above-captioned matter, appeals to the United States Court of Appeals for the Eleventh Circuit from this Court's Order Denying Non-Party Motions to Intervene, entered on December 22, 2025 (Docket Entry 760).

Dated:  December 29, 2025          Respectfully Submitted,

                          */s/ Barbara R. Llanes*
                          ADAM M. SCHACHTER
                          Florida Bar No. 647101
                          aschachter@gsgpa.com
                          BARBARA R. LLANES
                          Florida Bar No. 1032727
                          bllanes@gsgpa.com
                          GELBER SCHACHTER & GREENBERG, P.A.
                          One Southeast Third Avenue, Suite 2600
                          Miami, Florida 33131
                          Telephone: (305) 728-0950
                          E-service: efilings@gsgpa.com

                          LOREE STARK (*Admitted pro hac vice*)
                          loree.stark@americanoversight.org

ELIZABETH HADDIX (*Admitted pro hac vice*)
elizabeth.haddix@americanoversight.org
AMERICAN OVERSIGHT
1030 15th Street, NW, B255
Washington, D.C. 20005
Telephone: 202-869-5246

*Counsel for Non-Party American Oversight*

TAB 768

Case No. 23-cr-80101-AMC, S.D. Fla.,

Doc. 768

```
1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                     WEST PALM BEACH DIVISION
                      CASE NO. 23-cr-80101-AMC
3
     UNITED STATES OF AMERICA,           Fort Pierce, Florida
4
                  Plaintiff,             January 6, 2026
5
             vs.
6                                        2:02 p.m. - 4:02 p.m.

7    DONALD J. TRUMP, WALTINE NAUTA, CARLOS
     DE OLIVEIRA,
8
                  Defendant.             Pages 1 to 86
9    _____

10                    TRANSCRIPT OF MOTIONS
        THIS TRANSCRIPT CONTAINS NON SEALED PROCEEDINGS ONLY
11          BEFORE THE HONORABLE AILEEN M. CANNON
                  UNITED STATES DISTRICT JUDGE
12   APPEARANCES:

13   FOR THE GOVERNMENT:

14                         UNITED STATES DEPARTMENT OF JUSTICE
                           ELIZABETH J. SHAPIRO, ESQ.
15                         P.O. Box 883
                           Washington, D.C. 20044
16
                           UNITED STATES DEPARTMENT OF JUSTICE
17                         - CIVIL DIVISION
                           BRIAN M. BOYNTON, ESQ.
18                         950 Pennsylvania Avenue, NW
                           Washington, DC 20530
19
                           UNITED STATES ATTORNEY'S OFFICE
20                         MARKENZY LAPOINTE, ESQ.
                           99 NE 4th Street
21                         Miami, Florida 33132
     FOR THE DEFENDANT:
22
     DONALD J. TRUMP
23
                           LAURO LAW FIRM
24                         JOHN LAURO, ESQ.
                           GREGORY M. SINGER, ESQ.
25                         400 N. Tampa Street
                           Tampa, Florida 33602
```

```
 1
         FOR THE DEFENDANT:
 2
         WALTINE NAUTA
 3                                BRAND WOODWARD LAW, LP
                                  STANLEY WOODWARD, ESQ.
 4                                400 FIFTH STREET
                                  NORTHWEST SUITE 300
 5                                WASHINGTON, DC 20001

 6                                RICHARD C. KLUGH, P.A.
                                  RICHARD C. KLUGH, ESQ.
 7                                25 SE 2ND AVENUE
                                  SUITE 1100
 8                                MIAMI, FLORIDA 33131

 9       CARLOS DE OLIVEIRA
                                  L.D. MURRELL, PA
10                                LARRY DONALD MURRELL JR., ESQ.
                                  400 EXECUTIVE CENTER DRIVE
11                                SUITE 201
                                  WEST PALM BEACH, FLORIDA 33401
12
                                  E&W LAW
13                                JOHN S. IRVING, ESQ.
                                  1455 PENNSYLVANIA AVENUE, NW
14                                SUITE 1400
                                  WASHINGTON, DC 20004
15
         STENOGRAPHICALLY REPORTED BY:
16
                                  LAURA E. MELTON, RMR, CRR, FPR
17                                Official Court Reporter to the
                                  Honorable Aileen M. Cannon
18                                United States District Court
                                  Fort Pierce, Florida
19

20

21

22

23

24

25
```

1          (Call to the order of the Court.)

2              THE COURT:  Good afternoon.  Please be seated.  Let's

3      call the case.

4              COURTROOM DEPUTY:  United States of

5      America v. Waltine Nauta and Carlos de Oliveira, Case

6      Number 23-cr-80101.

7              Will the parties please make your appearance, starting

8      with the United States.

9              MS. SHAPIRO:  Good afternoon, Your Honor.  I'm

10      Elizabeth Shapiro from the Department of Justice.

11              MR. BOYNTON:  Brian Boynton, Civil Division, Department

12      of Justice.

13              MR. LAPOINTE:  Good afternoon, Your Honor.

14      Markenzy Lapointe on behalf of the United States.  Pleasure to

15      be here.

16              THE COURT:  Good afternoon.

17              MR. WOODWARD:  Good afternoon, Your Honor.

18      Stanley Woodward on behalf of Mr. Waltine Nauta.  With me today

19      is Richard Klugh, who recently entered his appearance, also on

20      behalf of Mr. Nauta.

21              THE COURT:  Good afternoon.

22              MR. IRVING:  Good afternoon, Your Honor.  John Irving

23      and Donnie Murrell on behalf of Mr. de Oliveira.

24              MR. LAURO:  Good afternoon, Your Honor.  John Lauro on

25      behalf of President Trump, and along with me is Greg Singer,

```
 1    Lauro & Singer.
 2            THE COURT:  Excellent.  Good afternoon to everybody.
 3            This hearing concerns two motions that are pending
 4    before the Court.  First, we have an emergency motion to
 5    preclude release of Volume II of Special Counsel's report that
 6    was filed on January 6th at Docket Entry 679.  Second, we have
 7    a motion to intervene at Docket Entry 681; that was filed by
 8    President-elect Trump who joins in the emergency motion, and
 9    that seeks to intervene with respect to the release of
10    Volume II.
11            I have reviewed the various filings, both in support of
12    and in opposition to these motions.  I have also reviewed
13    Volume II itself, which was submitted to me in camera for
14    purposes of adjudicating this motion.  So I'm prepared to hear
15    argument on both of these, starting first with counsel for
16    Mr. Nauta and Mr. de Oliveira.
17            And, Mr. Woodward, is there a joint presentation in
18    mind on behalf of Defendants Nauta and de Oliveira?
19            MR. WOODWARD:  Thank you, Your Honor.
20            With respect to the legal precedence, that is correct.
21    To the extent that we get into factual circumstances that are
22    unique to both Mr. Nauta -- or unique to each Mr. Nauta and
23    Mr. de Oliveira, then Mr. Irving is prepared to address the
24    Court on specific sections of the report.  So if the Court
25    would permit us, we can just take that in turn.
```

1      I know that the Court has -- is wanting to do as much

2  of this in the open public as possible.

3      THE COURT:  Okay.  So who is going to be presenting

4  argument on the legal questions?

5      MR. WOODWARD:  I will, Your Honor.

6      THE COURT:  Okay.  All right, then.

7      And then on behalf of the Department of Justice, who

8  will be taking the lead this afternoon?

9      MS. SHAPIRO:  I will be presenting argument,

10  Your Honor.

11      THE COURT:  Okay.  Thank you.

12      All right, then.  So what I intend to do is start with

13  argument from the defense counsel on the Emergency Motion to

14  Preclude Release, then hear opposition from the Department of

15  Justice.  If rebuttal is necessary, then I will turn back to

16  defense counsel.  And, again, if it becomes necessary to close

17  the hearing, we will do so as well.

18      After conclusion of that segment, then I plan to turn

19  to the motion to intervene and hear from counsel for

20  President-elect Trump.

21      A few additional preliminary remarks.  As usual,

22  electronic devices are prohibited in the courthouse; this is

23  per Administrative Order 2023-47.  A separate live feed,

24  though, has been set up as usual on the second floor for

25  anybody who wishes to view the proceedings from there.

1        And, finally, as indicated, there shall be no

2   indication or discussion of the specific contents of Volume II.

3   But if it becomes necessary, as I said, to do so, to

4   meaningfully respond to the Court's questions, then you should

5   make that clear to the Court so that we can make arrangements

6   for that closure.

7        All right, then.  Mr. Woodward, you can either present

8   argument from there or the lectern, whichever you prefer.

9        MR. WOODWARD:  Thank you, Your Honor.  And good to see

10   you again.

11        Your Honor, in light of the events and the

12   circumstances that have preceded this hearing, I think it's

13   fair to begin with the following observation, which is that

14   both -- well, I turned the screen off somehow.  Did I break it?

15   Okay.  Okay.

16        The government and defense counsel agree that

17   Section II or Part II of the Special Counsel's report should

18   not be publicly disseminated.  I don't think you're going to

19   hear argument from my colleagues that there is a need for

20   public dissemination of Volume II.  So the question, really,

21   for the Court has been narrowed quite considerably to whether

22   or not the Court can and should issue an order restricting the

23   dissemination of Volume II outside of the Department of

24   Justice.  Specifically, the government is asking to disseminate

25   the report to four members of Congress.

549

1      Beginning first with the authority of the Court, we
2   think it is beyond question that the Court, A, has authority to
3   enforce its own orders, and B, has the authority to control
4   this case and all of the surrounding events and circumstances
5   of this case.  Were the appeal in this matter to result in the
6   case coming back to the Court, then Your Honor would have
7   absolutely every prerogative to ensure that a trial
8   is -- occurs without undue injustice to the defendants in this
9   case.  And so, again, everyone agrees that the contents of
10   Volume II ought not be publicly disseminated.
11      We do disagree with the government on what standard
12   this Court should follow in making a determination.  We do not
13   think that we need to show irreparable harm for reasons that I
14   will return to.  We think we can show irreparable harm.  But,
15   really, there are several authorities that we would like to
16   point the Court to that allow the Court to do what it is that
17   we're asking it to do.
18      I would take us all the way back to the beginning of
19   this case when Magistrate Judge Reinhart was asked to enter a
20   protective order in this case pursuant to Rule 16.  That
21   protective order language proposed by government prevented
22   defense counsel from disseminating any -- any information that
23   was produced in this case.  And the Court will recall that
24   we've come before the Court and complained about the fact that
25   literally every single page of discovery in this case was

550

1   marked as -- as subject to the protective order, meaning that

2   its dissemination was precluded by that protective order.

3         That language in the protective order does not apply to

4   the government; we acknowledge that.  But we would also

5   acknowledge that the government proposed the language that was

6   in the protective order, and that the protective order was

7   entered before either Mr. Nauta or Mr. de Oliveira had come

8   into the case.  Mr. Nauta had not yet been arraigned.  He had

9   not yet retained local counsel.  And Mr. de Oliveira had not

10  even been indicted in this case.

11        Certainly, at that point the government wasn't

12  objecting to the Court's prerogative to restrict the

13  dissemination of information.  And so, it's completely

14  contradictory that here we are today with the government

15  objecting to how the Court controls the information in this

16  case.  So Rule 16 would be the first point of authority we

17  would direct the Court to.

18        In our briefing we also make reference simply to the

19  Court's inherent authority to control how proceedings happen in

20  this case.  We cite United States v. DiBernardo, 775 F.2d 1470,

21  and I quote, "Federal courts may exercise their supervisory

22  powers to remedy violations of recognized rights to protect the

23  integrity of the federal courts and to deter illegal conduct by

24  government officials."

25        The Eleventh Circuit has made clear, Your Honor, that

551

1   you can do what must be done in order to prevent the

2   dissemination of this information.

3        If necessary, we also cite the All Writs Act.  I'm sure

4   the Court is familiar generally with the concept of the

5   All Writs Act.  I won't belabor the point.  But the

6   Eleventh Circuit has made clear that the Act applies -- and I

7   quote again -- "not only to ongoing proceedings, but potential

8   future proceedings as well as already issued orders and

9   judgments."  There, I'm quoting from Klay v. United

10  Healthgroup, Inc., 376 F.3d 1092.

11       Your Honor, I won't reiterate all the case law that we

12  cite in our opening brief.  That's ECF 679-21, beginning on

13  page 21.  The point being is that there is ample authority for

14  the Court to do what it is we're asking it to do.  We don't

15  think that the Court needs to find that there is irreparable

16  harm.  We think that that is a standard the government is

17  seeking to impose here because they're trying to raise the bar

18  on what is necessary to prevent the dissemination of this

19  information.

20       THE COURT:  Okay.  So if you don't view this as a civil

21  injunction standard, then what is the conceptual framework for

22  determining whether to provide this injunctive relief in the

23  context of a criminal case?

24       MR. WOODWARD:  I actually thought the Court did a

25  really nice job at doing that in its first initial order, way

1   better than my esteemed colleagues had asked the Court.  You

2   described it as an enjoinment -- "enjoinment" with an E.  That

3   is absolutely the Court's prerogative.  The Court can issue an

4   order enjoining the Department of Justice from doing things

5   contrary to what is necessary for the Court to ensure due

6   process in these proceedings.

7          If you -- if we wanted to call it a protective order,

8   we can do that too.  The Court can issue a protective order

9   pursuant to Rule 16, I think, (d), that governs the material

10  that is provided or that is created in the course of this

11  litigation.  I don't think, again, my colleagues on the other

12  side -- I don't think they will disagree with me that the vast

13  majority of the information contained in Part II is subject to

14  the protective order that bars myself and Mr. de Oliveira's

15  counsel from responding publicly, right?  We cannot respond

16  publicly to the contents --

17         THE COURT:  Do you know of any situation, a criminal

18  case specifically, where a Court overseeing a criminal matter

19  has had to provide some degree of enjoinment?  And, if so, what

20  conceptual framework was employed?  Was it a discussion of

21  competing interests of harms, or was it just, kind of, a

22  general evaluation of --

23         MR. WOODWARD:  So I have filed motions of that -- I

24  have -- I have filed motions of that type in cases where, as

25  the Court is -- not in -- not in this District, to be clear,

1   but in the District of Maryland, where we have felt that the

2   government's press release following an indictment was unduly

3   egregious.

4           THE COURT:  So in that context, if the Court agreed

5   with you, what was the conceptual framework that was applied to

6   provide the relief?

7           MR. WOODWARD:  In that context there are three -- there

8   are three authorities that both exist here and in most

9   districts across the country.

10          The first authority that I will point the Court to is

11  the Professional Rules of Responsibility, which as a -- I'm not

12  a member of the Florida Bar, obviously, but as a pro hac vice,

13  the Court knows I had to read and review those.  The

14  Professional Rules of Responsibility preclude attorneys before

15  this Court from disseminating information about a case,

16  criminal or civil, incidentally.  That rule is largely repeated

17  in Rule 77.2 of this Court's local rules which, again, preclude

18  the dissemination of information.  I can't recall off the top

19  of my head whether that applies to civil cases; I think it

20  does, though.  I think it says that attorneys practicing before

21  this Court shall not -- shall not argue their cases in the

22  court of public opinion; my words, but that's the effect of the

23  rule.

24          And then Rule 16, in this court -- I mean, Rule 16 is a

25  federal rule; it's not a local rule.  And Rule 16 generally

1    precludes the dissemination of information -- excuse me.

2    Rule 16 allows the Court to control the dissemination of

3    information concerning a criminal case.  And there is nothing

4    in the language of Rule 16 that limits its application to a

5    defendant or a defense attorney.  Rule 16 is broad in its

6    application to counsel to parties before the Court.

7         And in this case if -- if I may be blunt, I think it

8    was just simply an oversight that defense counsel did not

9    request Rule 16's applicability, both to the government and to

10   defense counsel.

11        We have had this colloquy about the protective order in

12   this case, and whether Rule 6(e) is sufficient to protect the

13   information in this case.  And the way in which the government

14   throughout this case has had varying definitions -- varying

15   interpretations of Rule 6(e) --

16        THE COURT:  So getting to the 6(e) issue, do you still

17   believe -- do you believe, upon review of Volume II, that it

18   still contains 6(e) information?

19        MR. WOODWARD:  Yes, Your Honor, I believe that it

20   contains 6(e) information, perhaps not -- perhaps not in the

21   way that the letter of Rule 6(e) can be construed.  What the

22   government will tell you is that Rule 6(e) protects the process

23   and the deliberations of the grand jury, not necessarily

24   information that is presented to the grand jury.  And so, if

25   the grand jury subpoenas telephone records or text messages,

1  and that information is presented to the grand jury, then what

2  the government will tell you is, if they can -- if they can

3  strip that information from any suggestion that it was

4  requested or presented to the grand jury, then it's not

5  protected by Rule 6(e).

6       Yet, Your Honor, with respect -- that is exactly the

7  opposite position they would take if the question were whether

8  a defense counsel could disseminate grand jury material.

9       And so whether that would be covered by the protective

10 order or otherwise, you know, in many -- in many districts, a

11 Rule 6(e) order is entered at the start of a case.  I

12 understand in this district typically grand jury materials are

13 not provided to defense counsel until they're required as

14 Jencks, and so, much closer to trial.  But the fact of the

15 matter is that the spirit of Rule 6(e) applies not just to the

16 actual deliberations or to grand jury transcripts, but to the

17 information that is presented to the grand jury.  The fact of

18 the matter is that information would not exist if a grand jury

19 had not been investigating.

20      THE COURT:  So do you know what standard the government

21 is operating, in terms of its own 6(e) determinations in the

22 volume itself?

23      MR. WOODWARD:  I can tell you that what the government

24 told me when I inquired about this very issue, is that, so long

25 as the report does not reference grand jury deliberations or

1 grand jury transcripts, which necessarily implicate grand jury

2 deliberations, that 6(e) does not apply.

3        Now, to be sure, that was a representative of the

4 Special Counsel's Office who are no longer with us.  So I don't

5 want to speak out of turn on behalf of my colleagues on behalf

6 of the Department of Justice, but when I flagged this issue

7 last weekend, being quite concerned about some of the new

8 information that is concerned in the report that was presented

9 not to one grand jury, but to two grand juries, as it happens

10 in this case, that was the response that I got.

11        And that, Your Honor -- as you will recall, we had a

12 sealed telephonic hearing about Rule 6(e) and how it applies to

13 the records in this case.  And the quote -- Your Honor's quote

14 was --

15        THE COURT:  I take it you're not going to be quoting

16 from a sealed transcript?

17        MR. WOODWARD:  No.  Fair enough, Your Honor.  I won't

18 quote from a sealed transcript.

19        But Your Honor had much to say about the way the

20 government treated Rule 6(e) material when it came to their

21 desire to disseminate that information, as opposed to defense

22 counsel's desire to disseminate that information.

23        THE COURT:  So, I guess final question, though, on 6(e)

24 specifically.  Having reviewed Volume II, again speaking in

25 generalities, what categories of information do you believe are

1   in the redacted version of Volume II that, in your view, runs

2   afoul of 6(e)?

3           MR. WOODWARD:  So with a significant caveat that my

4   ability to review Volume II has been limited.  On Sunday, late

5   morning, early afternoon, with no access to my own devices or

6   to the discovery in this case -- and then -- I asked to review

7   the report this morning and was told that I could come see it

8   beginning at noon today, and have been at the courthouse since

9   roughly 12:05 with the report today.  There, I, again, did not

10  have access --

11          THE COURT:  All right.  I understand the caveats.  At

12  that point, though, what is your answer?

13          MR. WOODWARD:  I would put this in three buckets.

14  There is specific reference to subpoenas in the report that are

15  unredacted.  Now, the reason the caveats are important is that

16  it may be that the subpoenas have been publicly disclosed

17  already, and I just don't -- I have not had the ability to

18  verify that.  There is specific reference to records that were

19  obtained pursuant to those subpoenas.  There --

20          THE COURT:  Okay.  No -- I -- so references to

21  subpoenas -- is it your view that substantive evidence acquired

22  as a result of a grand jury subpoena would fall under the

23  definition of matter before the grand jury?

24          MR. WOODWARD:  So, no.  I would be -- that would be

25  speaking contrary to case law if I were to make that argument.

1      My argument is that the spirit of Rule 6(e) ought to

2  involve -- and I'm going a little bit far afield here.  But to

3  answer your question, if we're -- if this -- if the Court's

4  decision on whether to release Volume II is going to turn on

5  the application of 6(e), then I believe that we are entitled

6  and that justice requires an opportunity for us to sit down and

7  go line by line and have that argument -- and have that

8  argument with respect to each line.

9      THE COURT:  Have you had an opportunity to weigh in or

10  provide counter-redactions or any sort of meaningful

11  participation in the 6(e) analysis?

12      MR. WOODWARD:  Yes.  They invited me -- you know, I was

13  there on a Sunday afternoon; that was the soonest that I could.

14  I was out of -- I was not in the District of Columbia when I

15  was first invited to come review the report.  I tried to come

16  on Saturday, but I couldn't make it on Saturday for personal

17  reasons.  I went Sunday.  I reviewed the report.  It's a

18  hundred-and-something pages.

19      They said I could write a letter by 2:00 p.m. the

20  following day identifying any concerns -- not limited to grand

21  jury concerns, but any concerns.

22      Your Honor, I didn't write a letter because I couldn't

23  in that short period of time.  And I have not yet had the

24  opportunity to review the report with the actual discovery that

25  is cited in the report.  I don't know what --

1      THE COURT:  Okay.

2      MR. WOODWARD:  -- a Bates number is -- what type of

3 document a Bates number is referring to.

4      What I do know is that there is information in that

5 report that is presented to the grand jury.  And to simply

6 claim that because it's coming from a source that is different

7 from how it was presented to the grand jury -- you know, for

8 example, an interview transcript with the FBI, as opposed to

9 the FBI's summary testimony.  I mean, that -- you know, that's

10 a little bit too cute for purposes of what is a

11 significant -- a significant issue for this Court to resolve,

12 where there is a pending case.

13      By the way, you know, as -- as Congressman Raskin, who

14 they want to give the report to, publicly said yesterday, the

15 Department of Justice should dismiss this case as against

16 Mr. Nauta and Mr. de Oliveira.  You know, so the person that

17 they're telling us to --

18      THE COURT:  What do you take -- how does that

19 January 15th letter play into your argument at all?

20      MR. WOODWARD:  Well, it plays -- I mean, first of all,

21 I think it's worth noting that the legislative branch, or at

22 least the representative of the legislative branch, thinks this

23 case ought to be dismissed.  It also plays into the argument

24 with respect to any suggestion that the dissemination of this

25 report is not reasonably likely to be public is just completely

560

1  false.

2         What Congressman Raskin makes clear in his letter of

3  January 15th is that he has every expectation of talking about

4  what's in the report, talking about the conclusions of the

5  report, the conclusions and how they -- how they pertain to

6  Mr. Nauta and de Oliveira by virtue of being co-defendants in

7  the report.

8         I simply have virtually zero confidence that some of

9  the key findings of the report won't be disclosed by

10  Congressman Raskin, and there is no authority of this Court,

11  with respect, to tell Congressman Raskin otherwise.  That would

12  be a blatant violation of separation of powers.  I don't think

13  my colleagues on the other side of the aisle are going to

14  disagree with me about that.

15         And so the Court can -- other than the word of the

16  Department of Justice, the Court can have no assurances that

17  the four members of Congress who are going to be provided the

18  report are not going to publicly disseminate it.

19         And, Your Honor, I have experienced this firsthand in

20  the last two weeks.  I mean, part of my responsibilities now

21  are briefing members of the Senate on the confidential

22  background investigations of President-elect Trump's nominees

23  to this cabinet.  And no sooner had I briefed a member of the

24  Senate, than The New York Times is writing about the contents

25  of that briefing.  I mean, you know, we saw this together

1    throughout the history of this case.

2          THE COURT:  Okay.  So getting back, though, to the

3    discussion of congressional review, there was some discussion

4    in the papers about certain conditions or specified conditions

5    under which these Congress members would be permitted to review

6    the volume.  Are you familiar with the details of those

7    conditions at all?

