**No. 25-14507**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

United States of America,

*Plaintiff-Appellee*,

v.

Knight First Amendment Institute at Columbia University; American Oversight,

*Interested Parties-Appellants*,

Donald J. Trump; Waltine Nauta; Carlos De Oliveira,

*Defendants-Appellees*.

On appeal from the United States District Court for the Southern District of Florida
No. 9:23-cr-80101-AMC (Judge Aileen M. Cannon)

## BRIEF OF *AMICI CURIAE* FIRST AMENDMENT SCHOLARS IN SUPPORT OF INTERESTED PARTIES-APPELLANTS

John Langford
David A. Schulz
MEDIA FREEDOM & INFORMATION
  ACCESS CLINIC
ABRAMS INSTITUTE, YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
(919) 619-9819
john.langford@ylsclinics.org
schulzd@ballardspahr.com

*Counsel for Amici Curiae First
Amendment Scholars*

## CERTIFICATE OF INTERESTED PERSONS

As required by Eleventh Circuit Rules 26.1-1, 28-1, and 29-2, I certify that in addition to the individuals set forth in the appellants' briefs, the following individuals have an interest in the outcome of this matter:

1. Yale Media Freedom & Information Access Clinic, Abrams Institute for Freedom of Expression (counsel for putative *amici curiae*);

2. Balkin, Jack;

3. Griffin, Kelsey;

4. Johnson, Ara;

5. Kitrosser, Heidi;

6. Koningisor, Christina;

7. Lakier, Genevieve;

8. Langford, John;

9. Magarian, Greg;

10. Neuborne, Burt;

11. Procaccini, Francesca;

12. Schulz, David;

13. Selbrede, Anna; and

14. West, Sonja R.

February 23, 2026

/s/ *John Langford*
John Langford

## CORPORATE DISCLOSURE STATEMENT

*Amici curiae* are individuals with no publicly traded parent, subsidiary, or affiliated corporations.

The Floyd Abrams Institute for Freedom of Expression is an unincorporated organization administered by the Information Society Project at Yale Law School. It has no publicly traded parent, subsidiary, or affiliated corporations.


February 23, 2026                                    /s/ *John Langford*
                                                      John Langford

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.......................................................... i

TABLE OF CONTENTS ........................................................................................ iii

TABLE OF AUTHORITIES...................................................................................iv

STATEMENT OF THE ISSUE ...............................................................................1

INTEREST OF AMICI CURIAE AND CONSENT TO FILE...............................1

AUTHORSHIP AND CONTRIBUTION DISCLOSURE .....................................2

STATEMENT OF THE CASE ................................................................................2

SUMMARY OF ARGUMENT................................................................................8

ARGUMENT ..........................................................................................................9

    I.  THIS CASE IMPLICATES PUBLIC INTERESTS AT THE VERY
        HEART OF THE ACCESS RIGHT ................................................................9

    II.  VOLUME II IS A JUDICIAL RECORD UNDER THIS COURT'S
        DIRECTLY CONTROLLING PRECEDENT .............................................12

       A. Because Volume II Was Submitted to the Court in Connection
           with a Substantive Motion, It Is a Judicial Record ..................................13

           1.  The Emergency Motion was a substantive motion invoking the
               district court's adjudicative authority. .................................................13

           2.  Volume II was not only submitted to, but demanded by, the
               district court in adjudicating the Emergency Motion. ........................16

       B. Every Pillar of the District Court's Contrary Conclusion Is Legal
           Error, Foreclosed by Binding Precedent .................................................17

           1.  Filing status and in camera submission do not defeat judicial-
               record status. .......................................................................................17

           2.  The presence of discovery material or potentially inadmissible
               information is irrelevant.......................................................................20

           3.  Whether parties voluntarily submit a document to the court is
               immaterial. ...........................................................................................21

CONCLUSION .....................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Callahan v. United Network for Organ Sharing*,
    17 F.4th 1356 (11th Cir. 2021) ................................ 10–11, 13–14, 16, 19–22, 25

*Chicago Trib. Co. v. Bridgestone/Firestone, Inc.*,
    263 F.3d 1304 (11th Cir. 2001)......................................................... 10, 13, 16, 20

*Comm'r, Ala. Dep't of Corrs. v. Advance Loc. Media*,
    918 F.3d 1161 (11th Cir. 2019)............................................. 10–11, 18–20, 22–23

*F.T.C. v. AbbVie Prods., LLC*,
    713 F.3d 54 (11th Cir. 2013)........................................................................ 10, 20

*Hamm v. Dunn*,
    No. 2:17-CV-02083-KOB, 2018 WL 2431340 (N.D. Ala. May 30, 2018)........ 23

*Letidas Logistics, LLC v. Citibank, N.A.*,
    No. 0:24-CV-61469, 2025 WL 3699702 (S.D. Fla. Dec. 17, 2025)................... 14

*Newman v. Graddick*,
    696 F.2d 796 (11th Cir. 1983)....................................................................... 18, 23

