Nos. 25-14507, 26-10674

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA, *Plaintiff-Appellee*,

v.

KNIGHT FIRST AMENDMENT INSTITUTE AT
COLUMBIA UNIVERSITY and AMERICAN OVERSIGHT,
*Interested Parties-Appellants*,

DONALD J. TRUMP, WALTINE NAUTA, and CARLOS DE OLIVEIRA
*Defendants-Appellees*.

On Appeal from the United States District Court for the Southern District
of Florida, No. 9:23-cr-80101 (Cannon, J.)

## BRIEF OF UNITED STATES SENATORS
## AS *AMICI CURIAE* IN SUPPORT OF APPELLANTS

Norman L. Eisen
Stephen A. Jonas*
Joshua G. Kolb*
DEMOCRACY DEFENDERS ACTION
600 Pennsylvania Ave. SE #15180
Washington, D.C. 20003
(202) 594-9958
norman@democracydefenders.org

Matthew J. Platkin*
Angela Cai
Platkin LLP
413 Washington Ave #174
Belleville, NJ 07109
973-561-1952
acai@platkinllp.com

*Counsel for amici curiae*

*Application for admission *pro hac vice* pending.

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

*Amici curiae* certify that they are individuals with no publicly traded parent, subsidiary, or affiliated corporations.

As required by Eleventh Circuit Rules 26.1-1, 27-1, and 29-1, *amici curiae* also certify that in addition to persons already listed in the certificates of interested persons filed by appellants and by prior *amici*, the following individuals associated with the foregoing motion and brief have an interest in the outcome of this matter:

<u>*Amici curiae*</u>

1. Senator Adam Schiff

2. Senator Richard Blumenthal

3. Senator Sheldon Whitehouse

4. Senator Cory Booker

5. Senator Chris Coons

6. Senator Peter Welch

7. Senator Dick Durbin

8. Senator Mazie Hirono

9. Senator Alex Padilla

10. Senator Amy Klobuchar

<u>Counsel for *amici curiae*</u>

11. Platkin LLP

i

12. Matthew J. Platkin

13. Angela Cai

14. Democracy Defenders Action

15. Norman L. Eisen

16. Stephen A. Jonas

17. Joshua G. Kolb

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ........................................................................ i

TABLE OF CONTENTS .............................................................................. iii

TABLE OF AUTHORITIES ........................................................................ iv

INTEREST OF *AMICI CURIAE* ..................................................................1

SUMMARY OF ARGUMENT .......................................................................2

ARGUMENT ...............................................................................................4

   I. THE DISTRICT COURT'S ORDERS RELEVANT TO THIS APPEAL
   WERE NOT THE RESULT OF ADVERSARIAL LITIGATION......................4

      A. The Department Of Justice Reversed Its Position On The Release Of The
      Report After Trump Became President. ...........................................................4

      B. Judicial Decisionmaking Functions Best When Outcomes Are The Product
      Of Adversarial Litigation. ..............................................................................10

   II. THE DISTRICT COURT'S DECISIONS MISUNDERSTOOD VOLUME
   II'S RELEVANCE TO CONGRESS'S ROLE AND RESPONSIBILITIES. ....14

      A. The District Court Overlooked Congress's Specific Requests For
      Volume II. ....................................................................................................14

      B. Access To Volume II Was And Remains Necessary To The Senate
      Judiciary Committee's Discharge Of Its Constitutional Responsibilities. ......18

      C. Release Of Volume II To Congress Would Not Jeopardize
      Confidentiality. .............................................................................................24

CONCLUSION ..........................................................................................28

CERTIFICATE OF COMPLIANCE .............................................................29

CERTIFICATE OF SERVICE ......................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Baker v. Carr*, 369 U.S. 186  (1962)..................................................................11

*Clark v. Putnam Cnty.*, 168 F.3d 458 (11th Cir. 1999) .............................................13

*Comite de Apoyo a los Trabajadores Agricolas (CATA) v.
    U.S. Dep't of Lab.*, 995 F.2d 510 (4th Cir. 1993) ....................................................11

*Comm. on Judiciary, United States House of Representatives v. McGahn*,
    415 F. Supp. 3d 148 (D.D.C. 2019)..................................................................22

*Greenlaw v. United States*, 554 U.S. 237 (2008)......................................................11

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) .......................................................21

*INS v. Chadha*, 462 U.S. 919 (1983) .................................................................12

*In re Application of Comm. on Judiciary, U.S. House of Representatives, for an
    Ord. Authorizing Release of Certain Grand Jury Materials*,
    414 F. Supp. 3d 129 (D.D.C. 2019)............................................. 26, 27

*In re Flynn*, 973 F.3d 74 (D.C. Cir. 2020).............................................................12

*In re: Knight First Amendment Institute*, No. 25-13403 Dkt. 11
    (11th Cir. Nov. 3, 2025)..................................................................11

*McGrain v. Daugherty*, 273 U.S. 135 (1927) ............................................. 22, 23, 24

*Montgomery v. Louisiana*, 577 U.S. 190 (2016) ....................................................11

*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020)......................................................11

*Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*,
    874 F.3d 692 (11th Cir. 2017) ..................................................................13

*Trbovich v. United Mine Workers*, 404 U.S. 528 (1972).............................................13

*Trump v. Anderson*, 601 U.S. 100 (2024)..................................................................21

*Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020)......................................................22

*United States v. Adams*, 777 F. Supp. 3d 185 (S.D.N.Y. 2025) ..............................11