8          MR. WOODWARD:  I am, based on what's in the briefing,

9    right?  They would invite the members of the Congress to come

10   to the Department of Justice and review the report, and Scout's

11   honor, they won't disclose the content of the report as soon as

12   they get back to the Capitol Building.  But again, there is

13   nothing that the Department of Justice can do.  And there is

14   just -- there is nothing, again with respect, this Court can do

15   to prevent any of those members of Congress from walking onto

16   the House floor and disclosing some of the -- any of the

17   findings in the report.

18          There is just -- there is nothing.  I mean, I am happy

19   to cite McSurely v. McClellan, this case out of the D.C.

20   Circuit, at 553 F.2d 1277.  There, the D.C. Circuit made clear

21   that the courts cannot order members of Congress to do things;

22   it's a violation of separation of powers.  I mean, this

23   is -- this is a -- that's a case from 1976.  It's just not a

24   novel concept.

25          What I expect my colleagues on the other side will say

1  is --

2  THE COURT:  Their argument, I think, might be:  Well,

3  your remedy would come in the form of a postconviction motion

4  to dismiss or some other thing in the future.

5  If there were a dissemination of the contents, then you

6  could seek remedies elsewhere, after the fact, once all of that

7  information has been laid out for public consumption.

8  MR. WOODWARD:  I mean, isn't that clever?  I mean,

9  we're not here to argue about legislative purpose.  But what

10  legislative purpose does Congress have to see this report if

11  they're not going to legislate about the contents of the

12  report?

13  So, yes, I hear them in saying I can move to dismiss

14  this case after Mr. Nauta has been unfairly prejudiced by the

15  dissemination, the public dissemination of the contents of the

16  report.  This is not a press release of the Department of

17  Justice, Your Honor.  You've had the privilege of reading the

18  report.  This is not something where we should wait and see

19  what damage is done.

20  I ask -- I ask -- I will ask in the alternative.  What

21  damage is done to the Department by waiting until the case is

22  resolved?  And the answer is literally none.  So why should

23  this Court be persuaded that we can wait and see whether

24  Mr. Nauta and Mr. de Oliveira survive the publication of the

25  report and can be fairly prosecuted?  We have the opportunity

1  to stop that prejudice before it happens.  Let's -- let's do

2  that.

3  THE COURT:  All right.  Are you aware of any situation

4  in which a report by a Special Counsel has been released to

5  Congress in this limited sense prior to the conclusion,

6  including appellate proceedings, of a criminal case?

7  MR. WOODWARD:  I'm not aware of any example of that,

8  no, Your Honor.

9  I mean, we make -- we make issue of that in our opening

10  brief about whether the Special Counsel has, in fact, concluded

11  his work.  You know, that point has become moot, but we will

12  make the obvious observation that were the Eleventh Circuit to

13  remand this case to Your Honor for further proceedings, there

14  are lots of motions pending.  It's hard to say that the Special

15  Counsel's Office has stopped collecting information in

16  furtherance of their prosecution in this case.  Now, they have

17  because they've resigned.

18  But what criminal case does a prosecutor stand before

19  Your Honor and say:  You're right.  We're done.  We don't

20  expect to see any other evidence.  We will wait until the trial

21  to present our case, but we've stopped gathering evidence in

22  this case.  We won't -- we don't welcome any additional

23  information?

24  So, no, the -- of course, we all understand why the

25  Special Counsel timed this the way that it did, but that -- you

1    know, that ship has sailed with respect to the fact that the

2    report has now been transmitted to the Department of Justice.

3    And so we're here, really, to focus on the two points that I

4    have touched upon.  One, that this Court's local rule, 77.2,

5    absolutely authorizes the Court to place limitations on

6    dissemination of the information within the report.  And even

7    if it didn't, we're far from being confident that Rule 6(e) is

8    being complied with.

9         And so if -- again, my ask would be that if Rule 6(e)

10   is the basis upon which the Court decides the report could be

11   released -- in other words, that if it redacted to comply with

12   Rule 6(e), the report could be disseminated to Congress, then

13   we would respectfully request an opportunity -- first of all,

14   we think we should have the report so that we can make a

15   meaningful argument about line by line, footnote by footnote,

16   how 6(e) applies.

17        I mean, I think we're entitled to the report anyway.

18   It's clearly discoverable under Rule 16.  There is probably

19   some debate about whether Rule 16 is operative, given that the

20   case has been dismissed.  But Brady vs. Maryland -- and the

21   government's obligation pursuant to Brady doesn't go away

22   simply because the case has been dismissed and is on appeal.

23        So that is our ask.

24        If -- if the Court is inclined to agree that

25   dissemination is appropriate, so long as Rule 6(e) has been

1    complied with, then I think we need to come back and have a

2    hearing, as we've had with the Court before, about exactly what

3    information may be disseminated and which information must be

4    redacted.

5          THE COURT:  All right.  Last question.  Do you know if

6    there has been an official request by these members of Congress

7    for Volume II, outside of the ranking member's letter of

8    two days ago?  And the reason for my question is there was some

9    discussion in the government's papers about this generalized

10   interest in legislating in the field of special counsels.  And

11   so, I guess my question is:  Is there an official request?  Is

12   there any pending legislation?  Is there any concrete work

13   being done at the moment that would be directly pertinent to

14   review of this volume by those specified members of Congress?

15         MR. WOODWARD:  No, Your Honor.  I'm not.  And, in fact,

16   if there had been, I think that would weaken any argument that

17   the confidentiality of the report was assured.  Because, again,

18   if the legislative purpose of disseminating the report is to

19   legislate on Special Counsels and what was done in this case,

20   then the members themselves would be in dereliction of their

21   legislative function by not disseminating this information to

22   their staff and their colleagues so that they can propose

23   legislation about how Special Counsels work.

24         But to Your Honor's points, I'm not aware that either

25   the chairman or ranking members of the judiciary committees

 1   have made formal requests for the report, other than the -- the

 2   letter of January 15th from Ranking Member Raskin.

 3           THE COURT:  Okay.  Thank you.

 4           MR. WOODWARD:  Thank you, Your Honor.

 5           THE COURT:  Ms. Shapiro.

 6           MS. SHAPIRO:  Good afternoon, Your Honor.

 7           I guess I would like to start by agreeing with my

 8   colleagues on the other side that there is really very little

 9   dispute, actually, between the parties.  The Attorney General

10   has agreed there should be no public dissemination of

11   Volume II; so we're not talking about public release of this

12   report.  They want to be very clear about that.

13           We have a very small slice of disagreement, and that is

14   whether four members of Congress, the Chair, and the ranking

15   members of the Judiciary Committee of the Senate and the House

16   can review the report -- not have the report, not take the

17   report, but only to review ex parte, under conditions of

18   extreme confidentiality.

19           THE COURT:  What are those conditions?

20           MS. SHAPIRO:  So those would include:  They cannot take

21   devices into the room where they would review the report.  They

22   cannot take notes out of the room where they can leave the

23   report.  They can take notes and leave them with the report,

24   but they can't take any notes with them.  They cannot share the

25   information with staff.  They need to agree that the

1   information remains confidential for the entirety of the time

2   that this case remains pending.  And --

3           THE COURT:  Have those conditions been memorialized in

4   any way, or is this more of an anticipatory request that you're

5   making prior to actually ironing out these details?

6           MS. SHAPIRO:  Well, they wouldn't be ironed out.  It

7   would be these are the conditions that they would be permitted

8   to review the report.  And if they did not agree to those

9   conditions, they wouldn't be able to review the report.

10          THE COURT:  Was this request by these four members made

11  in the form of an official letter to the Department of Justice?

12  Because I haven't seen any official or actual document

13  demanding or urging the presentation of this volume.

14          MS. SHAPIRO:  So my understanding is that there have

15  been multiple requests to view the report, but not a formal

16  subpoena.  There has -- I --

17          THE COURT:  And what was the basis of those requests?

18  In other words, why is Congress interested in seeing Volume II

19  now?

20          MS. SHAPIRO:  Well, I can tell Your Honor -- and I

21  think Your Honor alluded to the footnote in our brief that

22  cited formal filings from the Judiciary Committee in cases

23  about other Special Counsel matters.  And they have been very

24  express about wanting to look at the Special Counsel rules,

25  whether they need to be changed, whether there should be a

1   return --

2        THE COURT:  Well, do any of those instances involve

3   what we have here?  Those were all, to my understanding,

4   released to Congress after full conclusion of criminal

5   proceedings or after a final determination had been made not to

6   bring criminal proceedings.  So do you have any example

7   historically where the Department of Justice has issued a

8   Special Counsel report to Congress, even on a limited basis,

9   prior to the conclusion of criminal proceedings?

10        MS. SHAPIRO:  Two responses to that, Your Honor.  One

11   is that we would not be providing the report to Congress

12   since --

13        THE COURT:  Or permitting review.  Excuse me.

14        MS. SHAPIRO:  Right.

15        THE COURT:  It should either be yes or no.  Is there

16   any example of that ever happening?

17        MS. SHAPIRO:  I can cite you an example in the case of

18   Special Counsel Weiss where there was information shared with

19   Congress, including testimony during the pendency of the

20   prosecutions.

21        THE COURT:  All right.  So what case was that?

22        MS. SHAPIRO:  That was the Special Counsel

23   investigating Hunter Biden.

24        THE COURT:  I'm aware.  But the case number?  And was

25   there any litigation to that effect prior to the -- to the

 1   release of that information to Congress?

 2         MS. SHAPIRO:  So there was not litigation.  There was a

 3   request and subpoenas from Congress, and then there was an

 4   accommodation process.

 5         THE COURT:  So there was a subpoena?

 6         MS. SHAPIRO:  Yes.

 7         THE COURT:  Our discussion, I think, raises the

 8   question why is -- why is there such urgency to release this to

 9   Congress now, prior to the full conclusion of this criminal

10   proceeding, which would seem to be the ordinary course of

11   handling such a situation?

12         MS. SHAPIRO:  Well, again, there -- it's not

13   contemplated, a public release, during the pendency.

14         THE COURT:  Right.  But why is there an urgency to

15   provide this to the four members of Congress that you've

16   identified now as opposed to waiting until this criminal

17   proceeding is fully over?

18         MS. SHAPIRO:  The reason that they -- that -- that the

19   urgency, if you want to say "urgency," is that the

20   historic -- historical practice of Special Counsel reports has

21   been to share them with Congress.  And this Attorney General,

22   who said from the very outset of his tenure that he intended to

23   be fully transparent about Special Counsel investigations that

24   he appointed, including making the reports available in public

25   at the appropriate time and --

1     THE COURT:  I think -- keyword, "appropriate time," I

2   think that's the real concern is the timing.  It may very well

3   be appropriate certainly when the criminal proceeding is fully

4   concluded to do, as has been done in prior Special Counsel

5   situations.  But my concern is the premature nature of this

6   request, prior to full resolution of a proceeding that remains

7   pending before the Eleventh Circuit, and I'm still not hearing

8   a satisfactory answer to that question.

9     MS. SHAPIRO:  Well, the -- the proposal is to only do

10  an ex parte review by four members of Congress.

11    THE COURT:  And why does that ex parte review have to

12  happen now?

13    MS. SHAPIRO:  I think simply because it is the desire

14  of this Attorney General to comply with the historical practice

15  that there has always been, and his time is limited.  And he

16  appointed these Special Counsels, and he would like to see that

17  the -- the historical practice of all Special Counsel, and his

18  commitment to what he said that he would share with Congress is

19  satisfied during his tenure.

20    THE COURT:  You've referred a number of times to

21  "historical practice," but I'm not seeing a historical practice

22  of releasing Special Counsel reports prior to the conclusion of

23  criminal proceedings, unless I'm missing an example of --

24    MS. SHAPIRO:  No.

25    THE COURT:  -- of one.

571

1        MS. SHAPIRO:  You're absolutely correct about public

2   dissemination.  But there are --

3        THE COURT:  Even -- even though to Congress on this

4   limited basis, I'm -- it just seems to me that those reports

5   have awaited that moment of finality, where there was really no

6   doubt that the criminal proceeding was fully concluded.  And,

7   again, we await the decision of a higher court on the subject

8   of the superseding indictment in this case.

9        MS. SHAPIRO:  Your Honor, again, the -- it's not even a

10   dissemination to Congress, other than this ex parte review.

11        So, I think, looking just on the flipside, the

12   defendants are seeking an injunction against what the

13   Department has determined to do, and they're seeking to enjoin

14   it, and so they are necessarily claiming that they will be

15   irreparably harmed.  And the harm is difficult to understand

16   because of multiple reasons.

17        One is that there was a very lengthy indictment in this

18   case and a number of public motions.  So there is much

19   information that is public right now about the case.

20        And, two, it assumes and speculates that these four

21   members of Congress, despite agreeing to confidentiality, would

22   not abide by that confidentiality.

23        THE COURT:  But you agree there would be no enforcement

24   mechanism for the Court; unless, of course, those members of

25   Congress wish to submit to the jurisdiction of this Court,

1  which I am sure is not the case.  Then there is really no way

2  that this Court could ever enforce or really do anything about

3  leaks, given the heightened public scrutiny given to this

4  matter.

5        So you would agree, right, that there is nothing from

6  an enforcement perspective this Court could ever feasibly do to

7  cure the harm that could result from public dissemination of

8  the report; correct?

9        MS. SHAPIRO:  I -- I don't agree, Your Honor.

10        THE COURT:  Okay.  So what could I do?  What could I do

11  if somehow this report gets leaked?

12        MS. SHAPIRO:  So, two responses to that, Your Honor.

13  First, again, these members of Congress will not receive the

14  report.  So there is virtually no likelihood that it can -- the

15  report can leak.  I think the only complaint that my colleagues

16  on the other side have mentioned is that they might get on the

17  floor of the House and characterize the report.

18        Again, the characterization, I submit, is not the kind

19  of prejudice that cannot be cured.  And there are two things

20  that I would say.  One is that these members of Congress have

21  every incentive not to leak or characterize or do anything in

22  violation of the agreement because the executive branch and the

23  legislative branch have to share information all the time, and

24  they reach accommodations with respect to the sharing of that

25  information all the time.  And if they don't abide by

1    the agreement, they're not likely to be granted the sort of

2    confidential, ex parte access that they have been accustomed to

3    getting on occasion.

4          THE COURT:  So, but in the meantime, the criminal

5    defendants are just supposed to hope and, you know, have solace

6    that whatever characterization is made of this report is

7    accurate, and, certainly, they don't have an opportunity to

8    rebut it.

9          At the end of the day, what's the upside of doing this

10   right now rather than just waiting until the proceeding is

11   fully concluded?

12         MS. SHAPIRO:  Again, Your Honor, it's just the

13   Department's determination that it would like to see this

14   through to conclusion and comply with the historical practice.

15   And, again, likely I think it's the Heller decision that my

16   colleagues cited that this -- even assuming there was some

17   member who disregarded the agreement and characterized it on

18   the floor -- even assuming that -- and we think that's

19   unlikely, but let's say that it happened.

20         THE COURT:  Uh-huh.

21         MS. SHAPIRO:  Your Honor has all kinds of mechanisms by

22   which it can control any prejudice to these proceedings.  In

23   the Heller case, for example, it was undue publicity that came

24   out in the middle of trial, and it was actually just as the

25   defendant was taking the stand.  And the Court ended up

1  reversing and remanding because the trial judge in that case

2  had not polled the jurors to account for any undue prejudice.

3  But this case, if it -- if it ever goes to trial, it won't go

4  to trial for a long time --

5       THE COURT:  But have you dismissed the indictment with

6  prejudice?

7       MS. SHAPIRO:  No -- well, I'm saying if it does go to

8  trial, it won't be for a long time because there is still an

9  appeal pending.

10      THE COURT:  Right.  But it's still not foreclosed.  In

11  other words, the criminal liability is still there for the

12  defendants in this case.

13      MS. SHAPIRO:  Correct.  But my point, Your Honor, is

14  that it would be months or years away.  And Your Honor has many

15  mechanisms at Your Honor's disposal to control for undue

16  prejudice:  The voir dire process, the jury questionnaire, all

17  sorts of things to ensure that jurors who are seated in this

18  case are not subjected to -- that don't come in with

19  pre-notions -- predecided notions or -- or, you know, the

20  normal way that you would screen to ensure that jurors can be

21  fair and impartial in a trial.  And if there was no way to seat

22  an impartial jury, then Your Honor, of course, has -- can

23  dismiss the indictment.

24      So there are -- and, again, there would be a lapse of

25  time before this even came about because the trial is not

575

1   imminent.

2       So I -- the prejudice -- this is really quite

3   speculative.  It's really speculation on speculation.  And

4   given that, entering an injunction seems to be, you know,

5   quite -- quite unusual in a criminal case like this.

6       THE COURT:  Well, I guess you say it's unusual, but has

7   the -- has the United States ever sought to do this?  There may

8   be no case law in this situation, but isn't that because there

9   has been no effort in the past by the Department of Justice to

10  seek release of substantive case information prior to the end

11  of a case?

12      MS. SHAPIRO:  Well, Your Honor, again, there has been a

13  sharing of information with Congress on ongoing cases.  So it's

14  certainly not unprecedented that the Department shares

15  information with Congress in an ex parte way with conditions of

16  confidentiality.  And even -- even broader than that, in the

17  Weiss case, the Special Counsel actually testified in front of

18  Congress during the pendency of the criminal case.  So that is

19  not unprecedented.  But it's unprecedented to get a motion to

20  enjoin the Attorney General from making a dissemination to

21  Congress.

22      THE COURT:  Well, theoretically, yes, in the abstract,

23  but I think that the difficulty is that this does very clearly

24  and expressly implicate the fair trial rights of defendants in

25  a case that is ongoing.  And that is really, I think, the key

576

1    differentiating fact.

2        MS. SHAPIRO:  And I agree with that, Your Honor, and

3    the Attorney General agrees with you on that.  And that's why

4    there is the decision not to.  And the Special Counsel agreed.

5    He recommended that it not be released publicly, and the

6    Attorney General agreed with that.  So I think everybody is in

7    agreement on that point, that public release would unduly

8    prejudice the defendants.

9        THE COURT:  All right.  Now, we did have some

10   discussion about the Rule 6(e) issues.  Do you wish to comment

11   on that?

12       MS. SHAPIRO:  Well, I guess I would say, you know,

13   prosecutors are very expert in reviewing for Rule 6(e).  They

14   do it unsupervised all the time.  But they are correct --

15       THE COURT:  But you would agree that when there is a

16   true dispute about a Rule 6(e) question, the normal mechanism

17   is for there to be review of that contested question by a

18   judicial officer.  And in this case, it appears those

19   determinations have been made entirely unilaterally without any

20   meaningful input or opportunity for input by the defense.  So

21   this does strike me as a different way of going about dealing

22   with contested questions of Rule 6(e) material.

23       MS. SHAPIRO:  I guess I didn't hear, really, contested

24   issues of 6(e).  I think what I heard is that the defendants'

25   counsel thought that the -- that the -- there was a spirit

1    violated, as opposed to the rule.  I think what they

2    articulated as having been told by the Special Counsel's Office

3    is absolutely correct about 6(e) material; if it doesn't

4    identify the source of the material, that that is not a

5    violation of 6(e).  And I think the case law is very strong.

6    For example, in the Freedom of Information Act context under

7    exemption 3 which includes 6(e), courts routinely require the

8    release of substantive information that may have been 6(e)

9    material but is not associated with any identification that it

10    came from a grand jury source.

11        Courts routinely require the disclosure of that

12    information as not being protected by statute, as 6(e) would --

13    as exemption 3 of the FOIA requires.  So I think that's clear.

14        THE COURT:  So, just hypothetically, if the government

15    acquires toll records, and then the summary agent goes before

16    the grand jury and repeats and quotes from the toll records, do

17    you take the position it's no longer 6(e) material?

18        MS. SHAPIRO:  Well, I think if there are multiple

19    sources of information and you don't identify --

20        THE COURT:  Well, that's just very direct.  It's, "I

21    subpoenaed, via grand jury -- subpoenaed toll records.  I then

22    give those to my agent, and my agent goes before a grand jury

23    and tells the grand jury about what the toll records show."

24        Is that 6(e) material?

25        MS. SHAPIRO:  If it's not -- I -- I guess -- and again,

```
 1    I'm not the authority on this; I want to make that clear.  But
 2    if it -- if that information is not associated, it's not
 3    identified that it was presented to the grand jury, then I
 4    think those toll records wouldn't be 6(e) with --
 5    disassociated.  And if Your Honor --
 6            THE COURT:  I don't know.  The term "matter" before the
 7    grand jury has been interpreted relatively broadly, and my
 8    understanding is that it covers anything that reasonably can be
 9    said to have occurred before the grand jury.  And if you're
10    just merely transplanting information and then conveying it
11    through another mechanism, I just query whether it still falls
12    within the Rule 6(e) rubric.
13            MS. SHAPIRO:  What I can do, if it's helpful to
14    Your Honor, is provide you with a written description of the
15    process by which the 6(e) redactions were done.  We can do that
16    today.
17            THE COURT:  Were you involved in that process?
18            MS. SHAPIRO:  No.
19            THE COURT:  Okay.  So, given the departure of the
20    Special Counsel and, presumably, his team with detailed
21    knowledge, who currently, within the Department of Justice,
22    could speak with authority about the factual questions that
23    potentially implicate 6(e)?
24            MS. SHAPIRO:  Well, I -- I do have information about
25    how the Special Counsel went through the redaction process, and
```

1    we can provide you with that information.

2          THE COURT:  But without really knowing the facts of the

3    investigation and the evidence acquired as a result of the

4    investigation, plus what was actually shared with the grand

5    jury, how would one be able to really tell?

6          It just strikes me that these factual questions are not

7    always self-evident, and that is why they often do require

8    judicial resolution in a granular way.

9          But anyhow, I do want to get back to just the

10   conceptual question.  I think you framed this as a -- in a

11   traditional civil injunction format, and I wanted to hear from

12   you on that.  Why are you taking that approach as opposed to

13   something maybe different in the criminal context that's not in

14   the traditional civil injunction format?

15         MS. SHAPIRO:  Well, I think that the -- the --

16   whichever rule you use, I don't think, makes a significant

17   difference because I still think there is always going to be a

18   balancing of the harms.

19         THE COURT:  Right.

20         MS. SHAPIRO:  Your Honor, I think, correctly cited in

21   her own order Rule 65.  Because, you know, this is an enjoining

22   and -- and it was styled as "emergency motion," and that

23   normally requires irreparable harm.  So that's why --

24         THE COURT:  Right.  I mean, that was a prior order, and

25   it was referencing the agents and officers, et cetera, with

1    that language, but that was not a substantive determination of

2    what legal framework applies to this present question.

3          So then just substantively, I think what you're saying

4    is that the analysis doesn't really materially differ.  So

5    then --

6          MS. SHAPIRO:  I think there is always going to be a

7    balancing of the harms.  And I think there is no question that

8    Your Honor has the authority to enforce the fair trial rights

9    of the defendants.  Nobody disputes that.  But in balancing the

10   harms, the speculative harm from the potential characterization

11   of members who have agreed to confidentiality, to a trial that

12   will not take place, if ever, for quite some time, balancing

13   that with directing the Attorney General not to share

14   information with Congress, that seemed unwarranted to us.

15         THE COURT:  All right.  I did want to -- what has been

16   told to me through your notice is that there is no classified

17   information in this report.  Is that correct still?

18         MS. SHAPIRO:  Correct.

19         THE COURT:  Okay.  Has the report -- or Volume II, I

20   should say, been reviewed by the CISO or by any intelligence

21   agencies to assure that no classified information is contained

22   within it?

23         MS. SHAPIRO:  Not to my knowledge; although, of course,

24   members of the Special Counsel Office -- Counsel's Office has

25   reviewed it carefully.

1        THE COURT:  Okay.  Do you know whether it was submitted

2   for review by the intelligence agencies?  And we have taken

3   great protections and safeguards to ensure that classified

4   information remains classified.  And although I hear you that

5   it does not contain classified information, what I'm looking

6   for is something more definitive.

7        MS. SHAPIRO:  I don't know if it was submitted for a

8   formal review.  I could find out, but I don't know that

9   information.  I am confident that it doesn't contain classified

10  information.

11       THE COURT:  All right.

12       Okay.  One final question.

13       There -- with litigation in the underlying case related

14  to material as to which an assertion of attorney-client

15  privilege had been made, those items as to which a privilege

16  was asserted were sealed in the criminal proceeding.

17       Is it -- am I correct to understand that Volume II does

18  not redact that information?