*Nixon v. Warner Commc'ns., Inc.*,
    435 U.S. 589 (1978)..................................................................................... 10–11

*Perez-Guerrero v. U.S. Att'y Gen.*,
    717 F.3d 1224 (11th Cir. 2013).......................................................................... 10

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980).......................................................................................... 10

*Romero v. Drummond Co., Inc.*,
    480 F.3d 1234 (11th Cir. 2007)................................................. 10–11, 13–16, 20

*Rtskhiladze v. Mueller*,
    784 F. Supp. 3d 256 (D.D.C. 2025) ................................................................. 12

*Techtronic Indus. Co. Ltd. v. Bonilla*,
   No. 8:23-CV-1734, 2025 WL 1735591 (M.D. Fla. June 23, 2025)................... 14

*United States v. Amodeo*,
   71 F.3d 1044 (2d Cir. 1995)......................................................................... 13–14

*United States v. Sereme*,
   No. 2:11-CR-97, 2025 WL 1527039 (M.D. Fla. May 29, 2025)...................... 14

*Wilkerson v. Carnival Corp.*,
   No. 23-CV-24050, 2025 WL 2523399 (S.D. Fla. June 16, 2025) .................... 14

## OTHER AUTHORITIES

Letter from Special Couns. Jack Smith to Att'y Gen. Merrick Garland, re: Final
   Report of the Special Counsel Under 28 C.F.R. § 600.8 (Jan. 7, 2025) ............... 4

## REGULATIONS

28 C.F.R. § 600.8..................................................................................................... 3

28 C.F.R. § 600.9(c) ........................................................................................... 4, 11

## STATEMENT OF THE ISSUE

Whether the district court erred in concluding that Volume II is not a judicial record subject to the common-law right of access.

## INTEREST OF *AMICI CURIAE* AND CONSENT TO FILE

*Amici curiae* are scholars of First Amendment law with a particular understanding of the importance of public access to court records. These scholars have studied, written about, and litigated the First Amendment and common-law rights of access to judicial records and the critically important role these access rights play in the functioning of our judicial system. *Amici* submit this brief to assist the Court in deciding an important issue central to the exercise and protection of these rights.

Interested Parties-Appellants have consented to the filing of this brief, and Plaintiff-Appellees and Defendants-Appellees do not oppose or object to the filing of this brief. Identity and affiliation of the *amici*, who are participating in their individual capacities and not as representatives of the institutions with which they are affiliated, appear below:

Prof. Jack M. Balkin
Knight Professor of Constitutional Law and the First Amendment
Yale Law School

Prof. Heidi Kitrosser
William W. Gurley Professor of Law
Northwestern – Pritzker School of Law

Prof. Christina Koningisor
Associate Professor of Law
University of California Law San Francisco

Prof. Genevieve Lakier
Professor of Law and Herbert & Marjorie Fried Teaching Scholar
The University of Chicago Law School

Prof. Gregory P. Magarian
Thomas and Karole Green Professor of Law
Washington University in St. Louis School of Law

Prof. Burt Neuborne
Norman Dorsen Professor of Civil Liberties Emeritus
New York University School of Law

Prof. Francesca Procaccini
Associate Professor of Law
Vanderbilt Law School

Prof. Sonja R. West
Brumby Distinguished Professor in First Amendment Law
University of Georgia School of Law

## AUTHORSHIP AND CONTRIBUTION DISCLOSURE

No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person contributed money that was intended to fund preparing or submitting the brief. Counsel for *amici curiae* prepared this brief *pro bono*.

## STATEMENT OF THE CASE

From October 2023 to January 2025, Special Counsel Jack Smith oversaw the prosecution by the United States Department of Justice (DOJ) of President Donald

Trump, Walt Nauta, and Carlos De Oliveira on charges related to national security documents stored at Mar-a-Lago. Dkt. No. 85.[1] DOJ dropped its prosecution of President Trump after the 2024 election. *See* Mot. to Dismiss the Appeal as to Donald J. Trump, *United States v. Trump*, No. 24-12311-j (11th Cir. Nov. 25, 2024), Dkt. No. 79.

Pursuant to DOJ regulations, 28 C.F.R. § 600.8, Special Counsel Smith prepared a two-volume final report to the Attorney General explaining his prosecutorial decisions, Volume II of which detailed the investigation and prosecution related to the Mar-a-Lago documents case. Dkt. No. 690. Before transmitting the report to the Attorney General, Special Counsel Smith provided counsel for Nauta and De Oliveira an opportunity to review the report between January 3 and January 6, 2025. Dkt. No. 679.