*United States v. Flynn*, No. 1:17-cr-232, Dkt. 205 (D.D.C. May 13, 2020) ...........11

*United States v. Nauta*, No. 25-10076 (11th Cir. 2025) ...........................................7

*United States v. Nixon*, 418 U.S. 683 (1974)..............................................................5

*United States v. Trump*, No. 24-12311 (11th Cir. 2024) ......................................5, 8

*United States v. Windsor*, 570 U.S. 744 (2013)............................................. 11, 12

*Watkins v. United States*, 354 U.S. 178  (1957)............................................. 22, 23

**Statutes**

28 U.S.C. § 509..............................................................................................5

28 U.S.C. § 510..............................................................................................5

28 U.S.C. § 515..............................................................................................5

28 U.S.C. § 533..............................................................................................5

**Rules**

Fed. R. Civ. P. 24 .................................................................................137
Fed. R. Crim. P. 6(e) ...........................................................................6, 7

**Regulations**

28 C.F.R. § 45.2(c)(1) .............................................................................20

**Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 ..................................................................19
U.S. Const. art. I, § 1.............................................................................21

**Other Authorities**

Ltr. from Special Counsel Jack Smith to
    Att'y Gen. Merrick B. Garland (Jan. 7, 2025) ......................................6
Office of the Att'y Gen., Order No. 5559-2022, *Appointment of John L. Smith as
    Special Counsel*, ¶ (c) (Nov. 18, 2022).................................................4
Senate Judiciary Committee, Nomination Hearing (Feb. 12, 2025) .......................18
Senate Judiciary Committee Democrats to Chairman Grassley,
    (Oct. 30, 2025) ...................................................................................18
Senate Judiciary Committee Democrats' Letter to Acting Attorney General
    McHenry (Jan. 29, 2025) ........................................................ 16, 19, 27
Senate Judiciary Committee Democrats' Letter to Chairman Grassley (Feb. 4,
    2025) ................................................................................................17
Senate Judiciary Committee, Questions for the Record for Pamela Jo Bondi (Jan.
    16, 2025) ...................................................................................... 15, 20

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are current Members of the United States Senate and serve on the Senate Judiciary Committee. They are:

- Senator Adam Schiff

- Senator Richard Blumenthal

- Senator Sheldon Whitehouse

- Senator Cory Booker

- Senator Chris Coons

- Senator Peter Welch

- Senator Dick Durbin

- Senator Mazie Hirono

- Senator Alex Padilla

- Senator Amy Klobuchar

As Members of the Senate Judiciary Committee, *amici* are uniquely situated to provide insights and perspectives for this Court's consideration of these appeals. For one, the underlying subject matter of these appeals—a report prepared by Special Counsel to the Attorney General regarding alleged mishandling of classified documents by the President of the United States and his aides—is of great import to the work of the Committee. Volume II of the Special Counsel Report provides important information for Congress to carry out its legislative function and the

Committee's oversight role over the U.S. Department of Justice and the Federal Bureau of Investigation; it is also crucial to the Committee's role in determining its advice and consent of nominees. For another, *amici* have an interest in accurate descriptions of Congress's role in potentially receiving the contents of the Report, an issue that is raised in parties' briefing and the district court's decisions. Finally, given their significant institutional experience from evaluating the nominations of hundreds of federal judges, *amici* wish to present this Court with insights on the role of the adversarial process on judicial decisionmaking.[1]

## SUMMARY OF ARGUMENT

The proceedings below covered events of extraordinary public importance: the investigation and indictment of a then-former President of the United States and his aides for serious crimes, including willfully retaining classified documents and obstruction. The district court's dismissal of the indictments, on the basis that the Special Counsel was improperly appointed, was never reviewed by an appellate court: the re-election of President Trump and the change in administration led to the Department of Justice's ("DOJ") abandonment of the prosecutions. But it also led to the DOJ's acquiescence of defendants' demand that the district court block the

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person contributed money that was intended to fund preparing or submitting the brief. Counsel for *amici curiae* prepared this brief *pro bono*.

2

release of the Special Counsel's report on the investigation and prosecution. The district court granted the requests of defendants and DOJ—now helmed by former defense counsel—to block the release of the Report, despite intervenors' repeated assertions of statutory, common law, and constitutional interest in its release. The lack of adversity between the parties and the unusual reversals in the government's position raise serious prudential concerns about the soundness of the district court's decisions.

Moreover, *amici* must correct the record: Despite the district court's assertions otherwise, Members of Congress—particularly Minority Members of the Senate Judiciary Committee—had made repeated official requests for the Special Counsel Report. Despite the district court's assertion that no pending legislative activity could be aided by the release of the Report, the Members' requests directly pertained to their roles in advice and consent of presidential nominees, their legislative prerogative, and the Committee's oversight authority. Furthermore, notwithstanding the district court's assertion that transmittal to Congress would jeopardize confidential material and the due process rights of defendants, numerous prior Special Counsel reports have been transmitted to Congress without incident, and in any event the defendants' cases have been fully dismissed. While these appeals concern public release writ large, the interests that *amici* and other Members of Congress have in the materials are particularly salient.

3

## ARGUMENT

**I.    THE DISTRICT COURT'S ORDERS RELEVANT TO THIS APPEAL WERE NOT THE RESULT OF ADVERSARIAL LITIGATION.**

The circumstances under which the district court made the decisions relevant to these appeals are extraordinary: the Department of Justice suddenly reversed its position not only with regard to the underlying prosecution, but also the Court's decision that a Special Counsel report cannot be released to the public and to Congress. Because lack of adversity between the parties raises serious prudential concerns about judicial decisionmaking, *Amici* urge this Court to consider that context in evaluating Appellants' roles as intervenors in this matter.