19       MS. SHAPIRO:  I think that attorney-client privilege is

20  redacted.

21       THE COURT:  Because the notice of compliance doesn't

22  say that.  It says, "Grand jury material and matters sealed by

23  the Court" --

24       MS. SHAPIRO:  I can clarify.

25       THE COURT:  My review of the volume tentatively

582

1   indicates that there could be information that was at least

2   asserted to be privileged by the President-elect in the

3   underlying case, and that's another area that I don't think has

4   been at least briefed or evaluated.

5         MS. SHAPIRO:  I could -- I could get an answer for you

6   on that.  I don't -- I can't answer it myself.

7         THE COURT:  Okay.  All right.  Okay.  That's all I have

8   for now.  Thank you.

9         MS. SHAPIRO:  Thank you.

10        THE COURT:  Any rebuttal from Mr. Woodward on this

11  particular motion?  If not, I will turn to the motion to

12  intervene.

13        MR. WOODWARD:  Unless the Court has questions, I will

14  just address the historical practice that my colleague

15  repeatedly referred to.

16        The Court may or may not be familiar with the

17  circumstances surrounding the testimony of Special Counsel

18  Weiss, but I think you are --

19        THE COURT:  No, I do not have particularized knowledge

20  of that.

21        MR. WOODWARD:  Okay.  So that was not a request by the

22  Department of Justice to disseminate information about an

23  investigation.  That was a subpoena from Congress pursuant to

24  what was then characterized as preliminary impeachment

25  proceedings against the President of the United States.  Not

583

1   only did Special Counsel Weiss oppose the dissemination of

2   information related to this information, but he was backed by

3   the Department of Justice in opposing that information.

4        And so my colleague made reference to the fact that

5   there was a -- there was a discussion or an agreement, and

6   eventually it was decided that Special Counsel Weiss would

7   testify, but there was -- there was much litigation that

8   surrounded that in which the government at every step of the

9   way opposed what Congress was seeking.  And then, when Special

10  Counsel Weiss did testify before Congress, he refused to

11  testify about the particulars of the investigation itself.  He

12  refused to discuss some of the sources and methods in that

13  investigation, as well as the charging, or lack thereof, that

14  had been done in that case.

15       And so he sought to completely divorce that proceeding

16  of references to the ongoing prosecutions that were pending

17  from Congress's inquiry into the potential for an impeachment

18  of a sitting president.  And so, to call that historical

19  practice, we think is disingenuous.

20       There has never been an instance where an

21  Attorney General decides that, because he has three days left

22  in office, he wants the report that he commissioned to be

23  disseminated.  And I think it's especially stark to hear my

24  colleague provide Your Honor no real reason why these members

25  of Congress can't wait to review the report.

584

1    Your Honor will recall -- while it's comforting for me

2    as defense counsel to hear that this case may not be tried for

3    years -- but we were summoned by Your Honor repeatedly on very

4    aggressive trial schedules at the government's request.  And so

5    we don't know when the Eleventh Circuit will act.  It is unfair

6    to suggest any knowledge on behalf of the government as to when

7    this case would go to trial if they rule today.

8         And so, Your Honor, given that there is no reason for

9    the dissemination of the information in this report in any

10   manner whatsoever to a member of Congress, we would ask your

11   Court to enjoin the Department of Justice from doing so, unless

12   and until the proceedings in this matter have been resolved.

13        And, again, to the extent that you conclude the

14   dissemination is appropriate, so long as Rule 6(e) is honored,

15   we think that it's necessary to have another hearing on how

16   Rule 6(e) applies.

17        I will make one final observation about that point.

18   It's one thing for a FOIA request to require the disclosure of

19   information and -- in a vacuum.  We have no knowledge of how

20   that information came into the hands of the Department of

21   Justice.  This report is the entire result of the grand jury's

22   investigation.  There is no report, absent the two grand juries

23   that were empanelled in this case.  And so to claim that no one

24   will know what the grand jury was doing because we have excised

25   any reference to the grand jury in our hundred-plus pages of a

1    report, that's -- that's -- we are revealing the deliberative

2    and procedural process of the grand jury with the disclosure of

3    this report.

4            Thank you, Your Honor.

5            THE COURT:  Okay.  Thank you.

6            All right.  It's 3:00.  We will proceed now to hear

7    argument on the motion to intervene.

8            Mr. Lauro.

9            MR. LAURO:  Thank you, Your Honor.

10           We believe that the motion to intervene is squarely

11   based on the Gravel decision where the Supreme Court allowed a

12   senator of the United States to intervene in a pending criminal

13   case to advance and protect his personal interests as well as

14   institutional interests.  The Supreme Court there decided that,

15   certainly, the senator had a right to intervene based on

16   protected constitutional and statutory interests that were at

17   issue.

18           We would suggest to the Court that the Gravel decision

19   is on all fours with what we have here, where President Trump

20   is advancing personal concerns as well as institutional

21   concerns regarding the release of this information.

22           His personal concerns stem from the fact that although

23   the government has dismissed the appeal and Your Honor has

24   dismissed the case against President Trump, the government has

25   characterized its requests for dismissal as without prejudice.

586

1  Their position is that one day they could possibly bring this

2  case back again.  We, of course, disagree with that.  But

3  President Trump's interest is very similar and aligned with the

4  current defendants in the case in the sense that his due

5  process concerns, his right to fair process is implicated here

6  by release of this report, even under the circumstances that

7  the government suggests, which really have no guardrails at

8  all.  And for all intents and purposes, it would be released

9  publicly, as Your Honor has brought out in the questioning of

10  government counsel.

11      So President Trump has the same personal interests that

12  are raised by --

13      THE COURT:  Well, I don't know that it would be a full

14  public release.  What I have heard is characterizations of the

15  report, if they were leaked because they can't actually retain

16  a copy of it.  And so it just may be disseminations of

17  top-level conclusions or snippets and that sort of thing.

18      MR. LAURO:  That's hardly protective, I think as

19  Your Honor has suggested, in the case of those who are facing

20  criminal or potential criminal charges where you would have

21  representatives of the United States, elected representatives,

22  stand on the Senate or House floor and say, This is what I read

23  in a report.  Your Honor would have no ability to counteract

24  that, and the prejudicial effect would be enormous.

25      And then the question is Why?  Why take that risk?  And

587

1    there has been no good answer to that question at all.

2          And candidly, Your Honor, if counsel were 100 percent

3    honest with the Court as to the "why," it would bring disrepute

4    upon the Department of Justice, because there is no good answer

5    to that question of why there is a rush right now to release

6    anything about this report days before Merrick Garland leaves.

7    There simply is no good answer.  And counsel for the government

8    was unable or unwilling to provide an answer to that question.

9          Besides the personal interests that President Trump

10   has, which would be a basis for intervening, he also has

11   important institutional reasons for doing so.  He is about to

12   become President --

13         THE COURT:  Okay.  So before you get to the

14   institutional --

15         MR. LAURO:  Yes.

16         THE COURT:  -- let me ensure that I understand the full

17   scope of your personal interest.  You indicated the possibility

18   of a reactivation of a criminal indictment because the motion

19   for leave to dismiss the appeal was carefully crafted, to say

20   the words, "without prejudice."

21         Anything beyond this potential specter of a criminal

22   prosecution?

23         MR. LAURO:  I believe, also, he would have 6(e) rights

24   as well.  And, in addition, I think President Trump as a -- as

25   a former defendant in this case certainly has an interest in

588

1   counsel abiding by professional rules of responsibility,

2   including not disseminating information about a case that would

3   bring personal damage to anybody's reputation.

4        It is unprecedented -- unprecedented -- in this

5   District for a prosecutor to release information about a case,

6   this level of detail, after dismissing an action or a criminal

7   case against a defendant.  I don't think there has ever been a

8   situation in this District where the U.S. Attorney's Office

9   dismisses a case and then writes a lengthy 100-page report on

10  why it believes that a defendant is guilty.  It's

11  incomprehensible that a -- that a prosecutor following the

12  rules of professional conduct would engage in that in this

13  District.  And yet, Merrick Garland and Jack Smith, neither of

14  whom are lawyers in this District, are proposing to do just

15  that:  Public dissemination of information that should

16  otherwise be held confidential within the Department of

17  Justice.

18       So I think for all of those reasons, President Trump --

19       THE COURT:  Well, I mean, they have insisted it's not

20  public dissemination.

21       MR. LAURO:  Your Honor, candidly, any dissemination to

22  Congress under these circumstances is the equivalent of public

23  dissemination.  The individuals who would get the information

24  have not pledged to keep it confidential.  We don't even know

25  what the agreement looks like.  We don't even know what the

1    conditions are.

2            There has been no written agreement by these

3    individuals to keep it confidential -- or what the

4    circumstances would be.  And as we've indicated in our papers,

5    either one of them could get up before Congress and say, This

6    is what the report said, and they would be protected by the

7    speech and debate clause and there would be nothing that

8    anybody could do about it.  And as a result, these prosecutors

9    would have violated 6(e), their responsibilities under the

10   Florida Bar rules and the rules of this Court, as well as a

11   violation of due process.  And for them to be willing to take

12   that risk is, to me, incomprehensible that a prosecutor acting

13   in good faith would ever do that in the context of a criminal

14   defendant.  Incomprehensible that a prosecutor could stand

15   before the Court and say, "We are willing to take that risk

16   under these circumstances."  And then when Your Honor says,

17   "Why," they can't answer the question why, honestly.

18           THE COURT:  Well, what I heard was that in the waning

19   days of the administration, he wants to conclude the work that

20   he initiated by an appointment order, and that's the reason;

21   and that Congress, in general, has an interest in these

22   matters.

23           MR. LAURO:  There is an ongoing case -- and the

24   Department of Justice views itself as an institution, not as a

25   weaponized political entity, at least historically they have.

590

 1   But if the answer is, "We want to get our last licks in before

 2   we leave," then the answer to that question is, "Yeah, we want

 3   this released."  But what institutional reason is there for

 4   releasing this information now?  What criminal justice issue is

 5   there for releasing this information now, even on a limited

 6   basis?  How is that an advance of justice under any

 7   circumstances?  And the goal of the Department of Justice is to

 8   pursue justice, not to hinder it.

 9        THE COURT:  Okay.  Now, to wrap up the discussion of

10   personal interest, you mentioned the 6(e) rights.  And I do

11   know you joined the motion.  So I did want to ask you, are you

12   aware whether Volume II contains material as to which

13   President-elect Trump asserts privilege?

14        MR. LAURO:  I would have to defer at this point to my

15   colleagues who have a much greater understanding of that.  But

16   I don't have specific instances of that, Your Honor.

17        THE COURT:  Okay.

18        MR. LAURO:  But we have not -- we have not had the

19   opportunity to respond in terms of a -- of a careful review on

20   6(e) as well.

21        THE COURT:  All right, then.  Okay.  Then you were

22   segueing into a discussion of institutional concerns, I think

23   is how you phrased it.  So please proceed.

24        MR. LAURO:  Yes.  The institutional concerns are very

25   grave.  President Trump is about to take office again.  He is

1   in the middle of a transition.  There is -- there is certainly

2   a need for him to use all of his attention and all of his

3   concentration on becoming President again, and not have to deal

4   with these intermeddling issues, where, for no good reason, the

5   former Department of Justice -- or about to be the former

6   Department of Justice is going to engage in activity which, in

7   its essence, is contrary to everything that the Department of

8   Justice has done in the history of the United States, which is

9   to preserve the confidentiality of criminal information

10  developed by the Department, and not share it for political

11  reasons with --

12       THE COURT:  But negative press is negative press.  I am

13  concerned a bit that your position is too broad.  You're

14  essentially saying that anytime someone wishes to say something

15  negative about an incoming president or an outgoing president,

16  that -- that just the mere nature of negative press

17  would -- would interfere with the institution of the presidency

18  to such a degree that it would warrant a Court enjoining a

19  federal agency from disseminating information.

20       MR. LAURO:  I would say it a little bit different.

21  Certainly, Merrick Garland, Jack Smith can criticize

22  President Trump.  We have no problem with that.  But this is

23  the dissemination of prosecutorial work product to members of

24  Congress during an ongoing criminal case that has never been

25  done before in the history of the Department of Justice.

1          They want to make history today by releasing that

2    information.  Typically, what prosecutors do, ethical

3    prosecutors, is they guard the confidentiality of that

4    information scrupulously and don't release it under any

5    circumstances, certainly not in a political context.

6          I was a prosecutor.  I was an AUSA, as you were,

7    Your Honor.  And never would we, from an ethical standpoint,

8    make disclosures in that way, certainly gratuitously.  Don't

9    forget, this is a gratuitous disclosure.  Nobody has formally

10   asked for it.  There is not a subpoena.  There is not even a

11   letter that I'm aware of from Congress saying, We would -- We

12   want this information and we want it now, and it shouldn't have

13   to wait until after the conclusion of this case.

14          And yet --

15          THE COURT:  Well, what do you make of the January 15

16   letter from Ranking Member Raskin and others, if you have had

17   an opportunity to review it?

18          MR. LAURO:  Your Honor, I scanned it briefly.  And,

19   candidly, what it suggests to me is almost a -- you know, an

20   after-the-fact request.  But there is no subpoena that's been

21   issued.  And, as a result, there is nothing compelling the

22   Department to provide any of that information under subpoena.

23          And typically -- typically, historically, when there

24   has been a letter from Congress, "Give us information," the

25   response is, "Absolutely not."  This is protected, confidential

1    information by the Department of Justice that we don't share in

2    a political context, and certainly not until after a case is

3    over.

4          So there are grave institutional issues that

5    President Trump believes need to be protected in the context of

6    this case.  And the answers that the Department of Justice

7    currently are providing are certainly not worthy of

8    consideration in light of the fact that this is an ongoing

9    transition.  President Trump is about to take office on Monday,

10   and he has pledged to the American people that the Department

11   of Justice will not be weaponized and will not be run in a

12   political way.

13         THE COURT:  All right.  I had a question regarding just

14   the intervention standard.  If the Court ultimately determines,

15   following additional consideration, that release of Volume II,

16   at least in its current form is not appropriate, then would

17   your intervention request change?  In other words,

18   would President-elect Trump's rights still be implicated if the

19   Court's resolution of the motion is done in a way that is not

20   inconsistent with the requests you're making in the

21   intervention motion?  If that makes sense.

22         MR. LAURO:  It does.  And, obviously, if President

23   Trump received the full protection that was being requested,

24   then there is really not a need to intervene formally, if that

25   protection is going to be provided.  But as an alternative, we

1    would certainly ask that our papers be treated as an amicus

2    brief for Your Honor's consideration.  But we would also

3    suggest strongly that the issues that we're raising be

4    considered by the Court in the context of its decision.

5         THE COURT:  Okay.  And then, in terms of the, I guess,

6    specific federal rights or specific federal statutes or

7    constitutional interests that you're asserting in the motion to

8    intervene, I think you have touched on them somewhat, but I

9    want to be clear I fully understand which rights you say are

10   being implicated by the Court's resolution of the motion.

11        So, if you could just itemize those one final time,

12   that would be helpful.

13        MR. LAURO:  Absolutely.

14        With respect to his personal interests, certainly under

15   the Fifth Amendment, the right to due process is critical.  And

16   under the Sixth Amendment, his right to a fair trial, if that

17   ever came about as a result of the government's position, in

18   addition, to the extent that any aspect of Rule 6(e) is

19   implicated, we believe that that is his personal interest as

20   well.

21        With respect to the institutional interests, certainly

22   the vesting clause of Article II, Section 1, as well as the

23   Presidential Transition Act are all important considerations

24   that President Trump would raise in the context of intervening.

25        THE COURT:  Has the Presidential Transition Act ever

595

1    been substantively litigated?

2          MR. LAURO:  I don't believe so.

3          THE COURT:  Okay.  All right.  That's all I have.

4    Thank you.

5          MR. LAURO:  Thank you.

6          THE COURT:  Ms. Shapiro.

7          MS. SHAPIRO:  Yes.  I have very little to say about

8    intervention because I think in the reply brief that

9    President-elect Trump submitted he agrees that the relief that

10   is being requested by the defendants in this case would provide

11   relief.  He says that he agrees with the relief.  The Gravel

12   case that he cites was a case where intervention was allowed

13   because the witness at issue was not going to be able to fully

14   protect the rights of the intervenor.  So it's different in

15   that regard.  And we have agreed to have the brief accepted as

16   an amicus brief.  I think his reply brief says that they really

17   just want to be heard, they want to have their arguments

18   heard and I think that's --

19         THE COURT:  That's an interesting question just in

20   terms of intervention.  Is it the case that you deny a motion

21   to intervene because that intervenor might get what he or she

22   wants in the criminal litigation or civil litigation?  Is that,

23   really, sort of, the point to say, Well, no, you don't

24   even -- you don't get to have your motion to intervene granted

25   because somebody else is asserting an interest that is not

1    inconsistent with yours?  Is that your understanding of the

2    intervention case law?

3           MS. SHAPIRO:  Well, I think that if there is -- if

4    there is no space between what the intervenor wants and what

5    the parties want, then there is no need to intervene in the

6    case.  And, you know, the classic --

7           THE COURT:  Because I have seen a standard enunciated

8    in terms of, you know, are your rights implicated by a

9    resolution of the motion?  And the term "implicate" seems to be

10   broader than that.  In other words, it wouldn't hinge on

11   whether some other party's rights are being raised and/or

12   resolved by the Court.  And I just wasn't aware of case law

13   that said you deny a motion to intervene because the ask is

14   generally the same.

15          MS. SHAPIRO:  Well, I think the case law is -- is

16   generally negative about intervention in criminal cases

17   generally.

18          THE COURT:  That's true.

19          MS. SHAPIRO:  And I think the prototypical intervention

20   is when the media comes in and says you've sealed a hearing

21   that we have a First Amendment right to be present at.  And so

22   intervention is typically allowed in that circumstance.

23          THE COURT:  No.  Certainly.  Understanding it's a

24   narrow sets of circumstances, but nevertheless, still -- still

25   there, I guess the question again is, you know, what is the

1   intervention standard?  And if it is just merely asserting

2   constitutional or federal rights that are implicated by

3   resolution of the motion, I just wonder whether the fact that

4   the defendants are raising similar arguments necessarily spells

5   the end for the motion to intervene.

6         MS. SHAPIRO:  Well, I think that's certainly a strong

7   consideration.  But then if you also go to the constitutional

8   under statutory rights, as we've set out in our papers, we

9   don't think those exist either.

10        THE COURT:  What about the personal rights?  I mean, I

11  understand the motion for leave to dismiss the appeal was

12  stated in the "without prejudice" formulation.  So it could

13  have been the choice of the Special Counsel and then,

14  ultimately, of the Department of Justice upon referral to

15  dismiss that with prejudice, but it wasn't done in that

16  fashion.  Do you think that makes any difference?

17        MS. SHAPIRO:  I don't think it does, but I don't have

18  any knowledge or position on the formulation of the dismissal.

19        THE COURT:  But it is without prejudice.  In other

20  words, it's not inconceivable that the charges could be brought

21  again.  Do you agree with that?

22        MS. SHAPIRO:  I don't know because I -- you would have

23  to look at the statute of limitations.  And there, you know,

24  are numerous other factors.  So I really couldn't speak to

25  that.

1          THE COURT:  So at this point, to this day, is the

2    Department of Justice ruling out charging the President-elect?

3          MS. SHAPIRO:  I just can't speak to that.  I'm sorry,

4    Your Honor.

5          THE COURT:  So it's uncertain at this point?

6          MS. SHAPIRO:  I could say that I don't know.

7          THE COURT:  Okay.  All right.  Anything further on the

8    motion to intervene?

9          MS. SHAPIRO:  No.  Just to be clear, that we haven't

10   objected to amicus participation, and I think that accomplishes

11   what the President-elect is looking for here.

12         THE COURT:  Okay.  All right.  Thank you very much.

13         Any rebuttal on the motion to intervene?

14         MR. LAURO:  No, Your Honor.

15         THE COURT:  Okay.  Now, do the parties or the

16   prospective intervenor wish to add any materials to the record

17   for resolution of this motion or any authorities for the

18   Court's review?  And I will turn first to counsel for Mr. Nauta

19   and Mr. de Oliveira.

20         MR. WOODWARD:  The Court's indulgence, Your Honor.

21         MR. LAURO:  Do you want to go first?

22         MR. WOODWARD:  Did you?

23         MR. LAURO:  Your Honor, the only thing I would add is

24   if the Court is inclined to grant our motion to intervene, then

25   we would want the opportunity to fully brief the issues as

1   well, and have that time, to the extent that the Court

2   requested any further briefing on these issues as well.

3         THE COURT:  Do you have a position on the argument that

4   if you -- if the prospective intervenor's request is materially

5   the same as the request made by parties in the case, that there

6   is really no basis for intervention?

7         MR. LAURO:  I don't agree with that because I think the

8   issue first is the right to intervene, and I think our right to

9   intervene is -- has been established.  And once we're

10  intervened and once we're a part of the proceeding, then I

11  think we have the appropriate ability to raise these arguments

12  and separately brief them.

13        So all I would say is that, you know, our first and

14  most important argument is that we believe we have the right to

15  intervene for the reasons that we have been arguing.

16        THE COURT:  And then hypothetically what additional

17  briefing even would be necessary at this point?

18        MR. LAURO:  Only if the Court required any.

19        THE COURT:  Okay.

20        Okay.  Mr. Woodward, anything further?

21        MR. WOODWARD:  So, Your Honor, we are prepared to

22  highlight portions of the report that we think warrant

23  additional consideration.  We're not going to ask for that, but

24  we certainly don't want any suggestion that we weren't prepared

25  to do that in a closed session.  So we make the offer and we

```
 1    defer to the Court.

 2                THE COURT:  Okay.

 3                All right.  Ms. Shapiro, is there any other material or

 4    authority you wish to bring before the Court?

 5                MS. SHAPIRO:  No, Your Honor.

 6                THE COURT:  Okay.  All right.  Then what I'm going to

 7    do now is take a 15-minute break in light of the representation

 8    of Mr. Woodward that there are some additional items to discuss

 9    governing Volume II and its specified contents.  We will be

10    closing this hearing for the remainder in order for the Court

11    to hear the specifics of Volume II.  And if there is a reason

12    to reopen the proceeding, then that will be done promptly.

13                So, for now we are in a brief recess until 3:35, at

14    which point only counsel will be permitted in the courtroom and

15    any security personnel.  Thank you.

16                (A recess was taken from 3:20 p.m. to 3:39 p.m.)

17                (The follow proceedings are sealed proceedings.)

18

19

20

21

22

23

24

25
```

1

2

3

4

5

6

7

8

9

10

11          (The following proceedings were held in open court.)

12          THE COURT:  Please be seated.  Thank you.  We are back

13  in open session.  The courtroom is open to the public.  It is

14  4:02.

15          Anything further from the parties?

16          MR. WOODWARD:  Not on behalf of Mr. Nauta, Your Honor.

17          THE COURT:  Ms. Shapiro.

18          MS. SHAPIRO:  No, Your Honor.  I will just repeat in

19  open court that the report was reviewed by the intelligence

20  community.

21          THE COURT:  And it was responded that no classified

22  information was in the report?

23          MS. SHAPIRO:  Correct.

24          THE COURT:  Okay.  All right.  Thank you.

25          The motions are taken under advisement.  Thank you all

1    for being here.  The court is in recess.

2         (These proceedings concluded at 4:02 p.m.)

1                        C E R T I F I C A T E

2

3

4        I hereby certify that the foregoing is an accurate

5        transcription of the proceedings in the above-entitled matter.