On January 6, Nauta and De Oliveira filed an emergency motion (the "Emergency Motion") requesting an injunction barring Special Counsel Smith from even transmitting the report to the Attorney General, as well as barring DOJ from releasing the report. *Id.* Nauta and De Oliveria argued that the report's release would violate their rights to a fair trial, given the prosecution still pending against them at the time, *id*. at 2–3, 9, 14, and they requested a hearing to propose redactions to the

---

[1]  Pursuant to 11th Cir. R. 28-5, citations to documents in the docket below are cited herein as "Dkt. [#] at [Page #]."

document, *id.* at 1, 8, 13–14. On January 7, Nauta and De Oliveira filed a motion seeking similar relief directly in this Court. Defs.' Emergency Mot., *United States v. Trump*, No. 24-12311-j (11th Cir. Jan. 7, 2025), Dkt. No. 85. Later that day, the district court entered a temporary injunction barring DOJ from releasing the report to anyone outside the Department, Dkt. No. 682, and Special Counsel Smith transmitted the final report to the Attorney General.[2]

On January 8, DOJ filed an opposition to Nauta and De Oliveira's motion in the Eleventh Circuit. Opp'n to Mot. for Inj., *United States v. Trump*, No. 24-12311-j (11th Cir. Jan. 8, 2025), Dkt. No. 90. It explained that the Attorney General intended to release Volume I of the report—which concerned another prosecution of President Trump—to Congress and the public, pursuant to 28 C.F.R. § 600.9(c). *Id.* at 1. In contrast, to avoid any risk of prejudice to Nauta and De Oliveira, the Attorney General determined, at the recommendation of the Special Counsel, that he would not publicly release Volume II so long as their criminal proceedings remain pending. *Id.* at 1–2. However, to "further the public interest in keeping congressional leadership apprised of a significant matter within the Department while safeguarding defendants' interests," the Attorney General would, if permitted, make Volume II

---

[2] Letter from Special Couns. Jack Smith to Att'y Gen. Merrick Garland, re: Final Report of the Special Counsel Under 28 C.F.R. § 600.8 (Jan. 7, 2025), https://perma.cc/8swu-pkl7; 28 C.F.R. § 600.9(c) ("The Attorney General may determine that public release of these reports would be in the public interest, to the extent that release would comply with applicable legal restrictions.").

available for *in camera* review by the Chairmen and Ranking Members of the House and Senate Judiciary Committees upon their request and agreement not to release any information from Volume II publicly. *Id.*

On January 13, the district court lifted its injunction with respect to Volume I, but, referencing DOJ's filing in this Court, it expressed concern that even *in camera* review of Volume II by Congressional members could prejudice Nauta and De Oliveira and left the injunction in place for Volume II. Dkt. No. 697. The Court set a hearing on the narrowed Emergency Motion for January 17 and entered an expedited briefing schedule. *Id.*

On January 14, pursuant to the briefing schedule, DOJ filed its opposition to the Emergency Motion. Dkt. No. 703. DOJ argued that Nauta and De Oliveira failed to demonstrate any irreparable harm. Specifically, DOJ contended that limited *in camera* review by high-ranking Congressional members was highly unlikely to lead to public disclosure, and that even if it did, any such public disclosure would not cause Nauta and De Oliveira irreparable harm, given the availability of curative instructions and the possibility of judicial reversal or dismissal of any prejudiced conviction. *Id.*

On January 15, the district court entered an order directing DOJ to provide a copy of Volume II to both the Court and Defendants Nauta and De Olivera ahead of the January 17 hearing. "[T]o facilitate the Court's review of Defendants' Joint

Emergency Motion as narrowed by the Court's Order 679 697 [sic]," the order directed DOJ "on or before 2 p.m. on January 16, 2025, to hand deliver a copy of Volume II to the Court to be reviewed in camera." Dkt. No. 705. On January 16, DOJ filed a notice of compliance with this directive, noting its position that "[a] review of the contents of Volume Two [wa]s not necessary to" resolve Nauta and De Oliveira's arguments that the disclosure to high-ranking Congressional members risked prejudicing their fair trial rights. Dkt. No. 708.

The January 17 hearing on the Emergency Motion lasted approximately two hours. Dkt. No. 713. During the open portion of the January 17 hearing, the district court specifically noted that it had reviewed Volume II of the report. Dkt. No. 768 at 4. It also closed a portion of the hearing in order "to discuss specified contents of Volume II with designated counsel." Dkt. No. 713.

Following the hearing, the district court entered an order maintaining its injunction prohibiting the release of Volume II beyond DOJ. Dkt. No. 714. The district court's order repeatedly described Volume II's contents, *id.* at 1–2, 5–6, 9, 12.; found that there was no proposed legislation that might be furthered by Congressional review of Volume II's contents, *id.* at 10; held that Nauta and De Oliveira's fair trial rights would be prejudiced by public dissemination of Volume II, *id.* at 11; suggested that the district court lacked any means to remediate the prejudice that would be caused by any public disclosure, *id.* at 12; and ultimately

held that "[r]elease of Volume II to Congress under the proposed conditions—without any enforcement mechanism to prevent public dissemination, and without any valid countervailing reason justifying a break from traditional norms—presents a substantial and unacceptable risk of prejudice to Defendants," *id.* at 13.