**A. The Department Of Justice Reversed Its Position On The Release Of The Report After Trump Became President.**

The history of this matter is long and unusual; at critical junctures relevant to this appeal, the parties—the Department of Justice and the defendants whose charges had since been dismissed—had no adversity in their positions before the district court after DOJ reversed course midstream.

In November 2022, then-Attorney General of the United States Merrick Garland appointed Special Counsel Jack Smith to oversee an ongoing investigation into whether Donald Trump, then the former President of the United States, mishandled classified documents. *See* Office of the Att'y Gen., Order No. 5559-2022, *Appointment of John L. Smith as Special Counsel*, ¶ (c) (Nov. 18, 2022). The Special Counsel's investigation led to the grand jury's indictments of President

Trump and two of his aides, Waltine Nauta and Carlos De Oliveira, with multiple criminal counts. *See United States v. Trump*, No. 9:23-cr-80101(S.D. Fla.) Dkt. 85.[2]

On July 15, 2024, the district court determined that the Special Counsel's appointment violated the Constitution's Appointments Clause and Appropriations Clause and dismissed the indictments, stating that the Supreme Court's conclusion in *United States v. Nixon*, 418 U.S. 683 (1974) that Congress had "vested" in the Attorney General "the power to appoint subordinate officers" pursuant to 28 U.S.C. §§ 509, 510, 515, and 533 was mere dicta. *See* S.D. Fla. Dkt. 672 at 54-55. While that decision was on appeal, President Trump was again elected to office. On November 24, 2024, the Special Counsel moved to dismiss the appeal because of longstanding DOJ policy that "the United States Constitution forbids the federal indictment and subsequent criminal prosecution of a sitting President." *United States v. Trump*, No. 24-12311 (11th Cir.) Dkt. 79. The Court granted that dismissal on November 26, 2024. *Id.* Dkt. 81-1.

On January 7, 2025, the Special Counsel submitted a final report to the Attorney General regarding this investigation (Volume II) and a separate investigation as to efforts to interfere with the lawful transfer of power following the 2020 presidential election (Volume I). The Special Counsel explained to the Attorney General, "Both volumes minimize the identification of witnesses and co-

---

[2] All references to S.D. Fla. refer to the district court docket below.

conspirators, consistent with accepted Department practice" and that Volume II included redactions regarding "certain information that remains under seal or is restricted from public disclosure by Federal Rule of Criminal Procedure 6(e)." Ltr. from Special Counsel Jack Smith to Att'y Gen. Merrick B. Garland (Jan. 7, 2025), https://www.justice.gov/storage/Report-of-Special-Counsel-Smith-Volume-1-January-2025.pdf. The Special Counsel added, "Because Volume Two discusses the conduct of Mr. Trump's alleged co-conspirators in the Classified Documents Case, Waltine Nauta and Carlos De Oliveira, consistent with Department policy, Volume Two should not be publicly released while their case remains pending." *Id.* The Special Counsel added that the defendants were given an opportunity to review the contents of Volume II and that President Trump's counsel wrote a response, which was included in an Addendum. *Id.*

Defendants Nauta and De Oliveira filed emergency motions to block the release of Volume II of the Special Counsel Report. S.D. Fla. Dkt. 679.[3] In response, DOJ made its position clear: "[a]n extended injunction intrudes without basis on the Attorney General's prerogative to manage the affairs of the Justice Department, including to determine whether to make public or share with Congress in a limited respect a report prepared by subordinate officials within the Department." S.D. Fla.

---

[3] President Trump filed a motion to intervene or to participate as amicus to support Nauta and De Oliveira's motion. S.D. Fla. Dkt. 681.

Dkt. 690 at 5.[4] But DOJ also stated that it would *not* publicly release Volume II while the appeals were still pending. It added: "If permitted, the Attorney General does intend to make Volume Two of the Final Report available for in camera review only by the Chairmen and Ranking Members of the House and Senate Judiciary Committees, pursuant to restrictions to protect confidentiality." *Id.* at 6. DOJ added that if in camera congressional review is permitted, the report sent for that purpose would "redact[] grand jury information protected by Rule 6(e) as well as information sealed by court order. There is therefore no risk of prejudice to Defendants and no basis for an injunction against the Attorney General." *Id.*

One day after the Inauguration, on January 21, 2025, the district court issued its ruling that Volume II should not be released to the Ranking Members of the House and Senate Judiciary Committees because DOJ was still pursuing its appeal of Nauta and De Oliveira's indictment dismissals, "and there has been no indication by any government official in this case that the Department will not proceed on the Superseding Indictment should it prevail in the Eleventh Circuit or in subsequent proceedings." S.D. Fla. Dkt. 714 at 11. The court asserted, "There is no indication of pending legislative activity that could be aided by the proposed disclosure of

---

[4] DOJ also argued that its pending appeal of the district court's grant of a temporary injunction on January 7, 2025, *United States v. Nauta*, No. 25-10076 (11th Cir.), divested the district court of jurisdiction to entertain the motion.