6

7

8        DATE:   01-06-2026          /s/Laura Melton
                                     LAURA E. MELTON, RMR, CRR, FPR
9                                    Official Court Reporter
                                     United States District Court
10                                   Southern District of Florida
                                     Fort Pierce, Florida

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**1**

1 [1] - 1:52:22
100 [1] - 1:45:2
100-page [1] - 1:46:9
1092 [1] - 1:9:10
1100 [1] - 1:2:7
1277 [1] - 1:19:20
12:05 [1] - 1:15:9
1400 [1] - 1:2:14
1455 [1] - 1:2:13
1470 [1] - 1:8:20
15 [1] - 1:50:15
15-minute [1] - 1:58:7
15th [3] - 1:17:19, 1:18:3, 1:24:2
16 [11] - 1:7:20, 1:8:16, 1:10:9, 1:11:24, 1:11:25, 1:12:2, 1:12:4, 1:12:5, 1:22:18, 1:22:19
16's [1] - 1:12:9
1976 [1] - 1:19:23

**2**

20001 [1] - 1:2:5
20004 [1] - 1:2:14
201 [1] - 1:2:11
2023-47 [1] - 1:5:23
21 [1] - 1:9:13
23-cr-80101 [1] - 1:3:6
25 [1] - 1:2:7
2:00 [1] - 1:16:19
2ND [1] - 1:2:7

**3**

3 [2] - 1:35:7, 1:35:13
300 [1] - 1:2:4
33131 [1] - 1:2:8
33401 [1] - 1:2:11
376 [1] - 1:9:10
3:00 [1] - 1:43:6
3:20 [1] - 1:58:16
3:35 [1] - 1:58:13
3:39 [1] - 1:58:16

**4**

400 [2] - 1:2:4, 1:2:10
4:02 [2] - 2:69:14, 2:70:2

**5**

553 [1] - 1:19:20

**6**

6(e [43] - 1:12:12, 1:12:15, 1:12:16, 1:12:18, 1:12:20, 1:12:21, 1:12:22, 1:13:11, 1:13:15, 1:13:21, 1:14:2, 1:14:12, 1:14:20, 1:14:23, 1:15:2, 1:16:1, 1:16:5, 1:16:11, 1:22:7, 1:22:9, 1:22:12, 1:22:16, 1:22:25, 1:34:10, 1:34:16, 1:34:22, 1:35:3, 1:35:7, 1:35:8, 1:35:12, 1:35:17, 1:35:24, 1:36:4, 1:36:12, 1:36:15, 1:36:23, 1:42:14, 1:42:16, 1:45:23, 1:47:9, 1:48:10, 1:48:20, 1:52:18
6(e) [4] - 1:13:5, 1:34:13, 1:34:24, 1:35:5
65 [1] - 1:37:21
679 [1] - 1:4:6
679-21 [1] - 1:9:12
681 [1] - 1:4:7
6th [1] - 1:4:6

**7**

77.2 [2] - 1:11:17, 1:22:4
775 [1] - 1:8:20

**A**

abide [2] - 1:29:22, 1:30:25
abiding [1] - 1:46:1
ability [4] - 1:15:4, 1:15:17, 1:44:23, 1:57:11
able [3] - 1:25:9, 1:37:5, 1:53:13
absent [1] - 1:42:22
absolutely [6] - 1:7:7, 1:10:3, 1:22:5, 1:29:1, 1:35:3, 1:52:13
Absolutely [1] - 1:50:25
abstract [1] - 1:33:22
accepted [1] - 1:53:15
access [3] - 1:15:5, 1:15:10, 1:31:2
accommodation [1] - 1:27:4

accommodations [1] - 1:30:24
accomplishes [1] - 1:56:10
account [1] - 1:32:2
accurate [1] - 1:31:7
accustomed [1] - 1:31:2
acknowledge [2] - 1:8:4, 1:8:5
acquired [2] - 1:15:21, 1:37:3
acquires [1] - 1:35:15
Act [6] - 1:9:3, 1:9:5, 1:9:6, 1:35:6, 1:52:23, 1:52:25
act [1] - 1:42:5
acting [1] - 1:47:12
action [1] - 1:46:6
activity [1] - 1:49:6
actual [3] - 1:13:16, 1:16:24, 1:25:12
add [2] - 1:56:16, 1:56:23
addition [2] - 1:45:24, 1:52:18
additional [6] - 1:5:21, 1:21:22, 1:51:15, 1:57:16, 1:57:23, 1:58:8
address [2] - 1:4:23, 1:40:14
adjudicating [1] - 1:4:14
administration [1] - 1:47:19
Administrative [1] - 1:5:23
advance [2] - 1:43:13, 1:48:6
advancing [1] - 1:43:20
advisement [1] - 2:69:25
afield [1] - 1:16:2
afoul [1] - 1:15:2
after-the-fact [1] - 1:50:20
afternoon [13] - 1:3:2, 1:3:9, 1:3:13, 1:3:16, 1:3:17, 1:3:21, 1:3:22, 1:3:24, 1:4:2, 1:5:8, 1:15:5, 1:16:13, 1:24:6
agencies [2] - 1:38:21, 1:39:2
agency [1] - 1:49:19
agent [3] - 1:35:15, 1:35:22

agents [1] - 1:37:25
aggressive [1] - 1:42:4
ago [1] - 1:23:8
agree [11] - 1:6:16, 1:22:24, 1:24:25, 1:25:8, 1:29:23, 1:30:5, 1:30:9, 1:34:2, 1:34:15, 1:55:21, 1:57:7
agreed [6] - 1:11:4, 1:24:10, 1:34:4, 1:34:6, 1:38:11, 1:53:15
agreeing [2] - 1:24:7, 1:29:21
agreement [7] - 1:30:22, 1:31:1, 1:31:17, 1:34:7, 1:41:5, 1:46:25, 1:47:2
agrees [4] - 1:7:9, 1:34:3, 1:53:9, 1:53:11
Aileen [1] - 1:2:17
aisle [1] - 1:18:13
aligned [1] - 1:44:3
allow [1] - 1:7:16
allowed [1] - 1:43:11, 1:53:12, 1:54:22
allows [1] - 1:12:2
alluded [1] - 1:25:21
almost [1] - 1:50:19
alternative [2] - 1:20:20, 1:51:25
Amendment [3] - 1:52:15, 1:52:16, 1:54:21
America [1] - 1:3:5
American [1] - 1:51:10
amicus [3] - 1:52:1, 1:53:16, 1:56:10
ample [1] - 1:9:13
analysis [2] - 1:16:11, 1:38:4
answer [13] - 1:15:12, 1:16:3, 1:20:22, 1:28:8, 1:40:5, 1:40:6, 1:45:1, 1:45:4, 1:45:7, 1:45:8, 1:47:17, 1:48:1, 1:48:2
answers [1] - 1:51:6
anticipatory [1] - 1:25:4
anyhow [1] - 1:37:9
anytime [1] - 1:49:14
anyway [1] - 1:22:17
appeal [6] - 1:7:5, 1:22:22, 1:32:9, 1:43:23, 1:45:19, 1:55:11
appearance [2] - 1:3:7, 1:3:19

appellate [1] - 1:21:6
applicability [1] - 1:12:9
application [3] - 1:12:4, 1:12:6, 1:16:5
applied [1] - 1:11:5
applies [7] - 1:9:6, 1:11:19, 1:13:15, 1:14:12, 1:22:16, 1:38:2, 1:42:16
apply [2] - 1:8:3, 1:14:2
appointed [2] - 1:27:24, 1:28:16
appointment [1] - 1:47:20
approach [1] - 1:37:12
appropriate [7] - 1:22:25, 1:27:25, 1:28:1, 1:28:3, 1:42:14, 1:51:16, 1:57:11
area [1] - 1:40:3
argue [2] - 1:11:21, 1:20:9
arguing [1] - 1:57:15
argument [18] - 1:4:15, 1:5:4, 1:5:9, 1:5:13, 1:6:8, 1:6:19, 1:15:25, 1:16:1, 1:16:7, 1:16:8, 1:17:19, 1:17:23, 1:20:2, 1:22:15, 1:23:16, 1:43:7, 1:57:3, 1:57:14
arguments [3] - 1:53:17, 1:55:4, 1:57:11
arraigned [1] - 1:8:8
arrangements [1] - 1:6:5
Article [1] - 1:52:22
articulated [1] - 1:35:2
aspect [1] - 1:52:18
asserted [2] - 1:39:16, 1:40:2
asserting [3] - 1:52:7, 1:53:25, 1:55:1
assertion [1] - 1:39:14
asserts [1] - 1:48:13
associated [2] - 1:35:9, 1:36:2
assumes [1] - 1:29:20
assuming [2] - 1:31:16, 1:31:18
assurances [1] - 1:18:16
assure [1] - 1:38:21
assured [1] - 1:23:17
attention [1] - 1:49:2
Attorney [8] - 1:24:9,

1:27:21, 1:28:14, 1:33:20, 1:34:3, 1:34:6, 1:38:13, 1:41:21
attorney [3] - 1:12:5, 1:39:14, 1:39:19
Attorney's [1] - 1:46:8
attorney-client [2] - 1:39:14, 1:39:19
attorneys [2] - 1:11:14, 1:11:20
AUSA [1] - 1:50:6
authorities [2] - 1:7:15, 1:11:8, 1:56:17
authority [12] - 1:7:1, 1:7:2, 1:7:3, 1:8:16, 1:8:19, 1:9:13, 1:11:10, 1:18:10, 1:36:1, 1:36:22, 1:38:8, 1:58:4
authorizes [1] - 1:22:5
available [1] - 1:27:24
AVENUE [2] - 1:2:7, 1:2:13
await [1] - 1:29:7
awaited [1] - 1:29:5
aware [7] - 1:21:3, 1:21:7, 1:23:24, 1:26:24, 1:48:12, 1:50:11, 1:54:12

**B**

backed [1] - 1:41:2
background [1] - 1:18:22
balancing [4] - 1:37:18, 1:38:7, 1:38:9, 1:38:12
bar [1] - 1:9:17
Bar [2] - 1:11:12, 1:47:10
bars [1] - 1:10:14
based [3] - 1:19:8, 1:43:11, 1:43:15
basis [7] - 1:22:10, 1:25:17, 1:26:8, 1:29:4, 1:45:10, 1:48:6, 1:57:6
Bates [2] - 1:17:2, 1:17:3
BEACH [1] - 1:2:11
become [2] - 1:21:11, 1:45:12
becomes [2] - 1:5:16, 1:6:3
becoming [1] - 1:49:3
begin [1] - 1:6:13
beginning [4] - 1:7:1,

1:7:18, 1:9:12, 1:15:8
behalf [11] - 1:3:14, 1:3:18, 1:3:20, 1:3:23, 1:3:25, 1:4:18, 1:5:7, 1:14:5, 1:42:6, 2:69:16
belabor [1] - 1:9:5
believes [2] - 1:46:10, 1:51:5
better [1] - 1:10:1
between [2] - 1:24:9, 1:54:4
beyond [2] - 1:7:2, 1:45:21
Biden [1] - 1:26:23
bit [4] - 1:16:2, 1:17:10, 1:49:13, 1:49:20
blatant [1] - 1:18:12
blunt [1] - 1:12:7
BOYNTON [1] - 1:3:11
Boynton [1] - 1:3:11
Brady [2] - 1:22:20, 1:22:21
branch [4] - 1:17:21, 1:17:22, 1:30:22, 1:30:23
BRAND [1] - 1:2:3
break [2] - 1:6:14, 1:58:7
Brian [1] - 1:3:11
brief [11] - 1:9:12, 1:21:10, 1:25:21, 1:52:2, 1:53:8, 1:53:15, 1:53:16, 1:56:25, 1:57:12, 1:58:13
briefed [1] - 1:18:23, 1:40:4
briefing [6] - 1:8:18, 1:18:21, 1:18:25, 1:19:8, 1:57:2, 1:57:17
briefly [1] - 1:50:18
bring [5] - 1:26:6, 1:44:1, 1:45:3, 1:46:3, 1:58:4
broad [2] - 1:12:5, 1:49:13
broader [1] - 1:33:16, 1:54:10
broadly [1] - 1:36:7
brought [2] - 1:44:9, 1:55:20
buckets [1] - 1:15:13
Building [1] - 1:19:12
BY [1] - 1:2:15

**C**

cabinet [1] - 1:18:23

camera [1] - 1:4:13
candidly [3] - 1:45:2, 1:46:21, 1:50:19
Cannon [1] - 1:2:17
cannot [6] - 1:10:15, 1:19:21, 1:24:20, 1:24:22, 1:24:24, 1:30:19
Capitol [1] - 1:19:12
careful [1] - 1:48:19
carefully [2] - 1:38:25, 1:45:19
CARLOS [1] - 1:2:9
Carlos [1] - 1:3:5
case [96] - 1:3:3, 1:7:4, 1:7:5, 1:7:6, 1:7:9, 1:7:19, 1:7:20, 1:7:23, 1:7:25, 1:8:8, 1:8:10, 1:8:16, 1:8:20, 1:9:11, 1:9:23, 1:10:18, 1:11:15, 1:12:3, 1:12:7, 1:12:12, 1:12:13, 1:12:14, 1:13:11, 1:14:10, 1:14:13, 1:15:6, 1:15:25, 1:17:12, 1:17:15, 1:17:23, 1:19:1, 1:19:19, 1:19:23, 1:20:14, 1:20:21, 1:21:6, 1:21:13, 1:21:16, 1:21:18, 1:21:21, 1:21:22, 1:22:20, 1:22:22, 1:23:19, 1:25:2, 1:26:17, 1:26:21, 1:26:24, 1:29:8, 1:29:18, 1:29:19, 1:30:1, 1:31:23, 1:32:1, 1:32:3, 1:32:12, 1:32:18, 1:33:5, 1:33:8, 1:33:10, 1:33:11, 1:33:17, 1:33:18, 1:33:25, 1:34:18, 1:35:5, 1:39:13, 1:40:3, 1:41:14, 1:42:2, 1:42:7, 1:42:23, 1:43:13, 1:43:24, 1:44:2, 1:44:4, 1:44:19, 1:45:25, 1:46:2, 1:46:5, 1:46:7, 1:46:9, 1:47:23, 1:49:24, 1:50:13, 1:51:2, 1:51:6, 1:53:10, 1:53:12, 1:53:20, 1:54:2, 1:54:6, 1:54:12, 1:54:15, 1:57:5
Case [1] - 1:3:5
cases [6] - 1:10:24, 1:11:19, 1:11:21, 1:25:22, 1:33:13, 1:54:16
categories [1] - 1:14:25
caveat [1] - 1:15:3
caveats [2] - 1:15:11, 1:15:15
CENTER [1] - 1:2:10
certain [1] - 1:19:4

certainly [18] – 1:8:11.., 1:28:3.., 1:31:7.., 1:33:14.., 1:43:15.., 1:45:25.., 1:49:1.., 1:49:21.., 1:50:5.., 1:50:8.., 1:51:2.., 1:51:7.., 1:52:1.., 1:52:14.., 1:52:21.., 1:54:23.., 1:55:6.., 1:57:24

cetera [1] – 1:37:25

Chair [1] – 1:24:14

chairman [1] – 1:23:25

change [1] – 1:51:17

changed [1] – 1:25:25

characterization [3] – 1:30:18.., 1:31:6.., 1:38:10

characterizations [1] – 1:44:14

characterize [2] – 1:30:17.., 1:30:21

characterized [3] – 1:31:17.., 1:40:24.., 1:43:25

charges [2] – 1:44:20.., 1:55:20

charging [2] – 1:41:13.., 1:56:2

choice [1] – 1:55:13

Circuit [7] – 1:8:25.., 1:9:6.., 1:19:20.., 1:21:12.., 1:28:7.., 1:42:5

circumstance [1] – 1:54:22

circumstances [11] – 1:4:21.., 1:6:12.., 1:7:4.., 1:40:17.., 1:44:6.., 1:46:22.., 1:47:4.., 1:47:16.., 1:48:7.., 1:50:5.., 1:54:24

CISO [1] – 1:38:20

cite [5] – 1:8:20.., 1:9:3.., 1:9:12.., 1:19:19.., 1:26:17

cited [4] – 1:16:25.., 1:25:22.., 1:31:16.., 1:37:20

cites [1] – 1:53:12

Civil [1] – 1:3:11

civil [6] – 1:9:20.., 1:11:16.., 1:11:19.., 1:37:11.., 1:37:14.., 1:53:22

claim [2] – 1:17:6.., 1:42:23

claiming [1] – 1:29:14

clarify [1] – 1:39:24

classic [1] – 1:54:6

classified [7] – 1:38:16.., 1:38:21.., 1:39:3.., 1:39:4.., 1:39:5.., 1:39:9.., 2:69:21

clause [2] – 1:47:7.., 1:52:22

clear [11] – 1:6:5.., 1:8:25.., 1:9:6.., 1:10:25.., 1:18:2.., 1:19:20.., 1:24:12.., 1:35:13.., 1:36:1.., 1:52:9.., 1:56:9

clearly [2] – 1:22:18.., 1:33:23

clever [1] – 1:20:8

client [2] – 1:39:14.., 1:39:19

close [1] – 1:5:16

closed [1] – 1:57:25

closer [1] – 1:13:14

closing [1] – 1:58:10

closure [1] – 1:6:6

co [1] – 1:18:6

co-defendants [1] – 1:18:6

colleague [3] – 1:40:14.., 1:41:4.., 1:41:24

colleagues [11] – 1:6:19.., 1:10:1.., 1:10:11.., 1:14:5.., 1:18:13.., 1:19:25.., 1:23:22.., 1:24:8.., 1:30:15.., 1:31:16.., 1:48:15

collecting [1] – 1:21:15

colloquy [1] – 1:12:11

Columbia [1] – 1:16:14

comforting [1] – 1:42:1

coming [2] – 1:7:6.., 1:17:6

comment [1] – 1:34:10

commissioned [1] – 1:41:22

commitment [1] – 1:28:18

Committee [2] – 1:24:15.., 1:25:22

committees [1] – 1:23:25

community [1] – 2:69:20

compelling [1] – 1:50:21

competing [1] – 1:10:21

complained [1] – 1:7:24

complaint [1] – 1:30:15

completely [3] – 1:8:13.., 1:17:25.., 1:41:15

compliance [1] – 1:39:21

complied [2] – 1:22:8.., 1:23:1

comply [2] – 1:22:11..,

1:28:14.., 1:31:14

concentration [1] – 1:49:3

concept [2] – 1:9:4.., 1:19:24

conceptual [4] – 1:9:21.., 1:10:20.., 1:11:5.., 1:37:10

concern [2] – 1:28:2.., 1:28:5

concerned [3] – 1:14:7.., 1:14:8.., 1:49:13

concerning [1] – 1:12:3

concerns [10] – 1:4:3.., 1:16:20.., 1:16:21.., 1:43:20.., 1:43:21.., 1:43:22.., 1:44:5.., 1:48:22.., 1:48:24

conclude [2] – 1:42:13.., 1:47:19

concluded [5] – 1:21:10.., 1:28:4.., 1:29:6.., 1:31:11.., 2:70:2

conclusion [8] – 1:5:18.., 1:21:5.., 1:26:4.., 1:26:9.., 1:27:9.., 1:28:22.., 1:31:14.., 1:50:13

conclusions [3] – 1:18:4.., 1:18:5.., 1:44:17

concrete [1] – 1:23:12

conditions [10] – 1:19:4.., 1:19:7.., 1:24:17.., 1:24:19.., 1:25:3.., 1:25:7.., 1:25:9.., 1:33:15.., 1:47:1

conduct [2] – 1:8:23.., 1:46:12

confidence [1] – 1:18:8

confident [2] – 1:22:7.., 1:39:9

confidential [7] – 1:18:21.., 1:25:1.., 1:31:2.., 1:46:16.., 1:46:24.., 1:47:3.., 1:50:25

confidentiality [8] – 1:23:17.., 1:24:18.., 1:29:21.., 1:29:22.., 1:33:16.., 1:38:11.., 1:49:9.., 1:50:3

Congress [46] – 1:6:25.., 1:18:17.., 1:19:5.., 1:19:9.., 1:19:15.., 1:19:21.., 1:20:10.., 1:21:5.., 1:22:12.., 1:23:6.., 1:23:14.., 1:24:14.., 1:25:18.., 1:26:4.., 1:26:8.., 1:26:11.., 1:26:19.., 1:27:1.., 1:27:3.., 1:27:9.., 1:27:15.., 1:27:21.., 1:28:10.., 1:28:18.., 1:29:3.., 1:29:10.., 1:29:21.., 1:29:25.., 1:30:13.., 1:30:20.., 1:33:13.., 1:33:15.., 1:33:18

1:33:21.., 1:38:14.., 1:40:23.., 1:41:9.., 1:41:10.., 1:41:25.., 1:42:10.., 1:46:22.., 1:47:5.., 1:47:21.., 1:49:24.., 1:50:11.., 1:50:24

Congress's [1] – 1:41:17

congressional [1] – 1:19:3

Congressman [4] – 1:17:13.., 1:18:2.., 1:18:10.., 1:18:11

considerably [1] – 1:6:21

consideration [5] – 1:51:8.., 1:51:15.., 1:52:2.., 1:55:7.., 1:57:23

considerations [1] – 1:52:23

considered [1] – 1:52:4

constitutional [1] – 1:43:16.., 1:52:7.., 1:55:2.., 1:55:7

construed [1] – 1:12:21

consumption [1] – 1:20:7

contain [2] – 1:39:5.., 1:39:9

contained [1] – 1:10:13.., 1:38:21

contains [3] – 1:12:18.., 1:12:20.., 1:48:12

contemplated [1] – 1:27:13

content [1] – 1:19:11

contents [8] – 1:6:2.., 1:7:9.., 1:10:16.., 1:18:24.., 1:20:5.., 1:20:11.., 1:20:15.., 1:58:9

contested [1] – 1:34:17.., 1:34:22.., 1:34:23

context [11] – 1:9:23.., 1:11:4.., 1:11:7.., 1:35:6.., 1:37:13.., 1:47:13.., 1:50:5.., 1:51:2.., 1:51:5.., 1:52:4.., 1:52:24

contradictory [1] – 1:8:14

contrary [3] – 1:10:5.., 1:15:25.., 1:49:7

control [5] – 1:7:3.., 1:8:19.., 1:12:2.., 1:31:22.., 1:32:15

controls [1] – 1:8:15

conveying [1] – 1:36:10

copy [1] – 1:44:16

obligation [1]_ - 1:22:21
observation [1]_ - 1:6:13
_, 1:21:12_, 1:42:17
obtained [1]_ - 1:15:19
obvious [1]_ - 1:21:12
obviously [2]_ - 1:11:12_,
1:51:22
occasion [1]_ - 1:31:3
occurred [1]_ - 1:36:9
occurs [1]_ - 1:7:8
offer [1]_ - 1:57:25
office [3]_ - 1:41:22_,
1:48:25_, 1:51:9
Office [6]_ - 1:14:4_,
1:21:15_, 1:35:2_, 1:38:24_,
1:46:8
officer [1]_ - 1:34:18
officers [1]_ - 1:37:25
official [4]_ - 1:23:6_,
1:23:11_, 1:25:11_, 1:25:12
Official [1]_ - 1:2:17
officials [1]_ - 1:8:24
often [1]_ - 1:37:7
OLIVEIRA [1]_ - 1:2:9
Oliveira [11]_ - 1:3:5_,
1:3:23_, 1:4:16_, 1:4:18_,
1:4:23_, 1:8:7_, 1:8:9_,
1:17:16_, 1:18:6_, 1:20:24_,
1:56:19
Oliveira's [1]_ - 1:10:14
once [3]_ - 1:20:6_, 1:57:9_
_, 1:57:10
one [14]_ - 1:14:9_, 1:24:2_
_, 1:26:10_, 1:28:25_,
1:29:17_, 1:30:20_, 1:37:5_,
1:39:12_, 1:42:17_, 1:42:18
_, 1:42:23_, 1:44:1_, 1:47:5_,
1:52:11
ongoing [7]_ - 1:9:7_,
1:33:13_, 1:33:25_, 1:41:16
_, 1:47:23_, 1:49:24_, 1:51:8
open [5]_ - 1:5:2_, 2:69:11_
_, 2:69:13_, 2:69:19
opening [2]_ - 1:9:12_,
1:21:9
operating [1]_ - 1:13:21
operative [1]_ - 1:22:19
opinion [1]_ - 1:11:22
opportunity [10]_ - 1:16:6
_, 1:16:9_, 1:16:24_, 1:20:25
_, 1:22:13_, 1:31:7_, 1:34:20
_, 1:48:19_, 1:50:17_,
1:56:25

oppose [1]_ - 1:41:1
opposed [6]_ - 1:14:21_,
1:17:8_, 1:27:16_, 1:35:1_,
1:37:12_, 1:41:9
opposing [1]_ - 1:41:3
opposite [1]_ - 1:13:7
opposition [1]_ - 1:4:12_,
1:5:14
Order [1]_ - 1:5:23
order [23]_ - 1:3:1_, 1:6:22
_, 1:7:20_, 1:7:21_, 1:8:1_,
1:8:2_, 1:8:3_, 1:8:6_, 1:9:1_,
1:9:25_, 1:10:4_, 1:10:7_,
1:10:8_, 1:10:14_, 1:12:11_,
1:13:10_, 1:13:11_, 1:19:21
_, 1:37:21_, 1:37:24_,
1:47:20_, 1:58:10
orders [2]_ - 1:7:3_, 1:9:8
ordinary [1]_ - 1:27:10
otherwise [2]_ - 1:13:10_,
1:18:11_, 1:46:16
ought [3]_ - 1:7:10_, 1:16:1
_, 1:17:23
outgoing [1]_ - 1:49:15
outset [1]_ - 1:27:22
outside [1]_ - 1:6:23_,
1:23:7
overseeing [1]_ - 1:10:18
oversight [1]_ - 1:12:8
own [4]_ - 1:7:3_, 1:13:21_,
1:15:5_, 1:37:21