Of note, the district court took particular issue with DOJ's position that the district court need not have reviewed Volume II to resolve the Emergency Motion:

> In its papers, the Department defends its position that immediate review of Volume II by members of Congress is warranted, despite the obvious risks of prejudice to Defendants from that disclosure (addressed below). Yet the Department simultaneously protests even this Court's own *in camera* review of Volume II for purposes of adjudicating the Emergency Motion as to Volume II. This objection is startling. The Court is tasked with determining whether review of substantive case information by Congress, during the pendency of a criminal proceeding, accords with Defendants' constitutional rights, applicable law, and this Court's rules. Independent judicial review of the information in question is important to make a considered determination on those matters. It is regrettable that the Department would deem it appropriate to resist this Court's *in camera* review of information directly relevant to a pending motion. The Department expressed no similar hesitation when offering to transmit Volume I for *in camera* review.

*Id.* at 5 n.8 (internal citations omitted).

In February 2025, after DOJ dropped its prosecution of Nauta and De Oliveira,[3] the Knight First Amendment Institute and American Oversight moved to intervene in the district court and requested the rescission of the injunction prohibiting Volume II's release. Dkt. No. 717; Dkt. No. 721. On December 22, 2025, the district court denied the motions to intervene. Dkt. No. 760. In addition to holding that the intervenors lacked standing, the district court held that Volume II does not constitute a "judicial record" subject to the common law and First Amendment rights of access. *Id.* at 12, 15–18.

*Amici* submit this brief to address the narrow issue of whether Volume II is a judicial record under this Court's precedent.

## SUMMARY OF ARGUMENT

The district court erred in concluding that Volume II is not a judicial record subject to the common-law right of access.

The common-law access right serves an integral structural purpose, providing a public check on judicial action by establishing a presumption of public decision-making. It also ensures that the public has access to the activities of the judiciary, matters of outsized public concern. The interests protected by the right are at their apex here, where the district court overrode the discretion of the executive branch to

---

[3] Order of Dismissal, *United States v. Trump*, No. 24-12311-SS (11th Cir. Feb. 11, 2025), Dkt. No. 113.

disclose information to leaders of the legislative branch regarding prosecution of the President.

Volume II of Special Counsel Smith's final report is a judicial record subject to the common-law right of access. Under this Court's precedent, the right of access attaches to all records submitted to a court in connection with a substantive motion, with the sole, narrow exception of material appended to motions to compel discovery. Because Defendants Nauta and De Oliveira's Emergency Motion was a substantive motion and Volume II was submitted in connection with that motion, Volume II is a judicial record. Every pillar of the district court's contrary conclusion is legal error foreclosed by binding precedent. Neither formal filing by a party nor discussion of a document in open court are pre-requisites to judicial-record status, and the inclusion of discovery material or potentially inadmissible information do not preclude judicial-record status.

## ARGUMENT

## I.    THIS CASE IMPLICATES PUBLIC INTERESTS AT THE VERY HEART OF THE ACCESS RIGHT

The common-law right of access "establish[es] a general presumption that criminal and civil actions should be conducted publicly."[4] *Comm'r, Ala. Dep't of*

---

[4] The district court ruled on both the First Amendment and common-law right of access. Dkt. No. 760 at 12. We address only the dispositive common-law right of access here.

*Corrs. v. Advance Loc. Media, LLC*, 918 F.3d 1161, 1166 (11th Cir. 2019) (quoting *F.T.C. v. AbbVie Prods., LLC*, 713 F.3d 54, 62 (11th Cir. 2013)); *Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1361 (11th Cir. 2021). This presumptive right of public access includes the right to inspect and copy judicial records. *Advance Loc. Media*, 918 F.3d at 1166 (citing *Nixon v. Warner Commc'ns., Inc.*, 435 U.S. 589, 597 (1978)); *Chi. Trib. Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001) (same).

This Court firmly enforces the right of access "for good reason," recognizing that "access to judicial proceedings is an essential component of our system of justice and instrumental in securing the integrity of the process." *Callahan*, 17 F.4th at 1358, 1361 (internal quotation marks omitted); *Romero v. Drummond Co., Inc.*, 480 F.3d 1234, 1245 (11th Cir. 2007). Transparency in the conduct of judges and court administration ensures "respect for the law" and promotes a "strong confidence in judicial remedies . . . which could never be inspired by a system of secrecy." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980). By contrast, "withdraw[ing] an element of the judicial process from public view makes the ensuing decision look more like fiat." *Advance Loc. Media*, 918 F.3d at 1166 n.4 (quoting *Perez-Guerrero v. U.S. Att'y Gen.*, 717 F.3d 1224, 1235 (11th Cir. 2013)).

Beyond securing public confidence in the integrity of judicial proceedings, the common-law right secures public access to information about "[t]he operations

of the courts and the judicial conduct of judges"—"matters of utmost public concern." *Romero*, 480 F.3d at 1245. It "protects 'the citizen's desire to keep a watchful eye on the workings of public agencies, and . . . a newspaper publisher's intention to publish information concerning the operation of government.'" *Advance Loc. Media*, 918 F.3d at 1166 (quoting *Nixon*, 435 U.S. at 597–98).