Volume II to the specified members of Congress" and "there has been no record provided of an official request by members of Congress for review of Volume II in the manner proposed by the Department." *Id.* at 10-11. The court added, "there is certainly a reasonable likelihood that review by members of Congress as proposed will result in public dissemination of all or part of Volume II," and that release would "risk[] substantial prejudice to the due process rights of Defendants." *Id.* at 12.

But the facts underlying that analysis changed just three weeks later. On January 29, 2025, DOJ dismissed the appeal of the district court's dismissal of charges against Nauta and De Oliveira, and this Court granted that request on February 11. *United States v. Trump*, No. 24-12311 Dkts. 111, 113 (11th Cir.). And on March 14, 2025, the U.S. Attorney's Office for the Southern District of Florida confirmed in a written submission to the court that DOJ had reversed its prior position: "At this juncture, the United States Attorney's Office for the Southern District of Florida does not intend to revive the charges brought by Special Counsel Smith, and the Attorney General of the United States has not expressed an intent to release Volume II outside the Department of Justice." S.D. Fla. Dkt. 738 at 2.[5]

---

[5] The backdrop against which these reversals were made is extraordinary. After inauguration, not only did leadership at DOJ change, but the defendants' former defense counsel in this very matter, including President Trump's personal criminal defense attorneys Todd Blanche, Emil Bove, and Kendra Wharton, along with Nauta's criminal defense attorney Stanley Woodward, also became the top officials at DOJ itself. It remains dubious whether these officials then recused themselves from matters related to their prior representations. *See, e.g.*, Senate Judiciary

At that point, the rationale underlying the district court's January 21, 2025 order had evaporated: the defendants were no longer being prosecuted, and the Attorney General had reversed course on any plan to release Volume II. DOJ then went further, indicating that it "does not object to the Court keeping its order enjoining the Attorney General of the United States and the Department of Justice from releasing Volume II outside the Department of Justice, or sharing any information contained in Volume II with anyone outside the Department of Justice, in place." *Id.* at 1. It added, "The United States understands and appreciates the arguments made by Waltine Nauta and Carlos De Oliveira regarding the prejudice they would suffer if Volume II were to be released." *Id.*

In the absence of party adversity on the question of the release of Volume II, Appellants—American Oversight and Knight First Amendment Institute at Columbia University—separately moved on February 14 and 24, 2025 to intervene in the case in order to press the district court to rescind its January 21, 2025 order and for public release of Volume II. S.D. Fla. Dkts. 717, 721. The proposed intervenors relied on their statutory rights under the Freedom of Information Act ("FOIA")—since their FOIA requests to DOJ had been denied on the basis of the Court's January 21 order—and under common law and First Amendment rights. *See*

---

Committee, Nomination Hearing, at 3:18:19 – 3:19:24; 3:20:37 – 3:22:31 (Feb. 12, 2025, at 10:15 EST), https://www.judiciary.senate.gov/committee-activity/hearings/02/12/2025/nominations.

*id.* The district court did not rule on the Intervenors' motion for ten months—and only did so after this Court issued an order in Intervenors' petition for a writ of mandamus stating that "Petitioners have established undue delay." *See In re: Knight First Amendment Institute*, No. 25-13403 Dkt. 11 (11th Cir. Nov. 3, 2025). The district court denied the motions for intervention on December 22, 2025, S.D. Fla. Dkt. 760, and appeal No. 25-14507 followed.

While that appeal was pending, on January 20, 2026, Defendants Nauta and De Oliveira again moved before the district court, this time to permanently enjoin the release of Volume II. S.D. Fla. Dkt. 772. DOJ indicated that it agreed that the report should not be released. S.D. Fla. Dkt. 773. Intervenors again moved to intervene for the purpose of seeking a stay of that decision, arguing, *inter alia*, that the district court lacked jurisdiction since its prior notice of appeal had divested the lower court of continuing jurisdiction of the very matter that was on appeal. S.D. Fla. Dkt. 775. The district court granted the defendants' motion and denied the intervenor's motion on February 23, 2026. S.D. Fla. Dkt. 779, 780. The instant appeal by Intervenors followed.

## B. Judicial Decisionmaking Functions Best When Outcomes Are The Product Of Adversarial Litigation.

The district court's orders regarding the fate of Volume II—an issue of great public importance—were not the result of the usual adversarial process that usually precedes substantive judicial decisionmaking. By refusing to allow Appellants to

10

intervene and failing to appoint *amici*, the court did not equip itself with briefing and argument in favor of releasing the report. That raises serious prudential concerns about both the process by which the court's decisions were made and the wisdom of the outcome.

Longstanding precedent makes clear that for our justice system to work most effectively, courts should "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Even in cases where Article III's case or controversy requirement is otherwise satisfied, there can nonetheless be "prudential problems inherent" in cases where the Executive Branch takes an "unusual position" that aligns with its adversary. *United States v. Windsor*, 570 U.S. 744, 745, 759-60 (2013). Those "[p]rudential considerations … demand that there be 'concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *Id.* at 760 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). And "this sharpened presentation in turn helps reduce the risk of an erroneous or poorly thought-out decision." *Comite de Apoyo a los Trabajadores Agricolas (CATA) v. U.S. Dep't of Lab.*, 995 F.2d 510, 513 (4th Cir. 1993) ("[W]e should like to hear all interested voices before we venture a permanent ruling on the merits").