**P**

P.A [1]_ - 1:2:6
p.m [4]_ - 1:16:19_,
1:58:16_, 2:70:2
PA [1]_ - 1:2:9
page [2]_ - 1:7:25_, 1:9:13
pages [2]_ - 1:16:18_,
1:42:25
PALM [1]_ - 1:2:11
papers [5]_ - 1:19:4_,
1:23:9_, 1:47:4_, 1:52:1_,
1:55:8
Part [2]_ - 1:6:17_, 1:10:13
part [2]_ - 1:18:20_,
1:57:10
parte [6]_ - 1:24:17_,
1:28:10_, 1:28:11_, 1:29:10
_, 1:31:2_, 1:33:15
participation [2]_ -
1:16:11_, 1:56:10

particular [1]_ - 1:40:11
particularized [1]_ -
1:40:19
particulars [1]_ - 1:41:11
parties [7]_ - 1:3:7_,
1:12:6_, 1:24:9_, 1:54:5_,
1:56:15_, 1:57:5_, 2:69:15
party's [1]_ - 1:54:11
past [1]_ - 1:33:9
pendency [3]_ - 1:26:19_,
1:27:13_, 1:33:18
pending [9]_ - 1:4:3_,
1:17:12_, 1:21:14_, 1:23:12
_, 1:25:2_, 1:28:7_, 1:32:9_,
1:41:16_, 1:43:12
PENNSYLVANIA [1]_ -
1:2:13
people [1]_ - 1:51:10
per [1]_ - 1:5:23
percent [1]_ - 1:45:2
perhaps [2]_ - 1:12:20
period [1]_ - 1:16:23
permit [1]_ - 1:4:25
permitted [3]_ - 1:19:5_,
1:25:7_, 1:58:14
permitting [1]_ - 1:26:13
person [1]_ - 1:17:16
personal [12]_ - 1:16:16_,
1:43:13_, 1:43:20_, 1:43:22
_, 1:44:11_, 1:45:9_, 1:45:17
_, 1:46:3_, 1:48:10_, 1:52:14
_, 1:52:19_, 1:55:10
personnel [1]_ - 1:58:15
perspective [1]_ - 1:30:6
persuaded [1]_ - 1:20:23
pertain [1]_ - 1:18:5
pertinent [1]_ - 1:23:13
phrased [1]_ - 1:48:23
Pierce [1]_ - 1:2:18
place [2]_ - 1:22:5_,
1:38:12
plan [1]_ - 1:5:18
play [1]_ - 1:17:19
plays [1]_ - 1:17:20_,
1:17:23
pleasure [1]_ - 1:3:14
pledged [2]_ - 1:46:24_,
1:51:10
plus [1]_ - 1:37:4_, 1:42:25
point [17]_ - 1:7:16_, 1:8:11
_, 1:8:16_, 1:9:5_, 1:9:13_,
1:11:10_, 1:15:12_, 1:21:11

_, 1:32:13_, 1:34:7_, 1:42:17.
_, 1:48:14_, 1:53:23_, 1:56:1.
_, 1:56:5_, 1:57:17_, 1:58:14
points [2]_ - 1:22:3_,
1:23:24
political [5]_ - 1:47:25_,
1:49:10_, 1:50:5_, 1:51:2_,
1:51:12
polled [1]_ - 1:32:2
portions [1]_ - 1:57:22
position [7]_ - 1:13:7_,
1:35:17_, 1:44:1_, 1:49:13_,
1:52:17_, 1:55:18_, 1:57:3
possibility [1]_ - 1:45:17
possible [1]_ - 1:5:2
possibly [1]_ - 1:44:1
postconviction [1]_ -
1:20:3
potential [5]_ - 1:9:7_,
1:38:10_, 1:41:17_, 1:44:20
_, 1:45:21
potentially [1]_ - 1:36:23
powers [3]_ - 1:8:22_,
1:18:12_, 1:19:22
practice [8]_ - 1:27:20_,
1:28:14_, 1:28:17_, 1:28:21
_, 1:31:14_, 1:40:14_,
1:41:19
practicing [1]_ - 1:11:20
pre [1]_ - 1:32:19
pre-notions [1]_ - 1:32:19
preceded [1]_ - 1:6:12
precedence [1]_ - 1:4:20
Preclude [1]_ - 1:5:14
preclude [3]_ - 1:4:5_,
1:11:14_, 1:11:17
precluded [1]_ - 1:8:2
precludes [1]_ - 1:12:1
predecided [1]_ - 1:32:19
prefer [1]_ - 1:6:8
prejudice [13]_ - 1:21:1_,
1:30:19_, 1:31:22_, 1:32:2_,
1:32:6_, 1:32:16_, 1:33:2_,
1:34:8_, 1:43:25_, 1:45:20_,
1:55:12_, 1:55:15_, 1:55:19
prejudiced [1]_ - 1:20:14
prejudicial [1]_ - 1:44:24
preliminary [2]_ - 1:5:21_,
1:40:24
premature [1]_ - 1:28:5
prepared [4]_ - 1:14:14_,
1:4:23_, 1:57:21_, 1:57:24
prerogative [3]_ - 1:7:7_,

correct [10] - 1:4:20_, 1:29:1_, 1:30:8_, 1:32:13_, 1:34:14_, 1:35:3_, 1:38:17_, 1:38:18_, 1:39:17_, 2:69:23
correctly [1] - 1:37:20
Counsel [23] - 1:21:4_, 1:21:10_, 1:21:25_, 1:25:23_, 1:25:24_, 1:26:8_, 1:26:18_, 1:26:22_, 1:27:20_, 1:27:23_, 1:28:4_, 1:28:17_, 1:28:22_, 1:33:17_, 1:34:4_, 1:36:20_, 1:36:25_, 1:38:24_, 1:40:17_, 1:41:1_, 1:41:6_, 1:41:10_, 1:55:13
counsel [21] - 1:4:15_, 1:5:13_, 1:5:16_, 1:5:19_, 1:6:16_, 1:7:22_, 1:8:9_, 1:10:15_, 1:12:6_, 1:12:8_, 1:12:10_, 1:13:8_, 1:13:13_, 1:34:25_, 1:42:2_, 1:44:10_, 1:45:2_, 1:45:7_, 1:46:1_, 1:56:18_, 1:58:14
counsel's [1] - 1:14:22
Counsel's [6] - 1:4:5_, 1:6:17_, 1:14:4_, 1:21:15_, 1:35:2_, 1:38:24
counsels [1] - 1:23:10
Counsels [3] - 1:23:19_, 1:23:23_, 1:28:16
counter [1] - 1:16:10
counter-redactions [1] - 1:16:10
counteract [1] - 1:44:23
country [1] - 1:11:9
course [7] - 1:7:10_, 1:21:24_, 1:27:10_, 1:29:24_, 1:32:22_, 1:38:23_, 1:44:2
Court [72] - 1:2:17, 1:2:18_, 1:3:1_, 1:4:4_, 1:4:24_, 1:5:1_, 1:6:5_, 1:6:21_, 1:6:22_, 1:7:1_, 1:7:2_, 1:7:6_, 1:7:12_, 1:7:16_, 1:7:23_, 1:7:24_, 1:8:15_, 1:8:17_, 1:9:4_, 1:9:14_, 1:9:15_, 1:9:24_, 1:10:1_, 1:10:3_, 1:10:5_, 1:10:8_, 1:10:18_, 1:10:25_, 1:11:4_, 1:11:10_, 1:11:13_, 1:11:15_, 1:11:21_, 1:12:2_, 1:12:6_, 1:17:11_, 1:18:10_, 1:18:15_, 1:18:16_, 1:19:14_, 1:20:23_, 1:22:5_, 1:22:10_, 1:22:24_, 1:23:2_, 1:29:24_, 1:29:25_, 1:30:2_, 1:30:6_, 1:31:25_, 1:39:23_, 1:40:13_, 1:40:16_, 1:42:11_, 1:43:11_, 1:43:14_, 1:43:18_, 1:45:3_, 1:47:10_,

_, 1:47:15_, 1:49:18_, 1:51:14_, 1:52:4_, 1:54:12_, 1:56:24_, 1:57:1_, 1:57:18_, 1:58:1_, 1:58:4_, 1:58:10
court [6] - 1:11:22_, 1:11:24_, 1:29:7_, 2:69:11_, 2:69:19_, 2:70:1
COURT [105] - 1:3:2_, 1:3:16, 1:3:21_, 1:4:2_, 1:5:3_, 1:5:6_, 1:5:11_, 1:9:20_, 1:10:17_, 1:11:4_, 1:12:16_, 1:13:20_, 1:14:15_, 1:14:23_, 1:15:11_, 1:15:20_, 1:16:9_, 1:17:1_, 1:17:18_, 1:19:2_, 1:20:2_, 1:21:3_, 1:23:5_, 1:24:3_, 1:24:5_, 1:24:19_, 1:25:3_, 1:25:10_, 1:25:17_, 1:26:2_, 1:26:13_, 1:26:15_, 1:26:21_, 1:26:24_, 1:27:5_, 1:27:7_, 1:27:14_, 1:28:1_, 1:28:11_, 1:28:20_, 1:28:25_, 1:29:3_, 1:29:23_, 1:30:10_, 1:31:4_, 1:31:20_, 1:32:5_, 1:32:10_, 1:33:6_, 1:33:22_, 1:34:9_, 1:34:15_, 1:35:14_, 1:35:20_, 1:36:6_, 1:36:17_, 1:36:19_, 1:37:2_, 1:37:19_, 1:37:24_, 1:38:15_, 1:38:19_, 1:39:1_, 1:39:11_, 1:39:21_, 1:39:25_, 1:40:7_, 1:40:10_, 1:40:19_, 1:43:5_, 1:44:13_, 1:45:13_, 1:45:16_, 1:46:19_, 1:47:18_, 1:48:9_, 1:48:17_, 1:48:21_, 1:49:12_, 1:50:15_, 1:51:13_, 1:52:5_, 1:52:25_, 1:53:3_, 1:53:6_, 1:53:19_, 1:54:7_, 1:54:18_, 1:54:23_, 1:55:10_, 1:55:19_, 1:56:1_, 1:56:5_, 1:56:7_, 1:56:12_, 1:56:15_, 1:57:3_, 1:57:16_, 1:57:19_, 1:58:2_, 1:58:6_, 2:69:12_, 2:69:17_, 2:69:21_, 2:69:24
Court's [11] - 1:6:4_, 1:8:12_, 1:8:19_, 1:10:3_, 1:11:17_, 1:16:3_, 1:22:4_, 1:51:19_, 1:52:10_, 1:56:18_, 1:56:20
courthouse [2] - 1:5:22_, 1:15:8
courtroom [2] - 1:58:14_, 2:69:13
COURTROOM [1] - 1:3:4
courts [5] - 1:8:21_, 1:8:23_, 1:19:21_, 1:35:7_, 1:35:11
covered [1] - 1:13:9

covers [1] - 1:36:8
crafted [1] - 1:45:19
created [1] - 1:10:10
criminal [33] - 1:9:23_, 1:10:17_, 1:10:18_, 1:11:16_, 1:12:3_, 1:21:6_, 1:21:18_, 1:26:4_, 1:26:6_, 1:26:9_, 1:27:9_, 1:27:16_, 1:28:3_, 1:28:23_, 1:29:6_, 1:31:4_, 1:32:11_, 1:33:5_, 1:33:18_, 1:37:13_, 1:39:16_, 1:43:12_, 1:44:20_, 1:45:18_, 1:45:21_, 1:46:6_, 1:47:13_, 1:48:4_, 1:49:9_, 1:49:24_, 1:53:22_, 1:54:16
critical [1] - 1:52:15
criticize [1] - 1:49:21
CRR [1] - 1:2:16
cure [1] - 1:30:7
cured [1] - 1:30:19
current [2] - 1:44:4_, 1:51:16
cute [1] - 1:17:10

**D**

D.C [2] - 1:19:19_, 1:19:20
damage [3] - 1:20:19_, 1:20:21_, 1:46:3
days [4] - 1:23:8_, 1:41:21_, 1:45:6_, 1:47:19
DC [2] - 1:2:5, 1:2:14
de [12] - 1:3:5_, 1:3:23_, 1:4:16_, 1:4:18_, 1:4:23_, 1:8:7_, 1:8:9_, 1:10:14_, 1:17:16_, 1:18:6_, 1:20:24_, 1:56:19
DE [1] - 1:2:9
deal [1] - 1:49:3
dealing [1] - 1:34:21
debate [2] - 1:22:19_, 1:47:7
decided [2] - 1:41:6_, 1:43:14
decides [2] - 1:22:10_, 1:41:21
decision [7] - 1:16:4_, 1:29:7_, 1:31:15_, 1:34:4_, 1:43:11_, 1:43:18_, 1:52:4
defendant [6] - 1:12:5_, 1:31:25_, 1:45:25_, 1:46:7_, 1:46:10_, 1:47:14
DEFENDANT [1] - 1:2:1

Defendants [1] - 1:4:18
defendants [11] - 1:7:8_, 1:18:6_, 1:29:12_, 1:31:5_, 1:32:12_, 1:33:24_, 1:34:8_, 1:38:9_, 1:44:4_, 1:53:10_, 1:55:4
defendants' [1] - 1:34:24
defense [12] - 1:5:13_, 1:5:16_, 1:6:16_, 1:7:22_, 1:12:5_, 1:12:8_, 1:12:10_, 1:13:8_, 1:13:13_, 1:14:21_, 1:34:20_, 1:42:2
defer [2] - 1:48:14_, 1:58:1
definition [1] - 1:15:23
definitions [1] - 1:12:14
definitive [1] - 1:39:6
degree [2] - 1:10:19_, 1:49:18
deliberations [4] - 1:12:23_, 1:13:16_, 1:13:25_, 1:14:2
deliberative [1] - 1:43:1
demanding [1] - 1:25:13
deny [2] - 1:53:20_, 1:54:13
Department [39] - 1:3:10_, 1:3:11_, 1:5:7_, 1:5:14_, 1:6:23_, 1:10:4_, 1:14:6_, 1:17:15_, 1:18:16_, 1:19:10_, 1:19:13_, 1:20:16_, 1:20:21_, 1:22:2_, 1:25:11_, 1:26:7_, 1:29:13_, 1:33:9_, 1:33:14_, 1:36:21_, 1:40:22_, 1:41:3_, 1:42:11_, 1:42:20_, 1:45:4_, 1:46:16_, 1:47:24_, 1:48:7_, 1:49:5_, 1:49:6_, 1:49:7_, 1:49:10_, 1:49:25_, 1:50:22_, 1:51:1_, 1:51:6_, 1:51:10_, 1:55:14_, 1:56:2
Department's [1] - 1:31:13
departure [1] - 1:36:19
DEPUTY [1] - 1:3:4
dereliction [1] - 1:23:20
described [1] - 1:10:2
description [1] - 1:36:14
desire [1] - 1:14:21_, 1:14:22_, 1:28:13
despite [1] - 1:29:21
detail [1] - 1:46:6
detailed [1] - 1:36:20
details [2] - 1:19:6_, 1:25:5

deter [1] – 1:8:23
determination [4] – 1:7:12…, 1:26:5…, 1:31:13…, 1:38:1
determinations [2] – 1:13:21…, 1:34:19
determined [1] – 1:29:13
determines [1] – 1:51:14
determining [1] – 1:9:22
developed [1] – 1:49:10
devices [3] – 1:5:22…, 1:15:5…, 1:24:21
diBernardo [1] – 1:8:20
differ [1] – 1:38:4
difference [2] – 1:37:17…, 1:55:16
different [5] – 1:17:6…, 1:34:21…, 1:37:13…, 1:49:20…, 1:53:14
differentiating [1] – 1:34:1
difficult [1] – 1:29:15
difficulty [1] – 1:33:23
dire [1] – 1:32:16
direct [2] – 1:8:17…, 1:35:20
directing [1] – 1:38:13
directly [1] – 1:23:13
disagree [4] – 1:7:11…, 1:10:12…, 1:18:14…, 1:44:2
disagreement [1] – 1:24:13
disassociated [1] – 1:36:5
disclose [1] – 1:19:11
disclosed [2] – 1:15:16…, 1:18:9
disclosing [1] – 1:19:16
disclosure [4] – 1:35:11…, 1:42:18…, 1:43:2…, 1:50:9
disclosures [1] – 1:50:8
discoverable [1] – 1:22:18
discovery [3] – 1:7:25…, 1:15:6…, 1:16:24
discuss [1] – 1:41:12…, 1:58:8
discussion [10] – 1:6:2…, 1:10:20…, 1:19:3…, 1:23:9…, 1:27:7…, 1:34:10…, 1:41:5…, 1:48:9…, 1:48:22
disingenuous [1] –

1:41:19
dismiss [7] – 1:17:15…, 1:20:4…, 1:20:13…, 1:32:23…, 1:45:19…, 1:55:11…, 1:55:15
dismissal [2] – 1:43:25…, 1:55:18
dismissed [6] – 1:17:23…, 1:22:20…, 1:22:22…, 1:32:5…, 1:43:23…, 1:43:24
dismisses [1] – 1:46:9
dismissing [1] – 1:46:6
disposal [1] – 1:32:15
dispute [2] – 1:24:9…, 1:34:16
disputes [1] – 1:38:9
disregarded [1] – 1:31:17
disrepute [1] – 1:45:3
disseminate [6] – 1:6:24…, 1:13:8…, 1:14:21…, 1:14:22…, 1:18:18…, 1:40:22
disseminated [5] – 1:6:18…, 1:7:10…, 1:22:12…, 1:23:3…, 1:41:23
disseminating [6] – 1:7:22…, 1:11:15…, 1:23:18…, 1:23:21…, 1:46:2…, 1:49:19
dissemination [28] – 1:6:20…, 1:6:23…, 1:8:2…, 1:8:13…, 1:9:2…, 1:9:18…, 1:11:18…, 1:12:1…, 1:12:2…, 1:17:24…, 1:20:5…, 1:20:15…, 1:22:6…, 1:22:25…, 1:24:10…, 1:29:2…, 1:29:10…, 1:30:7…, 1:33:20…, 1:41:1…, 1:42:9…, 1:42:14…, 1:46:15…, 1:46:20…, 1:46:21…, 1:46:23…, 1:49:23
disseminations [1] – 1:44:16
district [1] – 1:13:12
District [8] – 1:2:18…, 1:10:25…, 1:11:1…, 1:16:14…, 1:46:5…, 1:46:8…, 1:46:13…, 1:46:14
districts [2] – 1:11:9…, 1:13:10
Division [1] – 1:3:11
divorce [1] – 1:41:15
Docket [2] – 1:4:6…, 1:4:7
document [2] – 1:17:3…, 1:25:12
DONALD [1] – 1:2:10
done [14] – 1:9:1…,

1:20:19…, 1:20:21…, 1:21:19…, 1:23:13…, 1:23:19…, 1:28:4…, 1:36:15…, 1:41:14…, 1:49:8…, 1:49:25…, 1:51:19…, 1:55:15…, 1:58:12
Donnie [1] – 1:3:23
doubt [1] – 1:29:6
down [1] – 1:16:6
DRIVE [1] – 1:2:10
due [4] – 1:10:5…, 1:44:4…, 1:47:11…, 1:52:15
during [5] – 1:26:19…, 1:27:13…, 1:28:19…, 1:33:18…, 1:49:24

## E

E&W [1] – 1:2:12
early [1] – 1:15:5
ECF [1] – 1:9:12
effect [3] – 1:11:22…, 1:26:25…, 1:44:24
effort [1] – 1:33:9
egregious [1] – 1:11:3
either [6] – 1:6:7…, 1:8:7…, 1:23:24…, 1:26:15…, 1:47:5…, 1:55:9
elect [9] – 1:4:8…, 1:5:20…, 1:18:22…, 1:40:2…, 1:48:13…, 1:51:18…, 1:53:9…, 1:56:2…, 1:56:11
elected [1] – 1:44:21
electronic [1] – 1:5:22
Eleventh [5] – 1:8:25…, 1:9:6…, 1:21:12…, 1:28:7…, 1:42:5
Elizabeth [1] – 1:3:10
elsewhere [1] – 1:20:6
emergency [3] – 1:4:4…, 1:4:8…, 1:37:22
Emergency [1] – 1:5:13
empanelled [1] – 1:42:23
employed [1] – 1:10:20
end [3] – 1:31:9…, 1:33:10…, 1:55:5
ended [1] – 1:31:25
enforce [3] – 1:7:3…, 1:30:2…, 1:38:8
enforcement [2] – 1:29:23…, 1:30:6
engage [2] – 1:46:12…, 1:49:6

enjoin [3] – 1:29:13…, 1:33:20…, 1:42:11
enjoining [3] – 1:10:4…, 1:37:21…, 1:49:18
enjoinment [3] – 1:10:2…, 1:10:19
enormous [1] – 1:44:24
ensure [1] – 1:7:7…, 1:10:5…, 1:32:17…, 1:32:20…, 1:39:3…, 1:45:16
enter [1] – 1:7:19
entered [3] – 1:3:19…, 1:8:7…, 1:13:11
entering [1] – 1:33:4
entire [1] – 1:42:21
entirely [1] – 1:34:19
entirety [1] – 1:25:1
entitled [2] – 1:16:5…, 1:22:17
entity [2] – 1:47:25
Entry [2] – 1:4:6…, 1:4:7
enunciated [1] – 1:54:7
equivalent [1] – 1:46:22
especially [1] – 1:41:23
ESQ [4] – 1:2:3, 1:2:6, 1:2:10, 1:2:13
essence [1] – 1:49:7
essentially [1] – 1:49:14
established [1] – 1:57:9
esteemed [1] – 1:10:1
et [1] – 1:37:25
ethical [2] – 1:50:2…, 1:50:7
evaluated [1] – 1:40:4
evaluation [1] – 1:10:22
events [1] – 1:6:11…, 1:7:4
eventually [1] – 1:41:6
evidence [4] – 1:15:21…, 1:21:20…, 1:21:21…, 1:37:3
evident [1] – 1:37:7
ex [6] – 1:24:17…, 1:28:10…, 1:28:11…, 1:29:10…, 1:31:2…, 1:33:15
exactly [2] – 1:13:6…, 1:23:2
example [8] – 1:17:8…, 1:21:7…, 1:26:6…, 1:26:16…, 1:26:17…, 1:28:23…, 1:31:23…, 1:35:6
excellent [1] – 1:4:2
excised [1] – 1:42:24

excuse [2]- - 1:12:1.., 1:26:13
executive [1]- - 1:30:22
EXECUTIVE [1] - 1:2:10
exemption [2]- - 1:35:7.., 1:35:13
exercise [1]- - 1:8:21
exist [3]- - 1:11:8.., 1:13:18.., 1:55:9
expect [2]- - 1:19:25.., 1:21:20
expectation [1]- - 1:18:3
experienced [1]- - 1:18:19
expert [1]- - 1:34:13
express [1]- - 1:25:24
expressly [1]- - 1:33:24
extent [4]- - 1:4:21.., 1:42:13.., 1:52:18.., 1:57:1
extreme [1]- - 1:24:18