Because a party accessing judicial proceedings and records is both "securing the integrity of the process" and informing the public on matters of public concern, this Court "has been resolute in [its] enforcement" of the right of access. *Callahan*, 17 F.4th at 1359, 1361; *Advance Loc. Media*, 918 F.3d at 1166. Nowhere is this more important than when a court exercises the judicial power to command another, coequal branch of government, as did the district court below in preventing the Attorney General from exercising his statutory authority to disclose Volume II.

In *Romero*, as here, the district court "assumed the role of gatekeeper between the parties and the executive branch of the federal government." *Romero*, 480 F.3d at 1246. The motion presented not just a substantive question for the parties—its resolution raised issues related directly to the "conduct of the court" itself. *Id.* The district court's exercise of judicial power in *Romero*, this Court concluded, involved "public concerns that are at the heart of the interest protected by the right of access." *Id.*

11

As in *Romero*, the district court in this case took on the role of gatekeeper. It interposed itself between the executive branch and the public, overriding the Attorney General's discretion to release the Special Counsel report. *See* 28 C.F.R. § 600.9(c) ("The Attorney General *may* determine that public release of these reports would be in the public interest . . . .") (emphasis added); *see also Rtskhiladze v. Mueller*, 784 F. Supp. 3d 256, 265 (D.D.C. 2025) (finding that "the Attorney General's decision to release" a Special Counsel report is "committed to agency discretion by law"). The court also placed itself between the executive and legislative branches, undercutting the Executive's capacity to inform even the highest-ranking members of Congress about its own conduct. And it did so in a case involving the Executive's power to prosecute the now and former head of the executive branch. This was an exercise of judicial power that the public has both an interest and a duty to oversee. If *Romero* implicated interests at the heart of the right of access, this case is the beating center.

## II.    VOLUME II IS A JUDICIAL RECORD UNDER THIS COURT'S DIRECTLY CONTROLLING PRECEDENT

Volume II is a judicial record subject to the common-law right of access under controlling precedent of this Court. The reasons identified by the district court for reaching a contrary conclusion are all foreclosed by binding precedent.

### A. Because Volume II Was Submitted to the Court in Connection with a Substantive Motion, It Is a Judicial Record

Faithful to its "tradition favoring access," this Court has adopted and consistently applied a broad, categorical definition of "judicial record" to safeguard meaningful public oversight of the judicial process: any material submitted to the court "in connection with a substantive motion" constitutes a judicial record subject to the common-law right of access. *Callahan*, 17 F.4th at 1362–63; *see Romero*, 480 F.3d at 1245; *Chi. Trib. Co.*, 263 F.3d at 1312. Volume II clears both gates.

### 1. The Emergency Motion was a substantive motion invoking the district court's adjudicative authority.

A motion is substantive if it is "presented to the court to invoke its powers or affect its decisions." *Romero*, 480 F.3d at 1246 (quoting *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995)). That is so regardless of whether the motion is case dispositive. *Id.*

The sole exception to the "substantive motion" standard underscores the breadth of the judicial record definition. Only materials submitted exclusively in connection with discovery disputes—namely, motions to compel—fall outside the definition. *Chi. Trib. Co.*, 263 F.3d at 1312–13; *Romero*, 480 F.3d at 1245–46. That narrow exception is driven by the concern that subjecting all discovery materials to presumptive public access "would likely lead to an increased resistance to discovery requests," *Chi. Trib. Co.*, 263 F.3d at 1312 n.10, and rests on the understanding that

13

discovery is "essentially a private process . . . sole purpose [of which] is to assist trial preparation," not to invoke the court's adjudicative authority, *Romero*, 480 F.3d at 1245 (quoting *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986)). Beyond this limited carveout, this Court has expressly rejected efforts to narrow the definition of judicial records. *Callahan*, 17 F.4th at 1362–63.[5]

The facts of *Romero* are particularly instructive here. There, Colombian union leaders and victims' families alleged that executives of a U.S. mining company conspired with paramilitary groups to murder union organizers in Colombia. *Romero*, 480 F.3d at 1238. The district court entered an order prohibiting the parties from contacting the State Department directly. *Id.* at 1239.[6] The plaintiffs subsequently filed a motion seeking permission to submit two witness declarations

---

[5] Applying this Court's precedent, district courts in this circuit have rightly held all varieties of documents submitted in connection with substantive motions, other than discovery disputes, to be judicial records subject to the access right. These have included, for example, expert reports attached to a motion in limine, *Techtronic Indus. Co. Ltd. v. Bonilla*, No. 8:23-CV-1734, 2025 WL 1735591 (M.D. Fla. June 23, 2025); billing records attached to a motion for attorney's fees, *Wilkerson v. Carnival Corp.*, No. 23-CV-24050, 2025 WL 2523399 (S.D. Fla. June 16, 2025); declarations related to a motion for class certification, *Letidas Logistics, LLC v. Citibank, N.A.*, No. 0:24-CV-61469, 2025 WL 3699702, at *1 (S.D. Fla. Dec. 17, 2025); witness lists and transcripts related to hearing on a motion to suppress evidence, *United States v. Sereme*, No. 2:11-CR-97, 2025 WL 1527039, at *1, 3 (M.D. Fla. May 29, 2025); and motions and *in camera* orders related to a request to prevent disclosure of the investigation of certain witnesses, *id.* at *1, 3–4.