11

While those prudential concerns are less prominent in an ordinary scenario in which opposing parties agree on a point of fact or law, they are most serious when the issue before the court is novel or of great public importance. And they are especially acute when a party suddenly switches its position without explanation. In some cases, the prudential concerns associated with non-adversity can be ameliorated when the court receives the perspectives of other entities to defend the position that parties have abandoned. For example, "adversarial presentation of the issues is ensured by the participation of *amici curiae* prepared to defend with vigor" the position that no party advances. *Windsor*, 570 U.S. at 745. In cases where the Department of Justice takes a litigation position that aligns with the position of defendants, courts have recognized the structural problem of lack of adversity and appointed amicus counsel to provide the court with argumentation to ameliorate the prudential problem. *See, e.g.*, *United States v. Adams*, 777 F. Supp. 3d 185, 203 (S.D.N.Y. 2025); Order Appointing Amicus Curiae, *United States v. Flynn*, No. 1:17-cr-232, Dkt. 205 (D.D.C. May 13, 2020), *writ of mandamus to vacate appointment of amici denied*, *In re Flynn*, 973 F.3d 74 (D.C. Cir. 2020) (en banc); *see also Seila Law LLC v. CFPB*, 591 U.S. 197 (2020); *Montgomery v. Louisiana*, 577 U.S. 190 (2016). In other cases, courts have expressly noted that the presence of intervenors not only resolved Article III standing concerns but also "prudential"

12

concerns about adversity. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919 (1983); *Windsor*, 570 U.S. at 761.

The proper advancement of issues by adversaries is also why, in civil cases, the Federal Rules of Civil Procedure require lack of adequate representation for mandatory intervention. For example, movants for mandatory intervention under Rule 24(a) must demonstrate that the movant's "interest is represented inadequately by the existing parties to the suit." *See Tech. Training Assocs., Inc. v. Buccaneers Ltd. P'ship*, 874 F.3d 692, 696 (11th Cir. 2017). And while there is a presumption of adequate representation that attaches "when an existing party seeks the same objectives as the would-be interveners"—something that is lacking here—even that "presumption is weak" and the burden of overcoming it is "minimal." *Clark v. Putnam Cnty.*, 168 F.3d 458, 461 (11th Cir. 1999) (*Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). While the instant case originated in the context of criminal prosecutions, the concern animated by Rule 24 exists with full force: no party in the case represents the perspective or outcome that Appellants urge, and a properly situated intervenor can assist the court in comprehensively considering the facts and law before rendering a reasoned judgment.

By contrast, as the below analysis shows, the district court made a number of errors with respect to the role of Congress in receiving Volume II of the Report.

## II. THE DISTRICT COURT'S DECISIONS MISUNDERSTOOD VOLUME II'S RELEVANCE TO CONGRESS'S ROLE AND RESPONSIBILITIES.

The district court's orders demonstrate a lack of understanding of Congress's constitutional roles. The court discounted or overlooked specific Congressional requests that had already been made, failed to appreciate the nexus between Volume II and pending nomination proceedings and its legislative and oversight work, and maligned Congress's customary role in receiving sensitive documents.

### A. The District Court Overlooked Congress's Specific Requests For Volume II.

The district court's January 21, 2025 order rested in significant part on its finding that no adequate Congressional request for Volume II had been made. The court asserted, "There is no indication of pending legislative activity that could be aided by the proposed disclosure of Volume II to the specified members of Congress" and that "there has been no record provided of an official request by members of Congress for review of Volume II in the manner proposed by the Department." S.D. Fla. Dkt. 714 at 10-11. Both conclusions were wrong. But as noted above, the Department of Justice failed to correct the record, either then or in subsequent proceedings.

Contrary to the district court's assertion that there was "no record of an official request by members of Congress," the Senate Judiciary Committee had made

14

multiple specific, written, formal requests for access to Volume II, including a request that predated the January 21, 2025 order by five days.

*First*, on January 16, 2025, Senator Dick Durbin, the Ranking Member of the Senate Judiciary Committee, submitted written Questions for the Record ("QFR") to Attorney General nominee Pamela Jo Bondi one day after her confirmation hearing before the Committee explicitly requesting that Bondi commit to releasing Volume II of the Report to the Committee.[6] *See, e.g.*, Senate Judiciary Committee, Questions for the Record for Pamela Jo Bondi (Jan. 16, 2025), https://www.judiciary.senate.gov/imo/media/doc/2025-01-15_-_qfr_responses_-_bondi.pdf (hereinafter "Jan. 16 QFR.") (Ranking Member Durbin: "Do you commit to making available immediately for review Volume Two of Special Counsel Smith's report to the Chair and Ranking Member of the Senate Judiciary Committee, or their designees?").

A written QFR from the Ranking Member of the Senate Judiciary Committee asking an Attorney General nominee to commit to producing a specific government document to the Committee is, self-evidently, an official congressional request. But the district court's January 21 order entered just five days later made no mention of this request. Instead, the court claimed the opposite: "there has been no record

---

[6] Notably, the Senate Judiciary Committee had no need to make a public request for the Special Counsel's report prior to the related nominations because DOJ had indicated the report would be released in due course.

provided of an official request by members of Congress for review of Volume II in the manner proposed by the Department." S.D. Fla. Dkt. 714. The court's omission of the January 16 request from its analysis, and its failure to address the legal weight of the ongoing nominations then before the Committee, reflects an incomplete factual record and a misunderstanding of congressional action.