**F**

F.2d [2]- - 1:8:20.., 1:19:20
F.3d [1]- - 1:9:10
facing [1]- - 1:44:19
fact [13]- - 1:7:24.., 1:13:14.., 1:13:17.., 1:20:6.., 1:21:10.., 1:22:1.., 1:23:15.., 1:34:1.., 1:41:4.., 1:43:22.., 1:50:20.., 1:51:8.., 1:55:3
factors [1]- - 1:55:24
facts [1]- - 1:37:2
factual [3]- - 1:4:21.., 1:36:22.., 1:37:6
fair [7]- - 1:6:13.., 1:14:17.., 1:32:21.., 1:33:24.., 1:38:8.., 1:44:5.., 1:52:16
fairly [1]- - 1:20:25
faith [1]- - 1:47:13
fall [1]- - 1:15:22
falls [1]- - 1:36:11
false [1]- - 1:18:1
familiar [3]- - 1:9:4.., 1:19:6.., 1:40:16
far [2]- - 1:16:2.., 1:22:7
fashion [1]- - 1:55:16
FBI [1]- - 1:17:8
FBI's [1]- - 1:17:9
feasibly [1]- - 1:30:6
Federal [1]- - 1:8:21
federal [6]- - 1:8:23..,

1:11:25.., 1:49:19.., 1:52:6.., 1:55:2
feed [1]- - 1:5:23
felt [1]- - 1:11:1
few [1]- - 1:5:21
field [1]- - 1:23:10
Fifth [1]- - 1:52:15
FIFTH [1] - 1:2:4
filed [4]- - 1:4:6.., 1:4:7.., 1:10:23.., 1:10:24
filings [2]- - 1:4:11.., 1:25:22
final [5]- - 1:14:23.., 1:26:5.., 1:39:12.., 1:42:17.., 1:52:11
finality [1]- - 1:29:5
finally [1]- - 1:6:1
findings [2]- - 1:18:9.., 1:19:17
first [14]- - 1:4:4.., 1:4:15.., 1:7:1.., 1:8:16.., 1:9:25.., 1:11:10.., 1:16:15.., 1:17:20.., 1:22:13.., 1:30:13.., 1:56:18.., 1:56:21.., 1:57:8.., 1:57:13
First [1]- - 1:54:21
firsthand [1]- - 1:18:19
flagged [1]- - 1:14:6
flipside [1]- - 1:29:11
floor [5]- - 1:5:24.., 1:19:16.., 1:30:17.., 1:31:18.., 1:44:22
FLORIDA [2]- 1:2:8, 1:2:11
Florida [3]- - 1:2:18.., 1:11:12.., 1:47:10
focus [1]- - 1:22:3
FOIA [1]- - 1:35:13.., 1:42:18
follow [2]- - 1:7:12, 1:58:17
following [6]- - 1:6:13.., 1:11:2.., 1:16:20.., 1:46:11.., 1:51:15.., 2:69:11
footnote [3]- - 1:22:15.., 1:25:21
FOR [1]- 1:2:1
foreclosed [1]- - 1:32:10
forget [1]- - 1:50:9
form [3]- - 1:20:3.., 1:25:11.., 1:51:16
formal [4]- - 1:24:1.., 1:25:15.., 1:25:22.., 1:39:8

formally [2]- - 1:50:9.., 1:51:24
format [2]- - 1:37:11.., 1:37:14
former [3]- - 1:45:25.., 1:49:5
formulation [1]- - 1:55:12.., 1:55:18
Fort [1] - 1:2:18
four [7]- - 1:6:25.., 1:18:17.., 1:24:14.., 1:25:10.., 1:27:15.., 1:28:10.., 1:29:20
fours [1]- - 1:43:19
FPR [1] - 1:2:16
framed [1]- - 1:37:10
framework [4]- - 1:9:21.., 1:10:20.., 1:11:5.., 1:38:2
Freedom [1]- - 1:35:6
front [1]- - 1:33:17
full [6]- - 1:26:4.., 1:27:9.., 1:28:6.., 1:44:13.., 1:45:16.., 1:51:23
fully [8]- - 1:27:17.., 1:27:23.., 1:28:3.., 1:29:6.., 1:31:11.., 1:52:9.., 1:53:13.., 1:56:25
function [1]- - 1:23:21
furtherance [1]- - 1:21:16
future [2]- - 1:9:8.., 1:20:4

**G**

Garland [3]- - 1:45:6.., 1:46:13.., 1:49:21
gathering [1]- - 1:21:21
General [8]- - 1:24:9.., 1:27:21.., 1:28:14.., 1:33:20.., 1:34:3.., 1:34:6.., 1:38:13.., 1:41:21
general [2]- - 1:10:22.., 1:47:21
generalities [1]- - 1:14:25
generalized [1]- - 1:23:9
generally [5]- - 1:9:4.., 1:11:25.., 1:54:14.., 1:54:16.., 1:54:17
given [6]- - 1:22:19.., 1:30:3.., 1:33:4.., 1:36:19.., 1:42:8
goal [1]- - 1:48:7
governing [1]- - 1:58:9
government [25]- - 1:6:16.., 1:6:24.., 1:7:11..,

1:7:21.., 1:8:4.., 1:8:5.., 1:8:11.., 1:8:14.., 1:8:24.., 1:9:16.., 1:12:9.., 1:12:13.., 1:12:22.., 1:13:2.., 1:13:20.., 1:13:23.., 1:14:20.., 1:35:14.., 1:41:8.., 1:42:6.., 1:43:23.., 1:43:24.., 1:44:7.., 1:44:10.., 1:45:7
government's [5]- - 1:11:2.., 1:22:21.., 1:23:9.., 1:42:4.., 1:52:17
governs [1]- - 1:10:9
grand [34]- - 1:12:23.., 1:12:24.., 1:12:25.., 1:13:1.., 1:13:4.., 1:13:8.., 1:13:12.., 1:13:16.., 1:13:17.., 1:13:18.., 1:13:25.., 1:14:1.., 1:14:9.., 1:15:22.., 1:15:23.., 1:16:20.., 1:17:5.., 1:17:7.., 1:35:10.., 1:35:16.., 1:35:21.., 1:35:22.., 1:35:23.., 1:36:3.., 1:36:7.., 1:36:9.., 1:37:4.., 1:42:21.., 1:42:22.., 1:42:24.., 1:42:25.., 1:43:2
Grand [1]- - 1:39:22
grant [1]- - 1:56:24
granted [2]- - 1:31:1.., 1:53:24
granular [1]- - 1:37:8
gratuitous [1]- - 1:50:9
gratuitously [1]- - 1:50:8
grave [2]- - 1:48:25.., 1:51:4
Gravel [3]- - 1:43:11.., 1:43:18.., 1:53:11
great [1]- - 1:39:3
greater [1]- - 1:48:15
Greg [1]- - 1:3:25
guard [1]- - 1:50:3
guardrails [1]- - 1:44:7
guess [9]- - 1:14:23.., 1:23:11.., 1:24:7.., 1:33:6.., 1:34:12.., 1:34:23.., 1:35:25.., 1:52:5.., 1:54:25
guilty [1]- - 1:46:10

**H**

hac [1]- - 1:11:12
handling [1]- - 1:27:11
hands [1]- - 1:42:20
happy [1]- - 1:19:18
hard [1]- - 1:21:14
hardly [1]- - 1:44:18

harm [7] - 1:7:13_, 1:7:14_, 1:9:16_, 1:29:15_, 1:30:7_, 1:37:23_, 1:38:10
harmed [1] - 1:29:15
harms [4] - 1:10:21_, 1:37:18_, 1:38:7_, 1:38:10
head [1] - 1:11:19
Healthgroup [1] - 1:9:10
hear [12] - 1:4:14_, 1:5:14_, 1:5:19_, 1:6:19_, 1:20:13_, 1:34:23_, 1:37:11_, 1:39:4_, 1:41:23_, 1:42:2_, 1:43:6_, 1:58:11
heard [5] - 1:34:24_, 1:44:14_, 1:47:18_, 1:53:17_, 1:53:18
hearing [9] - 1:4:3_, 1:5:17_, 1:6:12_, 1:14:12_, 1:23:2_, 1:28:7_, 1:42:15_, 1:54:20_, 1:58:10
heightened [1] - 1:30:3
held [2] - 1:46:16_, 2:69:11
Heller [2] - 1:31:15_, 1:31:23
helpful [2] - 1:36:13_, 1:52:12
higher [1] - 1:29:7
highlight [1] - 1:57:22
hinder [1] - 1:48:8
hinge [1] - 1:54:10
historic [1] - 1:27:20
historical [8] - 1:27:20_, 1:28:14_, 1:28:17_, 1:28:21_, 1:31:14_, 1:40:14_, 1:41:18
historically [3] - 1:26:7_, 1:47:25_, 1:50:23
history [4] - 1:19:1_, 1:49:8_, 1:49:25_, 1:50:1
honest [1] - 1:45:3
honestly [1] - 1:47:17
Honor [68] - 1:3:9_, 1:3:13_, 1:3:17_, 1:3:22_, 1:3:24_, 1:4:19_, 1:5:5_, 1:5:10_, 1:6:9_, 1:6:11_, 1:7:6_, 1:8:25_, 1:9:11_, 1:12:19_, 1:13:6_, 1:14:11_, 1:14:17_, 1:14:19_, 1:16:22_, 1:18:19_, 1:20:17_, 1:21:8_, 1:21:13_, 1:21:19_, 1:23:15_, 1:24:4_, 1:24:6_, 1:25:20_, 1:25:21_, 1:26:10_, 1:29:9_, 1:30:9_, 1:30:12_, 1:31:12_, 1:31:21_, 1:32:13

_, 1:32:14_, 1:32:22_, 1:33:12_, 1:34:2_, 1:36:5_, 1:36:14_, 1:37:20_, 1:38:8_, 1:41:24_, 1:42:1_, 1:42:3_, 1:42:8_, 1:43:4_, 1:43:9_, 1:43:23_, 1:44:9_, 1:44:19_, 1:44:23_, 1:45:2_, 1:46:21_, 1:47:16_, 1:48:16_, 1:50:7_, 1:50:18_, 1:56:4_, 1:56:14_, 1:56:20_, 1:56:23_, 1:57:21_, 1:58:5_, 2:69:16_, 2:69:18
honor [1] - 1:19:11
Honor's [4] - 1:14:13_, 1:23:24_, 1:32:15_, 1:52:2
Honorable [1] - 1:2:17
honored [1] - 1:42:14
hope [1] - 1:31:5
House [4] - 1:19:16_, 1:24:15_, 1:30:17_, 1:44:22
hundred [2] - 1:16:18_, 1:42:25
hundred-and-something [1] - 1:16:18
hundred-plus [1] - 1:42:25
Hunter [1] - 1:26:23
hypothetically [2] - 1:35:14_, 1:57:16

**I**

identification [1] - 1:35:9
identified [2] - 1:27:16_, 1:36:3
identify [2] - 1:35:4_, 1:35:19
identifying [1] - 1:16:20
II [25] - 1:4:5_, 1:4:10_, 1:4:13_, 1:6:2_, 1:6:17_, 1:6:20_, 1:6:23_, 1:7:10_, 1:10:13_, 1:12:17_, 1:14:24_, 1:15:1_, 1:15:4_, 1:16:4_, 1:23:7_, 1:24:11_, 1:25:18_, 1:38:19_, 1:39:17_, 1:48:12_, 1:51:15_, 1:52:22_, 1:58:9_, 1:58:11
illegal [1] - 1:8:23
imminent [1] - 1:33:1
impartial [2] - 1:32:21_, 1:32:22
impeachment [1] - 1:40:24_, 1:41:17
implicate [1] - 1:14:1_, 1:33:24_, 1:36:23_, 1:54:9
implicated [6] - 1:44:5_,

1:51:18_, 1:52:10_, 1:52:19_, 1:54:8_, 1:55:2
important [4] - 1:15:15_, 1:45:11_, 1:52:23_, 1:57:14
impose [1] - 1:9:17
Inc [1] - 1:9:10
incentive [1] - 1:30:21
incidentally [1] - 1:11:16
inclined [1] - 1:22:24_, 1:56:24
include [1] - 1:24:20
includes [1] - 1:35:7
including [4] - 1:21:6_, 1:26:19_, 1:27:24_, 1:46:2
incoming [1] - 1:49:15
incomprehensible [3] - 1:46:11_, 1:47:12_, 1:47:14
inconceivable [1] - 1:55:20
inconsistent [1] - 1:51:20_, 1:54:1
indicated [3] - 1:6:1_, 1:45:17_, 1:47:4
indicates [1] - 1:40:1
indication [1] - 1:6:2
indicted [1] - 1:8:10
indictment [6] - 1:11:2_, 1:29:8_, 1:29:17_, 1:32:5_, 1:32:23_, 1:45:18
individuals [2] - 1:46:23_, 1:47:3
indulgence [1] - 1:56:20
Information [1] - 1:35:6
information [79] - 1:7:22_, 1:8:13_, 1:8:15_, 1:9:2_, 1:9:19_, 1:10:13_, 1:11:15_, 1:11:18_, 1:12:1_, 1:12:3_, 1:12:13_, 1:12:18_, 1:12:20_, 1:12:24_, 1:13:1_, 1:13:3_, 1:13:17_, 1:13:18_, 1:14:8_, 1:14:21_, 1:14:22_, 1:14:25_, 1:17:4_, 1:20:7_, 1:21:15_, 1:21:23_, 1:22:6_, 1:23:3_, 1:23:21_, 1:24:25_, 1:25:1_, 1:26:18_, 1:27:1_, 1:29:19_, 1:30:23_, 1:30:25_, 1:33:10_, 1:33:13_, 1:33:15_, 1:35:8_, 1:35:12_, 1:35:19_, 1:36:2_, 1:36:10_, 1:36:24_, 1:37:1_, 1:38:14_, 1:38:17_, 1:38:21_, 1:39:4_, 1:39:5_, 1:39:9_, 1:39:10_, 1:39:18_, 1:40:1_, 1:40:22_, 1:41:2_, 1:41:3_, 1:42:9_, 1:42:19_, 1:42:20_, 1:43:21_, 1:46:2_,

1:46:5_, 1:46:15_, 1:46:23_, 1:48:4_, 1:48:5_, 1:49:9_, 1:49:19_, 1:50:2_, 1:50:4_, 1:50:12_, 1:50:22_, 1:50:24_, 1:51:1_, 2:69:22
inherent [1] - 1:8:19
initial [1] - 1:9:25
initiated [1] - 1:47:20
injunction [5] - 1:9:21_, 1:29:12_, 1:33:4_, 1:37:11_, 1:37:14
injunctive [1] - 1:9:22
injustice [1] - 1:7:8
input [2] - 1:34:20
inquired [1] - 1:13:24
inquiry [1] - 1:41:17
insisted [1] - 1:46:19
instance [1] - 1:41:20
instances [1] - 1:26:2_, 1:48:16
institution [2] - 1:47:24_, 1:49:17
institutional [9] - 1:43:14_, 1:43:20_, 1:45:11_, 1:45:14_, 1:48:3_, 1:48:22_, 1:48:24_, 1:51:4_, 1:52:21
integrity [1] - 1:8:23
intelligence [3] - 1:38:20_, 1:39:2_, 2:69:19
intend [1] - 1:5:12
intended [1] - 1:27:22
intents [1] - 1:44:8
interest [8] - 1:23:10_, 1:44:3_, 1:45:17_, 1:45:25_, 1:47:21_, 1:48:10_, 1:52:19_, 1:53:25
interested [1] - 1:25:18
interesting [1] - 1:53:19
interests [9] - 1:10:21_, 1:43:13_, 1:43:14_, 1:43:16_, 1:44:11_, 1:45:9_, 1:52:7_, 1:52:14_, 1:52:21
interfere [1] - 1:49:17
intermeddling [1] - 1:49:4
interpretations [1] - 1:12:15
interpreted [1] - 1:36:7
intervene [21] - 1:4:7_, 1:4:9_, 1:5:19_, 1:40:12_, 1:43:7_, 1:43:10_, 1:43:12_, 1:43:15_, 1:51:24_, 1:52:8_, 1:53:21_, 1:53:24_, 1:54:5_,

1:54:13_, 1:55:5_, 1:56:8_,
1:56:13_, 1:56:24_, 1:57:8_,
1:57:9_, 1:57:15
  intervened [1]_ - 1:57:10
  intervening [2]_ - 1:45:10
_, 1:52:24
  intervenor [4]_ - 1:53:14_,
1:53:21_, 1:54:4_, 1:56:16
  intervenor's [1]_ - 1:57:4
  intervention [12]_ -
1:51:14_, 1:51:17_, 1:51:21
_, 1:53:8_, 1:53:12_, 1:53:20
_, 1:54:2_, 1:54:16_, 1:54:19
_, 1:54:22_, 1:55:1_, 1:57:6
  interview [1]_ - 1:17:8
  investigating [2]_ -
1:13:19_, 1:26:23
  investigation [6]_ - 1:37:3
_, 1:37:4_, 1:40:23_, 1:41:11
_, 1:41:13_, 1:42:22
  investigations [2]_ -
1:18:22_, 1:27:23
  invite [1]_ - 1:19:9
  invited [2]_ - 1:16:12_,
1:16:15
  involve [2]_ - 1:16:2_,
1:26:2
  involved [1]_ - 1:36:17
  ironed [1]_ - 1:25:6
  ironing [1]_ - 1:25:5
  irreparable [4]_ - 1:7:13_,
1:7:14_, 1:9:15_, 1:37:23
  irreparably [1]_ - 1:29:15
  Irving [2]_ - 1:3:22_, 1:4:23
  IRVING [2]_ - 1:2:13_,
1:3:22
  issue [12]_ - 1:6:22_,
1:10:3_, 1:10:8_, 1:12:16_,
1:13:24_, 1:14:6_, 1:17:11_,
1:21:9_, 1:43:17_, 1:48:4_,
1:53:13_, 1:57:8
  issued [3]_ - 1:9:8_, 1:26:7
_, 1:50:21
  issues [7]_ - 1:34:10_,
1:34:24_, 1:49:4_, 1:51:4_,
1:52:3_, 1:56:25_, 1:57:2
  itemize [1]_ - 1:52:11
  items [2]_ - 1:39:15_,
1:58:8
  itself [4]_ - 1:4:13_, 1:13:22
_, 1:41:11_, 1:47:24

**J**

  Jack [2]_ - 1:46:13_,
1:49:21
  January [5]_ - 1:4:6_,
1:17:19_, 1:18:3_, 1:24:2_,
1:50:15
  Jencks [1]_ - 1:13:14
  job [1]_ - 1:9:25
  JOHN [1]_ - 1:2:13
  John [2]_ - 1:3:22_, 1:3:24
  joined [1]_ - 1:48:11
  joins [1]_ - 1:4:8
  joint [1]_ - 1:4:17
  JR [1]_ - 1:2:10
  judge [1]_ - 1:32:1
  Judge [2]_ - 1:7:19
  judgments [1]_ - 1:9:9
  judicial [2]_ - 1:34:18_,
1:37:8
  judiciary [1]_ - 1:23:25
  Judiciary [2]_ - 1:24:15_,
1:25:22
  juries [2]_ - 1:14:9_,
1:42:22
  jurisdiction [1]_ - 1:29:25
  jurors [3]_ - 1:32:2_,
1:32:17_, 1:32:20
  jury [34]_ - 1:12:23_,
1:12:24_, 1:12:25_, 1:13:1_,
1:13:4_, 1:13:8_, 1:13:12_,
1:13:16_, 1:13:17_, 1:13:18
_, 1:13:25_, 1:14:1_, 1:14:9_,
1:15:22_, 1:15:23_, 1:16:21
_, 1:17:5_, 1:17:7_, 1:32:16_,
1:32:22_, 1:35:10_, 1:35:16
_, 1:35:21_, 1:35:22_,
1:35:23_, 1:36:3_, 1:36:7_,
1:36:9_, 1:37:5_, 1:39:22_,
1:42:24_, 1:42:25_, 1:43:2
  jury's [1]_ - 1:42:21
  Justice [34]_ - 1:3:10_,
1:3:12_, 1:5:7_, 1:5:15_,
1:6:24_, 1:10:4_, 1:14:6_,
1:17:15_, 1:18:16_, 1:19:10
_, 1:19:13_, 1:20:17_, 1:22:2
_, 1:25:11_, 1:26:7_, 1:33:9_,
1:36:21_, 1:40:22_, 1:41:3_,
1:42:11_, 1:42:21_, 1:45:4_,
1:46:17_, 1:47:24_, 1:48:7_,
1:49:5_, 1:49:6_, 1:49:8_,
1:49:25_, 1:51:1_, 1:51:6_,
1:51:11_, 1:55:14_, 1:56:2
  justice [4]_ - 1:16:6_,
1:48:4_, 1:48:6_, 1:48:8

**K**

  keep [2]_ - 1:46:24_,
1:47:3
  key [2]_ - 1:18:9_, 1:33:25
  keyword [1]_ - 1:28:1
  kind [2]_ - 1:10:21_,
1:30:18
  kinds [1]_ - 1:31:21
  Klay [1]_ - 1:9:9
  KLUGH [2]_ - 1:2:6, 1:2:6
  Klugh [1]_ - 1:3:19
  knowing [1]_ - 1:37:2
  knowledge [6]_ - 1:36:21
_, 1:38:23_, 1:40:19_, 1:42:6
_, 1:42:19_, 1:55:18
  knows [1]_ - 1:11:13

**L**

  L.D [2]_ - 1:2:9
  lack [1]_ - 1:41:13
  laid [1]_ - 1:20:7
  language [5]_ - 1:7:21_,
1:8:3_, 1:8:5_, 1:12:4_,
1:38:1
  LAPOINTE [1]_ - 1:3:13
  Lapointe [1]_ - 1:3:14
  lapse [1]_ - 1:32:24
  largely [1]_ - 1:11:16
  LARRY [1]_ - 1:2:10
  last [4]_ - 1:14:7_, 1:18:20
_, 1:23:5_, 1:48:1
  late [1]_ - 1:15:4
  LAURA [1]_ - 1:2:16
  LAURO [21]_ - 1:3:24_,
1:43:9_, 1:44:18_, 1:45:15_,
1:45:23_, 1:46:21_, 1:47:23
_, 1:48:14_, 1:48:18_,
1:48:24_, 1:49:20_, 1:50:18
_, 1:51:22_, 1:52:13_, 1:53:2
_, 1:53:5_, 1:56:14_, 1:56:21
_, 1:56:23_, 1:57:7_, 1:57:18
  Lauro [3]_ - 1:3:24_, 1:4:1_
_, 1:43:8
  law [7]_ - 1:9:11_, 1:15:25_,
1:33:8_, 1:35:5_, 1:54:2_,
1:54:12_, 1:54:15
  LAW [2]_ - 1:2:3, 1:2:12
  lawyers [1]_ - 1:46:14
  lead [1]_ - 1:5:8
  leak [2]_ - 1:30:15_,
1:30:21
  leaked [2]_ - 1:30:11_,
1:44:15
  leaks [1]_ - 1:30:3
  least [5]_ - 1:17:22_,
1:40:1_, 1:40:4_, 1:47:25_,
1:51:16
  leave [5]_ - 1:24:22_,
1:24:23_, 1:45:19_, 1:48:2_,
1:55:11
  leaves [1]_ - 1:45:6
  lectern [1]_ - 1:6:8
  left [1]_ - 1:41:21
  legal [3]_ - 1:4:20_, 1:5:4_,
1:38:2
  legislate [2]_ - 1:20:11_,
1:23:19
  legislating [1]_ - 1:23:10
  legislation [1]_ - 1:23:12_,
1:23:23
  legislative [7]_ - 1:17:21_,
1:17:22_, 1:20:9_, 1:20:10_,
1:23:18_, 1:23:21_, 1:30:23
  lengthy [2]_ - 1:29:17_,
1:46:9
  letter [11]_ - 1:12:21_,
1:16:19_, 1:16:22_, 1:17:19
_, 1:18:2_, 1:23:7_, 1:24:2_,
1:25:11_, 1:50:11_, 1:50:16
_, 1:50:24
  level [2]_ - 1:44:17_, 1:46:6
  liability [1]_ - 1:32:11
  licks [1]_ - 1:48:1
  light [3]_ - 1:6:11_, 1:51:8_,
1:58:7
  likelihood [1]_ - 1:30:14
  likely [3]_ - 1:17:25_,
1:31:1_, 1:31:15
  limitations [2]_ - 1:22:5_,
1:55:23
  limited [7]_ - 1:15:4_,
1:16:20_, 1:21:5_, 1:26:8_,
1:28:15_, 1:29:4_, 1:48:5
  limits [1]_ - 1:12:4
  line [5]_ - 1:16:7_, 1:16:8_,
1:22:15
  literally [2]_ - 1:7:25_,
1:20:22
  litigated [1]_ - 1:53:1
  litigation [7]_ - 1:10:11_,
1:26:25_, 1:27:2_, 1:39:13_,
1:41:7_, 1:53:22
  live [1]_ - 1:5:23
  local [4]_ - 1:8:9_, 1:11:17_