[6] The district court in *Romero* was apparently concerned about the defendant company's *ex parte* efforts to lobby the U.S. State Department to intervene in the litigation. *Romero*, 480 F.3d at 1239–40. As this Court noted, it is not immediately "apparent" why the district court felt the need to enter that order. *Id.* at 1246.

14

to the U.S. State Department. *Id.* at 1240. The district court sealed the motion papers and denied a journalist's request to unseal the declarations, reasoning that the materials were not filed in connection with a "dispositive motion" and disclosure might prejudice the defendants' right to a fair trial. *Id.* at 1240–41, 1245.

This Court reversed. It held that "[m]aterial filed in connection with *any* substantive pretrial motion, unrelated to discovery, is subject to the common law right of access." *Id.* at 1245 (emphasis added). A motion need not be dispositive to be substantive; instead, a motion is "substantive" whenever it is "presented to the court to invoke its powers or affect its decisions." *Id.* at 1246. The motion in *Romero* was substantive because "[t]he object of the motion to provide the declarations to the State Department was not discovery." *Id.* "Because the plaintiffs' motion asked the court to vary from its previous public order and did not involve the disclosure of discovery materials, the common law presumption of public access attached." *Id.*

Under this Court's bright-line definition, the Emergency Motion here was a substantive motion. It sought affirmative judicial relief preventing the executive branch from sharing Volume II (a) within the executive branch; (b) with high-ranking members of Congress; and (c) with the public. Dkt. No. 679. The Emergency Motion asked the district court to act as gatekeeper over the disclosure of documents among the branches of government and to the public, and, as in *Romero*, the district court in fact inserted itself as gatekeeper, when it issued its initial injunction.

15

Moreover, just as the plaintiffs in *Romero* submitted the declarations in an effort to have the court modify its prior order and allow disclosure, DOJ here submitted Volume II to the district court in service of its opposition to the initial injunction and position that the court should revise its prior order to permit DOJ to share Volume II with Congress.

The Emergency Motion had nothing to do with the resolution of a discovery dispute. Nauta and De Oliveira called upon the court to restrain governmental action and adjudicate substantive rights. The district court admitted just that. According to the court, the motion required it to "to make a considered determination" regarding "whether review of substantive case information by Congress, during the pendency of a criminal proceeding, accord[ed] with Defendants' constitutional rights, applicable law, and [the district court's] rules." Dkt. No. 714 at 5 n.8. Under *Romero*, that is the hallmark of a substantive motion.

### 2. Volume II was not only submitted to, but demanded by, the district court in adjudicating the Emergency Motion.

Volume II was submitted to the district court "in connection with" the Emergency Motion. *Callahan*, 17 F.4th at 1362; *Romero*, 480 F.3d at 1245; *Chi. Trib. Co.*, 263 F.3d at 1312. Indeed, it was not only submitted; the district court *ordered* the United States to "deliver a copy of Volume II to the Court to be reviewed *in camera*" to properly resolve the motion. Dkt. No. 705. The parties then discussed "specified contents of Volume II" in a private session during a hearing Defendants

had requested to assert objections to particular material in the report. Dkt. No. 713. Defendants described the hearing and close judicial review of Volume II as necessary for judicial resolution of disagreements over the material's release and the "scope of resulting prejudice." Dkt. No. 679 at 13. The district court later agreed, explaining that "[i]ndependent judicial review" of Volume II had been "important" to making "a considered determination" on the motion. Dkt. No. 714 at 5 n.8.

\* \* \*

Volume II was thus delivered to the court, examined by the court, and debated by the parties for the purpose of resolving a substantive motion invoking the court's adjudicative authority—in precisely the same manner as *Romero*. Under this Court's categorical rule, Volume II a judicial record.

### B. Every Pillar of the District Court's Contrary Conclusion Is Legal Error, Foreclosed by Binding Precedent

Each rationale the district court invoked to exclude Volume II from the category of judicial records misapprehends and conflicts with binding Eleventh Circuit precedent.

#### 1. Filing status and in camera submission do not defeat judicial-record status.

In deciding whether Volume II was a judicial record, the district court improperly weighed the fact that Volume II was not formally filed on the public docket and was reviewed only *in camera*. Dkt. No. 760 at 5 ("Neither party attached

Volume II to any filing related to the Emergency Motion or otherwise quoted from it."); *id.* at 15 ("It was not filed on the docket . . . ."); *id.* at 17 ("[P]rospective intervenors offer no authority supporting the flawed suggestion that a court's mere *in camera* review of material, without a party filing the material as a part of a substantive motion for resolution on the merits, transforms an otherwise non-judicial document into a judicial one.").