*Second*, even after Senate Judiciary Committee Democrats publicly corrected the record on the Senators' request and need for the information, the district court failed to include that consideration in its subsequent orders. On January 29, 2025, a week after the district court issued its order, Senate Judiciary Committee Democrats wrote directly to Acting Attorney General James McHenry correcting the record and again requesting Volume II. *See* Senate Judiciary Committee Democrats' Letter to Acting Attorney General McHenry (Jan. 29, 2025), https://www.judiciary.senate.gov/imo/media/doc/2025-01-29%20SJC%20Dems% 20Letter%20-%20Smith%20Report%20Vol%20II.pdf. (hereinafter "Jan. 29 Ltr."). The Members pointed out that the district court's January 21 order "erroneously stated that '[t]here is no record of an official request by members of Congress for in camera review of Volume II as proposed by the Department in this case,' despite the prior request which her order omits." And the Members made a formal and urgent re-request of access to Volume II. The letter explained the constitutional basis for the request in detail:

16

> As the Senate Judiciary Committee exercises its constitutional responsibility to provide advice and consent on the nomination by President Trump of Kashyap 'Kash' Patel to serve as Director of the Federal Bureau of Investigation (FBI), it is necessary for the Committee to evaluate Mr. Patel's full record, including the veracity of his public and private statements and activities that pertain to the handling and protection of classified information…. Specifically, the Committee requests any and all sections of Volume Two of the 'Final Report of the Special Counsel's Investigations and Prosecutions,' submitted on January 7, 2025, by Special Counsel Jack Smith to the Attorney General, that refer or pertain to Mr. Patel's testimony or actions.

*Id.* The letter also noted that the Committee had issued a Notice of Hearing for Patel's confirmation, with the hearing scheduled for January 30, 2025, and requested compliance by February 10, 2025—an explicit, time-sensitive, constitutionally grounded demand. And on February 4, 2025, the Senate Judiciary Committee Democrats wrote to Committee Chairman Chuck Grassley directly, noting that Patel had refused to answer basic questions about his role in the classified documents case. *See* Senate Judiciary Committee Democrats' Letter to Chairman Grassley (Feb. 4, 2025), https://www.judiciary.senate.gov/imo/media/doc/Letter%20to%20Chairman%20Grassley%20re%20Patel.pdf (hereinafter "Feb. 4 Ltr."). That letter also noted, "Now that the government has moved to drop the prosecution of President Trump's co-defendants in the case, no bar stands in the way of disclosing Volume Two of the report." *Id.*

**Third**, in a later letter dated October 30, 2025, Senate Judiciary Committee Democrats renewed their request to Chairman Grassley, asking him to direct DOJ to

17

transmit Volume II to the Committee, along with any underlying materials related to both volumes. That letter explained that "while Volume I has already been made public, Volume II was not released to avoid any prejudice to President Trump's then-codefendants," that the Department had since "dropped the cases against both individuals," but had "inexplicably continued to block disclosure of Volume II." *See* Letter from Senate Judiciary Committee Democrats to Chairman Grassley (Oct. 30, 2025), https://www.grassley.senate.gov/imo/media/doc/sjc_dems_to_grassley_-_jack_smith.pdf (hereinafter "Oct. 30 Ltr.").

These public requests directly undercut the district court's assertion that Congress had not made official requests for Volume II. But by this point, the Department of Justice had abdicated its prior role in the case and sought no relief from the district court's January 21 order. *See supra* at 10-11.

**B. Access To Volume II Was And Remains Necessary To The Senate Judiciary Committee's Discharge Of Its Constitutional Responsibilities.**

Moreover, the district court also incorrectly asserted in its January 21, 2025 order that there was "no indication of pending legislative activity that could be aided" by disclosure of Volume II to the specified Members of Congress. S.D. Fla. Dkt. 714 at 10. That ignores Congress's fundamental prerogative to provide advice and consent on presidential nominations, to legislate effectively, and to provide oversight on the functioning of executive branches—here, the FBI and DOJ. That

prerogative applies equally to all Members of Congress—regardless of whether they are in the Majority or Minority at any given time.

First, the Appointments Clause of the Constitution, art. II, § 2, cl. 2, vests the Senate with the role of advice and consent on nominations of principal officers. The Senate Judiciary Committee sits at the center of that process for nominations to DOJ, FBI, and the federal judiciary. At the time of the district court's January 21 order, and in the weeks immediately following it, the Committee was actively engaged in considering nominations with a direct and documented nexus to the subject matter of Volume II.

For example, one of those nominees was Kash Patel, who was nominated to be the Director of the FBI. As Senate Judiciary Committee Democrats explained in their January 29, 2025 letter, their review of Volume II is necessary because "the Committee cannot adequately fulfill its constitutional duty without reviewing details in the report of Mr. Patel's testimony under oath, which is necessary to evaluate Mr. Patel's truthfulness, trustworthiness, and regard for the protection of classified information." Jan. 29 Ltr. The letter further explained that "according to public reports, federal prosecutors subpoenaed Mr. Patel to testify before a grand jury investigating President Trump's retention of classified materials after leaving office and granted Mr. Patel immunity to facilitate his testimony in November 2022 after Mr. Patel invoked his Fifth Amendment right against self-incrimination and refused

19

to answer questions." *Id.* The Special Counsel's findings regarding Patel's related activities and statements remained entirely unknown to the Committee, despite the fact that Patel's core responsibilities as FBI Director would include seeking and telling the truth, maintaining the trust of the public and of Congress, and protecting the nation's most sensitive information.