_, 1:11:25_, 1:22:4
look [2]_ - 1:25:24_,
1:55:23
looking [3]_ - 1:29:11_,
1:39:5_, 1:56:11
looks [1]_ - 1:46:25
LP [1] - 1:2:3

**M**

Magistrate [1]_ - 1:7:19
majority [1]_ - 1:10:13
manner [1]_ - 1:42:10
marked [1]_ - 1:8:1
Markenzy [1]_ - 1:3:14
Maryland [2]_ - 1:11:1_,
1:22:20
material [13]_ - 1:10:9_,
1:13:8_, 1:14:20_, 1:34:22_,
1:35:3_, 1:35:4_, 1:35:9_,
1:35:17_, 1:35:24_, 1:39:14
_, 1:39:22_, 1:48:12_, 1:58:3
materially [2]_ - 1:38:4_,
1:57:4
materials [2]_ - 1:13:12_,
1:56:16
matter [8]_ - 1:7:5_,
1:10:18_, 1:13:15_, 1:13:18
_, 1:15:23_, 1:30:4_, 1:36:6_,
1:42:12
matters [3]_ - 1:25:23_,
1:39:22_, 1:47:22
McClellan [1]_ - 1:19:19
McSurely [1]_ - 1:19:19
mean [14]_ - 1:11:24_,
1:17:9_, 1:17:20_, 1:18:20_,
1:18:25_, 1:19:18_, 1:19:22
_, 1:20:8_, 1:21:9_, 1:22:17_,
1:37:24_, 1:46:19_, 1:55:10
meaning [1]_ - 1:8:1
meaningful [3]_ - 1:16:10
_, 1:22:15_, 1:34:20
meaningfully [1]_ - 1:6:4
meantime [1]_ - 1:31:4
mechanism [3]_ - 1:29:24
_, 1:34:16_, 1:36:11
mechanisms [2]_ -
1:31:21_, 1:32:15
media [1]_ - 1:54:20
MELTON [1]_ - 1:2:16
Member [1]_ - 1:24:2_,
1:50:16
member [4]_ - 1:11:12_,

_, 1:18:23_, 1:31:17_, 1:42:10
member's [1]_ - 1:23:7
members [24]_ - 1:6:25_,
1:18:17_, 1:18:21_, 1:19:5_,
1:19:9_, 1:19:15_, 1:19:21_,
1:23:6_, 1:23:14_, 1:23:20_,
1:23:25_, 1:24:14_, 1:24:15
_, 1:25:10_, 1:27:15_,
1:28:10_, 1:29:21_, 1:29:24
_, 1:30:13_, 1:30:20_,
1:38:11_, 1:38:24_, 1:41:24
_, 1:49:23
memorialized [1]_ -
1:25:3
mentioned [2]_ - 1:30:16,
_, 1:48:10
mere [1]_ - 1:49:16
merely [2]_ - 1:36:10_,
1:55:1
Merrick [3]_ - 1:45:6_,
1:46:13_, 1:49:21
messages [1]_ - 1:12:25
methods [1]_ - 1:41:12
MIAMI [1] - 1:2:8
middle [2]_ - 1:31:24_,
1:49:1
might [3]_ - 1:20:2_,
1:30:16_, 1:53:21
mind [1]_ - 1:4:18
missing [1]_ - 1:28:23
moment [2]_ - 1:23:13_,
1:29:5
Monday [1]_ - 1:51:9
months [1]_ - 1:32:14
moot [1]_ - 1:21:11
morning [2]_ - 1:15:5_,
1:15:7
most [2]_ - 1:11:8_,
1:57:14
Motion [1]_ - 1:5:13
motion [29]_ - 1:4:4_, 1:4:7,
_, 1:4:8_, 1:4:14_, 1:5:19_,
1:20:3_, 1:33:19_, 1:37:22_,
1:40:11_, 1:43:7_, 1:43:10_,
1:45:18_, 1:48:11_, 1:51:19
_, 1:51:21_, 1:52:7_, 1:52:10
_, 1:53:20_, 1:53:24_, 1:54:9
_, 1:54:13_, 1:55:3_, 1:55:5_,
1:55:11_, 1:56:8_, 1:56:13_,
1:56:17_, 1:56:24
motions [7]_ - 1:4:3_,
1:4:12_, 1:10:23_, 1:10:24_,
1:21:14_, 1:29:18_, 2:69:25
move [1]_ - 1:20:13

MR [51]_ - 1:3:11_, 1:3:13_,
1:3:17_, 1:3:22_, 1:3:24_,
1:4:19_, 1:5:5_, 1:6:9_,
1:9:24_, 1:10:23_, 1:11:7_,
1:12:19_, 1:13:23_, 1:14:17
_, 1:15:3_, 1:15:13_, 1:15:24
_, 1:16:12_, 1:17:2_, 1:17:20
_, 1:19:8_, 1:20:8_, 1:21:7_,
1:23:15_, 1:24:4_, 1:40:13_,
1:40:21_, 1:43:9_, 1:44:18_,
1:45:15_, 1:45:23_, 1:46:21
_, 1:47:23_, 1:48:14_,
1:48:18_, 1:48:24_, 1:49:20
_, 1:50:18_, 1:51:22_,
1:52:13_, 1:53:2_, 1:53:5_,
1:56:14_, 1:56:20_, 1:56:21
_, 1:56:22_, 1:56:23_, 1:57:7,
_, 1:57:18_, 1:57:21_,
2:69:16
MS [58]_ - 1:3:9_, 1:5:9_,
1:24:6_, 1:24:20_, 1:25:6_,
1:25:14_, 1:25:20_, 1:26:10,
1:26:14_, 1:26:17_, 1:26:22
_, 1:27:2_, 1:27:6_, 1:27:12_,
1:27:18_, 1:28:9_, 1:28:13_,
1:28:24_, 1:29:1_, 1:29:9_,
1:30:9_, 1:30:12_, 1:31:12_,
1:31:21_, 1:32:7_, 1:32:13_,
1:33:12_, 1:34:2_, 1:34:12_,
1:34:23_, 1:35:18_, 1:35:25
_, 1:36:13_, 1:36:18_,
1:36:24_, 1:37:15_, 1:37:20
_, 1:38:6_, 1:38:18_, 1:38:23
_, 1:39:7_, 1:39:19_, 1:39:24
_, 1:40:5_, 1:40:9_, 1:53:7_,
1:54:3_, 1:54:15_, 1:54:19_,
1:55:6_, 1:55:17_, 1:55:22_,
1:56:3_, 1:56:6_, 1:56:9_,
1:58:5_, 2:69:18_, 2:69:23
multiple [3]_ - 1:25:15_,
1:29:16_, 1:35:18
MURRELL [2] - 1:2:9,
1:2:10
Murrell [1]_ - 1:3:23
must [2]_ - 1:9:1_, 1:23:3

**N**

narrow [1]_ - 1:54:24
narrowed [1]_ - 1:6:21
nature [2]_ - 1:28:5_,
1:49:16
NAUTA [1] - 1:2:2
Nauta [15]_ - 1:3:5_,
1:3:18, 1:3:20_, 1:4:16_,
1:4:18_, 1:4:22_, 1:8:7_,
1:8:8_, 1:17:16_, 1:18:6_,
1:20:14_, 1:20:24_, 1:56:18

_, 2:69:16
necessarily [4]_ - 1:12:23
_, 1:14:1_, 1:29:14_, 1:55:4
necessary [8]_ - 1:5:15_,
1:5:16_, 1:6:3_, 1:9:3_,
1:9:18_, 1:10:5_, 1:42:15_,
1:57:17
need [9]_ - 1:6:19_, 1:7:13
_, 1:23:1_, 1:24:25_, 1:25:25,
_, 1:49:2_, 1:51:5_, 1:51:24_,
1:54:5
needs [1]_ - 1:9:15
negative [5]_ - 1:49:12_,
1:49:15_, 1:49:16_, 1:54:16
never [3]_ - 1:41:20_,
1:49:24_, 1:50:7
nevertheless [1]_ -
1:54:24
new [1]_ - 1:14:7
New [1]_ - 1:18:24
nice [1]_ - 1:9:25
nobody [2]_ - 1:38:9_,
1:50:9
nominees [1]_ - 1:18:22
none [1]_ - 1:20:22
noon [1]_ - 1:15:8
normal [2]_ - 1:32:20_,
1:34:16
normally [1]_ - 1:37:23
NORTHWEST [1] -
1:2:4
notes [3]_ - 1:24:22_,
1:24:23_, 1:24:24
nothing [7]_ - 1:12:3_,
1:19:13_, 1:19:14_, 1:19:18
_, 1:30:5_, 1:47:7_, 1:50:21
notice [2]_ - 1:38:16_,
1:39:21
noting [1]_ - 1:17:21
notions [2]_ - 1:32:19
novel [1]_ - 1:19:24
number [5]_ - 1:17:2_,
1:17:3_, 1:26:24_, 1:28:20_,
1:29:18
Number [1]_ - 1:3:6
numerous [1]_ - 1:55:24
NW [1] - 1:2:13

**O**

objected [1]_ - 1:56:10
objecting [2]_ - 1:8:12_,
1:8:15

1:8:12_, 1:10:3
  **present** [4]_ - 1:6:7_,
1:21:21_, 1:38:2_, 1:54:21
  **presentation** [2]_ - 1:4:17.
_, 1:25:13
  **presented** [8]_ - 1:12:24_,
1:13:1_, 1:13:4_, 1:13:17_,
1:14:8_, 1:17:5_, 1:17:7_,
1:36:3
  **presenting** [2]_ - 1:5:3_,
1:5:9
  **preserve** [1]_ - 1:49:9
  **presidency** [1]_ - 1:49:17
  **President** [26]_ - 1:3:25_,
1:4:8_, 1:5:20_, 1:18:22_,
1:40:2_, 1:40:25_, 1:43:19_,
1:43:24_, 1:44:3_, 1:44:11_,
1:45:9_, 1:45:12_, 1:45:24_,
1:46:18_, 1:48:13_, 1:48:25
_, 1:49:3_, 1:49:22_, 1:51:5_,
1:51:9_, 1:51:18_, 1:51:22_,
1:52:24_, 1:53:9_, 1:56:2_,
1:56:11
  **president** [3]_ - 1:41:18_,
1:49:15
  **President-elect** [9]_ -
1:4:8_, 1:5:20_, 1:18:22_,
1:40:2_, 1:48:13_, 1:51:18_,
1:53:9_, 1:56:2_, 1:56:11
  **Presidential** [2]_ -
1:52:23_, 1:52:25
  **press** [5]_ - 1:11:2_,
1:20:16_, 1:49:12_, 1:49:16
  **presumably** [1]_ -
1:36:20
  **prevent** [3]_ - 1:9:1_,
1:9:18_, 1:19:15
  **prevented** [1]_ - 1:7:21
  **privilege** [5]_ - 1:20:17_,
1:39:15_, 1:39:19_, 1:48:13
  **privileged** [1]_ - 1:40:2
  **pro** [1]_ - 1:11:12
  **problem** [1]_ - 1:49:22
  **procedural** [1]_ - 1:43:2
  **proceed** [2]_ - 1:43:6_,
1:48:23
  **proceeding** [10]_ -
1:27:10_, 1:27:17_, 1:28:3_,
1:28:6_, 1:29:6_, 1:31:10_,
1:39:16_, 1:41:15_, 1:57:10
_, 1:58:12
  **proceedings** [18]_ -
1:5:25_, 1:8:19_, 1:9:7_,
1:9:8_, 1:10:6_, 1:21:6_,
1:21:13_, 1:26:5_, 1:26:6_,

1:26:9_, 1:28:23_, 1:31:22_,
1:40:25_, 1:42:12, 1:58:17_,
2:69:11_, 2:70:2
  **process** [12]_ - 1:10:6_,
1:12:22_, 1:27:4_, 1:32:16_,
1:36:15_, 1:36:17_, 1:36:25
_, 1:43:2_, 1:44:5_, 1:47:11_,
1:52:15
  **produced** [1]_ - 1:7:23
  **product** [1]_ - 1:49:23
  **professional** [2]_ - 1:46:1.
_, 1:46:12
  **Professional** [2]_ -
1:11:11_, 1:11:14
  **prohibited** [1]_ - 1:5:22
  **promptly** [1]_ - 1:58:12
  **proposal** [1]_ - 1:28:9
  **propose** [1]_ - 1:23:22
  **proposed** [2]_ - 1:7:21_,
1:8:5
  **proposing** [1]_ - 1:46:14
  **prosecuted** [1]_ - 1:20:25
  **prosecution** [2]_ -
1:21:16_, 1:45:22
  **prosecutions** [2]_ -
1:26:20_, 1:41:16
  **prosecutor** [6]_ - 1:21:18
_, 1:46:5_, 1:46:11_, 1:47:12
_, 1:47:14_, 1:50:6
  **prosecutorial** [1]_ -
1:49:23
  **prosecutors** [4]_ -
1:34:13_, 1:47:8_, 1:50:2_,
1:50:3
  **prospective** [2]_ - 1:56:16.
_, 1:57:4
  **protect** [4]_ - 1:8:22_,
1:12:12_, 1:43:13_, 1:53:14
  **protected** [6]_ - 1:13:5_,
1:35:12_, 1:43:16_, 1:47:6_,
1:50:25_, 1:51:5
  **protection** [2]_ - 1:51:23_,
1:51:25
  **protections** [1]_ - 1:39:3
  **protective** [13]_ - 1:7:20_,
1:7:21_, 1:8:1_, 1:8:2_, 1:8:3
_, 1:8:6_, 1:10:7_, 1:10:8_,
1:10:14_, 1:12:11_, 1:13:9_,
1:44:18
  **protects** [1]_ - 1:12:22
  **prototypical** [1]_ - 1:54:19
  **provide** [2]_ - 1:9:22_,
1:10:19_, 1:11:6_, 1:16:10_,
1:27:15_, 1:36:14_, 1:37:1_,

1:41:24_, 1:45:8_, 1:50:22_,
1:53:10
  **provided** [4]_ - 1:10:10_,
1:13:13_, 1:18:17_, 1:51:25
  **providing** [2]_ - 1:26:11_,
1:51:7
  **public** [21]_ - 1:5:2_, 1:6:20
_, 1:11:22_, 1:17:25_, 1:20:7.
_, 1:20:15_, 1:24:10_,
1:24:11_, 1:27:13_, 1:27:24
_, 1:29:1_, 1:29:18_, 1:29:19
_, 1:30:3_, 1:30:7_, 1:34:7_,
1:44:14_, 1:46:15_, 1:46:20
_, 1:46:22_, 2:69:13
  **publication** [1]_ - 1:20:24
  **publicity** [1]_ - 1:31:23
  **publicly** [9]_ - 1:6:18_,
1:7:10_, 1:10:15_, 1:10:16_,
1:15:16_, 1:17:14_, 1:18:18
_, 1:34:5_, 1:44:9
  **purpose** [2]_ - 1:20:9_,
1:20:10_, 1:23:18
  **purposes** [3]_ - 1:4:14_,
1:17:10_, 1:44:8
  **pursuant** [5]_ - 1:7:20_,
1:10:9_, 1:15:19_, 1:22:21_,
1:40:23
  **pursue** [1]_ - 1:48:8
  **put** [1]_ - 1:15:13

| Q |
| --- |

  **query** [1]_ - 1:36:11
  **questioning** [1]_ - 1:44:9
  **questionnaire** [1]_ -
1:32:16
  **questions** [6]_ - 1:5:4_,
1:6:4_, 1:34:22_, 1:36:22_,
1:37:6_, 1:40:13
  **quite** [6]_ - 1:6:21_, 1:14:7.
_, 1:33:2_, 1:33:5_, 1:38:12
  **quote** [5]_ - 1:8:21_, 1:9:7.
_, 1:14:13_, 1:14:18
  **quotes** [1]_ - 1:35:16
  **quoting** [2]_ - 1:9:9_,
1:14:15

| R |
| --- |

  **raise** [3]_ - 1:9:17_,
1:52:24_, 1:57:11
  **raised** [2]_ - 1:44:12_,
1:54:11
  **raises** [1]_ - 1:27:7
  **raising** [2]_ - 1:52:3_,

1:55:4
  **ranking** [3]_ - 1:23:7_,
1:23:25_, 1:24:14
  **Ranking** [2]_ - 1:24:2_,
1:50:16
  **Raskin** [6]_ - 1:17:13_,
1:18:2_, 1:18:10_, 1:18:11_,
1:24:2_, 1:50:16
  **rather** [1]_ - 1:31:10
  **reach** [1]_ - 1:30:24
  **reactivation** [1]_ - 1:45:18
  **read** [2]_ - 1:11:13_,
1:44:22
  **reading** [1]_ - 1:20:17
  **real** [1]_ - 1:28:2_, 1:41:24
  **really** [21]_ - 1:6:20_,
1:7:15_, 1:9:25_, 1:22:3_,
1:24:8_, 1:29:5_, 1:30:1_,
1:30:2_, 1:33:2_, 1:33:3_,
1:33:25_, 1:34:23_, 1:37:2_,
1:37:5_, 1:38:4_, 1:44:7_,
1:51:24_, 1:53:16_, 1:53:23
_, 1:55:24_, 1:57:6
  **reason** [9]_ - 1:15:15_,
1:23:8_, 1:27:18_, 1:41:24_,
1:42:8_, 1:47:20_, 1:48:3_,
1:49:4_, 1:58:11
  **reasonably** [2]_ - 1:17:25.
_, 1:36:8
  **reasons** [7]_ - 1:7:13_,
1:16:17_, 1:29:16_, 1:45:11.
_, 1:46:18_, 1:49:11_,
1:57:15
  **rebut** [1]_ - 1:31:8
  **rebuttal** [3]_ - 1:5:15_,
1:40:10_, 1:56:13
  **receive** [1]_ - 1:30:13
  **received** [1]_ - 1:51:23
  **recently** [1]_ - 1:3:19
  **recess** [3]_ - 1:58:13_,
1:58:16_, 2:70:1
  **recognized** [1]_ - 1:8:22
  **recommended** [1]_ -
1:34:5
  **record** [1]_ - 1:56:16
  **records** [8]_ - 1:12:25_,
1:14:13_, 1:15:18_, 1:35:15
_, 1:35:16_, 1:35:21_,
1:35:23_, 1:36:4
  **redact** [1]_ - 1:39:18
  **redacted** [4]_ - 1:15:1_,
1:22:11_, 1:23:4_, 1:39:20
  **redaction** [1]_ - 1:36:25
  **redactions** [2]_ - 1:16:10.

_, 1:36:15
reference [6]_ - 1:8:18_,
1:13:25_, 1:15:14_, 1:15:18
_, 1:41:4_, 1:42:25
references [2]_ - 1:15:20_
_, 1:41:16
referencing [1]_ - 1:37:25
referral [1]_ - 1:55:14
referred [1]_ - 1:28:20_,
1:40:15
referring [1]_ - 1:17:3
refused [1]_ - 1:41:10_,
1:41:12
regard [1]_ - 1:53:15
regarding [2]_ - 1:43:21_,
1:51:13
Reinhart [1]_ - 1:7:19
reiterate [1]_ - 1:9:11
related [2]_ - 1:39:13_,
1:41:2
relatively [1]_ - 1:36:7
release [19]_ - 1:4:5_,
1:4:9_, 1:11:2_, 1:16:4_,
1:20:16_, 1:24:11_, 1:27:1_,
1:27:8_, 1:27:13_, 1:33:10_,
1:34:7_, 1:35:8_, 1:43:21_,
1:44:6_, 1:44:14_, 1:45:5_,
1:46:5_, 1:50:4_, 1:51:15
Release [1]_ - 1:5:14
released [6]_ - 1:21:4_,
1:22:11_, 1:26:4_, 1:34:5_,
1:44:8_, 1:48:3
releasing [4]_ - 1:28:22_,
1:48:4_, 1:48:5_, 1:50:1
relief [5]_ - 1:9:22_, 1:11:6_
_, 1:53:9_, 1:53:11
remainder [1]_ - 1:58:10
remains [4]_ - 1:25:1_,
1:25:2_, 1:28:6_, 1:39:4
remand [1]_ - 1:21:13
remanding [1]_ - 1:32:1
remarks [1]_ - 1:5:21
remedies [1]_ - 1:20:6
remedy [1]_ - 1:8:22_,
1:20:3
reopen [1]_ - 1:58:12
repeat [1]_ - 2:69:18
repeated [1]_ - 1:11:16
repeatedly [2]_ - 1:40:15_
_, 1:42:3
repeats [1]_ - 1:35:16
reply [2]_ - 1:53:8_,
1:53:16

report [75]_ - 1:4:5_, 1:4:24
_, 1:6:17_, 1:6:25_, 1:13:25_,
1:14:8_, 1:15:7_, 1:15:9_,
1:15:14_, 1:16:15_, 1:16:17_,
_, 1:16:24_, 1:16:25_, 1:17:5
_, 1:17:14_, 1:17:25_, 1:18:4
_, 1:18:5_, 1:18:7_, 1:18:9_,
_, 1:19:17_, 1:19:10_, 1:19:11
_, 1:19:17_, 1:20:10_,
1:20:12_, 1:20:16_, 1:20:18
_, 1:20:25_, 1:21:4_, 1:22:2_,
1:22:6_, 1:22:10_, 1:22:12_,
1:22:14_, 1:22:17_, 1:23:17
_, 1:23:18_, 1:24:1_, 1:24:12
_, 1:24:16_, 1:24:17_,
1:24:21_, 1:24:23_, 1:25:8_,
1:25:9_, 1:25:15_, 1:26:8_,
1:26:11_, 1:30:8_, 1:30:11_,
1:30:14_, 1:30:15_, 1:30:17
_, 1:31:6_, 1:38:17_, 1:38:19
_, 1:41:22_, 1:41:25_, 1:42:9
_, 1:42:21_, 1:42:22_, 1:43:1
_, 1:43:3_, 1:44:6_, 1:44:15_,
1:44:23_, 1:45:6_, 1:46:9_,
1:47:6_, 1:57:22_, 2:69:19_,
2:69:22
REPORTED [1]_ - 1:2:15
Reporter [1]_ - 1:2:17
reports [4]_ - 1:27:20_,
1:27:24_, 1:28:22_, 1:29:4
representation [1]_ -
1:58:7
representative [2]_ -
1:14:3_, 1:17:22
representatives [2]_ -
1:44:21
reputation [1]_ - 1:46:3
request [15]_ - 1:12:9_,
1:22:13_, 1:23:6_, 1:23:11_,
1:25:4_, 1:25:10_, 1:27:3_,
1:28:6_, 1:40:21_, 1:42:4_,
1:42:18_, 1:50:20_, 1:51:17
_, 1:57:4_, 1:57:5
requested [4]_ - 1:13:4_,
1:51:23_, 1:53:10_, 1:57:2
requests [5]_ - 1:24:1_,
1:25:15_, 1:25:17_, 1:43:25
_, 1:51:20
require [4]_ - 1:35:7_,
1:35:11_, 1:37:7_, 1:42:18
required [2]_ - 1:13:13_,
1:57:18
requires [3]_ - 1:16:6_,
1:35:13_, 1:37:23
resigned [1]_ - 1:21:17
resolution [7]_ - 1:28:6_,