This Court has repeatedly held that formal filing is not a prerequisite to judicial-record status. In *Newman v. Graddick*, it held that prisoner lists that were not formally filed with the district court and did not appear on the court's docket were subject to the common-law right of access because they had become "part of the court proceedings" in the case. 696 F.2d 796, 802–03 (11th Cir. 1983); *see Advance Loc. Media*, 918 F.3d at 1167 (recognizing that the prisoner lists in *Newman* "were not formally filed with the district court and did not appear on the court's docket"). In *Advance Local Media*, it similarly held that a lethal injection protocol that was never formally filed was nevertheless a judicial record. 918 F.3d at 1167– 68. Stating the rule, the Court explained that "materials submitted by litigants— whether or not they are formally filed with the district court—that are 'integral to the "judicial resolution of the merits"' in any action taken by that court are subject to the common law right of access." *Id.* at 1167; *see id.* ("We have never held . . . that filing is *required* in order to turn a document into a judicial record—especially

when that document may help a court to resolve the merits of an action."). As *Callahan* explained, "while filing a document with a pretrial motion is sufficient to make it a judicial record, that rule establishes a floor rather than a ceiling." 17 F.4th at 1362.

Nor has this Court ever suggested that a document that is reviewed only *in camera* is not a judicial record. To the contrary, in *Advance Local Media*, this Court explicitly relied on *in camera* review itself to explain why an unfiled document qualified as a judicial record subject to the common-law right of access. 918 F.3d at 1164 n.6 (explaining that the execution protocol was a judicial record, in part, *because* "[t]he parties discussed the protocol with the district court in an *in camera* hearing").[7]

Neither of the additional considerations cited by the district court—that the report "was not admitted into evidence" and was not retained by Defendants, Dkt. No. 760 at 15—has ever even been viewed as relevant to the Court's definition of a judicial record. To the contrary, this Court has "consistently rejected any test that would make a document's status as a judicial record dependent upon 'whether it played a discernible role in the resolution of the case' or that would require [the

---

[7] It appears that the lists at issue in *Newman* may also have been discussed only in *in camera* hearings. *See* 696 F.2d at 799 (referencing that the court twice "preclude[ed] without prior notice the public and press from attending an in camera hearing").

Court] to determine 'the actual role the document played.'" *Callahan*, 17 F.4th at 1362 (quoting *AbbVie Prods.*, 713 F.3d at 64).

### 2. The presence of discovery material or potentially inadmissible information is irrelevant.

The district court further reasoned that Volume II was not a judicial record because it "contain[ed] large swaths of nonpublic discovery information" and had not been deemed "admissible as evidence in the criminal case." Dkt. No. 760 at 15, 17. But this Court has never conditioned judicial-record status on compliance with the Federal Rules of Evidence. The common-law right of access attaches to material submitted in connection with substantive motions—not merely to evidence that is ultimately admissible. *See, e.g.*, *AbbVie Prods.*, 713 F.3d at 64; *Romero*, 480 F.3d at 1246; *Advance Loc. Media*, 918 F.3d at 1167; *Callahan*, 17 F.4th at 1362–63; *Chi. Trib. Co.*, 263 F.3d at 1312.

Nor does the inclusion of discovery material disqualify a document from being a judicial record. As *Chicago Tribune* squarely held, "material filed with discovery motions is not subject to the common-law right of access, whereas *discovery material* filed in connection with pretrial motions that require judicial resolution of the merits is subject to the common-law right." 263 F.3d at 1312 (emphasis added); *see also Callahan*, 17 F.4th at 1362 ("[T]hough discovery materials do not automatically qualify as judicial records subject to the common-law right of access, they take on that status once they are filed in connection with a

substantive motion."). The relevant distinction is not between discovery and non-discovery material, but between documents submitted solely with discovery motions and those submitted in connection with substantive motions. By treating the origin of the material as dispositive rather than its use, the district court inverted the governing rule.

### 3. Whether parties voluntarily submit a document to the court is immaterial.

The district court took final refuge in the fact that neither the defendants nor DOJ voluntarily submitted Volume II to the court. Unable to dispute that the court in fact relied on Volume II, the court suggested that because "no party attached Volume II to a substantive motion or sought to have it made part of the record on the Emergency Motion," it is not a judicial record. Dkt. No. 760 at 17.

To reach this conclusion, the district court latched onto a single line in this Court's decision in *Callahan*. There, a defendant opposed the unsealing of filed documents, claiming that they were not judicial records because they did not bear a relationship to the court's decision on a dispute. 17 F.4th at 1362. This Court decisively rejected that proposition.

> We have consistently rejected any test that would make a document's status as a judicial record dependent upon whether it played a discernible role in the resolution of the case or that would require us to determine the actual role the document played. . . . *What matters is how the document was used by the parties—to support an*

> *argument before the court—and not whether the court itself used the document to resolve that argument.*

*Id.* at 1363 (internal citations omitted) (emphasis added). Below, the district court distorted this final line in support of its conclusion that Volume II is not a judicial record because neither the individual defendants nor DOJ voluntarily submitted Volume II, even though the district court in fact relied on Volume II. Dkt. No. 760 at 17.