And the QFR to Attorney General-nominee Bondi raised the same concern, noting that Patel had "a political relationship with President-elect Trump as defined by 28 C.F.R. § 45.2(c)(1)," that Patel "is a fact witness in multiple investigations concerning President-elect Trump's conduct, including both the January 6 and classified documents investigations," that Patel "was called by President-elect Trump to serve as a character witness in *Trump v. Anderson*," and that Patel "reportedly received immunity for his testimony in the case regarding President-elect Trump's handling of classified documents." Jan. 16 QFR. The information sought bore directly on the most basic advice-and-consent inquiry: whether the nominee is truthful, trustworthy, and fit for one of the nation's most powerful law enforcement positions.

Moreover, Volume II may also shed light on the nomination of Todd Blanche as Deputy Attorney General, and subsequently his now-pending nomination as Attorney General. Immediately before his nomination as the Deputy Attorney General, Blanche served as President Trump's personal criminal defense attorney in

the criminal cases involving the documents at the center of Volume II's investigation. Without an understanding of the contents of Volume II, the Senate's ability to understand the context in which Blanche was nominated—then and now—is hampered.[7]

Second, transmittal of Volume II is also relevant to how Congress performs its legislative and oversight functions. *See* U.S. Const. art. I, § 1. ("All legislative Powers herein granted shall be vested in a Congress of the United States."). Courts have consistently recognized that Congress's authority to gather information in order to discharge its legislative responsibilities is broad. Congress's "efforts to inform itself through committee hearings are part of the legislative function." *Hutchinson v. Proxmire*, 443 U.S. 111, 132–33 (1979). After all, "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change; and where the legislative body does not itself possess the requisite information-which not infrequently is true-recourse must be had to others who do possess it." *McGrain v. Daugherty*, 273 U.S. 135, 175 (1927). That is why the "power of inquiry" is "a necessary and appropriate

---

[7] The same is true for the nominations of Emil Bove—who with Blanche served as personal counsel to President Trump in this very underlying case—to the Third Circuit Court of Appeals and of Stanley Woodward—who served as defense counsel to Waltine Nauta in this underlying case—as Associate Attorney General. Indeed, Bove listed this matter in his Senate Judiciary Questionnaire as his most significant litigation.

21

attribute of the power to legislate." *Id.* Thus, congressional oversight authority "encompasses inquiries into the administration of existing laws, studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them.'" *Trump v. Mazars USA, LLP*, 591 U.S. 848, 863 (2020) (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)). Courts have further held that "if there is fraud or abuse or waste or corruption in the federal government, it is the constitutional duty of Congress to find the facts and, as necessary, take corrective action." *Comm. on Judiciary, United States House of Representatives v. McGahn*, 415 F. Supp. 3d 148, 191 (D.D.C. 2019) (subsequent history omitted). This power is broad for good reason: "Without information, Congress would be shooting in the dark, unable to legislate 'wisely or effectively.'" *Mazars*, 591 U.S. at 863 (quoting *McGrain*, 273 U.S. at 175).

Furthermore, courts "must presume Congress is acting in furtherance of its constitutional duties and must defer to congressional judgments about what it needs to carry out that purpose." *Trump v. Comm. on Oversight & Reform of U.S. House of Representatives*, 380 F. Supp. 3d 76, 82 (D.D.C. 2019) (subsequent history omitted). Indeed, "as a committee of Congress, the Judiciary Committee has the 'broad power' under Article I of the Constitution to conduct its investigations however it sees fit, so long as it does not impinge upon the constitutional rights of

those it undertakes to question." *McGahn*, 415 F. Supp. 3d at 192 (citing *Watkins*, 354 U.S. at 198-99).

Lack of access to Volume II hampers the ability of Committee Members to perform legislative and oversight functions. For example, the inability to review the contents of the Report impedes Members' ability to discharge legislative powers as they inquire into potentially selective prosecutions and produce legislation to ensure that political motivations do not infect the delivery of impartial justice. Volume II covers the Special Counsel's investigative findings and prosecutorial decisions about the misuse of classified documents in a particularly high-profile case. Details regarding this prior example are especially critical for Congress's evaluation of whether other similar investigations or prosecutions were proper.

These concerns are nonpartisan: Members of all political backgrounds have advocated for structures that avoid the "weaponization" of criminal prosecution and have expressed concern over handling of classified documents. But without basic information about this particularly high-profile allegation and how its prosecution was performed, Congress's effectiveness in its legislative and oversight role diminishes.

In short, Volume II's subject matter—the handling of classified materials after President Trump's departure from office, and the conduct of persons now nominated to lead the very agencies charged with protecting those materials—is precisely the

type of information that Congress's advice-and-consent and legislative and oversight functions require. The district court's conclusion that no constitutional function was implicated, entered at the very moment the Committee was seeking Volume II to faithfully execute its constitutional roles, was mistaken.

### C. Release Of Volume II To Congress Would Not Jeopardize Confidentiality.

The district court also improperly cast aspersions on whether in camera disclosure to Members of the Committee would jeopardize privileged or protected grand jury material and jeopardize defendants' due process rights. In the January 21 order, the district court claimed:

> Given the very strong public interest in this criminal proceeding and the absence of any enforceable limits on the proposed disclosure, there is certainly a reasonable likelihood that review by members of Congress as proposed will result in public dissemination of all or part of Volume II. That reasonable likelihood risks substantial prejudice to the due process rights of Defendants, who remain subject to the protective order in this case. This Court lacks any means to enforce any proffered conditions of confidentiality, to the extent they even exist in memorialized form.