1:37:8_, 1:51:19_, 1:52:10_,
1:54:9_, 1:55:3_, 1:56:17
resolve [1]_ - 1:17:11
resolved [3]_ - 1:20:22_,
1:42:12_, 1:54:12
respect [11]_ - 1:4:9_,
1:4:20_, 1:13:6_, 1:16:8_,
1:17:24_, 1:18:11_, 1:19:14
_, 1:22:1_, 1:30:24_, 1:52:14
_, 1:52:21
respectfully [1]_ - 1:22:13
respond [3]_ - 1:6:4_,
1:10:15_, 1:48:19
responded [1]_ - 2:69:21
responding [1]_ - 1:10:15
response [2]_ - 1:14:10_,
1:50:25
responses [2]_ - 1:26:10_
_, 1:30:12
responsibilities [2]_ -
1:18:20_, 1:47:9
responsibility [1]_ -
1:46:1
Responsibility [2]_ -
1:11:11_, 1:11:14
restrict [1]_ - 1:8:12
restricting [1]_ - 1:6:22
result [8]_ - 1:7:5_, 1:15:22
_, 1:30:7_, 1:37:3_, 1:42:21_,
1:47:8_, 1:50:21_, 1:52:17
retain [1]_ - 1:44:15
retained [1]_ - 1:8:9
return [2]_ - 1:7:14_,
1:26:1
revealing [1]_ - 1:43:1
reversing [1]_ - 1:32:1
review [27]_ - 1:11:13_,
1:12:17_, 1:15:4_, 1:15:6_,
1:16:15_, 1:16:24_, 1:19:3_,
1:19:5_, 1:19:10_, 1:23:14_,
1:24:16_, 1:24:17_, 1:24:21
_, 1:25:8_, 1:25:9_, 1:26:13_,
1:28:10_, 1:28:11_, 1:29:10
_, 1:34:17_, 1:39:2_, 1:39:8_,
1:39:25_, 1:41:25_, 1:48:19
_, 1:50:17_, 1:56:18
reviewed [7]_ - 1:4:11_,
1:4:12_, 1:14:24_, 1:16:17_,
1:38:20_, 1:38:25_, 2:69:19
reviewing [1]_ - 1:34:13
Richard [1]_ - 1:3:19
RICHARD [2]_ - 1:2:6,
1:2:6
rights [14]_ - 1:8:22_,

1:33:24_, 1:38:8_, 1:45:23_,
1:48:10_, 1:51:18_, 1:52:6_,
1:52:9_, 1:53:14_, 1:54:8_,
1:54:11_, 1:55:2_, 1:55:8_,
1:55:10
risk [3]_ - 1:44:25_, 1:47:12
_, 1:47:15
RMR [1]_ - 1:2:16
room [1]_ - 1:24:21_,
1:24:22
roughly [1]_ - 1:15:9
routinely [2]_ - 1:35:7_,
1:35:11
rubric [1]_ - 1:36:12
rule [8]_ - 1:11:16_,
1:11:23_, 1:11:25_, 1:22:4_,
1:35:1_, 1:37:16_, 1:42:7
Rule [36]_ - 1:7:20_, 1:8:16
_, 1:10:9_, 1:11:17_, 1:11:24_
_, 1:11:25_, 1:12:2_, 1:12:4_,
1:12:5_, 1:12:9_, 1:12:12_,
1:12:15_, 1:12:21_, 1:12:22
_, 1:13:5_, 1:13:11_, 1:13:15
_, 1:14:12_, 1:14:20_, 1:16:1_,
1:22:7_, 1:22:9_, 1:22:12_,
1:22:18_, 1:22:19_, 1:22:25
_, 1:34:10_, 1:34:13_,
1:34:16_, 1:34:22_, 1:36:12
_, 1:37:21_, 1:42:14_,
1:42:16_, 1:52:18
Rules [2]_ - 1:11:11_,
1:11:14
rules [6]_ - 1:11:17_,
1:25:24_, 1:46:1_, 1:46:12_,
1:47:10
ruling [1]_ - 1:56:2
run [1]_ - 1:51:11
runs [1]_ - 1:15:1
rush [1]_ - 1:45:5

S

safeguards [1]_ - 1:39:3
sailed [1]_ - 1:22:1
satisfactory [1]_ - 1:28:8
satisfied [1]_ - 1:28:19
Saturday [2]_ - 1:16:16
saw [1]_ - 1:18:25
scanned [1]_ - 1:50:18
schedules [1]_ - 1:42:4
scope [1]_ - 1:45:17
Scout's [1]_ - 1:19:10
screen [2]_ - 1:6:14_,
1:32:20

scrupulously [1] - 1:50:4
scrutiny [1] - 1:30:3
SE [1] - 1:2:7
sealed [7] - 1:14:12_, 1:14:16_, 1:14:18_, 1:39:16 _, 1:39:22_, 1:54:20, 1:58:17
seat [1] - 1:32:21
seated [3] - 1:3:2_, 1:32:17_, 2:69:12
second [1] - 1:4:6_, 1:5:24
Section [1] - 1:6:17_, 1:52:22
sections [1] - 1:4:24
security [1] - 1:58:15
see [8] - 1:6:9_, 1:15:7_, 1:20:10_, 1:20:18_, 1:20:23 _, 1:21:20_, 1:28:16_, 1:31:13
seeing [2] - 1:25:18_, 1:28:21
seek [2] - 1:20:6_, 1:33:10
seeking [4] - 1:9:17_, 1:29:12_, 1:29:13_, 1:41:9
seeks [1] - 1:4:9
seem [1] - 1:27:10
segment [1] - 1:5:18
segueing [1] - 1:48:22
self [1] - 1:37:7
self-evident [1] - 1:37:7
Senate [4] - 1:18:21_, 1:18:24_, 1:24:15_, 1:44:22
senator [2] - 1:43:12_, 1:43:15
sense [3] - 1:21:5_, 1:44:4_, 1:51:21
separate [1] - 1:5:23
separately [1] - 1:57:12
separation [2] - 1:18:12 _, 1:19:22
session [2] - 1:57:25_, 2:69:13
set [2] - 1:5:24_, 1:55:8
sets [1] - 1:54:24
several [1] - 1:7:15
shall [3] - 1:6:1_, 1:11:21
SHAPIRO [58] - 1:3:9_, 1:5:9_, 1:24:6_, 1:24:20_, 1:25:6_, 1:25:14_, 1:25:20_, 1:26:10, 1:26:14_, 1:26:17_, 1:26:22_, 1:27:2_, 1:27:6_,

1:27:12_, 1:27:18_, 1:28:9_, 1:28:13_, 1:28:24_, 1:29:1_, 1:29:9_, 1:30:9_, 1:30:12_, 1:31:12_, 1:31:21_, 1:32:7_, 1:32:13_, 1:33:12_, 1:34:2_, 1:34:12_, 1:34:23_, 1:35:18 _, 1:35:25_, 1:36:13_, 1:36:18_, 1:36:24_, 1:37:6_ _, 1:37:20_, 1:38:6_, 1:38:18 _, 1:38:23_, 1:39:7_, 1:39:19 _, 1:39:24_, 1:40:5_, 1:40:9_, 1:53:7_, 1:54:3_, 1:54:15_, 1:54:19_, 1:55:6_, 1:55:17_, 1:55:22_, 1:56:3_, 1:56:6_, 1:56:9_, 1:58:5_, 2:69:18_, 2:69:23
Shapiro [5] - 1:3:10_, 1:24:5_, 1:53:6_, 1:58:3_, 2:69:17
share [7] - 1:24:24_, 1:27:21_, 1:28:18_, 1:30:23 _, 1:38:13_, 1:49:10_, 1:51:1
shared [2] - 1:26:18_, 1:37:4
shares [1] - 1:33:14
sharing [2] - 1:30:24_, 1:33:13
ship [1] - 1:22:1
short [1] - 1:16:23
show [3] - 1:7:13_, 1:7:14 _, 1:35:23
side [5] - 1:10:12_, 1:18:13_, 1:19:25_, 1:24:8_, 1:30:16
significant [1] - 1:15:3_, 1:17:11_, 1:37:16
similar [2] - 1:44:3_, 1:55:4
simply [7] - 1:8:18_, 1:12:8_, 1:17:5_, 1:18:8_, 1:22:22_, 1:28:13_, 1:45:7
Singer [2] - 1:3:25_, 1:4:1
single [1] - 1:7:25
sit [1] - 1:16:6
sitting [1] - 1:41:18
situation [5] - 1:10:17_, 1:21:3_, 1:27:11_, 1:33:8_, 1:46:8
situations [1] - 1:28:5
Sixth [1] - 1:52:16
slice [1] - 1:24:13
small [1] - 1:24:13
Smith [2] - 1:46:13_, 1:49:21
snippets [1] - 1:44:17

solace [1] - 1:31:5
someone [1] - 1:49:14
somewhat [1] - 1:52:8
soon [1] - 1:19:11
sooner [1] - 1:18:23
soonest [1] - 1:16:13
sorry [1] - 1:56:3
sort [4] - 1:16:10_, 1:31:1 _, 1:44:17_, 1:53:23
sorts [1] - 1:32:17
sought [2] - 1:33:7_, 1:41:15
source [3] - 1:17:6_, 1:35:4_, 1:35:10
sources [2] - 1:35:19_, 1:41:12
space [1] - 1:54:4
speaking [2] - 1:14:24_, 1:15:25
special [1] - 1:23:10
Special [31] - 1:4:5_, 1:6:17_, 1:14:4_, 1:21:4_, 1:21:10_, 1:21:14_, 1:21:25 _, 1:23:19_, 1:23:23_, 1:25:23_, 1:25:24_, 1:26:8_, 1:26:18_, 1:26:22_, 1:27:20 _, 1:27:23_, 1:28:4_, 1:28:16 _, 1:28:17_, 1:28:22_, 1:33:17_, 1:34:4_, 1:35:2_, 1:36:20_, 1:36:25_, 1:38:24 _, 1:40:17_, 1:41:1_, 1:41:6_, 1:41:9_, 1:55:13
specific [1] - 1:4:24_, 1:6:2_, 1:15:14_, 1:15:18_, 1:48:16_, 1:52:6
specifically [3] - 1:6:24_, 1:10:18_, 1:14:24
specifics [1] - 1:58:11
specified [3] - 1:19:4_, 1:23:14_, 1:58:9
specter [1] - 1:45:21
speculates [1] - 1:29:20
speculation [1] - 1:33:3
speculative [2] - 1:33:3_, 1:38:10
speech [1] - 1:47:7
spells [1] - 1:55:4
spirit [3] - 1:13:15_, 1:16:1_, 1:34:25
squarely [1] - 1:43:10
staff [2] - 1:23:22_, 1:24:25
stand [4] - 1:21:18_,

1:31:25_, 1:44:22_, 1:47:14
standard [7] - 1:7:11_, 1:9:16_, 1:9:21_, 1:13:20_, 1:51:14_, 1:54:7_, 1:55:1
standpoint [1] - 1:50:7
Stanley [1] - 1:3:18
STANLEY [1] - 1:2:3
stark [1] - 1:41:23
start [3] - 1:5:12_, 1:13:11 _, 1:24:7
starting [2] - 1:3:7_, 1:4:15
States [10] - 1:2:18_, 1:3:4 _, 1:3:8_, 1:3:14_, 1:8:20_, 1:33:7_, 1:40:25_, 1:43:12_, 1:44:21_, 1:49:8
statute [1] - 1:35:12_, 1:55:23
statutes [1] - 1:52:6
statutory [2] - 1:43:16_, 1:55:8
stem [1] - 1:43:22
STENOGRAPHICAL LY [1] - 1:2:15
step [1] - 1:41:8
still [12] - 1:12:16_, 1:12:18_, 1:28:7_, 1:32:8_, 1:32:10_, 1:32:11_, 1:36:11 _, 1:37:17_, 1:38:17_, 1:51:18_, 1:54:24
stop [1] - 1:21:1
stopped [2] - 1:21:15_, 1:21:21
STREET [1] - 1:2:4
strike [1] - 1:34:21
strikes [1] - 1:37:6
strip [1] - 1:13:3
strong [2] - 1:35:5_, 1:55:6
strongly [1] - 1:52:3
styled [1] - 1:37:22
subject [3] - 1:8:1_, 1:10:13_, 1:29:7
subjected [1] - 1:32:18
submit [2] - 1:29:25_, 1:30:18
submitted [1] - 1:4:13_, 1:39:1_, 1:39:7_, 1:53:9
subpoena [7] - 1:15:22_, 1:25:16_, 1:27:5_, 1:40:23_, 1:50:10_, 1:50:20_, 1:50:22
subpoenaed [2] - 1:35:21

617

**subpoenas** [6] - 1:12:25, 1:15:14, 1:15:16, 1:15:19, 1:15:21, 1:27:3

**substantive** [4] - 1:15:21, 1:33:10, 1:35:8, 1:38:1

**substantively** [2] - 1:38:3, 1:53:1

**sufficient** [1] - 1:12:12

**suggest** [3] - 1:42:6, 1:43:18, 1:52:3

**suggested** [1] - 1:44:19

**suggestion** [3] - 1:13:3, 1:17:24, 1:57:24

**suggests** [2] - 1:44:7, 1:50:19

**SUITE** [4] - 1:2:4, 1:2:7, 1:2:11, 1:2:14

**summary** [2] - 1:17:9, 1:35:15

**summoned** [1] - 1:42:3

**Sunday** [3] - 1:15:4, 1:16:13, 1:16:17

**superseding** [1] - 1:29:8

**supervisory** [1] - 1:8:21

**support** [1] - 1:4:11

**supposed** [1] - 1:31:5

**Supreme** [2] - 1:43:11, 1:43:14

**surrounded** [1] - 1:41:8

**surrounding** [2] - 1:7:4, 1:40:17

**survive** [1] - 1:20:24

**T**

**team** [1] - 1:36:20

**telephone** [1] - 1:12:25

**telephonic** [1] - 1:14:12

**tentatively** [1] - 1:39:25

**tenure** [2] - 1:27:22, 1:28:19

**term** [2] - 1:36:6, 1:54:9

**terms** [5] - 1:13:21, 1:48:19, 1:52:5, 1:53:20, 1:54:8

**testified** [1] - 1:33:17

**testify** [3] - 1:41:7, 1:41:10, 1:41:11

**testimony** [3] - 1:17:9, 1:26:19, 1:40:17

**text** [1] - 1:12:25

**THE** [106] - 1:2:1, 1:3:2,

1:3:16, 1:3:21, 1:4:2, 1:5:3, 1:5:6, 1:5:11, 1:9:20, 1:10:17, 1:11:4, 1:12:16, 1:13:20, 1:14:15, 1:14:23, 1:15:11, 1:15:20, 1:16:9, 1:17:1, 1:17:18, 1:19:2, 1:20:2, 1:21:3, 1:23:5, 1:24:3, 1:24:5, 1:24:19, 1:25:3, 1:25:10, 1:25:17, 1:26:2, 1:26:13, 1:26:15, 1:26:21, 1:26:24, 1:27:5, 1:27:7, 1:27:14, 1:28:1, 1:28:11, 1:28:20, 1:28:25, 1:29:3, 1:29:23, 1:30:10, 1:31:4, 1:31:20, 1:32:5, 1:32:10, 1:33:6, 1:33:22, 1:34:9, 1:34:15, 1:35:14, 1:35:20, 1:36:6, 1:36:17, 1:36:19, 1:37:2, 1:37:19, 1:37:24, 1:38:15, 1:38:19, 1:39:1, 1:39:11, 1:39:21, 1:39:25, 1:40:7, 1:40:10, 1:40:19, 1:43:5, 1:44:13, 1:45:13, 1:45:16, 1:46:19, 1:47:18, 1:48:9, 1:48:17, 1:48:21, 1:49:12, 1:50:15, 1:51:13, 1:52:5, 1:52:25, 1:53:3, 1:53:6, 1:53:19, 1:54:7, 1:54:18, 1:54:23, 1:55:10, 1:55:19, 1:56:1, 1:56:5, 1:56:7, 1:56:12, 1:56:15, 1:57:3, 1:57:16, 1:57:19, 1:58:2, 1:58:6, 2:69:12, 2:69:17, 2:69:21, 2:69:24

**themselves** [1] - 1:23:20

**theoretically** [1] - 1:33:22

**thereof** [1] - 1:41:13

**they've** [1] - 1:21:17

**thinks** [1] - 1:17:22

**three** [4] - 1:11:7, 1:11:8, 1:15:13, 1:41:21

**throughout** [2] - 1:12:14, 1:19:1

**timed** [1] - 1:21:25

**timing** [1] - 1:28:2

**today** [3] - 1:3:18, 1:8:14, 1:15:8, 1:15:9, 1:36:16, 1:42:7, 1:50:1

**together** [1] - 1:18:25

**toll** [5] - 1:35:15, 1:35:16, 1:35:21, 1:35:23, 1:36:4

**top** [2] - 1:11:18, 1:44:17

**top-level** [1] - 1:44:17

**touched** [2] - 1:22:4, 1:52:8

**traditional** [2] - 1:37:11, 1:37:14

**transcript** [3] - 1:14:16, 1:14:18, 1:17:8

**transcripts** [2] - 1:13:16, 1:14:1

**Transition** [1] - 1:52:23, 1:52:25

**transition** [2] - 1:49:1, 1:51:9

**transmitted** [1] - 1:22:2

**transparent** [1] - 1:27:23

**transplanting** [1] - 1:36:10

**treated** [2] - 1:14:20, 1:52:1

**trial** [16] - 1:7:7, 1:13:14, 1:21:20, 1:31:24, 1:32:1, 1:32:3, 1:32:4, 1:32:8, 1:32:21, 1:32:25, 1:33:24, 1:38:8, 1:38:11, 1:42:4, 1:42:7, 1:52:16

**tried** [2] - 1:16:15, 1:42:2

**true** [2] - 1:34:16, 1:54:18

**Trump** [17] - 1:3:25, 1:4:8, 1:5:20, 1:43:19, 1:43:24, 1:44:11, 1:45:9, 1:45:24, 1:46:18, 1:48:13, 1:48:25, 1:49:22, 1:51:5, 1:51:9, 1:51:23, 1:52:24, 1:53:9

**Trump's** [3] - 1:18:22, 1:44:3, 1:51:18

**trying** [1] - 1:9:17

**turn** [7] - 1:4:25, 1:5:15, 1:5:18, 1:14:5, 1:16:4, 1:40:11, 1:56:18

**turned** [1] - 1:6:14

**two** [10] - 1:4:3, 1:14:9, 1:18:20, 1:22:3, 1:23:8, 1:26:10, 1:29:20, 1:30:12, 1:30:19, 1:42:22

**type** [2] - 1:10:24, 1:17:2

**typically** [5] - 1:13:12, 1:50:2, 1:50:23, 1:54:22

**U**

**U.S** [1] - 1:46:8

**ultimately** [2] - 1:51:14, 1:55:14

**unable** [1] - 1:45:8

**uncertain** [1] - 1:56:5

**under** [16] - 1:15:22, 1:19:5, 1:22:18, 1:24:17, 1:35:6, 1:44:6, 1:46:22, 1:47:9, 1:47:16, 1:48:6, 1:50:4, 1:50:22, 1:52:14, 1:52:16, 1:55:8, 2:69:25

**underlying** [2] - 1:39:13, 1:40:3

**undue** [4] - 1:7:8, 1:31:23, 1:32:2, 1:32:15

**unduly** [2] - 1:11:2, 1:34:7

**unfair** [1] - 1:42:5

**unfairly** [1] - 1:20:14

**unilaterally** [1] - 1:34:19

**unique** [1] - 1:4:22

**United** [10] - 1:2:18, 1:3:4, 1:3:8, 1:3:14, 1:8:20, 1:33:7, 1:40:25, 1:43:12, 1:44:21, 1:49:8

**united** [1] - 1:9:9

**unless** [4] - 1:28:23, 1:29:24, 1:40:13, 1:42:11

**unlikely** [1] - 1:31:19

**unprecedented** [5] - 1:33:14, 1:33:19, 1:46:4

**unredacted** [1] - 1:15:15

**unsupervised** [1] - 1:34:14

**unusual** [2] - 1:33:5, 1:33:6

**unwarranted** [1] - 1:38:14

**unwilling** [1] - 1:45:8

**up** [4] - 1:5:24, 1:31:25, 1:47:5, 1:48:9

**upside** [1] - 1:31:9

**urgency** [4] - 1:27:8, 1:27:14, 1:27:19

**urging** [1] - 1:25:13

**usual** [2] - 1:5:21, 1:5:24

**V**

**vacuum** [1] - 1:42:19

**various** [1] - 1:4:11

**varying** [2] - 1:12:14

**vast** [1] - 1:10:12

**verify** [1] - 1:15:18

**version** [1] - 1:15:1

**vesting** [1] - 1:52:22

**via** [1] - 1:35:21

vice [1] - 1:11:12

view [5] - 1:5:25_, 1:9:20_, 1:15:1_, 1:15:21_, 1:25:15

views [1] - 1:47:24

violated [2] - 1:35:1_, 1:47:9

violation [5] - 1:18:12_, 1:19:22_, 1:30:22_, 1:35:5_, 1:47:11

violations [1] - 1:8:22

virtually [2] - 1:18:8_, 1:30:14

virtue [1] - 1:18:6

voir [1] - 1:32:16

volume [5] - 1:13:22_, 1:19:6_, 1:23:14_, 1:25:13_, 1:39:25

Volume [21] - 1:4:5_, 1:4:10_, 1:4:13_, 1:6:2_, 1:6:20_, 1:6:23_, 1:7:10_, 1:12:17_, 1:14:24_, 1:15:1_, 1:15:4_, 1:16:4_, 1:23:7_, 1:24:11_, 1:25:18_, 1:38:19_, 1:39:17_, 1:48:12_, 1:51:15_, 1:58:9_, 1:58:11

vs [1] - 1:22:20

---

**W**

---

wait [5] - 1:20:18_, 1:20:23_, 1:21:20_, 1:41:25_, 1:50:13

waiting [3] - 1:20:21_, 1:27:16_, 1:31:10

walking [1] - 1:19:15

WALTINE [1] - 1:2:2

Waltine [2] - 1:3:5_, 1:3:18

waning [1] - 1:47:18

wants [4] - 1:41:22_, 1:47:19_, 1:53:22_, 1:54:4

warrant [2] - 1:49:18_, 1:57:22

WASHINGTON [2] - 1:2:5, 1:2:14

weaken [1] - 1:23:16

weaponized [2] - 1:47:25_, 1:51:11

weekend [1] - 1:14:7

weeks [1] - 1:18:20

weigh [1] - 1:16:9

Weiss [6] - 1:26:18_, 1:33:17_, 1:40:18_, 1:41:1_, 1:41:6_, 1:41:10

welcome [1] - 1:21:22

WEST [1] - 1:2:11

whatsoever [1] - 1:42:10

whichever [2] - 1:6:8_, 1:37:16

willing [2] - 1:47:11_, 1:47:15

wish [4] - 1:29:25_, 1:34:10_, 1:56:16_, 1:58:4

wishes [2] - 1:5:25_, 1:49:14

witness [1] - 1:53:13

wonder [1] - 1:55:3

Woodward [5] - 1:3:18_, 1:6:7_, 1:40:10_, 1:57:20_, 1:58:8

WOODWARD [29] - 1:2:3, 1:2:3_, 1:3:17_, 1:4:19_, 1:5:5_, 1:6:9_, 1:9:24_, 1:10:23_, 1:11:7_, 1:12:19_, 1:13:23_, 1:14:17_, 1:15:3_, 1:15:13_, 1:15:24_, 1:16:12_, 1:17:2_, 1:17:20_, 1:19:8_, 1:20:8_, 1:21:7_, 1:23:15_, 1:24:4_, 1:40:13_, 1:40:21_, 1:56:20_, 1:56:22_, 1:57:21_, 2:69:16

woodward [1] - 1:4:17

word [1] - 1:18:15

words [8] - 1:11:22_, 1:22:11_, 1:25:18_, 1:32:11_, 1:45:20_, 1:51:17_, 1:54:10_, 1:55:20

worth [1] - 1:17:21

worthy [1] - 1:51:7

wrap [1] - 1:48:9

write [2] - 1:16:19_, 1:16:22

writes [1] - 1:46:9

writing [1] - 1:18:24

Writs [1] - 1:9:3_, 1:9:5

written [2] - 1:36:14_, 1:47:2

---

**Y**

---

years [2] - 1:32:14_, 1:42:3

yesterday [1] - 1:17:14

York [1] - 1:18:24

---

**Z**

---

zero [1] - 1:18:8