In context, however, it is clear that the *Callahan* Court did not intend to *narrow* the universe of judicial records to only those voluntarily submitted by parties. To the contrary, *Callahan* rejected a functional approach for filed documents precisely because it would run contrary to this Circuit's "tradition favoring access," which has consistently "*expanded* the definition of judicial records." 17 F.4th at 1363 (quoting *Advance Loc. Media*, 918 F.3d at 1168) (emphasis in original). Consistent with expanding public access, *Callahan* explained, the Court in *Advance Local Media* extended the common-law right of access to those documents that were "integral to the judicial resolution of the merits in any action taken by that court." *Id.* at 1362 (quoting *Advance Loc. Media*, 918 F.3d at 1167). Throughout its decision, the Court made clear that the rule is not keyed to a party's voluntary submission of a document, but to whether a document is submitted "in connection with any substantive pretrial motion, unrelated to discovery." *Id. Callahan* confirmed, in short, that this Court's precedent has only "entrenche[d] rather than

22

erode[d] our commitment to the principle that public access is presumed for documents 'filed with pretrial motions that require judicial resolution of the merits of an action.'" *Id.* at 1363 (quoting *Advance Loc. Media*, 918 F.3d at 1167).

Lest there be any doubt, the judicial records in *Advance Local Media* and *Newman* were not voluntarily submitted by parties. In *Newman*, "the district court ordered the Department of Corrections to submit [the] periodic lists of 250 prisoners 'least deserving of further incarceration'" which were subsequently determined to be judicial records. *Newman* 696 F.2d at 799. In *Advance Local Media*, Alabama submitted its lethal injection protocol to the court only after the district court "notified the parties that it would need to review Alabama's lethal injection protocol." *Hamm v. Dunn*, No. 17-CV-02083, 2018 WL 2431340, at *1 (N.D. Ala. May 30, 2018), *aff'd sub nom. Comm'r, Ala. Dep't of Corrs. v. Advance Loc. Media*, 918 F.3d 1161 (11th Cir. 2019). The clear lesson of *Newman* and *Advance Local Media* is that although a court's non-reliance on filed documents does not exclude those records from the common-law right of access, a court's demand to see unfiled documents in connection with a substantive motion renders such documents "judicial records." *Callahan* is not to the contrary.

23

Because Volume II was submitted to the court in connection with a substantive motion invoking its adjudicative authority, it is a judicial record.[8]

\* \* \*

Binding precedent directly forecloses the district court's conclusion that Volume II is not a judicial record. But the district court's error does not stop there. As a matter of first principles, the district court's rule simply cannot be correct. The common-law right of access cannot reasonably extend to the vast majority of materials submitted to courts in ordinary private litigation—including those never examined by a judge—yet exclude a document the court itself demanded access to in order to resolve an issue bearing on the relationship between all three branches of the federal government in the prosecution of a former and current President of the United States. Such a framework would contract transparency precisely where the public interest is at its apex. The Eleventh Circuit's categorical and expansive

---

[8] Even if the district court's reading of *Callahan* were correct and it imposed a voluntariness requirement, the record makes clear that defendants sought to bring Volume II before the court; they presumably did not attach Volume II because they could not do so given DOJ's restrictions on access to the report. Prior to filing the Emergency Motion, counsel for defendants were permitted only limited, in-person access to the report and had not been permitted to keep a copy or reproduce any part of it. Dkt. No. 679 at 6–7; Dkt. No. 760 at 3. Citing their limited access, defendants argued that "[c]ourt review of *both* Volumes is warranted in this case," Dkt. No. 689 at 2 n.1, and they requested a hearing to discuss the contents of Volume II, Dkt. No. 679 at 1. For the defendants, voluntary submission was impossible.

understanding of judicial records, favoring public access, forecloses that result. *Callahan*, 17 F.4th at 1362–63.

## CONCLUSION

For the foregoing reasons, Volume II is a judicial record subject to the common-law right of access. *Amici* respectfully urge the Court to grant Intervenors-Appellants' motions and vacate the injunction prohibiting release of the report.

Dated: February 23, 2026                 Respectfully submitted,

  /s/ *John Langford*
John Langford[*]
David A. Schulz
MEDIA FREEDOM & INFORMATION
   ACCESS CLINIC
ABRAMS INSTITUTE, YALE LAW SCHOOL[†]
127 Wall Street
New Haven, CT 06511
(919) 619-9819
john.langford@ylsclinics.org
schulzd@ballardspahr.com

*Counsel for Amici Curiae First
Amendment Scholars*

---

[*] Yale Law School students Kelsey Griffin ('27), Ara Johnson ('26), and Anna Selbrede ('26) contributed significantly to the drafting, editing, and final preparation of this brief.

[†] The views expressed herein do not purport to represent the institutional views of Yale Law School, if any.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 5,966 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font. This brief complies with the virus scan requirements required by Local Rule 28A(h)(2) and is virus-free.


February 23, 2026                                  /s/ *John Langford*
                                                   John Langford

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eleventh Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the appellate CM/ECF system.

February 23, 2026                    /s/ *John Langford*
                                     John Langford