S.D. Fla. Dkt. 714 (citations omitted). These accusations were inappropriate.

The district court's statement that Members of Congress are "reasonabl[y] likel[y]" to disclose confidential information was unfounded from the start. *See Id.*. The district court continued to lean into the specter of inappropriate disclosure in its February 23, 2026 order, citing the presence of grand jury material protected by Federal Rule of Criminal Procedure 6(e) and privileged material. *See* S.D. Fla. Dkt.

24

789. But the standard practice for handling such material, targeted redactions, amply addresses those concerns. Notwithstanding the district court's apparent mistrust of Congress, which is not a substitute for evidence, Congress regularly successfully handles sensitive documents provided by the Executive Branch, including classified materials.

The proposition that a Special Counsel's final report should be made available to Congress, in redacted form as necessary, is not a novel or contested one. It reflects a well-established practice that has been followed consistently across administrations of both parties. As Senate Judiciary Committee Democrats observed in their October 30, 2025 letter, "providing both volumes to the Committee would be in keeping with the longstanding practice of such information being made available to Congress and the public." And previously, DOJ had already proposed providing Congress with a redacted version of Volume II with Rule 6(e)-protected grand jury material removed. The redaction process is a well-developed, routinely employed mechanism that courts and prosecutors have used across high-profile Special Counsel reports for years, including in the Mueller Report, the Hur Report, the Durham Report, and the Weiss Report. Each of those reports was released publicly, and to Congress, with redactions addressing grand jury material, classified information, and privacy concerns. There is no reason why Volume II would present

25

categorically different or more complex redaction challenges than those prior reports.

Moreover, the district court's purported concern about grand jury secrecy rings particularly hollow in the context of legislative disclosure. In cases where Congress required information to which the public was not privy, Congress routinely reviews and protects such information. The Supreme Court has recognized that disclosure to a body operating under confidentiality obligations is fundamentally different from public disclosure. As courts have noted, the grand jury secrecy interest diminishes significantly where the recipient entity itself is bound by norms of confidentiality and has agreed to in-camera review procedures, as Members of the Committee did in its letters requesting access to Volume II.

The Mueller Report itself provides especially instructive precedent. When the House Judiciary Committee sought grand jury materials from his investigation for purposes of its constitutional oversight and impeachment inquiry, the district court reviewing the case found that the House was legally engaged in a judicial process that exempts Congress from grand jury secrecy rules, holding that "in carrying out the weighty constitutional duty of determining whether impeachment of the President is warranted, Congress need not redo the nearly two years of effort spent on the special counsel's investigation, nor risk being misled by witnesses who may have provided information to the grand jury." *In re Application of Comm. on*

*Judiciary, U.S. House of Representatives, for an Ord. Authorizing Release of Certain Grand Jury Materials*, 414 F. Supp. 3d 129, 137 (D.D.C. 2019) (subsequent history omitted). While the specific procedural posture differs here, the principle is the same: Congress, in carrying out its constitutional responsibilities—whether legislative and oversight, advice and consent, or an impeachment inquiry—should not be forced to work blindly when a Special Counsel's investigation has already compiled the relevant record.

In ordering the release of grand jury materials from Special Counsel Mueller's investigation to the House Judiciary Committee, the court found that the need for continued secrecy was "minimal" because the Justice Department had already made redacted portions of the Mueller Report available to certain Members of Congress and because the Judiciary Committee agreed to negotiations to prevent release of information that would harm any ongoing investigations. *Id*. With respect to Volume II of the Smith Report, the Senate Judiciary Committee explicitly offered to accept in camera review, which further minimized any disclosure risk. *See* Jan. 29 Ltr. In short, any legitimate concerns related to sensitive information contained within Volume II of the Smith Report can be resolved with proper redactions, not the suppression of Volume II in its entirety.

Finally, both the district court's January 21, 2025 order and the February 23, 2026 order's discussion of confidentiality relied on the potential impact of disclosure

27

on defendants' due process rights, a rationale that no longer applies because DOJ has confirmed in writing that defendants will not be subject to criminal prosecution. There is no jury pool to taint, no pending suppression motion to affect, and no upcoming trial where the integrity of judicial proceedings would be at risk. As the Senate Judiciary Committee Democrats' October 2025 letter noted, DOJ had "dropped the cases against both individuals," yet had "inexplicably continued to block disclosure of Volume II." Continuing to withhold release of Volume II, including from Congress, on the basis of a prejudice rationale that no longer has a living defendant to protect is not a legal justification — it is an obstacle without a supporting interest.

## CONCLUSION

*Amici* respectfully submit the foregoing points for this Court to consider in rendering its ruling.

June 18, 2026                                             Respectfully submitted,

/s/ Norman L. Eisen                              /s/ Angela Cai
Norman L. Eisen                                   Matthew J. Platkin*
Stephen A. Jonas*                                 Angela Cai
Joshua G. Kolb*                                   PLATKIN LLP
DEMOCRACY DEFENDERS ACTION          413 Washington Ave #174
600 Pennsylvania Ave. SE #15180           Belleville, NJ 07109
Washington, D.C. 20003                        973-561-1952
(202) 594-9958                                      acai@platkinllp.com
norman@democracydefenders.org
                            *Counsel for amici curiae*

   *Application for admission *pro hac vice* pending.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,450 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

Dated: June 18, 2026

/s/ Angela Cai

**CERTIFICATE OF SERVICE**

I hereby certify that on June 18, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


Dated: June 18, 2026

/s/ Angela Cai